Case No. 25-2230

# In the United States Court of Appeals For the First Circuit

PRESIDENT AND FELLOWS OF HARVARD COLLEGE,

*Plaintiff-Appellee,*

v.

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; NATIONAL INSTITUTES OF HEALTH; ROBERT F. KENNEDY, in his official capacity as Secretary of the United States Department Health and Human Services; UNITED STATES DEPARTMENT OF JUSTICE; TODD BLANCHE, in his official capacity as Attorney General of the United States; UNITED STATES DEPARTMENT OF EDUCATION; LINDA MCMAHON, in her official capacity as Secretary of the United States Department of Education; GENERAL SERVICES ADMINISTRATION; EDWARD FORST, in his official capacity as Administrator of the United States General Services Administration; UNITED STATES DEPARTMENT OF ENERGY; CHRISTOPHER WRIGHT, in his official capacity as Secretary of the Department of Education; NATIONAL SCIENCE FOUNDATION; BRIAN STONE, in his official capacity Acting Director of the United States National Science Foundation; UNITED STATES DEPARTMENT OF DEFENSE; PETER HEGSETH, in his official capacity as Secretary of the United States Department of Defense; NATIONAL AERONAUTICS AND SPACE ADMINISTRATION; JARED ISAACMAN, in his official capacity as Administrator of the National Aeronautics and Space Administration; UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT; SCOTT TURNER, in his official capacity as Secretary of Housing and Urban Development; UNITED STATES DEPARTMENT OF AGRICULTURE; BROOKE L. ROLLINS, in her official capacity as Secretary of Agriculture,

*Defendants-Appellants.*

*On Appeal from the United States District Court for the District of Massachusetts; Judge Allison Burroughs, Case No. 1:25-cv-11048-ABD*

## BRIEF FOR FEDERAL DEFENDANTS-APPELLANTS

*(Counsel on following page)*

**BRETT A. SHUMATE**
Assistant Attorney General
Civil Division

**MICHAEL VELCHIK**
Senior Counsel to the Assistant
Attorney General, Civil Division
U.S. Department of Justice
950 Pennsylvania Ave
Washington, D.C. 20530
Tel. 202-860-8388

**TIBERIUS DAVIS**
Counsel to the Assistant Attorney
General, Civil Division

*Counsel for Appellants*

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................1

STATEMENT OF JURISDICTION.......................................................................4

STATEMENT OF THE ISSUES...........................................................................5

STATEMENT OF THE CASE ..............................................................................6

    I.      Factual Background.........................................................................6

          A.     Antisemitism at Harvard .......................................................6

          B.     Agencies Terminate Harvard's Grants That No Longer Align With Government's Antisemitism Priorities .................11

          C.     This Lawsuit.........................................................................15

    II.     Decision Below .............................................................................16

    III.    Related Litigation and Investigations...........................................19

SUMMARY OF THE ARGUMENT ....................................................................21

STANDARD OF REVIEW ..................................................................................23

ARGUMENT .......................................................................................................24

    I.      The District Court Lacked Jurisdiction Over Termination Letters ..........................................................................................24

    II.     The District Court Erred In Concluding That The Termination Letters Violated Title VI ........................................................39

    III.    The District Court Erred In Finding That Defendants Violated The First Amendment..............................................................45

CONCLUSION ....................................................................................................54

CERTIFICATE OF COMPLIANCE....................................................................56

CERTIFICATE OF SERVICE .............................................................................56

i

# TABLE OF AUTHORITIES

**Cases**

*Adams v. United States*,
No. 07-809C, 2008 WL 4725452 (Fed. Cl. July 16, 2008) ......................... 36, 37

*Albrecht v. Committee on Emp. Benefits of the Fed. Rsrv. Emp. Benefits Sys.*,
357 F.3d 62 (D.C. Cir. 2004) .....................................................................25

*Am. Ass'n of Univ. Professors v. Trump*,
No. 25-CV-07864-RFL, 2025 WL 3187762 (N.D. Cal. Nov. 14, 2025) ............45

*Am. Ass'n of Univ. Professors v. U.S. Dep't of Just.*,
No. 25-CV-2429 (MKV), 2025 WL 1684817 (S.D.N.Y. June 16, 2025) ... 27, 35, 44, 45

*Am. Ass'n of Univ. Professors —Harvard Chapter v. U.S. Dep't of Just.*,
No. 25-cv-10910 (D. Mass.), No. 25-2231 (1st Cir.). ...........................................2

*Am. Pub. Health Assoc. v. Nat'l Inst. of Health*,
791 F. Supp. 3d 119 (D. Mass. 2025) .......................................................28

*Am. Pub. Health Assoc. v. Nat'l Inst. of Health*,
145 F.4th 39 (1st Cir. 2025) .................................................................. 28, 31

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ...............................................................................23

*Bakersfield City Sch. Dist. of Kern Cnty. v. Boyer*,
610 F.2d 621 (9th Cir. 1979) ....................................................................34

*Bd. of Cnty. Comm'rs, Wabaunsee Cnty. v. Umbehr*,
518 U.S. 668 (1996) .............................................................................. 46, 47

*Bowen v. Pub. Agencies Opposed To Soc. Sec. Entrapment*,
477 U.S. 41 (1986) ..................................................................................39

*Christopher Vill., L.P. v. United States*,
360 F.3d 1319 (Fed. Cir. 2004) ................................................................26

*Columbus Reg'l Hosp. v. United States*,
990 F.3d 1330 (Fed. Cir. 2021) ................................................................32

*Commonwealth v. Bharmal*,
No. 2408-cr-355 (Bos. Mun.) ...............................................................7

*Commonwealth v. Tettey-Tamaklo*,
No. 2408-cr-356 (Bos. Mun.) ...............................................................7

*Consol. Edison Co. of New York v. U.S. Dep't of Energy*,
247 F.3d 1378 (Fed. Cir. 2001)............................................................26

*Dep't of Educ. v. California*,
604 U.S. 650 (2025)...................................... 2, 3, 26, 27, 28, 29, 44

*Esso Standard Oil Co. v. Lopez-Freytes*,
522 F.3d 136 (1st Cir. 2008)................................................................24

*FAA v. Cooper*,
566 U.S. 284 (2012).................................................................... 24, 25

*Falmouth Sch. Dep't v. Doe*,
44 F.4th 23 (1st Cir. 2022)...................................................................46

*Gartenberg v. Cooper Union for the Advancement of Sci. & Art*,
765 F. Supp. 3d 245 (S.D.N.Y. 2025) .................................................48

*Gattineri v. Town of Lynnfield, Massachusetts*,
58 F.4th 512 (1st Cir. 2023)................................................................46

*Great-West Life & Annuity Ins. Co. v. Knudson*,
534 U.S. 204 (2002)............................................................................27

*Guscott v. City of Bos.*,
958 F.2d 361 (1st Cir. 1992)................................................................23

*Ingersoll-Rand Co. v. United States*,
780 F.2d 74 (D.C. Cir. 1985)...............................................................34

*Kestenbaum v. President & Fellows of Harvard Coll.*,
743 F. Supp. 3d 297 (D. Mass. 2024) ...................................... 7, 8, 48

*Kidwell v. Dep't of Army*,
56 F.3d 279 (D.C. Cir. 1995).................................................................30

iii

*Louis D. Brandeis Ctr. for Hum. Rts. Under L. v. President & Fellows of Harvard Coll.*,
  No. CV 24-11354-RGS, 2024 WL 4681802 (D. Mass. Nov. 5, 2024) .......... 8, 11

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
  567 U.S. 209 (2012) ................................................................25

*Megapulse, Inc. v. Lewis*,
  672 F.2d 959 (D.C. Cir. 1982) ................................... 26, 30, 31, 32, 36

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*,
  429 U.S. 274 (1977) ................................................................47

*Nat'l Inst. of Health v. Am. Pub. Health Assoc.*,
  145 S. Ct. 2658 (2025) ........................... 2, 3, 16, 17, 27, 28, 31, 38, 44

*New York v. Trump*,
  No. 25-1236, 2026 WL 734941 (1st Cir. Mar. 16, 2026) ...................... 22, 37, 38

*Peguero-Moronta v. Santiago*,
  464 F.3d 29 (1st Cir. 2006) ................................................................53

*Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205*,
  391 U.S. 563 (1968) ................................................................46

*President & Fellows of Harvard Coll. v. U.S. Dep't of Homeland*,
  Sec'y, 788 F. Supp.3d 182 (D. Mass. 2025) ......................................................19

*Regents of the Univ. of Cal. v. Bakke*,
  438 U.S. 265 (1978) ................................................................6

*Roberts v. U.S. Jaycees*,
  468 U.S. 609 (1984) ................................................................48

*Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*,
  547 U.S. 47 (2006) ................................................................47

*Rust v. Sullivan*,
  500 U.S. 173 (1991) ................................................................45

*Segev v. President & Fellows of Harvard Coll.*,
  No. 1:25-cv-12020, (D. Mass. July 17, 2025) ......................................................7

*Solutions in Hometown Connections v. Noem*,
  165 F.4th 835 (4th Cir. 2026) ...............................................................32

*Spectrum Leasing Corp. v. United States*,
  764 F.2d 891 (D.C. Cir. 1985) .............................................. 33, 34, 37

*Speiser v. Randall*,
  357 U.S. 513 (1958)...............................................................................47

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
  600 U.S. 181 (2023)..................................................... 4, 6, 20, 48, 51

*Suburban Mortg. Assocs. v. Dep't of Urb. Dev.*,
  480 F.3d 1116 (Fed. Cir. 2007)................................................. 30, 36

*Sustainability Inst. v. Trump*,
  165 F.4th 817 (4th Cir. 2026) .................................. 22, 30, 31, 37, 44

*Telecare Corp. v. Leavitt*,
  409 F.3d 1345 (Fed. Cir. 2005).............................................................26

*Thakur v. Trump*,
  163 F.4th 1198 (9th Cir. 2025) ............................................................29

*Thorne v. Bailey*,
  846 F.2d 241 (4th Cir. 1988) ...............................................................48

*TikTok Inc. v. Garland*,
  604 U.S. 56 (2025)........................................................ 4, 23, 47, 51, 54

*Trump v. Boyle*,
  145 S. Ct. 2653 (2025) ...........................................................................27

*United States v. Am. Libr. Ass'n, Inc.*,
  539 U.S. 194 (2003)...............................................................................45

*United States v. Kirby*,
  74 U.S. 482 (1868).................................................................................44

*United States v. President & Fellows of Harvard Coll.*,
  No.1:26-cv-10844 (D. Mass 2026)...................................................20

*United States v. President & Fellows of Harvard Coll.*,
  No.1:26-cv-11352 (D. Mass 2026) ....................................................20

*United States v. Regents of the Univ. of Cal.*,
  No. 2:26-cv-1946 (Feb. 24, 2026): ...................................................52

*United States v. Sayer*,
  748 F. 3d 425 (1st Cir. 2014)...........................................................49

*United States v. Tingey*,
  30 U.S. (5 Pet.) 115 (1831) ...................................................... 39, 43

*U.S. Conf. of Cath. Bishops v. U.S. Dep't of State*,
  No. 1:25-cv-00465, ---F. Supp. 3d ---, 2025 WL 763738 (D.D.C. 2025)...........24

**Statutes**

5 U.S.C. § 704 ...................................................................................25

5 U.S.C. § 706(2)(B) ........................................................................19

5 U.S.C. § 706(2)(C) ........................................................................19

5 U.S.C. § 706(2)(D) ........................................................................19

28 U.S.C. § 1291 .................................................................................5

28 U.S.C. § 1294(1) ............................................................................5

28 U.S.C. § 1331 .................................................................................4

28 U.S.C. § 1491(a)(1)............................................. 2, 21, 22, 25, 27

28 U.S.C. § 1346(a)(2)................................................................ 34, 35

42 U.S.C. § 2000d .............................................................................40

42 U.S.C. § 2000d-1................................... 22, 39, 40, 41, 42, 43, 47

42 U.S.C. § 2000d-2...........................................................................35

42 U.S.C. § 2000d-5...........................................................................34

## Rules

Fed. R. App. P. 4(a)(1)(B) ....................................................................5

Fed. R. App. P. 32(a)(5) ......................................................................56

Fed. R. App. P. 32(a)(6) ......................................................................56

Fed. R. App. P. 32(a)(7)(B) ................................................................56

Fed. R. Civ. P. 56(a) ...........................................................................23

## Regulations

2 C.F.R. § 200.340 ............................................................ 13, 14, 41, 44

2 C.F.R. § 200.340(a) ................................................ 1, 13, 22, 39, 40, 45

2 C.F.R. § 200.340(a)(2) .....................................................................32

2 C.F.R. § 200.340(a)(4) ............................................................ 15, 18, 44

2 C.F.R. § 200.341(a) ..........................................................................40

2 C.F.R. § 200.342 ..............................................................................40

2 C.F.R. § 200.344 ..............................................................................40

2 C.F.R. § 200.346 ..............................................................................40

28 C.F.R. § 50.3 ..................................................................................42

34 C.F.R. § 100 ...................................................................................42

34 C.F.R. § 100.13(f) ..........................................................................42

Executive Order No. 11,246, 30 Fed. Reg. 12319 ...............................43

Executive Order No. 14,188, 90 Fed. Reg. 8847 ........................... 1, 11

Guidance for Federal Financial Assistance, 89 Fed. Reg. 30046 ...........41

## Legislative Materials

H.Res. 927, 118th Cong. (2023) ..........................................................10

S.Res. 418, 118th Cong. (2023) .......................................................................10

**Other Authorities**

Lee M Friedman, *Judah Monis, First Instructor in Hebrew at Harvard University,* 22 Am. J. Hist. Q. 1 (1914).................................................................6

## <u>REASONS WHY ORAL ARGUMENT SHOULD BE HEARD</u>

Under 1st Cir. R. 34.0, the Government requests oral argument. Oral argument is appropriate because this case raises significant issues concerning courts' jurisdiction over substantial sums of federal grants and the scope of Title VI.

## INTRODUCTION

It is the "policy of the United States to combat anti-Semitism vigorously, using all available and appropriate legal tools, to prosecute, remove, or otherwise hold to account the perpetrators of unlawful anti-Semitic harassment and violence." Exec. Order No. 14,188, Additional Measures to Combat Anti-Semitism, 90 Fed. Reg. 8847, 8847 (Jan. 29, 2025). At the very least, the Government is not required to continue giving taxpayer dollars to universities that have demonstrated deliberate indifference to antisemitic conduct and discrimination on campus.

To that end, Federal agencies have invoked their authority under the terms of various grants and awards, which explicitly state that "[t]he Federal award may be terminated … [b]y the Federal agency … if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a). Federal agencies have invoked this authority in response to the documented failures to combat antisemitism on campus at many universities, including—at issue here—Harvard.

As the district court recognized, "it is clear, even based solely on Harvard's own admissions, that Harvard has been plagued by antisemitism in recent years and could (and should) have done a better job of dealing with the issue." A79. "Harvard was wrong to tolerate hateful behavior for as long as it did." *Id.* at 81. Indeed, Harvard's failure to address antisemitism has been the subject of congressional

1

hearings, reports, and resolutions as well as civil and criminal suits. Harvard even convened its own internal Task Force that published a damning 311-page report. The parties do not dispute that Harvard has failed adequately to address antisemitism on campus.

Harvard nonetheless challenged the termination of these grants and awards in Federal district court, arguing that these terminations and ongoing negotiations violated the Administrative Procedure Act ("APA"), the First Amendment, and Title VI. In a related case, unions ("Organizational Plaintiffs") also sued raising similar claims. *Am. Ass'n of Univ. Professors—Harvard Chapter v. U.S. Dep't of Just.*, No. 25-cv-10910 (D. Mass.), No. 25-2231 (1st Cir.).

The district court granted in part Plaintiffs' motions for summary judgment and enjoined Defendants from implementing grant terminations. The district court erred in three fundamental ways.

First, the district court erred in asserting jurisdiction over the termination of grants and awards. Under the Tucker Act, the Court of Federal Claims has exclusive jurisdiction over claims founded on contracts—such as the awards and grants at issue here. 28 U.S.C. § 1491(a)(1). The Supreme Court has twice now addressed this issue in stay opinions. *See Dep't of Educ. v. California*, 604 U.S. 650 (2025); *Nat'l Inst. of Health v. Am. Pub. Health Assoc.*, 145 S. Ct. 2658 (2025) ("*NIH*"). Yet the district court went out of its way to criticize these opinions and ultimately asserted

jurisdiction over what the court styled "Freeze Orders" and "Termination Letters." Although the district court correctly found that it lacked jurisdiction over Plaintiffs' arbitrary and capricious claims as to the Termination Letters, the district court erred by failing to extend that same reasoning to Plaintiffs' "APA claims based on the First Amendment and violations of Title VI pursuant to [5 U.S.C.] § 706(2)," as to the same Termination Letters. A28. As the Supreme Court has held, "[t]he [APA's] 'limited waiver of [sovereign] immunity' does not provide the District Court with jurisdiction to adjudicate claims 'based on' … research-related grants or to order relief designed to enforce any 'obligation to pay money' pursuant to those grants." *NIH* , 145 S. Ct. at 2659 (quoting *California*, 604 U.S. at 651)). Yet that is exactly what the district court ordered with respect to the Termination Letters.

Second, the district court erred in finding that Title VI provides the exclusive means for agencies to stop funding entities that fail to take adequate action to address antisemitism, even where contracts provide a separate basis for termination. Nothing in Title VI precludes the Government from entering into or enforcing contractual terms that provide for termination based on agency priorities, including based on a determination that a grant recipient has abetted antisemitism. The district court's opinion also leads to the absurd result that entities that violate our nation's civil rights laws—including by failing to address racism, antisemitism, and other illicit conduct—have greater procedural protections than all other Federal contractors.

3

Third, the district court erred in finding that the Government's attempts to secure voluntary resolution of its concerns with Harvard's conduct violated the First Amendment. Plaintiffs' claims ultimately turn on the contents of the Government's April 11 offer letter and Harvard's quick rejection. But even if some proposals contained in the April 11 letter implicated protected conduct, the overwhelming majority of the proposals did not. JA128-132. The reforms were primarily focused on addressing antisemitism and continued racial discrimination at Harvard even following the Supreme Court's decision in *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181 (2023) ("*SFFA*"). Such unlawful conduct does not enjoy First Amendment protection. Further, as demonstrated by the Government's continued investigations at Harvard resulting in two separate enforcement lawsuits, and its termination of grants at other similarly situated universities, "[t]he record … adequately supports the conclusion that" the Government would have taken the same action based on the content-neutral "justification alone." *TikTok Inc. v. Garland*, 604 U.S. 56, 79 (2025).

This Court should reverse.

## STATEMENT OF JURISDICTION

Plaintiff-Appellee Harvard asserted that the U.S. District Court for the District of Massachusetts had jurisdiction under 28 U.S.C. § 1331 to consider actions under the Constitution of the United States and Federal statutes, including Title VI of the

4

Civil Rights Act of 1964, and the APA. JA71. Defendants-Appellants argue that the district court lacked jurisdiction because these claims must be brought in the Court of Federal Claims under the Tucker Act. On September 3, 2025, the district court granted in part Harvard's motion for summary judgment, A3, and on October 20, 2025 entered final judgment. A85. On December 18, 2025, the Government timely appealed.  Fed. R. App. P. 4(a)(1)(B); JA121. This Court's jurisdiction arises under 28 U.S.C. § 1291, which grants courts of appeals jurisdiction over final decisions of district courts. Venue is proper in this Court because the decision came from a district court within this Circuit. 28 U.S.C. § 1294(1).

## STATEMENT OF THE ISSUES

1. Whether the district court erred in asserting jurisdiction over the Government's termination of grants and awards to Harvard, notwithstanding that the Tucker Act provides exclusive jurisdiction over claims seeking money damages against the government for termination of contracts.

2. Whether the district court erred in finding that Title VI provides the exclusive means to terminate awards based on discrimination, even where Federal awards by their terms provide an independent basis for termination.

3. Whether the district court erred in finding that the Government's decision to terminate grants and awards to Harvard violated the First Amendment.

5

## STATEMENT OF THE CASE

### I.      Factual Background

### A.      Antisemitism at Harvard

Harvard has a long, sordid history of antisemitism. The first Jew to receive a degree from Harvard was Judah Monis, who, upon application to teach Hebrew at the college, was required to undergo a public baptism as a condition of employment. Lee M. Friedman, *Judah Monis, First Instructor in Hebrew at Harvard University*, 22 Am. J. Hist. Q. 1, 2-3 (1914). Notoriously, during the early 20th century, Harvard adopted a "'holistic' admissions policy" that was consciously "developed to exclude Jews." *SFFA,* 600 U.S. at 257 (Thomas, J., concurring). When the Supreme Court evaluated the constitutionality of race-based admissions in *Regents of the Univ. of Cal. v. Bakke*, the Supreme Court leaned heavily on an amicus brief from Harvard and other universities explaining how they considered applicants' race under the banner of "diversity." 438 U.S. 265, 316-17 (1978). But the Supreme Court ultimately held that Harvard's race-based admissions policies violated Title VI. *SFFA*, 600 U.S. at 198 n.2. Only a few months later, antisemitism on campus would erupt out of control.

On October 7, 2023, Hamas—a designated foreign terrorist organization— launched a surprise attack on the State of Israel that resulted in the brutal slaughter of more than a thousand innocent Israeli citizens as well as the taking of more than

two-hundred hostages, including American citizens. In the immediate aftermath, dozens of Havard's student organizations published statements that they "hold the Israeli regime entirely responsible for all unfolding violence." JA204. Activists cut the locks from Johnston Gate and forcibly occupied Harvard Yard for weeks, chanting "from the river to the sea" and other antisemitic slogans. JA312-13. Protestors surveilled and monitored the movements of Jewish faculty. JA334. They blocked the use of libraries and other public places at least a dozen times. They spilled red paint over the statute of John Harvard, broke the windows of University Hall, and hoisted a Palestinian flag over his head. JA312-17. They vandalized buildings and even "post[ed] swastika stickers near Harvard Hillel's Rosovsky Hall." JA224. They assaulted and battered Jewish students. JA306. Jewish students were forced "to hide their identities on campus[.]" JA206.

Law enforcement prosecuted students for assault and battery and civil rights violations. *See, e.g.*, *Commonwealth v. Bharmal*, No. 2408-cr-355 (Bos. Mun.); *Commonwealth v. Tettey-Tamaklo*, No. 2408-cr-356 (Bos. Mun.). Students and other organizations sued Harvard for failing to address antisemitism on campus. *See, e.g.*, *Segev v. President & Fellows of Harvard Coll.*, No. 1:25-cv-12020, Dkt. 1 (D. Mass. July 17, 2025). These lawsuits documented how "Harvard student groups organized a metaphorical 'die-in' involving hundreds of students at which members of the protesting groups 'harassed and physically assaulted Jewish students.'" *Kestenbaum*

*v. President & Fellows of Harvard Coll.*, 743 F. Supp. 3d 297, 303 (D. Mass. 2024) (quoting complaint). "Protestors marched through campus, staged classroom walkouts, and rallied in campus common areas, at times staying overnight." *Id.* "[D]emonstrators blockaded Jewish students in a study room[.]" *Id.* at 304. In response to stalking, Jewish students "felt compelled to doff clothing that might identify them as Jewish and ceased attending Jewish-sponsored events[,]" while "others feared walking about campus, missed classes, and felt isolated from their classmates." *Id.* at 304-05.

"Harvard students posted a flurry of antisemitic messages on a University-wide group app called Sidechat[,]" and when a student "reported the messages to Harvard administrators, the official response was to terminate his access[.]" *Id.* at 304. "[P]osters memorializing Israeli citizens taken hostage by Hamas were vandalized with messages such as "ISRAEL DID 9/11." *Id.* (quoting complaint). When students at the Harvard Kennedy School proposed a class "project based on their Israeli and Jewish identity[,]" the professor told them "'to abandon the project' and 'compared their use of the words 'Jewish State' to a student advocating for America to become a country of 'white supremacy.'" *Louis D. Brandeis Ctr. for Hum. Rts. Under L. v. President & Fellows of Harvard Coll.*, No. CV 24-11354-RGS, 2024 WL 4681802, at *1 (D. Mass. Nov. 5, 2024) (quoting complaint).

8

Harvard ultimately convened a Task Force, which found that over half of Jewish students at Harvard report "discrimination" and a "penalty" for being Jewish. JA224.

Congress conducted its own investigation. On December 5, 2023, then-President of Harvard Claudine Gay testified before Congress. In response to Chairwoman Stefanik's question "does calling for the genocide of Jews violate Harvard's rules on bullying and harassment?", Dr. Gay repeatedly refused to say the simple word "yes." Shortly afterwards, House committees released a joint report. U.S. House of Representatives, Staff Report on Antisemitism (Dec. 18, 2024), JA151-98. It recounted how "Harvard drew national attention for pervasive antisemitic misconduct, including the assault of an Israeli student, classroom disruptions, and a building occupation, but its leaders ignored their own advisors' recommendations to address the problem." JA158. It described how then-President Gay "failed to condemn Hamas" in her October 9 statement and documented how "Harvard's top administrators made deliberate decisions to remove draft language that denounced Hamas' terrorism[.]" JA161. Then-President Gay also asked Senior Fellow Penny Pritzker not to characterize the slogan "from the river to the sea" as antisemitic. JA162. The Report documented how "Harvard failed to suspend any students for conduct violations related to numerous antisemitic incidents including an unlawful encampment, the occupation of a campus building, and repeated

9

disruptions of classes with bullhorns[,]" which even Pritzker described as "unacceptable." JA164.

Both chambers of Congress formally condemned Harvard. H.Res. 927, 118th Cong. (2023) ("the House … strongly condemns the rise of antisemitism on university campuses … and … strongly condemns the testimony of … Harvard University President Claudine Gay"); S.Res. 418, 118th Cong. (2023) ("[c]ondemning Hamas and antisemitic student activities on college campuses[,]" including "students at Harvard University" who "wrote that they 'hold the Israeli regime entirely responsible for all unfolding violence'").

Harvard's largest private donors stopped giving, citing antisemitism. Emma Haidar et al., *Major Harvard Donor Len Blavatnik to Pause Donations to Harvard, Report Says*, The Harvard Crimson (Dec. 22, 2023)[1] ("Leonard V. Blavatnik, a billionaire philanthropist and major Harvard donor, will cease donations to the University over its handling of antisemitism on campus"); Emma Haidar et al., *Billionaire Megadonor Ken Griffin Says He Will Stop Donations to Harvard*, The Harvard Crimson (Jan. 31, 2024)[2] ("Billionaire hedge fund manager Kenneth C.

---

[1] https://perma.cc/2DSX-679N

[2] https://perma.cc/75GY-NTPS

Griffin '89 said he is pausing donations to Harvard over its handling of antisemitism on campus").

On January 2, 2024, President Gay resigned "after fierce criticism of the University's response to the Hamas attack on Israel and backlash from her disastrous congressional testimony spiraled into allegations of plagiarism and doubts about her personal academic integrity." Emma Haidar et al., *Harvard President Claudine Gay Resigns, Shortest Tenure in University History*, The Harvard Crimson (Jan. 2, 2024).[3] Her "tenure—of just six months and two days—is the shortest in Harvard's history." *Id.*

**B.    Agencies Terminate Harvard's Grants That No Longer Align With Government's Antisemitism Priorities**

Upon taking office, President Trump issued Exec. Order 14,188 establishing "the policy of the United States to combat anti-Semitism vigorously, using all available and appropriate legal tools, to prosecute, remove, or otherwise hold to account the perpetrators of unlawful anti-Semitic harassment and violence." Additional Measures to Combat Anti-Semitism, 90 Fed. Reg. at 8847. Days later, the Administration announced the creation of a Joint Task Force to Combat Antisemitism ("Government Task Force"), which stated that its "first priority will

---

[3] https://perma.cc/Z973-2KLZ

be to root out anti-Semitic harassment in schools and on college campuses." Press Release, Civil Rights Division, Justice Department Announces Formation of Task Force to Combat Anti-Semitism (Feb. 3, 2025).[4] On February 28, 2025, the Government Task Force announced it would be visiting ten universities, including Harvard, to investigate "allegations that the schools may have failed to protect Jewish students and faculty members from unlawful discrimination" and "consider[] whether remedial action is warranted." JA140.

On March 31, the Department of Education ("ED"), the Department of Health and Human Services ("HHS"), and the General Services Administration ("GSA") announced "a comprehensive review of federal contracts and grants at Harvard University and its affiliates." JA144. The same day, GSA sent a letter to Harvard informing it that "GSA is leading a Task Force comprehensive review of Federal contracts with certain institutions of higher education that are being investigated for potential infractions and dereliction of duties to curb or combat anti-Semitic harassment, including Harvard." JA124. The Government ultimately suspended or terminated grants at many universities, including Brown University, Columbia

---

[4] https://perma.cc/9VCY-WXE9

University, the University of Pennsylvania, the University of California Los Angeles, and Harvard.

Harvard receives more than $8.7 billion from the federal government in the form of multi-year grant agreements and contract awards. *See* JA124-25. Each contract contains a provision restating or incorporating 2 C.F.R. § 200.340, which states, "[t]he Federal award may be terminated in part or its entirety … [b]y the Federal agency or pass-through entity pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a); *see, e.g.,* HHSHarv_00000511; NASA-AR00 895; NSF_Harvard000022.

On April 3, the Government met with Harvard. HHSHarv_00005230. The Government Task Force shared its desires to see Harvard address antisemitism on campus and comply with *SFFA*. HHSHarv_00005232-35. The same day, the Joint Task Force sent Harvard a "follow up" letter reiterating information discussed at the meeting and "outlin[ing] immediate next steps that we [the Government Task Force] regard as necessary for Harvard University's continued financial relationship with the United States government." JA126.

On April 11, the Government Task Force sent another letter to Harvard that "incorporate[d] and supersede[d]" the April 3 letter. JA128. The April 11 letter presented ten bullet points that could serve "as the basis for an agreement in principle

that will maintain Harvard's financial relationship with the federal government." JA128-32. This included "reforming programs with egregious records of antisemitism[,]" using an external audit. JA130(capitalization altered). Other bullets addressed racial discrimination and compliance with the Supreme Court's decision in *SFFA* by committing to merit-based hiring and admissions reforms, as well as the discontinuation of DEI programs and promotion of viewpoint diversity in admissions and hiring. JA129. To ensure such reforms were meaningful, the letter also included "whistleblower reporting," "transparency and monitoring," and "governance and leadership reforms." JA128-32 (capitalization altered).

On April 14, Harvard sent a reply letter ("Harvard's Rejection Letter") rejecting the terms of the Government's Offer Letter. JA133. It stated, "Harvard will not accept the government's terms as an agreement in principle." JA134. Upon receiving Harvard's Rejection Letter, the Government Task Force issued a press release "announcing a freeze on $2.2 billion in multiyear grants and $60M in multi-year contract value to Harvard University." JA147.

On May 5, 2025, Education Secretary Linda McMahon sent another letter to Harvard explaining the Government's "sacred responsibility to be a wise and important steward of American taxpayer dollars" and criticizing Harvard's "plagiarism scandals," "mismanagement," illegal "racial preferencing," and failure to address "hate" on campus. JA135. She offered her perspective that Harvard should

14

no longer bother seeking federal grant funding, as none would be provided to an institution that acted contrary to the Government's priorities. *See id.*

On May 6, NIH's Director of the Office of Policy for Extramural Research Administration Michelle Bulls sent a letter to Harvard providing notice that funding for the projects on an attached list would be terminated pursuant to the NIH Grants Policy Statement and 2 C.F.R. § 200.340(a)(4). JA517-19. The letter indicated that the listed grants were being terminated because they "no longer effectuate agency priorities." *Id.* Rather, "grant dollars should only support institutions that comply with principles and laws of nondiscrimination." *Id.* But "Harvard continues to engage in race discrimination including in its admissions process" and has demonstrated "a disturbing lack of concern for the safety and wellbeing of Jewish students" in response to "antisemitic action[s]" on campus. *Id.* Other agencies later sent similar termination notices. *See, e.g.,* JA515 (NASA May 9 Letter), EDHarvAR_0001735-36 (ED May 12 Letter).

On May 13, the Government Task Force issued a press release explaining that "Harvard University has repeatedly failed to confront the pervasive race discrimination and anti-Semitic harassment plaguing its campus." JA149-50. The statement supported agencies' announcement of terminating grants to Harvard as part of the Government's "commitment to eradicating discrimination." *Id.*

15

### C.    This Lawsuit

On April 21, 2025, Harvard filed its original complaint. Dkt. 1. Following production of the administrative record, Dkt. 224, Harvard filed an amended complaint on May 13, 2025.  Dkt. 59. It challenged the April 14 and May 5 letters (which Harvard referred to as "Freeze Orders") and subsequent communications terminating grants and awards (which Harvard referred to as "Termination Letters"). *Id.*¶¶ 7 & 10. Harvard alleged that these orders and letters violated the First Amendment (Counts I and II), were in excess of statutory authority (Count III), failed to follow regulatory procedures (Count IV), were arbitrary and capricious (Count V), and violated statutory and constitutional authority (Count VI).  Dkt. 59 ¶¶ 106-213. The parties then cross-moved for summary judgment. Dkt. 69, 185.

## II.    Decision Below

On September 3, 2025, the district court granted in part Plaintiffs' motions for summary judgment. A1. The court acknowledged that "Hamas, a well-recognized terrorist organization, violently attacked and kidnapped Israeli citizens on October 7, 2023" and since then that "Harvard  … has experienced increased tensions and violence aimed at its Jewish community." A5.

With regard to the Tucker Act, the district court found "that it ha[d] jurisdiction over Plaintiffs' arbitrary and capricious claims that challenge the Freeze Orders, because it views those orders … as agency guidance documents that set the

16

federal government's policy moving forward as to grant funding at Harvard." A27 (citing *NIH*, 145 S. Ct. 2658). The district court found "however, that, given the current guidance from the Supreme Court, it lack[ed] jurisdiction over the arbitrary and capricious claims as they pertain to the Termination Letters, and that any such claim based on the grant terminations must be brought in the Court of Federal Claims." A27. Yet rather than extend this logic to all claims challenging the Termination Letters, the district court exercised jurisdiction over Plaintiffs' "APA claims based on the First Amendment and violations of Title VI pursuant to § 706(2)(B) and (C), which" the court considered "materially different from the more contract-based claims asserted in California and [*NIH*]." A28.[5]

On the merits, as relevant here, the district court found that "Harvard engaged in First Amendment protected activity," when it refused the terms in the Government's April 11 Letter and filed this lawsuit. A48-49. The district court further found that "Harvard's protected conduct was a substantial and motivating factor in the Freeze Orders and Termination Letters." A52. Based on the same underlying conduct, the district court found that "Defendants impermissibly

---

[5] In a footnote, the district court acknowledged "Justice Gorsuch's comments … that this Court is not free to 'defy' Supreme Court decisions," *id.* 27 n.9 (quoting *NIH* at 2663 (Gorsuch, J., concurring in part and dissenting in part)), but criticized "the Supreme Court's recent emergency docket rulings regarding terminations" as "not … models of clarity." *Id.* at 27 n.9. The district court acknowledged that the question of jurisdiction here involved "a rapidly evolving doctrinal landscape." *Id.* at 28 n.9.

imposed unconstitutional conditions on Harvard's receipt of federal funds." A57. Finally, the district court granted Organizational Plaintiffs' unconstitutional coercion claim, because "Defendants required the Organizational Plaintiffs' members to rebalance and alter their speech to save Harvard's funding[.]" A60.

As for Title VI, the district court held that Defendants were required to but "did not comply with [the statute's procedural] requirements before issuing the Freeze Orders or Termination Letters." A61. The court rejected Defendants' argument that 2 C.F.R. § 200.340(a)(4) provides an independent basis to terminate the grants at issue, instead concluding that Title VI "explicitly provides for when and how an agency can terminate federal funding to address this type of discrimination[,]" to the exclusion of other bases. A64.[6]

The district court concluded by acknowledging that "it is clear, even based solely on Harvard's own admissions, that Harvard has been plagued by antisemitism in recent years and could (and should) have done a better job of dealing with the issue." A79. "Harvard was wrong to tolerate hateful behavior for as long as it did." A81. As to relief, the district court granted Harvard summary judgment on Counts I, III, and IV and in part Count V (as to the Freeze Orders). A81. The district court

---

[6] The district court also concluded that the "Freeze Orders constitute[d] final agency action" under the APA, A45, and were arbitrary and capricious, A73. These are not at issue in this appeal.

"vacate[d] and se[t] aside the Freeze orders as arbitrary and capricious"; "vacate[d] and se[t] aside the Freeze Orders and Termination Letters as violative of the First Amendment under 5 U.S.C. § 706(2)(B)"; "vacate[d] and se[t] aside the Termination Letters as violative of Title VI under 5 U.S.C. § 706(2)(C), (D)"; and enjoined Defendants and their agents from implementing the Freeze Orders and Termination Letters or "[i]ssuing any other termination, fund freezes, stop work orders, or otherwise withholding payment on existing grants or other federal funding, or refusing to award future grants, contracts, or other federal funding to Harvard in retaliation for the exercise of its First Amendment rights, or on any purported grounds of discrimination without compliance with the terms of Title VI." A82-84.

On October 20, 2025, the court entered final judgment. Dkt. 247. On December 18, 2025, the Government timely appealed. Dkt. 250.

## III.    Related Litigation and Investigations

On June 23, 2025, Judge Burroughs enjoined officials from enforcing a Presidential Proclamation suspending entry of noncitizens to pursue a course of study at Havard. *President & Fellows of Harvard Coll. v. U.S. Dep't of Homeland Sec'y*, 788 F. Supp.3d 182 (D. Mass. 2025), No. 25-1627 (1st Cir.). On September 3, 2025, Judge Burroughs issued the opinion in this case, which also applied to *Am. Assoc. of Univ. Profs.—Harvard Chapter*, No. 25-cv-10910 (D. Mass.), No. 25-2231 (1st Cir.). Harvard has requested that all three cases be argued before the same panel

19

and on the same day as this appeal. In addition to these three cases, Judge Burroughs previously presided over a challenge to Harvard's use of race in its admissions decisions but was reversed by the Supreme Court. *SFFA*, 600 U.S. 181.

On June 30, 2025, HHS issued Harvard "a Notice of Violation under Title VI … based upon … discrimination … and Harvard's deliberate indifference toward that discrimination directed towards Jewish and Israeli students." OCR Trans. No. DO-25-607541-RV-CRR-Rac.[7] On February 13, 2026, the United States sued Harvard alleging that it "is not complying with a federal investigation" by "unlawfully … with[o]ld[ing] … information necessary to determine whether Harvard … is continuing to discriminate in its admissions process." *United States v. President & Fellows of Harvard Coll.*, No. 1:26-cv-10844, Dkt. 1 at 1 (D. Mass). On March 20, 2026, the United States sued Harvard "to compel Harvard to comply with Title VI, and to recover billions of dollars of taxpayer subsidies awarded to a discriminatory institution." *United States v. President & Fellows of Harvard Coll.*, No. 1:26-cv-11352, Dkt. 1 at 3 (D. Mass.). On March 23, 2026, the Department of Education's Office for Civil Rights announced two new investigations into Harvard to evaluate "whether Harvard continues to use illegal race-based preferences in admissions despite the Supreme Court's definitive ruling in *Students for Fair*

---

[7] https://perma.cc/34EJ-2236

*Admissions v. Harvard*. ED/OCR will also investigate alleged ongoing antisemitic harassment on Harvard's campus and the institution's purported failure to protect Jewish students." U.S. Department of Education, Press Release, *U.S. Dep't of Education's Office for Civil Rights Opens Two New Probes into Harvard University for Continued Discrimination on Campus* (March 23, 2026).[8]

## SUMMARY OF THE ARGUMENT

I. The district court lacked jurisdiction over the Government's termination of grants and awards to Harvard. 28 U.S.C. § 1491(a)(1). The district court correctly concluded that "it lack[ed] jurisdiction over the arbitrary and capricious claims as they pertain to the Termination Letters, and that any such claim based on the grant terminations must be brought in the Court of Federal Claims." A27. Yet rather than applying this reasoning to all of Plaintiffs' claims challenging the Termination Letters, the district court wrongly concluded that it had jurisdiction over Plaintiffs' "APA claims based on the First Amendment and violations of Title VI pursuant to [5 U.S.C.] § 706(2)," as to the same Termination Letters. A28.

This conclusion directly contradicts the Supreme Court's recent directive in *NIH* that the APA's "'limited waiver of sovereign immunity' does not provide the

---

[8] https://perma.cc/KFW9-5F5W

District Court with jurisdiction to adjudicate claims 'based on' … research-related grants or to order relief designed to enforce any 'obligation to pay money' pursuant to those grants." *Id.* Indeed, just last month, this Court vacated a portion of a district court's preliminary injunction that effectively "ordered specific performance with respect to payment to remedy the States' contractual injuries as to 'awarded grants' and 'executed contracts.'" *New York v. Trump*, No. 25-1236, 2026 WL 734941, at *17 (1st Cir. Mar. 16, 2026). The "alleged statutory and constitutional violations do not alter the essentially contractual nature of Plaintiffs' APA claims[.]" *Sustainability Inst. v. Trump*, 165 F.4th 817, 827 (4th Cir. 2026).

II. The district court also erred in concluding that Title VI provides the exclusive means by which the Government can terminate funding in response to concerns involving antisemitism. Rather, the Government permissibly terminated the grants at issue here pursuant to the terms of their awards. 2 C.F.R. § 200.340(a). Contract law and Title VI provide different authorities, require different procedures, and entail different remedies. The passage of Title VI did not impliedly preclude the Government from entering into contracts with the termination provisions invoked here. To the contrary, the statute expressly exempts efforts to achieve compliance when effectuated "by any other means authorized by law." 42 U.S.C. § 2000d-1. Here, the "other" source of "law" is the contract itself. Plaintiffs' contrary

22

interpretation would produce absurd results by investing those who violate civil rights with greater protections than all other contractors.

III. Finally, the district court erred in finding that the Government violated the First Amendment. The Government's April 11 letter set out ten items the Government proposed that Harvard undertake in order to continue receiving Federal funding. JA128-32. Harvard rejected the offer and sued. But the Government was within its rights to propose these reforms. Significantly, even if one or more items implicated protected conduct under the First Amendment, the vast majority of the reforms did not. These included compliance with civil rights laws, which are already required by law. Critically, the Government would have terminated Harvard's contracts, based solely on Harvard's refusal to address unprotected reforms. *TikTok Inc.*, 604 U.S. at 79. This Court should therefore reverse.

## STANDARD OF REVIEW

This Court's "review of the district court's grant of summary judgment is plenary[,]" including as to the Tucker Act. *Guscott v. City of Bos.*, 958 F.2d 361 (1st Cir. 1992). A court can grant summary judgment to a party only when "there is no genuine dispute as to any material fact" and that party is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A district court's

23

decision to grant a permanent injunction involves factual, legal, and discretionary components …: questions of law are reviewed de novo and the scope of the injunction is reviewed for abuse of discretion." *Esso Standard Oil Co. v. Lopez-Freytes*, 522 F.3d 136, 142 (1st Cir. 2008).

"[T]he party invoking a federal court's jurisdiction has the burden of proving it." *U.S. Conf. of Cath. Bishops v. U.S. Dep't of State*, 1:25-cv-00465, ---F. Supp. 3d ---, 2025 WL 763738, at *3 (D.D.C. 2025) (citation omitted). The Supreme Court has "said on many occasions that a waiver of sovereign immunity must be 'unequivocally expressed' in statutory text" and "[a]ny ambiguities in the statutory language are to be construed in favor of immunity[.]" *FAA v. Cooper*, 566 U.S. 284, 290 (2012) (citation omitted).

## ARGUMENT

### I.    The District Court Lacked Jurisdiction Over Termination Letters

Under the Tucker Act, Congress has vested the Court of Federal Claims with exclusive jurisdiction over claims that the Government has wrongfully terminated contracts. The essence of Harvard's complaint is that the Government should not have cancelled their grant agreements and must continue performing those contracts. That is a contractual dispute falling squarely within the Tucker Act's jurisdictional scheme, as the Supreme Court has recently and repeatedly made clear. The district court correctly determined that "it lacks jurisdiction over the arbitrary and capricious

24

claims as they pertain to the Termination letters, and that any such claim based on the grant terminations must be brought in the Court of Federal Claims." A27. But the district court failed to apply that same reasoning to Harvard's "APA claims based on the First Amendment and violations of Title VI pursuant to [5 U.S.C.] § 706(2)," as to the same Termination Letters. A28. That was error.[9]

**1.** To sue a federal agency or its officials, Plaintiffs must identify an express waiver of sovereign immunity and show that their claims fall within the waiver's scope. *Cooper*, 566 U.S. at 290. Though the APA provides a limited waiver of sovereign immunity for claims against the United States seeking relief other than money damages, Congress expressly limited APA review to situations where "there is no other adequate remedy in a court[.]" 5 U.S.C. § 704. This waiver does not apply "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012) (quotation omitted).

The Tucker Act provides the exclusive remedy and venue, providing that the "United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded" on "any express or implied contract with the United States[.]" 28 U.S.C. § 1491(a)(1). In doing so, "the Tucker

---

[9] The Government does not appeal the district court's assertion of jurisdiction over what it called "Freeze Orders."

Act impliedly forbids" the bringing of "contract actions" against "the government in a federal district court." *Albrecht v. Committee on Emp. Benefits of the Fed. Rsrv. Emp. Benefits Sys.*, 357 F.3d 62, 67-68 (D.C. Cir. 2004). The Federal Circuit has long held that "[t]he availability of an action for money damages under the Tucker Act or Little Tucker Act is presumptively an 'adequate remedy' for § 704 purposes." *Telecare Corp. v. Leavitt*, 409 F.3d 1345, 1349 (Fed. Cir. 2005). As a result, if a litigant can "sue the government for money damages in the Court of Federal Claims[,]" it has "an 'adequate remedy' that precludes an APA waiver of sovereign immunity in other courts." *Christopher Vill., L.P. v. United States*, 360 F.3d 1319, 1327 (Fed. Cir. 2004) (quoting *Consol. Edison Co. of New York v. U.S. Dep't of Energy*, 247 F.3d 1378,1384 (Fed. Cir. 2001)).

To determine whether "a particular action" is "at its essence a contract action" subject to the Tucker Act or instead a challenge properly brought under the APA, courts have looked at both (a) "the source of the rights upon which the plaintiff bases its claims" and (b) "the type of relief sought (or appropriate)." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982) (quotation omitted).

Two recent Supreme Court recent decisions are instructive. In *Department of Education v. California*, the district court "enjoin[ed] the Government from terminating various education-related grants" and "require[d] the Government to pay out past-due grant obligations and to continue paying [grant] obligations as they

26

accrue." 604 U.S. 650, 650 (2025). The Supreme Court stayed the district court's order, explaining that it likely "lacked jurisdiction to order the payment of money under the APA." *Id.* at 651. That is because the APA's waiver of sovereign immunity "does not extend to orders 'to enforce a contractual obligation to pay money' along the lines of what the District Court ordered[.]" *Id.* (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)). Instead, the Supreme Court explained, such suits must be brought in the Court of Federal Claims, in which Congress vested "jurisdiction over suits based on 'any express or implied contract with the United States.'" *Id.* (quoting 28 U.S.C. § 1491(a)(1)).

*California* "squarely control[s]" this materially identical case. *Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025). For example, when unions sued the Federal Government to challenge the termination of grants to Columbia University—which included a First Amendment challenge—the district court faithfully applied *California*, explaining that "the Supreme Court" has "characterized" such grants "as contracts" and so jurisdiction properly lay in the Court of Federal Claims. *Am. Ass'n of Univ. Professors v. U.S. Dep't of Just.*, No. 25-CV-2429 (MKV), 2025 WL 1684817, at *14 (S.D.N.Y. June 16, 2025).

The Supreme Court confirmed this approach in *NIH*, 145 S. Ct. 2658. There, the plaintiffs brought APA claims alleging that the government's terminations of research-related grants were arbitrary and capricious and "unconstitutional because

27

they violate[d] Separation of Powers and due to their impermissible vagueness, violate the Due Process Clause." No. 1:25-cv-10787, Dkt. 37 at 2 (April 25, 2025). The district court vacated the terminations on those grounds. 791 F. Supp. 3d 119, 126 (D. Mass. 2025). This Court denied the Government's request for a stay, concluding that the district court "likely had jurisdiction to enter the orders … to set aside an agency's actions." *Am. Pub. Health Assoc. v. Nat'l Inst. of Health,* 145 F.4th 39, 43-44, 52 (1st Cir. 2025).

The Supreme Court reversed, staying the district court's order "vacating the Government's termination of various research-related grants." *NIH*, 145 S. Ct. at 2659. The Court held that the APA's "'limited waiver of sovereign immunity' does not provide the District Court with jurisdiction to adjudicate claims 'based on' the research-related grants or to order relief designed to enforce any 'obligation to pay money' pursuant to those grants." *Id.* (quoting *California*, 604 U.S. at 651).

Justice Barrett concurred, explaining that while the Court of Federal Claims had exclusive jurisdiction over grant terminations, the district court could still hear claims challenging "internal guidance documents describing … priorities" setting forth how "[g]oing forward, the agency will not fund research related to DEI objectives, gender identity, or COVID-19." *Id.* at 2661 (Barrett, J., concurring). But "if the [Court of Federal Claims] has exclusive jurisdiction over the grant

28

terminations … plaintiffs cannot end-run that limit simply by packaging them with a challenge to agency guidance." *Id.* at 2661-62.

These cases clearly preclude Harvard's claims and require reversal of the district court's assertion of jurisdiction over the Termination Letters.

**2.** The district court distinguished between the Termination Letters and Freeze Orders. A27. Applying the reasoning of *NIH*, the district court found "that it has jurisdiction over Plaintiffs' arbitrary and capricious claims that challenge the Freeze Orders, because it views those orders … as agency documents that set the federal government's policy moving forward as to grant funding at Harvard." A27. In contrast, the district court found that "given the current guidance from the Supreme Court, it lacks jurisdiction over the arbitrary and capricious claims as they pertain to the Termination Letters, and that any such claim based on the grant terminations must be brought in the Court of Federal Claims." *Id.*; *accord Thakur v. Trump*, 163 F.4th 1198, 1204 (9th Cir. 2025) (district court likely lacked jurisdiction over plaintiffs' arbitrary and capricious claims challenging form termination letters cancelling university research grants for nonalignment with agency priorities). But rather than applying this reasoning to all of Plaintiffs' APA claims challenging the Termination Letters, the district court wrongly asserted jurisdiction over Plaintiffs' "APA claims based on the First Amendment and violations of Title VI pursuant to [5 U.S.C.] § 706(2)," as to the same Termination Letters. A28. That was error.

29

**a.** First, the district court incorrectly concluded that the APA claim based on the First Amendment rendered this suit "materially different from the more contract-based claims asserted in *California* and [*NIH*]." A28. Harvard's inclusion of a constitutional claim does not alter the analysis here, which still turns on the "source of the rights upon which the plaintiff bases its claims[.]" *Megapulse*, 672 F.2d at 968; *see also Kidwell v. Dep't of Army*, 56 F.3d 279, 284 (D.C. Cir. 1995) (Courts must look to the claims' "substance, not merely [their] form."). The source remains the contracts with the Government. When a constitutional claim is merely a vehicle to block the termination of a contract obligating money, an adequate remedy exists in the Court of Federal Claims. *See, e.g.*, *Suburban Mortg. Assocs. v. Dep't of Urb. Dev.*, 480 F.3d 1116, 1128 (Fed. Cir. 2007).

The Fourth Circuit recently applied this logic to the suspension and termination of grants in *Sustainability Inst. v. Trump*, 165 F.4th 817 (4th Cir. 2026). Plaintiffs challenged these terminations as arbitrary and capricious and violative of the First Amendment, Presentment Clauses, and separation of powers. *Id.* at 822-23. "Plaintiffs offer[ed] several arguments to try to circumvent *California* and [*NIH*]," including that "their claims 'arise from the Constitution and federal statute, not from contracts.'" *Id.* 827. But the Fourth Circuit expressly rejected this claim because "[t]he Supreme Court … considered and rejected the same argument in *California* and [*NIH*]." *Id.* Rather, the court found that there was "no meaningful difference

30

between" that case and *California*: in both, "the Government … froze or terminated grants *en masse*, allegedly without individualized analysis"; in both, plaintiffs "sought restoration of their specific grants under the APA"; and in both, "that relief is exactly what the district court awarded[,]" namely, setting aside the termination of grants and directing the Government to restore plaintiffs' access to grant funds immediately. *Id.* at 826-27 (citations omitted).

The Fourth Circuit emphasized the presence of constitutional claims in *NIH*, where "plaintiffs argued that certain 'agency-wide policies' were unlawful 'because they violate[d] various federal statutes and the Constitution." *Id.* at 827 (quoting *NIH*, 145 F.4th at 43). Nonetheless, the Supreme Court "stayed 'the District Court's judgments vacating the Government's termination of various research-related grants' because the APA did 'not provide the District Court with jurisdiction' to order such relief." *Id.* (quoting *NIH*, 145 S. Ct. at 2659). "The upshot is that the alleged statutory and constitutional violations do not alter the essentially contractual nature of Plaintiffs' APA claims[.]" *Id.* Furthermore, "Plaintiffs identif[ied] no source of law, besides their grant agreements, guaranteeing them the relief they seek: continued payments on those grants." *Id.* Ergo, "[u]nder the Supreme Court's recent decisions, 'the source of the rights upon which the plaintiff[s] base[] [their] claims' is thus contractual." *Id.* at 827-28 (quoting *Megapulse*, 672 F.2d at 968).

31

The Fourth Circuit applied the same reasoning in its decision in *Solutions in Hometown Connections v. Noem*, which reviewed the Department of Homeland Security's ("DHS") decision to freeze and terminate grants for nonalignment with agency priorities. 165 F.4th 835 (4th Cir. 2026). As here, the agency sent termination letters explaining that "Pursuant to 2 C.F.R. § 200.340(a)(2) and the terms and conditions of your award, DHS has determined that the scope of work performed under this award no longer effectuates the program goals and the Department's priorities." *Id.* at 838 (quoting letter). Plaintiffs sought a preliminary injunction, alleging that these actions were arbitrary and capricious, in violation of the separation of powers and First Amendment, and ultra vires. *Id.* at 837, 839. The Fourth Circuit held that the district court likely lacked jurisdiction over all of plaintiffs' claims, finding the case "materially similar to the Supreme Court's recent decisions in [*California*] and [*NIH*]." *Id.* at 842. That is because "these claims for relief are grounded only on alleged contractual obligations to fund their grants and therefore are committed to the Court of Federal Claims to resolve." *Id.* at 843. "Without that contractual basis, the plaintiffs could claim no relief." *Id.* 843. The presence of a constitutional claim made no difference.

Likewise, here, the "source of the rights upon which" Harvard "bases its claims," *Megapulse*, 672 F.2d at 968, is contracts with the Government. "[F]ederal grant agreements a[re] contracts when the standard conditions for a contract are

32

satisfied, including that the federal entity agrees to be bound." *Columbus Reg'l Hosp. v. United States*, 990 F.3d 1330, 1338 (Fed. Cir. 2021). Harvard for its part acknowledges that its claims are ultimately based on these contracts. *See* Am. Compl. ¶ 15 ("By accepting federal funds, Harvard agreed to abide by the provisions in Title VI and the relevant agencies' corresponding regulations."); *id.* ¶ 122 ("Defendants subjected Harvard to adverse action by freezing $2.2 billion in multi-year grants and $60 million in multi-year contracts previously awarded to Harvard."). Harvard does not have a First Amendment entitlement to taxpayer money; it has a contractual right, subject to a termination clause that the Government invoked. Harvard's claims would not exist absent these contracts. Merely raising a First Amendment defense to the invocation of a contractual termination clause does not remove a case from the exclusive jurisdiction of the Court of Federal Claims.

**b.** The district court also wrongly asserted jurisdiction over Plaintiffs' APA claim that the Termination Letters were contrary to Title VI. A28. As a general matter, a plaintiff cannot evade the Tucker Act simply by alleging that a contractual action violates some statute. In *Spectrum Leasing Corp. v. United States*, the plaintiff's contract was terminated, and it sued arguing that the Government had violated the Debt Collection Act in withholding its payments. 764 F.2d 891, 894 (D.C. Cir. 1985). In particular, it "contend[ed] that the source of its right to relief in this case is the Debt Collection Act and not the contract." *Id.* The D.C. Circuit

33

disagreed. It noted that "Spectrum seeks an injunction requiring the government to pay monies owed for computer hardware. The right to these payments is created in the first instance by the contract, not by the Debt Collection Act. The DCA, even if it applied, confers no such right in the absence of the contract itself." *Id.*; *see also Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 78 (D.C. Cir. 1985) (applying similar analysis to claim that contract termination violated federal acquisition regulations). So too here, Plaintiffs' claims and any right to relief stem from the grants, not Title VI. They have no substantive rights under Title VI.

The same logic applies to Title VI. In *Bakersfield City Sch. Dist. of Kern Cnty. v. Boyer*, the Government "alleged that [a school district] was violating Title VI of the Civil Rights Act of 1964," "concluded that voluntary compliance with Title VI could not be achieved[,]" and subsequently notified the district "that payment of federal funds not yet approved was 'deferred' pending the outcome of the proceedings." 610 F.2d 621, 623 (9th Cir. 1979). The school district sought "an injunction to prevent any subsequent unlawful deferral, and for an order requiring payment to the District of funds improperly deferred[,]" totaling "$220,000 in federal funds[.]" *Id.* at 627. The district raised statutory and constitutional arguments, including the Federal Government's alleged failure "to comply with the provisions of" Title VI. *Id.* at 624-28 (citing 42 U.S.C. § 2000d-5). But the Ninth Circuit held that the school district's "claim to the deferred funds … lies exclusively

34

in the court of claims under the Tucker Act[.]" *Id.* at 628 (citing 28 U.S.C. §§ 1346(a)(2), 1491). "Moreover, it is firmly established that, where the real effort of the complaining party is to obtain money from the federal government, the exclusive jurisdiction of the court of claims over non-tort claims exceeding $10,000 cannot be evaded or avoided by framing a district court complaint to appear to seek only injunctive, mandatory or declaratory relief against government officials or the government itself." *Id.* So even claims challenging the Government's use of Title VI to terminate contracts must be channeled to the Court of Federal Claims under the Tucker Act.[10]

In the Columbia University litigation, the district court suggested the same. *AAUP*, 2025 WL 1684817, at *14. Unions sued to challenge the Government's termination of research grants to Columbia, alleging this violated the APA, First Amendment, and Title VI procedures. *Id.* at *2. The district court held that plaintiffs

---

[10] Title VI provides that "Any department or agency action taken pursuant to section 2000d-1 of this title shall be subject to such judicial review as may otherwise be provided by law for similar action taken by such department or agency on other grounds." 42 U.S.C. § 2000d-2. Here, the Government's termination of these contracts was taken pursuant to the terms of the contracts, not pursuant to Title VI. But even if the Government's actions had been taken pursuant to Title VI, jurisdiction over claims for money promised in contract would still lie in the Court of Federal Claims, because the Tucker Act provide "such judicial review." *Id.* It is only "[i]n the case of action, not otherwise subject to judicial review" that Title VI provides jurisdiction under "chapter 7 of Title 5" for "terminating or refusing to grant or to continue financial assistance upon a finding of failure to comply with any requirement imposed pursuant to section 2000d-1 of this title." *Id.*

lacked standing and noted, at any rate, that the court would likely lack jurisdiction under *California* because "the principal relief Plaintiffs seek is money." *Id.* at *14.

That is not to say that all Title VI claims sound in contract. Where a plaintiff brings "claims of discriminatory violations of … Title VI … sound[ing] in tort[,]" the Court of Federal Claims "does not have jurisdiction" because such claims are "premised on tort[,]" rather than contract. *Adams v. United States*, No. 07-809C, 2008 WL 4725452, at *2 (Fed. Cl. July 16, 2008). But here, Harvard—like the Columbia unions—seeks the continued disbursement of funds promised in contract. Those contracts are "source of the rights upon which the plaintiff bases its claims," *Megapulse*, 672 F.2d at 968, regardless of whether it raises statutory defenses.

**3.** With respect to the Termination Letters, "[t]he relief sought [here] was to require the Government to perform its contract obligations so that [Plaintiffs] could get the money allegedly due … under the [grant] agreement." *Suburban Mortg. Assocs.*, 480 F.3d at 1117. Harvard expressly sought relief in the form of "vacating and setting aside Defendants' … Termination Letters … as well as any terminations of, freezes of, or refusals to grant or to continue federal funding undertaken pursuant to those agency actions[.]" Am. Compl. at 56. Harvard also requested relief "permanently enjoining Defendants … from … giving effect to … Termination Letters[.]" Am. Compl. at 57. And that is exactly the relief the district court ordered: "The … Termination Letters are VACATED and SET ASIDE" and further

36

Defendants were "PERMANENTLY ENJOINED from implementing, instituting, maintaining, or giving effect to the … Termination Letters." Dkt. 247. The Government then continued paying out funds to Harvard, in compliance with that order. There is "no meaningful distinction between the relief ordered here and the relief ordered in" *California* and *NIH*, where "Supreme Court determined was sufficiently contractual to trigger the Tucker Act." *Sustainability Inst.*, 165 F.4th at 828. "The relief Plaintiffs sought and the relief the district court gave them was the reinstatement of their grants. That is 'the classic *contractual* remedy of specific performance.'" *Id.* (quoting *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985) (emphasis added)).

This Court recognized as much just last month in *New York v. Trump*, No. 25-1236, 2026 WL 734941, at *1 (1st Cir. Mar. 16, 2026). As in *NIH*, plaintiffs "argued that the challenged grant terminations violated the APA and other various constitutional guarantees." *Id.* at *17. But this Court vacated a portion of the district court's preliminary injunction ordering "Agency Defendants 'to release and transmit any disbursements to the States on awarded grants, executed contracts, or other executed financial obligations that were paused on the grounds of the OMB Directive and Executive Orders included by reference therein or issued before the rescission of the OMB Directive.'" *Id.* at *17 (quoting district court order). This Court explained that this part of the injunction effectively "ordered specific

37

performance with respect to payment to remedy the States' contractual injuries as to 'awarded grants' and 'executed contracts.'" *Id.* But that is exactly what *NIH* forbids: "the APA does not grant district courts 'jurisdiction to adjudicate claims based on … grants <u>or</u> to order relief designed to enforce any obligation to pay money pursuant to those grants[.]" *Id.* (quoting *NIH*, 145 S. Ct. at 2658).

The same is true here. Even assuming the district court had jurisdiction to enter a permanent injunction of the so-called Freeze Orders, the district court lacked jurisdiction to vacate, set aside, or enjoin the Termination Letters. That order did nothing more and nothing less than order specific performance to the tune of billions of dollars. As Justice Barrett explained in her concurrence, as a matter of strict "logic," "[v]acating [agency] guidance does not reinstate terminated grants." *NIH*, 145 S. Ct. at 2661 (Barrett, J., concurring). "If one simply flowed from the other, the District Court would have needed only to vacate the guidance itself." *Id.* (citation omitted). Thus, while the district court had jurisdiction over plaintiffs' challenge to agency guidance, the district court lacked jurisdiction when it "separately 'vacated' the grant terminations and ordered the Government to pay plaintiffs sums due under the agreements[.]" *Id.* "Even if the guidance and grant terminations are linked, vacating the guidance does not necessarily void decisions made under it[.]" *Id.* Rather, "[t]he claims are legally distinct" and "plaintiffs cannot end-run that limit simply by packaging them with a challenge to agency guidance." *Id.* at 2661-62.

38

This Court should reverse the district court's conclusion that it had jurisdiction to vacate, set aside, and enjoin the Termination Letters.

## II.     The District Court Erred In Concluding That The Termination Letters Violated Title VI

The district court erred in ruling that Title VI's procedures provide the exclusive mechanism to terminate any grants where a recipient fails to address antisemitism on campus, regardless of the terms of the award. A60-65. Here, the Government terminated the contracts at issue pursuant to the terms of those agreements, not pursuant to Title VI or any regulation adopted under that authority. Title VI and contract law provide different authorities, with different processes, with different remedies. In enacting Title VI, Congress did not impliedly preclude the Government from including or enforcing termination provisions such as 2 C.F.R. § 200.340(a) in its contract with Federal grant recipients.

The Government's authority "to enter into a contract" stems from its "sovereignty." *United States v. Tingey*, 30 U.S. (5 Pet.) 115, 125 (1831) (Story, J.). Any contracting party may seek to terminate a contract pursuant to the general principles of contract law, but in particular a party may invoke the terms of the contract where they include a termination clause. *See, e.g.*, *Bowen v. Pub. Agencies Opposed To Soc. Sec. Entrapment*, 477 U.S. 41, 55 (1986). In contrast, the Government's authority to withhold funding pursuant to Title VI stems from that statutory authority. 42 U.S.C. § 2000d-1. While the Government's authority to

39

terminate funding for nonalignment is limited to cases where the contract includes such a term, the Government may terminate funding pursuant to Title VI regardless of whether its terms are included as a provision in the agreement. 42 U.S.C. § 2000d.

The procedures for terminating a contract depend on the terms of the contract. Here, the contracts expressly provided that "[t]he Federal award may be terminated in part or its entirety . . . [b]y the Federal agency . . . if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a). But pursuant to these terms, the Government also had to comply with various processes. These included providing "written notice of termination to the recipient or subrecipient," *id.* § 200.341(a), and, if terminated for noncompliance, providing "the recipient with an opportunity to object and provide information challenging the action." *Id.* § 200.342. These contracts also provide detailed processes to "close out the Federal award," § 200.344, and collection of outstanding amounts due. *Id.* § 200.346.

In contrast, Title VI's procedures require agencies to engage in rulemaking by "issuing rules, regulations, or orders of general applicability" that must be "approved by the President." 42 U.S.C. § 2000d-1. Agencies must always "advis[e] the appropriate person or persons of the failure to comply with the requirement" adopted "pursuant to this section" and "determin[e] that compliance cannot be secured by voluntary means." *Id.* Absent "other means authorized by law[,]" agencies must then make "an express finding on the record, after opportunity for hearing, of a failure to

40

comply with" such requirement "adopted pursuant to this section" before terminating or refusing to grant or continue financial assistance. *Id.* The head of the agency must also "file with the committees of the House and Senate having legislative jurisdiction over the program or activity involved a full written report of the circumstances and the grounds for such action." *Id.* The agency's action does not "become effective until thirty days have elapsed after the filing of such report." *Id.*

The applicability of these termination authorities also diverges. The Government's authority to terminate funding pursuant to contract applies only to the funds promised under that contract. Such terminations are typically limited to terminating future payments for those projects.

Meanwhile, Title VI's authority only applies to "[c]ompliance with any requirement adopted pursuant to this section[.]" 42 U.S.C. § 2000d-1. Notably, the provisions of 2 C.F.R. § 200.340 incorporated into the contracts were not adopted "pursuant to" Title VI. *See* Guidance for Federal Financial Assistance, 89 Fed. Reg. 30046, 30047-48 (Apr. 22, 2024).

Most significantly, the remedies for each are very different. Contract terminations can only be based on the terms of the contracts themselves and generally applicable principles of contract law. Such terminations are limited to the funds provided by that contract. Further, they only apply to contracts that contain

such termination provisions through the assent of the parties. Nor is the Government typically entitled to injunctive relief.

Title VI provides very different remedies. Where the Government invokes its Title VI authority, it may withdraw Federal financial assistance from the recipient university. 42 U.S.C. § 2000d-1. But "Federal financial assistance" includes much more than just the research grants and awards at issue here. *See* 34 C.F.R. § 100.13(f) (defining "Federal financial assistance" to include "grants and loans of Federal funds," "the grant or donation of Federal property," "the detail of Federal personnel," and "the permission to use … Federal property or"). It also includes student loans and dozens other grants, loans, awards, and allowances. 34 C.F.R. § 100 Appendix A (listing 62 categories of assistance). Further, it applies to such Federal financial assistance regardless of whether the recipient agreed to include any type of termination provision. Significantly, the Attorney General may also seek injunctive relief. 28 C.F.R. § 50.3. These extraordinary remedies are unavailable via contract.

Here, the Government terminated the awards at issue pursuant to the terms of these contracts. The Government invoked its termination authority for nonalignment with priorities. *See, e.g.,* JA512; JA517; JA520; JA522; JA524. The Government elected to terminate some—but not all—contracts. *See* Dkt. 219-1. Further, the Government's relief was limited to no longer disbursing funds to Harvard. It was not

42

entitled to seek injunctive relief or any other relief provided by Title VI. For example, the Government did not seek to terminate student loans. But the Government's sovereign power to enter into and exercise the termination clause was not limited by any "prohibit[ions] by law." *Tingey*, 30 U.S. at 125.

The district court's contrary conclusion is at odds with the text of Title VI. That statute by its terms applies only to attempts to achieve "[c]ompliance with any requirement adopted *pursuant to this section*." 42 U.S.C. § 2000d-1 (emphasis added); *see also id.* (referencing "compl[iance] with a requirement imposed *pursuant to this section*") (emphasis added). But the Government is seeking to enforce a contractual provision that allows it to terminate due to nonalignment with priorities. It is not seeking compliance with a regulation issued pursuant to Title VI.

The district court's opinion is also in tension with historical practice. Shortly after the enactment of Title VI, President Lyndon B. Johnson issued Exec. Order 11,246, which prohibited federal contracts from engaging in employment discrimination on the basis of race, color, religion, sex, or national origin and required the inclusion of a provision in all public contracts stating that "In the event of the contractor's noncompliance with the nondiscrimination clauses of this contract or with any of such rules, regulations, or orders, this contract may be cancelled, terminated or suspended in whole or in part and the contractor may be

43

declared ineligible for further Government contracts[.]" Equal Employment Opportunity, 30 Fed. Reg. 12319, 12320 (Sept. 24, 1965).

What is more, the district court's interpretation would produce absurd results. *United States v. Kirby*, 74 U.S. 482, 486-86 (1868) (describing absurdity canon). Under the district court's rule, those who discriminate on the basis of race would be afforded *greater* procedural protections than any other government contractor. Incredibly, the district court embraced this absurd consequence as reflecting congressional intent to shield contractors from the "irreversible stigma" as a "discriminator." A64.

It is also difficult to square the district court's conclusion with the Supreme Court's disposition of *California*, which held that an agency's termination of grants understood to unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic were governed by 2 C.F.R. § 200.340 and belonged in the Court of Federal Claims. 604 U.S. at 651; *see also id.* at 656 (Jackson, J., dissenting) (quoting termination letter language). Similarly, *NIH* concerned the termination of grants for DEI. 145 S. Ct. 2658. So did the Fourth Circuit's opinion in *Sustainability Inst.*, 165 F.4th at 822.

The district court in the Columbia University funding case rejected the plaintiffs' argument "that the Executive Branch may not count repudiating antisemitism among 'agency priorities' within the meaning of 2 C.F.R.

44

§ 200.340(a)(4)." *AAUP*, 2025 WL 1684817 at \*15. Rather, "all of Plaintiffs' arguments that Defendants violated the APA" by "failing to comply with procedural requirements for cutting funding pursuant to Title VI" wrongly "presuppose that Title VI is the exclusive vehicle by which the Executive Branch may withdraw financial support for an institution that allows religious discrimination." *Id. But see Am. Ass'n of Univ. Professors v. Trump*, No. 25-CV-07864-RFL, 2025 WL 3187762, at \*27 (N.D. Cal. Nov. 14, 2025).

The Court should reverse the district court's conclusion that Title VI barred terminating the grants and awards at issue based on agency priorities.

## III. The District Court Erred In Finding That Defendants Violated The First Amendment

"Within broad limits, 'when the Government appropriates public funds to establish a program it is entitled to define the limits of that program.'" *United States v. Am. Libr. Ass'n, Inc.*, 539 U.S. 194, 211 (2003) (quoting *Rust v. Sullivan*, 500 U.S. 173, 194 (1991)). Here, the Government elected to terminate contracts with Harvard because they no longer aligned with "agency priorities." 2 C.F.R. § 200.340(a). This included, most notably, Harvard's undisputed failure to address anti-Semitism on campus. *E.g.*, A79 ("[I]t is clear … that Harvard has been plagued by antisemitism in recent years and could (and should) have done a better job of dealing with the issue"). The district court erred in concluding otherwise. The conduct at issue was the Government's April 11 letter describing reforms proposed "as the basis for an

45

agreement in principle that will maintain Harvard' financial relationship with the federal government." JA128. Even if one or more conditions concerned First Amendment-protected speech, the vast majority clearly did not. And, the Government would have terminated Harvard's funding based on unprotected activity.

Plaintiffs allege the Government violated the First Amendment (1) by retaliating against Harvard based on the exercise of its First Amendment rights, (2) imposing content- and viewpoint-based burdens on those rights through the imposing of funding conditions, and (3) by impermissible coercion. To prevail on these First Amendment claims, plaintiffs must prove that Harvard (1) "engaged in constitutionally protected conduct," (2) was "subject[ ] to an adverse action," and (3) "the protected conduct was a substantial or motivating factor in the adverse action." *Gattineri v. Town of Lynnfield, Massachusetts*, 58 F.4th 512, 514 (1st Cir. 2023) (quoting *Falmouth Sch. Dep't v. Doe*, 44 F.4th 23, 47 (1st Cir. 2022)). Where, as here, the Government was acting in its capacity as a contractor, courts apply the test announced in *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205*, which weighs the "interests of the [contractor], as a citizen, in commenting upon matters of public concern and the interest of the State, as [a contracting entity], in promoting the efficiency of the public services it performs through its [contractors]." 391 U.S. 563,

46

568 (1968); *see Bd. of Cnty. Comm'rs, Wabaunsee Cnty. v. Umbehr*, 518 U.S. 668, 676 (1996) (applying *Pickering*).

In evaluating causation, "the government can escape liability by showing that it would have taken the same action even in the absence of the protected conduct." *Umbehr*, 518 U.S. at 675 (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 286 (1977)). Further, the Supreme Court recently clarified that where the Government's actions may be "justified on both content-neutral and content-based grounds," courts will uphold government action where "[t]he record … adequately supports the conclusion that" the Government would have taken the same action based on the content-neutral "justification alone." *TikTok Inc.*, 604 U.S. at 79.

The conduct at issue here turns on the Government's April 11 letter outlining reforms the Government proposed that Harvard undertake to maintain its financial relationship with the Government. JA128-32. *Cf.* 42 U.S.C. § 2000d-1 (Title VI provision requiring Government first attempt to secure compliance by "voluntary means"). On April 14, Harvard responded, acknowledging that "Harvard has made, and will continue to make, lasting and robust structural, policy, and programmatic changes" to address antisemitism, but rejecting the Government's offer. JA133.

The vast majority of reforms outlined in the April 11 letter concern conduct that is not protected under the First Amendment. *Cf. Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 59-60 (2006) ("It is clear that a funding condition

47

cannot be unconstitutional if it could be constitutionally imposed directly.") (citing *Speiser v. Randall*, 357 U.S. 513, 526 (1958)). For example, the Government's interest in ensuring that Harvard "cease all preferences based on race, color, national origin" in admissions, JA129, simply requires Harvard to comply with Title VI as interpreted by *SFFA*, 600 U.S. at 198 n.2 (holding that Harvard's admissions practices violated Title VI). To this end, the letter's bullets #2 and #3 addressed Harvard's use of race and other protected characteristics in hiring and admissions decisions, respectively. JA129. This conduct is prohibited under Title VI and Title VII. *See, e.g.*, *SFFA*, 600 U.S. at 198 n.2; *Roberts v. U.S. Jaycees*, 468 U.S. 609, 612 (1984) (rejecting First Amendment challenge to non-discrimination law). Relatedly, bullet #7 addressed Harvard's impermissible use of race through DEI programs and offices; to the extent that such conduct is prohibited by law, it is also not protected conduct.

Similarly, bullet #6 addresses Harvard's "[e]gregious" record on antisemitism. Such conduct is similarly punishable under Federal law and certainly not protected conduct. *See Thorne v. Bailey*, 846 F.2d 241, 243-44 (4th Cir. 1988) ("Prohibiting harassment is not prohibiting speech, because harassment is not a protected speech."); *Kestenbaum v. President & Fellows of Harvard Coll.*, 743 F. Supp. 3d 297, 309 (D. Mass. 2024) ("The court consequently is dubious that Harvard can hide behind the First Amendment" to cover for its "indecisive, vacillating, and

at times internally contradictory [response to antisemitism]."); *Gartenberg v. Cooper Union for the Advancement of Sci. & Art*, 765 F. Supp. 3d 245, 270-74 (S.D.N.Y. 2025) (university's failure to redress antisemitic conduct not protected by First Amendment). This provision contemplated audits and reports on specific violations, including "information as to individual faculty members who discriminated against Jewish or Israeli students or incited students to violate Harvard's rules." JA130. Such a proposal merely outlines a practical framework to identify past violations of Federal law, which are indisputably unprotected conduct. *See United States v. Sayer*, 748 F. 3d 425, 433 (1st Cir. 2014) ("[I]t has never been deemed an abridgement of freedom of speech ... to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed."). In the same spirit, the April 11 letter included whistleblower protections (bullet #9) and transparency procedures (bullet #10) as ancillary mechanisms to support the parties' identification of illegal conduct. To the extent the letter also suggested governance reforms (bullet #1) and student discipline reforms (bullet #8), these too aimed to ensure enforcement of Federal law and address unprotected conduct.

The overwhelming majority of the letter's contents addressed unprotected conduct. Indeed, to the extent the reforms implicated protected conduct, it did so only incidentally to address the root problems of unlawful discrimination and failure

49

to address antisemitism. As a practical matter, for any proposal to have teeth and address these root evils, they will necessarily include an apparatus of audits, reporting mechanisms, and other structural changes.

In fact, Harvard's own Task Force proposed many reforms along the same lines. These included "[a]dmissions" reform and "[a]cademic[]" reforms, including "a classroom experience … free from antisemitism" and new "[a]cademic offerings" such as classes on "Jewish civilization" and "antisemitism." JA227. To implement these changes, the Task Force similarly recommended the creation of a "robust administrative infrastructure" as well as "[c]omplaint mechanisms" ultimately "capable of generating publicly reportable aggregate data." *Id.* In Harvard's words, addressing "these damaging consequences … will require a comprehensive, integrated, and sustained program of efforts." JA371 (bold and underlined removed). Harvard's Task Force further "urge[d] changes in University governance as it relates to faculty and academic oversight[,]" including a "comprehensive review of … academic activities" and "implementing changes in response to that review[.]" *Id.*

The Harvard Task Force's own extensive recommendations (JA371-88) are quite similar to the proposals contained in the Government's April 11 letter.

The district court was thus clearly wrong to suggest that "[t]he idea that fighting antisemitism is Defendants' true aim is belied by the fact that the majority of the demands they are making of Harvard to restore its research funding are

50

directed, on their face, at Harvard's governance, staffing and hiring practices, and admissions policies[.]" A80. The Harvard Task Force's own recommendations emphasize reforms to all these aspects of university life, and yet no one questions whether that entity's true aim is addressing antisemitism. This further indicates that the Government was genuinely concerned with addressing racial discrimination and antisemitic conduct (rather than protected conduct) and was offered in good faith in the hope to secure voluntary resolution of these issues at Harvard.[11]

Critically, Government would have terminated the contract at issue based on Harvard's unproduced conduct. *Cf. TikTok*, 604 U.S. 79 (describing standard for mixed-justification cases). The record is replete with documentation that Harvard failed to address antisemitism on campus and has impermissibly discriminated on the basis of race. *E.g.*, A79; *SFFA*, 600 U.S. 181. Harvard, for its part, argues that "[t]he Government threatened to terminate Harvard's federal funding unless Harvard restructured its internal governance, changed its hiring and admissions practices to strike Defendants' preferred balance of viewpoints, and modified what it teaches its students to align with Defendants' views." Harvard Am. Compl. ¶108. But a fair reading of the record shows that the Government was concerned first and foremost

---

[11] Harvard's own rejection letter itself outlined many similar changes that it had adopted, including "new accountability procedures," the imposition of "meaningful discipline"; "enhanced programs designed to address bias and promote ideological diversity"; and additional "safety and security measures." JA133.

with addressing unlawful discrimination and harassment. The April 11 letter represented sufficient but not necessary conditions to achieve a voluntary resolution of these concerns. But the Government would have terminated the grants regardless of whether Harvard agreed to or rejected any particular reforms touching on governance or protected aspects of university life.

This conclusion is supported by the Government's subsequent actions. The Government has continued to investigate whether Harvard's admissions practices are compliant with the Supreme Court's *SFFA* decision and pursue Title VI remedies to address Harvard's failure to address antisemitism. *See supra* at 20 (describing two enforcement lawsuits and agency investigations). The district court expressly held open the possibility that the Government could pursue Title VI remedies through that process, A78, and the Government has taken that invitation as part of its continued mandate "to combat anti-Semitism vigorously, using all available and appropriate legal tools." JA138.

The final proof is how the Government has addressed similar problems at other universities. The Government in many cases has secured settlements that similarly address the root problems of unlawful discrimination and antisemitic harassment on campus. The Government continues to devote substantial resources to investigating antisemitism at universities across the country. *See, e.g.*, *United States v. Regents of the Univ. of Cal.*, No. 2:26-cv-1946 (Feb. 24, 2026) (Title VII

52

lawsuit concerning UCLA); Letter from Harmeet K. Dhillon, Assistant Attorney General, to Michael V. Drake, University of California (July 29, 2025) (finding "that UCLA's response to its students' complaints of antisemitism on UCLA's campus violated its obligations under … Title VI").[12] The Department of Education alone has opened at least sixty such investigations.[13] And the Government has demonstrated its willingness to enter into settlement agreements that do not contain everything the Government asked for in its opening bid during settlement negotiations. *E.g.*, Resolution Agreement Between the United States of America and Columbia University (July 23, 2025).[14] The Government would still have terminated Harvard grants based on its failure to address unlawful discrimination, and indeed has done so at many universities. *See Peguero-Moronta v. Santiago*, 464 F.3d 29, 46 (1st Cir. 2006) (a "'defendant [that] has produced enough evidence to establish that the plaintiff's dismissal would have occurred in any event for nondiscriminatory reasons [will prevail].'").

At the end of the day, Harvard tries to deflect from its indisputable failure to address antisemitism and racial discrimination, by grasping onto offer terms that incidentally touched on university admissions and governance. Harvard short-

---

[12] https://perma.cc/GP5K-3RZL

[13] https://perma.cc/P9LZ-2SV4

[14] https://perma.cc/R8F3-3ALH

circuited good-faith negotiations to achieve a voluntary resolution by seizing upon incidental aspects of negotiation offer. But Harvard's attempt to clothe itself with the banner of academic freedom fails. Not every attempt to address antisemitism or racial discrimination in higher education impinges on core First Amendment rights.

Rather, "[t]he record … adequately supports the conclusion that" the Government would have taken the same actions based on a content-neutral "justification alone," *TikTok*, 604 U.S. at 79, namely, Harvard's undisputed failure to address unlawful discrimination on campus. Indeed, the district court itself recognized the serious issues with antisemitism at Harvard. A79. And it ruled that Defendants had to go through Title VI to terminate grants to redress discriminatory conduct. That necessarily acknowledges that Defendants had sufficient alternative motivations to terminate the grants.

The Court should accordingly reverse the district court's finding that Plaintiffs were entitled to summary judgment on their First Amendment claims.

## CONCLUSION

For the reasons explained above, the Court should reverse and should vacate the district court's order.

Respectfully submitted,

**BRETT A. SHUMATE**
Assistant Attorney General
Civil Division

/s/ Michael Velchik
**MICHAEL VELCHIK**
Senior Counsel to the Assistant Attorney
General, Civil Division

**TIBERIUS T. DAVIS**
Counsel to the Assistant Attorney General
Civil Division

DATED:  April 15, 2026

55

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,406words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Word in fourteen-point Times New Roman.

## CERTIFICATE OF SERVICE

I certify that on April 15, 2026, I electronically filed the foregoing Brief for Respondent with the Clerk of Court for the United States Court of Appeals for the First Circuit using the appellate CM/ECF system. I also certify that opposing counsels are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ *Michael Velchik*
**MICHAEL VELCHIK**
Senior Counsel to the Assistant Attorney
General, Civil Division

**ADDENDUM**

**TABLE OF CONTENTS**

Opinion..................................................................................................A1

Judgment ...........................................................................................A85

U.S. Const. amend. I. ........................................................................A87

28 U.S.C. § 1491 ...............................................................................A87

42 U.S.C. § 2000d..............................................................................A88

42 U.S.C. § 2000d-1...........................................................................A88

42 U.S.C. § 2000d-2...........................................................................A89

2 C.F.R. § 200.340 ............................................................................A90

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| PRESIDENT AND FELLOWS OF HARVARD COLLEGE, et al., | * * * * | |
| Plaintiffs, | * * | |
| v. | * * | Civil Action No. 25-cv-11048-ADB |
| | * * | |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al., | * * * * | |
| Defendants. | * | |

|  |  |  |
|---|---|---|
| AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS – HARVARD CHAPTER, et al., | * * * * | |
| Plaintiffs, | * * | |
| v. | * * | Civil Action No. 25-cv-10910-ADB |
| | * * | |
| UNITED STATES DEPARTMENT OF JUSTICE, et al., | * * * | |
| Defendants. | * | |

## MEMORANDUM AND ORDER

BURROUGHS, D.J.

Plaintiffs President and Fellows of Harvard College ("Harvard"), the American

Association of University Professors ("AAUP"), the AAUP–Harvard Faculty Chapter ("AAUP-

Harvard"), the International Union, United Automobile, Aerospace and Agricultural Implement

**A001**

Workers of America ("UAW"), the Harvard Graduate Students Union ("HGSU–UAW"), and Harvard Academic Workers ("HAW–UAW") (the "Organizational Plaintiffs" and, collectively with Harvard, "Plaintiffs") bring two related suits against various federal agencies and agency heads (collectively, the "Defendants"), challenging the decision to freeze and ultimately terminate nearly $2.2 billion in federal grants to Harvard.[1]

More specifically, Plaintiffs collectively challenge the decision to freeze and then terminate the grants on three primary grounds, contending that (1) the funding decisions were made in response to Harvard's refusal to capitulate to Defendants' content- and viewpoint- based demands and its subsequent decision to file a lawsuit, in violation of the First Amendment; (2) the grant terminations did not comply with the procedural requirements of Title VI and are thus invalid; and (3) Defendants acted arbitrarily and capriciously when they froze and subsequently terminated funding to Harvard, as they failed to provide a reasoned explanation for how or why freezing and terminating funding would further the goal of ending antisemitism, to weigh the importance of the grants they sought to terminate, and to consider decades of reliance engendered through their prior practice of funding research at Harvard. Defendants' initial and primary argument in response is that this Court lacks jurisdiction over these claims, all of which belong in the Federal Court of Claims pursuant to the Tucker Act.

Currently before the Court are the parties' cross motions for summary judgment. In particular, Harvard and Defendants both move for summary judgment as to all Harvard's claims.

---

[1] These two related suits are President & Fellows of Harvard College v. United States Department of Health & Human Services, et al., 25-cv-11048 (D. Mass. April 21, 2025) and American Association of University Professors – Harvard Faculty Chapter et al. v. United States Department of Justice, et al., 25-cv-10910 (D. Mass. April 11, 2025). The dockets for the two suits, when cited, are referred to as "Harvard" and "AAUP."

2

**A002**

[Harvard, ECF No. 69; Harvard, ECF No. 185].  Defendants move for summary judgment as to all of the Organizational Plaintiffs' claims, while the Organizational Plaintiffs move for summary judgment only as to their First Amendment, Title VI, and arbitrary and capricious claims, but not their separation of powers, spending clause, and due process claims.  [AAUP, ECF No. 74; AAUP, ECF No. 103].  For the reasons stated herein, Harvard's motion for summary judgment, [Harvard, ECF No. 69], is **GRANTED IN PART** and **DENIED IN PART**; the Organizational Plaintiffs' motion for summary judgment, [AAUP, ECF No. 74], is **GRANTED IN PART** and **DENIED IN PART**; and Defendants' motions for summary judgment, [Harvard, ECF No. 185; AAUP, ECF No. 103], are **GRANTED IN PART** and **DENIED IN PART**.

3

**A003**

I.      BACKGROUND

    A.      Material Facts[2]

            1.      Harvard and its Task Force on Combatting Antisemitism

Harvard University is the oldest institution of higher learning in the United States and one

of the world's leading research universities.  [Harvard SOF ¶ 1].  As of April 14, 2025, as

relevant here, Harvard was a recipient of active grants from the following federal agencies: the

National Endowment of the Arts ("NEA"); the National Institutes of Health ("NIH"); other

subagencies of the Department of Health and Human Services ("HHS"); the National Science

Foundation ("NSF"); the Office of Personnel Management ("OPM"); the Department of Justice

("DOJ"); the Department of Agriculture ("USDA"); the Department of Education ("Department

of Education"); the Department of Energy ("Energy"); the Department of Defense ("DoD"); the

National Aeronautics and Space Administration ("NASA"); and the Department of Housing and

Urban Development ("HUD").  [Id. ¶ 4].[3]  Harvard's research programs—funded in part by these

government grants—serve as training grounds for the next generation of scientific, technological,

medical, and public health leaders, with grants supporting the work of more than a thousand

_____

[2] The Court draws facts from the administrative record, see [Harvard, ECF No. 224], which is
"the focal point for judicial review," Camp v. Pitts, 411 U.S. 138, 142 (1973), as well as from the
parties' Rule 56.1 statements of facts, as far as they are based on the administrative record, and
which include 1) Defendants' responses to Harvard's Statement of Material Facts, [Harvard,
ECF No. 186-1 ("Harvard SOF")]; 2) Harvard's responses to Defendants' Statement of Material
Facts, [Harvard, ECF No. 212 ("Defendants' SOF")]; and 3) Defendants' responses to AAUP's
Statement of Material Facts, [AAUP, ECF No. 105 ("AAUP SOF")].  With the consent of the
parties, [Harvard, ECF No. 229 at 9], the Court includes certain facts from outside the
administrative record in this fact section.  See Bos. Redevelopment Auth. v. Nat'l Park Serv.,
838 F.3d 42, 48 (1st Cir. 2016).  These are considered infra where relevant or as otherwise
explained.
[3] Although not listed in Harvard's statement of facts, the record reflects that Harvard also
received grants from the Department of Commerce that were terminated.  See [ECF No. 74-5].

4

**A004**

graduate students and postdoctoral fellows who collectively pioneer life-altering advancements that benefit the nation.  [Id. ¶¶ 2–3]; see also [id. ¶ 2 ("Harvard's researchers have pioneered life-altering advancements in improving cancer prevention and treatment, understanding neurodegenerative disorders, creating a new class of antibiotics to treat infections, and studying how spaceflight affects blood cell formation in astronauts.")].

Since Hamas, a well-recognized terrorist organization, violently attacked and kidnapped Israeli citizens on October 7, 2023, Harvard, like many other universities, has experienced increased tensions and violence aimed at its Jewish community.  See generally [HHSHarv_0000013–55]; [GSAHarv_00000137–445].  In response, in January 2024, Harvard President Alan Garber formed a Presidential Task Force on Combatting Antisemitism and Anti-Israeli Bias (the "Harvard Task Force") and charged it with "identifying the root causes of and contributing factors to bias-based behaviors on campus" and "recommending approaches to combat bias and to mitigate its impact on campus."  [Harvard SOF ¶ 8].  Harvard concurrently began making policy and other changes aimed at ensuring that its campus is safe and welcoming for Jewish and Israeli students, including: disciplining students and faculty who violate applicable policies; enhancing programs and policies designed to address bias and promote ideological diversity and civil discourse; adopting new accountability procedures and clarified policies, including specifying that protests are not permitted in classrooms, libraries, dormitories, dining halls, Harvard offices, and other places where they would interfere with normal university activities; expressly prohibiting unauthorized encampments, exhibits, and displays on campus; supplementing existing safety and security measures; refining procedures and protections for reporting misconduct; and making several leadership and personnel changes, all of which were publicly announced and widely reported.  [Id. ¶¶ 5–8].

**A005**

2.    The Federal Task Force to Combat Antisemitism

On January 29, 2025, President Trump signed Executive Order 14188, titled "Additional Measures to Combat Anti-Semitism."  [HHSHarv_00000001].  It requires the heads of all executive agencies or departments to submit reports identifying all civil and criminal authorities or actions within their jurisdictions "that might be used to curb or combat anti-Semitism, and containing an inventory and analysis of all pending administrative complaints, as of the date of the report, against or involving institutions of higher education alleging civil-rights violations related to or arising from post-October 7, 2023, campus anti-Semitism."  [AAUP SOF ¶¶ 1–2]. Executive Order 14188 explicitly reaffirmed Executive Order 13899, which President Trump issued during his first term, on December 11, 2019, and which invokes Title VI enforcement as the means for agencies to combat antisemitism on university campuses.  [Id. ¶ 3].[4]

Pursuant to Executive Order 14188, on February 3, 2025, DOJ announced the formation of a multi-agency Task Force to Combat Antisemitism ("Federal Task Force"), which included representatives from the Department of Education, HHS, and other agencies.  [Harvard SOF ¶ 19].  Senior Counsel to the Assistant Attorney General for Civil Rights Leo Terrell was selected to lead the Federal Task Force.  [Harvard SOF ¶ 19]; see also [AAUP SOF ¶ 4]; [ECF No. 77-1].  Terrell had previously announced, on October 20, 2024, just prior to the election of President Trump, that "Harvard will lose much more effective January 2025."  [Harvard SOF ¶ 20].

---

[4] The full texts of Executive Orders 14188 and 13899 are not part of the administrative record, but the Court takes judicial notice of them, as they are public records.  Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993) (permitting judicial notice of "official public records"); Michael Cetta, Inc. v. Admiral Indem. Co., 506 F. Supp. 3d 168, 173 (S.D.N.Y. 2020) (taking judicial notice of executive orders as public documents or matters of public record).

On March 31, 2025, Harvard received a letter from the Federal Task Force (the "March 31 Letter") notifying Harvard of a "review" of more than $8.7 billion in federal funding to Harvard. [Harvard SOF ¶ 21]. The March 31 Letter linked the review of funding to purported antisemitism on Harvard's campus, [id. ¶ 22], stating that it was sent "in light of" the Federal Task Force's "comprehensive review of Federal contracts with certain institutions of higher education that are being investigated for potential infractions and dereliction of duties to curb or combat anti-Semitic harassment," [GSAHarv_00000003]; see also [AAUP SOF ¶ 16]. The same day, HHS, the Department of Education, and the General Services Administration ("GSA") also publicly announced that they were "reviewing" Harvard's federal funding for failing to address antisemitism. [AAUP SOF ¶¶ 14–15].

### 3. The April 3 Letter

The Federal Task Force followed up several days later, on April 3, 2025, with an "official notice" of certain "pre-conditions" that Harvard was required to satisfy to continue receiving federal funding (the "April 3 Letter"). [Harvard SOF ¶ 23]; see also [AAUP SOF ¶ 19]; [HHSHarv_00000062]. Specifically, the April 3 Letter described "several broad, non-exhaustive areas of reform that the government views as necessary for Harvard to implement to remain a responsible recipient of federal taxpayer dollars," including governance reforms "to foster clear lines of authority"; oversight for "biased programs that fuel antisemitism" and to "improve viewpoint diversity"; and "shutter[ing]" diversity, equity, and inclusion ("DEI") programs that "teach" certain things. [Harvard SOF ¶ 24]; see also [AAUP SOF ¶ 20 (restating all nine areas of proposed reform verbatim)]. It expressly invoked Title VI, alleging that Harvard had "failed to protect American students and faculty from antisemitic violence and harassment in addition to other alleged violations of Title VI and Title VII of the Civil Rights Act of 1964," and it called

7

**A007**

for "immediate cooperation in implementing these critical reforms" as a prerequisite for "Harvard University's continued financial relationship with the United States government." [Harvard SOF ¶ 25]; see also [AAUP SOF ¶ 21].  Nowhere in the April 3 Letter did the government 1) acknowledge the reforms and commitments Harvard had already made, including commissioning the Harvard Task Force, which issued its report and recommendations shortly thereafter, 2) identify any specific instances of antisemitism on Harvard's campus, or 3) specify how Harvard failed to respond to any such acts of antisemitism in a way that violated Title VI. [Harvard SOF ¶¶ 26–28]; see also [AAUP SOF ¶ 22].

On the same day, the government sent Harvard's counsel an email asking to schedule a meeting, along with an attached document that contained a "[m]enu" of further demands. [Harvard SOF ¶ 29].  Many of those demands mirrored those contained in the April 3 Letter, such as a "choice" between "install[ing] new leadership in problematic depts" and "receivership."  [Harvard SOF ¶ 30].  The document also stated that the government sought a "[s]enior secured 1st Lien on all Harvard assets which will serve as collateral to pay back government from Harvard in event of non-compliance in the future."  [Harvard SOF ¶ 31].

4.   The April 11 Letter

Eight days later, on April 11, 2025, HHS, GSA, and the Department of Education sent another letter to President Garber (the "April 11 Letter").  [Harvard SOF ¶ 32]; see also [AAUP SOF ¶ 23].  The April 11 Letter, which "incorporate[d] and supersede[d]" the April 3 Letter, asserted that Harvard had "failed to live up to . . . [the] civil rights conditions that justify federal investment" and laid out a list of conditions that Harvard had to satisfy to "maintain Harvard's financial relationship with the federal government."  [Harvard SOF ¶ 33]; see also [AAUP SOF ¶ 24].  Specifically, among other demands, the government's conditions included:

8

**A008**

- "commission[ing] an external party . . . to audit the student body, faculty, staff, and leadership for viewpoint diversity, such that each department, field, or teaching unit must be individually viewpoint diverse";
- "abolish[ing] all criteria, preferences, and practices, whether mandatory or optional, throughout [Harvard's] admissions and hiring practices, that function as ideological litmus tests"; for departments, fields, and teaching units found to "lack viewpoint diversity";
- "hiring a critical mass of new faculty" and "admitting a critical mass of students" to provide the government's preferred balance of viewpoint diversity; "reform[ing] and restructuring" governance;
- "reducing the power held by students and untenured faculty," as well as "the power held by faculty . . . more committed to activism than scholarship"; and
- "shutter[ing]" all DEI programs "through structural and personnel changes."

[Harvard SOF ¶ 34]; see also [AAUP SOF ¶ 25 (restating demands verbatim)].

The final arbiter of compliance with these conditions would be the federal government, which would retain the right to audit Harvard (or review final audit reports by third parties) until at least the end of 2028. [Harvard SOF ¶ 35]. Like the April 3 Letter, the April 11 Letter stated that the government expected "immediate cooperation in implementing these critical reforms" if the University wanted to "maintain Harvard's financial relationship with the federal government." [Harvard SOF ¶ 36]; see also [AAUP SOF ¶ 26]. Once again, nowhere in the April 11 Letter did the government 1) acknowledge the reforms and commitments Harvard had already made, including around the Harvard Task Force, which by then had issued its preliminary recommendations, 2) identify any specific instances of antisemitism on Harvard's campus, or 3) specify how Harvard failed to respond to any such acts of antisemitism in a way that violated Title VI. [Harvard SOF ¶¶ 37–39].

5. Harvard's April 14 Rejection

In short order, on April 14, 2025, Harvard responded with a letter rejecting the terms set forth in the April 3 and April 11 Letters. [HHSHarv_00000104–05]; see also [Harvard SOF ¶ 41]; [AAUP SOF ¶ 27]. Specifically, Harvard's rejection letter explained that it remained

9

**A009**

"committed to fighting antisemitism and other forms of bigotry in its community" and detailed "substantial policy and programmatic measures" undertaken in the "past 15 months" to make Harvard "a very different place today from where it was a year ago." [HHSHarv_00000104]. It objected to the fact that the April 11 Letter "disregard[ed] Harvard's efforts and instead present[ed] demands that, in contravention of the First Amendment, invade university freedoms long recognized by the Supreme Court." [HHSHarv_00000104–05]. Harvard made clear that it would not "accept the government's terms" because it was "not prepared to agree to demands that go beyond the lawful authority of this or any administration," and because "[n]either Harvard nor any other private university can allow itself to be taken over by the federal government." [HHSHarv_00000105].

That same day, President Garber reiterated Harvard's position in a public message to the Harvard community, in which he explained that "[a]lthough some of the demands outlined by the government are aimed at combating antisemitism, the majority represent direct governmental regulation of the 'intellectual conditions' at Harvard." [Harvard SOF ¶ 42]. He reaffirmed that Harvard "do[es] not take lightly [its] moral duty to fight antisemitism," noting the steps Harvard had already taken and would continue to take to fulfill that duty, but also declared that "[n]o government—regardless of which party is in power—should dictate what private universities can teach, whom they can admit and hire, and which areas of study and inquiry they can pursue." [Id.].

6.    The April 14 Freeze Order

Within hours of Harvard's refusal to comply with the government's demands, the Federal Task Force "announc[ed] a freeze on $2.2 billion in multi-year grants and $60M in multi-year contract value to Harvard University" (the "April 14 Freeze Order"). [Harvard SOF ¶ 43]; see

10

**A010**

also [AAUP SOF ¶ 31]. The April 14 Freeze Order cited "Harvard's statement today," [GSAHarv_00000013], as well "[t]he harassment of Jewish students" and "the troubling entitlement mindset that is endemic in our nation's most prestigious universities and colleges— [namely,] that federal investment does not come with the responsibility to uphold civil rights laws." [Harvard SOF ¶ 44]; see also [AAUP SOF ¶ 31]. It did not acknowledge Harvard's communication from earlier that day outlining the measures that Harvard had taken and had committed to take. [Harvard SOF ¶ 45]. It also did not identify any specific instances of antisemitism on Harvard's campus or specify how Harvard's actions violated Title VI. [Id. ¶¶ 46–47]. The government issued the April 14 Freeze Order without holding any hearing or submitting any report to Congress. [Id. ¶ 48].

In the days following the April 14 Freeze Order, the government immediately began sending out stop work orders on certain grants, which required the cessation of all activities related to those projects, seemingly without regard to the consequences for the projects or the affected employees. [Harvard SOF ¶ 67]. For instance, on April 14, 2025, Robert Foster, Deputy General Counsel for HHS, announced to his HHS colleagues that HHS "has taken action to pause payments on NIH grants to Harvard University . . . These payments are to remain paused until further notice. This will impact $2.172B in total grant funding . . . across 658 individual grants." [AAUP SOF ¶ 61]. On April 16, 2025, DHS terminated two grants "totaling over $2.7 million to Harvard University, declaring it unfit to be entrusted with taxpayer dollars." [Harvard SOF ¶ 68]. On April 18, 2025, reports surfaced that the Director of NIH's Office of Policy for Extramural Research Administration had informed other officials at NIH that the agency had "received confirmation from HHS/IOS to hold off on making awards to schools where the funds have been frozen, i.e., Columbia, Brown, Northwestern, Cornell, Weill-Cornell,

11

**A011**

Harvard," and that "HHS/IOS has stated that we should not provide any communications to these schools about whether or why the funds are frozen." [Id. ¶ 53]. On April 18 and April 25, 2025, Jamie French of NSF sent emails to the Vice Provost for Research, John Shaw, stating that NSF had terminated six awards with a face value of $3,287,474. [AAUP SOF ¶ 73].

The April 14 Freeze Order was also immediately followed by an intensifying public pressure campaign, including from President Trump, regarding Harvard's federal funding and other federal benefits. On April 15, 2025, the President posted on social media, "[p]erhaps Harvard should lose its Tax Exempt Status and be Taxed as a Political Entity if it keeps pushing political, ideological, and terrorist inspired/supporting 'Sickness?' Remember, Tax Exempt Status is totally contingent on acting in the PUBLIC INTEREST!" [Harvard SOF ¶ 49]; [AAUP SOF ¶ 89]. The next day, the President further criticized Harvard on social media for "hiring almost all woke, Radical Left, idiots," and declared that Harvard "should no longer receive Federal Funds." [Harvard SOF ¶ 50]; [AAUP SOF ¶ 90]. Within the week, the President again denounced the university as "a Liberal mess," while referencing this lawsuit. [Harvard SOF ¶ 55]; [AAUP SOF ¶ 91]. On May 2, 2025, President Trump posted on social media: "We are going to be taking away Harvard's Tax Exempt Status. It's what they deserve!" [Harvard SOF ¶ 56]; [AAUP SOF ¶ 92].

### 7.    The Harvard Task Force Report

On April 29, 2025, the Harvard Task Force released its final 311-page report that noted "numerous examples of students, staff, and faculty dedicated to renewing and strengthening the Harvard community" but also explicitly acknowledged the "alienating and hostile atmosphere" experienced by many Jewish and Israeli students at Harvard, as well as "instances where administrators and faculty at certain Harvard Schools seemingly fell short in their responsibility

**A012**

to uphold principles of open inquiry, civility, and respectful disagreement within specific courses, programs, and events." [Harvard SOF ¶ 9]. To address these troubling findings, the Harvard Task Force recommended comprehensive changes to "campus culture and student experience" and "governance" at Harvard. [Id. ¶ 10]. The report called for changes in nine specific areas related to "campus culture and student experience": 1) admissions, 2) early student experiences, 3) academics, 4) academic offerings, 5) "co-curricular activities and residential life," 6) "building a pluralistic community," 7) religious life, 8) administrative infrastructure, and 9) "protests, complaints, and discipline." [Id.]. The report further recommended that Harvard:

- Create a dedicated leadership position "specifically tasked with addressing antisemitism and anti-Israel bias";
- Provide students with "substantially more opportunities to learn about antisemitism, Jewish history and culture, the history and politics of Israel, Zionism, and the Israeli-Palestinian conflict," and encourage classes to be cotaught where possible to help students ground their views "in established facts, rigorous scholarship, and adequately considered perspectives";
- Develop a channel for informal grievances and anonymous complaints;
- Ensure "greater consistency in disciplinary procedures" across Harvard's schools; and
- Provide more oversight by tenured faculty over "educational programs and instructor training."

[Id. ¶ 11]. The Harvard Task Force made clear that "the resolutions and the reforms" must come from Harvard. [Id. ¶ 12]. If "external parties . . . seek to compel adoption of some of [the] proposed reforms," the report observed, it "will make it more difficult for Harvard to fix itself." [Id.].

After the report's release, President Garber, on behalf of the university, stated that "Harvard cannot—and will not—abide bigotry" and that it was committed to "address[ing] with determination at every level of the University" the challenges identified in the report and would "act decisively" to do so. [Harvard SOF ¶ 13].

13

**A013**

To that end, since the release of the report, Harvard has taken steps to centralize and strengthen its disciplinary procedures, including by empowering the President to call on a faculty panel of the University Committee on Rights and Responsibilities ("UCRR") to investigate, find facts, and impose discipline where students are alleged to have violated university policies. [Harvard SOF ¶ 14]. Harvard's Academic Council (the president, provost, deans, and other senior leaders) have also "develop[ed] and implement[ed] new recommendations" in order to "nurtur[e] a widespread sense of belonging and promot[e] respectful dialogue; revis[e] and implement[] policies, procedures, and training; and strengthen[] academic and residential life." [Id. ¶ 15]. Harvard's deans have reviewed recommendations concerning admissions, appointments, curriculum, and orientation and training programs, and were directed to submit "action plans" by June 2025 for each of Harvard's schools. [Id. ¶ 16].

8.    The May 5 Freeze Order

On May 5, 2025, approximately one week following the release of the Harvard Task Force report, the Secretary of Education sent Harvard another letter (the "May 5 Freeze Order"), claiming that "[i]n every way, Harvard has failed to abide by its legal obligations" and stating that (1) "Harvard should no longer seek GRANTS from the federal government, since none will be provided," (2) "Harvard will cease to be a publicly funded institution," and (3) "today's letter marks the end of new grants for the University." [Harvard SOF ¶ 57]; see also [AAUP SOF ¶ 32]. The May 5 Freeze Order recited the government's objection to what it characterized as an imbalance of viewpoints in Harvard's governance, reiterated its earlier demands from the April letters, and stated that "[t]he Administration's priorities have not changed." [Harvard SOF ¶ 58];

14

**A014**

see also [AAUP SOF ¶ 33].[5]  Once again, nowhere in the May 5 Freeze Order did the government 1) acknowledge the reforms and commitments Harvard had already made, including commissioning the Harvard Task Force and beginning to act on its recommendations, 2) identify any specific instances of antisemitism on Harvard's campus, or 3) specify how Harvard failed to respond to any such acts of antisemitism in a way that violated Title VI.  [Harvard SOF ¶¶ 59–61].  The government issued the May 5 Freeze Order without holding any hearing or submitting any report to Congress.  [Harvard SOF ¶ 62].

### 9.    The Termination Letters

Even before the May 5 Freeze Order, the Federal Task Force and the White House had initiated an effort to identify both the total universe of grants to Harvard and those which were eligible for termination.  [Harvard SOF ¶¶ 69–70].  Beginning as early as April 30, 2025, GSA, in particular, was tasked with coordinating agency efforts to identify grants to Harvard, which included compiling data points on grants, tracking their gross award value, and providing template termination letters.  [May 19, 2025, Declaration of Josh Gruenbaum[6] ("Gruenbaum Decl.") ¶ 10]; [AAUP SOF ¶ 34]; [NASA-AR03541 (GSA representative explaining he was directed to "work with agencies to collect a few data points" on grants)].  On May 8, 2025, GSA sent Defendant agencies a spreadsheet containing detailed information on 1,056 federal grants to Harvard with a total face value of over $2.8 billion.  [AAUP SOF ¶¶ 36–37].  GSA then identified a set of grants at each agency that GSA "asked [the Defendant agencies] to prepare . . .

---

[5] On May 12, 2025, President Garber sent a letter to the Secretary of Education in response to the May 5 Freeze Order, explaining that Harvard had implemented "meaningful reform and recommendations designed to eliminate antisemitism and other forms of hate from our campus." [Harvard SOF ¶ 63].

[6] Although not Bates-stamped, the Gruenbaum Declaration was provided to this Court as part of the parties' joint administrative record.  [Harvard, ECF No. 224-23 at 52–55].

15

**A015**

for . . . termination awaiting final greenlight from the White House," [AAUP SOF ¶ 38]; [USDA-HARV-AR-00001]; [GSAHarv_00000125–26], and then provided a template termination letter, [Gruenbaum Decl. ¶ 10], which, in at least one instance, was described as "the form the WH wants to see it in," [USDA-HARV-AR-00084].  Then at least one such proposed termination letter was to be sent to White House officials for "review" by a "WH deadline of 5pm" on May 8, 2025, [NASA-AR03679, NASA-AR03682], before being sent to Harvard on May 9, 2025, [AAUP SOF ¶ 71].

Harvard ultimately received termination letters in early and mid-May from NIH, USDA, Energy, DoD, NSF, HUD, the Department of Education, the Department of Commerce, and the Centers for Disease Control and Prevention (collectively, the "Termination Letters").[7]  [Harvard SOF ¶ 73]; [AAUP SOF ¶¶ 42, 49, 57, 62, 68, 71, 75, 81].  The terminated grants related to all manner of medical, scientific, technological, and other projects—including projects on breast cancer detection and prevention, biological threats, overcoming antibiotic resistance, improving neurologic outcomes for pediatric cancer survivors, developing drugs to treat long-term radiation exposure and for chemotherapy, studying the effects of particulate matter exposure on military veterans, and creating "technologies that provide energy-relevant minerals for economic and national security."  [Harvard SOF ¶ 74].

Almost all of the Termination Letters cited a purported change in program goals or agency priorities as justification for the terminations and invoked 2 C.F.R. § 200.340(a)(4),

---

[7] The majority of these Termination Letters appear in the administrative record. [DoDHARV_00000039–40]; [EDHarvAR_0000011–12]; [ENERGY AR3932–33, 40–41 (duplicate)]; [HHSHarv_00000473–74]; [HUDHarvAR_0000063–64]; [NSF_Harvard000039–40]; [USDA-HARV-AR00008–09].  Harvard has submitted two further Termination Letters that do not appear in the record.  [Harvard, ECF Nos. 74-5, 74-6].

16

**A016**

which, as discussed further infra, provides that a federal agency may terminate an award "pursuant to the terms and conditions of the . . . award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." [Harvard SOF ¶ 77]; see also [AAUP SOF ¶¶ 42, 49, 57, 62, 68]. But see [AAUP SOF ¶¶ 78, 81, 85]. That said, no termination letter presented any program-specific rationale for the terminations or reflected that any program-specific consideration had occurred. [Harvard SOF ¶ 76]; see also [AAUP SOF ¶¶ 46, 53, 59, 65, 69, 72]. In support of the claim that Harvard's grant awards "no longer effectuate agency priorities," all but one of the Termination Letters cited to "recent events at Harvard University involving antisemitic action," "Harvard's ongoing inaction in the face of repeated and severe harassment and targeting of Jewish students," and Harvard's "refus[al] to take appropriate action . . . or implement necessary reforms." [Harvard SOF ¶ 78]; see also [AAUP SOF ¶¶ 43–44, 50–51, 57, 63, 69, 72, 74, 76, 83–84]. The Termination Letter that did not cite such concerns contained no explanation as to which agency priorities purportedly had changed or why Harvard's grant awards no longer aligned with agency priorities. [Harvard SOF ¶ 79]; see [AAUP SOF ¶¶ 71–72, 74, 79, 87]. Several of the Termination Letters specifically noted that no modification of the projects "could align the projects with agency priorities" because Harvard had failed to take "appropriate" action. [ENERGY AR3932]; [USDA-HARV-AR00008]; see also [HHSHarv_00000474 ("[N]o corrective action is possible here. That is because . . . the University has refused to take appropriate action.")].

None of the Termination Letters identified any specific instance of antisemitism on Harvard's campus, specified how Harvard failed to respond to any such acts of antisemitism in a way that violated Title VI, or reflected any effort to follow the Title VI procedural requirements that govern the termination of federal funding. [Harvard SOF ¶ 81]

17

**A017**

On May 13, 2025, the Federal Task Force (which, again, is distinct from the Harvard Task Force) issued a press release stating that "Harvard University has repeatedly failed to confront the pervasive race discrimination and anti-Semitic harassment plaguing its campus" and that "[t]he Task Force fully supports the Trump Administration's multi-agency move to cut funding to Harvard, demonstrating the entire Administration's commitment to eradicating discrimination on Harvard's campus." [Harvard SOF ¶ 64]. The government did not engage with or acknowledge the many reforms and commitments Harvard had already made and committed to make, nor did it claim to be adhering to Title VI's detailed procedural requirements. [Harvard SOF ¶ 64]; see also [AAUP SOF ¶ 94].

### 10. Examples of Terminated Projects

As a result of the Termination Letters, work has been ordered to stop on a vast number of research projects across fields that are critical both nationally and worldwide. There is no obvious link between the affected projects and antisemitism. By way of example (although by no means an exhaustive list), Defendants have ordered immunologists overseeing a multi-school tuberculosis consortium to immediately stop research, [Harvard SOF ¶ 88]; a researcher at the Wyss Institute to halt his development of an advanced chip designed to measure NASA astronauts' radiation exposure during the upcoming Artemis II mission to the moon, [id. ¶ 89]; and another Wyss Institute scientist, a recipient of the nation's highest honor for technological achievement, to cease his research into Lou Gehrig's disease, [id. ¶ 90]. Officials at the Department of Veterans Affairs have begun the process of cutting funding for research into,

18

**A018**

among other life-saving measures, "a predictive model to help V.A. emergency room physicians decide whether suicidal veterans should be hospitalized." [Id. ¶ 91].[8]

Harvard has submitted the details of one such grant termination to illustrate the chaotic impact of Defendants' rush to terminate funding without first considering its purpose, which specifically involves the Assured Microbial Preservation in Harsh or Remote Areas ("AMPHORA") Program. AMPHORA is managed by the Defense Advanced Research Projects Agency ("DARPA") and is aimed at increasing awareness of emerging biological threats. [Harvard SOF ¶¶ 84, 86]. A day after sending a termination letter to Harvard on May 12, 2025, DoD leadership informed officials at the agency that the Secretary of Defense had directed the cancellation of the grants and asked them to issue notices and stop work orders to individual grant recipients. [Id. ¶ 85]. The director of contracting at DARPA immediately followed up, imploring the agency to save the AMPHORA grant. [Id. ¶¶ 84, 86]. Specifically, he explained that:

> Harvard is currently the top performing team on the AMPHORA program. Inadequate knowledge of the biological threat landscape poses grave and immediate harm to national security. Development of critical technologies that enables bio surveillance and biocollection in austere, field forward locations bolsters national security and warfighter safety and lethality by enabling medical countermeasure development to new and emerging threats and provides biological threat intelligence to the deployed warfighter. This technology is significantly

---

[8] The Organizational Plaintiffs' SOF contains many other facts regarding research projects that Defendants do not dispute were terminated, and the Court refers the reader to these as well. They include, among others, grants related to: the health of young people, [AAUP SOF ¶ 123]; treating tuberculosis, [id. ¶¶ 124, 168]; reducing health disparities, [id. ¶ 134]; the effects of antiretroviral treatment for mothers with HIV and their children, [id. ¶ 140]; how different chromosomal backgrounds result in different risk for disease, [id. ¶ 146]; the health effects of environmental exposures on brain health, [id. ¶ 154]; how diets and lifestyle relate to cancer risk, [id. ¶ 162]; the effects of microgravity and radiation on astronauts, [id. ¶ 175]; understanding the neural circuits underlying motor skills, [id. ¶ 184]; and the impact of climate change-related heat stress on people worldwide, [id. ¶ 192].

19

**A019**

> outpacing the state-of-the art and provides a novel leap-ahead capability to the force. Harvard's effort is at a pivotal juncture in Phase 1 as they are just starting the microfluidic experiments that will give first indications of whether the program goal is achievable. They are also a critical integrator of multiple technologies that enable this effort and could not be readily reproduced.

[Id. ¶ 86]. Although nothing in the administrative record indicates that the Secretary of Defense acted on the DARPA director's request, [id. ¶ 87], and despite the termination notice from the government, DARPA personnel continued to engage with Harvard researchers, including requesting samples and a research update, [Harvard, ECF No. 221 ("Suppl. Shaw Decl.") ¶ 4]. Since it was continuing to work on the project at the direction of DARPA, Harvard requested payment, submitting a "Request for Advance or Reimbursement" for approximately $373,000 to DARPA on July 2, 2025. [Id. ¶ 5]. This reflected work performed on the AMPHORA project from May 1 through May 31, 2025, some of which was performed after the grant was purportedly terminated on May 12, 2025. [Id.]. On July 2, 2025, Harvard sent an email to the Director of DARPA's Contracts Management Office, asking DARPA to confirm whether the AMPHORA grant was still active, but received no response. [Id. ¶ 6]. Harvard did, however, receive full payment from DARPA for the July 2 invoice on July 8, 2025. [Id. ¶ 7].

> 11.    Grant Terminations and Threats Thereof Continue

After the flurry of termination letters in early- and mid-May 2025, the government's broadscale reductions in federal funding to Harvard continued. On May 20, 2025, HHS announced it was cutting an additional $60 million in multiyear grants to Harvard. [Harvard SOF ¶ 92]. On May 27, 2025, GSA targeted approximately $100 million in contracts, instructing agencies to "consider [their] contracts with Harvard University and determine whether Harvard and its services efficiently promote the priorities of the agency." [Id. ¶ 94]. Since Defendants first began sending the Freeze Orders and Termination Letters, Harvard has received notices of

20

**A020**

termination for over 950 already-awarded federal research projects, [id. ¶ 82], including some notices that were received after the filing of the Amended Complaint, [id. ¶ 83].

Further, the government has continued to pressure Harvard in other ways. As examples, on May 26, 2025, the President stated that he was considering taking away "Three Billion Dollars" from "a very antisemitic Harvard," which he would then give to "TRADE SCHOOLS." [Harvard SOF ¶ 93]. On May 28, 2025, Defendant McMahon described the government's funding conversations with Harvard to date, stating:

> When we looked at different aspects of what Harvard was doing relative to anti-Semitism on its campuses they were not enforcing Title VI the way it should be. And we had conversations with President Garber and I expected that we would have more, but Harvard's answer was a lawsuit so that's where we find ourselves . . . I think the President is looking at this as, OK, how, how can we really make our point, and what are the things that Harvard and other universities are doing that we, that we have to call attention to?

[AAUP SOF ¶ 95]. That same day, during an interview in the Oval Office, President Trump said that Harvard is "hurting [itself]" by "fighting," and noted that "Columbia has been, really, and they were very, very bad . . . . But they're working with us on finding a solution." [Harvard SOF ¶ 95]. He further stated that Harvard "wants to fight. They want to show how smart they are, and they're getting their ass kicked"; "every time [Harvard] fight[s], they lose another $250 million"; and "[a]ll they're doing is getting in deeper and deeper and deeper." [Id.].

### B. Procedural History

The Organizational Plaintiffs sued first, filing a complaint and a motion for a temporary restraining order on April 11, 2025, [AAUP, ECF Nos. 1, 4], although they withdrew the motion for a temporary restraining order on April 15, 2025, [AAUP, ECF Nos. 27, 29]. Harvard filed its action on April 21, 2025. [Harvard, ECF No. 1]. The Organizational Plaintiffs have since filed two amended complaints, one on May 5, 2025, [AAUP, ECF No. 50], and the other on May 20,

21

**A021**

2025, [AAUP, ECF No. 64]. Harvard filed an amended complaint on May 13, 2025, [Harvard, ECF No. 59].

The Court held a status conference on April 28, 2025, at which time the parties elected to proceed directly to summary judgment. [Harvard, ECF No. 47]. Pursuant to an agreed upon expedited briefing schedule, Plaintiffs filed their motions for summary judgment on June 2, 2025, [Harvard, ECF No. 69; AAUP, ECF No. 74]; Defendants opposed and filed cross motions for summary judgment on June 16, 2025, [Harvard, ECF No. 185; AAUP, ECF No. 103]; Plaintiffs replied on June 30, 2025, [Harvard, ECF No. 211; AAUP, ECF No. 110]; and Defendants replied on July 14, 2025. [Harvard, ECF No. 223; AAUP, ECF No. 130].

## II.    LEGAL STANDARD

Summary judgment is normally appropriate if the movant can show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "However, in cases involving review of agency action under the [Administrative Procedure Act ("APA")], the traditional Rule 56 standard does not apply due to the limited role of a court in reviewing the administrative record." Bennett v. Murphy, 166 F. Supp. 3d 128, 139 (D. Mass. 2016) (citing Int'l Jr. Coll. of Bus. and Tech., Inc. v. Duncan, 802 F.3d 99, 106 (1st Cir. 2015)). In particular, for summary judgment motions under the APA, the Court's review is ordinarily "limited to the administrative record," Lovgren v. Locke, 701 F.3d 5, 20 (1st Cir. 2012), and "[t]he 'entire case' on review is a question of law," Am. Bioscience, Inc. v. Thompson, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (citation omitted); id. ("[W]hen a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal."); see also Doe v. U.S. Citizenship & Immigr. Servs., 239 F. Supp. 3d 297, 305 (D.D.C. 2017) ("Summary judgment is [] the mechanism for deciding whether as a matter of law the agency

22

**A022**

action is supported by the administrative record and is otherwise consistent with the APA standard of review." (citation omitted)).

Judicial review of an APA claim "is narrow" because "the APA standard affords great deference to agency decisionmaking and because the [agency's] action is presumed valid." Associated Fisheries of Me., Inc. v. Daley, 127 F.3d 104, 109 (1st Cir. 1997). "Under this deferential standard of review, a court may set aside an administrative action if that action is "arbitrary, capricious, an abuse of discretion, or otherwise contrary to law." 5 U.S.C. § 706(2)(A). When reviewing such an action, the Court "may not substitute [its] judgment for that of the agency, even if [it] disagree[s] with [the agency's] conclusions." Sig Sauer, Inc. v. Brandon, 826 F.3d 598, 601 (1st Cir. 2016) (quoting Craker v. DEA, 714 F.3d 17, 26 (1st Cir. 2013)).

## III.    DISTRICT COURT JURISDICTION

As a threshold matter, Defendants assert that this Court lacks subject matter jurisdiction over Plaintiffs' claims because the waiver of sovereign immunity in the APA, 5 U.S.C. § 702, does not extend to contract actions, which are within the exclusive jurisdiction of the United States Court of Federal Claims under the Tucker Act, 28 U.S.C. § 1491. [Harvard, ECF No. 47 at 6–8]; [AAUP, ECF No. 104 at 22–28]. Plaintiffs, who contend they have brought a proper challenge under the APA, disagree that the Tucker Act divests this Court of jurisdiction. [Harvard, ECF No. 19 at 24–29]; [Harvard, ECF No. 53 at 7–10]; [AAUP, ECF No. 75 at 28–31]; [AAUP, ECF No. 110 at 13–16].

The APA "confers a general cause of action upon persons 'adversely affected or aggrieved by agency action within the meaning of a relevant statute.'" Block v. Cmty. Nutrition Inst., 467 U.S. 340, 345 (1984) (quoting 5 U.S.C. § 702). The APA's waiver of sovereign

23

**A023**

immunity, however, "does not apply 'if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.'" Dep't of Educ. v. California, 145 S. Ct. 966, 968 (2025) (per curiam) (quoting 5 U.S.C. § 702). As relevant here, the Tucker Act vests jurisdiction in the Court of Federal Claims over "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). Although "[t]he 'jurisdictional boundary' between the Tucker Act and [the APA] is well-traversed by litigants seeking relief against the federal government . . . the boundary's precise contours remain elusive," Massachusetts v. Nat'l Insts. of Health, 770 F. Supp. 3d 277, 292 (D. Mass. 2025) (quoting Suburban Mortg. Assocs., Inc. v. U.S. Dep't of Hous. & Urb. Dev., 480 F.3d 1116, 1117 (Fed. Cir. 2007)), even following recent rulings by the Supreme Court on its emergency docket.

Defendants maintain that the instant cases must be sent to the Court of Federal Claims because it "is, after all, about the money." [Harvard, ECF No. 223 at 14]; see also [Harvard, ECF No. 186 at 26 ("This case is about money.")]. As Defendants acknowledge, however, whether a case is, in some sense, "about the money" is not necessarily dispositive of the issue of jurisdiction. See, e.g., [Harvard, ECF No. 186 at 27 (explaining the "essential facts" involve whether "Harvard is seeking to enforce contractual rights and is seeking contractual remedies")]. Longstanding precedent indicates that monetary disputes against the government may, in some circumstances, play out in Article III courts. Bowen v. Massachusetts, 487 U.S. 879, 900–01 (1988) ("The fact that the mandate is one for the payment of money must not be confused with the question whether such payment, in these circumstances, is a payment of money as damages or as specific relief."). The parties agree that the determinative jurisdictional question is

24

**A024**

"[w]hether [the Plaintiffs'] claim is 'at its essence' contractual," which "'depends both on the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought (or appropriate).'" Crowley Gov't Servs., Inc. v. Gen. Servs. Admin., 38 F.4th 1099, 1106 (D.C. Cir. 2022) (quoting Megapulse, Inc. v. Lewis, 672 F.2d 959, 968 (D.C. Cir. 1982)). In other words, for present purposes and simply put, contract claims against the federal government must be brought in the Court of Federal Claims, but claims that do not sound in contract or seek contract-based relief stay in federal district court.

With regards to the instant case, Defendants contend that "[h]ere, both factors support a finding that the Court lacks jurisdiction over what are essentially claims that lie in contract because: 1) the source of Harvard's right to funds previously awarded are grant and contract agreements, and 2) the relief sought in this case amounts to the remaining, undisbursed value of those agreements." [Harvard, ECF No. 186 at 30]; see also [AAUP, ECF No. 104 at 24, 27]. Plaintiffs disagree and maintain that their action "arises from the [g]overnment's violation of rights protected by the Constitution and federal statutes, not the terms of any express or implied contract with the United States," [Harvard, ECF No. 211 at 12], and seeks "'neither the prototypical contractual remedy of damages' nor the 'classic contractual remedy of specific performance,'" [id. at 15 (quoting Crowley, 38 F.4th at 1110)]; see also [AAUP, ECF No. 110 at 13–15]. In response, Defendants accuse Plaintiffs of "artful pleading," ultimately contending that "the underlying rights [Harvard] seeks to enforce are based in contract and the relief sought would have the effect of compelling the government to pay money." [Harvard, ECF No. 223 at 7]; see also [AAUP, ECF No. 104 at 27 (asserting that Plaintiffs are "attempt[ing] to disguise their claims as ones for forward-looking equitable relief from conduct in violation of" constitutional and statutory rights (citation omitted))].

**A025**

After the summary-judgment motions in this case were fully briefed, the Supreme Court issued a per curiam stay order in National Institutes of Health v. American Public Health Association ("APHA"), No. 25A103, 2025 WL 2415669 (Aug. 21, 2025) (per curiam), which concerned the termination of approximately $800 million in NIH grants. The issues were whether the district court likely had jurisdiction to vacate NIH guidance documents and/or to find the individual grant terminations to be arbitrary and capricious under 5 U.S.C. § 706(2)(A). Ultimately, a very divided Court bifurcated the issue. Namely, the Court stayed those portions of the district court's orders that vacated the grant terminations, but otherwise denied the government's stay application, leaving intact the district court's vacatur of the agency guidance documents. APHA, 2025 WL 2415669, at *1. In a (controlling) concurrence, Justice Barrett explained that, although the district court had jurisdiction to vacate the NIH guidance documents that set out agency funding priorities, it "likely lacked jurisdiction to hear challenges to the grant terminations, which belong in the Court of Federal Claims." Id. at *2 (Barrett, J. concurring in the partial grant of the application for stay); see also Marks v. United States, 430 U.S. 188, 193 (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.'" (quoting Gregg v. Georgia, 428 U.S. 153, 169 n.15 (1976))). She reasoned that "[b]oth logic and law . . . support channeling challenges to the grant terminations and guidance to different forums." APHA, 2025 WL 2415669, at *2. As to logic, Justice Barrett explained that "[v]acating the guidance does not reinstate the terminated grants," noting that "[i]f one simply flowed from the other, the District Court would have needed only to vacate the guidance itself," rather than separately vacating the grant terminations as it did. Id. As to law, Justice Barrett wrote that "[e]ven if the guidance and

26

**A026**

grant terminations are linked, vacating the guidance does not necessarily void decisions made under it" such that "the claims are legally distinct." Id.

Plaintiffs here bring substantially similar arbitrary and capricious claims pursuant to 5 U.S.C. § 706(2)(A), through which they challenge both the Freeze Orders and Termination Letters, and ask the Court to vacate and set aside both the guidance within those documents and, separately, the resulting grant terminations. [Harvard, ECF No. 59 at Prayer for Relief]; see also [AAUP, ECF No. 64 at Prayer for Relief]. In light of the Supreme Court's per curiam decision in APHA, the Court holds that it has jurisdiction over Plaintiffs' arbitrary and capricious claims that challenge the Freeze Orders, because it views those orders, as discussed further infra, as agency guidance documents that set the federal government's policy moving forward as to grant funding at Harvard. It also holds, however, that, given the current guidance from the Supreme Court, it lacks jurisdiction over the arbitrary and capricious claims as they pertain to the Termination Letters, and that any such claim based on the grant terminations must be brought in the Court of Federal Claims.

That said, while this Court is endeavoring to follow the Supreme Court's reasoning in APHA,[9] the per curiam opinion in APHA, like the Supreme Court's prior decision in California,

---

[9] The Court is mindful of Justice Gorsuch's comments in his opinion in APHA and fully agrees that this Court is not free to "defy" Supreme Court decisions and is, in fact, "duty-bound to respect 'the hierarchy of the federal court system.'" APHA, 2025 WL 2415669, at *3 (Gorsuch, J., concurring in part and dissenting in part) (citation omitted). Consistent with these obligations, this Court (and likely all district courts) endeavors to follow the Supreme Court's rulings, "no matter how misguided [it] may think [them] to be." Hutto v. Davis, 454 U.S. 370, 375 (1982) (per curiam). That said, the Supreme Court's recent emergency docket rulings regarding grant terminations have not been models of clarity, and have left many issues unresolved. California was a four-paragraph per curiam decision issued in the context of a stay application. It cited Bowen as good law, stated that the Tucker Act gave the Court of Federal Claims jurisdiction over contract claims against the federal government, and then stated that the district court likely

**A027**

involved only arbitrary and capricious claims brought under § 706(2)(A).  Plaintiffs here have also brought and seek summary judgment on APA claims based on the First Amendment and violations of Title VI pursuant to § 706(2)(B) and (C), which seem to this Court materially different from the more contract-based claims asserted in California and APHA.

First, the rights at issue in First Amendment and Title VI claims do not ordinarily fall within the ambit of the Tucker Act, which is very specifically contract-focused.  As to the First Amendment, "[t]he Tucker Act confers subject matter jurisdiction to [the] Court [of Federal Claims] over money-mandating constitutional claims . . . [and t]he Federal Circuit has expressly held the Court of Federal Claims lacks jurisdiction over claims arising under the First Amendment . . . as they are not money-mandating."  Stephens v. United States, 165 Fed. Cl. 341, 348 (2023).  Nor does the Tucker Act's waiver of sovereign immunity strike the Court as relevant to Title VI, which itself expressly authorizes "judicial review" of agency action

---

lacked jurisdiction "to order the payment of money under the APA," without purporting to explain how the case was distinguishable from Bowen or other related, longstanding precedents. California, 145 S. Ct. at 968.  Then, in APHA, four justices thought grant-termination cases belong, in full, in the Court of Federal Claims, and four justices thought they belong, in full, in federal district court, and the decision was controlled by the vote of a single justice.  2025 WL 2415669, at *1–16.  The outcome, which no party had requested, was, thus, inconsistent with the views of eight justices, id. at *16 (Jackson, J., concurring in part and dissenting in part), and, again, provided little explanation as to how Bowen, which the controlling concurrence again cited as good law, id. at *2, applied or was distinguishable.  This Court understands, of course, that the Supreme Court, like the district courts, is trying to resolve these issues quickly, often on an emergency basis, and that the issues are complex and evolving.  See Trump v. CASA, Inc., 145 S. Ct. 2540, 2567 (2025) (Kavanaugh, J., concurring) ("In justiciable cases, this Court, not the district courts or courts of appeals, will often still be the ultimate decisionmaker as to the interim legal status of major new federal statutes and executive actions.").  Given this, however, the Court respectfully submits that it is unhelpful and unnecessary to criticize district courts for "defy[ing]" the Supreme Court when they are working to find the right answer in a rapidly evolving doctrinal landscape, where they must grapple with both existing precedent and interim guidance from the Supreme Court that appears to set that precedent aside without much explanation or consensus.

28

**A028**

"terminating or refusing to grant or to continue financial assistance," including through the APA, in an Article III court. 42 U.S.C. § 2000d-2; see also Colwell v. Dep't of Health & Hum. Servs., 558 F.3d 1112, 1128 (9th Cir. 2009) ("Judicial review of any [Title VI] funding termination is available in an Article III court."); Adams v. Bell, 711 F.2d 161, 189 (D.C. Cir. 1983) (Wright, J., dissenting) (noting that "the traditional mode" for review under 42 U.S.C. § 2000d-2 is "the APA").

Second, Plaintiffs seek relief beyond enforcement of an "'obligation to pay money' pursuant to . . . grants." APHA, 2025 WL 2415669, at *1 (citation omitted). They seek prospective relief that, among other things, mandates that Defendants comply with the First Amendment and Title VI's procedural requirements. Because of this, the Court of Federal Claims, if confronted with Plaintiffs' First Amendment and Title VI claims, could not "fully adjudicate the claims over which it [would have] jurisdiction," id. at *2 n.1 (Barrett, J., concurring), as it "does not have the general equitable powers" to grant prospective injunctive relief, Me. Cmty. Health Options v. United States, 590 U.S. 296, 327 (2020).

Third, the logical and legal considerations underlying the APHA decision, as explained in Justice Barrett's concurrence, do not graft cleanly onto Plaintiffs' First Amendment and Title VI claims, which likely makes splitting the claims between two forums procedurally unworkable. Bifurcating the APA claims as to the guidance and the terminations was possible in APHA because vacating the guidance as arbitrary did not necessarily render the terminations arbitrary. APHA, 2025 WL 2415669, at *2. In other words, the guidance and the terminations did not need to rise or fall together. This is what required the district court to enter two separate orders, one vacating the guidance and the other vacating the terminations, and what then allowed the Supreme Court to put the two issues on separate tracks going forward. In contrast, if this Court

29

**A029**

were to grant summary judgment to Plaintiffs on their First Amendment and Title VI claims, it would not have to issue separate orders. Rather, assuming a First Amendment violation, it could issue a single order invalidating Defendants' course of unlawful conduct, which would include both the Freeze Orders and the Termination Letters. Similarly, as to Title VI, it could issue an order addressing the Termination Letters but stand silent on the Freeze Orders, as the Title VI violations would be the termination decisions rather than the freezes. See Bowen, 487 U.S. at 911 (reviewing court need not "split" case into "two parts" where it "had the authority to hold unlawful and set aside agency action that it found to be not in accordance with law" (citation omitted)); APHA, 2025 WL 2415669, at *2 (citing Bowen as distinct from APHA and characterizing Bowen as involving "one judgment vacating HHS decision").[10] In other words, as to the First Amendment, the Termination Letters are not "legally distinct" as they constitute part of the pattern of retaliatory conduct and, as to the Title VI claim, the Termination Letters form the sole basis of the claim. Cf. APHA, 2025 WL 2415669, at *2.

It may well be that these differences would not distinguish these claims in the eyes of the Supreme Court, although that remains unclear under existing caselaw. But this is not Calvinball and there are rules. Under those rules, which are set by existing Supreme Court precedent, this Court cannot conclude that core First Amendment claims or pure statutory violations fall within the exclusive jurisdiction of the Court of Federal Claims. A contract claim is, by its nature about money and, for present purposes, whether the government is obligated to pay money under a

---

[10] California is also not dispositive on these issues as it did not involve a Title VI claim and because, in the underlying preliminary-injunction decision, the district court "did not reach the likelihood of success as to any constitutional claims," including claims brought under the First Amendment. Thakur v. Trump, No. 25-cv-04737, 2025 WL 1734471, at *21 (N.D. Cal. June 23, 2025).

**A030**

contract. The First Amendment claims here are about speech and whether the federal government is improperly infringing on the free speech rights of an academic institution and its employees. The resolution of these claims might result in money changing hands, but what is fundamentally at issue is a bedrock constitutional principle rather than the interpretation of contract terms. Similarly, resolution of the Title VI claims here will merely determine whether statutory procedural requirements were satisfied. Regardless of how these claims are resolved, the government will not necessarily be obligated to disburse any additional funds nor will any contract terms need to be considered as part of the analysis.

Given the nature of the First Amendment claims (purely constitutional) and the Title VI claims (statutory), these claims do not belong in the Court of Federal Claims, which in any event, cannot fully adjudicate either set of claims. Under these circumstances, the Megapulse factors tip to Plaintiffs. This Court therefore holds that it has jurisdiction over Plaintiffs' First Amendment and Title VI challenges as to both the Freeze Orders and Termination Letters, as well as over Plaintiffs' arbitrary and capricious challenges to the Freeze Orders (but not the Termination Letters).[11]

---

[11] Defendants move for summary judgment as to the Organizational Plaintiffs' separation of powers claims (Counts V and VI) and due process claims (Counts VII and VIII), each pair of which is fashioned as both an APA claim and an ultra vires claim. For similar reasons as those articulated herein, and given the Defendants' limited focus on these causes of action in their summary judgment briefing, see [AAUP, ECF No. 104 at 22–28, 47–52], the Court, on this record, is hesitant to find that the Court of Federal Claims has jurisdiction over these APA claims. More specifically, the Organizational Plaintiffs request the same relief for these claims as for their APA claims for violations of the First Amendment and Title VI; the rights at issue are constitutional and do not require the Court to consider to the terms of the grants; both claims are brought pursuant to 5 U.S.C. § 706(2)(B); and at least the separation of powers claim appears to be premised solely on the Freeze Orders, not the grant terminations, [AAUP, Am. Compl. ¶¶ 338 ("None of the funds received by Harvard University have a congressionally authorized condition requiring them to comply with any of the demands in the April 3, April 11, or May 5 Letters or

31

**A031**

## IV.      STANDING

The Constitution gives the judiciary power to hear "Cases" and "Controversies."  U.S. Const. art. III, § 2, cl. 1.  The Supreme Court has interpreted this language to mean that courts may decide only "cases and controversies of the sort traditionally amenable to, and resolved by, the judicial process."  Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 102 (1998).  A plaintiff's standing to sue is "part of the common understanding of what it takes to make a justiciable case."  Id.  Therefore, "the absence of standing sounds the death knell for a case." Microsystems Software, Inc. v. Scandinavia Online AB, 226 F.3d 35, 39 (1st Cir. 2000). The standing determination is "claim-specific," meaning that an individual plaintiff "must have standing to bring each and every claim that [he or] she asserts."  Katz v. Pershing, LLC, 672 F.3d 64, 71 (1st Cir. 2012).

Article III standing requires that three conditions be satisfied.  "First and foremost, there must be alleged (and ultimately proved) an 'injury in fact.'"  Steel Co., 523 U.S. at 103 (quoting Whitmore v. Arkansas, 495 U.S. 149, 155 (1990)).  This injury "must be concrete in both a qualitative and temporal sense," "distinct and palpable" as opposed to "abstract," and "actual or imminent" as opposed to "conjectural or hypothetical."  Whitmore, 495 U.S. at 155 (citation modified).  Second, standing requires causation, defined as a "fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant."  Steel Co., 523

---

that subject them to review in the manner Defendants have undertaken as alleged herein.")]. This Court likewise retains jurisdiction over the ultra vires versions of these claims, pursuant to its "equitable power[]" to "enjoin unconstitutional actions by state and federal officers." Armstrong v. Exceptional Child Ctr., Inc., 575 U.S. 320, 327–28 (2015).  That said, this Court recognizes that if it is incorrect in its assessment that it can exercise jurisdiction over APA claims premised on Title VI and the First Amendment, the Organizational Plaintiffs' separation of powers and due process claims may likewise need to be adjudicated, at least in part, in the Court of Federal Claims.

32

**A032**

U.S. at 103.  Finally, standing requires "redressability—a likelihood that the requested relief will redress the alleged injury."  Id.

Defendants contend that the Organizational Plaintiffs "lack standing as they have not shown sufficient harm to themselves or their members resulting from the agencies' actions," as they "are not parties to the grants issued to Harvard, lack any protected interest, and fail to establish any legally cognizable harm."  [AAUP, ECF No. 104 at 13].[12]  The Organizational Plaintiffs counter that they "have standing based on both injuries to their members—whose research funding has been cut with disastrous impacts and whose speech and academic freedom are chilled—and injuries [the Organizational] Plaintiffs have incurred directly."  [AAUP, ECF No. 75 at 21].

The Court finds that the Organizational Plaintiffs have Article III standing to assert the claims in their Amended Complaint against Defendants.  "[A]n association may have standing solely as the representative of its members even in the absence of injury to itself, in certain circumstances."  Camel Hair & Cashmere Inst. of Am., Inc. v. Associated Dry Goods Corp., 799 F.2d 6, 10 (1st Cir. 1986) (citing Warth v. Seldin, 422 U.S. 490, 511 (1975)).  Specifically, "an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  Hunt v. Wash. State Apple Advert.

---

[12] Defendants also argue that the Organizational Plaintiffs lack standing to "enforce payments" on "agreements that do not belong to them" but instead belong to non-party Harvard.  [AAUP, ECF No. 104 at 20–22].  For the reasons discussed in determining that the Tucker Act does not foreclose jurisdiction, the Organizational Plaintiffs' suit is largely not one to enforce payments under a contract; rather, it is one for injunctive relief to remedy constitutional and statutory violations.

33

**A033**

Comm'n, 432 U.S. 333, 343 (1977). The first two Hunt prongs are constitutional, and the third is prudential. United Food & Commercial Workers Union Local 751 v. Brown Grp., Inc., 517 U.S. 544, 555–57 (1996). Only one member of an organization need have individual standing for that organization to satisfy the first Hunt factor. See Playboy Enters., Inc. v. Pub. Serv. Comm'n of P.R., 906 F.2d 25, 34 (1st Cir. 1990) ("[T]he Supreme Court has never required that every member of an association have standing before it can sue on behalf of its members. 'The association must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit.'" (emphasis omitted) (quoting Warth, 422 U.S. at 511)).

As to the first Hunt prong, the Organizational Plaintiffs point to three harms that its members have suffered that they contend are sufficient for Article III standing. [AAUP, ECF No. 75 at 22–23]. First, some of the Organizational Plaintiffs' members "have been forced to cease research activities and have not been able to resume them, causing them 'continuing direct injury' sufficient to support a request for injunctive relief." [Id. at 22 (quoting Ocasio v. City of Lawrence, 788 F. Supp. 99, 100 (D. Mass. 1992))]. Second, "Defendants terminated funding supporting many of [the Organizational] Plaintiffs' other members, who expect to immediately experience these same harms once they exhaust their limited, short-term funds." [Id. at 23]. Third, "Defendants have chilled some of the [Organizational] Plaintiffs' members' protected speech and academic freedom," as the Organizational "Plaintiffs' members have begun to avoid speech and subject matter[s] that might draw the wrath of the Trump administration directly or cause them to become the University's next target in its concession to Defendants' demands." [Id. at 24].

34

**A034**

Defendants do not appear to contest that the first two harms the Organizational Plaintiffs have identified constitute injury in fact; rather, they assert that the Organizational Plaintiffs' members lack standing as "redressability and causation are lacking," where "[the Organizational] Plaintiffs' members [have] alleged personal harms that are too attenuated to support jurisdiction because any asserted harms must flow from independent choices made by the nonparty educational institution (Harvard), or their injury is otherwise too speculative." [AAUP, ECF No. 104 at 17]. Specifically, Defendants contend that "[u]ltimately, it is the choice of a nonparty, Harvard, whose funding was cut, to determine what to do. If, for example, Harvard chooses to continue funding the project, then no harm flows to Plaintiffs' members from the termination." [Id. at 18].

"The Supreme Court has explained that the fairly traceable standard requires 'a causal connection between the injury and the conduct complained of.'" Conservation L. Found., Inc. v. Acad. Express, LLC, 129 F.4th 78, 90 (1st Cir. 2025) (quoting Lujan, 504 U.S. at 560). It does not, however, require "a tort-like showing of proximate causation," and, as such, "[a] plaintiff can satisfy traceability by showing that the defendant's conduct is one among multiple causes of the alleged injury." Id. (citation omitted). "[W]hen (as here) a plaintiff challenges the government's 'unlawful regulation . . . of someone else' . . . causation 'ordinarily hinge[s] on the response of the regulated (or regulable) third party to the government action or inaction—and perhaps on the response of others as well.'" Food & Drug Admin. v. All. for Hippocratic Med., 602 U.S. 367, 383 (2024) (quoting Lujan, 504 U.S. at 562). "Therefore, to thread the causation needle in those circumstances, the plaintiff must show that the 'third parties will likely react in predictable ways' that in turn will likely injure the plaintiffs." Id. (quoting California v. Texas, 593 U.S. 659, 675 (2021)). Thus, "[t]he causation requirement precludes speculative links—that

35

**A035**

is, where it is not sufficiently predictable how third parties would react to government action or cause downstream injury to plaintiffs, as well as "attenuated links—that is, where the government action is so far removed from its distant (even if predictable) ripple effects that the plaintiffs cannot establish Article III standing." Id.

The Organizational Plaintiffs have adequately demonstrated that their members' harms are fairly traceable to Defendants' conduct. Although the Court recognizes that Defendants' actions ultimately impact grant agreements that are awarded, in name, to the "President and Fellows of Harvard College," see, e.g., [NSF_Harvard000681], the notion that the resultant harm to professors and graduate students is at best speculative or attenuated is divorced from the reality of how federal research grants function. The professors and graduate students—who are responsible for funding their own research—apply for federal grants, are awarded the grants on the strength of their credentials and proposed research, and then build their professional reputations on those grants. See, e.g., [AAUP, ECF No. 77-16 ¶ 2 (["I]n 1992 I applied for and received a prestigious Special Emphasis Research Career Award to work on the Human Genome Project. I have had continuous federal funding to support my research ever since.")]; [AAUP, ECF No. 77-22 ¶¶ 6–9 (describing process of research scientist applying for grants)]. As such, it is their names that appear directly on the face of the grant agreements, their labs that receive the funding, and their research that is eliminated when funding is discontinued. See, e.g., [NSF_Harvard000060 (noting that the PI and Site Director, whose name is redacted, is the "Mallinckckrodt Professor of Applied Physics and Physics," who "has ultimate responsibility for implementation of all aspects" of the grant)]. To that end, at least one AAUP member received notice directly from the federal government that his research was to stop. [AAUP SOF ¶ 176]; see also [DoDHarv_00000005 ("Attached is a copy of the grant termination notice. Please

36

**A036**

ensure the Principal Investigator, courtesy copied herein, receives a copy of this document.")]; cf. Am. Ass'n of Univ. Professors v. U.S. Dep't of Just. ("AAUP"), No. 25-cv-2429, 2025 WL 1684817, at *6 (S.D.N.Y. June 16, 2025) ("Indeed, Plaintiffs' evidence reflects that all communication about the termination of grants has been either between an executive agency and Columbia, or between Columbia and its faculty."). His injuries, like those of other similarly situated researchers, are clearly traceable to Defendants' conduct via the stop work order and tied to the grant that bears his name.

The Organizational Plaintiffs' members are at least as connected to the grants and funding at issue here as is Harvard and, by virtue of this relationship, their standing, more so than in the typical third-party standing case, hinges on a "predictable chain of events leading from the government action to the asserted injury." All. for Hippocratic Med., 602 U.S. at 385. It was entirely predictable that Defendants' sudden revocation of funding would immediately and directly harm the Organizational Plaintiffs' members, and, indeed, the summary judgment record reflects that it has. See, e.g., [AAUP SOF ¶¶ 128, 136, 141, 143, 147–50, 156, 158, 164–65, 168–70, 177–79, 188, 196]. And while Defendants would like to minimize this injury by claiming that Harvard has unlimited funds to replace the withdrawn funds, the summary judgment record does not reflect that. See, e.g., [AAUP, ECF No. 77-18 ¶¶ 27–28 ("I have no guarantee of funding from Harvard in writing, and any funding Harvard can provide will be far from sufficient to replace my federal grants or allow me to bring these projects to completion. The only long-term alternative to federal funding would be to find emergency philanthropic support, which is exceedingly unlikely. If federal funding is not restored, project staff for the third grant will soon have to explain to participants that projects are ending, and I will soon have to let the team in Peru go.")]; [AAUP, ECF No. 77-23 ¶ 14 ("Harvard has also informed me that

37

**A037**

they will not be able to provide funding to supplement what we are losing in federal funds.”)]; cf. AAUP, 2025 WL 1684817, at *13 (“Plaintiffs’ own evidence also demonstrates that Columbia has relied on ‘generous alumni’ to alleviate certain ‘unanticipated expenses.’”).

Moreover, even if the Court were to accept Defendants’ premise that Harvard could theoretically bridge the gap for all $2.2 billion in terminated grants in perpetuity, the Organizational Plaintiffs have adequately established that their members will still experience concrete harm by virtue of the grant terminations. For instance, the Organizational Plaintiffs point to the fact that “[w]ithout federal funding, [members] who are coming up for tenure may not be competitive applicants for that crucial promotion,” explaining that “[f]ederal grants impact tenure decisions beyond just the dollars themselves—tenure candidates must demonstrate that they have served as principal investigators on federal research grants and are capable of performing the sort of rigorous research that federal grant study sections (peer reviewers) approve for scarce federal dollars.” [AAUP, ECF No. 77-19 ¶ 17]; see also [id. ¶ 22 (“[R]eceiving federal grants is not just about the funds themselves—it is a key indication that your peers recognize the rigor and caliber of your work because federal grant applications are always peer-reviewed.”)]; [AAUP, ECF No. 77-21 ¶ 22 (“[F]or faculty who are working towards tenure (as I am), the loss of federal funding for public health research restricts the ability to create the type of broad, high-impact program of research required for tenure.”)]. As such, the Organizational Plaintiffs have successfully alleged that their members will suffer harm to their research as well as their careers by virtue of losing the opportunity to work with and receive funding from the federal government. “The loss of professional opportunities or income may certainly constitute an injury in some cases,” Nat. Res. Def. Council, Inc. v. Wheeler, 367 F. Supp. 3d 219, 232 (S.D.N.Y. 2019), and the loss of the opportunity to be a principal investigator

on a federal, peer-reviewed grant is solely traceable to the grant funding terminations. Cf. AAUP, 2025 WL 1684817, at *13 (finding no standing where plaintiffs had not "demonstrated that it makes a difference to their members whether the funding for their research and salaries comes from" the federal government or other funding sources).

The Organizational Plaintiffs have also adequately established that they have experienced harm sufficient to maintain their First Amendment claim. Defendants argue that "[i]t is well-settled that 'allegations of subjective chill are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm.'" [AAUP, ECF No. 104 at 16 (quoting Laird v. Tatum, 408 U.S. 1, 13–14 (1972))]. This ignores, however, a long line of Supreme Court case law recognizing standing in cases where "the challenged exercise of governmental power was regulatory, proscriptive, or compulsory in nature, and the complainant was either presently or prospectively subject to the regulations, proscriptions, or compulsions that he was challenging." Laird, 408 U.S. at 11 (1972); see also Speech First, Inc. v. Cartwright, 32 F.4th 1110, 1120 (11th Cir. 2022) ("[T]o determine whether a First Amendment plaintiff has standing, we simply ask whether the operation or enforcement, of the government policy would cause a reasonable would-be speaker to self-censor—even where the policy fall[s] short of a direct prohibition against the exercise of First Amendment rights." (citation modified)). As discussed further infra, the record reflects that Defendants' viewpoint-based demands have resulted in the Organizational Plaintiffs' members being well beyond "subjectively chilled." Rather, the Organizational Plaintiffs have established that their members have been and likely will continue to be compelled to forgo certain research and discussion topics or at least parse their words carefully to maximize any chance of maintaining funding. [AAUP SOF ¶¶ 137, 210–17, 235–37, 247–48].

39

**A039**

Defendants argue in their reply brief that these First Amendment harms are not fairly traceable to them because "Harvard exercised independent judgment in deciding which [of the government's] demands to accept." [AAUP, ECF No. 130 at 15]. Again, the Court is unconvinced. As discussed infra, the April 11 Letter unambiguously links funding to the demand that Harvard rebalance viewpoints on campus. The professors' and researchers' fears that adverse consequences may follow their decision not to abandon certain viewpoints are far from speculative. Rather, they are directly "caused by the [Freeze Orders' and Terminations Letters'] vagueness, the steep penalties [Defendants] have announced for [Harvard's] noncompliance with [their] requirements, and the measures [Defendants] ha[ve] already taken" demonstrating they expect Harvard to comply. Nat'l Educ. Ass'n v. Dep't of Educ., 779 F. Supp. 3d 149, 181 (D.N.H. 2025).

Finally, Defendants contend that, even if their members have experienced injury, the Organizational Plaintiffs fail on the second and third Hunt prongs, arguing that they have "failed to establish that the interests that the suit seeks to vindicate are pertinent to the objectives for which the organization was formed," [AAUP, ECF No. 104 at 19], and that "the claims [the Organizational] Plaintiffs have asserted require the participation of individual members," [id. at 20]. The Court disagrees. The Organizational Plaintiffs have submitted evidence that the primary mission of AAUP (and AAUP-Harvard) is "to advance academic freedom and shared governance in higher education, define fundamental professional values and standards for higher education, promote the security of academic workers, and ensure higher education's contribution to the common good." [AAUP SOF ¶¶ 96, 103]; see also [id. ¶ 96 ("Plaintiff AAUP 'regularly consults, works with, and represents local chapters and individual members regarding academic freedom, faculty governance, and other issues involving the employment relationship between

40

**A040**

AAUP members and their employers, including but not limited to collective bargaining.'" (citation omitted))].[13] Pursuing litigation to end an alleged government intrusion on protected and well-established First Amendment rights in higher education, as well as to stop alleged arbitrary funding cuts that could end careers, furthers those purposes. Additionally, the injunctive and declaratory relief the Organizational Plaintiffs request will not need to be tailored to each member individually as blanket relief will largely suffice and the relief sought will not require any individualized proof from any particular member. See Camel Hair, 799 F.2d at 12 ("Actions for declaratory, injunctive and other forms of prospective relief have generally been held particularly suited to group representation."); see also Playboy Enters., 906 F.2d at 35 ("[J]ust because a claim may require proof specific to individual members of an association does not mean the members are required to participate as parties in the lawsuit." (emphasis omitted)).

As such, the Court finds that the Hunt factors are satisfied, and the Organizational Plaintiffs have associational standing. Because of this, the Court does not reach their arguments regarding direct standing.

## V. FINAL AGENCY ACTION

The APA entitles any person "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action" to judicial review. 5 U.S.C. § 702. Such review, however, is limited to final agency actions unless otherwise specified by statute. See id. § 704.

---

[13] Having found the germaneness requirement met for AAUP and AAUP-Harvard, the Court will not consider whether it is also met for UAW, as "[a] proper case or controversy exists . . . when at least one plaintiff establishes . . . standing to sue." Murthy v. Missouri, 603 U.S. 43, 57 (2024) (citation modified).

41

**A041**

An agency action is final if two conditions are met: first, the action must "mark the consummation of the agency's decisionmaking process" and not be "of a merely tentative or interlocutory nature," and, second, it must be "one by which rights or obligations have been determined, or from which legal consequences will flow." Harper v. Werfel, 118 F.4th 100, 117 (1st Cir. 2024) (internal quotation marks omitted) (quoting Bennett v. Spear, 520 U.S. 154, 178 (1997)). "The core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." Brnovich v. Biden, 630 F. Supp. 3d 1157, 1171 (D. Ariz. 2022) (quoting Or. Nat. Desert Ass'n v. U.S. Forest Serv., 465 F.3d 977, 982 (9th Cir. 2006)).

Defendants contend that "[t]o the extent that an APA challenge can be properly brought in this Court, only final agency action is reviewable under the APA, and the only final items are letters terminating specific contracts." [Harvard, ECF No. 186 at 39]; see also [AAUP, ECF No. 104 at 29 (same)]. In particular, they argue that the April 11 Letter and May 5 Freeze Order do not constitute final agency action and thus are not reviewable under the APA. [Harvard, ECF No. 186 at 40–42]. In their view, the April 11 Letter "was merely the starting bid in a negotiation that Harvard has rejected, which is not agency action under the APA, let alone final agency action," because "[t]he opening offer of a negotiation does not determine rights or obligations, nor does it have its own legal consequences." [Harvard, ECF No. 186 at 40]; see also [AAUP, ECF No. 104 at 31 (same)]. Defendants assert that the Court should view this whole matter as a "contract dispute" and that "[f]undamental principles of contract law . . . demonstrate" that the April 11 Letter did not have "binding legal effect" under the first Bennett prong. [Harvard, ECF No. 186 at 41]; see also [AAUP, ECF No. 104 at 31 (same)]. Regarding the May 5 Freeze Order, Defendants appear to argue that it is not final agency action because it

42

**A042**

purports to speak on behalf of the entire federal government, which the Secretary of Education

cannot do.  [Harvard, ECF No. 186 at 42–43].[14]

Harvard counters that Defendants' argument regarding the April 11 Letter misses the

mark.[15]  It contends that "[e]ven assuming the April 11 Letter was not a final agency action the

day the [g]overnment sent it, the [g]overnment certainly took final action three days later when it

---

[14] Defendants additionally argue that the May 5 Freeze Order is unreviewable because it is the sort of funding decision committed to agency discretion by law under 5 U.S.C. § 701(a)(2). [Harvard, ECF No. 186 at 42].  The Court disagrees.  Even assuming that the decision to block Harvard from all future federal funding could be considered an "administrative decision traditionally regarded as committed to agency discretion," Lincoln v. Vigil, 508 U.S. 182, 192 (1993), and the Court is not convinced that it is, Planned Parenthood of N.Y.C., Inc. v. HHS, 337 F. Supp. 3d 308, 324 (S.D.N.Y. 2018) ("While the Supreme Court has held that certain allocations of funds from lump-sum appropriations may be committed to agency discretion, this narrow exception does not 'typically' or 'presumptively' extend to all allocations of appropriated funds."), the exception is typically limited to those "rare circumstances" where "no meaningful standard" exists by which a reviewing judge could cabin that agency discretion, Dep't of Com. v. New York, 588 U.S. 752, 772 (2019).  Here, "applicable regulations cabin the [Education] Department's discretion as to when it can terminate existing grants," which "create meaningful standards by which to judge the agency's action." California, 132 F.4th at 97 (citation modified); see Pol'y & Rsch., LLC v. HHS, 313 F. Supp. 3d 62, 75–78 (D.D.C. 2018) (K.B. Jackson, J.) (holding that agency's otherwise-presumptively unreviewable decision to halt funding to an agency program was reviewable under the APA because applicable regulations cabined its termination authority).

[15] The Court focuses on Harvard's arguments regarding final agency action but notes that the Organizational Plaintiffs urge the Court to also consider Defendants' March 31 Letter, the April 3 Letter, and the April 11 Letter as final agency actions.  [AAUP, ECF No. 110 at 26].  On this issue, the Court disagrees with the Organizational Plaintiffs. The March 31 Letter, in essence, announced an investigation into higher education funding and noted that "any institution found to be in violation of federal compliance standards may face administrative actions, including contract termination." [GSAHarv_00000002 (emphasis added)].  The First Circuit has been clear that "investigatory measures are not final agency action;" rather, the opening of a review or investigation is a preliminary step, "leading toward the possibility of a final action in the form of an enforcement or other action." Harper v. Werfel, 118 F.4th 100, 116 (1st Cir. 2024).  As to the April 3 Letter, the April 11 Letter, by its terms, "incorporates and supersedes the terms of" the April 3 Letter, [HHSHarv_00000098], such that the Court considers the April 3 Letter to be non-final.  The April 11 Letter itself poses a closer question.  Ultimately, however, in light of the Court's conclusion that the April 14 and May 5 Letters are final agency action, the Court need not resolve this question.

43

**A043**

made good on the threats and froze Harvard's funding." [Harvard, ECF No. 211 at 33]. It further clarifies that "it is the culmination of the [g]overnment's actions—punishing Harvard on April 14 and thereafter for not acceding to unlawful demands made on April 3 and April 11— that Harvard's APA claim challenges." [Id.]. As to the May 5 Freeze Order, Harvard contends that Defendants' argument "is not a claim about finality at all" but rather a concession that the May 5 Freeze Order was "not in accordance with law" and ultra vires. [Id. at 34].

Given that Defendants offer no response regarding the finality of the April 14 Freeze Order or the May 5 Freeze Order at least as to the Department of Education, the Court will not spill too much ink on this issue. It is satisfied that both freeze orders constituted final agency action such that they are reviewable under the APA. On the first Bennet prong, the text of each document is clear. The April 14 Freeze Order unambiguously states that "[t]he Joint Task Force to combat anti-Semitism is announcing a freeze on $2.2 billion in multi year grants and $60M in multi-year contract value to Harvard University." [GSAHarv_00000012–13]. The May 5 Freeze Order states that "today's letter marks the end of new grants for the University," that "this letter is to inform you that Harvard should no longer seek GRANTS from the federal government, since none will be provided," and that "Harvard will cease to be a publicly funded institution." [EDHarv_0000009]. This language is not "merely tentative or interlocutory" in nature, Harper, 118 F.4th at 116; rather, it is prescriptive and "mandatory," Union of Concerned Scientists v. Wheeler, 377 F. Supp. 3d 34, 42 (D. Mass. 2019), aff'd in part, rev'd in part, and remanded, 954 F.3d 11 (1st Cir. 2020), in that it unequivocally states that Defendants have made a decision and are moving forward with it.

As to the second Bennett prong, again, the plain text of the April 14 and May 5 Letters communicates that consequences will be very shortly forthcoming. Moreover, if these

44

**A044**

announcements left room for doubt as to whether Plaintiffs would experience any legal effect, Defendants' conduct immediately following the announcements removed any such doubt, as the record reflects that Harvard immediately started to receive stop work orders following the issuance of the April 14 Freeze Order, [Harvard SOF ¶ 67], and a termination letter from the Department of Education arrived within the week, [EDHarvAR_0000011]. As such, this Court is satisfied that both freeze orders constitute reviewable final agency actions as they set policies that brought forth near immediate legal consequences. Brnovich, 630 F. Supp. 3d at 1171; Woonasquatucket River Watershed Council v. USDA, No. 25-cv-00097, 2025 WL 1116157, at *15 (D.R.I. Apr. 15, 2025); see also New York v. Trump, 133 F.4th 51, 69 (1st Cir. 2025) (funding freeze constituted "final agency action[]").

As such, the Court is satisfied that both Freeze Orders constitute final agency action such that the Court can review them under the APA.[16]

---

[16] Defendants also argue there is no "ripe dispute" between Harvard and DOJ because DOJ "grants . . . have not been frozen or terminated." [Harvard, ECF No. 186 at 63]. The Court disagrees, as DOJ is a member of the Federal Task Force that was ultimately responsible for freezing and terminating Harvard's federal funding. Various documents in the administrative record also reveal that at least one DOJ official was a central figure in the effort to terminate Harvard's funding. See, e.g., [NASA-AR03733 (May 8 email from NASA to DOJ official A. Kambli (OASG))]; [NASA-AR03742 (May 8 email from A. Kambli to NASA)]; [GSAHarv_00000035 (May 8 email from GSA addressed to the White House and DOJ)]. As such, the Court is satisfied that, in enjoining DOJ, it is not "entangling [itself] in [an] abstract dispute disagreement[] over administrative policies;" rather, as part of the Federal Task Force responsible for the Freeze Orders, DOJ's "administrative decision has been formalized and its effects felt in a concrete way by [Harvard]," such that the dispute is ripe. Nat'l Park Hosp. Ass'n v. Dep't of Interior, 538 U.S. 803, 807–08 (2003) (citation omitted).

45

**A045**

## VI.  DISCUSSION

### A.  First Amendment[17]

Harvard asserts that the Defendants' actions in this case "violated Harvard's First Amendment rights in at least two ways: 1) by retaliating against Harvard based on the exercise of its First Amendment rights, and 2) by imposing content- and viewpoint-based burdens on those rights through the imposition of funding conditions that are unrelated to any legitimate government interest in combating antisemitic harassment or otherwise." [Harvard, ECF No. 70 at 34–35].  Because of this, Harvard contends that "[t]he Freeze Orders and Termination Letters should be vacated and set aside, and any further similar action against Harvard should be permanently enjoined." [Harvard, ECF No. 70 at 35].  The Organizational Plaintiffs proceed under the same two First Amendment theories, but also base their claim on an unconstitutional coercion theory.[18]  [AAUP, ECF No. 75 at 51–58].  The parties have filed cross motions for summary judgment on these claims.   [Harvard, ECF Nos. 69, 185; AAUP, ECF Nos. 74, 103].

---

[17] This section addresses Plaintiffs' respective First Amendment claims under the APA, which is Count 1 in Harvard's action and Count IV in the Organizational Plaintiffs' action.  Their equitable causes of action for violation of the First Amendment—Count 2 in the Harvard action and Count III in the Organization Plaintiffs' action—are addressed in the Court's analysis of the ultra vires claims, infra.

[18] At the summary-judgment hearing, the Organizational Plaintiffs conceded that a victory for Harvard on the retaliation and viewpoint discrimination claims would provide the Organizational Plaintiffs with the relief they seek, [Harvard, ECF No. 229 at 12:23–13:12], and their arguments mirror those advanced by Harvard in its motion.  Defendants also oppose the Organizational Plaintiffs' claims for retaliation and viewpoint discrimination by reference to their briefs in the Harvard action.  [AAUP, ECF No. 104 at 35]; [AAUP, ECF No. 130 at 34–35].  As such, the Court focuses its analysis for those claims on Harvard's briefing as well.  The Organizational Plaintiffs also noted at the hearing, however, that they bring a claim for unconstitutional coercion, [Harvard, ECF No. 229 at 10:19–11:11], which is a theory that Harvard does not advance.  The Court addresses that argument infra with reference to the Organizational Plaintiffs' briefing.

46

**A046**

### 1.    Retaliation

As a threshold issue, the parties disagree on the relevant standard to be used in assessing Harvard's First Amendment retaliation claim, that is, its claim that Defendants retaliated against it based on the exercise of its First Amendment rights.  Harvard recites the typical framework applicable to private citizens.  [Harvard, ECF No. 70 at 35].  Defendants, on the other hand, assert that Harvard, as a recipient of federal grant funding, is a "government contractor" and, as such, its First Amendment rights "are circumscribed to the same extent as those of government employees," [Harvard, ECF No. 186 at 43 (citing Bd. of Cnty. Comm'rs v. Umbehr, 518 U.S. 668, 675 (1996))].  Specifically, Defendants contend that Harvard's First Amendment rights "are governed by the balancing test announced in Pickering v. Board, which weighs the 'interests of the [contractor], as a citizen, in commenting upon matters of public concern and the interest of the State, as [a contracting entity], in promoting the efficiency of the public services it performs through its [contractors].'"  [Id. (quoting Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968))].

Defendants point the Court to no binding authority, however, to support the notion that a private research university becomes a government "contractor" for First Amendment purposes by accepting the government's invitation to apply for and thus collaborate on federal research grants.  In the absence of clear precedent, the Court will not adopt such a rule, particularly given that the First Amendment right to and protection of academic freedom is squarely in play.  As Harvard notes, "the Supreme Court has applied Pickering only after it has ensured that the affected speech 'does not raise questions of academic freedom that may or may not involve 'additional' First Amendment 'interests' beyond those captured by [the Pickering] framework.'"  [Harvard, ECF No. 211 at 23 (quoting Kennedy v. Bremerton Sch. Dist., 597 U.S. 507, 528 (2022))].  Indeed, the Supreme Court, in a seminal government employee speech case, Garcetti

47

**A047**

v. Ceballos, 547 U.S. 410 (2006), noted that "[t]here is some argument that expression related to academic scholarship or classroom instruction implicates additional constitutional interests that are not fully accounted for by this Court's customary employee-speech jurisprudence." Id. at 425. Given this, the Court declines to apply Umbehr here.[19]

As such, to establish a prima facie case of First Amendment retaliation, Harvard must prove that 1) "[it] engaged in First Amendment-protected conduct," 2) "[it] suffered an adverse action," and 3) "[its] protected conduct played a 'substantial or motivating' part in the adverse action." Berge v. Sch. Comm. of Gloucester, 107 F.4th 33, 37 n.4 (1st Cir. 2024) (citation omitted). Defendants "may then avoid a finding of liability by showing that '[they] would have reached the same decision . . . even in the absence of the protected conduct.'" D.B. ex rel. Elizabeth B. v. Esposito, 675 F.3d 26, 43 (1st Cir. 2012) (quoting Powell v. Alexander, 391 F.3d 1, 17 (1st Cir. 2004)); see also McCue v. Bradstreet, 807 F.3d 334, 339, n.2 (1st Cir. 2015) (noting that "two-step framework" applied outside "the context of public employment, where it originated"). Defendants do not dispute that the Freeze Orders and Termination Letters constitute an adverse action, see generally [Harvard, ECF No. 186]; [Harvard, ECF No. 223], and thus the Court focuses on the first and third prongs of the retaliation analysis.

On the first prong, whether Harvard engaged in First Amendment protected activity, this Court has previously written on Harvard's relevant protected conduct in a separate action, President & Fellows of Harvard Coll. v. U.S. Dep't of Homeland Sec. ("DHS"), No. 25-cv-

---

[19] That said, out of an abundance of caution, for the reasons articulated herein, the Court finds that Harvard's claim would survive under Umbehr. Harvard has sufficiently demonstrated that it engaged in constitutionally protected conduct that was a substantial or motivating factor in the grant terminations, and Defendants have failed to meet their burden to show that they would have taken the same action even in the absence of the protected conduct, or that there are sufficiently strong legitimate countervailing government interests. Umbehr, 518 U.S. at 675.

11472, 2025 WL 1737493, at *15 (D. Mass. June 23, 2025), and thus endeavors or at least aspires to be brief. That said, it warrants repeating that Harvard engaged in constitutionally protected conduct 1) when it refused the terms set forth in the April 11 Letter, which sought to control viewpoints at Harvard, and 2) when it filed this lawsuit. Defendants do not dispute that the latter constitutes protected conduct.[20] As to the April 11 Letter rejection, there is "a zone of First Amendment protection for the educational process itself," Asociación de Educación Privada de P.R., Inc. v. Garcia-Padilla, 490 F.3d 1, 8 (1st Cir. 2007) (citation omitted), that encompasses not only "the independent and uninhibited exchange of ideas among teachers and students," but also Harvard's "autonomous decisionmaking," Regents of Univ. of Mich. v. Ewing, 474 U.S. 214, 226 n.12 (1985). The rights protected by the First Amendment include the right to "manage an academic community and evaluate teaching and scholarship free from [governmental] interference," Blasdel v. Nw. Univ., 687 F.3d 813, 816 (7th Cir. 2012) (citation omitted), as well as Harvard's "prerogative 'to determine for itself on academic grounds who may teach,'" Lieberman v. Gant, 630 F.2d 60, 67 (2d Cir. 1980) (Friendly, J.) (emphasis added) (quoting Sweezy v. New Hampshire, 354 U.S. 234, 263 (1957)), and what is taught in the "college classroom," Healy v. James, 408 U.S. 169, 180 (1972).

Defendants' April 11 Letter, on its face, was directed at these core freedoms, and Harvard's April 14 rejection, on its face, was aimed at preserving them. The April 11 Letter

---

[20] Contesting this would be difficult as the filing of a lawsuit is quintessential First Amendment protected conduct. The First Amendment protects the right "to petition the Government for a redress of grievances," U.S. Const. amend. I, that is, "the right of individuals to appeal to courts and other forums established by the government for resolution of legal disputes," Borough of Duryea v. Guarnieri, 564 U.S. 379, 387 (2011). Put simply, "[f]iling and pursuing lawsuits are forms of protected petitioning," Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of President, No. 25-917, 2025 WL 1502329, at *18 (D.D.C. May 27, 2025), that are "integral to the democratic process," Borough of Duryea, 564 U.S. at 388.

49

stated, in no uncertain terms, that the letter would constitute an "agreement in principle that w[ould] maintain Harvard's financial relationship with the federal government" but only if Harvard agreed to "audit the student body, faculty, and leadership for viewpoint diversity," report that audit to the government, and "hir[e] a critical mass of new faculty" and "admit[] a critical mass of students . . . who will provide viewpoint diversity." [HHSHarv_00000098–100]. It further required Harvard to "abolish all criteria, preferences, and practices, whether mandatory or optional, throughout its admissions and hiring practices, that function as ideological litmus tests;" to audit "programs and departments that . . . reflect ideological capture;" to "immediately shuttter all diversity, equity, and inclusion (DEI) programs, committees, positions, and initiatives . . . including DEI-based . . . speech control policies," and to demonstrate that it had done so "to the satisfaction of the federal government." [HHSHarv_00000099–100]. In brief, the April 11 Letter purported to require Harvard to overhaul its governance, hiring, and academic programs to comport with the government's ideology and prescribed viewpoint.

As to Harvard's rejection, Defendants contend that it cannot constitute protected activity because the April 11 Letter was nothing more than an "offer" in an ongoing negotiation, and "rejection of an offer is not protected expression; it is a legal act extinguishing the original offer." [ECF No. 186 at 46]. They further contend that "[t]he consequences that followed flowed directly from the 'noncommunicative impact' of this legal act of rejection." [Id. (quoting States v. O'Brien, 391 U.S. 367, 382 (1968)]. This Court has previously made clear that it views the characterization of the April 11 Letter as an "offer" to be disingenuous, given that the letter was not at all tentative as to what rejection would mean nor did it open the door to continued discussion. DHS, 2025 WL 1737493, at *15. That said, even accepting Defendants'

50

**A050**

characterization of the April 11 Letter as an "offer," the Court disagrees that such a rejection cannot constitute protected conduct when, as here, the rejection was repeatedly and explicitly based on Harvard's refusal to surrender its First Amendment freedoms in the face of government pressure. Harvard's rejection was clear, stating:

> It is unfortunate . . . that your letter . . . presents demands that, in contravention of the First Amendment, invade university freedoms long recognized by the Supreme Court. . . . The university will not surrender its independence or relinquish its constitutional rights. Neither Harvard nor any other private university can allow itself to be taken over by the federal government. Accordingly, Harvard will not accept the government's terms as an agreement in principle.

[HHSHarv_00000104–105]. In other words, Harvard's rejection communicated that it would not tolerate the government's attempt to control "who may teach, what may be taught, how it shall be taught, and who may be admitted to study," Regents of Univ. of California v. Bakke, 438 U.S. 265, 312 (1978), and that unequivocal expression of core First Amendment values in the face of government overreach constitutes protected speech.

Defendants further contend that, even if the April 11 Letter and the filing of this lawsuit constitute protected conduct (which the Court has now found), Harvard has not shown that the protected conduct was a substantial or motivating factor in the final agency action at issue. This is difficult to square, however, with the text of the April 11 Letter, which explicitly conditioned federal funding on Harvard's acceding to the government's demands, and the fact that the April 14 Freeze Order came within hours of Harvard's refusal to do so. In fact, Defendants acknowledge in their opposition brief that the April 11 Letter "was clear that if an agreement was not reached, [the government] would exercise its termination rights." [Harvard, ECF No. 186 at 48]. It is also difficult to square with the texts of the Freeze Orders and Termination letters, which blatantly link Harvard's April 14 rejection of the government's demands to the funding cuts. The April 14 Freeze Order made this clear right from its start, opening with, "Harvard's

51

**A051**

statement today reinforces the troubling entitlement mindset that is endemic in our nation's most prestigious universities and colleges." [GSAHarv_ 00000012–13 (emphasis added)]. The May 5 Freeze Order similarly links its issuance to Harvard's refusal to make "proposed common-sense reforms," referencing substantially similar reforms as those outlined in the April 11 Letter, [EDHarvAR_0000009], and it makes no secret of the government's ideological disagreements with Harvard, calling attention to, among other things, Harvard's decision to hire "failed Mayors Bill [d]e Blasio and Lori Lightfoot, perhaps the worst mayors ever to preside over major cities in our country's history," and to allow "strongly left-leaning Obama political appointee Penny Pritzker, a Democrat operative," to manage the Harvard Corporation, [EDHarvAR_0000008–09]. And many of the Termination Letters reiterate that the impetus for the terminations was Harvard's refusal to adopt "reforms" that the government deemed "appropriate." See, e.g., [HHSHarv_00000473–75 ("the University has refused to take appropriate action" (emphasis added))]; [USDA-HARV-AR-00008–09 (same)]; [ENERGY AR3932 ("Harvard has refused to take immediate, definitive and appropriate remedial action" (emphasis added))].

Based on this administrative record, the Court is satisfied that Harvard's protected conduct was a substantial and motivating factor in the Freeze Orders and Termination Letters. Defendants contend, however, that Harvard's retaliation claim nonetheless fails because "the agencies' terminations are explained by a nonretaliatory purpose: opposing antisemitism," [Harvard, ECF No. 186 at 45], such that the government "would have terminated" the grants irrespective of Harvard's viewpoints, [id. at 43]. This argument does not carry the day. Defendants have failed to meet their burden to show they acted with a non-retaliatory purpose for several reasons. First, as discussed, the April 11 Letter specifically conditioned funding on agreeing to its ten terms, only one of which related to antisemitism, [HHSHarv_00000100

52

**A052**

("Reforming Programs with Egregious Records of Antisemitism or Other Bias")], while six

related to ideological and pedagogical concerns, including who may lead and teach at Harvard,

[HHSHarv_00000098–99 ("Governance and leadership reforms;" "Merit-Based Hiring

Reform")], who may be admitted, [HHSHarv_00000099 ("Merit-Based Admissions Reform;"

"International Admissions Reform")], and what may be taught, [HHSHarv_00000099–100

("Viewpoint Diversity in Admissions and Hiring;" "Discontinuation of DEI")].  Additionally,

Defendants' argument ignores that Harvard's April 14 letter rejected only the conditions it

viewed as infringing on its First Amendment rights and, in fact, specifically agreed to discuss

measures aimed at combatting antisemitism, [HHSHarv_00000104–105 ("Harvard remains open

to dialogue about what the university has done, and is planning to do" to combat antisemitism)],

an offer Defendants similarly disregarded when instituting the first funding freeze on the basis of

"Harvard's statement[s]" hours later.  [GSAHarv_00000012].

Moreover, although combatting antisemitism is indisputably an important and worthy

objective, nothing else in the administrative record supports Defendants' contention that they

were primarily or even substantially motivated by that goal (or that cutting funding to Harvard

bore any relationship to achieving that aim).  As discussed further infra, before the April 14

Freeze Order, Defendants had announced a funding review consistent with the goals of

combatting antisemitism; the record, however, does not reflect that Defendants engaged in such a

review, weighed the value of any grant, gathered any data regarding antisemitism at Harvard, or

considered if and how terminating certain grants would improve the situation for Jewish students

at Harvard.  Rather, all that Defendants learned between March 31 and April 14, 2025 was that

Harvard would not capitulate to government demands that it audit, censor, or dictate viewpoints

of staff and students.  The fact that Defendants' swift and sudden decision to terminate funding,

**A053**

ostensibly motivated by antisemitism, was made before they learned anything about antisemitism on campus or what was being done in response, leads the Court to conclude that the sudden focus on antisemitism was, at best (and as discussed infra), arbitrary and, at worst, pretextual.

Thus, the Court is satisfied that Harvard is entitled to summary judgment on its claim for First Amendment retaliation on the face of the administrative record. The Court would be remiss, however, if it did not note that the summary judgment record also contains numerous exhibits and undisputed facts that go beyond the administrative record that speak to Defendants' retaliatory motive in terminating Harvard's funding.[21] Although Defendants now contend that Harvard's April 14 rejection and subsequent lawsuit had nothing to do with their decision to cut its funding, numerous government officials spoke publicly and contemporaneously on these issues, including about their motivations, and those statements are flatly inconsistent with what Defendants now contend. These public statements corroborate that the government-initiated

---

[21] It is not entirely clear whether the Court can consider undisputed facts in the summary judgment record that go beyond the administrative record in deciding Plaintiffs' First Amendment claim brought under 5 U.S.C. § 706(2)(B). See, e.g., Chiayu Chang v. U.S. Citizenship & Immigr. Servs., 254 F. Supp. 3d 160, 161 (D.D.C. 2017) ("As to plaintiffs' constitutional claims, there appears to be some disagreement among district courts whether the assertion of constitutional claims takes a case outside the procedural strictures of the APA, including the record review rule."). Here, however, Defendants agreed at the hearing that such undisputed facts could be considered by the Court, [ECF No. 229 at 9:7–23], nor have they objected in subsequent motion practice. See Bos. Redevelopment Auth., 838 F.3d at 48 (considering supplemental information where "the parties—by mutual consent—conducted additional discovery" and "cite[d] to and rel[ied] on this supplemental information throughout their . . . briefs"). Thus, while the Court is satisfied that the administrative record alone fully supports its decision, it includes some of the additional undisputed information here. Additionally, Plaintiffs have brought equitable claims for First Amendment violations, which the Court does not reach because it finds that they are entitled to relief under the APA. That said, it is the Court's understanding that these additional facts would be available and relevant to the Court's analysis in equity if Plaintiffs' APA claims were not successful.

54

**A054**

onslaught against Harvard was much more about promoting a governmental orthodoxy in violation of the First Amendment than about anything else, including fighting antisemitism.

For instance, in the forty-eight hours following the April 14 Freeze Order, the President took to social media multiple times to talk about Harvard. He posted on Truth Social that Harvard is "a JOKE" that "should no longer receive Federal Funds." [AAUP SOF ¶ 90]; [ECF No. 77-9]. His stated concerns (which would later be echoed in the May 5 Freeze Order) were untethered from antisemitism and instead based entirely on Harvard's "hiring almost all woke, Radical Left, idiots and 'birdbrains' who are only capable of teaching FAILURE to students," including "two of the WORST and MOST INCOMPETENT mayors in the history of our Country," referring to Democratic mayors Bill de Blasio and Lori Lightfoot. [AAUP SOF ¶ 90]; [ECF No. 77-9]. This post echoed his comments from a day earlier, when he opined, again on Truth Social, that "[p]erhaps Harvard should lose its Tax Exempt status and be Taxed as a Political Entity." [Harvard SOF ¶ 49]. Again, that post did not reference antisemitism explicitly but rather was focused on Harvard's "pushing political, ideological, and terrorist inspired/supporting 'Sickness[.]'" [Id.]. It was not until nearly ten days later that the President would call Harvard "Anti-Semitic," doing so in a Truth Social post that, in the same breath, called Harvard a "Far Left Institution" and a "Liberal mess, allowing a certain group of crazed lunatics to enter and exit the classroom and spew fake ANGER AND HATE." [AAUP SOF ¶ 91]; [ECF No. 77-10].[22]

---

[22] On May 7, 2025, Linda McMahon made a statement in which she denied that the funding cuts were "about [the] First Amendment" and were in fact "about civil rights." [AAUP SOF ¶ 93]. In that same statement, however, she noted that, in addition to civil rights concerns, the government "also wanted to make sure some of the other things that [the government] talked [to Harvard] about" were resolved, including whether Harvard was "vetting students who are

55

**A055**

A similar barrage followed Harvard's decision to litigate rather than settle this case, with Administration officials being clear about the connection between that decision and the funding cuts. In particular, on May 28, 2025, the Secretary of Education summarized the situation with Harvard, stating:

> When we looked at different aspects of what Harvard was doing relative to anti-Semitism on its campuses they were not enforcing Title VI the way it should be. And we had conversations with President Garber and I expected that we would have more, but Harvard's answer was a lawsuit so that's where we find ourselves. . . . I think the President is looking at this as, OK, how, how can we really make our point[?]

[AAUP SOF ¶ 95 (emphasis added)]. The same day, during an interview in the Oval Office, the President himself said that Harvard is "hurting [itself]" by "fighting," contrasting Harvard with Columbia, who he noted "has been . . . very, very bad . . . . But they're working with us on finding a solution." [Harvard SOF ¶ 95]. He declared that Harvard "wants to fight. They want to show how smart they are, and they're getting their ass kicked." [Id.]. His conclusion: "[E]very time [Harvard] fight[s], they lose another $250 million." [Id.].

In brief, Defendants' contention that Harvard's First Amendment activities were not a "substantial and motivating" factor in the funding terminations, or that those terminations were animated by non-retaliatory motives, does not square with the government's communications regarding its decision, which specifically and repeatedly linked the coordinated funding cuts to Harvard's decision to "fight." That "fight" (Harvard's decision to speak out and litigate its case in the courts and the marketplace of ideas), however, is indisputably protected by the First

---

coming in from outside of the country to make sure they're not activists" and "vetting professors that [it is] hiring to make sure that they're not teaching ideologies." [Id.]. In other words, she again tied the government's actions to viewpoint-related conditions similar to those within the April 11 Letter.

Amendment. Borough of Duryea, 564 U.S. at 387. To the extent the Court can consider these public statements, they provide additional support for granting Plaintiffs' summary judgment motion as to their First Amendment claims; to the extent it cannot, however, the administrative record, standing alone, is more than sufficient to demonstrate that Defendants impermissibly retaliated against Harvard for refusing to capitulate to the government's demands. Plaintiffs are thus entitled to summary judgment on their First Amendment retaliation claims.

2. Unconstitutional Conditions

Given that Harvard is entitled to summary judgment on its retaliation-based First Amendment claim, the Court need not reach Harvard's unconstitutional conditions-based theory, that is, its claim that Defendants impermissibly imposed on Harvard content- and viewpoint-based funding conditions that were unrelated to any legitimate government interest. [Harvard, ECF No. 70 at 40–42]. That said, having found that the Freeze Orders and Termination Letters resulted from Harvard's exercise of its First Amendment rights, it is evident that Defendants impermissibly imposed unconstitutional conditions on Harvard's receipt of federal funds.[23] Perry v. Sindermann, 408 U.S. 593, 597 (1972) ("[T]his Court has made clear that even though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons . . . [i]t may not deny a benefit to a person on a

---

[23] It is, in fact, unclear to this Court that these two claims are distinct from one another. Best Payphones, Inc. v. Dobrin, 410 F. Supp. 3d 457, 511 (E.D.N.Y. 2019) ("At the outset, this Court notes that it is entirely unclear how a claim alleging a First Amendment unconstitutional condition differs from First Amendment retaliation. Indeed, many opinions suggest that they are one and the same."). Out of an abundance of caution, however, the Court addresses Harvard's unconstitutional conditions theory separately.

57

**A057**

basis that infringes . . . his interest in freedom of speech."); see also Agency for Int'l Dev. v. All. For Open Soc'y Int'l, Inc., 570 U.S. 205, 214 (2013) ("[A] funding condition can result in an unconstitutional burden on First Amendment rights."). Moreover, it is worth noting that the conditions here are particularly concerning because, as discussed, many of them were based on Harvard's "particular beliefs," Nat'l Rifle Ass'n of Am. v. Vullo, 602 U.S. 175, 188 (2024), and sought to dictate the content of speech on campus and the "particular views taken by speakers on [particular] subject[s]," Rosenberger v. Rectors & Visitors of Univ. of Va., 515 U.S. 819, 829 (1995). "On the spectrum of dangers to free expression, there are few greater than allowing the government to change the speech of private actors in order to achieve its own conception of speech nirvana." Moody v. NetChoice, LLC, 603 U.S. 707, 719, 741–42 (2024).

Defendants in opposition offer only that "[i]t is an open question whether the unconstitutional conditions doctrine can even be properly applied to settlement negotiations at all." [Harvard, ECF No. 186 at 49]. Defendants' cited authority, however, notes that the "mere fact that one agrees to the challenged condition, even in a settlement, cannot by itself render the bargain constitutional because the unconstitutional conditions doctrine focuses on the propriety of the condition, not the fact that the claimant agreed to it." Stephens v. Cnty. of Albemarle, No. 04-cv-00081, 2005 WL 3533428, at *6 (W.D. Va. Dec. 22, 2005); see also Koontz v. St. Johns River Water Mgmt. Dist., 570 U.S. 595, 608 (2013) (holding that a constitutional claim may rest on "an unconstitutionally extortionate demand"). Here, Defendants' focus on whether the April 11 Letter was a final agency action or whether it was a simple settlement term is misplaced; rather, the issue is the impropriety of conditioning Harvard's federal funding, even as part of settlement negotiations, on Harvard's realigning its campus to better reflect a viewpoint favored

58

**A058**

by the government.  As such, the Court finds that Defendants imposed unconstitutional conditions on Harvard's receipt of federal funding in violation of the First Amendment.

### 3. Unconstitutional Coercion

The Organizational Plaintiffs also assert a First Amendment claim based on a theory of unconstitutional coercion, relying primarily on National Rifle Association of America v. Vullo, which held that "[a] government official cannot directly or indirectly coerce a private party to punish or suppress disfavored speech on her behalf."  602 U.S. at 190; see also id. at 189 ("The First Amendment prohibits government officials from relying on the 'threat of invoking legal sanctions and other means of coercion . . . to achieve the suppression' of disfavored speech." (quoting Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 67 (1963))).  Defendants contend that Vullo is distinguishable because, "unlike Vullo, [this case] does not involve the government threatening coercive action against one party to get at the protected speech of a third; instead, the government is using its enforcement authority to act directly upon a regulated entity because of that entity's own conduct."  [AAUP, ECF No. 104 at 33].  They further assert that "[u]nlike in Vullo, there are no plausible allegations here that any of the actions taken by the agencies were done 'in order to' suppress or punish protected speech, rather than to pursue a legitimate interest," namely combatting antisemitism.  [Id. at 34].

The Court disagrees.  Vullo is instructive on this issue, if not determinative.  In that case, the Superintendent of the New York Department of Financial Services ("DFS"), Maria Vullo, in the wake of a high-profile school shooting allegedly criticized the National Rifle Association ("NRA"), urging insurance companies and other financial institutions regulated by DFS to discontinue any arrangements they had with the NRA or face investigation for technical regulatory infractions.  602 U.S. at 182–84.  DFS subsequently entered into consent decrees with

**A059**

two insurers, who agreed not to any provide NRA-endorsed insurance programs and then cut ties with the NRA. Id. at 185. The Court held that the government cannot threaten or impose legal sanctions or use other means of coercion to suppress speech. Id. at 180. Although "Vullo was free to criticize the NRA and pursue the conceded violations of New York insurance law," id. at 187, as a government official, she could not "attempt to coerce private parties in order to punish or suppress views that the government disfavors," id. at 180.

Defendants' contention that this case "is different in kind" than Vullo, [AAUP, ECF No. 104 at 33], is unavailing. As discussed at length, the administrative record reflects that, via the April 11 Letter, Defendants unconstitutionally sought to force Harvard to better manifest the government's favored worldview. To do so, Defendants (like Maria Vullo) urged and threatened Harvard (in the position of the insurer) to hire faculty and make curricula and research choices that better aligned with the government's preferred viewpoints, to the detriment of professors and researchers with competing views (like the NRA). Pursuant to Vullo, using this type of coercion to suppress speech, third-party or otherwise, is not permissible. 602 U.S. at 180–81. Because the Defendants required the Organizational Plaintiffs' members to rebalance and alter their speech to save Harvard's funding, the Court finds the Organizational Plaintiffs are entitled to summary judgment on their unconstitutional coercion claim.

Based on the foregoing, the Court **GRANTS** summary judgment to Plaintiffs on their First Amendment claims for retaliation, unconstitutional conditions, and unconstitutional coercion, and it **DENIES** Defendants' competing motions.

### B. Title VI

Plaintiffs and Defendants have filed cross motions for summary judgment on Plaintiffs' Title VI claims. Title VI of the Civil Rights Act of 1964 prohibits discrimination on the basis of

60

**A060**

race, color, or national origin in "any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.[24] In Title VI, Congress identified specific procedures that an agency must follow before "terminating, or refusing to grant or continue, assistance" based on an alleged failure to comply with a requirement adopted pursuant to Title VI. Id. at § 2000d-1. Specifically, Title VI provides that no action terminating financial assistance "shall be taken until the department or agency concerned has" 1) "advised the appropriate person or persons of the failure to comply with the requirement," and 2) "determined that compliance cannot be secured by voluntary means." Id. If the relevant department or agency determines that voluntary compliance is not possible, it may then terminate grants, but only if "there has been an express finding on the record, after opportunity for hearing, of a failure to comply with such requirement," and the termination must be "limited to the particular . . . recipient as to whom such a finding has been made," as well as "the particular program, or part thereof, in which such noncompliance has been so found." Id. Further, once these procedural steps have been met, "the head of the Federal department or agency shall file with the committees of the House and Senate having legislative jurisdiction over the program or activity involved a full written report of the circumstances and the grounds for such action." Id. After this report is filed with Congress, the action still may not "become effective until thirty days have elapsed." Id. Only then may an agency terminate funding because of concerns about discrimination.

It is undisputed that Defendants did not comply with these requirements before issuing the Freeze Orders or Termination Letters. The administrative record contains no evidence of a

---

[24] The parties do not dispute that Title VI protects Jewish students from harassment. "[D]iscrimination based on actual or perceived Israeli identity is of course discrimination based on national origin." Kestenbaum v. President & Fellows of Harvard Coll., 743 F. Supp. 3d 297, 307 (D. Mass. 2024).

**A061**

notice of noncompliance, an assessment that compliance could not be achieved by voluntary means, a hearing, a finding on the record, or a report to Congress. See generally [Harvard, ECF No. 224]; see also [Harvard SOF ¶¶ 96, 98–101]. Thus, to the extent Defendants were required to comply with Title VI, Plaintiffs are indisputably entitled to summary judgment on their Title VI claims. See, e.g., City of Providence v. Barr, 954 F.3d 23, 31 (1st Cir. 2020) ("Any action that an agency takes outside the bounds of its statutory authority is ultra vires . . . and violates the Administrative Procedure Act." (citation omitted)).

Defendants contend, however, that they, rather than Plaintiffs, are entitled to summary judgment on the Title VI claims because they were not required to comply with Title VI at all. See [Harvard, ECF No. 186 at 51]. Rather, they argue that they terminated Harvard's funding pursuant to 2 C.F.R. § 200.340(a)(4), which provides that a "Federal award may be terminated in part or its entirety. . . . [b]y the Federal agency . . . pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." [Harvard, ECF No. 186 at 52–55]. Notably, however, neither the April 14 nor the May 5 Freeze Order contains any reference to 2 C.F.R. § 200.340, and it is a fundamental principle of administrative law that "the post hoc rationalizations of the agency . . . cannot serve as a sufficient predicate for agency action." Am. Textile Mfrs. Inst., Inc. v. Donovan, 452 U.S. 490, 539 (1981).

This lack of reference to 2 C.F.R. § 200.340 in the Freeze Orders does not reflect an isolated or accidental oversight; in fact, this Court's diligent review of the administrative record has not identified a single document predating the Termination Letters that references 2 C.F.R. § 200.340 as a basis for ending Harvard's funding. Rather, the record is replete with documents calling on Harvard's funding to be investigated and terminated pursuant to Title VI (not 2 C.F.R.

62

**A062**

§ 200.340) or, more generally, "civil rights laws" (like Title VI). This includes a December 2024 Congressional Staff Report on Antisemitism, [HHSHarv_00000030 ("The Executive Branch Should Aggressively Enforce Title VI")]; Executive Order 14188, [HHSHarv_00000001 (calling on the Attorney General to "employ appropriate civil rights enforcement," referencing Title VI complaints, and incorporating prior executive order discussing Title VI at length)]; see also Exec. Order No. 14188, 90 Fed. Reg. 8857 (Jan. 29, 2025); the April 3 Letter (which, as discussed, was incorporated into the April 11 Letter), [GSAHarv_00000005 (claiming Harvard "has fundamentally failed to protect American students and faculty from antisemitic violence and harassment in addition to other alleged violations of Title VI")]; the April 11 Letter, [GSAHarv_00000007 (federal investment "depends on Harvard upholding federal civil rights laws")]; and, the April 14 Freeze Order, [GSAHarv_00000013 (noting that federal investment comes with "the responsibility to uphold civil rights laws")]. To conclude that 2 C.F.R. § 200.340(a)(4) served as the basis for these terminations, rather than Title VI, is simply "incongruent with what the record reveals about the agenc[ies'] priorities and decisionmaking process." Dep't of Com. v. New York, 588 U.S. 752, 785 (2019).

Defendants maintain that the Termination Letters are the relevant final agency action, and that those letters do cite to 2 C.F.R. § 200.340(a)(4) as the basis for the terminations. [Harvard, ECF No. 223 at 8 n.1]. Even accepting the premise that invoking 2 C.F.R. § 200.340(a)(4) at the last moment was not a post hoc attempt to remedy the failure to follow Title VI's procedures, the argument that this regulation authorizes Defendants' conduct is, at best, circular. The regulation permits an agency to terminate federal grants for no longer effectuating "agency priorities," and to do so "to the extent authorized by law." 2 C.F.R. § 200.340(a)(4). The agency priority identified in the Termination Letters is, almost uniformly, Harvard's purported failure to combat

63

**A063**

antisemitism. [Harvard SOF ¶ 78]; see also [AAUP SOF ¶¶ 43–44, 50–51, 57, 63, 69, 72, 74, 76, 83–84]. Congress has, however, passed a law that explicitly provides for when and how an agency can terminate federal funding to address this type of discrimination—and that law is Title VI, which dictates that "no such action shall be taken until the department or agency" has gone through the appropriate procedures. 42 U.S.C. § 2000d-1. In other words, allowing Defendants to use 2 C.F.R. § 200.340(a)(4) to cancel grants based on discrimination is not authorized by law, as it would result in the regulation wholly nullifying an explicit statutory scheme, which is impermissible. P. Gioioso & Sons, Inc. v. Occupational Safety & Health Rev. Comm'n, 115 F.3d 100, 105 (1st Cir. 1997) ("[R]egulations cannot alter th[e] statutory scheme.").

Defendants disagree with the Court's reading of the interplay between Title VI and 2 C.F.R. § 200.340(a)(4), contending that it "would require concluding that Congress intended discriminators to have more protections than those whose contract[s] are terminated for different policy reasons under 2 C.F.R. § 200.340, which would conflict with Congress's intent of achieving maximal civil rights protections." [Harvard, ECF No. 186 at 54]. It is Congress's role, however, to circumscribe agency authority as it sees fit, and here it has, passing a statute aimed at "avoid[ing] a punitive . . . application of the termination power" by imposing "procedural limitations . . . designed to [e]nsure" that end. Bd. of Pub. Instruction v. Finch, 414 F.2d 1068, 1075 (5th Cir. 1969). "Discriminators" are not afforded more protections; rather, people and entities receiving federal funding are shielded against being labeled with the "irreversible stigma" of "discriminator" until a certain level of agency process has determined that there was misconduct that warranted termination. Bowman v. EPA, 712 F. Supp. 375, 383 (S.D.N.Y. 1989); see also Foster v. Mydas Assocs., Inc., 779 F. Supp. 614, 620 (D. Mass. 1991) ("To charge racial discrimination is to accuse a person of a most despicable and disreputable act.

Thus, one who seeks to secure his own civil rights must, in turn, be equally sensitive to the rights of the innocent to preserve their good name and not, without sufficient legal basis, rob them of that which not enriches him but makes them poor indeed." (citation modified)).  This Court's role is not to second guess Congress's judgment, and it may not disregard an explicit statutory scheme aimed at exactly the harm at issue, namely addressing discriminatory conduct.[25]

As such, the Court **GRANTS** Plaintiffs' motions for summary judgment as to their Title VI claims and **DENIES** Defendants' motions.

### C.    Arbitrary and Capricious

Plaintiffs further contend that Defendants' actions violate the APA because they were arbitrary and capricious.  Plaintiffs raise three main arguments: 1) Defendants failed to provide a reasoned explanation as to why it was necessary to freeze funding to Harvard; 2) Defendants failed to consider the consequences of freezing funding to Harvard, namely, "whether any putative benefits from terminating Harvard's funding could outweigh the costs of terminating critical research programs;" and, 3) Defendants failed to consider serious reliance interests before freezing funding to Harvard.  [Harvard, ECF No. 70 at 50–58]; see also [AAUP, ECF No. 75 at 35–51 (similar)].  Defendants' counterargument is similarly three-fold.  They contend that 1) deciding to freeze grants was not arbitrary and capricious because they followed a

---

[25] Count 3 of Harvard's Amended Complaint cites 5 U.S.C. § 706(2)(A) and (C), while Count 4 cites 5 U.S.C. § 706(2)(A) and (D).  [Harvard, ECF No. 59 at ¶¶ 140–92].  Because the Defendant agencies failed to follow the procedures prescribed in Title VI, their actions were "not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations," and "without observance of procedure required by law," 5 U.S.C. § 706(2)(A), (C), (D); see also Campanale & Sons, Inc. v. Evans, 311 F.3d 109, 117–21, 121 n.15 (1st Cir. 2002) (holding that agency's failure to follow explicit statutory procedural requirement in enacting regulations would violate 5 U.S.C. § 706(2)(D)), and thus Harvard's motion is granted as to both counts.

65

**A065**

"comprehensive review of Federal contracts with certain institutions of higher education that [were] being investigated for potential infractions and dereliction of duties to curb or combat anti-Semitic harassment," including Harvard, citing to the Federal Task Force's March 31 Letter informing Harvard of the funding review; 2) Defendants weighed the cost of cutting research; and 3) Harvard cannot have a serious reliance interest in grant programs that are discretionary under 2 C.F.R. § 200.340.  [Harvard, ECF No. 186 at 56–60]; [AAUP, ECF No. 104 at 41–46].

"An agency action qualifies as 'arbitrary' or 'capricious' if it is not 'reasonable and reasonably explained.'" Ohio v. Env't Prot. Agency, 603 U.S. 279, 292 (2024) (quoting FCC v. Prometheus Radio Project, 592 U.S. 414, 423 (2021)).  "In reviewing an agency's action under that standard, a court may not 'substitute its judgment for that of the agency.'" Id. (quoting FCC v. Fox Television Stations, Inc., 556 U.S. 502, 513 (2009)).  "But it must ensure, among other things, that the agency has offered 'a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made.'" Id. (quoting Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)); see also Penobscot Air Servs., Ltd. v. FAA, 164 F.3d 713, 719 (1st Cir. 1999) ("The task of a court reviewing agency action under the APA's 'arbitrary and capricious' standard is to determine whether the agency has examined the pertinent evidence, considered the relevant factors, and 'articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" (quoting State Farm, 463 U.S. at 43)).  "While this is a highly deferential standard of review, it is not a rubber stamp." Penobscot Air Servs., 164 F.3d at 720 (quoting Dubois v. U.S. Dep't of Agric., 102 F.3d 1273, 1285 (1st Cir. 1996)).

Starting with the choice made, the Freeze Orders base the decision to end funding on the Defendant agencies having set a new priority, that is, to combat antisemitism, and their

66

**A066**

determination that Harvard had not taken sufficient steps to address antisemitism. Combatting antisemitism is, without question, a laudable and important goal. Even an indisputably worthy goal, however, does not allow Defendants to change course on decades of federal funding for critical research without providing a reasoned explanation as to how the agency determined that freezing funding would advance that goal, or, in other words, help combat antisemitism. Encino Motorcars, LLC v. Navarro, 579 U.S. 211, 221 (2016) ("Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change."). On that front, the Freeze Orders come up short for several reasons.

First, the Court is cognizant that, as Defendants contend, it "must 'uphold a decision of less than ideal clarity if the agency's path may be reasonably discerned,'" [Harvard, ECF No. 186 at 57 (quoting Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc., 419 U.S. 281, 286 (1974))], and that weighing the costs and benefits of terminating funding is "vested in the agencies, even if the plaintiff (or the court) would have weighed those interests differently," [id. at 59]. Here, however, the administrative record does not support that such a "path" was charted or that such weighing occurred. Although it is true that the Federal Task Force announced on March 31, 2025 that it would be embarking on a comprehensive review of federal contracts at Harvard to combat antisemitism, [GSAHarv_00000002], the record does not reflect that such a review occurred between that March 31 Letter and the Freeze Orders. Defendants have not pointed to a single document, nor has the Court's review of the record located one, that indicates that they weighed the value of the research funded by a particular grant against the goal of combating antisemitism at Harvard. Several documents, in fact, indicate that such a weighing likely did not occur before the assault on Harvard began or even by the time of the eventual Termination Letters (although, to be clear, the Court is not purporting to rule on the Termination

67

**A067**

Letters as part of its arbitrary and capricious analysis). For instance, DoD did not inform its officials that the Secretary of Defense had directed the cancellation of grants until the day after sending their termination letter, [DoDHarv_00000039–46, DoDHarv_00000033], leading, as discussed supra, the director of DARPA to plead with her supervisors to save a grant with Harvard aimed at preparing the country for emerging biological threats. [DoDHarv_00000047 ("Development of critical technologies that enables bio surveillance and biocollection in austere, field forward locations bolsters national security and warfighter safety and lethality.")]. Presumably, had any grant-based weighing occurred in advance, these concerns would have been raised, and, in any case, the record contains no information that this grant or any other DoD grant was discussed at all before being terminated.[26]

Second, the record reflects that Defendants had essentially no information about the prevalence of antisemitism at Harvard before issuing the Freeze Orders. DHS v. Regents of the Univ. of Cal., 951 U.S. 1, 30 (2020) (holding agency action was arbitrary and capricious where agency "entirely fail[ed] to consider [an] important aspect[] of the problem" that was "the centerpiece of the policy" (citation omitted)). The administrative record contains two documents which discuss antisemitism at Harvard: 1) the December 2024 Congressional Staff Report on Antisemitism, [HHSHarv _00000013–55], and 2) the April 29, 2025 Harvard Task Force Report.[27] As to the former, there is no indication in the record that the agencies considered the

---

[26] While not part of the administrative record, it is again worth noting that, per post-motion filings, this grant appears to have continued, despite nominally being cancelled. [ECF No. 221].

[27] Although neither party points to it in briefing, the Court's review of the record reveals one other document outlining methods of "[a]ddressing [a]ntisemitism and [a]nti-Americanism" at Harvard, produced bearing an HHS bates stamp. [HHSHarv_00000083–97]. The Court cannot discern on the face of the document, however, which agency, if any, created it or considered it. In any event, of the many methods it proposes to address antisemitism and anti-Americanism, none of those methods involve terminating federal grants. [Id.].

68

**A068**

Congressional Staff Report in deciding to freeze funding. The Freeze Orders make no mention of it, and even the Termination Letters almost uniformly cite to the Harvard Task Force Report as support, rather than anything that came before Harvard's own report. See, e.g., [USDA-HARV-AR-00008 (basing finding that Harvard failed to combat antisemitism on the conclusions of the "the Harvard Presidential Task Force on combating Antisemitism and Anti-Israeli Bias")]; [DoDHarv _ 00000039 (same)]; [EDHarvAR_0000011 (same)]; [ENERGY AR3932 (same)]. And that Harvard Task Force Report cannot serve as the justification for the April 14 Freeze Order because it was released on April 29, 2024, two weeks after the Freeze Order. As discussed supra, the agencies at issue here simply cannot rely on a post hoc rationalization for having frozen funding, and a report that postdated an action would certainly qualify as post hoc.[28]

Third, even accepting the premise that Defendants relied on the Congressional Staff Report and the Harvard Task Force Report to identify antisemitism as a problem, the administrative record contains no evidence that Defendants considered any of the steps Harvard had taken to research or address antisemitism on campus before declaring that funding would be frozen because Harvard had failed to address the issue.[29] The record reflects that Harvard was, in fact, working to respond to and ameliorate antisemitism, that it continued to do so each time the government raised concerns, and that it remained (and seemingly remains) open to dialogue as to what more it could do in the government's eyes to combat the problem. For instance, after

---

[28] Moreover, timing aside, allowing Defendants to rely solely on the Harvard Task Force Report would have raised other concerns, including the disincentive it could create for universities to assess and remedy their own shortcomings regarding issues like antisemitism.

[29] There is one document in the administrative record which appears to have been circulated by counsel for HHS entitled "Already Done by Harvard," which does describe some steps Harvard had taken to address antisemitism. [HHSHarv_00005232–35]. This document, however, is undated, and it was not circulated until May 29, 2025; thus, its only appearance in the administrative record is, necessarily, after the Freeze Orders were issued.

69

**A069**

the Congressional Staff Report raised antisemitism concerns at Harvard, Harvard began

implementing reforms, which were publicly announced and widely reported.  These included:

- creating the Harvard Task Force;
- disciplining students and faculty who violate applicable policies; enhancing programs and policies designed to address bias and promote ideological diversity and civil discourse;
- adopting new accountability procedures and clarified policies, including specifying that protests are not permitted in classrooms, libraries, dormitories, dining halls, Harvard offices, and other places where they would interfere with normal activities, and they expressly prohibit unauthorized encampments, exhibits, and displays on campus;
- supplementing existing safety and security measures;
- refining procedures and protections for reporting misconduct; and making several leadership and personnel changes.

[Harvard SOF ¶¶ 5–8].[30]  Yet, the record does not reflect that Defendants ever acknowledged or

considered these reforms or what impact Harvard's own efforts should have on the decision to

terminate funding.  When Defendants accused Harvard of failing to combat antisemitism in the

April 11 Letter, Harvard responded by detailing the steps taken and progress made, both via a

letter and in President Garber's public statements.  See [HHSHarv_00000104–05 (Harvard April

14 rejection letter outlining steps to combat antisemitism on campus and noting "[i]t is

unfortunate, then, that [the April 11 L]etter disregards Harvard's efforts")]; [Harvard SOF ¶ 42

(President Garber's April 14 statements outlining university response to antisemitism)].  Again,

there is no evidence in the record that Defendants ever considered these reforms or Harvard's

---

[30] The Court notes that the administrative record does not include all of Harvard's various statements and announcements regarding measures it has taken or will take to combat antisemitism, including President Garber's April 14, 2025 statement outlining those efforts.  The Court takes those statements into account, however, as it finds that Harvard's response to antisemitism is a factor that Defendants should have considered when deciding whether to terminate funding based on Harvard's response to antisemitism.  See Esch v. Yeutter, 876 F.2d 976, 991 (D.C. Cir. 1989) ("[E]xceptions to the general rule [against going beyond the administrative record] have been recognized . . . when the agency failed to consider factors which are relevant to its final decision.").

attention to the problem of antisemitism, despite declaring on April 14, 2025 that Harvard had not done enough.[31]

Fourth, the administrative record does not indicate that Defendants considered the potential societal costs to Harvard, the American public generally, Jews in particular, or even the government itself of freezing the underlying research. Cf. Michigan v. EPA, 576 U.S. 743, 759 (2015) ("The Agency must consider cost—including, most importantly, cost of compliance—before deciding whether regulation is appropriate and necessary."). As Harvard explains,

> In addition to canceling military research pivotal to national security, the [g]overnment ordered immunologists overseeing a multi-school tuberculosis consortium to immediately stop research, HHSHarv_00005181, told a Harvard researcher at the Wyss Institute to halt his development of an advanced chip designed to measure NASA astronauts' radiation exposure during the upcoming Artemis II mission to the Moon, HHSHarv_00004937, and directed yet another Wyss Institute scientist, a recipient of the nation's highest honor for technological achievement, to cease his research into Lou Gehrig's disease, HHSHarv_00005228. Officials at the Department of Veterans Affairs have begun the process of cutting funding for research into, among other lifesaving measures, "a predictive model to help V.A. emergency room physicians decide whether suicidal veterans should be hospitalized." See HHSHarv_00002326. This is sadly just the tip of the iceberg, as future projects at Harvard of a similar caliber are now categorically barred from even being considered for federal support.

[Harvard, ECF No. 70 at 55 (footnotes omitted)]. It is difficult if not impossible to conclude that Defendants considered all important aspects of the problem where the record reveals that they cancelled this broad swath of critical research without any consideration as to whether there were less restrictive alternatives or alternatives that would preserve the value and continuity of research already in progress. Research that has been frozen could save lives, money, or the

---

[31] The Harvard Task Force Report itself contains an appendix that details the actions Harvard has taken to combat antisemitism, which Defendants do not seem to have considered even by the time they terminated funding. [GSAHarv_00000327–34 ("Appendix 1: Recent Progress on Addressing Antisemitism and Anti-Israeli Bias Across Harvard.")].

71

**A071**

environment, to name a few. And the research was frozen without any sort of investigation into whether particular labs were engaging in antisemitic behavior, were employing Jews, were run by Jewish scientists, or were investigating issues or diseases particularly pertinent to Jews (such as, for example, Tay-Sachs disease), meaning that the funding freezes could and likely will harm the very people Defendants professed to be protecting. And it is unlikely that any Jew, even one directly impacted by antisemitism would be in favor of stopping research on, for example, Alzheimer's disease, heart disease, or autism to name a few, as a means of redressing their unrelated harm.

Finally, the decades of reliance interests that have been engendered by the government's prior practice of supporting Harvard as a research institution compound the problem of Defendants' lack of reasoned explanation and failure to consider important aspects of freezing funding. Housatonic River Initiative v. U.S. Env't Prot. Agency, 75 F.4th 248, 270 (1st Cir. 2023) ("A more detailed justification may be required . . . when the agency's prior position has engendered serious reliance interests." (citation modified)). Harvard scientists and other researchers have operated for years under the assumption that they would be able to continue to compete on fair terms for federal funding, build and staff their labs, create collaborations with other university research teams, and continue to be financially able to engage in and complete cutting-edge work aimed at important and beneficial scientific advances. To upend the longstanding, collaborative relationship between the government and Harvard and its partner institutions without considering alternatives or articulating a connection to the problem of antisemitism sounds in arbitrariness and reeks of pretext.

In sum, the Freeze Orders, on their face, purport to explain the decision to terminate funding as based on Harvard's failure to address antisemitism or uphold civil rights laws. It is

72

**A072**

difficult, however, if not impossible, for this Court to view that explanation as "reasoned" when the administrative record reflects that, before freezing nearly $2.2 billion in federal grants, the agencies considered little, if any, data regarding the antisemitism problem at Harvard, disregarded the substantial policy and other changes Harvard had taken and was continuing to take to address the issue, and failed to weigh the importance of any particular grant or to evaluate whether a particular grant recipient had engaged in antisemitic behavior before cutting off critical research. Although this Court may not "substitute its judgment for that of the agenc[ies]," Fox Television Stations, 556 U.S. at 513 (quoting State Farm, 463 U.S. at 54), "it must ensure, among other things, that the agency has offered 'a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made,'" Ohio, 603 U.S. at 292 (quoting State Farm, 463 U.S. at 43). It is that rational connection between the grant terminations and the fight against antisemitism that is wholly lacking here. Therefore, Plaintiffs' motions for summary judgment are **GRANTED** as to their arbitrary and capricious claims regarding the Freeze Orders, and Defendants' corresponding motions are **DENIED**.

### D. Ultra Vires Claims for First Amendment and Title VI Violations

Both Harvard and the Organizational Plaintiffs move for summary judgment on their ultra vires First Amendment claims, and Harvard additionally moves for summary judgment as to its ultra vires claim for violations of Title VI. Defendants cross move for summary judgment on the same claims.

"Before enactment of the APA, those challenging agency action often lacked a statutory cause of action," but "courts recognized a right to equitable relief where an agency's action was ultra vires—that is, 'unauthorized by any law and . . . in violation of the rights of the individual.'" Nuclear Regul. Comm'n v. Texas, 605 U.S. 665, 680 (2025) (quoting Am. Sch. of

73

**A073**

Magnetic Healing v. McAnnulty, 187 U.S. 94, 110 (1902)). "Since the APA was enacted, however, the Supreme Court has 'strictly limited nonstatutory ultra vires review' to avoid creating an 'easy end-run around the limitations of . . . judicial-review statutes.'" Am. Ctr. for Int'l Lab. Solidarity v. Chavez-DeRemer, No. 25-cv-1128, 2025 WL 1795090, at *27 (D.D.C. June 30, 2025) (quoting Nuclear Regul. Comm'n, 605 U.S. at 681). As it currently stands, ultra vires review "applies only when an agency has taken action entirely 'in excess of its delegated powers and contrary to a specific prohibition' in a statute." Nuclear Regul. Comm'n, 605 U.S. at 681 (quoting Ry. Clerks v. Ass'n for Benefit of Non-Contract Emps., 380 U.S. 650, 660 (1965)). Such review is unavailable if "a statutory review scheme provides aggrieved persons 'with a meaningful and adequate opportunity for judicial review.'" Id. (quoting Bd. of Governors of the Fed. Rsrv. Sys. v. MCorp Fin., Inc., 502 U.S. 32, 43 (1991)). An ultra vires challenge "requires satisfying the traditional factors for injunctive relief, since this type of review 'is a suit in equity.'" Am. Ctr. for Int'l Lab. Solidarity, 2025 WL 1795090, at *27 (quoting Am. Foreign Serv. Ass'n v. Trump, No. 25-cv-5184, 2025 WL 1742853, at *2 (D.D.C. June 20, 2025)).

The Organizational Plaintiffs offer no particularized argument in support of their equitable cause of action under the First Amendment, essentially conflating it with their APA claim. Harvard, likewise, offers little argument in support of its ultra vires claims, arguing them primarily in the alternative to its claims under the APA. See [Harvard, ECF No. 70 at 58 ("Even if APA review were not available here (it is), the [g]overnment's actions should still be set aside as ultra vires.")]. It overall contends that "the [g]overnment's actions are flagrantly in violation of the First Amendment. And it has ignored the mandatory statutory requirements to revoke federal funding to a university based on allegations of antisemitism." [Id.]. Defendants respond that 1) by failing to engage with the ultra vires standard, Harvard has effectively waived the

74

**A074**

argument, 2) the plain language of Title VI provides for judicial review, and 3) the constitutional claims are barred by the Tucker Act.  [ECF No. 186 at 37–39].

The Court finds neither party's arguments particularly helpful.  Given, however, Plaintiffs' limited briefing on the issue, their success on their APA challenges, and the Supreme Court's guidance that "ultra vires review is not available [where Plaintiffs] ha[ve] an alternative path to judicial review," Nuclear Regul. Comm'n, 605 U.S. at 682, the Court **GRANTS** Defendants' motion for summary judgment as to Plaintiffs' equitable and ultra vires claims, which are Count 2 in the Harvard action and Count III in the Organizational Plaintiffs' action.

### E.    Due Process Claims

Defendants move for summary judgment on the Organizational Plaintiffs' procedural due process claims, one of which is brought under the APA and the other ultra vires, arguing primarily that the Organizational Plaintiffs do not have a protected property interest in their federal grants.  [AAUP, ECF No. 104 at 50–52; AAUP, ECF No. 130 at 36].  The Organizational Plaintiffs did not move for summary judgment on their due process claims, but they oppose (albeit briefly) Defendants' motion on the grounds that they have a protected liberty interest (as distinct from a property interest)—referring to their First Amendment interests, discussed at length supra.  [AAUP, ECF No. 110 at 41].  Because Defendants' arguments largely talk past the Organizational Plaintiffs' claims,[32] the Court cannot find that they are entitled to judgment as a

---

[32] Defendants' response to the Organizational Plaintiffs' assertion of a liberty interest is limited to arguing that a void for vagueness challenge can only be brought against statutes or regulations that govern primary conduct.  [AAUP, ECF No. 104 at 50].  Defendants' cited authority, however, is not so narrow, and given, as discussed supra, that the Organizational Plaintiffs' viewpoints and related research are the targets of the April 11 Letter's unclear and unconstitutional demands, the Court is unconvinced that summary judgment should be granted in favor of Defendants as to the due process claims at this stage.  San Francisco A.I.D.S. Found. v.

75

**A075**

matter of law.  See Bauer v. Montgomery, 215 F.3d 656, 662 (6th Cir. 2000) (reversing district court grant of summary judgment on procedural due process claim where plaintiff had otherwise "established sufficient facts to preclude summary judgment on his First Amendment claim"); Aguiar-Carrasquillo v. Agosto-Alicea, 445 F.3d 19, 25 (1st Cir. 2006) (summary judgment appropriate only where moving party "has met its burden to demonstrate undisputed facts entitling it to summary judgment as a matter of law" (citation omitted)).  As such, Defendants' motion for summary judgment as to Count VIII, the Organizational Plaintiffs' APA claim, is **DENIED**.  That said, because the Organizational Plaintiffs have a remedy at law, the Court **GRANTS** Defendants' motion as to the ultra vires claim, Count VII.

### F.  Separation of Powers/Spending Clause Claims

Defendants move for summary judgment as to the Organizational Plaintiffs' separation of powers claims, one of which is styled as an ultra vires claim (Count V) and the other of which is brought pursuant to the APA (Count VI).  Defendants argue that 1) "the Executive has both express and implied authority to terminate individual grants," 2) the Organizational Plaintiffs' "separation of powers and spending clause arguments are merely repackaged claims under Title VI, which fail for the reasons outlined above," and 3) "the [g]overnment's cancellation of funding due to concerns regarding compliance with antidiscrimination laws is entirely proper." [AAUP, ECF No. 104 at 47–49].  Defendants, however, cite no legal authority to support their purported express and implied authority to terminate individual grants, and this Court has already

---

Trump, No. 25-cv-01824, 2025 WL 1621636, at \*20 (N.D. Cal. June 9, 2025) (rejecting defendants' primary conduct argument where challenged directives implicated "the traditional concerns under the vagueness doctrine, i.e., that they d[id] not give fair notice so that grantees can act accordingly, and they encourage[d] arbitrary and discriminatory enforcement by the implementing agencies").

76

**A076**

found that the termination violated Title VI and the First Amendment.  As such, the Court finds Defendants arguments unavailing and **DENIES** their motion for summary judgment as to Count VI.  That said, as explained supra, the Organizational Plaintiffs' substantially similar ultra vires claim cannot proceed where the Organizational Plaintiffs have "an alternative path to judicial review," Nuclear Regul. Comm'n, 605 U.S. at 682, in this instance under the APA.  Defendants' motion for summary judgment as to Count V is therefore **GRANTED**.

### G.    Permanent Injunction

In addition to seeking vacatur of the Freeze Orders and Termination Letters under 5 U.S.C. § 706, Plaintiffs also request a permanent injunction against any unconstitutional conditions imposed to date, and which prohibits Defendants from "[i]ssuing any other termination, freezing of funds, stop work orders, or withholding of payment on existing grants or other federal funding, or refusal to award future grants, contracts, or other federal funding to [Harvard] in retaliation for the exercise of its First Amendment rights, or on purported grounds of discrimination without compliance with the terms of Title VI." [Harvard, ECF No. 69-1 at 2]; see also [AAUP, ECF No. 64 at Prayer for Relief (similar)].  "Where a plaintiff seeks permanent injunctive relief, the test is the same [as for preliminary injunctive relief], except that 'the movant must show actual success on the merits of the claim, rather than a mere likelihood of success.'" Esso Standard Oil Co. v. Freytes, 467 F. Supp. 2d 156, 159 (D.P.R. 2006) (citation omitted), aff'd sub nom. Esso Standard Oil Co. v. Lopez-Freytes, 522 F.3d 136 (1st Cir. 2008). The plaintiff must also demonstrate that it "would be irreparably injured in the absence of injunctive relief," that "the harm to [plaintiff] from defendant's conduct would exceed the harm to the defendant accruing from the issuance of an injunction," and "that the public interest would not be adversely affected by an injunction." Id. at 168 (citation omitted).

77

**A077**

Defendants do not dispute that the loss of First Amendment freedoms would constitute irreparable harm to Plaintiffs, nor do they dispute that the balancing of harms and the public interest favor granting permanent injunctive relief.  [Harvard, ECF No. 186 at 61–63; Harvard, ECF No. 223 at 33]; [AAUP, ECF No. 104 at 52–55; AAUP, ECF No. 130 at 37].  Rather, Defendants oppose Plaintiffs' request on the grounds that "any relief should be limited to remedying improper agency action and must leave intact the Executive Branch's discretion to engage in further consideration of the topic at hand and consider other future agency actions consistent with law."  [Harvard, ECF No. 186 at 61].  Harvard, in particular, responds that it "does not request an injunction that would prevent the [g]overnment from initiating proper investigations in full conformance with the Title VI process."  [Harvard, ECF No. 211 at 40].  Rather, "[i]t simply requests that the [g]overnment be enjoined from depriving Harvard of funding as a form of retaliation for Harvard's exercise of its First Amendment rights, in a repeat of what has transpired over the last several months and in a manner that fails to follow the procedural requirements set forth in Title VI and the individual agency Defendants' implementing regulations."  [Id.].  Harvard further asserts that Defendants' suggestion that "the only improper agency action to be remedied is the agencies' decisions to terminate existing grants," is incorrect and that "injunctive relief is necessary here because of the [g]overnment's further categorical, across-the-board policy that Harvard is ineligible for any future grants."  [Id. at 39].

The Court agrees with Plaintiffs.  They have succeeded on their First Amendment claims, as well as their Title VI claims.  It goes without saying that this Court cannot and will not enjoin Defendants from acting within their constitutional, statutory, or regulatory authority, nor does it construe Plaintiffs as requesting that it do so.  But, given the First Amendment violations, the

78

**A078**

harms to Harvard's research, and the benefit to the public of that research continuing, the Court grants Harvard's request for a permanent injunction that prevents Defendants reimposing any unconstitutional conditions imposed to date, and enjoins Defendants from issuing any other termination, freezing of funds, stop work orders, or withholding of payment on existing grants or other federal funding, or refusal to award future grants, contracts, or other federal funding to Harvard in retaliation for the exercise of its First Amendment rights, or on purported grounds of discrimination without compliance with the requirements of Title VI.

## VII.    CONCLUSION

This case, of course, raises complicated and important legal issues, but, at its core, it concerns the future of grants sponsoring research that promises to benefit significantly the health and welfare of our country and the world.  Through the government's statements and actions, the fate of that research has now become intertwined with the issue of antisemitism at Harvard. Antisemitism, like other types of discrimination or prejudice, is intolerable.  And it is clear, even based solely on Harvard's own admissions, that Harvard has been plagued by antisemitism in recent years and could (and should) have done a better job of dealing with the issue.  That said, there is, in reality, little connection between the research affected by the grant terminations and antisemitism.  In fact, a review of the administrative record makes it difficult to conclude anything other than that Defendants used antisemitism as a smokescreen for a targeted, ideologically-motivated assault on this country's premier universities, and did so in a way that runs afoul of the APA, the First Amendment and Title VI.  Further, their actions have jeopardized decades of research and the welfare of all those who could stand to benefit from that research, as well as reflect a disregard for the rights protected by the Constitution and federal statutes.

**A079**

With respect to the difficult jurisdictional issues in this case, the Court has done its best to follow the Supreme Court's limited recent guidance, which is preliminary and might well change over the course of this litigation (and the many other cases involving similar issues)—an outcome that seems not unlikely given the seeming lack of consensus in APHA and the procedural challenges posed by having substantially similar cases proceed in two different forums. Although the doctrinal framework that applies to these threshold issues is certainly important, the issue of jurisdiction is something of a red herring. Whether this case plays out in this Court or in the Court of Federal Claims, what lies at the core of this dispute is the fact that Defendants are trying to pressure Harvard to accede to the government's demands in a way that squarely violates Plaintiffs' First Amendment rights and ignores the procedural requirements of Title VI and, to a certain extent, the APA. The idea that fighting antisemitism is Defendants' true aim is belied by the fact that the majority of the demands they are making of Harvard to restore its research funding are directed, on their face, at Harvard's governance, staffing and hiring practices, and admissions policies—all of which have little to do with antisemitism and everything to do with Defendants' power and political views.

The First Amendment is important and the right to free speech must be zealously guarded. Free speech has always been a hallmark of our democracy. The Supreme Court itself has recognized that efforts to educate people, change minds, and foster tolerance all benefit from more open communication, not less. As Justice Brandeis wrote in the seminal case of Whitney v. California, "[i]f there be time to expose through discussion the falsehood and fallacies, to avert the evil by the processes of education, the remedy to be applied is more speech, not enforced silence," 274 U.S. 357, 377 (1927) (Brandeis, J., concurring), or, in this case, the forced adoption of a political orthodoxy. As pertains to this case, it is important to recognize and remember that

80

**A080**

if speech can be curtailed in the name of the Jewish people today, then just as easily the speech of the Jews (and anyone else) can be curtailed when the political winds change direction.

Defendants and the President are right to combat antisemitism and to use all lawful means to do so. Harvard was wrong to tolerate hateful behavior for as long as it did. The record here, however, does not reflect that fighting antisemitism was Defendants' true aim in acting against Harvard and, even if it were, combatting antisemitism cannot be accomplished on the back of the First Amendment. We must fight against antisemitism, but we equally need to protect our rights, including our right to free speech, and neither goal should nor needs to be sacrificed on the altar of the other. Harvard is currently, even if belatedly, taking steps it needs to take to combat antisemitism and seems willing to do even more if need be. Now it is the job of the courts to similarly step up, to act to safeguard academic freedom and freedom of speech as required by the Constitution, and to ensure that important research is not improperly subjected to arbitrary and procedurally infirm grant terminations, even if doing so risks the wrath of a government committed to its agenda no matter the cost.

The Court rules as follows:

1. The Court **GRANTS** Harvard's motion for summary judgment, [Harvard, ECF No. 69], as to Counts 1, 3, and 4 and Defendants' cross motion for summary judgment, [Harvard, ECF No. 185], as to Counts 2 and 6. As to Count 5, the Court **GRANTS IN PART** Harvard's motion with respect to the Freeze Orders and **GRANTS IN PART** Defendants' motion with respect to the Termination Letters, which it lacks jurisdiction to review under 5 U.S.C. § 706(2)(A). Harvard's and Defendants' summary judgment motions in Case No. 25-cv-11048 are otherwise **DENIED**.

81

**A081**

2. The Court **GRANTS** the Organizational Plaintiffs' motion for summary judgment, [AAUP, ECF No. 74], as to Counts I and IV and Defendants' cross motion for summary judgment as to Counts III, V, and VII.  It **DENIES** Defendants' cross motion, [AAUP, ECF No. 103], as to Counts VI and VIII.  As to Count II, the Court **GRANTS IN PART** the Organizational Plaintiffs' motion with respect to the Freeze Orders and **GRANTS IN PART** Defendants' motion with respect to the Termination Letters, which it lacks jurisdiction to review under 5 U.S.C. § 706(2)(A).  The Organizational Plaintiffs' and Defendants' summary judgment motions in Case No. 25-cv-10910 are otherwise **DENIED**.

The Court orders the following relief:

1. The Court vacates and sets aside the Freeze Orders as arbitrary and capricious under 5 U.S.C. § 706(2)(A).

2. The Court vacates and sets aside the Freeze Orders and Termination Letters as violative of the First Amendment under 5 U.S.C. § 706(2)(B).  All freezes and terminations of funding to Harvard made pursuant to the Freeze Orders and Termination Letters on or after April 14, 2025 are vacated and set aside.

3. The Court vacates and sets aside the Termination Letters as violative of Title VI under 5 U.S.C. § 706(2)(C), (D).  All terminations of funding to Harvard made pursuant to the Termination Letters are vacated and set aside.

4. Defendants, their agents, and anyone acting in concert or participation with Defendants are hereby permanently enjoined from:

    a. Implementing, instituting, maintaining, or giving any force or effect to Defendants' Freeze Orders, Termination Letters, and attendant unconstitutional

82

**A082**

conditions, as well as any terminations of, freezes of, or refusing to grant or to continue federal funding undertaken pursuant to the Freeze Orders and Termination Letters, including but not limited to:

    i.   The April 3, 2025 Letter from the Federal Task Force to Combat Antisemitism;

    ii.   The April 11, 2025 Letter from the Federal Task Force to Combat Antisemitism;

    iii.   The April 14, 2025 Freeze Order;

    iv.   The May 5, 2025 Freeze Order;

    v.   The May 6, 2025 Termination Letter from the National Institutes of Health;

    vi.   The May 9, 2025 Termination Letter from the United States Department of Agriculture;

    vii.   The May 12, 2025 Termination Letter from the Department of Commerce;

    viii.   The May 12, 2025 Termination Letter from the Department of Defense;

    ix.   The May 12, 2025 Termination Letter from the Department of Energy;

    x.   The May 12, 2025 Termination Letter from the Department of Housing and Urban Development;

    xi.   The May 12, 2025 Termination Letter from the National Science Foundation;

    xii.   The May 12, 2025 Termination Letter from the Department of Education;

    xiii.   The May 12, 2025 Termination Letter from the Centers of Disease Control and Prevention;

xiv. The May 20, 2025 announcement by the Department of Health and

Human Services to cut $60 million in multi-year grants to Harvard; and

xv. The May 27, 2025 Termination Letter from the General Services

Administration.

b. Issuing any other termination, fund freezes, stop work orders, or otherwise

withholding payment on existing grants or other federal funding, or refusing to

award future grants, contracts, or other federal funding to Harvard in retaliation

for the exercise of its First Amendment rights, or on any purported grounds of

discrimination without compliance with the terms of Title VI.

**SO ORDERED.**

September 3, 2025

*/s/ Allison D. Burroughs*
ALLISON D. BURROUGHS
U.S. DISTRICT JUDGE

84

**A084**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

---

PRESIDENT AND FELLOWS OF HARVARD COLLEGE,

    Plaintiff,

        v.

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al.,

    Defendants.

Case No. 1:25-cv-11048-ADB

---

## ORDER ENTERING FINAL JUDGMENT

In accordance with the Court's Memorandum and Order dated September 3, 2025, it is hereby ORDERED, ADJUDGED, and DECREED as follows:

1. Judgment is entered for Plaintiff on its claims under the Administrative Procedure Act for violations of the First Amendment to the Constitution of the United States and Title VI of the Civil Rights Act of 1964. Judgment is also entered for Plaintiff on its claims under the Administrative Procedure Act insofar as they challenge the April 14 and May 5, 2025, Freeze Orders as arbitrary and capricious.

2. Judgment is entered for Defendants, as set forth in the Memorandum and Order, on Plaintiff's ultra vires claims, and on its claim under the Administrative Procedure Act that the Termination Letters are arbitrary and capricious for lack of subject matter jurisdiction.

3. The Freeze Orders and Termination Letters[1] are VACATED and SET ASIDE as set forth

---

[1] "Termination Letters" refers to: the May 6, 2025, Termination Letter from the National Institutes of Health; the May 9, 2025, Termination Letter from the United States Department of Agriculture; the May 9, 2025, Termination Letter from the National Aeronautics and Space

1

**A085**

in the Memorandum and Order.

4. Defendants, their agents, and all those acting in concert with them are PERMANENTLY ENJOINED from implementing, instituting, maintaining, or giving effect to the Freeze Orders and Termination Letters, or any conditions imposed therein, and from issuing further terminations, freezes, stop work orders, refusals to award grants or contracts, or withholdings of funding to Harvard in retaliation for the exercise of First Amendment rights, or on purported grounds of discrimination without compliance with Title VI.

5. The Court expressly reserves jurisdiction over the issue of attorney's fees and costs. Any motion for attorney's fees shall be filed in accordance with Federal Rule of Civil Procedure 54(d).

**SO ORDERED.**

_/s/ Allison D. Burroughs_

Allison D. Burroughs
United States District Judge

Date: October 20, 2025

---

Administration; the May 12, 2025, Termination Letter from the Department of Commerce; the May 12, 2025, Termination Letter from the Department of Defense; the May 12, 2025, Termination Letter from the Department of Energy; the May 12, 2025, Termination Letter from the Department of Housing and Urban Development; the May 12, 2025, Termination Letter from the National Science Foundation; the May 12, 2025, Termination Letter from the Department of Education; the May 19, 2025, Termination Letter from the Centers for Disease Control and Prevention; the May 20, 2025, announcement by the Department of Health and Human Services to cut multi-year grants; and the May 27, 2025, Termination Letter from the General Services Administration.

2

**A086**

**U.S. Const. amend I:**

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

**28 U.S.C. § 1491**

Claims against United States generally; actions involving Tennessee Valley Authority:

(a)(1) The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort. For the purpose of this paragraph, an express or implied contract with the Army and Air Force Exchange Service, Navy Exchanges, Marine Corps Exchanges, Coast Guard Exchanges, or Exchange Councils of the National Aeronautics and Space Administration shall be considered an express or implied contract with the United States.

(2) To provide an entire remedy and to complete the relief afforded by the judgment, the court may, as an incident of and collateral to any such judgment, issue orders directing restoration to office or position, placement in appropriate duty or retirement status, and correction of applicable records, and such orders may be issued to any appropriate official of the United States. In any case within its jurisdiction, the court shall have the power to remand appropriate matters to any administrative or executive body or official with such direction as it may deem proper and just. The Court of Federal Claims shall have jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under section 7104(b)(1) of title 41, including a dispute concerning termination of a contract, rights in tangible or intangible property, compliance with cost accounting standards, and other nonmonetary disputes on which a decision of the contracting officer has been issued under section 61 of that Act.

(b)(1) Both the Unites2 States Court of Federal Claims and the district courts of the United States shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement. Both the United States Court of Federal Claims and the district courts of the United States shall have jurisdiction to entertain such an action without regard to whether suit is instituted before or after the contract is awarded.

**A087**

(2) To afford relief in such an action, the courts may award any relief that the court considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs.

(3) In exercising jurisdiction under this subsection, the courts shall give due regard to the interests of national defense and national security and the need for expeditious resolution of the action.

(4) In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5.

(5) If an interested party who is a member of the private sector commences an action described in paragraph (1) with respect to a public-private competition conducted under Office of Management and Budget Circular A-76 regarding the performance of an activity or function of a Federal agency, or a decision to convert a function performed by Federal employees to private sector performance without a competition under Office of Management and Budget Circular A-76, then an interested party described in section 3551(2)(B) of title 31 shall be entitled to intervene in that action.

(6) Jurisdiction over any action described in paragraph (1) arising out of a maritime contract, or a solicitation for a proposed maritime contract, shall be governed by this section and shall not be subject to the jurisdiction of the district courts of the United States under the Suits in Admiralty Act (chapter 309 of title 46) or the Public Vessels Act (chapter 311 of title 46).

(c) Nothing herein shall be construed to give the United States Court of Federal Claims jurisdiction of any civil action within the exclusive jurisdiction of the Court of International Trade, or of any action against, or founded on conduct of, the Tennessee Valley Authority, or to amend or modify the provisions of the Tennessee Valley Authority Act of 1933 with respect to actions by or against the Authority.

## 42 U.S.C. § 2000d

Prohibition against exclusion from participation in, denial of benefits of, and discrimination under federally assisted programs on ground of race, color, or national origin:

No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

## 42 U.S.C. § 2000d-1

Federal authority and financial assistance to programs or activities by way of grant, loan, or contract other than contract of insurance or guaranty; rules and regulations;

approval by President; compliance with requirements; reports to Congressional committees; effective date of administrative action:

Each Federal department and agency which is empowered to extend Federal financial assistance to any program or activity, by way of grant, loan, or contract other than a contract of insurance or guaranty, is authorized and directed to effectuate the provisions of section 2000d of this title with respect to such program or activity by issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken. No such rule, regulation, or order shall become effective unless and until approved by the President. Compliance with any requirement adopted pursuant to this section may be effected (1) by the termination of or refusal to grant or to continue assistance under such program or activity to any recipient as to whom there has been an express finding on the record, after opportunity for hearing, of a failure to comply with such requirement, but such termination or refusal shall be limited to the particular political entity, or part thereof, or other recipient as to whom such a finding has been made and, shall be limited in its effect to the particular program, or part thereof, in which such noncompliance has been so found, or (2) by any other means authorized by law: Provided, however, That no such action shall be taken until the department or agency concerned has advised the appropriate person or persons of the failure to comply with the requirement and has determined that compliance cannot be secured by voluntary means. In the case of any action terminating, or refusing to grant or continue, assistance because of failure to comply with a requirement imposed pursuant to this section, the head of the Federal department or agency shall file with the committees of the House and Senate having legislative jurisdiction over the program or activity involved a full written report of the circumstances and the grounds for such action. No such action shall become effective until thirty days have elapsed after the filing of such report.

## 42 U.S.C. § 2000d-2

Judicial review; administrative procedure provisions:

Any department or agency action taken pursuant to section 2000d-1 of this title shall be subject to such judicial review as may otherwise be provided by law for similar action taken by such department or agency on other grounds. In the case of action, not otherwise subject to judicial review, terminating or refusing to grant or to continue financial assistance upon a finding of failure to comply with any requirement imposed pursuant to section 2000d-1 of this title, any person aggrieved (including any State or political subdivision thereof and any agency of either) may obtain judicial review of such action in accordance with chapter 7 of Title 5, and

A089

such action shall not be deemed committed to unreviewable agency discretion within the meaning of that chapter.

**2 C.F.R. § 200.340**

Termination:

(a) The Federal award may be terminated in part or its entirety as follows:

(1) By the Federal agency or pass-through entity if the recipient or subrecipient fails to comply with the terms and conditions of the Federal award;

(2) By the Federal agency or pass-through entity with the consent of the recipient or subrecipient, in which case the two parties must agree upon the termination conditions. These conditions include the effective date and, in the case of partial termination, the portion to be terminated;

(3) By the recipient or subrecipient upon sending the Federal agency or pass-through entity a written notification of the reasons for such termination, the effective date, and, in the case of partial termination, the portion to be terminated. However, if the Federal agency or pass-through entity determines that the remaining portion of the Federal award will not accomplish the purposes for which the Federal award was made, the Federal agency or pass-through entity may terminate the Federal award in its entirety; or

(4) By the Federal agency or pass-through entity pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities.

(b) The Federal agency or pass-through entity must clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award.

(c) When the Federal agency terminates the Federal award prior to the end of the period of performance due to the recipient's material failure to comply with the terms and conditions of the Federal award, the Federal agency must report the termination in SAM.gov. A Federal agency must use the Contractor Performance Assessment Reporting System (CPARS) to enter information in SAM.gov.

(1) The information required under paragraph (c) of this section is not to be reported in SAM.gov until the recipient has either:

(i) Exhausted its opportunities to object or challenge the decision (see § 200.342); or

(ii) Has not, within 30 calendar days after being notified of the termination, informed the Federal agency that it intends to appeal the decision to terminate.

**A090**

(2) If a Federal agency, after entering information about a termination in SAM.gov, subsequently:

(i) Learns that any of that information is erroneous, the Federal agency must correct the information in the system within three business days;

(ii) Obtains an update to that information that could be helpful to other Federal agencies, the Federal agency is strongly encouraged to amend the information in the system to incorporate the update in a timely way.

(3) The Federal agency must not post any information that will be made publicly available in the non-public segment of SAM.gov that is covered by a disclosure exemption under the Freedom of Information Act (FOIA). When the recipient asserts within seven calendar days to the Federal agency which posted the information that a disclosure exemption under FOIA covers some of the information made publicly available, the Federal agency that posted the information must remove the posting within seven calendar days of receiving the assertion. Before reposting the releasable information, the Federal agency must resolve the issue in accordance with the agency's FOIA procedures.

(d) When the Federal award is terminated in part or its entirety, the Federal agency or pass-through entity and recipient or subrecipient remain responsible for compliance with the requirements in §§ 200.344 and 200.345.

**A091**