Case No. 25-2230

---

# In the United States Court of Appeals
# For the First Circuit

---

**PRESIDENT AND FELLOWS OF HARVARD COLLEGE**,

*Plaintiff-Appellee*,

v.

**UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; NATIONAL INSTITUTES OF HEALTH; ROBERT F. KENNEDY,** in his official capacity as Secretary of the United States Department Health and Human Services; **UNITED STATES DEPARTMENT OF JUSTICE; TODD BLANCHE**, in his official capacity as Attorney General of the United States; **UNITED STATES DEPARTMENT OF EDUCATION; LINDA MCMAHON,** in her official capacity as Secretary of the United States Department of Education; **GENERAL SERVICES ADMINISTRATION; EDWARD FORST,** in his official capacity as Administrator of the United States General Services Administration; **UNITED STATES DEPARTMENT OF ENERGY; CHRISTOPHER WRIGHT,** in his official capacity as Secretary of the Department of Education; **NATIONAL SCIENCE FOUNDATION; BRIAN STONE,** in his official capacity Acting Director of the United States National Science Foundation; **UNITED STATES DEPARTMENT OF DEFENSE; PETER HEGSETH,** in his official capacity as Secretary of the United States Department of Defense; **NATIONAL AERONAUTICS AND SPACE ADMINISTRATION; JARED ISAACMAN,** in his official capacity as Administrator of the National Aeronautics and Space Administration; **UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT; SCOTT TURNER,** in his official capacity as Secretary of Housing and Urban Development; **UNITED STATES DEPARTMENT OF AGRICULTURE; BROOKE L. ROLLINS,** in her official capacity as Secretary of Agriculture,

*Defendants-Appellants*.

---

*On Appeal from the United States District Court for the District of Massachusetts; Judge Allison Burroughs, Case No. 1:25-cv-11048-ABD*

---

## JOINT APPENDIX
## (VOLUME 1: JA1-JA198)

---

*(Counsel on following page)*

**BRETT A. SHUMATE**
Assistant Attorney General
Civil Division

**MICHAEL VELCHIK**
Senior Counsel to the Assistant
Attorney General, Civil Division
U.S. Department of Justice
950 Pennsylvania Ave
Washington, D.C. 20530
Tel. 202-860-8388

**TIBERIUS DAVIS**
Counsel to the Assistant Attorney
General, Civil Division

*Counsel for Appellants*

# TABLE OF CONTENTS

Volumes

Volume 1 ........................................................................................................JA1-198

Volume 2 ......................................................................................................JA199-398

Volume 3 ......................................................................................................JA399-689


Excerpts from Harvard Docket

Docket Sheet .........................................................................................................JA1

Amended Complaint, Dkt. 59 ..............................................................................JA61

Notice of Appeal ...............................................................................................JA121


Excerpts from Administrative Record

Memorandum from Josh Gruenbaum, GSA, to Alan M. Garber, Harvard
        (March 31, 2025), GSAHarv_00000003 ................................................JA124

Letter from Josh Gruenbaum, GSA, to Alan M. Garber, Harvard (April 3,
        2025), EDHarvAR_0000001 ...................................................................JA126

Letter from Josh Gruenbaum, GSA, to Alan M. Garber, Harvard (April 11,
        2025), EDHarvAR_0000003 ...................................................................JA128

Letter from William A. Burck, Quinn Emanuel, to Josh Gruenbaum, GSA
        (April 14, 2025), HHSHarv_00000104 ..................................................JA133

Letter from Linda E. McMahon, Secretary of Education, to Alan M. Garber,
        Harvard (May 5, 2025), EDHarvAR_0000008 .......................................JA135

Executive Order 14188, Additional Measures to Combat Anti-Semitism, 90
        Fed. Reg. 8847 (Jan. 29, 2025), HHSHarv_00000001 ...........................JA138

Government Press Release (Feb. 28, 2025), HHSHarv_00000003 ................... JA140

Government Press Release (March 31, 2025), HHSHarv_00000006 .............. JA143

Government Press Release (April 14, 2025), HHSHarv_00000010 .................. JA47

Government Press Release (May 13, 2025), GSAHarv_00000014 ................. JA149

U.S. House of Representatives, Staff Report on Antisemitism (Dec. 18, 2024), HHSHarv_00000013 ................................................................. JA151

Harvard Presidential Task Force on Combating Antisemitism and Anti-Israeli Bias, Final Report (April 29, 2025), HHSHarv_00000162 .................... JA199

Letter from Peter Hegseth, Secretary of Defense, to Alana M. Garber, Harvard (May 12, 2025), DODHarv_00000039 ................................................ JA510

Letter from Murray Bessette, Department of Education, to Eve Blau, Harvard (May 12, 2025), EDHarv_00000011 ...................................................... JA512

Letter from Matthew Ammon, U.S. Department of Housing and Urban Development, to Alan M. Garber, Harvard (May 12, 2025), HUDHarv_00000064 ................................................................................. JA514

Letter from Racheal Down, NASA, to President & Fellows of Harvard College (May 9, 2025), NASA-AR03749 ............................................... JA515

Letter from Michelle G. Bulls, National Institutes of Health, to Alan M. Garber, Harvard (May 6, 2025), HHSHarv_00000473 .......................... JA517

Letter from Jamie H. French, National Science Foundation, to Alan M. Garber, Harvard (May 12, 2025), NSF_Harvard00039 ......................... JA520

Letter from Andria Weeks, U.S. Department of Agriculture, to Alan M. Garber, Harvard (May 9, 2025), USDA-HARV-AR-0008 .................... JA522

Letter from Juston Fontaine, U.S. Department of Energy, to Alan M. Garber, Harvard (May 12, 2025), ENERGY AR3929 ........................................ JA524

Letter from Shane Kosinski, U.S. Department of Energy, to Alan M. Garber, Harvard (May 12, 2025), ENERGY AR3932 ........................................ JA527

Letter from Juston Fontaine, U.S. Department of Energy, to Alan M. Garber, Harvard (May 12, 2025), ENERGY AR3936 .........................................JA531

Letter from Shane Kosinski, U.S. Department of Energy, to Alan M. Garber, Harvard (May 12, 2025), ENERGY AR3940 .........................................JA535

Letter from Shane Kosinski, U.S. Department of Energy, to Alan M. Garber, Harvard (May 12, 2025), ENERGY AR3944 .........................................JA539

Email from Ryuichi Kudo, Department of War, to John Doyle, Harvard (May 15, 2025), DODHarv_00000001 ...........................................................JA542

Email from Jennifer Cramer, Department of War, to Jason Day, Department of War (May 13, 2025), DoDHarv_00000033 ......................................JA543

Email from Efstathia Fragogiannis, Department of War, to James Hickey, Department of War (May 13, 2025) DoDHarv_00000047 ....................JA550

Letter from Leo Terrell, Department of Justice, to Alan M. Garber, Harvard (February 27, 2025), Harv. Dkt. 59-11.......................................................JA551

Joint Task Force statement regarding Harvard University (April 14, 2025), GSAHarv_00000012 ................................................................................JA553

Email from Josh Gruenbaum, GSA, to Abhishek Kambli, Department of Justice (May 8, 2025), GSAHarv_00000035 .........................................JA555

Email from Josh Gruenbaum, GSA, to Brandon Bartel, GSA (May 8, 2025), GSAHarv_00000038 ................................................................................JA558

Email from Marvin Horne, NASA, to Alexander Simonpour, NASA (May 12, 2025), GSAHarv_00000124..................................................................JA560

Email from Jeremy Lichtman, USDA, to Ralph Linden, USDA (May 8, 2025), USDA-HARV-AR-00001 ...................................................................JA562

Email from Brandon Bartel, GSA, to Josh Gruenbaum, GSA (May 8, 2025), USDA-HARV-AR-00084 ...................................................................JA572

Email from Josh Gruenbaum, GSA, to Alan M. Garber, Harvard (April 4, 2025), HHSHarv_00000061 ...................................................................JA573

3

Notice of Award (Nov. 8, 2024), HHSHarv_00002326 ................................... JA576

Notice of Award (Feb. 17, 2025), HHSHarv_00004700 ................................. JA577

Statement of Work, HHSHarv_00004937 ...................................................... JA578

Letter from George Kennedy to Wendy Chan (April 14, 2025), HHSHarv_00005225 ................................................................ JA580

Email from Kathleen Sears, NIH, to Harvard (April 14, 2025), HHSHarv_00005226 ................................................................ JA581

Letter from Nancy Lamonkritikos, NIH, to Harvard (April 14, 2025), HHSHarv_00005228 ................................................................ JA583

Email from Kathleen Sears, NIH, to Harvard (April 14, 2025), HHSHarv_00005229 ................................................................ JA584

Menu, HHSHarv_00005233 .......................................................................... JA585

Email from Josh Gruenbaum, GSA, to Alan M. Garber, Harvard (March 31, 2025), Harv. Dkt. 59-14.................................................................... JA588

Email from Alexander Simonpour, GSA, to Brandon Bartel, GSA (April 30, 2025), NASA-AR03541 ....................................................................... JA589

Email from Alexander Simonpour, GSA, to Marvin Horne, NASA (May 1, 2025), NASA-AR03547 ....................................................................... JA590

Email from Brandon Bartel, GSA, to Josh Gruenbaum, GSA (May 8, 2025), NASA-AR03558................................................................................... JA591

Email from Alexander Simonpour, GSA, to Marvin Horne, NASA (May 8, 2025), NASA-AR03637 ....................................................................... JA670

Email from Trey Carlson, NASA, to Mark Clampin, NASA (May 8, 2025), NASA-AR03679................................................................................... JA674

Email from Trey Carlson, NASA, to Karla Smith Jackson, NASA (May 8, 2025), NASA-AR03692 ....................................................................... JA675

# United States District Court
## District of Massachusetts (Boston)
## CIVIL DOCKET FOR CASE #: 1:25-cv-11048-ADB

President and Fellows of Harvard College v. US Department of
Health and Human Services et al
Assigned to: Judge Allison D. Burroughs
Case in other court: USCA, 25-02230
Cause: 05:702 Administrative Procedure Act

Date Filed: 04/21/2025
Date Terminated: 10/20/2025
Jury Demand: None
Nature of Suit: 899 Other Statutes:
Administrative Procedures Act/Review or
Appeal of Agency Decision
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**President and Fellows of Harvard College**          represented by  **Steven Paul Lehotsky**
Lehotsky Keller Cohn LLP
200 Massachusetts Avenue NW
Suite 700
Washington, DC 20001
202-365-2509
Email: steve@lkcfirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Danielle Kerker Goldstein**
Lehotsky Keller Cohn LLP
3280 Peachtree Road NE
Atlanta, GA 30305
512-693-8350
Email: danielle@lkcfirm.com
*ATTORNEY TO BE NOTICED*

**Douglas Hallward-Driemeier**
Ropes & Gray LLP - DC
2099 Pennsylvania Avenue, NW
Washington, DC 20006
202-508-4776
Email: douglas.Hallward-
Driemeier@ropesgray.com
*ATTORNEY TO BE NOTICED*

**Elena W. Davis**
Ropes & Gray - MA
Prudential Tower
800 Boylston Street
Boston, MA 02199-3600
617-951-7017
Email: elena.davis@ropesgray.com
*ATTORNEY TO BE NOTICED*

**Jacob Richards**

**JA001**

Lehotsky Keller Cohn
200 Mass Ave
Washington, DC 20001
623-377-0227
Email: jacob@lkcfirm.com
*ATTORNEY TO BE NOTICED*

**John Mark Barnes**
Ropes & Gray LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199
617-951-7000
Email: mark.barnes@ropesgray.com
*ATTORNEY TO BE NOTICED*

**John P. Bueker**
Ropes & Gray - MA
Prudential Tower
800 Boylston Street
Boston, MA 02199-3600
617-951-7000
Fax: 617-951-7050
Email: john.bueker@ropesgray.com
*ATTORNEY TO BE NOTICED*

**Jonathan F. Cohn**
Lehotsky Keller Cohn LLP
200 Massachusetts Avenue, NW
Suite 700
Washington, DC 20001
512-693-8350
Fax: 512-727-4755
Email: jon@lkcfirm.com
*ATTORNEY TO BE NOTICED*

**Joshua S. Levy**
Ropes & Gray LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199
617-951-7000
Email: joshua.levy@ropesgray.com
*ATTORNEY TO BE NOTICED*

**Joshua Paul Morrow**
Lehotsky Keller Cohn LLP
408 W. 11th Street
5th Floor
Austin, TX 78701
512-693-8350
Fax: 512-727-4755
Email: josh@lkcfirm.com
*ATTORNEY TO BE NOTICED*

**JA002**

**Katherine Yarger**
Lehotsky Keller Cohn LLP
700 Colorado Blvd.
Unit 407
Denver, CO 80206
303-717-4749
Email: katie@lkcfirm.com
*ATTORNEY TO BE NOTICED*

**Mary Elizabeth Miller**
Lehotsky Keller Cohn LLP
200 Massachusetts Avenue, NW
Suite 700
Washington, DC 20001
512-693-8350
Fax: 512-727-4755
Email: mary@lkcfirm.com
*ATTORNEY TO BE NOTICED*

**Robert K. Hur**
1700 Pennsylvania Ave NW
Ste 200
Washington, DC 20006
202-737-0500
Email: rhur@kslaw.com
*ATTORNEY TO BE NOTICED*

**Scott Allen Keller**
Lehotsky Keller Cohn LLP
200 Massachusetts Ave. NW
Washington, DC 20001
512-693-8350
Fax: 512-727-4755
Email: scott@lkcfirm.com
*ATTORNEY TO BE NOTICED*

**Shannon Grammel Denmark**
Lehotsky Keller Cohn LLP
200 Massachusetts Ave., NW
Washington, DC 20001
270-498-5375
Email: shannon@lkcfirm.com
*ATTORNEY TO BE NOTICED*

**Stephen Sencer**
Ropes & Gray LLP
2099 Pennsylvania Avenue, N.W.
Washington, DC 20006
202-508-4688
Email: stephen.sencer@ropesgray.com
*ATTORNEY TO BE NOTICED*

**William A. Burck**

**JA003**

Quinn Emanuel Urquhart & Sullivan
555 13th Street NW
Suite 600
Washington, DC 20004
202-538-8120
Fax: 202-538-8100
Email: williamburck@quinnemanuel.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**US Department of Health and Human Services**                represented by **Abhishek Kambli**
DOJ-Oasg
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001
202-445-5496
Email: abhishek.kambli@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Anuj K. Khetarpal**
United States Attorney's Office
1 Courthouse Way
Suite 9200
Boston, MA 02210
617-823-6325
Email: akhetarpal@seyfarth.com
*TERMINATED: 07/15/2025*
*ATTORNEY TO BE NOTICED*

**Eitan Sirkovich**
DOJ-Civ
1100 L Street NW
Room 12310
Washington, DC 20005
585-694-1124
Email: eitan.r.sirkovich@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Michael Velchik**
DOJ-Civ
950 Pennsylvania Avenue NW
Washington, DC 20530
202-860-8388
Email: michael.velchik@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Ryan Underwood**
DOJ-Civ
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20530

**JA004**

202-305-1925
Email: ryan.m.underwood2@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**National Institutes of Health**                    represented by    **Anuj K. Khetarpal**
(See above for address)
*TERMINATED: 07/15/2025*
*ATTORNEY TO BE NOTICED*

**Eitan Sirkovich**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael Velchik**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ryan Underwood**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Robert F. Kennedy, Jr.**                           represented by    **Anuj K. Khetarpal**
*in his official capacity as Secretary of the*                         (See above for address)
*United States Department of Health and*                               *TERMINATED: 07/15/2025*
*Human Services*                                                       *ATTORNEY TO BE NOTICED*

**Eitan Sirkovich**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael Velchik**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ryan Underwood**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**US Department of Justice**                         represented by    **Anuj K. Khetarpal**
(See above for address)
*TERMINATED: 07/15/2025*
*ATTORNEY TO BE NOTICED*

**Eitan Sirkovich**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael Velchik**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JA005**

Ryan Underwood
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Pamela Bondi**
*in her official capacity as Attorney General
of the United States*

represented by   **Anuj K. Khetarpal**
(See above for address)
*TERMINATED: 07/15/2025*
*ATTORNEY TO BE NOTICED*

**Eitan Sirkovich**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ryan Underwood**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**US Department of Education**

represented by   **Anuj K. Khetarpal**
(See above for address)
*TERMINATED: 07/15/2025*
*ATTORNEY TO BE NOTICED*

**Eitan Sirkovich**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael Velchik**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ryan Underwood**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Linda M McMahon**
*in her official capacity as Secretary of the
United States Department of Education*

represented by   **Anuj K. Khetarpal**
(See above for address)
*TERMINATED: 07/15/2025*
*ATTORNEY TO BE NOTICED*

**Eitan Sirkovich**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael Velchik**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ryan Underwood**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JA006**

**Defendant**

**US General Services Administration**       represented by    **Anuj K. Khetarpal**
                                                               (See above for address)
                                                               *TERMINATED: 07/15/2025*
                                                               *ATTORNEY TO BE NOTICED*

                                                               **Eitan Sirkovich**
                                                               (See above for address)
                                                               *ATTORNEY TO BE NOTICED*

                                                               **Michael Velchik**
                                                               (See above for address)
                                                               *ATTORNEY TO BE NOTICED*

                                                               **Ryan Underwood**
                                                               (See above for address)
                                                               *ATTORNEY TO BE NOTICED*

**Defendant**

**Stephen Ehikian**                          represented by    **Anuj K. Khetarpal**
*in his official capacity as Acting*                           (See above for address)
*Administrator of the United States General*                   *TERMINATED: 07/15/2025*
*Services Administration*                                      *ATTORNEY TO BE NOTICED*

                                                               **Eitan Sirkovich**
                                                               (See above for address)
                                                               *ATTORNEY TO BE NOTICED*

                                                               **Michael Velchik**
                                                               (See above for address)
                                                               *ATTORNEY TO BE NOTICED*

                                                               **Ryan Underwood**
                                                               (See above for address)
                                                               *ATTORNEY TO BE NOTICED*

**Defendant**

**US Department of Energy**                  represented by    **Anuj K. Khetarpal**
                                                               (See above for address)
                                                               *TERMINATED: 07/15/2025*
                                                               *ATTORNEY TO BE NOTICED*

                                                               **Eitan Sirkovich**
                                                               (See above for address)
                                                               *ATTORNEY TO BE NOTICED*

                                                               **Michael Velchik**
                                                               (See above for address)
                                                               *ATTORNEY TO BE NOTICED*

                                                               **Ryan Underwood**
                                                               (See above for address)
                                                               *ATTORNEY TO BE NOTICED*

**JA007**

**Defendant**

**Christopher A. Wright**                    represented by  **Anuj K. Khetarpal**
*in his official capacity as Secretary of the*                  (See above for address)
*United States Department of Energy*                            *TERMINATED: 07/15/2025*
                                                               *ATTORNEY TO BE NOTICED*

                                                               **Eitan Sirkovich**
                                                               (See above for address)
                                                               *ATTORNEY TO BE NOTICED*

                                                               **Michael Velchik**
                                                               (See above for address)
                                                               *ATTORNEY TO BE NOTICED*

                                                               **Ryan Underwood**
                                                               (See above for address)
                                                               *ATTORNEY TO BE NOTICED*

**Defendant**

**US National Science Foundation**           represented by  **Anuj K. Khetarpal**
                                                               (See above for address)
                                                               *TERMINATED: 07/15/2025*
                                                               *ATTORNEY TO BE NOTICED*

                                                               **Eitan Sirkovich**
                                                               (See above for address)
                                                               *ATTORNEY TO BE NOTICED*

                                                               **Michael Velchik**
                                                               (See above for address)
                                                               *ATTORNEY TO BE NOTICED*

                                                               **Ryan Underwood**
                                                               (See above for address)
                                                               *ATTORNEY TO BE NOTICED*

**Defendant**

**Sethuraman Panchanathan**                  represented by  **Anuj K. Khetarpal**
*in his official capacity as Director of the*                  (See above for address)
*United States National Science Foundation*                    *TERMINATED: 07/15/2025*
                                                               *ATTORNEY TO BE NOTICED*

                                                               **Eitan Sirkovich**
                                                               (See above for address)
                                                               *ATTORNEY TO BE NOTICED*

                                                               **Michael Velchik**
                                                               (See above for address)
                                                               *ATTORNEY TO BE NOTICED*

                                                               **Ryan Underwood**
                                                               (See above for address)
                                                               *ATTORNEY TO BE NOTICED*

**JA008**

**Defendant**

**US Department of Defense**    represented by    **Anuj K. Khetarpal**
(See above for address)
*TERMINATED: 07/15/2025*
*ATTORNEY TO BE NOTICED*

**Eitan Sirkovich**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael Velchik**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ryan Underwood**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Peter B. Hegseth**    represented by    **Anuj K. Khetarpal**
*in his official capacity as Secretary of the*        (See above for address)
*United States Department of Defense*        *TERMINATED: 07/15/2025*
*ATTORNEY TO BE NOTICED*

**Eitan Sirkovich**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael Velchik**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ryan Underwood**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**National Aeronautics and Space Administration**    represented by    **Anuj K. Khetarpal**
(See above for address)
*TERMINATED: 07/15/2025*
*ATTORNEY TO BE NOTICED*

**Eitan Sirkovich**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael Velchik**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ryan Underwood**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JA009**

**Defendant**

| | | |
|---|---|---|
| **Janet E. Petro** *in her official capacity as Acting Administrator of the National Aeronautics and Space Administration* | represented by | **Anuj K. Khetarpal** (See above for address) *TERMINATED: 07/15/2025* *ATTORNEY TO BE NOTICED* |
| | | **Eitan Sirkovich** (See above for address) *ATTORNEY TO BE NOTICED* |
| | | **Michael Velchik** (See above for address) *ATTORNEY TO BE NOTICED* |
| | | **Ryan Underwood** (See above for address) *ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **US Department of Housing and Urban Development** | represented by | **Anuj K. Khetarpal** (See above for address) *TERMINATED: 07/15/2025* *ATTORNEY TO BE NOTICED* |
| | | **Eitan Sirkovich** (See above for address) *ATTORNEY TO BE NOTICED* |
| | | **Michael Velchik** (See above for address) *ATTORNEY TO BE NOTICED* |
| | | **Ryan Underwood** (See above for address) *ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **Scott Turner** *in his official capacity as Secretary of Housing and Urban Development* | represented by | **Anuj K. Khetarpal** (See above for address) *TERMINATED: 07/15/2025* *ATTORNEY TO BE NOTICED* |
| | | **Eitan Sirkovich** (See above for address) *ATTORNEY TO BE NOTICED* |
| | | **Michael Velchik** (See above for address) *ATTORNEY TO BE NOTICED* |
| | | **Ryan Underwood** (See above for address) *ATTORNEY TO BE NOTICED* |

**JA010**

**Defendant**

**US Department of Agriculture**            represented by   **Anuj K. Khetarpal**
(See above for address)
*TERMINATED: 07/15/2025*
*ATTORNEY TO BE NOTICED*

**Eitan Sirkovich**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael Velchik**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ryan Underwood**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Brooke L. Rollins**            represented by   **Anuj K. Khetarpal**
*in her official capacity as Secretary of*       (See above for address)
*Agriculture*                                 *TERMINATED: 07/15/2025*
*ATTORNEY TO BE NOTICED*

**Eitan Sirkovich**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael Velchik**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ryan Underwood**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**American Council on Education**         represented by   **Gregory F Noonan**
Hogan Lovells US LLP
125 High Street
Suite 2010
Boston, MA 02110
617-371-1029
Email: gregory.noonan@hoganlovells.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jessica L. Ellsworth**
Hogan Lovells US LLP
555 Thirteenth Street NW
Washington, DC 20004
202-637-5886
Email: jessica.ellsworth@hoganlovells.com

**JA011**

Case: 25-2230    Document: 00118437646    Page: 18    Date Filed: 04/27/2026    Entry ID: 6804858

*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kayla Ghantous**
Hogan Lovells US LLP
125 High Street
Suite 2010
Boston, MA 02110
781-308-8610
Email: kayla.ghantous@hoganlovells.com
*ATTORNEY TO BE NOTICED*

**Reedy Swanson**
Hogan Lovells US LLP
555 13th Street N.W,
Washington, DC 20004
202-637-5764
Email: reedy.swanson@hoganlovells.com
*ATTORNEY TO BE NOTICED*

**Stephanie Julie Gold**
Hogan Lovells US LLP
555 Thirteenth St NW
Washington, DC 20004
202-637-5600
Email: stephanie.gold@hoganlovells.com
*ATTORNEY TO BE NOTICED*

**Amicus**

**Harvard Undergraduate Palestine Solidarity Committee**                represented by    **Radhika Sainath**
Palestine Legal
637 S. Dearborn St.
3rd Floor
Chicago, IL 60605
312-964-2667
Email: radhika@palestinelegal.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Dylan Saba**
Palestine Legal
55 Exchange Place
Suite 402
New York City, NY 10005
312-964-2667
Email: dsaba@palestinelegal.org
*ATTORNEY TO BE NOTICED*

**Ragini N. Shah**
Suffolk University Law School
120 Tremont Street
Suite 190B
Boston, MA 02118

**JA012**

617-305-1651
Email: rnshah@suffolk.edu
*ATTORNEY TO BE NOTICED*

**Amicus**

**American Civil Liberties Union**                represented by  **Matthew Segal**
American Civil Liberties Union Foundation
One Center Plaza
Suite 850
Boston
Boston, MA 02108
617-299-6664
Email: msegal@aclu.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jessie J. Rossman**
ACLU of Massachusetts
Massachusetts
One Center Plaza
Suite 850
Boston, MA 02108
617-482-3170
Fax: 617-451-0009
Email: jrossman@aclum.org
*ATTORNEY TO BE NOTICED*

**Rachel Davidson**
ACLU of Massachusetts
One Center Plaza
Suite 850
Boston, MA 02108
617-482-3170
Email: rdavidson@aclum.org
*ATTORNEY TO BE NOTICED*

**Amicus**

**American Civil Liberties Union of Massachusetts**                represented by  **Matthew Segal**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jessie J. Rossman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rachel Davidson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Cato Institute**                represented by  **Matthew Segal**
(See above for address)
*LEAD ATTORNEY*

**JA013**

*ATTORNEY TO BE NOTICED*

**Jessie J. Rossman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rachel Davidson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Electronic Frontier Foundation**                    represented by    **Matthew Segal**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jessie J. Rossman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rachel Davidson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Knight First Amendment Institute at**                represented by    **Matthew Segal**
**Columbia University**                                                  (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jessie J. Rossman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rachel Davidson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**National Coalition Against Censorship**              represented by    **Matthew Segal**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jessie J. Rossman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rachel Davidson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**JA014**

**Reporters Committee for Freedom of the Press**

represented by **Matthew Segal**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jessie J. Rossman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rachel Davidson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Rutherford Institute**

represented by **Matthew Segal**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jessie J. Rossman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rachel Davidson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Middle East Studies Association of North America, Inc.**
3542 N. Geronimo Avenue
Tucson, AZ 85705
520-333-2577

represented by **Corey Sullivan Martin**
HM Law, P.C.
24 Shipyard Drive
Suite 202
Hingham, MA 02043
781-789-8070
Email: cmartin@myhmlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Darryl Li**
1126 E. 59th St.
Chicago, IL 60637
773-702-4001
Email: darrylli@protonmail.com
*ATTORNEY TO BE NOTICED*

**Amicus**

**Commonwealth of Massachusetts**

represented by **Anna E. Lumelsky**
Massachusetts Attorney General's Office
McCormack Building
One Ashburton Place
Boston, MA 02108
617-963-2334
Email: anna.lumelsky@mass.gov

**JA015**

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Columbia Alumni for Academic Freedom**                represented by    **Sean H. Donahue**
Donahue, Goldberg & Herzog
1008 Pennsylvania Ave., SE
Washington, DC 20003
202-277-7085
Email: sean@donahuegoldberg.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jocelyn Baker Jones**
Segal Roitman LLP
33 Harrison Avenue, 7th Flr.
Boston, MA 02111
617-899-1382
Fax: 617-742-2187
Email: jjones@segalroitman.com
*ATTORNEY TO BE NOTICED*

**Amicus**

**California Institute of Technology**                represented by    **Daniel J. Cloherty**
Cloherty & Steinberg LLP
One Financial Center
Suite 1120
Boston, MA 02111
617-481-0160
Email: dcloherty@clohertysteinberg.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Donald Beaton Verrilli , Jr.**
Munger, Tolles & Olson LLP
601 Massachusetts Avenue, NW
Suite 500e
Washington, DC 20001-5369
202-220-1101
Email: donald.verrilli@mto.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Helen E White**
Munger, Tolles & Olson LLP
601 Massachusetts Ave. NW
Suite 500e
Washington, DC 20001
202-220-1136
Email: helen.white@mto.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**JA016**

**Alexandra Arnold**
Cloherty & Steinberg LLP
One Financial Center
Ste 1120
Boston, MA 02111
617-481-0160
Email: aarnold@clohertysteinberg.com
*ATTORNEY TO BE NOTICED*

**Esthena Barlow**
Munger, Tolles & Olson LLP
601 Massachusetts Avenue N.W.
Suite 500E
Washington, DC 20001
202-220-1100
Email: esthena.barlow@mto.com
*ATTORNEY TO BE NOTICED*

**Victoria L. Steinberg**
Cloherty & Steinberg LLP
One Financial Center
Suite 1120
Boston, MA 02111
617-481-0160
Email: vsteinberg@clohertysteinberg.com
*ATTORNEY TO BE NOTICED*

**Amicus**

| | | |
|---|---|---|
| **Trustees Boston University** | represented by | **Daniel J. Cloherty** |

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Donald Beaton Verrilli , Jr.**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Helen E White**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexandra Arnold**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Esthena Barlow**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Victoria L. Steinberg**

**JA017**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Brown University**                                  represented by **Daniel J. Cloherty**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Donald Beaton Verrilli , Jr.**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Helen E White**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexandra Arnold**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Esthena Barlow**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Victoria L. Steinberg**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Colorado State University**                          represented by **Daniel J. Cloherty**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Donald Beaton Verrilli , Jr.**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Helen E White**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexandra Arnold**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Esthena Barlow**

**JA018**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Victoria L. Steinberg**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Dartmouth College**                    represented by    **Daniel J. Cloherty**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Donald Beaton Verrilli , Jr.**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Helen E White**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexandra Arnold**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Esthena Barlow**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Victoria L. Steinberg**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Johns Hopkins University**                    represented by    **Daniel J. Cloherty**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Donald Beaton Verrilli , Jr.**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Helen E White**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexandra Arnold**

**JA019**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Esthena Barlow**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Victoria L. Steinberg**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Massachusetts Institute of Technology**    represented by    **Daniel J. Cloherty**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Donald Beaton Verrilli , Jr.**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Helen E White**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexandra Arnold**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Esthena Barlow**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Victoria L. Steinberg**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Michigan State University**    represented by    **Daniel J. Cloherty**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Donald Beaton Verrilli , Jr.**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Helen E White**
(See above for address)

**JA020**

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexandra Arnold**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Esthena Barlow**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Victoria L. Steinberg**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Oregon State University**                represented by   **Daniel J. Cloherty**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Donald Beaton Verrilli , Jr.**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Helen E White**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexandra Arnold**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Esthena Barlow**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Victoria L. Steinberg**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Princeton University**                represented by   **Daniel J. Cloherty**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Donald Beaton Verrilli , Jr.**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*

**JA021**

*ATTORNEY TO BE NOTICED*

**Helen E White**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexandra Arnold**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Esthena Barlow**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Victoria L. Steinberg**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Rice University**                    represented by    **Daniel J. Cloherty**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Donald Beaton Verrilli , Jr.**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Helen E White**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexandra Arnold**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Esthena Barlow**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Victoria L. Steinberg**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Rutgers University**                    represented by    **Daniel J. Cloherty**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**JA022**

**Donald Beaton Verrilli , Jr.**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Helen E White**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexandra Arnold**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Esthena Barlow**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Victoria L. Steinberg**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Tufts University**                    represented by **Daniel J. Cloherty**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Donald Beaton Verrilli , Jr.**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Helen E White**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexandra Arnold**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Esthena Barlow**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Victoria L. Steinberg**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**JA023**

**University of Maryland, College Park**          represented by **Daniel J. Cloherty**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Donald Beaton Verrilli , Jr.**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Helen E White**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexandra Arnold**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Esthena Barlow**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Victoria L. Steinberg**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**University of Oregon**          represented by **Daniel J. Cloherty**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Donald Beaton Verrilli , Jr.**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Helen E White**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexandra Arnold**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Esthena Barlow**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Victoria L. Steinberg**

**JA024**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**University of Pennsylvania**                represented by    **Daniel J. Cloherty**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Donald Beaton Verrilli , Jr.**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Helen E White**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexandra Arnold**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Esthena Barlow**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Victoria L. Steinberg**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**University of Pittsburgh**                represented by    **Daniel J. Cloherty**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Donald Beaton Verrilli , Jr.**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Helen E White**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexandra Arnold**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Esthena Barlow**

**JA025**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Victoria L. Steinberg**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Yale University**                   represented by   **Daniel J. Cloherty**
                                                       (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Alexandra Arnold**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Victoria L. Steinberg**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

**Amicus**

**A Jewish Voice for Peace**          represented by   **Bina Ahmad**
                                                       Hadsell Stormer Renick & Dai LLP
                                                       128 N. Fair Oaks Ave.
                                                       Pasadena, CA 91103
                                                       626-585-9600
                                                       Email: bahmad@hadsellstormer.com
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Rachel L. Weber**
                                                       48 Ward Avenue
                                                       01060
                                                       Northampton, MA 01060
                                                       413-325-5431
                                                       Email: rweber@rweberlaw.com
                                                       *ATTORNEY TO BE NOTICED*

**Amicus**

**Conference of Boston Teaching Hospital, Inc.**   represented by   **Eric M. Gold**
                                                       Manatt, Phelps & Phillips
                                                       177 Huntington Avenue, Suite 2500
                                                       Boston, MA 02115
                                                       617-646-1423
                                                       Email: egold@manatt.com
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Martin F Murphy**
                                                       Manatt, Phelps & Phillips, LLP
                                                       One Beacon Street
                                                       Suite 28-200
                                                       Boston, MA 02108
                                                       617-646-1447
                                                       Email: MFMurphy@manatt.com

**JA026**

*ATTORNEY TO BE NOTICED*

**Max A. Jacobs**
Manatt, Phelps & Phillips, LLP
One Beacon Street
Ste 28-200
Boston, MA 02108
617-646-1450
Email: mjacobs@manatt.com
*ATTORNEY TO BE NOTICED*

Amicus

**Foundation for Individual Rights and Expression**
510 Walnut Street
Suite 900
Philadelphia, PA 19106
215-717-3473

represented by **Dustin F Hecker**
Hecker ADR LLC
43 Bradford Street
Needham, MA 02492
617-721-5212
Email: dustin.heckeradr@outlook.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Amicus

**12,041 Harvard Alumni**

represented by **Joel Anderson Fleming**
Equity Litigation Group LLP
1 Washington Mall #1307
Boston, MA 02108
617-388-0622
Email: jfleming@equitylitigation.com
*ATTORNEY TO BE NOTICED*

**Lauren G. Milgroom**
Equity Litigation Group LLP
1 Washington Mall
#1307
Boston, MA 02108
617-475-0039
Email: lmilgroom@equitylitigation.com
*ATTORNEY TO BE NOTICED*

Amicus

**American University**

represented by **Daniel J. Cloherty**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Donald Beaton Verrilli , Jr.**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Helen E White**
(See above for address)
*LEAD ATTORNEY*

**JA027**

*ATTORNEY TO BE NOTICED*

**Esthena Barlow**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Georgetown University**                    represented by   **Daniel J. Cloherty**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Donald Beaton Verrilli , Jr.**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Helen E White**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Esthena Barlow**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Stanford University**                    represented by   **Daniel J. Cloherty**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Donald Beaton Verrilli , Jr.**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Helen E White**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Esthena Barlow**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**University of Delaware**                    represented by   **Daniel J. Cloherty**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**JA028**

**Donald Beaton Verrilli , Jr.**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Helen E White**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Esthena Barlow**
(See above for address)
*ATTORNEY TO BE NOTICED*

**<u>Amicus</u>**

**University of Denver**                     represented by **Daniel J. Cloherty**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Donald Beaton Verrilli , Jr.**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Helen E White**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Esthena Barlow**
(See above for address)
*ATTORNEY TO BE NOTICED*

**<u>Amicus</u>**

**University of Maryland, Baltimore**        represented by **Daniel J. Cloherty**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Donald Beaton Verrilli , Jr.**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Helen E White**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Esthena Barlow**

**JA029**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Jewish Scholars of Jewish Studies**          represented by **Yaman Salahi**
Salahi PC
505 Montgomery St.
Ste 11th Floor
San Francisco, CA 94111
415-236-2352
Email: yaman@salahilaw.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rachel L. Weber**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Amici States**

**Amicus**

**Muslim Legal Fund of America**          represented by **Christina Jump**
Muslim Legal Fund of America
100 N. Central Expy.
Suite 1010
Richardson, TX 75080
972-914-2507
Fax: 972-692-7454
Email: cjump@jump-start-legal.com
*ATTORNEY TO BE NOTICED*

**Mark D. Stern**
Law Offices of Mark D. Stern
Office
34 Liberty Avenue
Somerville, MA 02144
617-776-4020
Fax: 617-776-9250
Email: attorneymarkdstern@comcast.net
*ATTORNEY TO BE NOTICED*

**Amicus**

**Former U.S. Agency Officials**          represented by **Rebecca Livengood**
Relman Colfax
1225 19th St, N.W.
Suite 600
Washington, DC 20036
202-728-1888
Email: rlivengood@relmanlaw.com
*LEAD ATTORNEY*
*PRO HAC VICE*

**JA030**

*ATTORNEY TO BE NOTICED*

**Tara Ramchandani**
Relman Colfax PLLC
1225 19th Street NW
Suite 600
Washington, DC 20036
202-728-1888
Email: tramchandani@relmanlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Amicus

**Kaveh L. Afrasiabi**

Amicus

**The Louis D. Brandeis Center for Human Rights Under Law**          represented by          **Douglas S. Brooks**
Libby Hoopes Brooks & Mulvey, P.C.
260 Franklin Street
Suite 1920
Boston, MA 02110
617-338-9300
Email: dbrooks@lhbmlegal.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jeffrey Lang**
The Louis D. Brandeis Center for Human Rights Under Law
1717 Pennsylvania Ave., NW
Suite 1025
Washington, DC 20006
Email: jlang@brandeiscenter.com
*ATTORNEY TO BE NOTICED*

**L. Rachel Lerman**
The Louis D Brandeis Center for Human Rights Under Law
1717 Pennsylvania Avenue
Suite 1025
Washington, DC 20006
310-498-3414
Email: rlerman@brandeiscenter.com
*ATTORNEY TO BE NOTICED*

**Rebecca L. Harris**
The Louis D. Brandeis Center
1717 Pennsylvania Avenue NW
Suite 1025
Washington, DC 20006
201-328-4953
Email: rharris@brandeiscenter.com
*ATTORNEY TO BE NOTICED*

**JA031**

**Amicus**

**The State of Iowa and 15 other States**    represented by    **Eric H Wessan**
Iowa Department of Justice
Solicitor General
1305 Walnut St.
Des Moines, IA 50319
515-823-9117
Email: eric.wessan@ag.iowa.gov
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nathaniel M. Lindzen**
The Law Office of Nathaniel M. Lindzen
57 School Street
Wayland, MA 01778
212-810-7627
Email: nlindzen@corpfraudlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**National Jewish Advocacy Center, Inc.**    represented by    **George W. Vien**
Donnelly, Conroy & Gelhaar, LLP
Suite 1600
260 Franklin Street
Boston, MA 02110
617-720-2880
Fax: 617-720-3554
Email: gwv@dcglaw.com
*ATTORNEY TO BE NOTICED*

**Pietro A. Conte**
Donnelly Conroy & Gelhaar
260 Franklin Street
Suite 1600
Boston, MA 02110
617-720-2880
Email: pac@dcglaw.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 04/21/2025 | 1 | COMPLAINT against All Defendants Filing fee: $ 405, receipt number AMADC-10963463 (Fee Status: Filing Fee paid), filed by President and Fellows of Harvard College. (Attachments: # 1 Exhibit A. April 11 Letter to Harvard, # 2 Exhibit B. April 14 Lawyers Letter from Harvard, # 3 Exhibit C. Freeze Order, # 4 Exhibit D. February 27 Letter to Harvard, # 5 Exhibit E. February 28 Press Release, # 6 Exhibit F. March 31 Letter to Harvard, # 7 Exhibit G. March 31 Cover Email, # 8 Exhibit H. April 3 Cover Email, # 9 Exhibit I. April 3 Letter to Harvard, # 10 Civil Cover Sheet, # 11 Category Form, # 12 Supplement Certificate of Related Case)(Lehotsky, Steven) (Entered: 04/21/2025) |

**JA032**

| 04/21/2025 | 2 | CORPORATE DISCLOSURE STATEMENT by President and Fellows of Harvard College. (Lehotsky, Steven) (Entered: 04/21/2025) |
|---|---|---|
| 04/21/2025 | 3 | NOTICE of Appearance by Jacob Richards on behalf of President and Fellows of Harvard College (Richards, Jacob) (Entered: 04/21/2025) |
| 04/22/2025 | 4 | NOTICE of Appearance by John P. Bueker on behalf of President and Fellows of Harvard College (Bueker, John) (Entered: 04/22/2025) |
| 04/22/2025 | 5 | ELECTRONIC NOTICE of Case Assignment. Judge Allison D. Burroughs assigned to case. If the trial Judge issues an Order of Reference of any matter in this case to a Magistrate Judge, the matter will be transmitted to Magistrate Judge M. Page Kelley. (JKK) (Entered: 04/22/2025) |
| 04/22/2025 | 6 | Summons Issued as to Pamela J. Bondi, Stephen Ehikian, Peter B. Hegseth, Robert F. Kennedy, Jr, Linda M McMahon, National Aeronautics and Space Administration, National Institutes of Health, Sethuraman Panchanathan, Janet E. Petro, US Department of Defense, US Department of Education, US Department of Energy, US Department of Health and Human Services, US Department of Justice, US General Services Administration, US National Science Foundation, Christopher A. Wright. **Counsel receiving this notice electronically should download this summons, complete one for each defendant and serve it in accordance with Fed.R.Civ.P. 4 and LR 4.1. Summons will be mailed to plaintiff(s) not receiving notice electronically for completion of service.** (KLM) (Entered: 04/22/2025) |
| 04/22/2025 | 7 | NOTICE of Appearance by Douglas Hallward-Driemeier on behalf of President and Fellows of Harvard College (Hallward-Driemeier, Douglas) (Entered: 04/22/2025) |
| 04/22/2025 | 8 | NOTICE of Appearance by Elena W. Davis on behalf of President and Fellows of Harvard College (Davis, Elena) (Entered: 04/22/2025) |
| 04/23/2025 | 9 | MOTION for Leave to Appear Pro Hac Vice for admission of Scott A. Keller Filing fee: $ 125, receipt number AMADC-10969123 by President and Fellows of Harvard College. (Attachments: # 1 Affidavit of Scott A. Keller)(Lehotsky, Steven) (Entered: 04/23/2025) |
| 04/23/2025 | 10 | MOTION for Leave to Appear Pro Hac Vice for admission of Jonathan F. Cohn Filing fee: $ 125, receipt number AMADC-10969124 by President and Fellows of Harvard College. (Attachments: # 1 Affidavit Jonathan F. Cohn)(Lehotsky, Steven) (Entered: 04/23/2025) |
| 04/23/2025 | 11 | MOTION for Leave to Appear Pro Hac Vice for admission of Katherine C. Yarger Filing fee: $ 125, receipt number AMADC-10969127 by President and Fellows of Harvard College. (Attachments: # 1 Affidavit Katherine C. Yarger)(Lehotsky, Steven) (Entered: 04/23/2025) |
| 04/23/2025 | 12 | MOTION for Leave to Appear Pro Hac Vice for admission of Mary Elizabeth Miller Filing fee: $ 125, receipt number AMADC-10969128 by President and Fellows of Harvard College. (Attachments: # 1 Affidavit Mary Elizabeth Miller)(Lehotsky, Steven) (Entered: 04/23/2025) |
| 04/23/2025 | 13 | MOTION for Leave to Appear Pro Hac Vice for admission of Shannon G. Denmark Filing fee: $ 125, receipt number AMADC-10969129 by President and Fellows of Harvard College. (Attachments: # 1 Affidavit Shannon G. Denmark)(Lehotsky, Steven) (Entered: 04/23/2025) |
| 04/23/2025 | 14 | MOTION for Leave to Appear Pro Hac Vice for admission of Joshua P. Morrow Filing fee: $ 125, receipt number AMADC-10969130 by President and Fellows of Harvard |

**JA033**

| | | | |
|---|---|---|---|
| | | | College. (Attachments: # 1 Affidavit Joshua P. Morrow)(Lehotsky, Steven) (Entered: 04/23/2025) |
| 04/23/2025 | 15 | | MOTION for Leave to Appear Pro Hac Vice for admission of Danielle K. Goldstein Filing fee: $ 125, receipt number AMADC-10969131 by President and Fellows of Harvard College. (Attachments: # 1 Affidavit Danielle K. Goldstein)(Lehotsky, Steven) (Entered: 04/23/2025) |
| 04/23/2025 | 16 | | MOTION for Leave to Appear Pro Hac Vice for admission of William A. Burck Filing fee: $ 125, receipt number AMADC-10969132 by President and Fellows of Harvard College. (Attachments: # 1 Affidavit William A. Burck)(Lehotsky, Steven) (Entered: 04/23/2025) |
| 04/23/2025 | 17 | | MOTION for Leave to Appear Pro Hac Vice for admission of Robert K. Hur Filing fee: $ 125, receipt number AMADC-10969133 by President and Fellows of Harvard College. (Attachments: # 1 Affidavit Robert K. Hur)(Lehotsky, Steven) (Entered: 04/23/2025) |
| 04/23/2025 | 18 | | NOTICE of Appearance by Joshua S. Levy on behalf of President and Fellows of Harvard College (Levy, Joshua) (Entered: 04/23/2025) |
| 04/23/2025 | 19 | | MOTION for Leave to Appear Pro Hac Vice for admission of John Mark Barnes Filing fee: $ 125, receipt number AMADC-10969145 by President and Fellows of Harvard College.(Bueker, John) (Main Document replaced; Additional attachment(s) added on 4/24/2025: # 1 Certification) . Modified on 4/24/2025 to separate Attachment from Main Document pursuant to CM/ECF Administrative Procedures (CAM). (Entered: 04/23/2025) |
| 04/23/2025 | 20 | | MOTION for Leave to Appear Pro Hac Vice for admission of Stephen Sencer Filing fee: $ 125, receipt number AMADC-10969147 by President and Fellows of Harvard College. (Bueker, John) (Main Document replaced; Additional attachment(s) added on 4/24/2025: # 1 Certification) . Modified on 4/24/2025 to separate Attachment from Main Document pursuant to CM/ECF Administrative Procedures (CAM). (Entered: 04/23/2025) |
| 04/23/2025 | 21 | | MOTION for Status Conference by President and Fellows of Harvard College. (Attachments: # 1 Exhibit A. April 21 Letter to Alex Haas)(Lehotsky, Steven) (Entered: 04/23/2025) |
| 04/24/2025 | 22 | | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 21 Motion for status conference. (KF) (Entered: 04/24/2025) |
| 04/24/2025 | 23 | | ELECTRONIC NOTICE of Hearing. Status Conference set for 4/28/2025 10:30 AM in Courtroom 17 (In person with remote access provided) before Judge Allison D. Burroughs. Although there will be remote access available, the Court prefers that counsel who intend to speak be present in the courtroom if possible. Counsel of record will receive a video conference invite at the email registered in CM/ECF. If you have technical or compatibility issues with the technology, please notify the courtroom deputy of the session as soon as possible. Audio access to the hearing may be available to the media and public. Please check the Court schedule. In order to gain access to the hearing, you must sign up at the following address: https://forms.mad.uscourts.gov/courtlist.html. For questions regarding access to hearings, you may refer to the general orders and public notices of the Court available on www.mad.uscourts.gov or contact the session here. (KF) (Entered: 04/24/2025) |

**JA034**

| | | |
|---|---|---|
| 04/24/2025 | 24 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered. GRANTING 9 , 10 , 11 , 12 , 13 , 14 , 15 , 16 , 17 , 19 and 20 Motions for Leave to Appear Pro Hac Vice for admission of Scott A. Keller, Jonathan F. Cohn, Katherine C. Yarger, Mary Elizabeth Miller, Shannon G. Denmark, Joshua P. Morrow, Danielle K. Goldstein, William A. Burck, Robert K. Hur, John Mark Barnes, and Stephen Sencer.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.<br><br>A Notice of Appearance must be entered on the docket by each newly admitted attorney *using their own Pacer credentials*.<br><br>**Pursuant to Local Rule 83.5.3, local counsel shall also file an appearance in this matter. Further, local counsel shall review all filings and shall personally appear in Court for any hearings or conferences, unless expressly excused by the Court for good cause.**(CAM) (Entered: 04/24/2025) |
| 04/24/2025 | 25 | NOTICE of Appearance by William A. Burck on behalf of President and Fellows of Harvard College (Burck, William) (Entered: 04/24/2025) |
| 04/24/2025 | 26 | NOTICE of Appearance by Anuj K. Khetarpal on behalf of Stephen Ehikian, US Department of Energy, Christopher A. Wright, US National Science Foundation, Sethuraman Panchanathan, US Department of Defense, Peter B. Hegseth, National Aeronautics and Space Administration, Janet E. Petro, US Department of Health and Human Services, National Institutes of Health, Robert F. Kennedy, Jr, US Department of Justice, Pamela J. Bondi, US Department of Education, Linda M McMahon, US General Services Administration (Khetarpal, Anuj) (Entered: 04/24/2025) |
| 04/25/2025 | 27 | NOTICE of Appearance by Robert Hur on behalf of President and Fellows of Harvard College (Hur, Robert) (Entered: 04/25/2025) |
| 04/25/2025 | 28 | NOTICE of Appearance by Stephen Sencer on behalf of President and Fellows of Harvard College (Sencer, Stephen) (Entered: 04/25/2025) |
| 04/25/2025 | 29 | NOTICE of Appearance by John Mark Barnes on behalf of President and Fellows of Harvard College (Barnes, John) (Entered: 04/25/2025) |
| 04/25/2025 | 30 | NOTICE of Appearance by Abhishek Kambli on behalf of US Department of Health and Human Services (Kambli, Abhishek) (Entered: 04/25/2025) |
| 04/25/2025 | 31 | NOTICE of Appearance by Scott Allen Keller on behalf of President and Fellows of Harvard College (Keller, Scott) (Entered: 04/25/2025) |
| 04/25/2025 | 32 | NOTICE of Appearance by Jonathan F. Cohn on behalf of President and Fellows of Harvard College (Cohn, Jonathan) (Entered: 04/25/2025) |
| 04/25/2025 | 33 | NOTICE of Appearance by Katherine Yarger on behalf of President and Fellows of Harvard College (Yarger, Katherine) (Entered: 04/25/2025) |
| 04/25/2025 | 34 | NOTICE of Appearance by Mary Elizabeth Miller on behalf of President and Fellows of Harvard College (Miller, Mary) (Entered: 04/25/2025) |

**JA035**

| 04/25/2025 | 35 | NOTICE of Appearance by Shannon Grammel Denmark on behalf of President and Fellows of Harvard College (Denmark, Shannon) (Entered: 04/25/2025) |
| 04/25/2025 | 36 | NOTICE of Appearance by Joshua Paul Morrow on behalf of President and Fellows of Harvard College (Morrow, Joshua) (Entered: 04/25/2025) |
| 04/25/2025 | 37 | NOTICE of Appearance by Ryan Underwood on behalf of Stephen Ehikian, US Department of Energy, Christopher A. Wright, US National Science Foundation, Sethuraman Panchanathan, US Department of Defense, Peter B. Hegseth, National Aeronautics and Space Administration, Janet E. Petro, President and Fellows of Harvard College, US Department of Health and Human Services, National Institutes of Health, Robert F. Kennedy, Jr, US Department of Justice, Pamela J. Bondi, US Department of Education, Linda M McMahon, US General Services Administration (Underwood, Ryan) (Entered: 04/25/2025) |
| 04/25/2025 | 38 | NOTICE of Appearance by Eitan Sirkovich on behalf of Stephen Ehikian, US Department of Energy, Christopher A. Wright, US National Science Foundation, Sethuraman Panchanathan, US Department of Defense, Peter B. Hegseth, National Aeronautics and Space Administration, Janet E. Petro, US Department of Health and Human Services, National Institutes of Health, Robert F. Kennedy, Jr, US Department of Justice, Pamela J. Bondi, US Department of Education, Linda M McMahon, US General Services Administration (Sirkovich, Eitan) (Entered: 04/25/2025) |
| 04/25/2025 | 39 | SUMMONS Returned Executed by President and Fellows of Harvard College. (Bueker, John) (Entered: 04/25/2025) |
| 04/25/2025 | 40 | SUMMONS Returned Executed as to US Attorney by President and Fellows of Harvard College. All Defendants. (Bueker, John) (Entered: 04/25/2025) |
| 04/28/2025 | 41 | MOTION for Leave to File Amicus Curiae Brief. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(CAM) (Entered: 04/28/2025) |
| 04/28/2025 | 42 | Electronic Clerk's Notes for proceedings held before Judge Allison D. Burroughs: Status Conference held on 4/28/2025. Parties would like to go straight to summary judgment and have an agreed upon briefing schedule. Administrative record by 5/19/25, Motion for SJ filed by 6/2/25, amicus briefs by 6/9/25, govt. opposition and cross motions by 6/16/25, amicus briefs 6/23/25, plaintiff's opposition/reply 6/30/25, govt. reply briefs 7/14/25. Hearing on the motion will be 7/21/25 at 9:30 a.m. Related case will have until 5/5/25 to amend complaint and will follow the same briefing schedule. Scheduling Order to issue. (Court Reporter: Kelly Mortellite at mortellite@gmail.com.) (KF) (Entered: 04/28/2025) |
| 04/28/2025 | 43 | ELECTRONIC NOTICE of Hearing.Motion Hearing set for 7/21/2025 09:30 AM in Courtroom 17 (In person only) before Judge Allison D. Burroughs. (KF) (Entered: 04/28/2025) |
| 04/28/2025 | 44 | NOTICE of Appearance by Danielle Kerker Goldstein on behalf of President and Fellows of Harvard College (Goldstein, Danielle) (Entered: 04/28/2025) |
| 04/29/2025 | 45 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered. For substantially the same reasons as articulated in American Association of University Professors - Harvard Faculty Chapter et al v. United States Department of Justice et al, 25-cv-10910, [ECF No. 47 ], [ECF No. 41 ] is DENIED. (CAM) (Entered: 04/29/2025) |
| 04/29/2025 | 46 | Copy re 45 Order on Motion for Leave to File Amicus Brief, emailed to pietzreceipts@gmail.com on 4/29/2025. (CAM) (Entered: 04/29/2025) |

**JA036**

| 04/29/2025 | 47 | Judge Allison D. Burroughs: ORDER entered. Following the Status Conference held on April 28, 2025, the Court adopts the parties' agreed-upon expedited briefing schedule: |
|---|---|---|
| | | Production of the Administrative Record: <u>May 19, 2025</u> |
| | | Plaintiffs' Summary Judgment Motion: <u>June 2, 2025</u> |
| | | Amicus Briefs in support of Plaintiffs: <u>June 9, 2025</u> |
| | | Defendants' Opposition/Cross Motion/Motion to Dismiss: <u>June 16, 2025</u> |
| | | Amicus Briefs in support of Defendants: <u>June 23, 2025</u> |
| | | Plaintiffs' Reply/Opposition: <u>June 30, 2025</u> |
| | | Defendants' Reply: <u>July 14, 2025</u> |
| | | Oral Argument: <u>July 21, 2025</u>, at <u>9:30 AM</u>. |
| | | The total page limit for each party shall not exceed 80 pages. Permission to file amicus briefs must be sought and obtained prior to filing. Any amicus briefs allowed by the Court may not exceed 10 pages. |
| | | The same briefing schedule is adopted in the related case <u>American Association of University Professors-Harvard Faculty Chapter et al. v. United States Department of Justice et al.</u> (25-cv-10910). Plaintiffs in the related case may file an Amended Complaint by <u>May 5</u>, <u>2025</u>. |
| | | (CAM) (Entered: 04/29/2025) |
| 04/29/2025 | 48 | MOTION to Intervene filed by John Doe. (Attachments: # 1 Cover Letter)(CAM) (Entered: 04/29/2025) |
| 04/29/2025 | 49 | Proposed Intervenor John Doe's MOTION to Proceed Under Pseudonym. (Attachments: # 1 Text of Proposed Order)(CAM) (Entered: 04/29/2025) |
| 04/29/2025 | 50 | Proposed Intervenor John Doe's MOTION for Order to to Show Cause why Defendants may act on behalf of the United States. (CAM) (Entered: 04/29/2025) |
| 04/30/2025 | 51 | Proposed Intervenor's Emergency MOTION for Temporary Restraining Order. (Attachments: # 1 Appendix A, # 2 Text of Proposed Order)(CAM) (Entered: 04/30/2025) |
| 04/30/2025 | 52 | SEALED Letter/request (non-motion) from John Doe. (Attachments: # 1 Signature Page - filed provisionally under seal)(CAM) (Entered: 04/30/2025) |
| 04/30/2025 | 53 | Judge Allison D. Burroughs: ORDER entered. MEMORANDUM AND ORDER Denying John Doe's Motion to Intervene. |
| | | Here, the Court does not believe that allowing John Doe to intervene will be helpful, constructive, or protective of an otherwise unrepresented interest. Therefore, the motion to intervene, [ECF No. 48 ], is <u>DENIED</u>, and related motions [ECF No. 49 ] and [ECF No. 50 ] are <u>DENIED</u> as moot. |
| | | **SO ORDERED.** |
| | | (CAM) (Entered: 04/30/2025) |

**JA037**

| | | |
|---|---|---|
| 05/01/2025 | 54 | Transcript of Status Conference held on April 28, 2025, before Judge Allison D. Burroughs. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Kelly Mortellite at mortellite@gmail.com. Redaction Request due 5/22/2025. Redacted Transcript Deadline set for 6/2/2025. Release of Transcript Restriction set for 7/30/2025. (DRK) (Entered: 05/01/2025) |
| 05/01/2025 | 55 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm (DRK) (Entered: 05/01/2025) |
| 05/01/2025 | 56 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered. Pursuant to ECF No. 53 , ECF No. 51 is DENIED as moot. As a non-party, John Doe may not seek a temporary restraining order. (CAM) (Entered: 05/01/2025) |
| 05/06/2025 | 57 | MOTION for Reconsideration re 53 Memorandum & ORDER On Motion to Intervene filed by Proposed Intervenor John Doe. (Attachments: # 1 Cover Letter)(CAM) (Additional attachment(s) added on 5/6/2025: # 2 Signature Page - Filed Provisionally Under Seal) (CAM). (Entered: 05/06/2025) |
| 05/07/2025 | 58 | Judge Allison D. Burroughs: ELECTRONIC ORDER ENTERED. John Doe's motion for reconsideration, [ECF No. 57 ], is DENIED. As articulated in the Court's prior order, [ECF No. 53 ], John Doe has not established that his interests in the action are different from or not adequately represented by the existing parties. Accordingly, the motion is DENIED. (CAM) (Entered: 05/07/2025) |
| 05/13/2025 | 59 | AMENDED COMPLAINT against All Defendants, filed by President and Fellows of Harvard College. (Attachments: # 1 Exhibit A. April 11 Letter, # 2 Exhibit B. April 14 Lawyers Letter, # 3 Exhibit C. April 14 Freeze Order, # 4 Exhibit D. May 5 Education Letter, # 5 Exhibit E. May 6 NIH Letter, # 6 Exhibit F. May 9 USDA Letter, # 7 Exhibit G. May 12 Energy Letter, # 8 Exhibit H. May 12 DoD Letter, # 9 Exhibit I. May 12 NSF Letter, # 10 Exhibit J. May 12 HUD Letter, # 11 Exhibit K. February 27 Letter, # 12 Exhibit L. February 28 Press Release, # 13 Exhibit M. March 31 Letter, # 14 Exhibit N. March 31 Cover Email, # 15 Exhibit O. April 3 Cover Email, # 16 Exhibit P. April 3 Letter)(Lehotsky, Steven) (Entered: 05/13/2025) |
| 05/16/2025 | 60 | Joint MOTION to Stay *Defendants' Deadline to File Answer or Otherwise Respond to First Amended Complaint* by President and Fellows of Harvard College.(Lehotsky, Steven) (Entered: 05/16/2025) |
| 05/19/2025 | 61 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered GRANTING 60 Joint Motion to Stay to Stay Deadline to Answer or Otherwise Respond. (CAM) (Entered: 05/19/2025) |
| 05/19/2025 | 62 | Consent MOTION for Extension of Time to May 20, 2025 to Produce USDA's Portion of the Administrative Record by Pamela J. Bondi, Stephen Ehikian, Peter B. Hegseth, Robert F. Kennedy, Jr, Linda M McMahon, National Aeronautics and Space Administration, National Institutes of Health, Sethuraman Panchanathan, Janet E. Petro, Brooke L. Rollins, Scott Turner, US Department of Agriculture, US Department of Defense, US Department of Education, US Department of Energy, US Department of Health and Human Services, US Department of Housing and Urban Development, US Department of Justice, US General Services Administration, US National Science Foundation, Christopher A. Wright.(Sirkovich, Eitan) (Entered: 05/19/2025) |
| 05/19/2025 | 63 | NOTICE by Pamela J. Bondi, Stephen Ehikian, Peter B. Hegseth, Robert F. Kennedy, Jr, Linda M McMahon, National Aeronautics and Space Administration, National Institutes |

**JA038**

| | | |
|---|---|---|
| | | of Health, Sethuraman Panchanathan, Janet E. Petro, Brooke L. Rollins, Scott Turner, US Department of Agriculture, US Department of Defense, US Department of Education, US Department of Energy, US Department of Health and Human Services, US Department of Housing and Urban Development, US Department of Justice, US General Services Administration, US National Science Foundation, Christopher A. Wright *Notice of Production of Administrative Record* (Sirkovich, Eitan) (Entered: 05/19/2025) |
| 05/20/2025 | 64 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered GRANTING 62 Consent Motion for Extension of Time to May 20, 2025 to Produce USDA's Portion of the Administrative Record. (CAM) (Entered: 05/20/2025) |
| 05/20/2025 | 65 | NOTICE by Pamela J. Bondi, Stephen Ehikian, Peter B. Hegseth, Robert F. Kennedy, Jr, Linda M McMahon, National Aeronautics and Space Administration, National Institutes of Health, Sethuraman Panchanathan, Janet E. Petro, Brooke L. Rollins, Scott Turner, US Department of Agriculture, US Department of Defense, US Department of Education, US Department of Energy, US Department of Health and Human Services, US Department of Housing and Urban Development, US Department of Justice, US General Services Administration, US National Science Foundation, Christopher A. Wright *Second Notice of Production of Administrative Record* (Sirkovich, Eitan) (Entered: 05/20/2025) |
| 05/22/2025 | 66 | Summons Issued as to Brooke L. Rollins, Scott Turner, US Department of Agriculture, US Department of Housing and Urban Development. **Counsel receiving this notice electronically should download this summons, complete one for each defendant and serve it in accordance with Fed.R.Civ.P. 4 and LR 4.1. Summons will be mailed to plaintiff(s) not receiving notice electronically for completion of service.** (CAM) (Entered: 05/22/2025) |
| 05/28/2025 | 67 | SUMMONS Returned Executed by President and Fellows of Harvard College. (Bueker, John) (Entered: 05/28/2025) |
| 05/30/2025 | 68 | NOTICE by Pamela J. Bondi, Stephen Ehikian, Peter B. Hegseth, Robert F. Kennedy, Jr, Linda M McMahon, National Aeronautics and Space Administration, National Institutes of Health, Sethuraman Panchanathan, Janet E. Petro, Brooke L. Rollins, Scott Turner, US Department of Agriculture, US Department of Defense, US Department of Education, US Department of Energy, US Department of Health and Human Services, US Department of Housing and Urban Development, US Department of Justice, US General Services Administration, US National Science Foundation, Christopher A. Wright *Notice of Supplementation of Administrative Record* (Sirkovich, Eitan) (Entered: 05/30/2025) |
| 06/02/2025 | 69 | MOTION for Summary Judgment by President and Fellows of Harvard College. (Attachments: # 1 Text of Proposed Order)(Lehotsky, Steven) (Entered: 06/02/2025) |
| 06/02/2025 | 70 | MEMORANDUM in Support re 69 MOTION for Summary Judgment filed by President and Fellows of Harvard College. (Lehotsky, Steven) (Entered: 06/02/2025) |
| 06/02/2025 | 71 | Statement of Material Facts L.R. 56.1 re 69 MOTION for Summary Judgment filed by President and Fellows of Harvard College. (Lehotsky, Steven) (Entered: 06/02/2025) |
| 06/02/2025 | 72 | DECLARATION re 69 MOTION for Summary Judgment *[John Shaw]* by President and Fellows of Harvard College. (Lehotsky, Steven) (Entered: 06/02/2025) |
| 06/02/2025 | 73 | DECLARATION re 69 MOTION for Summary Judgment *[Peggy Newell]* by President and Fellows of Harvard College. (Lehotsky, Steven) (Entered: 06/02/2025) |
| 06/02/2025 | 74 | DECLARATION re 69 MOTION for Summary Judgment *[Steven P. Lehotsky]* by President and Fellows of Harvard College. (Attachments: # 1 Exhibit 1. Cover E-mail to March 31, 2025 Letter to Alan M. Garber, # 2 Exhibit 2. April 11, 2025 Letter from Harmeet K. Dhillon to Jennifer OConnor, # 3 Exhibit 3. May 12, 2025 Letter from Alan |

**JA039**

| | | |
|---|---|---|
| | | M. Garber to Linda E. McMahon, # 4 Exhibit 4. May 22, 2025 Revocation of Harvards Student and Exchange Visitor Program Certification, # 5 Exhibit 5. May 12, 2025 Termination Letter from Department of Commerce, # 6 Exhibit 6. May 19, 2025 Termination Letter from Centers for Disease Control and Prevention, # 7 Exhibit 7. May 27, 2025 Letter from General Services Administration)(Lehotsky, Steven) (Attachment 1 replaced with flattened PDF on 6/3/2025) (CAM). (Entered: 06/02/2025) |
| 06/04/2025 | 75 | NOTICE of Appearance by Gregory F Noonan on behalf of American Council on Education (Noonan, Gregory) (Entered: 06/04/2025) |
| 06/04/2025 | 76 | NOTICE of Appearance by Kayla Ghantous on behalf of American Council on Education (Ghantous, Kayla) (Entered: 06/04/2025) |
| 06/04/2025 | 77 | MOTION for Leave to Appear Pro Hac Vice for admission of Stephanie J. Gold Filing fee: $ 125, receipt number AMADC-11049067 by American Council on Education. (Attachments: # 1 Certification of Stephanie J. Gold)(Noonan, Gregory) (Entered: 06/04/2025) |
| 06/04/2025 | 78 | MOTION for Leave to Appear Pro Hac Vice for admission of Jessica L. Ellsworth Filing fee: $ 125, receipt number AMADC-11049069 by American Council on Education. (Attachments: # 1 Certification of Jessica L. Ellsworth)(Noonan, Gregory) (Entered: 06/04/2025) |
| 06/04/2025 | 79 | MOTION for Leave to Appear Pro Hac Vice for admission of Reedy C. Swanson Filing fee: $ 125, receipt number AMADC-11049070 by American Council on Education. (Attachments: # 1 Certification of Reedy C. Swanson)(Noonan, Gregory) (Entered: 06/04/2025) |
| 06/04/2025 | 80 | MOTION for Leave to File *a Brief Amicus Curiae* by American Council on Education. (Noonan, Gregory) (Entered: 06/04/2025) |
| 06/05/2025 | 81 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 77 Motion for Leave to Appear Pro Hac Vice of Stephanie J. Gold. **Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.** Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm. A Notice of Appearance must be entered on the docket by the newly admitted attorney. **Pursuant to Local Rule 83.5.3, local counsel shall also file an appearance in this matter. Further, local counsel shall review all filings and shall personally appear in Court for any hearings or conferences, unless expressly excused by the Court for good cause.**(CAM) (Entered: 06/05/2025) |
| 06/05/2025 | 82 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 78 Motion for Leave to Appear Pro Hac Vice Added Jessica L. Ellsworth. **Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.** Instructions on how to link CM/ECF accounts to upgraded |

**JA040**

pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen-current-pacer-accounts.htm#link-account.

**Pursuant to Local Rule 83.5.3, local counsel shall also file an appearance in this matter. Further, local counsel shall review all filings and shall personally appear in Court for any hearings or conferences, unless expressly excused by the Court for good cause.** (CAM) (Entered: 06/05/2025)

| 06/05/2025 | 83 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 79 Motion for Leave to Appear Pro Hac Vice of Reedy C. Swanson. <br><br> **Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.** <br><br> Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm. <br><br> A Notice of Appearance must be entered on the docket by the newly admitted attorney. <br><br> **Pursuant to Local Rule 83.5.3, local counsel shall also file an appearance in this matter. Further, local counsel shall review all filings and shall personally appear in Court for any hearings or conferences, unless expressly excused by the Court for good cause.**(CAM) (Entered: 06/05/2025) |
| 06/05/2025 | 84 | NOTICE of Appearance by Ragini N. Shah on behalf of Palestine Solidarity Committee (Shah, Ragini) (Entered: 06/05/2025) |
| 06/05/2025 | 85 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered GRANTING 80 Motion for Leave to File *a Brief Amicus Curaie* ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (CAM) (Entered: 06/05/2025) |
| 06/05/2025 | 86 | Assented to MOTION for Leave to File *Amicus Brief* by Palestine Solidarity Committee. (Shah, Ragini) (Entered: 06/05/2025) |
| 06/05/2025 | 87 | MOTION to Correct 86 Assented to MOTION for Leave to File *Amicus Brief* by Palestine Solidarity Committee. (Attachments: # 1 Corrected Motion for Leave to File Amicus Brief)(Shah, Ragini) (Entered: 06/05/2025) |
| 06/05/2025 | 88 | MOTION for Leave to File *Amicus Brief in Support of Plaintiff's Motion for Summary Judgment* by American Civil Liberties Union, American Civil Liberties Union of Massachusetts, Cato Institute, Electronic Frontier Foundation, Knight First Amendment Institute at Columbia University, National Coalition Against Censorship, Reporters Committee for Freedom of the Press, Rutherford Institute. (Attachments: # 1 Text of Proposed Order Proposed Order Granting Motion for Leave to File Amicus Brief)(Segal, Matthew) (Entered: 06/05/2025) |
| 06/05/2025 | 89 | MOTION for Leave to Appear Pro Hac Vice for admission of Dylan Saba Filing fee: $ 125, receipt number AMADC-11051632 by Palestine Solidarity Committee. (Attachments: # 1 Accompanying Certificate of Dylan Saba, Esq in support of Motion to Admit Pro Hac Vice)(Shah, Ragini) (Entered: 06/05/2025) |

**JA041**

| 06/05/2025 | 90 | MOTION for Leave to Appear Pro Hac Vice for admission of Radhika Sainath Filing fee: $ 125, receipt number AMADC-11051643 by Palestine Solidarity Committee. (Attachments: # 1 Accompanying Certificate of Radhika Sainath, Esq in support of Motion to Admit Pro Hac Vice)(Shah, Ragini) (Entered: 06/05/2025) |
|---|---|---|
| 06/06/2025 | 91 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered finding as moot 86 Motion ; GRANTING 87 Motion for Leave to File Amicus Brief by Palestine Solidarity Committee; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. Modified to add further instructions on 6/6/2025 (CAM). (Entered: 06/06/2025) |
| 06/06/2025 | 92 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered GRANTING 88 Motion Amicus Brief in Support of Plaintiff's Motion for Summary Judgment by American Civil Liberties Union, American Civil Liberties Union of Massachusetts, Cato Institute, Electronic Frontier Foundation, Knight First Amendment Institute at Columbia University, National Coalition Against Censorship, Reporters Committee for Freedom of the Press, Rutherford Institute. ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (CAM) (Entered: 06/06/2025) |
| 06/06/2025 | 93 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 89 Motion for Leave to Appear Pro Hac Vice of Dylan Saba. <br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.** <br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm. <br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney. <br><br>**Pursuant to Local Rule 83.5.3, local counsel shall also file an appearance in this matter. Further, local counsel shall review all filings and shall personally appear in Court for any hearings or conferences, unless expressly excused by the Court for good cause.** (CAM) (Entered: 06/06/2025) |
| 06/06/2025 | 94 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 90 Motion for Leave to Appear Pro Hac Vice of Radhika Sainath. <br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.** <br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm. |

**JA042**

A Notice of Appearance must be entered on the docket by the newly admitted attorney.

**Pursuant to Local Rule 83.5.3, local counsel shall also file an appearance in this matter. Further, local counsel shall review all filings and shall personally appear in Court for any hearings or conferences, unless expressly excused by the Court for good cause.**(CAM) (Entered: 06/06/2025)

| | | |
|---|---|---|
| 06/06/2025 | 95 | NOTICE of Appearance by Corey Sullivan Martin on behalf of Middle East Studies Association of North America, Inc. (Martin, Corey) (Entered: 06/06/2025) |
| 06/06/2025 | 96 | CORPORATE DISCLOSURE STATEMENT by Middle East Studies Association of North America, Inc.. (Martin, Corey) (Entered: 06/06/2025) |
| 06/06/2025 | 97 | First MOTION for Leave to Appear Pro Hac Vice for admission of Darryl Li Filing fee: $ 125, receipt number AMADC-11052808 by Middle East Studies Association of North America, Inc.. (Attachments: # 1 Exhibit Certificate of Attorney Li)(Martin, Corey) (Entered: 06/06/2025) |
| 06/06/2025 | 98 | First MOTION for Leave to File *Amicus Brief in Support of Plaintiff's Motion for Summary Judgment* by Middle East Studies Association of North America, Inc..(Martin, Corey) (Entered: 06/06/2025) |
| 06/06/2025 | 99 | NOTICE of Appearance by Anna E. Lumelsky on behalf of COMMONWEALTH OF MASSACHUSETTS (Lumelsky, Anna) (Entered: 06/06/2025) |
| 06/06/2025 | 100 | Assented to MOTION for Leave to File *Amicus Brief* by COMMONWEALTH OF MASSACHUSETTS.(Lumelsky, Anna) (Entered: 06/06/2025) |
| 06/06/2025 | 101 | NOTICE of Appearance by Jocelyn Baker Jones on behalf of Columbia Alumni for Academic Freedom (Jones, Jocelyn) (Entered: 06/06/2025) |
| 06/06/2025 | 102 | MOTION for Leave to Appear Pro Hac Vice for admission of Sean H. Donahue Filing fee: $ 125, receipt number AMADC-11053191 by Columbia Alumni for Academic Freedom.(Jones, Jocelyn) (Entered: 06/06/2025) |
| 06/06/2025 | 103 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 97 Motion for Leave to Appear Pro Hac Vice of Darryl Li. **Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.** Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm. A Notice of Appearance must be entered on the docket by the newly admitted attorney. **Pursuant to Local Rule 83.5.3, local counsel shall also file an appearance in this matter. Further, local counsel shall review all filings and shall personally appear in Court for any hearings or conferences, unless expressly excused by the Court for good cause.**(CAM) (Entered: 06/06/2025) |
| 06/06/2025 | 104 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered GRANTING 98 Motion for Leave to File Amicus Brief in Support of Plaintiff's Motion for Summary Judgment by Middle East Studies Association of North America, Inc. ; Counsel using the Electronic |

**JA043**

| | | |
|---|---|---|
| | | Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (CAM) (Entered: 06/06/2025) |
| 06/06/2025 | 105 | DECLARATION re 102 MOTION for Leave to Appear Pro Hac Vice for admission of Sean H. Donahue Filing fee: $ 125, receipt number AMADC-11053191 by Columbia Alumni for Academic Freedom. (Jones, Jocelyn) (Entered: 06/06/2025) |
| 06/06/2025 | 106 | MOTION for Leave to File *Brief Amicus Curiae* by Columbia Alumni for Academic Freedom.(Jones, Jocelyn) (Entered: 06/06/2025) |
| 06/06/2025 | 107 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered GRANTING 100 Assented-to Motion for Leave to File Amicus Brief by Commonwealth of Massachusetts. ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (CAM) (Entered: 06/06/2025) |
| 06/06/2025 | 108 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered GRANTING 106 Motion for Leave to File Brief Amicus Curiae by Columbia Alumni for Academic Freedom ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (CAM) (Entered: 06/06/2025) |
| 06/06/2025 | 109 | NOTICE of Appearance by Daniel J. Cloherty on behalf of California Institute of Technology, Boston University, Brown University, Colorado State University, Dartmouth College, Johns Hopkins University, Massachusetts Institute of Technology, Michigan State University, Oregon State University, Princeton University, Rice University, Rutgers University, Tufts University, University of Maryland, College Park, University of Oregon, University of Pennsylvania, University of Pittsburgh, Yale University (Cloherty, Daniel) (Entered: 06/06/2025) |
| 06/06/2025 | 110 | NOTICE of Appearance by Victoria L. Steinberg on behalf of Boston University, Brown University, California Institute of Technology, Colorado State University, Dartmouth College, Johns Hopkins University, Massachusetts Institute of Technology, Michigan State University, Oregon State University, Princeton University, Rice University, Rutgers University, Tufts University, University of Maryland, College Park, University of Oregon, University of Pennsylvania, University of Pittsburgh, Yale University (Steinberg, Victoria) (Entered: 06/06/2025) |
| 06/06/2025 | 111 | NOTICE of Appearance by Alexandra Arnold on behalf of Boston University, Brown University, California Institute of Technology, Colorado State University, Dartmouth College, Johns Hopkins University, Massachusetts Institute of Technology, Michigan State University, Oregon State University, Princeton University, Rice University, Rutgers University, Tufts University, University of Maryland, College Park, University of Oregon, University of Pennsylvania, University of Pittsburgh, Yale University (Arnold, Alexandra) (Entered: 06/06/2025) |
| 06/06/2025 | 112 | Assented to MOTION for Leave to File *Amicus Brief* by Boston University, Brown University, California Institute of Technology, Colorado State University, Dartmouth College, Johns Hopkins University, Massachusetts Institute of Technology, Michigan State University, Oregon State University, Princeton University, Rice University, Rutgers University, Tufts University, University of Maryland, College Park, University of Oregon, University of Pennsylvania, University of Pittsburgh, Yale University.(Cloherty, Daniel) (Entered: 06/06/2025) |

**JA044**

| 06/06/2025 | 113 | NOTICE of Appearance by Rachel L. Weber on behalf of A Jewish Voice for Peace (Weber, Rachel) (Entered: 06/06/2025) |
|---|---|---|
| 06/06/2025 | 114 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered GRANTING 112 Motion for Leave to File Amicus Brief by Boston University et al. ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (CAM) (Entered: 06/06/2025) |
| 06/06/2025 | 115 | NOTICE of Appearance by Martin F Murphy on behalf of Conference of Boston Teaching Hospital, Inc. (Murphy, Martin) (Entered: 06/06/2025) |
| 06/06/2025 | 116 | NOTICE of Appearance by Max A. Jacobs on behalf of Conference of Boston Teaching Hospital, Inc. (Jacobs, Max) (Entered: 06/06/2025) |
| 06/06/2025 | 117 | NOTICE of Appearance by Eric M. Gold on behalf of Conference of Boston Teaching Hospital, Inc. (Gold, Eric) (Entered: 06/06/2025) |
| 06/06/2025 | 118 | Assented to MOTION for Leave to File *Memorandum as Amicus Curiae* by Conference of Boston Teaching Hospital, Inc.. (Attachments: # 1 Exhibit A Proposed Amicus Memorandum)(Gold, Eric) (Entered: 06/06/2025) |
| 06/06/2025 | 119 | First MOTION for Leave to Appear Pro Hac Vice for admission of Bina Ahmad Filing fee: $ 125, receipt number AMADC-11054643 by A Jewish Voice for Peace.(Weber, Rachel) (Additional attachment(s) added on 6/9/2025: # 1 Certificate of Bina Ahmad) (CAM). (Main Document 119 replaced on 6/9/2025) (CAM). (Entered: 06/06/2025) |
| 06/06/2025 | 120 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered GRANTING 118 Motion for Leave to File Memorandum as Amicus Curiae by Conference of Boston Teaching Hospital, Inc. ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (CAM) (Entered: 06/06/2025) |
| 06/07/2025 | 121 | NOTICE of Appearance by Darryl Li on behalf of Middle East Studies Association of North America, Inc. (Li, Darryl) (Entered: 06/07/2025) |
| 06/09/2025 | 122 | NOTICE of Appearance by Dustin F Hecker on behalf of Foundation for Individual Rights and Expression (Hecker, Dustin) (Entered: 06/09/2025) |
| 06/09/2025 | 123 | AMICUS BRIEF filed by Conference of Boston Teaching Hospital, Inc. *in Support of Plaintiff's Motion for Summary Judgment*. (Gold, Eric) (Entered: 06/09/2025) |
| 06/09/2025 | 124 | AMICUS BRIEF filed by Columbia Alumni for Academic Freedom . (Jones, Jocelyn) (Entered: 06/09/2025) |
| 06/09/2025 | 125 | MOTION for Leave to File *Amicus Brief* by Foundation for Individual Rights and Expression. (Attachments: # 1 Exhibit [Proposed] Amicus Brief)(Hecker, Dustin) (Entered: 06/09/2025) |
| 06/09/2025 | 126 | Amicus Curiae APPEARANCE entered by Lauren G. Milgroom on behalf of 12,041 Harvard Alumni. (Milgroom, Lauren) (Entered: 06/09/2025) |
| 06/09/2025 | 127 | Assented to MOTION for Leave to File *Amicus Brief in Support of Plaintiff's Motion for Summary Judgment* by 12,041 Harvard Alumni. (Attachments: # 1 [Proposed] Brief of Amici Curiae 12,041 Harvard Alumni, # 2 Affidavit Names, Degrees, and Years of Graduation of 12,041 Harvard Alumni)(Milgroom, Lauren) (Entered: 06/09/2025) |

**JA045**

| 06/09/2025 | 128 | Supplemental MOTION for Leave to File *Amicus Brief* by Boston University, Brown University, California Institute of Technology, Colorado State University, Dartmouth College, Johns Hopkins University, Massachusetts Institute of Technology, Michigan State University, Oregon State University, Princeton University, Rice University, Rutgers University, Tufts University, University of Maryland, College Park, University of Oregon, University of Pennsylvania, University of Pittsburgh, Yale University, American University, Georgetown University, Stanford University, University of Delaware, University of Denver, University of Maryland, Baltimore.(Cloherty, Daniel) (Entered: 06/09/2025) |
|---|---|---|
| 06/09/2025 | 129 | NOTICE of Appearance by Joel Anderson Fleming on behalf of 12,041 Harvard Alumni (Fleming, Joel) (Entered: 06/09/2025) |
| 06/09/2025 | 130 | NOTICE of Appearance by Dylan Saba on behalf of Palestine Solidarity Committee (Saba, Dylan) (Entered: 06/09/2025) |
| 06/09/2025 | 131 | NOTICE of Appearance by Radhika Sainath on behalf of Palestine Solidarity Committee (Sainath, Radhika) (Entered: 06/09/2025) |
| 06/09/2025 | 132 | AMICUS BRIEF filed by Harvard Undergraduate Palestine Solidarity Committee. (Sainath, Radhika) Modified to correct filer name as updated on docket at request of counsel on 6/9/2025 (CAM). (Entered: 06/09/2025) |
| 06/09/2025 | 133 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 119 Motion for Leave to Appear Pro Hac Vice of Bina Ahmad.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>**Pursuant to Local Rule 83.5.3, local counsel shall also file an appearance in this matter. Further, local counsel shall review all filings and shall personally appear in Court for any hearings or conferences, unless expressly excused by the Court for good cause.**(CAM) (Entered: 06/09/2025) |
| 06/09/2025 | 134 | MOTION for Leave to File *Amicus Curiae Brief* by A Jewish Voice for Peace. (Attachments: # 1 Exhibit Amicus Curiae Brief, # 2 Affidavit Declaration of Stefanie Fox)(Weber, Rachel) (Entered: 06/09/2025) |
| 06/09/2025 | 135 | NOTICE of Appearance by Rachel L. Weber on behalf of Jewish Scholars of Jewish Studies (Weber, Rachel) (Entered: 06/09/2025) |
| 06/09/2025 | 136 | MOTION for Leave to Appear Pro Hac Vice for admission of Yaman Salahi Filing fee: $ 125, receipt number AMADC-11057403 by Jewish Scholars of Jewish Studies. (Attachments: # 1 Decl. of Yaman Salahi ISO Mot. to Appear Pro Hac Vice)(Weber, Rachel) (Entered: 06/09/2025) |
| 06/09/2025 | 137 | AMICUS BRIEF filed by Amici States *Massachusetts, California, Colorado, Connecticut, Delaware, the District of Columbia, Hawai'i, Illinois, Maine, Maryland, Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York, Oregon, Rhode* |

**JA046**

| | | |
|---|---|---|
| | | *Island, Vermont, Washington, and Wisconsin (leave to file granted on June 6, 2025).* (Lumelsky, Anna) (Entered: 06/09/2025) |
| 06/09/2025 | 138 | NOTICE of Appearance by Bina Ahmad on behalf of A Jewish Voice for Peace (Ahmad, Bina) (Entered: 06/09/2025) |
| 06/09/2025 | 139 | MOTION for Leave to File *Amicus Curiae Brief* by Jewish Scholars of Jewish Studies. (Attachments: # 1 Proposed Amicus Curiae Brief for Jewish Scholars of Jewish Studies) (Weber, Rachel) (Entered: 06/09/2025) |
| 06/09/2025 | 140 | NOTICE of Appearance by Jessie J. Rossman on behalf of American Civil Liberties Union, American Civil Liberties Union of Massachusetts, Cato Institute, Electronic Frontier Foundation, Knight First Amendment Institute at Columbia University, National Coalition Against Censorship, Reporters Committee for Freedom of the Press, Rutherford Institute (Rossman, Jessie) (Entered: 06/09/2025) |
| 06/09/2025 | 141 | NOTICE of Appearance by Rachel Davidson on behalf of American Civil Liberties Union, American Civil Liberties Union of Massachusetts, Cato Institute, Electronic Frontier Foundation, Knight First Amendment Institute at Columbia University, National Coalition Against Censorship, Reporters Committee for Freedom of the Press, Rutherford Institute (Davidson, Rachel) (Entered: 06/09/2025) |
| 06/09/2025 | 142 | AMICUS BRIEF filed by American Civil Liberties Union, American Civil Liberties Union of Massachusetts, Cato Institute, Electronic Frontier Foundation, Knight First Amendment Institute at Columbia University, National Coalition Against Censorship, Reporters Committee for Freedom of the Press, Rutherford Institute . (Rossman, Jessie) (Entered: 06/09/2025) |
| 06/09/2025 | 143 | AMICUS BRIEF filed by American Council on Education *and 27 other amici*. (Noonan, Gregory) (Entered: 06/09/2025) |
| 06/09/2025 | 144 | MOTION for Leave to File *Amicus Brief* by Muslim Legal Fund of America. (Attachments: # 1 Exhibit Proposed Brief)(Stern, Mark) (Entered: 06/09/2025) |
| 06/09/2025 | 145 | MOTION for Leave to Appear Pro Hac Vice of Christina A. Jump by Muslim Legal Fund of America. (Attachments: # 1 Affidavit Declaration)(Stern, Mark) Modified to add name of attorney on 6/9/2025 (CAM). (Entered: 06/09/2025) |
| 06/09/2025 | 146 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered GRANTING 125 , 127 , 128 , 134 and 139 Motions for Leave to File Amicus Briefs ; Counsel using the Electronic Case Filing System should now file the documents for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (CAM) (Entered: 06/09/2025) |
| 06/09/2025 | 147 | AMICUS BRIEF filed by 12,041 Harvard Alumni *in support of Plaintiff's Motion for Summary Judgment*. (Milgroom, Lauren) (Entered: 06/09/2025) |
| 06/09/2025 | 148 | AMICUS BRIEF filed by American University, Boston University, Brown University, California Institute of Technology, Colorado State University, Dartmouth College, Georgetown University, Johns Hopkins University, Massachusetts Institute of Technology, Michigan State University, Oregon State University, Princeton University, Rice University, Rutgers University, Stanford University, Tufts University, University of Delaware, University of Denver, University of Maryland, Baltimore, University of Maryland, College Park, University of Oregon, University of Pennsylvania, University of Pittsburgh, Yale University . (Cloherty, Daniel) (Entered: 06/09/2025) |

## JA047

| 06/09/2025 | 149 | AMICUS BRIEF filed by Foundation for Individual Rights and Expression . (Hecker, Dustin) (Entered: 06/09/2025) |
| 06/09/2025 | 150 | AMICUS BRIEF filed by A Jewish Voice for Peace . (Attachments: # 1 Affidavit) (Ahmad, Bina) (Entered: 06/09/2025) |
| 06/09/2025 | 151 | NOTICE of Appearance by Tara Ramchandani on behalf of Former U.S. Agency Officials (Ramchandani, Tara) (Entered: 06/09/2025) |
| 06/09/2025 | 152 | MOTION for Leave to Appear Pro Hac Vice for admission of Rebecca Livengood Filing fee: $ 125, receipt number AMADC-11058337 by Former U.S. Agency Officials. (Attachments: # 1 Affidavit of R. Livengood)(Ramchandani, Tara) (Entered: 06/09/2025) |
| 06/09/2025 | 153 | AMICUS BRIEF filed by Middle East Studies Association of North America, Inc. *In Support of Plaintiff's Motion for Summary Judgment (Leave to File Granted June 6, 2025)*. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Martin, Corey) (Entered: 06/09/2025) |
| 06/09/2025 | 154 | MOTION for Leave to File *Amicus Curiae Brief* by Former U.S. Agency Officials. (Attachments: # 1 [Proposed] Brief of Amici Curiae, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C)(Ramchandani, Tara) (Entered: 06/09/2025) |
| 06/09/2025 | 155 | MOTION for Leave to Appear Pro Hac Vice for admission of Glenn Schlactus Filing fee: $ 125, receipt number AMADC-11058376 by Former U.S. Agency Officials. (Attachments: # 1 Affidavit of G. Schlactus)(Ramchandani, Tara) (Entered: 06/09/2025) |
| 06/09/2025 | 156 | NOTICE of Appearance by Jessica L. Ellsworth on behalf of American Council on Education (Ellsworth, Jessica) (Entered: 06/09/2025) |
| 06/09/2025 | 157 | MOTION for Leave to Appear Pro Hac Vice for admission of John P. Relman Filing fee: $ 125, receipt number AMADC-11058382 by Former U.S. Agency Officials. (Attachments: # 1 Affidavit of John P. Relman)(Ramchandani, Tara) (Entered: 06/09/2025) |
| 06/09/2025 | 158 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered GRANTING 144 Motion for Leave to File Amicus Brief ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (CAM) (Entered: 06/09/2025) |
| 06/09/2025 | 159 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 102 Motion for Leave to Appear Pro Hac Vice Added Sean H. Donahue.<br><br>**Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.** Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen-current-pacer-accounts.htm#link-account.<br><br>**Pursuant to Local Rule 83.5.3, local counsel shall also file an appearance in this matter. Further, local counsel shall review all filings and shall personally appear in Court for any hearings or conferences, unless expressly excused by the Court for good cause.**(CAM) (Entered: 06/09/2025) |
| 06/09/2025 | 160 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 136 Motion for Leave to Appear Pro Hac Vice Added Yaman Salahi. |

**JA048**

**Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.** Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen-current-pacer-accounts.htm#link-account.

**Pursuant to Local Rule 83.5.3, local counsel shall also file an appearance in this matter. Further, local counsel shall review all filings and shall personally appear in Court for any hearings or conferences, unless expressly excused by the Court for good cause.** (CAM) (Entered: 06/09/2025)

| | | |
|---|---|---|
| 06/09/2025 | 161 | Assented to MOTION for Leave to Appear Pro Hac Vice for admission of Donald B. Verrilli, Jr. Filing fee: $ 125, receipt number AMADC-11058407 by American University, Boston University, Brown University, California Institute of Technology, Colorado State University, Dartmouth College, Georgetown University, Johns Hopkins University, Massachusetts Institute of Technology, Michigan State University, Oregon State University, Princeton University, Rice University, Rutgers University, Stanford University, Tufts University, University of Delaware, University of Denver, University of Maryland, Baltimore, University of Maryland, College Park, University of Oregon, University of Pennsylvania, University of Pittsburgh. (Attachments: # 1 Affidavit Declaration of D. Verrilli, Jr.)(Cloherty, Daniel) (Entered: 06/09/2025) |
| 06/09/2025 | 162 | NOTICE of Appearance by Yaman Salahi on behalf of Jewish Scholars of Jewish Studies (Salahi, Yaman) (Entered: 06/09/2025) |
| 06/09/2025 | 163 | AMICUS BRIEF filed by Jewish Scholars of Jewish Studies . (Salahi, Yaman) (Entered: 06/09/2025) |
| 06/09/2025 | 164 | Assented to MOTION for Leave to Appear Pro Hac Vice for admission of Esthena Barlow Filing fee: $ 125, receipt number AMADC-11058428 by American University, Boston University, Brown University, California Institute of Technology, Colorado State University, Dartmouth College, Georgetown University, Johns Hopkins University, Massachusetts Institute of Technology, Michigan State University, Oregon State University, Princeton University, Rice University, Rutgers University, Stanford University, Tufts University, University of Delaware, University of Denver, University of Maryland, Baltimore, University of Maryland, College Park, University of Oregon, University of Pennsylvania, University of Pittsburgh. (Attachments: # 1 Declaration of E. Barlow)(Cloherty, Daniel) (Entered: 06/09/2025) |
| 06/09/2025 | 165 | Assented to MOTION for Leave to Appear Pro Hac Vice for admission of Helen White Filing fee: $ 125, receipt number AMADC-11058439 by American University, Boston University, Brown University, California Institute of Technology, Colorado State University, Dartmouth College, Georgetown University, Johns Hopkins University, Massachusetts Institute of Technology, Michigan State University, Oregon State University, Princeton University, Rice University, Rutgers University, Stanford University, Tufts University, University of Delaware, University of Denver, University of Maryland, Baltimore, University of Maryland, College Park, University of Oregon, University of Pennsylvania, University of Pittsburgh. (Attachments: # 1 Declaration of H. White)(Cloherty, Daniel) (Entered: 06/09/2025) |
| 06/09/2025 | 166 | **ELECTRONIC NOTICE TO COUNSEL** re 145 MOTION for Leave to Appear Pro Hac Vice for admission of Christina Jump: The required payment of $125.00 for admission for pro hac vice was bypassed in the filing of the motion. Counsel is directed to pay for the admission by submitting payment online using the Notice of Attorney Payment of Fees event, under Civil Events -> Other Filings -> Notices. This event |

**JA049**

| | | requires a PDF document to be attached to the filing. Please use the first page of the motion to complete the submission. (CAM) (Entered: 06/09/2025) |
|---|---|---|
| 06/09/2025 | 167 | NOTICE OF ATTORNEY PAYMENT OF FEES by Plaintiff Muslim Legal Fund of America. Filing fee $ 125, receipt number AMADC-11058450. Payment Type : PRO HAC VICE. (Stern, Mark) (Entered: 06/09/2025) |
| 06/09/2025 | 168 | AMICUS BRIEF filed by Muslim Legal Fund of America . (Stern, Mark) (Entered: 06/09/2025) |
| 06/10/2025 | 169 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 152 Motion for Leave to Appear Pro Hac Vice Added Rebecca Livengood.<br><br>**Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.** Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen-current-pacer-accounts.htm#link-account.<br><br>**Pursuant to Local Rule 83.5.3, local counsel shall also file an appearance in this matter. Further, local counsel shall review all filings and shall personally appear in Court for any hearings or conferences, unless expressly excused by the Court for good cause.**(CAM) (Entered: 06/10/2025) |
| 06/10/2025 | 170 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered GRANTING 154 Motion for Leave to File Amicus Curiae Brief by Former U.S. Agency Officials ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (CAM) (Entered: 06/10/2025) |
| 06/10/2025 | 171 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered GRANTING 145 Motion for Leave to Appear Pro Hac Vice of Christina A. Jump.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>**Pursuant to Local Rule 83.5.3, local counsel shall also file an appearance in this matter. Further, local counsel shall review all filings and shall personally appear in Court for any hearings or conferences, unless expressly excused by the Court for good cause.** (CAM) (Entered: 06/10/2025) |
| 06/10/2025 | 172 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 155 Motion for Leave to Appear Pro Hac Vice of Glenn Schlactus.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To** |

**JA050**

register for a PACER account, go the Pacer website at **https://pacer.uscourts.gov/register-account**. **You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**

Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.

A Notice of Appearance must be entered on the docket by the newly admitted attorney.

**Pursuant to Local Rule 83.5.3, local counsel shall also file an appearance in this matter. Further, local counsel shall review all filings and shall personally appear in Court for any hearings or conferences, unless expressly excused by the Court for good cause.**(CAM) (Entered: 06/10/2025)

| 06/10/2025 | 173 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 157 Motion for Leave to Appear Pro Hac Vice of John P. Relman.

**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**

Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.

A Notice of Appearance must be entered on the docket by the newly admitted attorney.

**Pursuant to Local Rule 83.5.3, local counsel shall also file an appearance in this matter. Further, local counsel shall review all filings and shall personally appear in Court for any hearings or conferences, unless expressly excused by the Court for good cause.**(CAM) (Entered: 06/10/2025) |
| 06/10/2025 | 174 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 161 Motion for Leave to Appear Pro Hac Vice Added Donald B. Verrilli, Jr..

**Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.** Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen-current-pacer-accounts.htm#link-account.

**Pursuant to Local Rule 83.5.3, local counsel shall also file an appearance in this matter. Further, local counsel shall review all filings and shall personally appear in Court for any hearings or conferences, unless expressly excused by the Court for good cause.**(CAM) (Entered: 06/10/2025) |
| 06/10/2025 | 175 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 164 Motion for Leave to Appear Pro Hac Vice of Esthena Barlow.

**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at** |

**JA051**

**https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**

Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.

A Notice of Appearance must be entered on the docket by the newly admitted attorney.

**Pursuant to Local Rule 83.5.3, local counsel shall also file an appearance in this matter. Further, local counsel shall review all filings and shall personally appear in Court for any hearings or conferences, unless expressly excused by the Court for good cause.** (CAM) (Entered: 06/10/2025)

| | | |
|---|---|---|
| 06/10/2025 | 176 | AMICUS BRIEF filed by Former U.S. Agency Officials . (Attachments: # 1 Exhibit A - List of Amici, # 2 Exhibit B - Declaration of D. Tatel, # 3 Exhibit C - Declaration of C. E. Lhamon)(Ramchandani, Tara) (Main Document 176 replaced on 6/11/2025) (KF). (Entered: 06/10/2025) |
| 06/10/2025 | 177 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 165 Motion for Leave to Appear Pro Hac Vice Added Helen White.<br><br>**Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.** Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen-current-pacer-accounts.htm#link-account.<br><br>**Pursuant to Local Rule 83.5.3, local counsel shall also file an appearance in this matter. Further, local counsel shall review all filings and shall personally appear in Court for any hearings or conferences, unless expressly excused by the Court for good cause.**(CAM) (Entered: 06/10/2025) |
| 06/10/2025 | 178 | NOTICE of Appearance by Reedy Swanson on behalf of American Council on Education (Swanson, Reedy) (Entered: 06/10/2025) |
| 06/11/2025 | 179 | NOTICE of Appearance by Sean H. Donahue on behalf of Columbia Alumni for Academic Freedom (Donahue, Sean) (Entered: 06/11/2025) |
| 06/11/2025 | 180 | NOTICE of Appearance by Stephanie Julie Gold on behalf of American Council on Education (Gold, Stephanie) (Entered: 06/11/2025) |
| 06/11/2025 | 181 | NOTICE of Appearance by Esthena Barlow on behalf of American University, Boston University, Brown University, California Institute of Technology, Colorado State University, Dartmouth College, Georgetown University, Johns Hopkins University, Massachusetts Institute of Technology, Michigan State University, Oregon State University, Princeton University, Rice University, Rutgers University, Stanford University, Tufts University, University of Delaware, University of Denver, University of Maryland, Baltimore, University of Maryland, College Park, University of Oregon, University of Pennsylvania, University of Pittsburgh (Barlow, Esthena) (Entered: 06/11/2025) |
| 06/11/2025 | 182 | NOTICE of Appearance by Donald Beaton Verrilli, Jr on behalf of American University, Boston University, Brown University, California Institute of Technology, Colorado State University, Dartmouth College, Georgetown University, Johns Hopkins University, Massachusetts Institute of Technology, Michigan State University, Oregon State |

**JA052**

| | | |
|---|---|---|
| | | University, Princeton University, Rice University, Rutgers University, Stanford University, Tufts University, University of Delaware, University of Denver, University of Maryland, Baltimore, University of Maryland, College Park, University of Oregon, University of Pennsylvania, University of Pittsburgh (Verrilli, Donald) (Entered: 06/11/2025) |
| 06/11/2025 | 183 | Motion for Leave to File Brief of Amici Curiae in Support of Defendants' Opposition to Plaintiff's Motion for Summary Judgment filed by Kaveh L. Afrasiabi. (Attachments: # 1 Exhibit)(MBM) Filing event modified on 7/24/2025 (CAM). (Entered: 06/11/2025) |
| 06/12/2025 | 184 | NOTICE of Appearance by Christina Jump on behalf of Muslim Legal Fund of America (Jump, Christina) (Entered: 06/12/2025) |
| 06/16/2025 | 185 | Cross MOTION for Summary Judgment by Pamela J. Bondi, Stephen Ehikian, Peter B. Hegseth, Robert F. Kennedy, Jr, Linda M McMahon, National Aeronautics and Space Administration, Sethuraman Panchanathan, Janet E. Petro, Brooke L. Rollins, Scott Turner, US Department of Agriculture, US Department of Defense, US Department of Education, US Department of Energy, US Department of Health and Human Services, US Department of Housing and Urban Development, US Department of Justice, US General Services Administration, US National Science Foundation, Christopher A. Wright. (Attachments: # 1 Memorandum in Support of Defendants' Motion, # 2 Rule 56.1 Statement)(Sirkovich, Eitan) (Entered: 06/16/2025) |
| 06/16/2025 | 186 | Opposition re 69 MOTION for Summary Judgment filed by Pamela J. Bondi, Stephen Ehikian, Peter B. Hegseth, Robert F. Kennedy, Jr, National Aeronautics and Space Administration, National Institutes of Health, Sethuraman Panchanathan, Janet E. Petro, Brooke L. Rollins, Scott Turner, US Department of Agriculture, US Department of Defense, US Department of Education, US Department of Energy, US Department of Health and Human Services, US Department of Housing and Urban Development, US Department of Justice, US General Services Administration, US National Science Foundation, Christopher A. Wright. (Attachments: # 1 Rule 56.1 Statement)(Sirkovich, Eitan) (Entered: 06/16/2025) |
| 06/20/2025 | 187 | MOTION for Leave to File *A Brief Amicus Curiae (Unopposed)* by The Louis D. Brandeis Center for Human Rights Under Law.(Brooks, Douglas) (Entered: 06/20/2025) |
| 06/20/2025 | 188 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 187 Motion for Leave to File A Brief Amicus Curiae (Unopposed) ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (KF) (Entered: 06/20/2025) |
| 06/21/2025 | 189 | MOTION for Leave to Appear Pro Hac Vice for admission of Rebecca L. Harris Filing fee: $ 125, receipt number AMADC-11079265 by The Louis D. Brandeis Center for Human Rights Under Law. (Attachments: # 1 Exhibit Certification of Rebecca L. Harris) (Brooks, Douglas) (Entered: 06/21/2025) |
| 06/21/2025 | 190 | MOTION for Leave to Appear Pro Hac Vice for admission of Jeffrey I. Lang Filing fee: $ 125, receipt number AMADC-11079266 by The Louis D. Brandeis Center for Human Rights Under Law. (Attachments: # 1 Exhibit Certification of Jeffrey I. Lang)(Brooks, Douglas) (Entered: 06/21/2025) |
| 06/21/2025 | 191 | MOTION for Leave to Appear Pro Hac Vice for admission of L. Rachel Lerman Filing fee: $ 125, receipt number AMADC-11079267 by The Louis D. Brandeis Center for Human Rights Under Law. (Attachments: # 1 Exhibit Certification of L. Rachel Lerman) (Brooks, Douglas) (Entered: 06/21/2025) |

**JA053**

| 06/22/2025 | 192 | NOTICE of Appearance by Nathaniel M. Lindzen on behalf of The State of Iowa and 15 other States (Lindzen, Nathaniel) (Entered: 06/22/2025) |
|---|---|---|
| 06/22/2025 | 193 | MOTION for Leave to File *Amicus Brief* by The State of Iowa and 15 other States. (Attachments: # 1 [Proposed] Amicus Brief)(Lindzen, Nathaniel) (Entered: 06/22/2025) |
| 06/23/2025 | 194 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered GRANTING 193 Motion for Leave to File Amicus Brief by The State of Iowa and 15 other States ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (CAM) (Entered: 06/23/2025) |
| 06/23/2025 | 195 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 189 Motion for Leave to Appear Pro Hac Vice of Rebecca L.Harris; granting 190 Motion for Leave to Appear Pro Hac Vice of Jeffrey I.Lang; granting 191 Motion for Leave to Appear Pro Hac Vice of L. Rachel Lerman.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.<br><br>A Notice of Appearance must be entered on the docket by each newly admitted attorney.<br><br>**Pursuant to Local Rule 83.5.3, local counsel shall also file an appearance in this matter. Further, local counsel shall review all filings and shall personally appear in Court for any hearings or conferences, unless expressly excused by the Court for good cause.** (CAM) (Entered: 06/23/2025) |
| 06/23/2025 | 196 | AMICUS BRIEF filed by The State of Iowa and 15 other States . (Lindzen, Nathaniel) (Entered: 06/23/2025) |
| 06/23/2025 | 197 | NOTICE of Appearance by Jeffrey Lang on behalf of The Louis D. Brandeis Center for Human Rights Under Law (Lang, Jeffrey) (Entered: 06/23/2025) |
| 06/23/2025 | 198 | NOTICE of Appearance by Rebecca L. Harris on behalf of The Louis D. Brandeis Center for Human Rights Under Law (Harris, Rebecca) (Entered: 06/23/2025) |
| 06/23/2025 | 199 | AMICUS BRIEF filed by The Louis D. Brandeis Center for Human Rights Under Law . (Brooks, Douglas) (Entered: 06/23/2025) |
| 06/24/2025 | 200 | NOTICE of Appearance by L. Rachel Lerman on behalf of The Louis D. Brandeis Center for Human Rights Under Law (Lerman, L. Rachel) (Entered: 06/24/2025) |
| 06/24/2025 | 201 | MOTION for Leave to Appear Pro Hac Vice for admission of Eric Wessan Filing fee: $ 125, receipt number AMADC-11082824 by The State of Iowa and 15 other States. (Attachments: # 1 Exhibit Declaration of Eric Wessan)(Lindzen, Nathaniel) (Entered: 06/24/2025) |
| 06/24/2025 | 202 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 201 Motion for Leave to Appear Pro Hac Vice Added Eric Wessan. |

**JA054**

**Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.** Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen-current-pacer-accounts.htm#link-account.

**Pursuant to Local Rule 83.5.3, local counsel shall also file an appearance in this matter. Further, local counsel shall review all filings and shall personally appear in Court for any hearings or conferences, unless expressly excused by the Court for good cause.**(CAM) (Entered: 06/24/2025)

| | | |
|---|---|---|
| 06/24/2025 | 203 | NOTICE of Appearance by Helen E White on behalf of American University, Boston University, Brown University, California Institute of Technology, Colorado State University, Dartmouth College, Georgetown University, Johns Hopkins University, Massachusetts Institute of Technology, Michigan State University, Oregon State University, Princeton University, Rice University, Rutgers University, Stanford University, Tufts University, University of Delaware, University of Denver, University of Maryland, Baltimore, University of Maryland, College Park, University of Oregon, University of Pennsylvania, University of Pittsburgh (White, Helen) (Entered: 06/24/2025) |
| 06/25/2025 | 204 | NOTICE of Appearance by George W. Vien on behalf of National Jewish Advocacy Center, Inc. (Vien, George) (Entered: 06/25/2025) |
| 06/25/2025 | 205 | NOTICE of Appearance by Pietro A. Conte on behalf of National Jewish Advocacy Center, Inc. (Conte, Pietro) (Entered: 06/25/2025) |
| 06/25/2025 | 206 | MOTION for Extension of Time to June 26, 2025 to File *Amicus Brief* by National Jewish Advocacy Center, Inc..(Conte, Pietro) (Entered: 06/25/2025) |
| 06/25/2025 | 207 | MOTION for Leave to File *Amicus Brief* by National Jewish Advocacy Center, Inc.. (Attachments: # 1 Exhibit A - Amicus Brief)(Conte, Pietro) (Entered: 06/25/2025) |
| 06/26/2025 | 208 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 206 Motion for Extension of Time to June 26, 2025 to File Amicus Brief by National Jewish Advocacy Center, Inc. (KF) (Entered: 06/26/2025) |
| 06/26/2025 | 209 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 207 Motion for Leave to File Amicus Brief by National Jewish Advocacy Center, Inc.; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (KF) (Entered: 06/26/2025) |
| 06/26/2025 | 210 | AMICUS BRIEF filed by National Jewish Advocacy Center, Inc. . (Conte, Pietro) (Entered: 06/26/2025) |
| 06/30/2025 | 211 | REPLY to Response to 69 MOTION for Summary Judgment filed by President and Fellows of Harvard College. (Lehotsky, Steven) (Entered: 06/30/2025) |
| 06/30/2025 | 212 | Statement of Material Facts L.R. 56.1 re 69 MOTION for Summary Judgment filed by President and Fellows of Harvard College. (Lehotsky, Steven) (Entered: 06/30/2025) |
| 06/30/2025 | 213 | Opposition re 185 Cross MOTION for Summary Judgment filed by President and Fellows of Harvard College. (Lehotsky, Steven) (Entered: 06/30/2025) |
| 07/03/2025 | 214 | MOTION for Leave to Appear Pro Hac Vice for admission of Mark Goldfeder Filing fee: $ 125, receipt number AMADC-11101803 by National Jewish Advocacy Center, Inc.. |

**JA055**

| | | (Attachments: # 1 Exhibit A)(Conte, Pietro) (Entered: 07/03/2025) |
|---|---|---|
| 07/03/2025 | 215 | MOTION for Leave to Appear Pro Hac Vice for admission of Ben Schlager Filing fee: $ 125, receipt number AMADC-11101815 by National Jewish Advocacy Center, Inc.. (Attachments: # 1 Exhibit A)(Conte, Pietro) (Entered: 07/03/2025) |
| 07/03/2025 | 216 | MOTION for Leave to Appear Pro Hac Vice for admission of Lauren Israelovitch Filing fee: $ 125, receipt number AMADC-11101822 by National Jewish Advocacy Center, Inc.. (Attachments: # 1 Exhibit A)(Conte, Pietro) (Entered: 07/03/2025) |
| 07/03/2025 | 217 | MOTION for Leave to Appear Pro Hac Vice for admission of Anat Beck Filing fee: $ 125, receipt number AMADC-11101828 by National Jewish Advocacy Center, Inc.. (Attachments: # 1 Exhibit A)(Conte, Pietro) (Entered: 07/03/2025) |
| 07/03/2025 | 218 | Judge Allison D. Burroughs: ELECTRONIC ORDER enteredgranting 214 , 215 , 216 , and 217 Motions for Leave to Appear Pro Hac Vice of Mark Goldfeder, Ben Schlager, Lauren Israelovitch, Anat Beck.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.<br><br>A Notice of Appearance must be entered on the docket by each newly admitted attorney.<br><br>**Pursuant to Local Rule 83.5.3, local counsel shall also file an appearance in this matter. Further, local counsel shall review all filings and shall personally appear in Court for any hearings or conferences, unless expressly excused by the Court for good cause.**(CAM) (Entered: 07/03/2025) |
| 07/11/2025 | 219 | Consent MOTION for Leave to File *Supplemental Declaration* by President and Fellows of Harvard College. (Attachments: # 1 Exhibit Supplemental Declaration of John Shaw, # 2 Text of Proposed Order)(Lehotsky, Steven) (Entered: 07/11/2025) |
| 07/14/2025 | 220 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered GRANTING 219 Consent Motion for Leave to File Supplemental Declaration ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (CAM) (Entered: 07/14/2025) |
| 07/14/2025 | 221 | DECLARATION *of John Shaw* by President and Fellows of Harvard College. (Lehotsky, Steven) (Entered: 07/14/2025) |
| 07/14/2025 | 222 | MOTION to Withdraw as Attorney by Stephen Ehikian, Peter B. Hegseth, Robert F. Kennedy, Jr, Linda M McMahon, National Aeronautics and Space Administration, National Institutes of Health, Sethuraman Panchanathan, Janet E. Petro, Brooke L. Rollins, Scott Turner, US Department of Agriculture, US Department of Defense, US Department of Education, US Department of Energy, US Department of Health and Human Services, US Department of Housing and Urban Development, US Department of Justice, US General Services Administration, US National Science Foundation, Christopher A. Wright.(Khetarpal, Anuj) (Entered: 07/14/2025) |

**JA056**

| 07/14/2025 | 223 | REPLY to Response to 185 Cross MOTION for Summary Judgment filed by Peter B. Hegseth, Robert F. Kennedy, Jr, Linda M McMahon, National Aeronautics and Space Administration, National Institutes of Health, Sethuraman Panchanathan, Janet E. Petro, Brooke L. Rollins, Scott Turner, US Department of Agriculture, US Department of Defense, US Department of Education, US Department of Energy, US Department of Health and Human Services, US Department of Housing and Urban Development, US Department of Justice, US General Services Administration, US National Science Foundation, Christopher A. Wright. (Attachments: # 1 Exhibit)(Underwood, Ryan) (Entered: 07/14/2025) |
|---|---|---|
| 07/14/2025 | 224 | Administrative Record *Joint Redacted* by Pamela Bondi, Stephen Ehikian, Peter B. Hegseth, Robert F. Kennedy, Jr, Linda M McMahon, National Aeronautics and Space Administration, Sethuraman Panchanathan, Janet E. Petro, Brooke L. Rollins, Scott Turner, US Department of Agriculture, US Department of Defense, US Department of Education, US Department of Energy, US Department of Health and Human Services, US Department of Housing and Urban Development, US Department of Justice, US General Services Administration, US National Science Foundation, Christopher A. Wright. (Attachments: # 1 Appendix Part 2, # 2 Appendix Part 3, # 3 Appendix Part 4, # 4 Appendix Part 5, # 5 Appendix Part 6, # 6 Appendix Part 7, # 7 Appendix Part 8, # 8 Appendix Part 9, # 9 Appendix Part 10, # 10 Appendix Part 11, # 11 Appendix Part 12, # 12 Appendix Part 13, # 13 Appendix Part 14, # 14 Appendix Part 15, # 15 Appendix Part 16, # 16 Appendix Part 17, # 17 Appendix Part 18, # 18 Appendix Part 19, # 19 Appendix Part 20, # 20 Appendix Part 21, # 21 Appendix Part 22, # 22 Appendix Part 23, # 23 Appendix Part 24)(Sirkovich, Eitan) Modified on 7/15/2025 (CAM). (Entered: 07/14/2025) |
| 07/15/2025 | 225 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 222 Motion to Withdraw as Attorney. Attorney Anuj K. Khetarpal terminated. (KF) (Entered: 07/15/2025) |
| 07/15/2025 | 226 | NOTICE of Appearance by Michael Velchik on behalf of Stephen Ehikian, Peter B. Hegseth, Robert F. Kennedy, Jr, Linda M McMahon, National Aeronautics and Space Administration, National Institutes of Health, Sethuraman Panchanathan, Janet E. Petro, Brooke L. Rollins, Scott Turner, US Department of Agriculture, US Department of Defense, US Department of Education, US Department of Energy, US Department of Health and Human Services, US Department of Housing and Urban Development, US Department of Justice, US General Services Administration, US National Science Foundation, Christopher A. Wright (Velchik, Michael) (Entered: 07/15/2025) |
| 07/20/2025 | 227 | Notice of Supplemental Authorities re 69 MOTION for Summary Judgment (Attachments: # 1 Exhibit Exhibit A)(Lehotsky, Steven) (Entered: 07/20/2025) |
| 07/22/2025 | 228 | Electronic Clerk's Notes for proceedings held before Judge Allison D. Burroughs: Motion Hearing held on 7/22/2025 regarding motions for summary judgment. Oral argument by the parties. Court takes matter under advisement. (Court Reporter: Kelly Mortellite at mortellite@gmail.com.) Associated Cases: 1:25-cv-11048-ADB, 1:25-cv-10910-ADB(KF) (Entered: 07/22/2025) |
| 07/22/2025 | 229 | Transcript of Motion Hearing held on July 21, 2025, before Judge Allison D. Burroughs. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Kelly Mortellite at mortellite@gmail.com. Redaction Request due 8/12/2025. Redacted Transcript Deadline set for 8/22/2025. Release of Transcript Restriction set for 10/20/2025. Associated Cases: 1:25-cv-11048-ADB, 1:25-cv-10910-ADB (DRK) (Entered: 07/22/2025) |

## JA057

4/1/26, 8:23 AM    CM/ECF - USDC Massachusetts - Version 1.8.5 as of 2/12/2026

| 07/22/2025 | 230 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm Associated Cases: 1:25-cv-11048-ADB, 1:25-cv-10910-ADB(DRK) (Entered: 07/22/2025) |
|---|---|---|
| 07/23/2025 | 231 | MOTION for Hearing re 183 MOTION for Leave to File Amicus Brief by Kaveh L. Afrasiabi. (Attachments: # 1 Copy of Envelope)(CAM) (Entered: 07/24/2025) |
| 07/28/2025 | 232 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered. The Court **DENIES** Kaveh L. Afrasiabi's motion for leave to file brief as amicus curiae. [ECF No. 183 ]. Although the Federal Rules of Civil Procedure do not contain provisions concerning amici appearances, it is well established that "the acceptance of amicus briefs is within the sound discretion of the court." Strasser v. Doorley, 432 F.2d 567, 569 (1st Cir. 1970). That said, "a district court lacking joint consent of the parties should go slow in accepting... an amicus brief unless, as a party, although short of a right to intervene, the amicus has a special interest that justifies [] having a say, or unless the court feels that existing counsel may need supplementing assistance." Id. Given the absence of either condition, the Court, in its discretion, **DENIES** [ECF No. 183 ]. As such, the related motion for a hearing, [ECF No. 231 ], is **DENIED** as moot. (CAM) (Entered: 07/28/2025) |
| 08/11/2025 | 233 | MOTION for Reconsideration re 232 Order by Kaveh L. Afrasiabi.(CAM) (Entered: 08/11/2025) |
| 08/12/2025 | 234 | Judge Allison D. Burroughs:

ELECTRONIC ORDER entered. Kaveh L. Afrasiabi seeks reconsideration of the Court's denial of his motion for leave to file brief as amicus curiae. [ECF No. 233 ]. "A motion for reconsideration will be granted only upon a showing of (1) a 'manifest error of law,' (2) new evidence, or (3) a misunderstanding or other error 'not of reasoning but apprehension.'" Corliss v. Cummings, No. 17-cv-10017, 2017 WL 5178787, at *1 (D. Mass. Nov. 8, 2017) (quoting Ruiz Rivera v. Pfizer Pharms., LLC, 521 F.3d 76, 81–82 (1st Cir. 2008)). Afrasiabi fails to show that reconsideration is warranted and the motion, [ECF No. 233 ], is DENIED.

(CAM) (Entered: 08/12/2025) |
| 08/23/2025 | 236 | Notice of Supplemental Authorities re 185 Cross MOTION for Summary Judgment (Attachments: # 1 Exhibit A)(Underwood, Ryan) (Entered: 08/23/2025) |
| 08/24/2025 | 237 | Response by President and Fellows of Harvard College to 236 Notice of Supplemental Authorities . (Lehotsky, Steven) (Entered: 08/24/2025) |
| 09/03/2025 | 238 | Judge Allison D. Burroughs: MEMORANDUM AND ORDER entered. The Court GRANTS Harvard's motion for summary judgment, [Harvard, ECF No. 69 ], as to Counts 1, 3, and 4 and Defendants' cross motion for summary judgment, [Harvard, ECF No. 185 ], as to Counts 2 and 6. As to Count 5, the Court GRANTS IN PART Harvard's motion with respect to the Freeze Orders and GRANTS IN PART Defendants' motion with respect to the Termination Letters, which it lacks jurisdiction to review under 5 U.S.C. § 706(2)(A). Harvard's and Defendants' summary judgment motions in Case No. 25-cv-11048 are otherwise DENIED.(CAM) (Entered: 09/03/2025) |
| 09/11/2025 | 239 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered. It is the Court's understanding that all claims have been resolved at summary judgment and that a final judgment should issue. The parties shall file a status report by September 19, 2025 indicating whether any additional issues need to be resolved before a final judgment |

**JA058**

| | | issues and submitting any proposed language for such a judgment. (CAM) (Entered: 09/11/2025) |
|---|---|---|
| 09/19/2025 | [240](#) | STATUS REPORT *(JOINT)* by President and Fellows of Harvard College. (Lehotsky, Steven) (Entered: 09/19/2025) |
| 09/22/2025 | 241 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered. The Court grants the parties' request for additional time to work through implementation issues before a final judgment is entered, (144 in 1:25-cv-10910-ADB; 240 in 1:25-cv-11048-ADB). The parties shall file a status report by October 3, 2025. Associated Cases: 1:25-cv-10910-ADB, 1:25-cv-11048-ADB(CAM) (Entered: 09/22/2025) |
| 10/01/2025 | [242](#) | MOTION to Stay *Deadline* by Pamela Bondi, Stephen Ehikian, Peter B. Hegseth, Robert F. Kennedy, Jr, Linda M McMahon, National Aeronautics and Space Administration, National Institutes of Health, Sethuraman Panchanathan, Janet E. Petro, Brooke L. Rollins, Scott Turner, US Department of Agriculture, US Department of Defense, US Department of Education, US Department of Energy, US Department of Health and Human Services, US Department of Housing and Urban Development, US Department of Justice, US General Services Administration, US National Science Foundation, Christopher A. Wright.(Underwood, Ryan) (Entered: 10/01/2025) |
| 10/02/2025 | 243 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered. Defendants' motion for a stay, [ECF No. [242](#) ], is **GRANTED IN PART** and **DENIED IN PART**. The deadline to file a status report is extended until October 10, 2025. Defendants may renew their motion by that date. (CAM) (Entered: 10/02/2025) |
| 10/08/2025 | [244](#) | Second MOTION to Stay *Deadline* by Pamela Bondi, Stephen Ehikian, Peter B. Hegseth, Robert F. Kennedy, Jr, Linda M McMahon, National Aeronautics and Space Administration, National Institutes of Health, Sethuraman Panchanathan, Janet E. Petro, Brooke L. Rollins, Scott Turner, US Department of Agriculture, US Department of Defense, US Department of Education, US Department of Energy, US Department of Health and Human Services, US Department of Housing and Urban Development, US Department of Justice, US General Services Administration, US National Science Foundation, Christopher A. Wright.(Sirkovich, Eitan) (Entered: 10/08/2025) |
| 10/09/2025 | 245 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered. Defendants' second motion for a stay, [ECF No. [244](#) ], is DENIED. The deadline to file a status report, see [ECF Nos. 239 , 241 , 243 ], is extended until October 17, 2025. (CAM) (Entered: 10/09/2025) |
| 10/17/2025 | [246](#) | STATUS REPORT *(JOINT)* by President and Fellows of Harvard College. (Attachments: # [1](#) Text of Proposed Order)(Lehotsky, Steven) (Entered: 10/17/2025) |
| 10/20/2025 | [247](#) | Judge Allison D. Burroughs: ORDER entered. Order Entering Final Judgment. (CAM) (Entered: 10/20/2025) |
| 10/29/2025 | [248](#) | MOTION to Stay *Deadline to File Motion for Attorney's Fees and Costs Pending Appeal* by President and Fellows of Harvard College. (Attachments: # [1](#) Text of Proposed Order)(Lehotsky, Steven) (Entered: 10/29/2025) |
| 10/30/2025 | 249 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting [248](#) Motion to Stay Deadline to File Motion for Attorney's Fees and Costs Pending Appeal. (KF) (Entered: 10/30/2025) |
| 12/18/2025 | [250](#) | NOTICE OF APPEAL as to [247](#) Order Dismissing Case by Pamela Bondi, Stephen Ehikian, Peter B. Hegseth, Robert F. Kennedy, Jr, Linda M McMahon, National Aeronautics and Space Administration, National Institutes of Health, Sethuraman Panchanathan, Janet E. Petro, Brooke L. Rollins, Scott Turner, US Department of Agriculture, US Department of Defense, US Department of Education, US Department of |

**JA059**

Energy, US Department of Health and Human Services, US Department of Housing and Urban Development, US Department of Justice, US General Services Administration, US National Science Foundation, Christopher A. Wright. Fee Status: US Government.

NOTICE TO COUNSEL: A Transcript Report/Order Form, which can be downloaded from the First Circuit Court of Appeals web site at http://www.ca1.uscourts.gov MUST be completed and submitted to the Court of Appeals. **Counsel shall register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf. Counsel shall also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf. US District Court Clerk to deliver official record to Court of Appeals by 1/7/2026. (Sirkovich, Eitan) (Entered: 12/18/2025)**

| 12/23/2025 | 251 | Certified and Transmitted Abbreviated Electronic Record on Appeal to US Court of Appeals re 250 Notice of Appeal. (SEC) (Entered: 12/23/2025) |
| 12/29/2025 | 252 | USCA Case Number 25-2230 for 250 Notice of Appeal filed by Christopher A. Wright, National Institutes of Health, US Department of Agriculture, US Department of Health and Human Services, US National Science Foundation, National Aeronautics and Space Administration, Sethuraman Panchanathan, US General Services Administration, Brooke L. Rollins, US Department of Energy, Robert F. Kennedy, Jr., Linda M McMahon, Pamela Bondi, US Department of Justice, Stephen Ehikian, US Department of Defense, Peter B. Hegseth, US Department of Housing and Urban Development, Janet E. Petro, Scott Turner, US Department of Education. (SEC) (Entered: 12/29/2025) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 04/01/2026 09:23:41 | | |
| **PACER Login:** | michaelkvelchik | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:25-cv-11048-ADB |
| **Billable Pages:** | 30 | **Cost:** | 3.00 |

**JA060**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

PRESIDENT AND FELLOWS OF
HARVARD COLLEGE,

          *Plaintiff*,

    v.

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES;
NATIONAL INSTITUTES OF HEALTH;
ROBERT F. KENNEDY, JR., in his official
capacity as Secretary of the United States
Department of Health and Human Services;
UNITED STATES DEPARTMENT OF
JUSTICE; PAMELA J. BONDI, in her
official capacity as Attorney General of the
United States; UNITED STATES
DEPARTMENT OF EDUCATION; LINDA
M. MCMAHON, in her official capacity as
Secretary of the United States Department of
Education; UNITED STATES GENERAL
SERVICES ADMINISTRATION;
STEPHEN EHIKIAN, in his official capacity
as Acting Administrator of the United States
General Services Administration; UNITED
STATES DEPARTMENT OF ENERGY;
CHRISTOPHER A. WRIGHT, in his official
capacity as Secretary of the United States
Department of Energy; UNITED STATES
NATIONAL SCIENCE FOUNDATION;
SETHURAMAN PANCHANATHAN, in his
official capacity as Director of the United
States National Science Foundation; UNITED
STATES DEPARTMENT OF DEFENSE;
PETER B. HEGSETH, in his official capacity
as Secretary of the United States Department
of Defense; NATIONAL AERONAUTICS
AND SPACE ADMINISTRATION; JANET
E. PETRO, in her official capacity as Acting
Administrator of the National Aeronautics
and Space Administration; UNITED
STATES DEPARTMENT OF
AGRICULTURE; BROOKE L. ROLLINS,

Case No. 1:25-cv-11048

**FIRST AMENDED
COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF**

in her official capacity as Secretary of Agriculture; UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT; and SCOTT TURNER, in his official capacity as Secretary of Housing and Urban Development,

*Defendants.*

## INTRODUCTION

1. Scientific advancement and the pursuit of knowledge fuel America's innovation, economic success, and global leadership. The commitment to expanding human understanding is foundational at American universities, including Harvard, the Nation's oldest institution of higher learning. Since its founding nearly four centuries ago, Harvard's students, faculty, and researchers have helped identify and solve some of society's most pressing problems. Those pathbreaking and life-saving advancements are due in part to the longstanding collaboration between universities such as Harvard and the federal Government dating back to the Second World War. Millions of Americans are healthier and safer as a result. Federal funding has enabled researchers at Harvard to develop novel drugs to fight Parkinson's and Alzheimer's diseases, engineer nanofibers to protect servicemembers and first responders, support American astronauts in space, and design an artificial intelligence system that can be used to diagnose and treat cancer.

2. In recent months, the federal Government has launched a broad attack on the critical funding partnerships that make this invaluable research possible. To date, the Government has—with little warning and even less explanation—slashed billions of dollars in federal funding to universities across America, including Brown, Columbia, Cornell, Princeton, the University of Pennsylvania, and Northwestern. This case involves the Government's efforts to use the withholding of federal funding as leverage to gain control of academic decisionmaking at Harvard.

1

**JA062**

3. On April 11, 2025, citing concerns of antisemitism and ideological capture, the Government identified ten conditions Harvard must satisfy to receive federal research funding already committed to by the Government and relied on by Harvard, its researchers, and its affiliates (the "April 11 Letter," attached as Exhibit A). Ex. A at 2, 4. The Government dictated that Harvard "reform and restructur[e]" its governance to "reduc[e] the power" of certain students, faculty, and administrators. *Id.* at 2. It required that Harvard hire a third-party to conduct an "audit" of the viewpoints of Harvard's student body, faculty, and staff. *Id.* at 3-4. Then, based on the results of this university-wide viewpoint audit, Harvard must "hir[e] a critical mass of new faculty" and "admit[] a critical mass of students" to achieve "viewpoint diversity" in "each department, field, or teaching unit"—to the Government's satisfaction as determined in the Government's sole discretion. *Id.* And the Government has demanded that Harvard terminate or reform its academic "programs" to the Government's liking. *Id.* at 4.

4. All told, the tradeoff put to Harvard and other universities is clear: Allow the Government to micromanage your academic institution or jeopardize the institution's ability to pursue medical breakthroughs, scientific discoveries, and innovative solutions.

5. Harvard is committed to "combatting antisemitism, one of the most insidious forms of bigotry"[1] and to "broaden[ing] the intellectual and viewpoint diversity within [its] community."[2] Harvard is actively undertaking structural reforms to do both. And while important steps have been taken, Harvard acknowledges that there is still "much work to do."[3] Harvard also fully recognizes

---

[1] Alan M. Garber, *Our Resolve*, Harvard Univ.: Off. of the President (Mar. 31, 2025), https://perma.cc/4UC7-E65V.

[2] Alan M. Garber, *The Promise of American Higher Education*, Harvard Univ.: Off. of the President (Apr. 14, 2025), https://perma.cc/L4G7-J8UB.

[3] Garber, *Our Resolve*, *supra* n.1.

the requirement that it comply with all federal laws, including Title VI of the Civil Rights Act of 1964.

6.      But, as Harvard made clear in a letter to the Government (attached as Exhibit B), "[n]either Harvard nor any other private university can allow itself to be taken over by the federal government." Ex. B at 3. In the words of Harvard's President, Alan M. Garber, "[t]he University will not surrender its independence or relinquish its constitutional rights."[4] "No government—regardless of which party is in power—should dictate what private universities can teach, whom they can admit and hire, and which areas of study and inquiry they can pursue."[5]

7.      In response to Harvard's defense of its own constitutional freedoms, the federal Government announced that it was freezing "$2.2 billion in multiyear grants and $60M in multiyear contract value to Harvard University" (the "April 14 Freeze Order," attached as Exhibit C). Ex. C at 2. Within hours of the April 14 Freeze Order, Harvard began receiving stop work orders. And the situation is getting worse. On April 20, it was reported that the Government is "planning to pull an additional $1 billion of [Harvard]'s funding for health research."[6] On May 5, the Secretary of Education, purporting to speak on behalf of every agency and department, announced an "end of new grants for the University," and directed that "Harvard should no longer seek GRANTS from the federal government, since none will be provided," and "Harvard will cease to be a publicly funded institution" (the "May 5 Letter" or "May 5 Freeze Order," attached as Exhibit D). Ex. D at 3-4. That announcement reiterated the Government's earlier demands and

---

[4]    Garber, *The Promise of American Higher Education*, *supra* n.2; *see also Research Funding*, Harvard Univ., https://www.harvard.edu/research-funding.

[5]    Garber, *The Promise of American Higher Education*, *supra* n.2.

[6]    Douglas Belkin & Liz Essley Whyte, *Trump Administration Irate at Harvard, Plans to Pull Additional $1 Billion in Funding*, Wall St. J. (Apr. 20, 2025), https://tinyurl.com/5e7r7abm.

said it was based, among other things, on the Government's assessment of Harvard's "academic rigor," admissions requirements and practices, grading systems, faculty hiring, teaching, and course construction. *Id.* at 2. The April 14 Freeze Order and May 5 Freeze Order are collectively referred to herein as the "Freeze Orders."

8.      Following in the footsteps of the April 14 and May 5 Freeze Orders, Harvard began, starting on May 6, to receive institution-wide termination notices for various agencies, invoking the earlier April 11 and 14 communications. On May 6, for example, the National Institutes of Health sent Harvard a letter stating that it was terminating all of Harvard's grant funding from that agency based on "the University's unwillingness to take corrective action or implement necessary reforms" and that Harvard's grant "awards no longer effectuate agency priorities" because of "recent events at Harvard University involving antisemitic action" and "Harvard's ongoing inaction in the face of repeated and severe harassment and targeting of Jewish students" (the "May 6 Letter" or "May 6 NIH Termination Letter," attached as Exhibit E). Ex. E at 2-3. The letter states that "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action," but "no corrective action is possible here." *Id.* at 3.

9.      Similarly, on May 9, the United States Department of Agriculture sent Harvard a letter announcing the termination of awards (the "May 9 letter" or "May 9 USDA Termination Letter," attached as Exhibit F).

10.     On May 12, other agencies followed suit. Harvard received analogous letters from the United States Department of Energy (the "May 12 Energy Termination Letter," attached as Exhibit G), United States Department of Defense (the "May 12 DoD Termination Letter," attached as Exhibit H), the National Science Foundation (the "May 12 NSF Termination Letter," attached

as Exhibit I), and the United States Department of Housing and Urban Development (the "May 12 HUD Termination Letter," attached as Exhibit J) (collectively, the "May 12 Letters" or "May 12 Termination Letters"). And the Department of Education has sent individual grant termination notices.

11.     Defendants' actions are unlawful. The First Amendment does not permit the Government to "interfere with private actors' speech to advance its own vision of ideological balance," *Moody v. NetChoice*, 603 U.S. 707, 741 (2024), nor may the Government "rely[] on the 'threat of invoking legal sanctions and other means of coercion . . . to achieve the suppression' of disfavored speech," *Nat'l Rifle Ass'n v. Vullo*, 602 U.S. 175, 189 (2024) (citation omitted). The Government's attempt to coerce and control Harvard disregards these fundamental First Amendment principles, which safeguard Harvard's "academic freedom." *Asociacion de Educacion Privada de P.R., Inc. v. Garcia-Padilla*, 490 F.3d 1, 8 (1st Cir. 2007). A threat such as this to a university's academic freedom strikes an equal blow to the research conducted and resulting advancements made on its campus.

12.     The Government's actions flout not just the First Amendment, but also federal laws and regulations. The Government has expressly invoked the protections against discrimination contained in Title VI of the Civil Rights Act of 1964 as a basis for its actions. Make no mistake: Harvard rejects antisemitism and discrimination in all of its forms and is actively making structural reforms to eradicate antisemitism on campus. But rather than engage with Harvard regarding those ongoing efforts, the Government announced a sweeping freeze of current and future funding for medical, scientific, technological, and other research that has nothing at all to do with antisemitism and Title VI compliance. Moreover, Congress in Title VI set forth detailed procedures that the Government "shall" satisfy before revoking or refusing to grant or continue federal funding based

on discrimination concerns. 42 U.S.C. § 2000d-1. Those procedures effectuate Congress's desire that "termination of or refusal to grant or to continue" federal financial assistance be a remedy of last resort. *Id.* The Government made no effort to follow those procedures—nor the procedures provided for in Defendants' own agency regulations—before freezing Harvard's federal financial assistance.

13.     These fatal procedural shortcomings are compounded by the arbitrary and capricious nature of Defendants' abrupt and indiscriminate decision. Even before the freezes and terminations, the Government had threatened to terminate up to $8.7 billion in federal funding not just to Harvard, but also to preeminent Boston hospitals such as Massachusetts General Hospital, Beth Israel Deaconess Medical Center, Brigham and Women's Hospital, Boston Children's Hospital, and the Dana-Farber Cancer Institute. These hospitals are independent corporate entities with their own boards of directors or trustees and their own separate officers, leadership, and management. They are not under Harvard's control. The hospitals have no control over Harvard's enforcement of Title VI requirements, and vice versa. These hospitals have their own tax identification numbers, endowments, and accounts. And they seek and receive federal financial assistance directly from federal agencies, not through Harvard.

14.     The Government has not identified—and cannot identify—any rational connection between antisemitism concerns and the medical, scientific, technological, and other research it has frozen or terminated that aims to save American lives, foster American success, preserve American security, and maintain America's position as a global leader in innovation. Nor has the Government acknowledged the significant consequences that the indefinite freeze and termination of billions of dollars in federal research funding will have on Harvard's research programs, the

6
**JA067**

beneficiaries of that research, and the national interest in furthering American innovation and progress.

15.     The Government has not characterized any of its actions as a "termination of or refusal to grant or to continue assistance" under 42 U.S.C. § 2000d-1. But the effect of the Government's decisions is the same. Under whatever name, the Government has ceased the flow of funds to Harvard as part of its pressure campaign to force Harvard to submit to the Government's control over its academic programs. That, in itself, violates Harvard's constitutional rights. But the Government has also failed to engage in the statutorily mandated process Congress required under Title VI before funds are cut off, which provides independent grounds for declaring the freeze and subsequent termination unlawful. By accepting federal funds, Harvard agreed to abide by the provisions in Title VI and the relevant agencies' corresponding regulations. But Harvard's agreement is not a blank check for agencies to impose the Government's recent, unrelated demands as a condition of continued funding. *See Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 219 (2022) ("[T]he legitimacy of Congress' power to enact Spending Clause legislation rests . . . on whether the recipient [of federal funds] voluntarily and knowingly accepts the terms of that contract," and "[r]ecipients cannot knowingly accept the deal with the Federal Government unless they would clearly understand the obligations that would come along with doing so." (cleaned up)).

16.     Defendants' actions threaten Harvard's academic independence and place at risk critical lifesaving and pathbreaking research that occurs on its campus. And they are part of a broader effort by the Government to punish Harvard for protecting its constitutional rights. In the month since Harvard rejected the Government's initial demands, the Government has launched multiple investigations and other actions against Harvard. Although the Government has indicated

that it has made several attempts to contact the University, at no time has it rescinded the draconian demands laid out in the April 11 Letter. Indeed, the Government has only doubled down, reupping the same demands in the May 5 Letter while noting that the "Administration's priorities have not changed." Ex. D at 4. Meanwhile, it has only ratcheted up funding cuts, investigations, and threats that will hurt students from every state in the country and around the world, as well as research that improves the lives of millions of Americans.

17.     Plaintiff President and Fellows of Harvard College ("Harvard") brings this civil action under the Constitution of the United States, the Administrative Procedure Act, and Title VI of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000d-2, to enjoin Defendants from exceeding the bounds of their legal authority and to protect Harvard's constitutional rights.

**PARTIES**

18.     Plaintiff President and Fellows of Harvard College is a non-profit corporation commonly known as Harvard University. Harvard is a private research university and the oldest institution of higher learning in the United States. It provides undergraduate and graduate instruction to more than 24,000 enrolled students annually across 13 schools, and it produces cutting-edge research in fields such as oncology, epidemiology, biotechnology, and many others. Advancements at Harvard have made Americans healthier and safer, increased our knowledge of the world, and made our nation more secure.

19.     Defendant United States Department of Health and Human Services ("HHS") (including all subagencies over which HHS exercises legal control) is an executive department of the United States. The National Institutes of Health ("NIH") is an agency within HHS.

20.     Defendant Robert F. Kennedy, Jr. is the Secretary and head of Defendant HHS. He is sued in his official capacity.

21.     Defendant United States Department of Justice ("DOJ") (including all subagencies

8
**JA069**

over which DOJ exercises legal control) is an executive department of the United States.

22.     Defendant Pamela J. Bondi is the Attorney General of the United States and the head of Defendant DOJ. She is sued in her official capacity.

23.     Defendant United States Department of Education (including all subagencies over which the United States Department of Education exercises legal control) is an executive department of the United States.

24.     Defendant Linda M. McMahon is the Secretary and head of Defendant United States Department of Education. She is sued in her official capacity.

25.     Defendant United States General Services Administration ("GSA") (including all subagencies over which GSA exercises legal control) is an agency of the United States.

26.     Defendant Stephen Ehikian is the Acting Administrator of Defendant GSA. He is sued in his official capacity.

27.     Defendant United States Department of Energy (including all subagencies over which the United States Department of Energy exercises legal control) is an executive department of the United States.

28.     Defendant Christopher A. Wright is the Secretary and head of Defendant United States Department of Energy. He is sued in his official capacity.

29.     Defendant United States National Science Foundation ("NSF") (including all subagencies over which NSF exercises legal control) is an agency of the United States.

30.     Defendant Sethuraman Panchanathan is the Director and head of Defendant NSF. He is sued in his official capacity.

**JA070**

31.     Defendant United States Department of Defense ("DoD") (including all subagencies over which DoD exercises legal control) is an executive department of the United States.

32.     Defendant Peter B. Hegseth is the Secretary and head of Defendant DoD. He is sued in his official capacity.

33.     Defendant National Aeronautics and Space Administration ("NASA") (including all subagencies over which NASA exercises legal control) is an agency of the United States.

34.     Defendant Janet E. Petro is the Acting Administrator of Defendant NASA. She is sued in her official capacity.

35.     Defendant United States Department of Agriculture ("USDA") (including all subagencies over which USDA exercises legal control) is an executive department of the United States.

36.     Defendant Brooke L. Rollins is the Secretary and head of Defendant USDA. She is sued in her official capacity.

37.     Defendant United States Department of Housing and Urban Development ("HUD") (including all subagencies over which HUD exercises legal control) is an executive department of the United States.

38.     Defendant Scott Turner is the Secretary and head of Defendant HUD. He is sued in his official capacity.

## JURISDICTION AND VENUE

39.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this civil action arises under the Constitution of the United States and federal statutes, including Title VI of the Civil Rights Act of 1964, as amended, *see* 42 U.S.C. § 2000d-2. The Court is authorized to

award the requested relief under 5 U.S.C. §§ 702, 703, 705, and 706; 28 U.S.C. §§ 2201 and 2202; 42 U.S.C. § 1988; and through the equitable powers of this Court.

40.     Harvard does not seek money damages or an order mandating specific performance of any contract. Instead, it seeks an order declaring unlawful and setting aside sweeping agency action taken in violation of Harvard's constitutional rights under the First Amendment and its rights guaranteed by statute and regulation. Therefore, this Court has jurisdiction over Harvard's claims.

41.     Venue is proper in this District under 28 U.S.C. § 1391(e)(1) because Defendants are agencies of the United States and officers of the United States acting in their official capacities, a substantial part of the events or omissions giving rise to the claims occurred in this District, Plaintiff resides in this District, and no real property is involved.

## BACKGROUND

### Federally Funded Research at Harvard University

42.     Harvard University is the oldest institution of higher learning in the United States and one of the world's leading research universities. For decades, universities like Harvard have conducted research identified by the federal Government as essential to advancing the boundaries of human knowledge and improving the lives of Americans. While this partnership traces back to our country's founding, the partnership between the Government and universities grew stronger during and after the Second World War, as the Government increasingly recognized that universities can help achieve scientific and technological advances that benefit the public.[7]

---

[7]     Ronald Brownstein, *Trump's Drive Against Top Universities Could Carry a Big Economic Cost*, CNN (Apr. 13, 2025), https://perma.cc/HR4S-5MC2.

43. Federal funding for university research serves as a cornerstone of the American research system. It is an essential resource for the groundbreaking discoveries made today by Harvard's faculty and staff, leading not only to scientific advancement and innovation, but also to the country's economic growth. Today, Harvard's federally funded research includes particular strengths in oncology, immunology, neuroscience, molecular biology, genomics, quantum science, and other areas of technology that support our national economy and defense.

44. Harvard's researchers, in collaboration with the federal Government, have pioneered groundbreaking innovations that make millions of people in our country healthier and safer across a wide range of medical, engineering, scientific, and other fields. Their research includes, for example:

- *Cancer Research*: Harvard's cancer research includes identifying mechanisms that drive disease development at all stages including tumor metastasis; developing new therapeutic approaches with the goal of preventing, targeting and suppressing cancer at every stage; mapping the metabolic signaling pathways that drive the association of cancer with other diseases to restore proper cellular function and enhance prevention; and developing a new machine learning method to model the behavior of all 25,000 human genes as they respond to high-intensity treatments like chemotherapy, which the National Cancer Institute cited as an advancement in basic cancer research that will lay the groundwork for future clinical breakthroughs.

- *Infectious Diseases Research*: Harvard researchers study infectious diseases to better understand and address the global threat of multidrug-resistant infections; develop new tools for global pandemic prevention; discover new therapeutic antibodies and small molecules to treat or cure viral diseases; and develop enhanced approaches to monitor disease outbreaks and to predict patterns of spread.

- *Microbiome Research*: Harvard's microbiome research includes developing new frontiers in precision medicine that can help individuals reduce their risk of cancer and other diseases by better understanding and leveraging our bodies' relationship with the multitude of bacteria and other microorganisms that contribute to human health and disease.

- *Toxin Reduction Research*: Harvard's toxin reduction research includes studying the harm from microplastics on sperm counts and fertility, and developing life-saving guidance for those exposed to high levels of toxins, including firefighters, individuals working in environments with high exposure potentials (*e.g.*, members of the military, miners, and chemical factory workers), and children in rural communities.

- ***Neurological Research***: Harvard's neurological research includes identifying numerous modifiable risk factors for Parkinson's disease, multiple sclerosis, and other neurological diseases including conditions that are generally age-related, such as Alzheimer's (and other forms of dementia) and stroke, which creates the potential to significantly cut disease incidence and reduce healthcare costs. Other research involves efforts to better understand the role of infections in seeding neurodegenerative disorders, with important implications for prevention, diagnosis, and treatment. And other research involves studying the long-term neurologic effects of radiation and chemotherapy-based treatment on young children who survived cancer and identifying treatments to improve outcomes that also reduce the impact of therapy-related collateral damage, which is also relevant to adult cancer survivors.

- ***Biotechnology***: Harvard's biotechnology research includes studying how spaceflight, including space-related radiation, affects blood cell formation in astronauts on the upcoming Space Station and ARTEMIS missions. That research is also developing a new class of anesthetics that could lead to breakthroughs in the care of wounded servicemembers in the field that would obviate the need for trained anesthesiologists or hospitalization. And it is advancing organ chip technology to further understanding of, among other things, illnesses and injuries that result from high doses of radiation.

- ***Technological Innovation***: Additional research at Harvard supports innovations in quantum computing, artificial intelligence and machine learning, nanomaterials, microchip design, biomechanics, chemical engineering, next-generation batteries, computer science, "smart" living environments for the elderly, and more.

- ***Other Military Advancements and National Security***: Harvard also dedicates research to reducing the short- and long-term consequences of traumatic battlefield related injuries; developing soft robotics for enhancing battlefield performance; creating compact and rapidly deployable (foldable) bridges and other structures for military use; developing radiation countermeasures and limb regeneration; and developing hack-resistant computer networks, rapid infectious agent diagnostics, and ways to combat antibiotic resistance.

45.    Federal funding for university research typically flows through a grant process administered by federal agencies. *See, e.g.*, 42 U.S.C. § 241(a)(3) (authorizing NIH to "make grants-in-aid to universities" for research support). As NIH explains, it is "the largest public funder of biomedical research in the world," investing "most of its nearly $48 billion budget in medical research seeking to enhance life and to reduce illness and disability."[8] Through the appropriations process, Congress establishes the annual budgets for research-focused federal agencies like NIH, NSF, NASA, and others that fund university research. *See, e.g.*, Further Consolidated

---

[8]    *Grants & Funding*, Nat'l Insts. of Health, https://perma.cc/B6CV-TKP7.

Appropriations Act, Pub. L. No. 118-47, 138 Stat. 460, 656-60 (2024) (appropriating funds for NIH research); Consolidated Appropriations Act, Pub. L. 118-42, 138 Stat. 25, 157-63 (2024) (appropriating funds for NSF and NASA research). These appropriations directly determine how much money is available to universities and other research institutions for research grants that are most often awarded on a competitive basis.

46. Pursuant to Congress's directives, the federal Government fuels critical research at Harvard, which is one of the nation's leading recipients of NIH grants. Along with investments by the universities themselves, these grants secure the funding necessary to pursue biomedical research and other research endeavors across the University. Numerous Harvard professors, including Nobel laureates, rely on NIH and other federal funding for their work.[9] Federally funded research at Harvard has led to life-altering advancements in improving cancer diagnoses.[10] It supports brain health and trauma research for veterans.[11] And federal funding has supported projects focused on understanding neurodegenerative disease and creating a new class of antibiotics to treat infections.[12] It has also enabled Harvard researchers to study how spaceflight affects blood cell formation in astronauts on upcoming missions.[13]

---

[9] *8 Harvard Medical School Researchers Receive NIH Awards*, Harvard Med. Sch. (Oct. 26, 2023), https://perma.cc/MNX2-V67K; *NIH Grantees Win Nobel Prizes*, NIH Record (Oct. 25, 2024), https://perma.cc/H99M-23YU (recognizing NIH-funded Harvard professor Gary Ruvkun for his 2024 Nobel Prize); *OER Congratulates Recent Nobel and Lasker Award Winners*, NIH Off. of Extramural Rsch. (Oct. 1, 2009), https://perma.cc/JL4W-R5ZN (congratulating NIH-funded Harvard professor Jack Szostak for his 2009 Nobel Prize).

[10] *See* Ekaterina Pesheva, *A New Artificial Intelligence Tool for Cancer*, Harvard Med. Sch. (Sept. 4, 2024), https://perma.cc/LLU4-Y4U8.

[11] *See Comprehensive Brain Health and Trauma Program*, Home Base, https://perma.cc/Q9UW-M5V7.

[12] *See* Sy Boles, *NIH Funding Delivers Exceptional Economic Returns,* Harvard Gazette (Mar. 11, 2025), https://tinyurl.com/ar3ajssj.

[13] *Human Organs-on-Chips*, Wyss Inst., https://perma.cc/AT2S-99ST.

47. Harvard's research programs—funded in part by Defendants—serve as training grounds for the next generation of scientific, technological, medical, and public health leaders, with grants supporting the work of thousands of graduate students and postdoctoral fellows.

**Title VI and Federal Financial Assistance**

48. Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Title VI permits an agency, under detailed conditions, to enforce this substantive provision by terminating or suspending federal financial assistance.

49. If an agency wants to freeze federal financial assistance to universities based on alleged civil rights violations under Title VI, then it must follow a detailed and mandatory statutory framework. The Supreme Court has referred to these procedural limits as "elaborate restrictions on agency enforcement." *Alexander v. Sandoval*, 532 U.S. 275, 290 (2001).

50. No action to terminate or refuse to grant or continue federal financial assistance may be taken "until the department or agency concerned has advised the appropriate person or persons of the failure to comply with the requirement and has determined that compliance cannot be secured by voluntary means." 42 U.S.C. § 2000d-1; *see Adams v. Richardson*, 351 F. Supp. 636, 641 (D.D.C. 1972) ("The underlying thrust of the statute requires that the agency involved . . . attempt at the outset to secure compliance by voluntary means, if such method is reasonably possible. This course involves negotiation, and negotiation takes time."); *cf. Mach Mining, LLC v. EEOC*, 575 U.S. 480, 486-89 (2015) (discussing similar procedural requirement in Title VII context).

51. If the agency determines that voluntary compliance is not possible, then it must initiate formal proceedings, specifically a hearing, and must make express findings on the record

15
**JA076**

before terminating or refusing to grant or to continue federal financial assistance. 42 U.S.C. § 2000d-1; *see Washington Legal Found. v. Alexander*, 984 F.2d 483, 484 (D.C. Cir. 1993). The agency head must file "a full written report of the circumstances and the grounds for such action" with the relevant committees in the House and Senate. 42 U.S.C. § 2000d-1. Further, the action does not "become effective until thirty days have elapsed after the filing of such report." *Id.*

52.    The agency Defendants' regulations layer on top of the statutory text of 42 U.S.C. § 2000d-1 and provide additional details on procedural requirements for any termination or refusal to grant or to continue federal financial assistance based on Title VI. *E.g.*, 45 C.F.R. § 80.8-.10 (HHS); 34 C.F.R. § 100.8 (Education); 41 C.F.R. § 101-6.211-1 to -4 (GSA); 28 C.F.R. § 42.108 (DOJ). These regulations are binding on the agencies that issued them.

53.    Defendants know and are capable of following these mandatory procedural steps. On the very same day as the April 11 Letter, DOJ's Civil Rights Division sent Harvard a letter announcing that it was "commencing a compliance review investigation of Harvard University [specifically Harvard Medical School] pursuant to Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*," and noting that "[i]f we conclude that Harvard University is violating Title VI, we will inform you and work with you to secure compliance by informal voluntary means. 28 C.F.R. §§ 42.107 & 42.108."[14]

---

[14]    Letter from Harmeet K. Dhillon, Assistant Att'y Gen., Civ. Rights Div., U.S. Dep't of Just., to Jennifer O'Connor, Vice President & Gen. Couns., Harvard Univ. (Apr. 11, 2025).

**The University's Response to Antisemitism on Harvard's Campus**

54.     On October 7, 2023, the terrorist organization Hamas conducted a surprise attack on Israeli citizens, killing and brutalizing thousands of Israelis and Americans and taking more than 240 people hostage.[15] This began an ongoing war between Israel and Hamas.[16]

55.     The escalating conflict in the Middle East dominated headlines around the globe. In the United States, protests erupted on university campuses across the country. Like other schools, Harvard experienced increased tensions among members of its campus community, including students.[17] Members of the Jewish and Israeli communities at Harvard reported treatment that was vicious and reprehensible.

56.     Harvard has made policy and other changes over the last year aimed at ensuring its campus is safe, fair, and welcoming to Jewish and Israeli students. Harvard has adopted new accountability procedures and clarified policies; imposed meaningful discipline on those who violate applicable policies; enhanced programs designed to address bias and promote ideological diversity and civil discourse; hired staff to support these programs and support students; and enhanced safety and security measures.

57.     In January 2024, then-interim President Garber and the Deans of Harvard's schools issued Guidance on Protest and Dissent under the University-wide Statement on Rights and

---

[15]  Josef Federman & Issam Adwan, *Hamas Surprise Attack Out of Gaza Stuns Israel and Leaves Hundreds Dead in Fighting, Retaliation*, Associated Press (Oct. 7, 2023), https://tinyurl.com/mr2m7hek.

[16]  *Id.*

[17]  J. Sellers Hill & Nia L. Orakwue, *Harvard Student Groups Face Intense Backlash for Statement Calling Israel 'Entirely Responsible' for Hamas Attack*, Harvard Crimson (Oct. 10, 2023), https://perma.cc/Z3K4-QJKF.

Responsibilities.[18] This Guidance made clear that protests are not permitted in classrooms, libraries, dormitories, dining halls, Harvard offices, or other places where they "would interfere with the normal activities of the University."[19] It also reiterated that protests may not interfere "with the free flow of vehicular, bicycle, or pedestrian traffic" on campus.[20]

58.  In August 2024, Harvard issued updated information on Rules for Use of Campus Spaces,[21] which expressly prohibit, among other things, structures such as tents, unauthorized exhibits and displays, and excessive noise.[22]

59.  In September 2024, Harvard released Guidance explaining that online "doxing" violates the University's prohibition on "intense personal harassment" and constitutes bullying under its Non-Discrimination and Anti-Bullying Policies.[23]

60.  In November 2024, Harvard issued a "Frequently Asked Questions" statement ("FAQs") on "Protests in Libraries" explaining how its Protest and Dissent Guidelines found in the University-wide Statement on Rights and Responsibilities apply to protests in Harvard's libraries. The FAQs underscore that when a library space is used to "express a shared message,"

---

[18]  *Statement of Interim President and Deans on University Rights and Responsibilities*, Harvard Univ.: Off. of the President (Jan. 19, 2024), https://perma.cc/2ND4-HHDV.

[19]  *Id.*

[20]  *Id.*

[21]  *Rules for Use of Campus Spaces*, Harvard Univ.: Off. of the Exec. Vice President (Aug. 1, 2024), https://perma.cc/3HTH-S4B2.

[22]  *Campus Use Rules*, Harvard Univ.: Off. of the Exec. Vice President, https://perma.cc/2M4M-ZS2C.

[23]  *Guidance on Addressing Online Harassment*, Harvard Univ.: Off. of the President (Sept. 5, 2024), https://perma.cc/25YW-EFN2.

even if the participants are silent, the demonstration "interfere[s] with the room's purpose as a place of study and research" and violates University policies.[24]

61. Harvard has also made changes to clarify the scope of prohibited conduct aimed at Jewish and Israeli students. In January 2025, Harvard committed to take account of the International Holocaust Remembrance Alliance's ("IHRA") definition of antisemitism in its anti-harassment policies and disciplinary proceedings.[25] The United States, as a member of IHRA, uses this definition and has encouraged other governmental and international organizations to use it. Harvard is one of only a few universities to have adopted the IHRA definition.

62. In March 2025, Harvard released updated "Frequently Asked Questions" clarifying that both Jewish and Israeli identities are covered by the University's Non-Discrimination and Anti-Bullying Policies, that the IHRA definition of antisemitism will be used, and that IHRA examples will be considered in assessing incidents.[26] The guidance also made clear that the Non-Discrimination policy applies to conduct targeting Zionists.[27]

63. Harvard has taken action to enforce these policies in response to campus incidents in the current academic year. During the fall 2024 semester, Harvard suspended library access for dozens of students and faculty members who violated University policies in connection with protests in Harvard's college, law school, and divinity school libraries.[28] In March 2025, Harvard

---

[24] *Frequently Asked Questions: Protests in Libraries*, Harvard Libr. (Dec. 10, 2024), https://perma.cc/AK9P-GPHH.

[25] Vimal Patel, *Harvard Adopts a Definition of Antisemitism for Discipline Cases*, N.Y. Times (Jan. 21, 2025), https://tinyurl.com/2mamnmaw.

[26] *Frequently Asked Questions*, Harvard Univ.: Off. for Cmty. Conduct, https://perma.cc/3NKY-LD97.

[27] *Id.*

[28] *See* Neil H. Shah, *Faculty Members Suspended From Harvard's Main Library After 'Study-In' Protest*, Harvard Crimson (Oct. 25, 2024), https://perma.cc/D3RV-8HJR; S. Mac Healy &

terminated a University employee who tore down Chabad posters (which showed images of Israeli hostages) in violation of Harvard's policy against "'tampering with or removing' approved displays."[29] And in April 2025, Harvard suspended the undergraduate Palestine Solidarity Committee and banned the organization from hosting public events until July due to violations of Harvard's Campus Use Rules.[30]

64. Well before the Government's engagement, Harvard had initiated steps to address antisemitism on campus. Recognizing the seriousness of this issue, Harvard has taken and will continue to take steps to do so in the future.

65. Concurrently with these changes, a Presidential Task Force on Combating Antisemitism ("Harvard Task Force") was formed on January 19, 2024, by President Garber and was charged with "identifying the root causes of and contributing factors to bias-based behaviors on campus," "evaluating evidence regarding the characteristics and frequency of these behaviors," and "recommending approaches to combat bias and to mitigate its impact on campus."[31]

66. The Harvard Task Force released its preliminary recommendations on June 6, 2024.[32] The Harvard Task Force observed that, since October 2023, Jewish and Israeli students

---

Saketh Sundar, *HLS Banned 60 Students From Its Library for a 'Study-In.' Dozens Just Did It Again*, Harvard Crimson (Oct. 25, 2024), https://perma.cc/GH98-8GAJ; Rachael A. Dziaba & Aisatu J. Nakoulima, *Students Suspended from Harvard Divinity School Library After Pray-In*, Harvard Crimson (Nov. 13, 2024), https://perma.cc/3RPA-TVNH.

[29] Samuel A. Church & Cam N. Srivastava, *Librarian Who Removed Chabad Poster Is No Longer Employed at Harvard*, Harvard Crimson (Mar. 10, 2025), https://perma.cc/U4VJ-AYTJ.

[30] Samuel A. Church, Elyse C. Goncalves & Cam N. Srivastava, *Harvard Places Palestine Solidarity Committee on Probation Over Tuesday HOOP Rally*, Harvard Crimson (Apr. 3, 2025), https://perma.cc/SR8Q-K6CA.

[31] *Announcement of Presidential Task Forces*, Harvard Univ.: Off. of the President (Jan. 19, 2024), https://perma.cc/45XJ-4NSV.

[32] *See generally* Presidential Task Force on Combating Antisemitism, Harvard Univ., *Preliminary Recommendations* (June 6, 2024), https://perma.cc/PD6T-7DGN.

had been subject to incidents of "shunning, harassment, and intimidation" on campus.[33] In response, the Harvard Task Force proposed "short-term actionable items" including releasing a statement clarifying Harvard's values, strengthening anti-bullying policies, and fostering constructive dialogue on campus.[34] Harvard has already acted on these recommendations.

67.     On April 29, 2025, the Harvard Task Force released its full report and detailed recommendations for ongoing reforms to ensure the safety and inclusion of Harvard's Jewish and Israeli student populations.[35] Harvard continues to update and enforce its policies and procedures to protect Jewish and Israeli members of the Harvard community while permitting the free and open exchange of ideas.

### Defendants' Actions Threatening Harvard's Federal Research Funding

68.     On February 3, 2025, DOJ announced the formation of a multi-agency Task Force to Combat Antisemitism ("Federal Task Force") including representatives from the Department of Education, HHS, and other agencies, led by Senior Counsel to the Assistant Attorney General for Civil Rights, Leo Terrell.[36]

69.     On February 26, 2025, a news article reported Terrell as saying, "When you see universities start losing millions of dollars in federal funding, you're going to see a change in their behavior."[37] A few days later, Terrell stated in a Fox Business clip he later shared on X, "I've

---

[33]   *Id.* at 1.

[34]   *Id.* at 1-5.

[35]   Alan M. Garber, *Update on Presidential Task Forces*, Harvard Univ.: Off. of the President (Apr. 29, 2025), https://perma.cc/YMG7-74VF.

[36]   Press Release, U.S. Dep't of Justice, *Justice Department Announces Formation of Task Force to Combat Anti-Semitism* (Feb. 3, 2025), https://perma.cc/Z4UV-HB2Y.

[37]   Akiva Van Koningsveld, *Head of DOJ Antisemitism Task Force: We'll Put Hamas Supporters in Jail 'for Years,'* Jewish News Syndicate (Feb. 26, 2025), https://perma.cc/5327-BU4R.

targeted ten schools. Columbia, Harvard, Michigan, UCLA, USC. Let me tell you what we're going to do. We're going to take away your funding."[38] These statements echo earlier comments made by Terrell and President Donald J. Trump. President Trump's campaign website touted his plan "to reclaim our once great educational institutions from the radical Left and Marxist maniacs,"[39] including by threatening to "take the billions and billions of dollars that we will collect by taxing, fining, and suing excessively large private university endowments" from "Harvard and other once-respected universities."[40] And prior to Terrell's appointment as Senior Counsel to the Assistant Attorney General for Civil Rights and head of the Federal Task Force, he promised that "Harvard will lose much more [funding] effective January 2025" because "America will no longer fund Jew Hating Schools!"[41]

70.     On February 27, 2025, Harvard received a letter (attached as Exhibit K) from the Federal Task Force. That letter requested a meeting "within 30 days with relevant administrators, faculty, staff members, and any on-campus Jewish stakeholder groups" to help the Federal Task Force "fully and objectively evaluate the allegations and determine what further action, if any, may be warranted." Ex. K at 3.

71.     On February 28, 2025, the Federal Task Force issued a press release (attached as Exhibit L) announcing its plans to visit ten university campuses, including Harvard, to gather information about allegations of antisemitic incidents as it considers whether remedial action is warranted.

---

[38]   @TheLeoTerrell, X.com (Feb. 28, 2025, 11:48 AM ET), https://perma.cc/5NBW-B6P5.

[39]   *Agenda47: Protecting Students from the Radical Left and Marxist Maniacs Infecting Educational Institutions*, DonaldJTrump.com (July 17, 2023), https://perma.cc/7VKE-VN89.

[40]   *Agenda47: The American Academy*, DonaldJTrump.com (Nov. 1, 2023), https://perma.cc/WFL2-Y262.

[41]   @TheLeoTerrell, X.com (Oct. 20, 2024, 3:33 PM ET), https://perma.cc/9WUM-PKHK.

72.     In the weeks following DOJ's letter to Harvard requesting a meeting and the Federal Task Force's press release announcing campus visits, Harvard worked with Government officials to schedule an on-campus meeting. A campus visit was scheduled for late April 2025.

73.     On March 31, 2025, Harvard received a letter from GSA (the "March 31 Letter," attached as Exhibit M). The March 31 Letter announced a federal review of more than $8.7 billion in federal research grants to Harvard and "its affiliates," Ex. M at 2—an apparent reference to Boston-area teaching hospitals and their affiliated professional corporations or group medical practices that employ Harvard Medical School faculty, but which are entirely independent entities and are *not* part of Harvard.

74.     The March 31 Letter linked the review of funding to Defendants' allegations about antisemitism on Harvard's campus: Harvard is "being investigated for potential infractions and dereliction of duties to curb or combat anti-Semitic harassment." *Id.* The cover e-mail (attached as Exhibit N) transmitting the letter to President Garber further confirmed: "This review is being conducted in support of President Trump's Executive Order, 'Additional Measures to Combat Anti-Semitism.'" Ex. N at 2. And Defendants' press release announcing the review offered even further confirmation: the review of funding is "part of an investigation aimed at eliminating anti-Semitic harassment on college campuses."[42] The press release referred to a "similar ongoing

---

[42]   Press Release, U.S. Dep't of Health and Human Servs., *HHS, ED, and GSA Initiate Federal Contract and Grant Review of Harvard University* (Mar. 31, 2025), https://tinyurl.com/4nzf3zth (cleaned up).

review of Columbia University,"[43] and linked to another press release concerning "ongoing investigations for potential violations of Title VI of the Civil Rights Act" at Columbia.[44]

75. On April 1, 2025, at a private lunch, President Trump proposed canceling all federal funds promised to Harvard. According to an anonymous source, President Trump asked, "What if we never pay them? . . . Wouldn't that be cool?"[45]

76. On April 3, 2025, Harvard's President received another e-mail (attached as Exhibit O). The e-mail's subject line was "Official Notice: Task Force to Combat Anti-Semitism Letter of Demands to Harvard University." Ex. O at 2. The e-mail stated: "I am sending you an official notice of pre-conditions your institution must comply with in order to be in good standing and continue to be the recipient of federal taxpayer dollars." *Id.*

77. A letter accompanying the e-mail (the "April 3 Letter," attached as Exhibit P) described "several broad, non-exhaustive areas of reform that the government views as necessary for Harvard to implement to remain a responsible recipient of federal taxpayer dollars." Ex. P at 2. The proposed reforms included governance reforms "to foster clear lines of authority"; oversight of "biased programs that fuel antisemitism" to "improve viewpoint diversity"; and efforts "to shutter" diversity, equity, and inclusion ("DEI") programs that "teach" certain things. *Id.* at 2-3. The April 3 Letter further stated that Harvard had "failed to protect American students and faculty from antisemitic violence and harassment in addition to other alleged violations of Title VI and

---

[43]  *Id.*

[44]  Press Release, U.S. Gen. Servs. Admin., *HHS, ED and GSA Respond to Columbia University's Actions to Comply with Joint Task Force Pre-conditions* (Mar. 24, 2025), https://perma.cc/F45D-N5VG.

[45]  Michael C. Bender, Alan Blinder, & Jonathan Swan, *Inside Trump's Pressure Campaign on Universities*, N.Y. Times (Apr. 14, 2025), https://tinyurl.com/2uummfbb.

Title VII of the Civil Rights Act of 1964" and closed by calling for "immediate cooperation in implementing these critical reforms" as a prerequisite for continued federal funding. *Id.*

78.     On April 11, 2025, HHS, GSA, and the Department of Education sent another letter to President Garber. Ex. A. The April 11 Letter, which "incorporates and supersedes" the April 3 Letter, similarly laid out a list of conditions to "maintain Harvard's financial relationship with the federal government," including the following:

- "**Viewpoint Diversity in Admissions and Hiring**. . . . [T]he University shall commission an external party . . . to *audit the student body, faculty, staff, and leadership* for viewpoint diversity, such that each department, field, or teaching unit *must be individually viewpoint diverse*. . . . Harvard must *abolish all criteria, preferences, and practices, whether mandatory or optional, throughout its admissions and hiring practices*, that function as ideological litmus tests. Every department or field found to lack viewpoint diversity *must be reformed by hiring a critical mass of new faculty* within that department or field who will provide viewpoint diversity; every teaching unit found to lack viewpoint diversity *must be reformed by admitting a critical mass of students* who will provide viewpoint diversity."

- "**Governance and leadership reforms**. . . . Harvard must make meaningful governance reform and restructuring . . . [including] empowering tenured professors and senior leadership, and, from among the tenured professoriate and senior leadership, exclusively those most devoted to the scholarly mission of the University and committed to the changes indicated in this letter; *reducing the power held by students and untenured faculty*; [and] *reducing the power held by faculty (whether tenured or untenured) and administrators* more committed to activism than scholarship."

- "**Discontinuation of DEI**. The University must immediately shutter all diversity, equity, and inclusion (DEI) programs, offices, committees, positions, and initiatives, under whatever name, and stop all DEI-based policies, including DEI-based disciplinary or speech control policies, under whatever name . . . through *structural and personnel changes*" and "demonstrate that it has done so to the satisfaction of the federal government."

- "**International Admissions Reform**. . . . [T]he University must reform its recruitment, screening, and admissions of international students to *prevent admitting students* hostile to the American values and institutions inscribed in the U.S. Constitution and Declaration of Independence . . . through *structural and personnel changes*."

- "**Student Discipline Reform and Accountability**. . . . In the future, funding decisions for student groups or clubs *must be made exclusively by a body of University faculty accountable to senior University leadership*. In particular, Harvard *must end support and recognition* of those student groups or clubs that engaged in anti-Semitic activity since October 7th, 2023, including the Harvard Palestine Solidarity Committee, Harvard Graduates Students 4 Palestine, Law Students 4 Palestine, Students for Justice in Palestine, and the National Lawyers Guild, and discipline and render ineligible the officers and active members of those student organizations."

- "**Transparency and Monitoring**. . . . The University must . . . , to the satisfaction of the federal government, disclose the source and purpose of all foreign funds; cooperate with the federal government in a forensic audit of foreign funding sources and uses, including how that money was used by Harvard, its agents, and . . . third parties acting on Harvard's campus." On a quarterly basis through the end of 2028, "the University shall submit to the federal government a report—certified for accuracy—that documents its progress on the implementation of the[se] reforms."

Ex. A at 2-6 (emphases added).

79.  The April 11 Letter stated the Government's expectation of "immediate cooperation in implementing these critical reforms" if the University wanted to "maintain Harvard's financial relationship with the federal government." *Id.* at 2, 6.

80.  On April 14, 2025, Harvard declined to accede to the Government's demands. In a letter to the Government, Harvard's lawyers said, "Neither Harvard nor any other private university can allow itself to be taken over by the federal government." Ex. B at 3. Because the April 11 Letter "presents demands that, in contravention of the First Amendment, invade university freedoms long recognized by the Supreme Court," the response said, "Harvard is not prepared to agree to demands that go beyond the lawful authority of this or any administration" and "will not accept the government's terms." *Id.* at 2-3.

81.  President Garber, in a statement to the Harvard community that day, wrote, "Although some of the demands outlined by the government are aimed at combating antisemitism,

26
**JA087**

the majority represent direct governmental regulation of the 'intellectual conditions' at Harvard."[46]

He also explained, "No government—regardless of which party is in power—should dictate what private universities can teach, whom they can admit and hire, and which areas of study and inquiry they can pursue."[47]

### Defendants Cut Harvard's Research Funding

82.     Just hours after Harvard rejected the Government's demands for control over its academic enterprise, the Federal Task Force "announc[ed] a freeze on $2.2 billion in multi-year grants and $60M in multi-year contract value to Harvard University." Ex. C at 2. The April 14 Freeze Order cited "[t]he harassment of Jewish students" and "the troubling entitlement mindset that is endemic in our nation's most prestigious universities and colleges." *Id.*

83.     The Government immediately began implementing the April 14 Freeze Order. Within hours, Harvard began receiving stop work orders.

84.     A few days later, reports surfaced that the Director of NIH's Office of Policy for Extramural Research Administration had informed other officials at NIH that the agency had "received confirmation from HHS/IOS to hold off on making awards to schools where the funds have been frozen, i.e., Columbia, Brown, Northwestern, Cornell, Weill-Cornell, Harvard."[48] The Director also noted that "HHS/IOS has stated that we should not provide any communications to these schools about whether or why the funds are frozen."[49]

---

[46]    Garber, *The Promise of American Higher Education*, *supra* n.2.

[47]    *Id.*

[48]    @maxdkozlov, X.com (Apr. 18, 2025, 4:24 PM ET), https://perma.cc/A6L3-M43C.

[49]    *Id.*

85.     On April 20, 2025, it was reported that the "Trump administration has grown so furious with Harvard University" that "it is planning to pull an additional $1 billion of the school's funding for health research."[50]

86.     On May 2, 2025, President Trump escalated the Government's demands, posting on social media: "We are going to be taking away Harvard's Tax Exempt Status. It's what they deserve!"[51]

87.     On May 5, 2025, the Secretary of Education sent Harvard another letter, which the Department of Education publicly released, stating that "Harvard should no longer seek GRANTS from the federal government, since none will be provided," that "Harvard will cease to be a publicly funded institution," and that "today's letter marks the end of new grants for the University." Ex. D at 3-4. The May 5 Freeze Order said the action was based, among other things, on the Government's assessment of Harvard's "academic rigor," admissions requirements and practices, grading systems, faculty hiring, and course construction. *Id.* at 2.[52]

88.     On May 6, 2025, NIH sent Harvard a letter announcing the termination of $2.2 billion[53] in awards, invoking 2 C.F.R. § 200.340(a)(4) and stating that Harvard's grant "awards no longer effectuate agency priorities" because of "recent events at Harvard University involving antisemitic action" and "Harvard's ongoing inaction in the face of repeated and severe harassment

---

[50] Belkin & Whyte, *Trump Administration Irate at Harvard*, *supra* n.6.

[51] @realDonaldTrump, Truth Social (May 2, 2025, 7:25 AM), https://tinyurl.com/35wu7kpk.

[52] As of the filing of this Complaint, the Government agreed to also include, in the Administrative Record that will be filed on May 19, 2025, all non-privileged documents directly or indirectly considered in issuing the May 5 Letter, the May 6 Letter, the May 9 Letter, and the May 12 Letters.

[53] *See* Jon Michael Raasch, *Trump Escalates War on Harvard by Officially Terminating $2.2B in Federal Grants*, Daily Mail (May 7, 2025), https://perma.cc/9QKQ-2H5W.

and targeting of Jewish students." Ex. E at 2-3. The letter stated that "NIH generally will suspend (rather than immediately terminate) a grant and allow the recipient an opportunity to take appropriate corrective action," but "no corrective action is possible here." *Id.* at 3. NIH claimed that "no modification of the projects could align the projects with agency priorities" because of "the University's unwillingness to take corrective action or implement necessary reforms." *Id.*

89.     On May 9, 2025, USDA sent Harvard a similar letter announcing the termination of awards and stating that Harvard's grant "awards no longer effectuate agency priorities" because of "recent events at Harvard University involving antisemitic action" and "Harvard's ongoing inaction in the face of repeated and severe harassment and targeting of Jewish students." Ex. F at 2. The letter asserted that "no modification of the projects could align the projects with agency priorities" because of "the University's unwillingness to take corrective action or implement necessary reforms." *Id.*

90.     On May 12, 2025, Harvard received letters from the Department of Energy, DoD, NSF, and HUD announcing the respective agencies' terminations of Harvard's awards. Ex. G; Ex. H; Ex. I; Ex. J.

91.     The May 12 Energy Termination Letter invoked 2 C.F.R. § 200.340(a)(4) and stated that Harvard's grant "awards no longer effectuate[]" agency priorities because of "recent events at Harvard involving antisemitic action" and "Harvard's ongoing inaction in the face of repeated and severe harassment and targeting of Jewish students." Ex. G at 2. The letter asserted that "no modification of the Harvard projects could align the projects with agency priorities and any continued funding of the projects is inconsistent with [the Department of Energy's] stewardship of American taxpayer funds and would be inconsistent with [the Department of Energy's] overall mission and goals" because "Harvard has refused to take immediate, definitive,

29

**JA090**

and appropriate remedial action." *Id.* The letter also cited 2 C.F.R. § 200.343 and stated that "costs to the recipient or subrecipient resulting from financial obligations incurred by the recipient or subrecipient during the termination of this award are not allowable." *Id.* at 3.

92.     The May 12 DoD Termination Letter invoked 2 C.F.R. § 200.340(a)(4) and stated its "awards to Harvard University no longer effectuate agency priorities of the DoD" because of "recent events at Harvard University involving antisemitic action" and "Harvard's ongoing inaction in the face of repeated and severe harassment and targeting of Jewish students." Ex. H at 2. That letter also cited 2 C.F.R. § 200.344 and stated that "[c]osts resulting from financial obligations incurred after termination are not allowable." *Id.*

93.     The May 12 NSF Termination Letter stated that "[t]he agency has determined that the termination of certain awards is necessary because they are not in alignment with current NSF priorities and/or programmatic goals." Ex. I at 2. As the basis for its termination, NSF asserted that "Harvard continues to engage in race discrimination including in its admissions process, and in other areas of student life, as well as failing to promote a research environment free of antisemitism and bias." *Id.* NSF's letter states "[t]his is the final agency decision and not subject to appeal." *Id.*

94.     The May 12 HUD Termination Letter invoked 2 C.F.R. § 200.340(a)(4) and stated that Harvard's "awards no longer effectuate agency priorities." Ex. J at 2. The letter contained no explanation as to which agency priorities had changed or why Harvard's grant awards were no longer in alignment with agency priorities.

95.     On May 13, 2025, the Federal Task Force issued a press release claiming "Harvard University has repeatedly failed to confront the pervasive race discrimination and anti-Semitic harassment plaguing its campus," and stating that "[t]he Task Force fully supports the Trump

30
**JA091**

Administration's multi-agency move to cut funding to Harvard, demonstrating the entire Administration's commitment to eradicating discrimination on Harvard's campus."[54]

96. The Government's repeated assertion that Harvard has refused to take remedial action ignores the "meaningful reforms" Harvard is undertaking to "eliminate antisemitism and other forms of hate from [its] campus," which have been detailed publicly.[55]

97. The Office of Management and Budget's ("OMB") Uniform Guidance (which applies to all federal Government agencies that award research grants) and specific HHS regulations (which apply directly to NIH, among other HHS subagencies) require the awarding agency to reimburse award recipients within 30 calendar days of a request for reimbursement, unless the awarding agency "reasonably believes the request to be improper." 2 C.F.R. § 200.305(b)(3); 45 C.F.R. § 75.305(b)(3). Allowable payments may be delayed under the Uniform Guidance only where the recipient (i) "has failed to comply with the terms and conditions of the Federal award," or (ii) "is delinquent in a debt to the United States." 2 C.F.R. § 200.305(b)(6). Similarly, under HHS regulations, the withholding of allowable payments is permitted only under specific circumstances, including where the recipient "has failed to comply with the project objectives, Federal statutes, regulations, or the terms and conditions of the Federal award"; the recipient "is delinquent in a debt to the United States"; or under other specified circumstances. 45 C.F.R. § 75.305(b)(6). If a recipient fails to comply with federal statutes, regulations, or the terms and conditions of a federal award, HHS may impose additional conditions, which (i) must be imposed with respect to a "*specific award*," (ii) do not include the delay of

---

[54] Press Release, U.S. Dep't of Health & Human Servs., *Joint Task Force to Combat Anti-Semitism Statement on Additional Harvard Actions* (May 13, 2025), https://perma.cc/99B4-AG8Z.

[55] Letter from Alan M. Garber, President, Harvard Univ., to Linda E. McMahon, Sec'y of Educ., U.S. Dep't of Educ. (May 12, 2025), https://perma.cc/Y7F9-C7FD.

reimbursement, and (iii) may be imposed only with *notice to the recipient, justification for the additional conditions, and an explanation of the "nature of the action needed to remove" them*. 45 C.F.R. § 75.207 (emphases added); *see also* 45 C.F.R. § 75.371. Only if and when the HHS entity "determines that noncompliance cannot be remedied by imposing additional conditions" may HHS withhold payments. 45 C.F.R. § 75.371. Importantly, any "payment withheld for failure to comply with Federal award conditions, but without suspension of the Federal award, must be released to the [recipient] upon subsequent compliance." 45 C.F.R. § 75.305(b)(6)(iii).

98.     Unless and until the April 14 and May 5 Freeze Orders are dissolved, and the Government's subsequent implementation of those Orders in the Termination Letters enjoined or vacated, Harvard will suffer widespread disruption of its research operations, with Harvard—and those faculty, staff, and students whose salaries are supported by the frozen or terminated funding—not knowing when, or if, existing funding will resume or whether it will be available in the future. This disruption threatens the integrity and continuity of ongoing research studies supported by the frozen or terminated funding, as well as their future viability. At this point, for example, Harvard does not know whether to end employment of anyone whose salary was supported by the frozen or terminated funding or what its future hiring decisions should look like. Nor does it know whether to expend funds to retain such items as cell cultures and other living and perishable materials used in research or to continue maintenance of research supplies and equipment tied to the frozen or terminated funding.

## Consequences of the Government's Actions

99.     The effect of Defendants' actions is to eliminate billions of dollars for Harvard's federally funded research. Over time, the school will be forced to either (i) reduce or halt ongoing research projects mid-stream and terminate employment contracts with researchers, staff, and administrators, or (ii) to make other cuts to departments or programs.

32
**JA093**

100.    If Harvard continues to replace the frozen and terminated funding from its own resources, it will be forced to reduce the number of graduate students it admits and the number of faculty and research staff it pays to conduct research. It will be unable to continue procuring and maintaining cutting-edge supplies, equipment, and facilities for research. Without the federal funding at issue, Harvard would need to operate at a significantly reduced level. And Harvard's overall reputation as a premier research institution will suffer, compromising its ability to recruit and retain talent, secure future funding, and maintain its relationships with other institutions.

101.    Harvard is one of Massachusetts' largest employers. Consequently, the Government's actions will also cause economic harm to the Boston area and the Commonwealth. And the impact will be felt in other states as well. As a recipient of federal research funding, Harvard issues subawards to institutions across America, including St. Jude Children's Research Hospital, the University of Alabama, and Baylor College of Medicine.

102.    Harvard frequently collaborates with state and local partners on regional initiatives to fuel spending in the local economy. The freezes and terminations will reduce, delay, or eliminate much of this activity.

103.    The freezes and terminations will chill Harvard's exercise of its First Amendment rights. Harvard will be unable to make decisions regarding its faculty hiring, academic programs, student admissions, and other core academic matters without fear that those decisions will run afoul of government censors' views on acceptable levels of ideological or viewpoint diversity on campus.

104.    Notably, the freezes and terminations are part of a broader effort by the Government to punish Harvard for protecting its constitutional rights. In the month since Harvard's April 14 letter and statement, the Government has launched multiple investigations and other actions

against Harvard. On April 16, 2025, for example, DHS threatened Harvard's eligibility to enroll international students.[56] On April 17, 2025, the House Committee on Oversight and Government Reform announced an investigation into Harvard.[57] Also on April 17, 2025, the Department of Education sent a records request to Harvard.[58] On April 24, 2025, President Trump derided Harvard as "an Anti-Semitic, Far Left Institution" and "a threat to Democracy."[59] And the President has announced, "We are going to be taking away Harvard's Tax Exempt Status. It's what they deserve!"[60]

105. The freezes and terminations also will adversely affect the broader landscape of American scientific and medical research and economic innovation by undermining critical research initiatives and interrupting ongoing scientific and other research. By halting the flow of federal funding, present and future, the freezes and terminations create a ripple effect extending beyond Harvard's campus by stifling job creation in the research sector across the nation, reducing intellectual property development, and delaying scientific and medical advances that boost the national economy and improve patient care. The economic implications are substantial, as each suspended research project hinders the cultivation of the scientific talent that drives the United States' global competitiveness in research and development. As President Garber put it, "[f]or the

---

[56] Samuel A. Church & Cam N. Srivastava, *DHS Threatens to Revoke Harvard's Eligibility to Host International Students Unless It Turns Over Disciplinary Records*, Harvard Crimson (Apr. 17, 2025), https://perma.cc/775F-QA32.

[57] Dhruv T. Patel & Grace E. Yoon, *House Oversight Committee Launches Investigation into Harvard, Requests Documents Related to Trump's Demands*, Harvard Crimson (Apr. 17, 2025), https://perma.cc/U3KP-RNLD.

[58] Press Release, U.S. Dep't of Educ., *U.S. Department of Education Initiates Records Request from Harvard University After Discovering Inaccurate Foreign Financial Disclosures* (Apr. 18, 2025), https://perma.cc/94K2-BQS7.

[59] @realDonaldTrump, Truth Social (Apr. 24, 2025, 9:33 AM), https://tinyurl.com/5zun98cf.

[60] @realDonaldTrump, Truth Social (May 2, 2025, 7:25 AM), https://tinyurl.com/35wu7kpk.

government to retreat from these partnerships now risks not only the health and well-being of millions of individuals, but also the economic security and vitality of our nation."[61] These harms are irreparable absent judicial intervention.

## CLAIMS

## COUNT 1

### VIOLATION OF THE FIRST AMENDMENT
### (ADMINISTRATIVE PROCEDURE ACT CAUSE OF ACTION)

106. Harvard incorporates by reference the allegations of the preceding paragraphs.

107. Under the Administrative Procedure Act ("APA"), a court shall "hold unlawful and set aside agency action . . . found to be . . . contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

108. The Government threatened to terminate Harvard's federal funding unless Harvard restructured its internal governance, changed its hiring and admissions practices to strike Defendants' preferred balance of viewpoints, and modified what it teaches its students to align with Defendants' views. For example, the demands required Harvard to modify its hiring and admissions practices to achieve a particular balance of viewpoints in every "department," "field," and "teaching unit." Ex. A at 3. In other words, the Government wielded the threat of withholding federal funds in an attempt to coerce Harvard to conform with the Government's preferred mix of viewpoints and ideologies. Defendants sent Harvard the April 11 Letter and, when Harvard refused the demands, ordered the freeze of billions of dollars in current federal funding. After Harvard filed this lawsuit, Defendants announced the end of future federal funding and termination of Harvard's grants.

---

[61] Garber, *The Promise of American Higher Education*, *supra* n.2.

35
**JA096**

109. Defendants' freeze and termination of Harvard's federal funding constitutes final agency action because it "mark[s] the 'consummation' of the . . . decisionmaking process" and "determines" the "rights [and] obligations" of parties and is backed by "legal consequences." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citations omitted).

110. The First Amendment provides that the federal Government "shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I.

111. "[A]cademic freedom" is "a special concern of the First Amendment" and receives heightened protection. *Keyishian v. Bd. of Regents of Univ. of N.Y.*, 385 U.S. 589, 603 (1967).

112. This freedom protects "not only students and teachers, but their host institutions as well." *Garcia-Padilla*, 490 F.3d at 8 (citation omitted). As the Supreme Court has recognized, "[a]cademic freedom thrives not only on the independent and uninhibited exchange of ideas among teachers and students, but also . . . on autonomous decisionmaking by the academy itself." *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 226 n.12 (1985) (citations omitted). Colleges and universities have a constitutionally protected right to "manage an academic community and evaluate teaching and scholarship free from [governmental] interference." *Blasdel v. Nw. Univ.*, 687 F.3d 813, 816 (7th Cir. 2012) (citation omitted). After all, "[i]f there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).

113. A "funding condition" that seeks to curtail academic freedom can therefore "result in an unconstitutional burden on First Amendment rights." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.* ("*AID*"), 570 U.S. 205, 214 (2013). The Government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests." *Perry v. Sindermann*,

408 U.S. 593, 597 (1972). Nor may the Government threaten "a third party 'to achieve the suppression' of disfavored speech." *Vullo*, 602 U.S. at 180-81, 188-91. The Government also cannot mandate its own preferred balance of viewpoints. *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 256-58 (1974). "On the spectrum of dangers to free expression, there are few greater than allowing the government to change the speech of private actors in order to achieve its own conception of speech nirvana." *Moody*, 603 U.S. at 741-42.

114. The Government's demands on Harvard cut at the core of Harvard's constitutionally protected academic freedom because they seek to assert governmental control over Harvard's research, academic programs, community, and governance.[62] And they bear no relation to Harvard's federal funding. *See AID*, 570 U.S. at 214-15 (Government may not "leverage funding to regulate speech outside the contours of the program itself"). The Government's demands seek to overhaul Harvard's governance, control Harvard's faculty hiring, and dictate what faculty may teach Harvard students. Put simply, the conditions seek to supplant Harvard's "autonomous decisionmaking." *Ewing*, 474 U.S. at 226 n.12.

115. Restrictions on Harvard's programs violate the First Amendment by seeking to restrict what Harvard's faculty may teach students. *See Garcia-Padilla*, 490 F.3d at 8 (recognizing a "zone of First Amendment protection for the educational process itself" (citation omitted)). The "classroom with its surrounding environs is peculiarly the 'marketplace of ideas'" that the First Amendment is designed to safeguard. *Healy v. James*, 408 U.S. 169, 180-81 (1972).

116. Restrictions on whom Harvard may hire also violate the First Amendment. It is Harvard's—not the Government's—"prerogative 'to determine for itself on academic grounds

---

[62] *See, e.g.*, Eugene Volokh, *"The Trump Administration's Unconstitutional Hate Mail to Harvard," by Prof. Genevieve Lakier (Chicago)*, Reason (Apr. 6, 2025), https://perma.cc/K3W6-LB94.

who may teach,'" and this discretion "is an important part of our long tradition of academic freedom." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 47 (2d Cir. 2000) (citation omitted).

117. Further, the Government's requirement that Harvard modify its hiring and admissions practices to achieve the Government's preferred balance of viewpoints in every "department," "field," and "teaching unit" (Ex. A at 3-4;[63] *see* Ex. D at 2-3) regulates the "recipient" and is far "'outside the scope of the federally funded program[s]'" for medical, scientific, and other research, *AID*, 570 U.S. at 218 (citation omitted). Although Harvard recognizes the importance of viewpoint diversity and the need to promote it,[64] the First Amendment makes clear that the authority to achieve that objective rests with the University rather than the Government.

118. Likewise, the Government lacks authority to dictate which student groups Harvard may recognize and fund. The Government "may not interfere with private actors' speech to advance its own vision of ideological balance." *Moody*, 603 U.S. at 741.

119. Restrictions on Harvard's ability to manage its own internal leadership likewise violate the First Amendment because leadership decisions shape how the University speaks and acts. Those decisions are at the core of the "autonomous decisionmaking" and independent management needed to maintain "[a]cademic freedom." *Ewing*, 474 U.S. at 226 n.12; *see Blasdel*, 687 F.3d at 816 (universities have First Amendment right to "manage an academic community" (citation omitted)).

---

[63] *See* @realDonaldTrump, Truth Social (Apr. 16, 2025, 6:05 AM), https://tinyurl.com/yww6nfw7 ("Harvard has been hiring almost all woke, Radical Left, idiots and 'birdbrains' who are only capable of teaching FAILURE to students and so-called 'future leaders.'")

[64] Garber, *The Promise of American Higher Education*, *supra* n.2 ("As we defend Harvard, we will continue to . . . broaden the intellectual and viewpoint diversity within our community.").

120. Defendants' April 3, April 11, and May 5 Letters target academic content that Harvard professors "teach students." Ex. P at 3; *see* Ex. A at 3-5; Ex. D at 2-3. That too is unlawful. *E.g.*, *Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521, 542-43 (N.D. Cal. 2020) (preliminarily enjoining executive order that "appear[ed] to require universities that accept federal grants to curtail promotion of [certain] concepts through teaching").

121. Defendants' freeze and termination of federal funding also violates the First Amendment because it is direct retaliation for Harvard's April 14 letter and statement refusing to comply with the Government's demands, as well as Harvard's protected decision to file this lawsuit. The First Amendment "prohibits government officials from subjecting an [entity] to retaliatory actions for engaging in protected speech." *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019) (cleaned up). To succeed on a First Amendment retaliation claim, a plaintiff must "prove that (1) [it] engaged in constitutionally protected conduct, (2) [it] was subjected to an adverse action by the defendant, and (3) the protected conduct was a substantial or motivating factor in the adverse action." *D.B. ex rel. Elizabeth B. v. Esposito*, 675 F.3d 26, 43 (1st Cir. 2012); *see Hartman v. Moore*, 547 U.S. 250, 260-61 (2006) (similar).

122. Harvard engaged in constitutionally protected conduct when it refused to comply with the Government's demands and announced that decision in its April 14 letter and statement. Just hours later, Defendants subjected Harvard to adverse action by freezing $2.2 billion in multi-year grants and $60 million in multi-year contracts previously awarded to Harvard. And then the Government blacklisted Harvard from future awards of federal funding and subsequently terminated existing grants. Harvard's protected conduct was a substantial and motivating factor for the freeze. In particular, Defendants issued the Freeze Orders *because* Harvard refused to comply with the demands, *because* Harvard issued the April 14 letter and statement, and *because*

Harvard filed this lawsuit. The causal link between Defendants' retaliatory motive and Defendants' adverse action is evident from, among other things: the minuscule amount of time that elapsed between Harvard's April 11 letter and statement and the freeze (only a few hours); Defendants' striking deviation from the procedures that govern funding suspensions under Title VI (*see infra* Count 3); Defendants' previous threats to pull funding if Harvard refused to comply with the demands (including on March 31, April 3, and April 11); the decision by the Secretary of Education to prohibit Harvard from receiving any future federal grants; and the termination of that funding without following any of the requisite procedures.

123. Defendants' Freeze Orders, Termination Letters, and attendant conditions on Harvard's federal funding trigger strict scrutiny because they seek to leverage Harvard's federal funding to indirectly infringe Harvard's constitutionally protected academic freedom.

124. Defendants' Freeze Orders, Termination Letters, and attendant conditions also trigger strict scrutiny because they are speaker-, content-, and viewpoint-based. The conditions expressly apply to Harvard only; they apply because of the "ideological" conditions at Harvard, Ex. A at 2; Ex. D at 2-3; and they specify exactly how Harvard should exercise its constitutionally protected autonomous decisionmaking. Unless Harvard does exactly what the Government wants in the way the Government wants and achieves the precise balance of viewpoints the Government wants, Harvard stands to lose billions of dollars in federal funding.

125. Where, as here, "the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." *FEC v. Cruz*, 596 U.S. 289, 305 (2022) (citation omitted).

126. Defendants cannot reasonably argue that the conditions they seek to impose on Harvard are "the least restrictive means of achieving a compelling [governmental] interest." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 607 (2021) (citation omitted).

127. The conditions are overbroad because they seek to impose a massive consequence unless an enormous amount of constitutionally protected academic freedom is curtailed. And that curtailment is not sufficiently related to the Government's previously-identified concerns about antisemitism.

128. The conditions are also overbroad because Defendants have ignored less restrictive alternatives. For example, the Government has not explained why it could not have worked with Harvard in a voluntary manner, as Title VI and regulations require, prior to freezing or terminating funding entirely. And even if a freeze or termination were warranted, which it is not, the Government has not explained why a more targeted reduction, tailored to the programs and purported discrimination at issue, would have been insufficient to achieve its objectives.

129. The conditions are further overbroad because they will chill a wide swath of protected speech. The "government [cannot] proscribe unprotected [speech] through a regulation that simultaneously encompasses a substantial amount of protected [speech]." *Seals v. McBee*, 898 F.3d 587, 596 (5th Cir. 2018).

130. Harvard also has a reasonable fear that Defendants will terminate or freeze additional federal funding, as they have threatened to do. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 165-66 (2014).

131. For these reasons, this Court should declare Defendants' actions unlawful and enjoin Defendants from engaging in future terminations, suspensions, or refusals to grant or to continue funding or work pursuant to the Freeze Orders and Termination Letters.

132.    Defendants' actions must be vacated and "set aside" under 5 U.S.C. § 706(2)(B).

133.    If Defendants' actions are not declared unlawful, set aside, and enjoined, Harvard will suffer substantial injury, including irreparable injury.

## COUNT 2

### VIOLATION OF THE FIRST AMENDMENT
### (EQUITABLE CAUSE OF ACTION — *ULTRA VIRES*)

134.    Harvard incorporates by reference the allegations of the preceding paragraphs.

135.    Even if the prerequisites of review under the Administrative Procedure Act were not satisfied, federal courts have the "equitable power[]" to "enjoin unconstitutional actions by state and federal officers." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327-28 (2015); *see also R.I. Dep't of Env't. Mgmt. v. United States*, 304 F.3d 31, 42-43 (1st Cir. 2002) ("district court[s]" retain the "nonstatutory" power "to review agency action that is *ultra vires*" and provide equitable relief unless Congress precludes that review).

136.    As alleged in Count 1, Defendants' demands that Harvard restructure its internal governance, change its hiring and admissions practices, and modify what it teaches its students to align with Defendants' views, or else lose federal funding, violate the First Amendment. The Constitution forecloses any lawful authority for Defendants' actions.

137.    Because Defendants' actions in imposing viewpoint-based conditions on Harvard's funding and terminating funding agreements violate the First Amendment, those actions lack lawful authority. This Court should declare them unconstitutional and *ultra vires*.

138.    Because Defendants' actions are unconstitutional and *ultra vires*, this Court should enjoin Defendants in their official capacities from imposing the Freeze Orders and Termination Letters.

139.    If Defendants' actions are not declared unlawful, set aside, and enjoined as

unconstitutional and *ultra vires*, Harvard will suffer substantial injury, including irreparable injury.

## COUNT 3

### IN EXCESS OF STATUTORY AUTHORITY (VIOLATION OF 42 U.S.C. § 2000d-1) (ADMINISTRATIVE PROCEDURE ACT CAUSE OF ACTION)

140. Harvard incorporates by reference the allegations of the preceding paragraphs.

141. The APA provides that a court must "hold unlawful and set aside" final agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

142. Defendants' freeze and termination of federal financial assistance constitutes "[a]gency action made reviewable by statute" under 5 U.S.C. § 704 and 42 U.S.C. § 2000d-2.

143. Defendants' freeze and termination of federal financial assistance constitutes final agency action because it "mark[s] the 'consummation' of the . . . decisionmaking process" and "determines" the "rights [and] obligations" of parties and is backed by "legal consequences." *Bennett*, 520 U.S. at 177-78 (citations omitted).

144. Defendants imposed the freeze and termination of federal financial assistance because of alleged antisemitism on Harvard's campus. Antisemitism at Harvard was the reason given by the federal Government in the March 31, April 3, and April 11 Letters, and in the April 14 Freeze Order. *See* Ex. M at 2, Ex. P at 2, Ex. A at 2, 4. The May 5 Freeze Order and Termination Letters echoed these same concerns. *See, e.g.*, Ex. D at 2-3; Ex. E at 2-3; Ex. F at 2; Ex. G at 2; Ex. H at 2, Ex. I at 2.

145. This basis for freezing or terminating federal financial assistance falls within Title VI. Title VI prohibits discrimination on the basis of "race, color, or national origin" in programs and activities receiving federal financial assistance. 42 U.S.C. § 2000d. Both the judicial and executive branches have interpreted discrimination against Jews as discrimination based on race

or shared ancestry covered under Title VI. *See, e.g.*, *Bachman v. St. Monica's Congregation*, 902 F.2d 1259, 1261 (7th Cir. 1990); Exec. Order No. 13,899, 84 Fed. Reg. 68,779 (Dec. 11, 2019) ("It shall be the policy of the executive branch to enforce Title VI against prohibited forms of discrimination rooted in anti-Semitism.").

146. Title VI delineates specific procedures that an agency must follow to "terminat[e] . . . or refus[e] to grant or to continue assistance" based upon alleged violations of Title VI. 42 U.S.C. § 2000d-1. Defendants have ordered the freeze or termination of Harvard's federal financial assistance without following these mandatory procedures.

147. Defendants did not advise Harvard of any failure to comply with a requirement imposed by Section 2000d-1.

148. Defendants did not provide Harvard with any opportunity to comply by voluntary means before freezing and terminating federal financial assistance.

149. Defendants did not afford Harvard an opportunity for a hearing before freezing and terminating federal financial assistance.

150. Defendants did not make an express finding on the record after any such hearing before freezing and terminating federal financial assistance.

151. Defendants did not submit a written report to the appropriate House and Senate committees thirty days before freezing and terminating federal financial assistance.

152. Rather, Defendants are purporting to immediately freeze current and future funds. That is, whereas Congress specified that Defendants must follow the delineated statutory procedures *first* and freeze or terminate federal financial assistance *after* (and then only as a last resort), here Defendants have done the precise opposite: they issued the Freeze Orders (with no process or opportunity for voluntary compliance) and used those freezes and subsequent

terminations as leverage to negotiate. Such action is flatly unlawful and contrary to statutory authority.

153. What is more, Title VI does not permit wholesale freezing of a recipient's federal financial assistance. Instead, it requires that a "refusal to grant or to continue assistance" be "limited in its effect to the *particular* program, or part thereof, *in which . . . noncompliance has been so found.*" *Id.* (emphasis added). Defendants have made no finding of Title VI noncompliance within the various research programs that are subject to the Freeze Orders and Termination Letters.

154. Further, Defendants' actions offer no explanation of how any alleged violation is connected to the remedy chosen by the government. That explanation is necessary to determine whether the freezes and terminations affected only particular programs or parts of programs where alleged violations purportedly exist.

155. Defendants' April 3 Letter also mentioned unspecified "alleged violations of . . . Title VII of the Civil Rights Act of 1964." Ex. P at 2. But Title VII does not authorize administrative enforcement through a funding freeze. And Defendants do not have the requisite authority to enforce Title VII here. Instead, Title VII establishes a judicial enforcement scheme centered on the Equal Employment Opportunity Commission and the courts. *See* 42 U.S.C. § 2000e-5(f)-(g).

156. For these reasons, this Court should declare that Defendants' actions are "in excess of statutory jurisdiction, authority, or limitations," 5 U.S.C. § 706(2)(C); set those actions aside; and enjoin Defendants and their agents, employees, and all persons acting under their direction or control from taking any action as to Harvard, including by terminating, freezing, or refusing to grant or to continue Harvard's federal financial assistance.

157.    In the alternative, the Court should postpone the effective date of the freeze. *See* 5 U.S.C. § 705.

158.    If Defendants' actions are not declared unlawful, set aside, and enjoined, Harvard will suffer substantial irreparable injury.

## COUNT 4

### FAILURE TO FOLLOW DEFENDANTS' OWN REGULATORY PROCEDURES
### (ADMINISTRATIVE PROCEDURE ACT CAUSE OF ACTION)

159.    Harvard incorporates by reference the allegations of the preceding paragraphs.

160.    The APA requires this Court to hold unlawful and set aside final agency action that is "not in accordance with law," 5 U.S.C. § 706(2)(A), or that is "without observance of procedure required by law," *id.* § 706(2)(D).

161.    Defendants' freeze and termination of federal financial assistance constitutes "[a]gency action made reviewable by statute" under 5 U.S.C. § 704 and 42 U.S.C. § 2000d-2.

162.    Defendants' freeze and termination of federal financial assistance constitutes final agency action because it "mark[s] the 'consummation' of the . . . decisionmaking process" and "determines" the "rights [and] obligations" of parties and is backed by "legal consequences." *Bennett*, 520 U.S. at 177-78 (citations omitted).

163.    An agency "must abide by its own regulations." *Fort Stewart Schs. v. Fed. Labor Rels. Auth.*, 495 U.S. 641, 654 (1990) (citing *Vitarelli v. Seaton*, 359 U.S. 535, 547 (1959)).

164.    Defendants' regulations require them to follow specific procedures for freezing or terminating federal financial assistance based on alleged violations of Title VI. *E.g.*, 45 C.F.R. § 80.2 (HHS and NIH); 45 C.F.R. § 611.1 (NSF); 32 C.F.R. § 195.1 (DoD); 10 C.F.R. § 1040.1 (Energy); 34 C.F.R. § 100.2 (Education); 41 C.F.R. § 101-6.203 (GSA); 28 C.F.R. § 42.103 (DOJ); 14 C.F.R. § 1250.101 (NASA); 24 C.F.R § 1.8 (HUD); 7 C.F.R. § 15.8 (USDA).

165. Defendants failed to comply with their own regulations before freezing and terminating Harvard's federal financial assistance.

166. Defendants' regulations require them to provide notice before freezing or terminating federal financial assistance based on alleged violations of Title VI. *E.g.*, 45 C.F.R. § 80.8(c) (HHS and NIH); 45 C.F.R. § 611.8(c)(1) (NSF); 32 C.F.R. § 195.9(c) (DoD); 10 C.F.R. § 1040.89-9(c)(1) (Energy); 34 C.F.R. § 100.8(c) (Education); 41 C.F.R. § 101-6.211-3 (GSA); 28 C.F.R. § 42.108(c)(1) (DOJ); 14 C.F.R. § 1250.107(c) (NASA); 24 C.F.R. § 1.8(c)(1) (HUD); 7 C.F.R. § 15.8(c)(1) (USDA).

167. Defendants did not provide the required notice to Harvard before freezing and terminating Harvard's federal financial assistance.

168. Defendants' regulations require them to attempt to secure compliance "by voluntary means" before freezing or terminating federal financial assistance based on alleged violations of Title VI. *E.g.*, 45 C.F.R. § 80.8(c) (HHS and NIH); 45 C.F.R. § 611.8(c)(1) (NSF); 32 C.F.R. § 195.9(c) (DoD); 34 C.F.R. § 100.8(c) (Education); 41 C.F.R. § 101-6.211-3 (GSA); 28 C.F.R. § 42.108(c)(1) (DOJ); 14 C.F.R. § 1250.107(c) (NASA); 24 C.F.R. § 1.8(c)(1) (HUD); 7 C.F.R. § 15.8(c)(1) (USDA); *see* 10 C.F.R. § 1040.89-9(c)(1) (Energy) (similar).

169. Defendants did not lawfully attempt to secure compliance by voluntary means before freezing and terminating Harvard's federal financial assistance.

170. Defendants' regulations require them to provide an "opportunity for hearing" before freezing or terminating federal financial assistance based on alleged violations of Title VI. *E.g.*, 45 C.F.R. § 80.8(c) (HHS and NIH); 45 C.F.R. § 611.8(c)(2) (NSF); 34 C.F.R. § 100.8(c) (Education); 41 C.F.R. § 101-6.211-3 (GSA); 28 C.F.R. § 42.108(c)(2) (DOJ); 14 C.F.R. § 1250.107(c) (NASA); 24 C.F.R. § 1.8(c)(2) (HUD); 7 C.F.R. § 15.8(c)(2) (USDA); *see* 32 C.F.R.

47

**JA108**

§ 195.9(c) (DoD) ("opportunity for a hearing"); 10 C.F.R. § 1040.89-9(a)(1) (Energy) (same). Defendants' regulations require them to hold hearings before a specific agency official or a "hearing examiner" in accordance with specific, formal procedures that Defendants have promulgated. 45 C.F.R. § 80.9(b) (HHS and NIH); 45 C.F.R. § 611.9(b) (NSF); 34 C.F.R. § 100.9(b) (Education); 32 C.F.R. § 195.10(b) (DoD); 28 C.F.R. § 42.109(b) (DOJ); 14 C.F.R. § 1250.108(b) (NASA); 7 C.F.R. § 15.9(d) (USDA); *see* 10 C.F.R. §§ 1040.121 to 1040.124 (listing Energy's procedures); 41 C.F.R. §§ 101-6.212-1 to 101-6.212-5 (listing GSA's procedures); 24 C.F.R. § 180.100-805 (listing HUD's procedures).

171. Defendants did not provide Harvard an opportunity for a hearing before freezing and terminating Harvard's federal financial assistance, nor did they comply with any of the formal procedural requirements for such a hearing set out in their regulations.

172. Defendants' regulations require them to make "an express finding on the record" before freezing or terminating Harvard's federal financial assistance based on alleged violations of Title VI. *E.g.*, 45 C.F.R. § 80.8(c) (HHS and NIH); 45 C.F.R. § 611.8(c)(2) (NSF); 10 C.F.R. § 1040.114(c) (Energy); 34 C.F.R. § 100.8(c) (Education); 41 C.F.R. § 101-6.211-3 (GSA); 28 C.F.R. § 42.108(c)(2) (DOJ); 14 C.F.R. § 1250.107(c) (NASA); 24 C.F.R. § 1.8(c)(2) (HUD); 7 C.F.R. § 15.8(c)(2) (USDA); *see* 32 C.F.R. § 195.9(c) (DoD) (similar).

173. Defendants did not make express findings on the record before freezing and terminating Harvard's federal financial assistance.

174. Defendants' regulations require them to "file[] with the committee of the House and the committee of the Senate having legislative jurisdiction over the program involved, a full written report of the circumstances and the grounds for such action" before freezing or terminating Harvard's federal financial assistance based on alleged violations of Title VI. *E.g.*, 45 C.F.R.

48

§ 80.8(c) (HHS and NIH); 34 C.F.R. § 100.8(c) (Education); 41 C.F.R. § 101-6.211-3 (GSA); 32 C.F.R. § 195.9(c) (DoD); 28 C.F.R. § 42.108(c)(4) (DOJ); 14 C.F.R. § 1250.107(c) (NASA); 24 C.F.R. § 1.8(c)(4) (HUD); 7 C.F.R. § 15.8(c)(4) (USDA); *see* 45 C.F.R. § 611.8(c)(4) (NSF) (similar); 10 C.F.R. § 1040.114(e) (Energy) (similar).

175. Defendants did not file full written reports in the House and Senate before freezing and terminating Harvard's federal financial assistance based on alleged violations of Title VI.

176. Defendants' regulations prohibit them from freezing or terminating federal financial assistance based on alleged violations of Title VI at any time before "the expiration of 30 days after" filing reports in the House and Senate. *E.g.*, 45 C.F.R. § 80.8(c) (HHS and NIH); 32 C.F.R. § 195.9(c) (DoD); 10 C.F.R. § 1040.114(e) (Energy); 34 C.F.R. § 100.8(c) (Education); 41 C.F.R. § 101-6.211-3 (GSA); 28 C.F.R. § 42.108(c)(4) (DOJ); 14 C.F.R. § 1250.107(c) (NASA); 24 C.F.R. § 1.8(c)(4) (HUD); 7 C.F.R. § 15.8(c)(4) (USDA); *see* 45 C.F.R. § 611.8(c) (NSF) (similar).

177. Defendants froze and terminated Harvard's federal financial assistance before the expiration of 30 days after filing reports in the House and Senate.

178. Defendants' regulations require that any freeze or termination of federal financial assistance based on alleged violations of Title VI "shall be limited in its effect to the particular program, or part thereof, in which such noncompliance has been so found." *E.g.*, 45 C.F.R. § 80.8(c) (HHS and NIH); 45 C.F.R. § 611.8(c) (NSF); 32 C.F.R. § 195.9(c) (DoD); 34 C.F.R. § 100.8(c) (Education); 41 C.F.R. § 101-6.211-3 (GSA); 28 C.F.R. § 42.108(c) (DOJ); 14 C.F.R. § 1250.107(c) (NASA); 24 C.F.R. § 1.8(c)(4) (HUD); 7 C.F.R. § 15.8(c)(4) (USDA); *see* 10 C.F.R. § 1040.114(e) (Energy) (similar).

179. Defendants froze and terminated Harvard's federal financial assistance without limiting the effect of this action to any particular program or part thereof.

180. Defendants' regulations require them to follow specific procedures if they seek to "effect compliance" with Title VI using "any other means authorized by law." 45 C.F.R. § 80.8(d) (HHS and NIH); 45 C.F.R. § 611.8(d) (NSF); 10 C.F.R. § 1040.115 (Energy); 34 C.F.R. § 100.8(d) (Education); 28 C.F.R. § 42.108(d) (DOJ); 14 C.F.R. § 1250.107(d) (NASA); 24 C.F.R. § 1.8(d) (HUD); 7 C.F.R. § 15.8(d) (USDA); *see* 32 C.F.R. § 195.9(d) (DoD) (similar); 41 C.F.R. § 101-6.211-4 (GSA) (similar).

181. Defendants did not attempt to effect compliance with Title VI using any means other than immediately freezing and terminating Harvard's federal financial assistance.

182. Instead, Defendants sought to "effect compliance" with Title VI only by "means" of freezes (and corresponding termination of federal financial assistance). Because they did so, their own regulations require them to follow all of the procedures just discussed—including voluntary compliance, notice, hearing, findings on the record, and a report to Congress. *E.g.*, 45 C.F.R. § 80.8 (HHS and NIH); 45 C.F.R. § 611.8 (NSF); 32 C.F.R. § 195.9 (DoD); 10 C.F.R. §§ 1040.89-9, 1040.114 to.115 (Energy); 34 C.F.R. § 100.8 (Education); 41 C.F.R. §§ 101-6.211-3 to -4 (GSA); 28 C.F.R. § 42.108 (DOJ); 14 C.F.R. § 1250.107 (NASA); 24 C.F.R. § 1.8 (HUD); 7 C.F.R. § 15.8 (USDA).

183. Even if Defendants had attempted to "effect compliance" with Title VI using "other means authorized by law," Defendants failed to comply with the specific procedures that their own regulations require in connection with those "other means." 45 C.F.R. § 80.8(d) (HHS and NIH); 45 C.F.R. § 611.8(d) (NSF); 32 C.F.R. § 195.9(d) (DoD); 10 C.F.R. § 1040.115 (Energy); 34 C.F.R. § 100.8(d) (Education); 28 C.F.R. § 42.108(d) (DOJ); 14 C.F.R. § 1250.107(d) (NASA);

24 C.F.R. § 1.8(d) (HUD); 7 C.F.R. § 15.8(d) (USDA); *see* 41 C.F.R. § 101-6.211-4 (GSA) (similar).

184. Specifically, Defendants failed to attempt to secure compliance by "voluntary means," failed to notify Harvard "of its failure to comply and of the action to be taken," took action before "the expiration of at least 10 days from the mailing of such notice," and failed to make "additional efforts . . . to persuade [Harvard] to comply with the regulation and to take such corrective action as may be appropriate." 45 C.F.R. § 80.8(d) (HHS and NIH); *see* 45 C.F.R. § 611.8(d) (NSF) (similar); 32 C.F.R. § 195.9(d) (DoD) (similar); 10 C.F.R. § 1040.115 (Energy) (similar); 34 C.F.R. § 100.8(d) (Education) (similar); 41 C.F.R. § 101-6.211-4 (GSA) (similar); 28 C.F.R. § 42.108(d) (DOJ) (similar); 14 C.F.R. § 1250.107(d) (NASA) (similar); 24 C.F.R. § 1.8(d) (HUD) (similar); 7 C.F.R. § 15.8(d) (USDA) (similar).

185. The March 31, April 3, April 11, May 5, May 6, May 9, and May 12 Letters do not constitute efforts at voluntary compliance. Not one of the letters identified a Title VI violation or a specific measure Harvard could take to rectify the alleged violation.

186. Defendants' actions also further violate the Uniform Guidance, 2 C.F.R. § 200.305(b)(3), (6), as implemented by the relevant agencies. For example, HHS regulations implementing the Uniform Guidance require payment under active grants within 30 days. 2 C.F.R. § 200.305(b)(3); 45 C.F.R. § 75.305(b)(3). Delay is permissible only under certain circumstances delineated in the applicable regulations and only after notice and an opportunity to cure. 2 C.F.R. § 200.305(b)(6); 45 C.F.R. § 75.207; 45 C.F.R. § 75.305(b)(6). Defendants have provided no notice and no opportunity to cure.

187. The May 6 NIH Termination Letter, May 12 Energy Termination Letter, May 12 DoD Termination Letter, and May 12 HUD Termination Letter invoked 2 C.F.R. § 200.340(a)(4)

and stated that Harvard's "awards no longer effectuate agency priorities." Ex. E at 2; Ex. G at 2; Ex. H at 2; Ex. J at 2. The May 9 USDA Letter and May 12 NSF letter similarly purported to cancel Harvard's grant awards because they "no longer effectuate agency priorities," Ex. F at 2, and because "they are not in alignment with current NSF priorities and/or programmatic goals." Ex. I at 2. But the letters purported to terminate some grants to which that provision does not apply. Defendants have not articulated any change in agency priorities justifying wholesale termination of Harvard's award across every subject matter and area of research.

188. That provision does not authorize an end-run around Title VI, or related regulations for enforcing Title VI's requirements, which provide a far more specific set of procedures. In their termination letters, Defendants cited "antisemitic action" on campus and "the University's unwillingness to take corrective action or implement necessary reforms" as the basis for terminating federal financial assistance. Ex. E at 3; Ex. F at 2; *see* Ex. G at 2 (similar); Ex. H at 2 (similar); Ex. I at 2 (similar). But Defendants did not identify Title VI violations or follow the relevant statutory and regulatory procedures for Title VI enforcement.

189. Instead, Defendants' invocations of 2 C.F.R. § 200.340(a)(4) are post-hoc rationalizations for Defendants' earlier failure to follow Title VI procedures and regulations before freezing Harvard's federal financial assistance.

190. Defendants' actions must be declared unlawful, vacated and "set aside" under 5 U.S.C. § 706(2)(A) and (D), and enjoined.

191. In the alternative, the Court should postpone the effective date of the freezes and terminations. *See* 5 U.S.C. § 705.

192. If Defendants' actions are not declared unlawful, set aside, and enjoined, Harvard will suffer substantial injury, including irreparable injury.

**COUNT 5**

**ARBITRARY AND CAPRICIOUS AGENCY ACTION
(ADMINISTRATIVE PROCEDURE ACT CAUSE OF ACTION)**

193.   Harvard incorporates by reference the allegations of the preceding paragraphs.

194.   The APA requires this Court to hold unlawful and set aside any final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

195.   Defendants' freeze and termination of federal financial assistance constitutes "[a]gency action made reviewable by statute" under 5 U.S.C. § 704 and 42 U.S.C. § 2000d-2.

196.   Defendants' freeze and termination of federal financial assistance constitutes final agency action because it "mark[s] the 'consummation' of the . . . decisionmaking process" and "determines" the "rights [and] obligations" of parties and is backed by "legal consequences." *Bennett*, 520 U.S. at 177-78 (citations omitted).

197.   Defendants' actions are arbitrary and capricious because they are neither "reasonable [nor] reasonably explained." *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (citation omitted). They are not the product of "reasoned decisionmaking." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983).

198.   Defendants' actions "entirely fail[] to consider . . . important aspect[s] of the problem." *Id.* at 43; *see also DHS v. Regents of the Univ. of Calif.*, 591 U.S. 1, 30 (2020). They ignore the significant consequences the freezes and terminations will have on researchers, the University, and the public.

199.   Defendants' actions are arbitrary and capricious because Defendants failed to "articulate a satisfactory explanation for [their] action[s]" and demonstrated no "rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (citation

omitted). Defendants have articulated no rational nexus between combatting antisemitism and the medical, scientific, and other research funding at hand. Defendants' actions are unreasoned and unexplained.

200. Defendants' actions are also arbitrary and capricious because they neglected to "take[] into account" the "serious reliance interests" that the awards of funding "engendered." *Regents of the Univ. of Calif.*, 591 U.S. at 30 (quoting *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016)). For decades, Harvard has relied on the well-established process for federal financial assistance in its budgeting and financial planning, including with respect to staffing, infrastructure, facility and equipment purchases, and long-term investment decisions.

201. Defendants' actions are also arbitrary and capricious because they failed to consider reasonable, obvious alternatives to an *en masse* freezes and terminations of Harvard's federal financial assistance. *See Yakima Valley Cablevision, Inc. v. FCC*, 794 F.2d 737, 746 n.36 (D.C. Cir. 1986).

202. Defendants' Termination Letters constitute an invalid post hoc rationalization. *See Am. Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 539 (1981) ("[T]he *post hoc* rationalizations of the agency or the parties to this litigation cannot serve as a sufficient predicate for agency action.").

203. For these reasons and others, Defendants' actions must be declared unlawful; vacated and "set aside" as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A); and enjoined.

204. In the alternative, the Court should postpone the effective dates of the freezes and terminations. *See* 5 U.S.C. § 705.

205. If Defendants' actions are not declared unlawful, set aside, and enjoined, Harvard will suffer substantial injury, including irreparable injury.

**COUNT 6**

**VIOLATION OF STATUTORY AND CONSTITUTIONAL AUTHORITY
(EQUITABLE CAUSE OF ACTION — *ULTRA VIRES*)**

206. Harvard incorporates by reference the allegations of the preceding paragraphs.

207. "The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." *Armstrong*, 575 U.S. at 327. Accordingly, even if the prerequisites of review under the APA were not satisfied, federal "district court[s]" retain the "nonstatutory" power "to review agency action that is *ultra vires*" and provide equitable relief unless Congress precludes that review. *R.I. Dep't of Env't Mgmt.*, 304 F.3d at 42-43. Congress has not precluded non-statutory judicial review of this agency action.

208. As alleged in Count 3, Defendants have no statutory authority to make an end run around the procedures mandated by Congress in Title VI.

209. Defendants also cannot rely on any inherent constitutional authority under Article II of the Constitution to terminate or freeze Harvard's research funding.

210. Congress has appropriated funds to support research through federal funding administered by NIH, NSF, NASA, and other agencies. *See, e.g.*, Further Consolidated Appropriations Act, Pub. L. No. 118-47, 138 Stat. 460, 656-60 (2024) (appropriating funds for NIH research); Consolidated Appropriations Act, Pub. L. 118-42, 138 Stat. 25, 157-63 (2024) (appropriating funds for NSF and NASA research). Because Defendants do not have any inherent authority to terminate or freeze appropriated federal funding to Harvard other than through specified procedures, this Court should declare that their actions are *ultra vires*.

211.    Defendants also lack any legal basis to prohibit Harvard from seeking future grant funding. Harvard has a protected liberty interest in its reputation as a responsible grant recipient, and Defendants cannot revoke that interest without affording Harvard even "the slightest opportunity to respond to those charges." *Old Dominion Dairy Prods., Inc. v. Sec'y of Def.*, 631 F.2d 953, 964 (D.C. Cir. 1980). Defendants' actions are therefore *ultra vires* in contravention of Harvard's right to due process.

212.    Because Defendants' actions are *ultra vires*, this Court should enjoin Defendants in their official capacities as federal officers from enforcing the freezes and terminations.

213.    If Defendants' actions are not declared unlawful, set aside, and enjoined as *ultra vires*, Harvard will suffer substantial, irreparable injury.

## PRAYER FOR RELIEF

For these reasons, Plaintiff respectfully requests an order:

a.    expediting the resolution of this action to prevent further harm to Plaintiff;

b.    declaring unlawful Defendants' Freeze Orders, Termination Letters, and attendant unconstitutional conditions in the April 3, April 11, May 5, May 6, May 9, and May 12 Letters, as well as any terminations of, freezes of, or refusals to grant or to continue federal funding undertaken pursuant to those agency actions;

c.    vacating and setting aside Defendants' Freeze Orders, Termination Letters, and attendant unconstitutional conditions in the April 3, April 11, May 5, May 6, May 9, and May 12 Letters, as well as any terminations of, freezes of, or refusals to grant or to continue federal funding undertaken pursuant to those agency actions;

d.    postponing the effectiveness of the Freeze Orders, Termination Letters, and attendant unconstitutional conditions in the April 3, April 11, May 5, May 6, May

9, and May 12 Letters, as well as any terminations of, freezes of, or refusals to grant or to continue federal funding undertaken pursuant to those agency actions;

e.    permanently enjoining Defendants, their agents, and all persons acting in concert or participation with Defendants from implementing, maintaining, or in any way giving effect to the Freeze Orders, Termination Letters, and attendant unconstitutional conditions in the April 3, April 11, May 5, May 6, May 9, and May 12 Letters, as well as any terminations of, freezes of, or refusals to grant or to continue federal funding undertaken pursuant to those agency actions;

f.    permanently enjoining Defendants from violating Plaintiff's First Amendment rights;

g.    permanently enjoining Defendants from terminating, freezing, or refusing to grant or to continue any federal funding at issue in this case without complying with federal law, including the requirements of Title VI and agency regulations;

h.    entering judgment in favor of Plaintiff;

i.    awarding Plaintiff its reasonable costs and attorney's fees in accordance with law, including but not limited to 42 U.S.C. § 1988; and

j.    issuing any and all other such relief as the Court deems just and proper.

Dated: May 13, 2025

Respectfully submitted,

/s/ Steven P. Lehotsky

William A. Burck*
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
1300 I Street NW, Suite 900
Washington, DC 20005
williamburck@quinnemanuel.com

Robert K. Hur*
KING & SPALDING LLP
1700 Pennsylvania Ave. NW, Suite 900
Washington, DC 20006
rhur@kslaw.com

Joshua S. Levy (BBO #563017)
Mark Barnes (BBO #568529)*
John P. Bueker (BBO #636435)
Elena W. Davis (BBO #695956)
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199
Joshua.Levy@ropesgray.com
Mark.Barnes@ropesgray.com
John.Bueker@ropesgray.com
Elena.Davis@ropesgray.com

Douglas Hallward-Driemeier
(BBO #627643)
Stephen D. Sencer*
ROPES & GRAY LLP
2009 Pennsylvania Avenue, NW
Washington, DC 20006
Douglas.Hallward-Driemeier@ropesgray.com
Stephen.Sencer@ropesgray.com

Steven P. Lehotsky (BBO # 655908)
Scott A. Keller*
Jonathan F. Cohn*
Mary Elizabeth Miller* (BBO # 696864)
Shannon G. Denmark*
Jacob B. Richards (BBO # 712103)
LEHOTSKY KELLER COHN LLP
200 Massachusetts Ave. NW, Suite 700
Washington, DC 20001
T: (512) 693-8350
F: (512) 727-4755
steve@lkcfirm.com
scott@lkcfirm.com
jon@lkcfirm.com
mary@lkcfirm.com
shannon@lkcfirm.com
jacob@lkcfirm.com

Katherine C. Yarger*
LEHOTSKY KELLER COHN LLP
700 Colorado Blvd., #407
Denver, CO 80206
katie@lkcfirm.com

Joshua P. Morrow*
LEHOTSKY KELLER COHN LLP
408 W. 11th Street, 5th Floor
Austin, TX 78701
josh@lkcfirm.com

Danielle K. Goldstein*
LEHOTSKY KELLER COHN LLP
3280 Peachtree Road NE
Atlanta, GA 30305
danielle@lkcfirm.com

*Admitted Pro Hac Vice

## <u>CERTIFICATE OF SERVICE</u>

Counsel for Plaintiff certify that they have submitted the foregoing document with the clerk of court for the District of Massachusetts, using the electronic case filing system of the Court. Counsel for Plaintiff hereby certify that they have served all parties electronically or by another manner authorized by Fed. R. Civ. P. 5(b)(2).

/s/ *Steven P. Lehotsky*
Steven P. Lehotsky

**JA120**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSSETTS**

| | |
|---|---|
| PRESIDENT AND FELLOWS OF HARVARD COLLEGE, | |
| *Plaintiff*, | Case No. 1:25-cv-11048-ADB |
| v. | |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al., | |
| *Defendants*. | |
| AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS—HARVARD FACULTY CHAPTER et al., | |
| *Plaintiffs*, | Case No. 1:25-CV-10910-ADB |
| v. | |
| UNITED STATES DEPARTMENT OF JUSTICE et al., | |
| *Defendants*. | |

## NOTICE OF APPEAL

PLEASE TAKE NOTICE that Defendants hereby appeal to the United States Court of Appeals for the First Circuit from this Court's Order Entering Final Judgment, entered in Case No. 1:25-cv-11048-ADB at ECF No. 247 and dated October 20, 2025, as well as this Court's Order and Final Judgment entered in Case No. 1:25-CV-10910-ADB at ECF No. 153 and dated October 20, 2025.

Dated: December 18, 2025

Respectfully submitted,

ABHISHEK KAMBLI
Deputy Associate Attorney General

1

**JA121**

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

JOSEPH BORSON
Assistant Director, Federal Programs Branch

/s/ *Eitan R. Sirkovich*

EITAN R. SIRKOVICH
RYAN M. UNDERWOOD
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Tel: (202) 305-1952
E-mail: ryan.m.underwood2@usdoj.gov

**CERTIFICATE OF SERVICE**

Counsel for Defendants certify that they have submitted the foregoing document with the clerk of court for the District of Massachusetts, using the electronic case filing system of the Court. Counsel for Defendant hereby certify that they have served all parties electronically or by another manner authorized by Fed. R. Civ. P. 5(b)(2).

/s/ *Eitan R. Sirkovich*
Eitan R. Sirkovich

3

**JA123**

Docusign Envelope ID: 8B5E1264-41A5-4866-8162-FD8B7092C5DA



**U.S. General Services Administration**

3/31/2025

MEMORANDUM FOR:    DR. ALAN M. GARBER
PRESIDENT
HARVARD UNIVERSITY
OFFICE OF THE PRESIDENT
MASSACHUSETTS HALL
CAMBRIDGE, MA 02138

PENNY PRITZKER
LEAD MEMBER, HARVARD CORPORATION
HARVARD CORPORATION
MASSACHUSETTS HALL
CAMBRIDGE, MA 02138

FROM:    JOSH GRUENBAUM
COMMISSIONER, FEDERAL ACQUISITION SERVICE
U.S. GENERAL SERVICES ADMINISTRATION (GSA)

Signed by:
*Josh Gruenbaum*
2E0F9ABC0FC249F...

SUBJECT:    Review of Federal Government Contracts

Pursuant to President Trump's [Executive Order, "Additional Measures to Combat Anti-Semitism"](#), on February 3, 2025, a multi-agency Task Force to Combat Anti-Semitism was created, consisting of the Departments of Justice, Education, Health and Human Services, and the General Services Administration. GSA is leading a Task Force comprehensive review of Federal contracts with certain institutions of higher education that are being investigated for potential infractions and dereliction of duties to curb or combat anti-Semitic harassment, including Harvard University.

In light of this review, the Federal Government is ready to work with each appropriate contracting agency on the potential issuance of Stop Work Orders for all contracts identified in the attached schedule, which total $255.6 million of contract ceiling value. In addition, we are requiring you to send a list of all other contracts between the Federal Government and Harvard University or its affiliates which are not listed on the schedule to GSA's Federal Acquisition Service Commissioner and Task Force member, Josh Gruenbaum. Commissioner Gruenbaum will lead GSA's review. All materials should be sent to: [universitycontracts@gsa.gov](mailto:universitycontracts@gsa.gov). Please be advised that alongside our fellow agencies, we will also be reviewing the greater than $8.7 billion of multi-year grant commitments between Harvard University, its affiliates and the Federal Government for potential compliance concerns, false claims or other infractions.

**JA124**

GSAHarv_00000003

Docusign Envelope ID: 8P5E1264-41A5-4866-8162-FD8B7992C5DA

The Federal Government reserves the right to terminate for convenience any contracts it has with your institution at any time during the period of performance. Additionally, the Federal Government reserves the right to take any relevant administrative action it deems necessary in response to any wrongdoing identified during the pendency of the investigations.

**JA125**

GSAHarv_00000004

  

April 03, 2025

Dr. Alan M. Garber
President
Harvard University
Office of the President
Massachusetts Hall
Cambridge, MA 02138

Penny Pritzker
Lead Member, Harvard Corporation
Harvard Corporation
Massachusetts Hall
Cambridge, MA 02138

Dear Dr. Garber:

Please consider this a formal communication with respect to the current situation on the campus of Harvard University and a follow up to the March 31, 2025, letter from Commissioner Gruenbaum informing you that the United States Government would be reviewing Harvard's federal funding. Harvard has asked for a dialogue with the Task Force to discuss this ongoing review. Below, you will find several broad, non-exhaustive areas of reform that the government views as necessary for Harvard to implement to remain a responsible recipient of federal taxpayer dollars. We look forward to a meaningful dialogue focused on lasting, structural reforms at Harvard.

U.S. taxpayers invest enormously in U.S. colleges and universities, including Harvard University. These funds are an investment and, like any investment, are based on the recipient's performance, not owed as a matter of custom or right. It is the responsibility of the federal government to ensure that all recipients are responsible stewards of taxpayer funds. Harvard University, however, has fundamentally failed to protect American students and faculty from antisemitic violence and harassment in addition to other alleged violations of Title VI and Title VII of the Civil Rights Act of 1964. This letter outlines immediate next steps that we regard as necessary for Harvard University's continued financial relationship with the United States government.

- **Oversight and accountability for biased programs that fuel antisemitism.** Programs and departments that fuel antisemitic harassment must be reviewed and necessary changes made to address bias, improve viewpoint diversity, and end ideological capture.
- **Disciplinary reform and consistent accountability.** Harvard has an obligation to consistently and proactively enforce its existing disciplinary policies, ensuring that senior administrative leaders are responsible for final decisions. Reforms must include a

**JA126**

EDHarvAR_0000001

comprehensive mask ban (with medical and religious exemptions, given identification is always displayed) and a clarified time, place, and manner policy. Harvard must review and report on disciplinary actions for antisemitic rule violations since October 7, 2023.

- **Student group accountability.** Recognized and unrecognized student groups, and their leadership, must be held accountable for violations of Harvard policy.
- **Governance and leadership reforms.** Harvard must make meaningful governance reforms to improve its organizational structure to foster clear lines of authority and accountability, and to empower faculty and administrative leaders who are committed to implementing the changes indicated in this letter.
- **Merit-based admissions reform.** Harvard must adopt and implement merit-based admissions policies; cease all preferences based on race, color, or national origin in admissions throughout its undergraduate, graduate, and other programs; and demonstrate through structural and personnel action that these changes are durable.
- **Merit-based hiring reform.** Harvard must adopt and implement merit-based hiring policies; cease all preferences based on race, color, religion, sex, or national origin in hiring throughout its teaching and research faculty, staff, and leadership; and demonstrate through structural and personnel action that these changes are durable.
- **Diversity, Equity, and Inclusion (DEI) programs.** DEI programs teach students, faculty, staff, and leadership to make snap judgments about each other based on crude race and identity stereotypes, which fuels division and hatred based on race, color, national origin, and other protected identity characteristics. All efforts should be made to shutter such programs.
- **Cooperation with law enforcement.** Harvard must cooperate with law enforcement to ensure student safety.
- **Transparency and reporting to ED, DHS, and other federal regulators.** Harvard must comply fully with existing statutory reporting requirements under Section 117 of the Higher Education Act, commit to full cooperation with DHS and other federal regulators, and make organizational changes as necessary to enable full compliance.

We expect your immediate cooperation in implementing these critical reforms that will enable Harvard to return to its original mission of providing a high-quality education in a safe environment for *all* students through a focus on truth-seeking, innovative research, and academic excellence.

Sincerely,

Josh Gruenbaum
Comm'r of the Fed. Acquisition Serv.
General Services Administration

Sean R. Keveney
Acting General Counsel
U.S. Dep't Health & Human Servs.

Thomas E. Wheeler
Acting General Counsel
U.S. Dept. of Education

**JA127**

EDHarvAR_0000002

  

April 11, 2025

Dr. Alan M. Garber
President
Harvard University
Office of the President
Massachusetts Hall
Cambridge, MA 02138

Penny Pritzker
Lead Member, Harvard Corporation
Harvard Corporation
Massachusetts Hall
Cambridge, MA 02138

Dear Dr. Garber:

The United States has invested in Harvard University's operations because of the value to the country of scholarly discovery and academic excellence. But an investment is not an entitlement. It depends on Harvard upholding federal civil rights laws, and it only makes sense if Harvard fosters the kind of environment that produces intellectual creativity and scholarly rigor, both of which are antithetical to ideological capture.

Harvard has in recent years failed to live up to both the intellectual and civil rights conditions that justify federal investment. But we appreciate your expression of commitment to repairing those failures and welcome your collaboration in restoring the University to its promise. We therefore present the below provisions as the basis for an agreement in principle that will maintain Harvard's financial relationship with the federal government.

If acceptable to Harvard, this document will constitute an agreement in principle, which the parties will work in good faith to translate into a more thorough, binding settlement agreement. As you will see, this letter incorporates and supersedes the terms of the federal government's prior letter of April 3, 2025.

- **Governance and leadership reforms.** By August 2025, Harvard must make meaningful governance reform and restructuring to make possible major change consistent with this letter, including: fostering clear lines of authority and accountability; empowering tenured professors and senior leadership, and, from among the tenured professoriate and senior leadership, exclusively those most devoted to the scholarly mission of the University and committed to the changes indicated in this letter; reducing the power held by students and untenured faculty; reducing the power held by faculty (whether tenured or untenured) and administrators more committed to activism than scholarship; and reducing forms of

**JA128**

EDHarvAR_0000003

governance bloat, duplication, or decentralization that interfere with the possibility of the reforms indicated in this letter.

- **Merit-Based Hiring Reform**. By August 2025, the University must adopt and implement merit-based hiring policies, and cease all preferences based on race, color, religion, sex, or national origin throughout its hiring, promotion, compensation, and related practices among faculty, staff, and leadership. Such adoption and implementation must be durable and demonstrated through structural and personnel changes. All existing and prospective faculty shall be reviewed for plagiarism and Harvard's plagiarism policy consistently enforced. All hiring and related data shall be shared with the federal government and subjected to a comprehensive audit by the federal government during the period in which reforms are being implemented, which shall be at least until the end of 2028.

- **Merit-Based Admissions Reform**. By August 2025, the University must adopt and implement merit-based admissions policies and cease all preferences based on race, color, national origin, or proxies thereof, throughout its undergraduate program, each graduate program individually, each of its professional schools, and other programs. Such adoption and implementation must be durable and demonstrated through structural and personnel changes. All admissions data shall be shared with the federal government and subjected to a comprehensive audit by the federal government—and non-individualized, statistical information regarding admissions shall be made available to the public, including information about rejected and admitted students broken down by race, color, national origin, grade point average, and performance on standardized tests—during the period in which reforms are being implemented, which shall be at least until the end of 2028. During this same period, the dean of admissions for each program or school must sign a public statement after each admissions cycle certifying that these rules have been upheld.

- **International Admissions Reform**. By August 2025, the University must reform its recruitment, screening, and admissions of international students to prevent admitting students hostile to the American values and institutions inscribed in the U.S. Constitution and Declaration of Independence, including students supportive of terrorism or anti-Semitism. Harvard will immediately report to federal authorities, including the Department of Homeland Security and State Department, any foreign student, including those on visas and with green cards, who commits a conduct violation. As above, these reforms must be durable and demonstrated through structural and personnel changes; comprehensive throughout all of Harvard's programs; and, during the reform period, shared with the federal government for audit, shared on a non-individualized basis with the public, and certified by deans of admissions.

- **Viewpoint Diversity in Admissions and Hiring**. By August 2025, the University shall commission an external party, which shall satisfy the federal government as to its competence and good faith, to audit the student body, faculty, staff, and leadership for viewpoint diversity, such that each department, field, or teaching unit must be individually viewpoint diverse. This audit shall begin no later than the summer of 2025 and shall proceed on a department-by-department, field-by-field, or teaching-unit-by-teaching-unit basis as appropriate. The report of the external party shall be submitted to University leadership and

**JA129**

the federal government no later than the end of 2025. Harvard must abolish all criteria, preferences, and practices, whether mandatory or optional, throughout its admissions and hiring practices, that function as ideological litmus tests. Every department or field found to lack viewpoint diversity must be reformed by hiring a critical mass of new faculty within that department or field who will provide viewpoint diversity; every teaching unit found to lack viewpoint diversity must be reformed by admitting a critical mass of students who will provide viewpoint diversity. If the review finds that the existing faculty in the relevant department or field are not capable of hiring for viewpoint diversity, or that the relevant teaching unit is not capable of admitting a critical mass of students with diverse viewpoints, hiring or admissions within that department, field, or teaching unit shall be transferred to the closest cognate department, field, or teaching unit that is capable of achieving viewpoint diversity. This audit shall be performed and the same steps taken to establish viewpoint diversity every year during the period in which reforms are being implemented, which shall be at least until the end of 2028.

- **Reforming Programs with Egregious Records of Antisemitism or Other Bias.** By August 2025, the University shall commission an external party, which shall satisfy the federal government as to its competence and good faith, to audit those programs and departments that most fuel antisemitic harassment or reflect ideological capture.

  o The programs, schools, and centers of concern include but are not limited to the Divinity School, Graduate School of Education, School of Public Health, Medical School, Religion and Public Life Program, FXB Center for Health & Human Rights, Center for Middle Eastern Studies, Carr Center for Human Rights at the Harvard Kennedy School, Department of Near Eastern Languages and Cultures, and the Harvard Law School International Human Rights Clinic.

  o The report of the external party shall include information as to individual faculty members who discriminated against Jewish or Israeli students or incited students to violate Harvard's rules following October 7, and the University and federal government will cooperate to determine appropriate sanctions for those faculty members within the bounds of academic freedom and the First Amendment.

  o The report of the external party shall be submitted to University leadership and the federal government no later than the end of 2025 and reforms undertaken to repair the problems. This audit shall be performed and the same steps taken to make repairs every year during the period in which reforms are being implemented, which shall be at least until the end of 2028.

- **Discontinuation of DEI**. The University must immediately shutter all diversity, equity, and inclusion (DEI) programs, offices, committees, positions, and initiatives, under whatever name, and stop all DEI-based policies, including DEI-based disciplinary or speech control policies, under whatever name; demonstrate that it has done so to the satisfaction of the federal government; and demonstrate to the satisfaction of the federal government that these reforms are durable and effective through structural and personnel changes. By August

**JA130**

EDHarvAR_0000005

2025, the University must submit to the government a report—certified for accuracy—that confirms these reforms.

- **Student Discipline Reform and Accountability.** Harvard must immediately reform its student discipline policies and procedures so as to swiftly and transparently enforce its existing disciplinary policies with consistency and impartiality, and without double standards based on identity or ideology. Where those policies are insufficient to prevent the disruption of scholarship, classroom learning and teaching, or other aspects of normal campus life, Harvard must develop and implement disciplinary policies sufficient to prevent those disruptions. This includes but is not limited to the following:

    o   Discipline at Harvard must include immediate intervention and stoppage of disruptions or deplatforming, including by the Harvard police when necessary to stop a disruption or deplatforming; robust enforcement and reinstatement of existing time, place, and manner rules on campus, including ordering the Harvard police to stop incidents that violate time, place, and manner rules when necessary; a disciplinary process housed in one body that is accountable to Harvard's president or other capstone official; and removing or reforming institutional bodies and practices that delay and obstruct enforcement, including the relevant Administrative Boards and FAS Faculty Council.

    o   Harvard must adopt a new policy on student groups or clubs that forbids the recognition and funding of, or provision of accommodations to, any student group or club that endorses or promotes criminal activity, illegal violence, or illegal harassment; invites non-students onto campus who regularly violate campus rules; or acts as a front for a student club that has been banned from campus. The leaders or organizers of recognized and unrecognized student groups that violate these policies must be held accountable as a matter of student discipline and made ineligible to serve as officers in other recognized student organizations. In the future, funding decisions for student groups or clubs must be made exclusively by a body of University faculty accountable to senior University leadership. In particular, Harvard must end support and recognition of those student groups or clubs that engaged in anti-Semitic activity since October 7th, 2023, including the Harvard Palestine Solidarity Committee, Harvard Graduates Students 4 Palestine, Law Students 4 Palestine, Students for Justice in Palestine, and the National Lawyers Guild, and discipline and render ineligible the officers and active members of those student organizations.

    o   Harvard must implement a comprehensive mask ban with serious and immediate penalties for violation, not less than suspension.

    o   Harvard must investigate and carry out meaningful discipline for all violations that occurred during the 2023-2024 and 2024-2025 academic years, including the Harvard Business School protest of October 2023, the University Hall sit-in of November 2023, and the spring encampment of 2024. This must include permanently expelling the students involved in the October 18 assault of an Israeli

**JA131**

EDHarvAR_0000006

Harvard Business School student, and suspending students involved in occupying university buildings, as warranted by the facts of individual cases.

- o The Harvard president and police chief must publicly clarify that the Harvard University Police Department will enforce University rules and the law. Harvard must also commit to cooperating in good faith with law enforcement.

- **Whistleblower Reporting and Protections**.  The University must immediately establish procedures by which any Harvard affiliate can report noncompliance with the reforms detailed in this letter to both university leadership and the federal government. Any such reporter shall be fully protected from any adverse actions for so reporting.

- **Transparency and Monitoring**. The University shall make organizational changes to ensure full transparency and cooperation with all federal regulators. No later than June 30, 2025, and every quarter thereafter during the period in which reforms are being implemented, which shall be at least until the end of 2028, the University shall submit to the federal government a report—certified for accuracy—that documents its progress on the implementation of the reforms detailed in this letter. The University must also, to the satisfaction of the federal government, disclose the source and purpose of all foreign funds; cooperate with the federal government in a forensic audit of foreign funding sources and uses, including how that money was used by Harvard, its agents, and, to the extent available, third parties acting on Harvard's campus; report all requested immigration and related information to the United States Department of Homeland Security; and comply with all requirements relating to the SEVIS system.

We expect your immediate cooperation in implementing these critical reforms that will enable Harvard to return to its original mission of innovative research and academic excellence.

Sincerely,

Josh Gruenbaum
Comm'r of the Fed. Acquisition Serv.
General Services Administration

Sean R. Keveney
Acting General Counsel
U.S. Dep't Health & Human Servs.

Thomas E. Wheeler
Acting General Counsel
U.S. Dept. of Education

**JA132**

EDHarvAR_0000007

quinn emanuel trial lawyers                    KING & SPALDING

April 14, 2025

**VIA ELECTRONIC MAIL**

Josh Gruenbaum
Commissioner of the Federal Acquisition Service
General Services Administration

Sean R. Keveney
Acting General Counsel
U.S. Department of Health & Human Services

Thomas E. Wheeler
Acting General Counsel
U.S. Department of Education

Dear Messrs. Gruenbaum, Keveney, and Wheeler:

We represent Harvard University.  We are writing in response to your letter dated April 11, 2025, addressed to Dr. Alan Garber, Harvard's President, and Penny Pritzker, Senior Fellow of the Harvard Corporation.

Harvard is committed to fighting antisemitism and other forms of bigotry in its community. Antisemitism and discrimination of any kind not only are abhorrent and antithetical to Harvard's values but also threaten its academic mission.

To that end, Harvard has made, and will continue to make, lasting and robust structural, policy, and programmatic changes to ensure that the university is a welcoming and supportive learning environment for all students and continues to abide in all respects with federal law across its academic programs and operations, while fostering open inquiry in a pluralistic community free from intimidation and open to challenging orthodoxies, whatever their source.

Over the past 15 months, Harvard has undertaken substantial policy and programmatic measures.  It has made changes to its campus use policies; adopted new accountability procedures; imposed meaningful discipline for those who violate university policies; enhanced programs designed to address bias and promote ideological diversity and civil discourse; hired staff to support these programs and support students; changed partnerships; dedicated resources to combat hate and bias; and enhanced safety and security measures.  As a result, Harvard is in a very different place today from where it was a year ago.  These efforts, and additional measures the university will be taking against antisemitism, not only are the right thing to do but also are critical to strengthening Harvard's community as a place in which everyone can thrive.

It is unfortunate, then, that your letter disregards Harvard's efforts and instead presents demands that, in contravention of the First Amendment, invade university freedoms long

**JA133**

HHSHarv_00000104

Messrs. Gruenbaum, Keveney, and Wheeler
April 14, 2015
Page 2

recognized by the Supreme Court. The government's terms also circumvent Harvard's statutory rights by requiring unsupported and disruptive remedies for alleged harms that the government has not proven through mandatory processes established by Congress and required by law. No less objectionable is the condition, first made explicit in the letter of March 31, 2025, that Harvard accede to these terms or risk the loss of billions of dollars in federal funding critical to vital research and innovation that has saved and improved lives and allowed Harvard to play a central role in making our country's scientific, medical, and other research communities the standard-bearers for the world. These demands extend not only to Harvard but to separately incorporated and independently operated medical and research hospitals engaging in life-saving work on behalf of their patients. The university will not surrender its independence or relinquish its constitutional rights. Neither Harvard nor any other private university can allow itself to be taken over by the federal government. Accordingly, Harvard will not accept the government's terms as an agreement in principle.

Harvard remains open to dialogue about what the university has done, and is planning to do, to improve the experience of every member of its community. But Harvard is not prepared to agree to demands that go beyond the lawful authority of this or any administration.

William A. Burck

Quinn Emanuel Urquhart & Sullivan, LLP
1300 I Street NW
Suite 900
Washington, DC  20005

Robert K. Hur

King & Spalding LLP
1700 Pennsylvania Avenue NW
Suite 900
Washington, DC  20006

**JA134**

HHSHarv_00000105



THE SECRETARY OF EDUCATION
WASHINGTON, DC 20202

May 5, 2025

Dr. Alan Garber
Office of the President
Harvard University
Massachusetts Hall
Cambridge, MA 02138

Dr. Garber,

The Federal Government has a sacred responsibility to be a wise and important steward of American taxpayer dollars. Harvard University, despite amassing a largely tax-free $53.2 billion dollar endowment (larger than the GDP of 100 countries), receives billions of dollars of taxpayer largess each year. Receiving such taxpayer funds is a privilege, not a right. Yet instead of using these funds to advance the education of its students, Harvard is engaging in a systemic pattern of violating federal law. Where do many of these "students" come from, who are they, how do they get into Harvard, or even into our country—and why is there so much HATE? These are questions that must be answered, among many more, but the biggest question of all is, why will Harvard not give straightforward answers to the American public?

Harvard University has made a mockery of this country's higher education system. It has invited foreign students, who engage in violent behavior and show contempt for the United States of America, to its campus. In every way, Harvard has failed to abide by its legal obligations, its ethical and fiduciary duties, its transparency responsibilities, and any semblance of academic rigor. It had scrapped standardized testing requirements and a normalized grading system. This year Harvard was forced to adopt an embarrassing "remedial math" program for undergraduates. Why is it, we ask, that Harvard has to teach simple and basic mathematics, when it is supposedly so hard to get into this "acclaimed university"? Who is getting in under such a low standard when others, with fabulous grades and a great understanding of the highest levels of mathematics, are being rejected?

Harvard has even been embroiled in humiliating plagiarism scandals, exposed clearly and plainly in the media, with respect to your then University President, who was an embarrassment to our Nation. Much of Harvard's hateful discrimination was revealed, last year, by the great work of Congresswoman Elise Stefanik, and her Committee. As if it were trying to embarrass itself even further, Harvard hired failed Mayors Bill De Blasio and Lori Lightfoot, perhaps the worst mayors ever to preside over major cities in our country's history, to supposedly teach "leadership" at their School of Public Health. This is like hiring the captain of the Titanic to teach navigation to future captains of the sea.

This incomprehensible failure becomes more understandable after reviewing Harvard's management. The Harvard Corporation, which is supposed to competently and professionally manage Harvard's vast academic, financial, and physical resources, is run by strongly left-leaning Obama political appointee Penny Pritzker, a Democrat operative, who is catastrophic and

**JA135**

EDHarvAR_0000008

running the institution in a totally chaotic way. Harvard alumnus and highly successful hedge fund manager Bill Ackman noted that, under her leadership, Harvard has become "a political advocacy organization for one party."

Ackman has called for the resignation of Pritzker, concluding that the "[t]he mismanagement here is Penny Pritzker" and noting that any serious corporation would have removed her after a litany of recent failings and the fact that, incredibly, "Harvard is not in a good financial position." According to Ackman, one of the world's foremost finance experts, Harvard's so-called $53 billion endowment is "massively overstated as far as what it's really worth," and Harvard has irresponsibly taken out $8 billion in debt.

If this is true, it is concerning evidence of Harvard's disastrous mismanagement, indicating an urgent need for massive reform—not continued taxpayer investment. If Harvard prefers not to change, then Harvard should have no problem using its overflowing endowment to fund its bloated bureaucracy.

At its best, a university should fulfill the highest ideals of our Nation, and enlighten the thousands of hopeful students who walk through its magnificent gates. But Harvard has betrayed this ideal.

Perhaps most alarmingly, Harvard has failed to abide by the United States Supreme Court's ruling demanding that it end its racial preferencing, and continues to engage in ugly racism in its undergraduate and graduate schools, and even within the Harvard Law Review itself. Our universities should be bastions of merit that reward and celebrate excellence and achievement. They should not be incubators of discrimination that encourage resentment and instill grievance and racism into our wonderful young Americans.

The above concerns are only a fraction of the long list of Harvard's consistent violations of its own legal duties. Given these and other concerning allegations, this letter is to inform you that Harvard should no longer seek GRANTS from the federal government, since none will be provided. Harvard will cease to be a publicly funded institution, and can instead operate as a privately-funded institution, drawing on its colossal endowment, and raising money from its large base of wealthy alumni. You have an approximately $53 Billion head start, much of which was made possible by the fact that you are living within the walls of, and benefiting from, the prosperity secured by the United States of America and its free-market system you teach your students to despise.

The Administration had previously been willing to maintain federal funding to Harvard, so long as Harvard committed to complying with long-settled Federal Law, including to protect and promote student welfare and the landmark decision of our Supreme Court against racial preferencing. The proposed common-sense reforms – which the Administration remains committed to – include a return to merit-based admissions and hiring, an end to unlawful programs that promote crude identity stereotypes, disciplinary reform and consistent accountability, including for student groups, cooperation with Law Enforcement, and reporting compliance with the Department of Education, Department of Homeland Security, and other

**JA136**

EDHarvAR_0000009

Federal Agencies. The Administration's priorities have not changed and today's letter marks the end of new grants for the University.

These requests will advance the best interests of Harvard University, so it can reclaim its status as a respected educational institution for the future leaders of America. Thank you for your attention to this matter!

Sincerely,

Linda E. McMahon
Secretary of Education

**JA137**



| | |
|---|---|
| **Federal Register**<br><br>Vol. 90, No. 21<br><br>Monday, February 3, 2025 | # Presidential Documents |

| | |
|---|---|
| **Title 3—**<br><br>**The President** | **Executive Order 14188 of January 29, 2025**<br><br>## Additional Measures To Combat Anti-Semitism |

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

**Section 1.** *Purpose.* My Administration has fought and will continue to fight anti-Semitism in the United States and around the world. On December 11, 2019, I issued Executive Order 13899, my first Executive Order on Combating Anti-Semitism, finding that students, in particular, faced anti-Semitic harassment in schools and on university and college campuses. Executive Order 13899 provided interpretive assistance on the enforcement of the Nation's civil rights laws to ensure that they would protect American Jews to the same extent to which all other American citizens are protected. The prior administration effectively nullified Executive Order 13899 by failing to give the terms of the order full force and effect throughout the Government. This order reaffirms Executive Order 13899 and directs additional measures to advance the policy thereof in the wake of the Hamas terrorist attacks of October 7, 2023, against the people of Israel. These attacks unleashed an unprecedented wave of vile anti-Semitic discrimination, vandalism, and violence against our citizens, especially in our schools and on our campuses. Jewish students have faced an unrelenting barrage of discrimination; denial of access to campus common areas and facilities, including libraries and classrooms; and intimidation, harassment, and physical threats and assault. A joint report by the House Committees on Education and the Workforce, Energy and Commerce, Judiciary, Oversight and Accountability, Veterans' Affairs, and Ways and Means calls the Federal Government's failure to fight anti-Semitism and protect Jewish students "astounding." This failure is unacceptable and ends today.

**Sec. 2.** *Policy.* It shall be the policy of the United States to combat anti-Semitism vigorously, using all available and appropriate legal tools, to prosecute, remove, or otherwise hold to account the perpetrators of unlawful anti-Semitic harassment and violence.

**Sec. 3.** *Additional Measures to Combat Campus Anti-Semitism.* (a) Within 60 days of the date of this order, the head of each executive department or agency (agency) shall submit a report to the President, through the Assistant to the President for Domestic Policy, identifying all civil and criminal authorities or actions within the jurisdiction of that agency, beyond those already implemented under Executive Order 13899, that might be used to curb or combat anti-Semitism, and containing an inventory and analysis of all pending administrative complaints, as of the date of the report, against or involving institutions of higher education alleging civil-rights violations related to or arising from post-October 7, 2023, campus anti-Semitism.

(b) The report submitted by the Attorney General under this section shall additionally include an inventory and an analysis of all court cases, as of the date of the report, against or involving institutions of higher education alleging civil-rights violations related to or arising from post-October 7, 2023, campus anti-Semitism and indicate whether the Attorney General intends to or has taken any action with respect to such matters, including filing statements of interest or intervention.

(c) The Attorney General is encouraged to employ appropriate civil-rights enforcement authorities, such as 18 U.S.C. 241, to combat anti-Semitism.

HHSHarv_00000001

(d) The report submitted by the Secretary of Education under this section shall additionally include an inventory and an analysis of all Title VI complaints and administrative actions, including in K–12 education, related to anti-Semitism—pending or resolved after October 7, 2023—within the Department's Office for Civil Rights.

(e) In addition to identifying relevant authorities to curb or combat anti-Semitism generally required by this section, the Secretary of State, the Secretary of Education, and the Secretary of Homeland Security, in consultation with each other, shall include in their reports recommendations for familiarizing institutions of higher education with the grounds for inadmissibility under 8 U.S.C. 1182(a)(3) so that such institutions may monitor for and report activities by alien students and staff relevant to those grounds and for ensuring that such reports about aliens lead, as appropriate and consistent with applicable law, to investigations and, if warranted, actions to remove such aliens.

**Sec. 4.** *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*January 29, 2025.*

[FR Doc. 2025–02230
Filed 1–31–25; 11:15 am]
Billing code 3395–F4–P

**JA139**

HHSHarv_00000002



**PRESS RELEASE**

# Federal Task Force to Combat Antisemitism Announces Visits to 10 College Campuses that Experienced Incidents of Antisemitism

Friday, February 28, 2025

**For Immediate Release**

Office of Public Affairs

The Federal Task Force to Combat Anti-Semitism announced that it will be visiting 10 university campuses that have experienced antisemitic incidents since October 2023. Created pursuant to President Trump's Executive Order on Additional Measures to Combat Anti-Semitism, the Task Force set as its first priority to eradicate antisemitic harassment in schools and on college campuses.

Leading Task Force member and Senior Counsel to the Assistant Attorney General for Civil Rights Leo Terrell informed the 10 universities yesterday that the Task Force was aware of allegations that the schools may have failed to protect Jewish students and faculty members from unlawful discrimination, in potential violation of federal law. Mr. Terrell said he intends for the Task Force to meet with university leadership, impacted students and staff, local law enforcement, and community members as it gathers information about these incidents and considers whether remedial action is warranted.

"The President, Attorney General Pamela Bondi, and the entire Administration are committed to ensuring that no one should feel unsafe or unwelcome on campus because of their religion," said Mr. Terrell. "The Task Force's mandate is to bring the full force of the federal government to bear in our effort to eradicate Anti-Semitism, particularly in schools. These visits are just one of many steps this Administration is taking to deliver on that commitment."

The 10 universities identified by the Task Force are: Columbia University; George Washington University; Harvard University; Johns Hopkins University; New York University; Northwestern University; the University of California, Los Angeles; the University of California, Berkeley; the University of Minnesota; and the University of Southern California.

**JA140**

HHSHarv_00000003

If you have been discriminated against, you can file a complaint with the Civil Rights Division at civilrights.justice.gov. President Trump's Executive Order can be found at www.whitehouse.gov/presidential-actions/2025/01/additional-measures-to-combat-anti-semitism/.

*Updated April 25, 2025*

**Topics**

| CIVIL RIGHTS | | COMMUNITY OUTREACH |

**Component**

Civil Rights Division

Press Release Number: 25-202

# Related Content

PRESS RELEASE

## Justice Department and City of Albuquerque Seek Termination of Consent Decree Covering the Albuquerque Police Department

The Justice Department and the City of Albuquerque filed a joint motion seeking U.S. District Court approval to terminate the federal consent decree covering the Albuquerque Police Department (APD) since...

May 9, 2025

PRESS RELEASE

## Tennessee Man Pleads Guilty to Aiding Police Officer in Destroying Evidence of Fatal Shooting

**JA141**

HHSHarv_00000004

Joshua M. Rogers of Memphis, Tennessee, pleaded guilty yesterday to a violation of 18 U.S.C. § 1512(c) for his role in destroying evidence related to a police officer's fatal shooting...

May 9, 2025

**PRESS RELEASE**

## Federal Grand Jury Indicts Essex County, New Jersey Man and Woman for Conspiracy to Commit Forced Labor; Man Also Charged with Sex Trafficking and Forced Labor

A federal grand jury in the District of New Jersey, returned an indictment on April 25 that was unsealed Wednesday, charging Treva Edwards, 60, with sex trafficking by force, fraud...

May 9, 2025



**Office of Public Affairs**

U.S. Department of Justice

950 Pennsylvania Avenue, NW

Washington DC 20530

Office of Public Affairs Direct Line

202-514-2007

Department of Justice Main Switchboard

202-514-2000

HHSHarv_00000005

 An official website of the United States government

**U.S. Department of**
**Health and Human Services**
Enhancing the health and well-being of all Americans

Home </>    Press Room </press-room/index.html>    HHS, ED, and GSA Initiate Federal Contract …

**Navigate to:**

T+    🖨    ⓕ    𝕏    ✉

**FOR IMMEDIATE RELEASE**
**March 31, 2025**

**Contact: HHS Press Office**

202-690-6343
Submit a Request for
Comment

# HHS, ED, and GSA Initiate Federal Contract and Grant Review of Harvard University

  

*Measures include a comprehensive review of federal contracts and grants as part of an investigation aimed at eliminating anti-Semitic harassment on college campuses*

**JA143**

HHSHarv_00000006

**WASHINGTON —** Today, the Departments of Education (ED), Health and Human Services (HHS), and the U.S. General Services Administration (GSA), announced a comprehensive review of federal contracts and grants at Harvard University and its affiliates. This review is part of the ongoing efforts of the Joint Task Force to Combat Anti-Semitism.

The Task Force will review the more than $255.6 million in contracts between Harvard University, its affiliates and the Federal Government. The review also includes the more than $8.7 billion in multi-year grant commitments to Harvard University and its affiliates to ensure the university is in compliance with federal regulations, including its civil rights responsibilities.

"Harvard has served as a symbol of the American Dream for generations – the pinnacle aspiration for students all over the world to work hard and earn admission to the storied institution," said **Secretary of Education Linda McMahon**. "Harvard's failure to protect students on campus from anti-Semitic discrimination - all while promoting divisive ideologies over free inquiry - has put its reputation in serious jeopardy. Harvard can right these wrongs and restore itself to a campus dedicated to academic excellence and truth-seeking, where all students feel safe on its campus."

Today's actions by the Task Force follow a similar ongoing review of Columbia University. That review led to Columbia agreeing to comply with 9 preconditions <https://www.gsa.gov/about-us/newsroom/news-releases/hhs-ed-and-gsa-respond-to-columbia-universitys-actions-to-comply-with-joint-03242025> for further negotiations regarding a return of canceled federal funds. This initiative strengthens enforcement of President Trump's Executive Order titled "Additional Measures to Combat Anti-Semitism <https://www.whitehouse.gov/presidential-actions/2025/01/additional-measures-to-combat-anti-semitism/>. The Task Force ensures that federally funded institutions uphold their legal and ethical responsibilities to prevent anti-Semitic harassment.

The federal government will collaborate with relevant contracting agencies to assess whether Stop Work Orders should be issued for any identified contracts. Additionally, Harvard has been directed to submit a comprehensive list of all contracts—both direct and through affiliates—between their institution and the federal government that were not included in the initial review.

"The Task Force will continue its efforts to root out anti-Semitism and to refocus our institutions of higher learning on the core values that undergird a liberal education," said **HHS Acting General Counsel and Task Force member, Sean Keveney**. "We are pleased that Harvard is willing to engage with us on these goals."

Any institution found to be in violation of federal compliance standards may face administrative actions, including contract termination.

HHSHarv_00000007

The Task Force remains committed to awarding federal funds responsibly and holding institutions accountable for taking decisive action against anti-Semitic harassment. GSA has been asked to facilitate the review of federal funding received by Harvard including grant and contract reviews across the Federal Government.

"Hate in any form goes against the foundational principles of America. While Harvard's recent actions to curb institutionalized anti-Semitism - though long overdue - are welcome, there is much more that the university must do to retain the privilege of receiving federal taxpayer's hard earned dollars," said **FAS Commissioner and Task Force Member, Josh Gruenbaum**. "This administration has proven that we will take swift action to hold institutions accountable if they allow anti-Semitism to fester. We will not hesitate to act if Harvard fails to do so."

For more information, visit the announcement on the formation of the Task Force to Combat Anti-Semitism <https://www.justice.gov/opa/pr/justice-department-announces-formation-task-force-combat-anti-semitism> and read the HHS, ED, and GSA joint press <https://www.gsa.gov/about-us/newsroom/news-releases/hhs-ed-and-gsa-announce-additional-measures-to-end-antisemitic-harassment-03032025> release from Monday, March 3rd.

###

Note: All HHS press releases, fact sheets and other news materials are available in our Press Room </press-room/index.html>.
Like HHS on Facebook, follow HHS on X @HHSgov <https://x.com/hhsgov>, @SecKennedy <https://x.com/seckennedy>, and sign up for HHS Email Updates <https://cloud.connect.hhs.gov/subscriptioncenter>.
Last revised: March 31, 2025

## Submit a request for comment

For media inquiries, please submit a request for comment.

## Sign up to receive our press releases

### Sign Up

<https://cloud.connect.hhs.gov/news-sign-up>

**JA145**

HHSHarv_00000008

# Related Press Releases

**Joint Task Force to Combat Anti-Semitism Statement on Additional Harvard Actions** </press-room/anti-semitism-task-force-statement-on-additional-harvard-grants.html>

MAY 13, 2025 | PRESS RELEASE

**ED, HHS, and GSA Initiate Review of Anti-Semitic Activity at the University of Washington**

</press-room/anti-semitism-task-force-statement-on-university-of-washington.html>

MAY 6, 2025 | PRESS RELEASE

**Administration for Community Living Grant Award and Funding Opportunity** </press-room/hhs-acl-grant-funding-older-americans-act.html>

MAY 5, 2025 | PRESS RELEASE

Content created by ASPA Press Office
Content last reviewed March 31, 2025

**JA146**

HHSHarv_00000009

An official website of the United States government



**U.S. Department of**
**Health and Human Services**
Enhancing the health and well-being of all Americans

Home </>     Press Room </press-room/index.html>     Joint Task Force Statement Regarding Harv…

**Navigate to:**

**FOR IMMEDIATE RELEASE**
**April 14, 2025**

**Contact: HHS Press Office**

202-690-6343
Submit a Request for
Comment

# Joint Task Force Statement Regarding Harvard University

Harvard's statement today reinforces the troubling entitlement mindset that is endemic in our nation's most prestigious universities and colleges – that federal investment does not come with the responsibility to uphold civil rights laws.

The disruption of learning that has plagued campuses in recent years is unacceptable. The harassment of Jewish students is intolerable. It is time for elite universities to take the problem seriously and commit to meaningful change if they wish to continue receiving taxpayer support.

The Joint Task Force to combat anti-Semitism is announcing a freeze on $2.2 billion in multi-year grants and $60M in multi-year contract value to Harvard University.

### 

**JA147**

HHSHarv_00000010

Note: All HHS press releases, fact sheets and other news materials are available in our Press Room </press-room/index.html>.

Like HHS on Facebook, follow HHS on X @HHSgov <https://x.com/hhsgov>, @SecKennedy <https://x.com/seckennedy>, and sign up for HHS Email Updates <https://cloud.connect.hhs.gov/subscriptioncenter>.

Last revised: April 14, 2025

## Submit a request for comment

For media inquiries, please submit a request for comment.

## Sign up to receive our press releases

### Sign Up

<https://cloud.connect.hhs.gov/news-sign-up>

# Related Press Releases

**HHS' Civil Rights Office Investigates Alleged Civil Rights Violations at a Prestigious Midwest University** </press-room/hhs-invest-alleg-discrim-jewish-students.html>

MAY 13, 2025 | PRESS RELEASE

**HHS, FDA Issue RFI on Deregulatory Plan to Lower Costs and Empower Providers** </press-room/fda-10-to-1-deregulatory-plan-to-lower-costs-empower-patients.html>

MAY 13, 2025 | PRESS RELEASE

**HHS Acts to Protect Health Care Workers' Conscience Rights** </press-room/hhs-protects-workers-conscience-rights.html>

MAY 12, 2025 | PRESS RELEASE

Content created by Assistant Secretary for Public Affairs (ASPA)
Content last reviewed April 14, 2025

**JA148**

HHSHarv_00000011


An official website of the United States government

**GSA** U.S. General Services Administration

**May 13, 2025**

# Joint Task Force to Combat Anti-Semitism Statement on Additional Harvard Actions







🔖 Glossary

**JA149**

GSAHarv_00000014

Today, the Task Force to Combat Anti-Semitism released the following statement:

Harvard University has repeatedly failed to confront the pervasive race discrimination and anti-Semitic harassment plaguing its campus. This is just the latest chapter in Harvard's long-standing policy and practice of discriminating on the basis of race as recognized by the Supreme Court in Students for Fair Admissions v. Harvard, where the Court rebuked Harvard for its unlawful race discrimination in admissions. That shameful legacy has continued on as recognized by Harvard's own Presidential Task Force on Combating Antisemitism and Anti-Israeli Bias, which lays bare an appalling reality: Jewish students were subjected to pervasive insults, physical assault, and intimidation, with no meaningful response from Harvard's leadership. Recent reporting has exposed the Harvard Law Review's (HLR) pattern of endemic race discrimination when evaluating articles for inclusion in its journal. Even more troubling, the HLR awarded a $65,000 fellowship–meant to "serve the public interest"—to a protester who faced criminal charges for assaulting a Jewish student on campus. The decision was reviewed and approved by a faculty committee, demonstrating just how radical Harvard has become.

Harvard's campus, once a symbol of academic prestige, has become a breeding ground for virtue signaling and discrimination. This is not leadership; it is cowardice. And it's not academic freedom; it's institutional disenfranchisement. There is a dark problem on Harvard's campus, and by prioritizing appeasement over accountability, institutional leaders have forfeited the school's claim to taxpayer support. As a result, eight federal agencies across the government are announcing the termination of approximately $450 million in grants to Harvard, which is in addition to the $2.2 billion that was terminated last week.

The Task Force fully supports the Trump Administration's multi-agency move to cut funding to Harvard, demonstrating the entire Administration's commitment to eradicating discrimination on Harvard's campus. As we have made clear time and again, this Task Force will not waver in its mission to root out discrimination, hate and bigotry at institutions entrusted with public funds. Harvard, and its leadership group who are tainted by the egregious infractions under its watch, faces a steep, uphill battle to reclaim its legacy as a lawful institution and center of academic excellence.

Josh Gruenbaum
Comm'r of the Fed. Acquisition Serv.
General Services Administration

Sean R. Keveney
Acting General Counsel
U.S. Dep't Health & Human Servs.

Thomas E. Wheeler
Acting General Counsel
U.S. Dept. of Education

**Contact**

[press@gsa.gov](mailto:press@gsa.gov)

Last updated: May 13, 2025

**JA150**

GSAHarv_00000015



# U.S. House of Representatives Staff Report on Antisemitism

## December 18, 2024

### *In coordination with the:*

Speaker of the House Mike Johnson
Majority Leader Steve Scalise
Majority Whip Tom Emmer
Republican Conference Chairwoman Elise Stefanik
Republican Conference Vice Chairman Blake Moore
Education and the Workforce Committee
Energy and Commerce Committee
Judiciary Committee
Oversight Committee
Veterans' Affairs Committee
Ways and Means Committee

      

**JA151**

HHSHarv_00000013

House Antisemitism Staff Report

# I.    Table of Contents

I.    Table of Contents ........................................................................................... 1

II.    Executive Summary ...................................................................................... 2

III.    The Committee on Education and the Workforce ................................. 4

   A.    Overview of the Investigation ................................................................ 4

   B.    Findings ...................................................................................................... 5

   C.    Recommendations ................................................................................... 15

IV.    The Committee on Energy and Commerce ........................................... 20

   A.    Overview of the Investigation .............................................................. 20

   B.    Recommendations ................................................................................... 28

V.    The Committee on the Judiciary .............................................................. 30

VI.    The Committee on Oversight and Accountability ............................... 32

VII.    The Committee on Veterans' Affairs ...................................................... 33

   A.    Overview of the Investigation .............................................................. 33

   B.    Recommendations ................................................................................... 35

VIII.    The Committee on Ways and Means ...................................................... 37

   A.    Overview of the Investigation .............................................................. 37

   B.    Findings .................................................................................................... 37

   C.    Recommendations ................................................................................... 40

IX.    Conclusion ................................................................................................... 42

**JA152**

HHSHarv_00000014

House Antisemitism Staff Report

## II.   Executive Summary

Since the horrific terrorist attack carried out by Hamas on October 7, 2023, the United States has witnessed an alarming surge in antisemitism. Across the nation, Jewish Americans have been harassed, assaulted, intimidated, and subjected to hostile environments—violations that stand in stark contrast to America's fundamental values, including a foundational commitment to religious freedom for all.

In response, on April 30, 2024, Speaker Mike Johnson announced a unified U.S. House of Representatives initiative to confront this crisis head-on. This effort, spanning multiple committees, reflects an unwavering dedication to combating antisemitism and ensuring the safety and dignity of Jewish Americans. The initiative has been spearheaded by the Committees on Education and the Workforce, Energy and Commerce, Judiciary, Oversight and Accountability, Veterans Affairs, and Ways and Means. Together, these committees have undertaken investigations into federal funding, federal departments and agencies, foreign student visa programs, and tax benefits granted to nonprofit organizations and universities, all to address the troubling rise of hate and extremism.

The Committees' findings are alarming. For instance, some of our most prominent American universities refused to crack down on antisemitism. In fact, many colleges handed down disparate disciplinary actions for Jewish students versus their antagonists—the students who engaged in antisemitic behavior, encampments, and intimidating tactics such as campus checkpoints and tax-exempt organizations that enabled and funded violent campus protests, among other troubling findings. The failure of our federal government departments and agencies is astounding. For example, HHS and its grant-making agencies have entirely avoided any accountability for institutions to which they award millions of dollars annually.

The recommendations contained in this report are a result of thoughtful investigations by each Committee. These recommendations should not be taken lightly. First and foremost, as a nation we must protect Jewish citizens and students. That may require colleges and universities to use their vast endowments to better protect and support students on campus. Universities must ensure equal treatment for equivalent infractions. Students must learn that actions have consequences—not that there is a different standard based on race or ethnicity. This report reveals the lack of oversight of institutions receiving significant sums of federal grant money and the recommendations urge that the U.S. Department of Health and Human Services (HHS), in particular, engage in more robust oversight. Likewise, the U.S. Department of Veterans Affairs has more work to do inside and outside their headquarters. This is not an exhaustive list—readers should refer to the subsections for more specifics.

As Speaker Johnson emphasized when he announced the House-wide initiative, "[n]early every committee here has a role to play in these efforts to stop the madness that has ensued." Highlights of the initiative include:

- **The Committee on Education and the Workforce**: Conducted oversight by holding hearings with students and university presidents and obtaining more than 400,000 pages

2

**JA153**

HHSHarv_00000015

## House Antisemitism Staff Report

of documents from postsecondary institutions through document requests and subpoenas to ensure accountability.

- **The Committee on Energy and Commerce**: Conducted oversight of the federal agencies responsible for disbursing taxpayer-funded research grants to institutions and several institutions themselves.

- **The Committee on the Judiciary**: Examined immigration policies and enforcement to address national security concerns, including foreign nationals with sympathies for Hamas entering the country.

- **The Committee on Oversight and Accountability**: Examined the actions of officials in the District of Columbia as it relates to their refusal to adequately address unlawful and antisemitic protests.

- **The Committee on Veterans Affairs**: Investigated antisemitic misconduct within the Department of Veterans Affairs and the inadequate internal investigation that followed such conduct. The Committee sent letters to the Department of Veterans Affairs and the Governors of California, New York, Illinois, Massachusetts, Michigan, and North Carolina asking them to investigate through the State Approving Agencies whether certain universities were adequately addressing the education needs of Jewish veteran students and were providing the quality of education required for participation in the GI Bill. These states and universities were chosen because they received a D or an F rating from the Anti-Defamation League's report card.

- **The Committee on Ways and Means**: Investigated tax-exempt organizations and antisemitism across the country to hold bad actors accountable and ensure that tax-exempt organizations, including universities, are not abusing our nation's tax code to support illegal activity or operate outside of tax-exempt purposes.

These robust, multi-faceted investigations have culminated in actionable findings and recommendations to safeguard Jewish Americans and uphold America's commitment to religious freedom and safety. House Republicans remain steadfast in their commitment to addressing this fateful moment with moral clarity and decisive action, ensuring that Jewish Americans can live safely and freely in the United States of America. In the 119th Congress, we look forward to continuing to shine a light wherever antisemitism rears its ugly head.

3

**JA154**

HHSHarv_00000016

House Antisemitism Staff Report

## III. The Committee on Education and the Workforce

### A. Overview of the Investigation

Over the past year, the House Committee on Education and the Workforce ("Committee"), led by Chairwoman Virginia Foxx, conducted an intensive investigation into antisemitism in postsecondary education. The Committee's investigation has been unprecedented in depth and scope, sending requests for documents and information to universities across the country and collecting nearly half a million pages of documents. For the first time in its 157-year history, the Committee issued subpoenas to universities for their failure to satisfy the Committee's demands. Chairwoman Foxx and the Committee held six hearings and a student roundtable on campus antisemitism. The Committee issued numerous reports and released documents that revealed extensive evidence of universities' apparent unwillingness to fulfill their legal obligations under Title VI of the *Civil Rights Act* ("Title VI") and their overwhelming failure to address the explosion of antisemitic conduct on their campuses.

**Relevant Federal Laws**

**Title VI:** Title VI prohibits recipients of federal funds ("recipients") from discriminating on the basis of race, color, or national origin.[1] Approximately 5,600 colleges and universities receive federal funds, including in the form of student aid under Title IV of the *Higher Education Act*, and therefore are subject to Title VI.[2] Since 2004, the Department of Education's Office for Civil Rights ("OCR") has repeatedly affirmed that discrimination against religious groups is prohibited by Title VI when it is based on an individual's actual or perceived shared ancestry or ethnic characteristics, or on an individual's citizenship or residency in a country with a dominant religion or distinct religious identity.[3]

Recipients may be found in violation of Title VI under disparate treatment claims (when a recipient treats students differently based on race, color, or national origin) and under hostile environment claims.[4] The Department of Education's OCR defines a hostile environment as "unwelcome conduct based on race, color, or national origin that, based on the totality of circumstances, is subjectively and objectively offensive and is so severe or pervasive that it

---

[1] Civil Rights Act of 1964 § 601.
[2] *Number of postsecondary institutions in the United States that award federal student aid*, NATIONAL CENTER FOR EDUCATION STATISTICS, https://nces.ed.gov/ipeds/TrendGenerator/app/answer/1/1.
[3] U.S. DEP'T OF ED. OFF. OF C.R., KNOW YOUR RIGHTS: TITLE VI AND RELIGION (2017), https://www2.ed.gov/about/offices/list/ocr/docs/know-rights-201701-religious-disc.pdf; U.S. DEP'T OF ED. OFF. OF C.R., FACT SHEET: PROTECTING STUDENTS FROM DISCRIMINATION BASED ON SHARED ANCESTRY OR ETHNIC CHARACTERISTICS (2023), https://www2.ed.gov/about/offices/list/ocr/docs/ocr-factsheet-shared-ancestry-202301.pdf.
[4] ABIGAIL A. GRABER, CONG. RSCH. SERV., LSB11129, RELIGIOUS DISCRIMINATION AT SCHOOL: APPLICATION OF TITLE VI OF THE CIVIL RIGHTS ACT OF 1964 (2024).

4

**JA155**

HHSHarv_00000017

## House Antisemitism Staff Report

limits or denies a person's ability to participate in or benefit from a school's education program or activity."[5]

Notably, the commission of a discriminatory act on a recipient's campus does not by itself amount to a Title VI violation. A Title VI violation occurs when a recipient has allowed, permitted, or created a hostile environment that targets someone based on race, color, or national origin.[6] Whether any particular incident amounts to a Title VI violation depends on the specific facts of the incident and any related incidents on campus and the university's response.[7]

**The Clery Act**: The *Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act* ("Clery Act") requires all institutions that receive Title IV funding to establish and publish various campus security policies, submit an annual crime report of campus crime statistics, and publish accurate and prompt reporting of all crimes to the campus police and appropriate law enforcement agencies.[8] The Clery Act provides for additional reporting when victims of certain crimes are selected on the basis of certain characteristics – including religion, national origin, and ethnicity.[9] This means that institutions must count crimes such as assault, intimidation, or vandalism when the victim is intentionally selected because of his or her perceived religion or national origin, such as when Jewish students are targeted.

## B. Findings

### (1) Universities Failed to Stop Antisemitism on Their Campuses, Likely Violating Title VI

The Committee found that numerous universities failed to stop antisemitism on their campuses, likely violating Title VI. Specifically, Columbia University explicitly acknowledged that its campus became a hostile environment in violation of Title VI. In addition, evidence suggests Title VI violations at other universities including the University of California, Los Angeles ("UCLA"), and Harvard.

- **Columbia University:** Columbia stands out for its egregious failure to combat antisemitism on its campus, despite its president acknowledging that the University was in violation of its Title VI obligations. On April 29, 2024, Columbia's then-President Minouche Shafik publicly stated that an encampment established on April 17, and related incidents "create[ed] a hostile environment in violation of Title VI, especially around our gates, that is unsafe for everyone."[10] This statement came after an April 21, Committee letter to the University

---

[5] Catherine E. Lhamon, *Dear Colleague Letter: Protecting Students from Discrimination, such as Harassment, Based on Race, Color, or National Origin, Including Shared Ancestry or Ethnic Characteristics*, U.S. DEP'T OF ED., (May 7, 2024), https://www.ed.gov/sites/ed/files/about/offices/list/ocr/letters/colleague-202405-shared-ancestry.pdf.
[6] U.S. DEP'T OF ED. OFF. OF C.R., DEAR COLLEAGUE LETTER: PROTECTING STUDENTS FROM DISCRIMINATION, SUCH AS HARASSMENT, BASED ON RACE, COLOR, OR NATIONAL ORIGIN, INCLUDING SHARED ANCESTRY OR ETHNIC CHARACTERISTICS (2024), https://www.ed.gov/sites/ed/files/about/offices/list/ocr/letters/colleague-202405-shared-ancestry.pdfhttps://www2.ed.gov/about/offices/list/ocr/docs/ocr-factsheet-shared-ancestry-202301.pdf.
[7] *Id.*
[8] Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act, 20 U.S.C. § 1092(f) (2024).
[9] Clery Act § 1092(f)(1)(F)(ii).
[10] Statement from Columbia Univ. President Minouche Shafik, Columbia Univ. (Apr. 29, 2024), https://president.columbia.edu/news/statement-columbia-university-president-minouche-shafik-4-29.

HHSHarv_00000018

## House Antisemitism Staff Report

documenting numerous disturbing incidents at and around the encampment, and warning that Columbia was in "major breach" of its Title VI obligations.[11] Yet, Columbia's leadership failed to restore order to the campus until May 1, after a group of students and others criminally took over a campus building, Hamilton Hall.[12]

- These were not isolated incidents. Rather, they were part of an extensive pattern of Columbia's failures to enforce University rules to address antisemitic conduct. In a disturbing August 2024 report, Columbia's presidentially appointed Task Force on Antisemitism detailed an atmosphere of pervasive civil rights violations at the University.[13] The Task Force wrote,"[Jewish students] consider the University bound by duty and by law to ensure students are able to learn and live in a neutral environment in which discrimination is not tolerated, without fear for their safety" but "[w]hat we heard makes clear that hundreds of Jewish and Israeli students did not have this experience at Columbia University in the academic year 2023-2024."[14] The Task Force found Israeli students were frequently targeted on the basis of their national origin in violation of federal antidiscrimination law, explaining that "hatred toward Israelis has reached alarming levels on campus" and that "Israeli students found the pervasive hostility made it difficult to access necessary services, such as healthcare."[15] The Task Force also found "[v]isibly observant [Jewish] students, like ones who wear traditional head coverings, have been frequently met with extreme hostility."[16]

- **UCLA:** UCLA allowed the creation of a hostile environment for Jewish students that appears to have violated Title VI.[17] UCLA administrators failed to heed recommendations by university police to identify outside agitators and remove nonstudents from the encampment, even as it fortified and expanded to include antisemitic checkpoints that denied Jewish

---

[11] Letter from Virginia Foxx, Chairwoman, H. Comm. on Ed. & the Workforce, to Columbia Univ. (Apr. 21, 2024), https://edworkforce.house.gov/uploadedfiles/4-21-24_columbia_april_letter.pdf.

[12] Kenneth Granger, et. al, *Violent pro-terror rioters shouting 'Intifada!' smash their way into Columbia University academic building in latest campus chaos*, NY POST (Apr. 30, 2024), https://nypost.com/2024/04/30/us-news/columbia-university-protesters-take-over-hamilton-hall/.

[13] Task Force on Antisemitism, *Columbia University Student Experiences of Antisemitism and Recommendations For Promoting Shared Values And Inclusion* (Aug. 2024), https://president.columbia.edu/sites/default/files/content/Announcements/Report-2-Task-Force-on-Antisemitism.pdf.

[14] *Id.* at 36-37.

[15] Task Force on Antisemitism, *Columbia University Student Experiences of Antisemitism and Recommendations For Promoting Shared Values And Inclusion*, 28-29 (Aug. 2024), https://president.columbia.edu/sites/default/files/content/Announcements/Report-2-Task-Force-on-Antisemitism.pdf.

[16] Task Force on Antisemitism, *Columbia University Student Experiences of Antisemitism and Recommendations For Promoting Shared Values And Inclusion*, 13 (Aug. 2024), https://president.columbia.edu/sites/default/files/content/Announcements/Report-2-Task-Force-on-Antisemitism.pdf.

[17] Though the Committee views the evidence as substantiating a Title VI violation, neither OCR nor a court, both of which have authority to find a violation has occurred, have yet done so.

**JA157**

HHSHarv_00000019

# House Antisemitism Staff Report

students access to central parts of campus.[18] Only after an outbreak of mob violence did the University take the overdue step of clearing the encampment.[19]

The U.S. District Court for the Central District of California found[20] that "Jewish students were excluded from portions of the UCLA campus because they refused to denounce their faith" and issued a preliminary injunction ordering the school to ensure Jewish students have access to the same resources as other students.[21]

- **Harvard University:** Harvard drew national attention for pervasive antisemitic misconduct, including the assault of an Israeli student, classroom disruptions, and a building occupation, but its leaders ignored their own advisors' recommendations to address the problem.[22] In the aftermath of the post-October 7th explosion of antisemitic hate, then-President Claudine Gay formed an Antisemitism Advisory Group ("AAG") to help "develop a robust strategy for confronting antisemitism on campus."[23] It found antisemitism to be a major problem at Harvard, noting significant harassment of Jewish students and pervasive ostracization of Israeli students.[24] AAG members became frustrated by Harvard's leaders' inaction, prompting five of its eight members to threaten to resign.[25]

  In December 2023, the AAG presented Harvard's leaders with a set of significant recommendations to combat antisemitism at the University including enforcing "zero tolerance" for classroom disruptions; countering antisemitic speech; reviewing the academic rigor of classes and programs with antisemitic content; and reviewing Harvard's Office for

---

[18] UCLA Police Message Thread (Apr. 25, 2024, 4:25 AM) (on file with Comm.); Email from UCLA Bruin Alert (Apr. 26, 2024, 12:26 PM) (on file with Comm.); Katherine Mangan, *Federal Judge Blasts UCLA for Allowing Encampment Protesters to Block Jewish Students*, THE CHRONICLE OF HIGHER ED. (Aug. 14, 2024) https://www.chronicle.com/article/federal-judge-blasts-ucla-for-allowing-encampment-protesters-to-block-jewish-students.

[19] UCPD Leadership Text Messages (May 1, 2024) (on file with Comm.); Letter from Assemb. Rick Chavez Zbur to Hon. Catherine E. Lhamon, Asst. Sec. U.S. Dept. of Ed. (Apr. 30, 2024), https://a51.asmdc.org/press-releases/20240430-assemblymember-zbur-requests-investigation-potential-violations-title-vi.

[20] The court's grant of a preliminary injunction was based on the undisputed facts underlying the plaintiffs' free exercise claims and did not adjudicate the Title VI or other claims asserted by the plaintiffs.

[21] Order for Preliminary Injunction, *Frankel v. Regents*, No. 2:24-cv-04702-MCS-PD (C.D. Cal., Aug. 13, 2024). The order states at 15, "Defendants are prohibited from knowingly allowing or facilitating the exclusion of Jewish students from ordinarily available portions of UCLA's programs, activities, and campus areas, whether as a result of a de-escalation strategy or otherwise."

[22] H. Comm. on Education and the Workforce, Investigative Update: *The Antisemitism Advisory Group and Harvard's Response: Clarity and Inaction* (May 15, 2024), https://edworkforce.house.gov/uploadedfiles/5.15.24_harvard_committee_report_final.pdf.

[23] Claudine Gay, Combating Antisemitism, Harvard Univ. (Nov. 9, 2023), https://www.harvard.edu/president/news-gay/2023/combating-antisemitism/; The group's members included former Harvard Law School Dean Martha Minow, visiting scholar Rabbi David Wolpe, writer and Harvard alumna Dara Horn, Government professor Eric Nelson, Divinity School professor Kevin Madigan, Harvard Board of Overseers member Geraldine Acuña-Sunshine, Harvard College Dean of Students Thomas Dunne, and a Jewish undergraduate.

[24] Investigative Update, *supra* note 21.

[25] Dara Horn, Transcribed Interview before the H. Comm. on Ed. & the Workforce, 38-39 (Mar. 18, 2024) (on file with Comm.); Letter from Antisemitism Advisory Grp. members to Claudine Gay, President, Harv. Univ. (Nov. 5, 2023) (on file with Comm.), at 1.

**JA158**

HHSHarv_00000020

Equity, Diversity, Inclusion, and Belonging's inadequacy in addressing antisemitism.[26] Harvard's leaders, however, failed to implement these and disbanded the AAG at the end of the fall 2023 semester,[27] and replaced it with a new Antisemitism Task Force in January 2024.[28] Rather than implement the AAG's recommendations, the Task Force took months to release a weaker, less detailed set of preliminary recommendations in June 2024, which drew criticism from Harvard's Jewish community.[29]

**(2) Students who established unlawful antisemitic encampments—which violated university polices and created unsafe, hostile environments—were granted shocking concessions.**

In the spring of 2024, there was a wave of unlawful antisemitic encampments established on campuses throughout the country. These encampments frequently generated substantial harassment – and in some cases physical assaults – of Jewish students, created hostile environments, and disrupted campus operations. In a dereliction of their responsibilities, many school officials failed to clear these encampments in a timely manner, often negotiating with encampment participants, and in some cases appeasing them with appalling concessions. Two of the most notable cases are Northwestern, the first school to capitulate to its encampment; and Columbia, the first school where an encampment was established, and where the University's fecklessness led to the criminal takeover of a campus building. In both cases, the universities' shocking efforts to appease students went farther than the public was led to believe.

- **Northwestern University:** Northwestern reached a shameful agreement appeasing its encampment after President Michael Schill chose radical anti-Israel faculty members Jessica Winegar and Nour Kteily to negotiate on the school's behalf with the antisemitic encampment.[30] The negotiators abused their positions to support encampment organizers, with Kteily writing that he aimed to "get some amazing wins" for them.[31] Northwestern's Provost Kathleen Hagerty endorsed this approach, affirming Kteily after he advised students on how to pressure trustees on advancing divestment.[32] Hagerty also supported Kteily's recommendation that Northwestern boycott Sabra hummus due to it being perceived as an

---

[26] Antisemitism Advisory Grp., *Potential Statement of Goals and Steps to Address Antisemitism Issues* (Dec. 18, 2023) (on file with Comm.).

[27] Andrew Bernard, *Harvard propped up Jew-hatred advisory group 'for show,' House committee report concludes*, JEWISH NEWS SYNDICATE (May 16, 2024), https://www.jns.org/harvard-propped-up-jew-hatred-advisory-group-for-show-house-committee-report-concludes/.

[28] Harvard was heavily criticized for selecting historian Derek Penslar to co-chair the Task Force which replaced the AAG, considering Penslar calling reports of antisemitism at Harvard "exaggerated" and signing a letter calling Israel a "regime of apartheid." *See* Jon Levine, *Chair of Harvard's new antisemitism task force accused of antisemitism*, NEW YORK POST (Jan. 20, 2024), https://nypost.com/2024/01/20/news/chair-of-harvards-new-task-force-accused-of-antisemitism/.

[29] Haley Cohen, *Harvard Jewish leaders, alumni disappointed by antisemitism task force recommendations*, JEWISH INSIDER (Jun. 27, 2024), https://jewishinsider.com/2024/06/harvard-task-force-antisemitism-jewish-leaders-alumni/

[30] STAFF OF H. COMM. ON ED. & THE WORKFORCE, 118TH CONG., ANTISEMITISM ON COLLEGE CAMPUSES EXPOSED 9-18 (Comm. Print 2024).

[31] Text Message from Nour Kteily, Professor of Mgmt. and Org., Nw. Univ. Kellog Sch. Of. Mgmt., to Wendy Pearlman, Professor of Pol. Sci., Nw. Univ. Weinberg Coll. Arts & Sci. (Apr. 26, 2024, 7:45 PM) (on file with Comm.).

[32] Text Message from Kathleen Hagerty, Provost, Nw. Univ., to Nour Kteily, Professor of Mgmt. and Org., Nw. Univ. Kellog Sch. Of Mgmt. (Apr. 26, 2024, 12:49 AM UTC-5) (on file with Comm.).

8

**JA159**

House Antisemitism Staff Report

Israeli product.[33] The final agreement contains an apparent mechanism for implementing such a boycott through a provision for students to provide input on dining services and vendors.

President Schill also appears to have misled Congress in his testimony before the Committee regarding whether the University entertained encampment organizers' demands to hire an anti-Zionist rabbi. Specifically, President Schill categorically denied that he would ever hire someone on such a basis, but documents produced to the Committee reveal President Schill actively entertained the request while expressing sensitivity to the optics of his actions.[34] Further, language in the final agreement contains a mechanism for facilitating such a hire,[35] and encampment organizers stated they would "be able to pick a new rabbi" as a result of the agreement.[36] At best, President Schill's testimony lacked candor and is unbecoming of a university president; at worst Schill's testimony was false and met the criteria of a federal crime.

- **Columbia University:** Despite Columbia offering more significant concessions than it publicly acknowledged, efforts to appease encampment organizers did not result in an agreement.[37] Columbia offered to have the University body responsible for considering divestment requests and making recommendations to the Board of Trustees review proposals to divest from companies with criteria that would open the door for anti-Israel activists to pursue spurious claims against companies with ties to Israel or that are involved in defense manufacturing. Columbia also offered amnesty for some encampment members, to create a University fund to invest in projects in Gaza and the West Bank and to provide scholarships for students with ties to Gaza and the West Bank.[38] Even after negotiations broke down,

---

[33] Text Message from Nour Kteily, Professor of Mgmt. and Org., Nw. U. Kellog Sch. Of Mgmt., to Kathleen Hagerty, Provost, Nw. U (Apr. 27, 2024, 3:18 AM) (on file with Comm.); Sabra is a U.S.-based company jointly owned by PepsiCo and the Israeli company Strauss Group.

[34] Text Messages from Michael H. Schill, President, Nw. Univ., to Susan Davis, Vice President of Student Aff., Nw. Univ. (Apr. 27, 2024) (on file with Comm.); Memorandum on Northwestern University's Three Ideals (Apr. 28, 2024) (on file with Comm.)

[35] Agreement on Deering Meadow, Northwestern Univ. (Apr. 29, 2024), https://www northwestern.edu/leadership-notes/2024/agreement-on-deering-meadow.pdf (The final language states: "The University will engage students in a process dedicated to ensuring additional support for Jewish and Muslim students within Student Affairs/Religious & Spiritual Life.").

[36] Live: Pro-Palestinian demonstrators continue to push for divestment on Deering Meadow following agreement, THE DAILY N.W. (Apr. 25, 2024), https://dailynorthwestern.com/2024/04/25/campus/live-pro-palestinian-student-activists-set-up-encampment-on-deering-meadow/.

[37] In her April 29 public statement on the negotiations' failure, then-President Shafik offered a sanitized and incomplete description of the University's offers. For example, Shafik omitted that the University had proposed specific forms of divestment for consideration by ACSRI, offered amnesty for conduct violators, and offered scholarships for students with ties to Gaza and the West Bank. *See* Statement from Columbia Univ, President Minouche Shafik, Columbia Univ. (Apr. 29, 2024), https://president.columbia.edu/news/statement-columbia-university-president-minouche-shafik-4-29.

[38] Student Demands and Possible Columbia Univ. Responses (Apr. 22, 2024) (on file with Comm.).

9

**JA160**

## House Antisemitism Staff Report

Columbia continued to appease the radical encampment when then-President Shafik promised to "explore pursuing" the encampment's demands.[39]

This mentality appears to be shared by Columbia's current leadership. In September 2024, Columbia's Interim President Katrina Armstrong shamefully apologized to students arrested for the takeover of Hamilton Hall and for participating in the encampment.[40]

**(3) So-Called University Leaders Intentionally Declined to Support Jewish Communities on Campus**

The Committee found that so-called university leaders deliberately chose to withhold support from Jewish communities on campus, demonstrating a refusal to address the hostile environments at their institutions. On many campuses numerous antisemitic students, faculty, and staff openly supported Hamas' terrorism and engaged in harassment and intimidation of Jewish communities.[41] Jewish students, faculty, and staff often felt abandoned by administrators' passive and muted responses to the explosion of antisemitic hate on campus. The Committee's investigation found that these failures to act were not mere oversights but intentional decisions.

- **Harvard Administrators Deliberately Chose Not to Condemn Hamas in Their Widely Criticized October 9th Statement**: Harvard was widely criticized when its October 9th statement on the October 7th attack failed to condemn Hamas.[42] The statement was issued by then-President Gay, current President (then-Provost) Alan Garber, and the deans of Harvard's various schools. The Committee's investigation revealed that this group of Harvard's top administrators made deliberate decisions to remove draft language that denounced Hamas' terrorism, acknowledged the impact of the taking of hostages upon the Harvard community, and called Hamas' attack "violent," while insisting on including

---

[39] Statement from Columbia Univ, President Minouche Shafik, Columbia Univ. (Apr. 29, 2024), https://president.columbia.edu/news/statement-columbia-university-president-minouche-shafik-4-29.

[40] Esha Karam, Shea Vance, & Sarah Huddleston, *'I'm really sorry': Armstrong apologizes to those 'hurt' by NYPD sweeps*, COLUMBIA SPECTATOR (Sept. 19, 2024), https://www.columbiaspectator.com/news/2024/09/19/im-really-sorry-armstrong-apologizes-to-those-hurt-by-nypd-sweeps/.

[41] *See*: J. Sellers Hill, *Harvard Student Groups Face Intense Backlash for Statement Calling Israel 'Entirely Responsible' for Hamas Attack*, HARVARD CRIMSON (Oct. 10, 2023), https://www.thecrimson.com/article/2023/10/10/psc-statement-backlash; Haley Cohen, *Columbia University, Barnard College silent after faculty letter calls Hamas terrorist attack a legitimate 'military action'*, JEWISH INSIDER (Oct. 31, 2023), https://jewishinsider.com/2023/10/colombia-university-barnard-college-faculty-letter-hamas-terror-attack-israel; Emily Scolnick, *Pro-Palestinian student activists denounce Penn, call Oct. 7 Hamas attacks 'a necessary step'*, Daily Pennsylvanian (Oct. 16, 2024), https://www.thedp.com/article/2024/10/penn-philadelphia-students-for-justice-in-palestine-statement; Sharon Otterman, *Pro-Palestinian Group at Columbia Now Backs 'Armed Resistance' by Hamas*, NY TIMES (OCT. 9, 2024), https://www.nytimes.com/2024/10/09/nyregion/columbia-pro-palestinian-group-hamas.html.

[42] Miles J. Herszenhorn, *Harvard Affiliates, Politicians Slam University Leaders Over Late, 'Word Salad' Statement on War in Israel*, HARVARD CRIMSON (Oct. 10, 2023), https://www.thecrimson.com/article/2023/10/10/harvard-statement-criticized.

10

**JA161**

House Antisemitism Staff Report

language expressing equivalence between Hamas' attack and the limited Israeli military operations in Gaza that had taken place at the time.[43]

- **Harvard's Then-President Gay and Then-Provost Garber Asked Harvard Corporation Senior Fellow Penny Pritzker Not to Call the Slogan "From The River To The Sea" Antisemitic:** The eliminationist antisemitic slogan, "From the River to the Sea," which calls for Israel to be wiped off the map and replaced with a Palestinian state, has been a hallmark of antisemitic activism at Harvard and other schools. Gay and Garber both objected to Harvard Corporation Senior Fellow Penny Pritzker calling the phrase antisemitic hate speech.[44] Gay asked Pritzker not to characterize the slogan as such, because Gay was concerned doing so would raise the question of whether Harvard would take disciplinary action.[45] Notably, Gay did not cite free speech principles as a reason for not taking disciplinary action as she had asserted in other venues, but rather, "contestation about what constitutes antisemitic speech."[46] Gay's response to Pritzker thus appears to substantiate criticisms that Harvard has treated antisemitic chants differently than other forms of hate.

- **Columbia University Failed to Correct False Narratives of a "Chemical Attack" Used to Vilify Jewish Students but Imposed Disproportionate Discipline on Jewish Students Involved:** Columbia University administrators allowed a false narrative that Jewish students had perpetrated a "chemical attack" at an anti-Israel rally to persist for months despite knowing it was false and that the students involved had merely sprayed novelty "fart sprays."[47] In an apparent case of disparate treatment, the Jewish students responsible were given excessive year-and-a-half long suspensions, substantially longer than any suspension for antisemitic conduct violations.[48] Columbia failed to correct the record despite requests from the Jewish community, even as anti-Israel students used the false narrative of a "chemical attack" purportedly involving military-grade "skunk spray" to demonize Jewish students and call for excluding Israelis.[49] Columbia finally acknowledged that the incident was not a "chemical attack" in August 2024, pursuant to a settlement with one of the Jewish

---

[43] E-mail from Claudine Gay, President, Harvard Univ. to Penny Pritzker, Senior Fellow, Harvard Corp. (Oct. 22, 2023, 11:24 AM) (on file with Comm.); E-mail from Claudine Gay, President, Harvard Univ. to Penny Pritzker, Senior Fellow, Harvard Corp. (Oct. 22, 2023, 10:46 PM) (on file with Comm.).

[44] E-mail from Penny Pritzker, Senior Fellow, Harvard Corp., to Claudine Gay, President, Harvard Univ. (Oct. 22, 2023, 8:59 AM) (on file with Comm.).

[45] E-mail from Claudine Gay, President, Harvard Univ. to Penny Pritzker, Senior Fellow, Harvard Corp. (Oct. 22, 2023, 10:46 PM) (on file with Comm.).

[46] E-mail from Claudine Gay, President, Harvard Univ. to Penny Pritzker, Senior Fellow, Harvard Corp. (Oct. 22, 2023, 10:46 PM) (on file with Comm.).

[47] STAFF OF H. COMM. ON ED. & THE WORKFORCE, 118TH CONG., ANTISEMITISM ON COLLEGE CAMPUSES EXPOSED 48-56 (Comm. Print 2024); Disciplinary Record, Columbia Univ. (Feb. 23, 2024) (on file with Comm.).

[48] Columbia failed to impose meaningful discipline for numerous serious antisemitic conduct offenses. *See* ANTISEMITISM ON COLLEGE CAMPUSES EXPOSED at 59-64; Confidential Settlement Agreement (Aug. 29, 2024) (on file with Comm.)

[49] ANTISEMITISM ON COLLEGE CAMPUSES EXPOSED at 48-56; Aneeta Bhole, *Antisemitic poster of skunk with Star of David plastered across Columbia University: 'Villainizes Jewish and Israeli students'*, NEW YORK POST (Feb. 6, 2024), https://nypost.com/2024/02/06/metro/antisemitic-skunk-poster-plastered-across-columbia/.

11

**JA162**

HHSHarv_00000024

House Antisemitism Staff Report

students excessively disciplined, which also awarded the student $395,000 and modified the suspension to conditional disciplinary probation.[50]

**(4) Universities Failed to Enforce Their Rules and Impose Meaningful Discipline for Antisemitic Behavior, and in Some Cases, Radical Faculty Thwarted Meaningful Discipline.**

Universities have often asserted that their FERPA obligations prevent sharing information about their responses to disciplinary cases, but that they would address antisemitic incidents seriously.[51] In fact, the Committee's review of disciplinary information, produced by 11 universities, reveals that the schools utterly failed to enforce their rules and impose discipline in response to antisemitic conduct violations, encouraging future transgressions. In some cases, radical faculty thwarted meaningful discipline. A sample of relevant statistics and cases are presented below:

- **Columbia University**: Columbia said the 22 students arrested for the criminal takeover of Hamilton Hall would face expulsion.[52] Instead, the University lifted the students' interim suspensions after pushback from radical faculty, allowing 7 to graduate, restoring 11 to good standing, and leaving 3 with preexisting sanctions suspended and 1 on probation.[53] Despite dozens of students being arrested for conduct related to Hamilton Hall and the encampment, or having faced discipline for other egregious antisemitic incidents; Columbia failed to expel students and issued final suspensions to only four students.[54]

  Members of Columbia's University Senate, led by Executive Committee Chair Jeanine D'Armiento, thwarted discipline by intimidating Columbia's weak leaders into allowing the Hamilton Hall perpetrators to avoid real discipline.[55] Columbia dropped the arrested students' interim suspensions, transferring their cases from an administrator-driven disciplinary process to a feeble Rules of University Conduct process under the control of the

---

[50] Confidential Settlement Agreement (Aug. 29, 2024). (on file with Comm.).

[51] For example, in the Committee's December 5, 2023, hearing, then-Harvard President Claudine Gay cited FERPA obligations in refusing to answer questions on Harvard's disciplinary response to antisemitic incidents, but testified, "I can assure you we have robust student disciplinary processes" and that, "students have been held to account for any episode in which they violated our behavior based policies." *See*: *Holding Campus Leaders Accountable and Confronting Antisemitism Before the H. Comm. on Ed. & the Workforce*, 118th Cong. 56 (2023), https://www.congress.gov/118/chrg/CHRG-118hhrg56239/CHRG-118hhrg56239.pdf.

[52] Press Release, Columbia Univ. Off. of Pub. Affs., Columbia Updates (Apr. 30, 2024, 5:40 PM), https://communications.news.columbia.edu/news/campus-updates.

[53] *2024.08.14 - Appendix A to Columbia Letter (revised)*, Columbia Univ. (Aug. 14, 2024) (on file with Comm.); Letter from Counsel, Columbia Univ., to Virginia Foxx, Chairwoman, H. Comm. on Ed. & the Workforce (Oct 11, 2024) (on file with the Comm.).

[54] Letter from Counsel, Columbia Univ., to Virginia Foxx, Chairwoman, H. Comm. on Ed. & the Workforce (Oct 15, 2024) (on file with the Comm.).

[55] ANTISEMITISM ON COLLEGE CAMPUSES EXPOSED at 88-106; *Discipline*, Stand Columbia Society (Oct. 23, 2024), https://standcolumbia.org/discipline/.

12

**JA163**

University Senate, which allowed nearly all arrested students to graduate or return to campus.[56]

- **University of Pennsylvania ("Penn")**: Despite multiple serious antisemitic incidents, including building occupations, a riot at the Interim President's house, an unlawful encampment that resulted in the arrest of nine students, and theft of an Israeli flag from a Jewish student's house by a student who later burned it at a rally where she gave a viral pro-Hamas rant, Penn imposed little discipline.[57] Only three students at Penn were suspended for a single semester and 14 students received semester-long disciplinary probations.[58]

- **UCLA**: Ninety-two of the 96 students arrested at the UCLA encampment signed resolution agreements allowing them to escape disciplinary consequences.[59] None were disciplined for the antisemitic checkpoints that violated Jewish students' civil rights by restricting them from central parts of campus.[60]

- **Harvard University**: Harvard failed to suspend any students for conduct violations related to numerous antisemitic incidents including an unlawful encampment, the occupation of a campus building, and repeated disruptions of classes with bullhorns.[61] Harvard College's disciplinary board downgraded many sanctions. This included diluting five suspensions of over a year, probations lasting no longer than a semester, and lowering the probations of 35 students to shorter periods.[62] Harvard Corporation Senior Fellow Penny Pritzker acknowledged that the disciplinary boards' unwillingness to impose sanctions was a real problem and said that the Corporation found the situation "unacceptable."[63]

- **Rutgers University**: Despite constant antisemitic acts of disruption and harassment, including encampments on multiple campuses and the disruption of a town hall that forced Rutgers' president to flee with a police escort, Rutgers suspended only three students and placed four on probation.[64] None of the students faced consequences for their involvement in the Rutgers encampments. As part of a pattern of disparate treatment, however, Rutgers took

---

[56] *Id.*
[57] ANTISEMITISM ON COLLEGE CAMPUSES EXPOSED at 64-67.
[58] Disciplinary Chart (amended), Univ. of Penn. (Oct. 14, 2024) (on file with Comm.)
[59] Disciplinary Chart, Univ. of Cal. Los Angeles (Oct. 8, 2024) (on file with Comm.).
[60] Disciplinary Chart, Univ. of Cal. Los Angeles (Oct. 8, 2024) (on file with Comm.).
[61] Harvard University Disciplinary Chart, H. Comm. on Ed. and the Workforce (Sept. 26, 2024), https://edworkforce.house.gov/uploadedfiles/harvard_disciplinary_charts_clean_mb_redacted_redacted.pdf.
[62] H. Comm. on Education and the Workforce, *Harvard University Failed to Discipline Antisemitic Conduct Violations* (Sept. 23, 2024), https://edworkforce.house.gov/uploadedfiles/9.23.2024_harvard_disciplinary_final.pdf; Harvard University Disciplinary Chart, H. Comm. on Ed. and the Workforce (Sept. 26, 2024), https://edworkforce.house.gov/uploadedfiles/harvard_disciplinary_charts_clean_mb_redacted_redacted.pdf;
[63] Penny Pritzker, Transcribed Interview before the H. Comm. on Ed. & the Workforce, 73 (Aug. 29, 2024) (on file with Comm.).
[64] Disciplinary chart (amended), Rutgers Univ. (Sept. 20, 2024) (on file with Comm.).

**JA164**

HHSHarv_00000026

## House Antisemitism Staff Report

harsh disciplinary actions against Jewish students for speaking out about antisemitism they experienced.[65]

- **University of California, Berkeley ("UC Berkeley")**: Despite an unlawful encampment, student riots, building occupations, and the obstruction of a major gate to the center of campus, UC Berkeley issued no suspensions and placed only one student on probation.[66]

- **Northwestern University**: Despite numerous antisemitic incidents, Northwestern placed only seven students on disciplinary probation and issued a warning to one student. Not a single Northwestern student faced disciplinary sanctions for the unlawful encampment, despite multiple incidents in which Jewish students experienced grotesque harassment.[67]

- **Massachusetts Institute of Technology ("MIT")**: MIT failed to suspend a single student for antisemitic conduct violations despite an encampment that required police intervention and arrests to clear, and numerous other significant antisemitic conduct incidents.[68] Notably, MIT failed to suspend any of the 27 students who were referred for discipline for the MIT encampment.[69]

- **Barnard College**: Barnard, a Columbia affiliate, overwhelmingly failed to discipline the numerous Barnard students who participated in the Columbia encampment. Fifty of 55 students initially placed on interim suspension for participating in the encampment had their suspensions lifted through "alternative resolution" agreements letting them off with short probations.[70] Four who did not sign the agreements still had their suspensions lifted[71]

- **Yale University**: Since October 7, 2023, Yale has not suspended a single student, and only placed two students on probation despite many antisemitic conduct incidents.[72] Notably, no students were disciplined for establishing antisemitic checkpoints blocking Jewish students from parts of campus.[73]

- **George Washington University ("GWU")**: Of the 22 students who faced disciplinary proceedings for the antisemitic GWU encampment, where mock trials called for the GWU president and other officials to be beheaded and hanged for not divesting from Israel, only

---

[65] ANTISEMITISM ON COLLEGE CAMPUSES EXPOSED at 72.

[66] Berkeley Disciplinary Chart (amended), Univ. of Cal. Berkeley. (Oct. 8, 2024) (on file with Comm.)

[67] Northwestern Disciplinary Chart (amended), Nw. Univ. (Oct. 14, 2024) (on file with Comm.).

[68] MIT Disciplinary Chart (amended), Mass. Inst. of Tech. (Oct. 22, 2024) (on file with Comm.).

[69] Id.

[70] Letter from Counsel, Barnard Coll., to Virginia Foxx, Chairwoman H. Comm. on Ed. and Workforce (Oct. 14, 2024) (on file with Comm.); Barnard College Disciplinary chart (amended), Barnard Coll. (Oct. 14, 2024) (on file with Comm.).

[71] Id.

[72] E-mail from Counsel, Yale Univ., to Comm. (Oct. 17, 2024, 8:22 PM) (on file with Comm.); E-mail from Counsel, Yale Univ., to Comm. (Oct. 14, 2024, 4:09 PM) (on file with Comm.); E-mail from Counsel, Yale Univ., to Comm. (June 19, 2024, 1:13 PM) (on file with Comm.).

[73] Id.

14

**JA165**

HHSHarv_00000027

one student was suspended. Despite numerous antisemitic conduct violations, GWU has suspended only one student and placed 16 on varying lengths of probation.[74]

**(5) So-Called University Leaders Expressed Hostility to Congressional Oversight and Treated Campus Antisemitism as a Public Relations Issue, Not a Serious Problem Demanding Action.**

So-called university leaders expressed hostility and contempt toward congressional oversight of campus antisemitism and public criticism. Rather than treat the antisemitic hate plaguing their campuses as a serious problem, they handled it as a public relations issue. For example, at Harvard, then-President Gay disparaged Representative Elise Stefanik in an official Board of Overseers meeting after Representative Stefanik's questioning yielded Gay's disastrous December 5, 2023, testimony,[75] falsely calling Representative Stefanik a "purveyor of hate" and "supporter of proudboys."[76] Other examples include Penn administrators trying to orchestrate media coverage depicting Members of Congress as "bullying and grandstanding" and Columbia Board of Trustees leaders dismissing congressional oversight on campus antisemitism as "capital [*sic*] hill nonsense" and expressing hope Democrats would win the House and spare them from further oversight.[77]

## C. Recommendations

The Committee's findings demand action. Universities must make significant changes to comply with the requirements of federal law and meet their obligations to protect Jewish and Israeli students, faculty, and staff and ensure a safe, uninterrupted learning environment. In addition, the executive branch should hold universities accountable for their failures to address campus antisemitism with meaningful consequences. Lastly, Congress should pass legislation to support students and ensure accountability.

**Universities**

- **Universities Must Enforce Their Conduct Rules and Impose Meaningful Discipline:** The Committee's investigation found that postsecondary institutions failed to enforce rules and impose meaningful discipline in response to antisemitic conduct violations, an abdication of their Title VI responsibility to prevent a hostile environment. To comply with their Title VI obligations, universities must enforce their conduct rules and enact meaningful disciplinary sanctions, including suspension, expulsion, and termination of employment where appropriate. Additionally, Jewish students received inappropriate or excessive

---

[74] Letter from Counsel, George Washington Univ., to Comm. (Oct. 11, 2024) (on file with Comm.); GWU Disciplinary chart (amended), George Washington Univ. (Oct. 11, 2024) (on file with Comm.); Stu, (@thestustustudio), TWITTER (May 3, 2024, 7:42 PM), https://x.com/thestustustudio/status/1786541753064931643.

[75] Meeting minutes, Board of Overseers, Harvard Univ. (Dec. 10, 2023) (on file with Comm.).

[76] *Id.*

[77] Text messages between Leah Popowich, Larry Platt, & Anna Cowenhoven (Dec. 5, 2023) (on file with Comm.); Text messages between David Greenwald, Co-Chair, Board of Trustees, Colum. Univ. and Jonathan Lavine, Chair Emeritus, Board of Trustees, Colum, Univ. (Jan. 7, 2024) (on file with Comm.); Text message from Claire Shipman, Co-Chair, Board of Trustees, Colum. Univ., to Minouche Shafik, President, Colum. Univ. (Dec. 28, 2024, 10:57 AM) (on file with Comm.).

HHSHarv_00000028

# House Antisemitism Staff Report

discipline, including for actions that should not have been conduct violations, such as speaking out about antisemitism. This contrasts with the meager discipline imposed for serious antisemitic incidents. These failures raise significant Title VI disparate treatment concerns, and universities must examine their disciplinary processes to eliminate such disparate treatment.

- **Universities Must Protect Student Safety to Maintain a Safe and Uninterrupted Learning Environment:** Many universities allowed unlawful antisemitic encampments and other protests to persist that threatened the safety of their campus communities, disrupted university operations, and created hostile environments. Universities must take seriously their obligation to preserve a safe and uninterrupted learning environment and prevent hostile environments. Maintaining order and safety, such as by clearing encampments, stopping attempts to obstruct Jewish students' movements across campus as occurred at universities including UCLA and Yale, and preventing disruptions of classes, lectures, and other activities, must begin immediately. Institutions should ensure that their police and security capabilities are sufficient to maintain safety and order.

- **Universities Should Forcefully Reject Antisemitism:** As antisemitic conduct raged on their campuses, many university leaders remained conspicuously silent or subdued. Statements that antisemitism has no place on a campus are meaningless if university heads fail to act on those words. Double standards are unacceptable and raise disparate treatment concerns under Title VI. Universities should condemn antisemitic speech, as they have for hate targeting any other minority group. Universities should also reform admissions and hiring processes that have filled their student bodies, faculties, and staffs with pro-Hamas antisemites.

- **Universities Must Recognize That Discrimination Against "Zionists" is an Unacceptable Antisemitic Civil Rights Violation:** Universities should make clear that discrimination against Zionists is an unacceptable violation of their conduct policies and must prevent hostile environments created by discrimination against "Zionists." Campus Jewish communities are often targeted through antisemitic discrimination and harassment on the purported basis of being "Zionists." While criticism of Israel is not inherently antisemitic, hatred against "Zionists" is.[78] Anti-Zionism has been recognized as a form of antisemitism by major Jewish organizations and a bipartisan vote of the U.S. House of Representatives.[79]

- **Universities Must Increase Academic Rigor and Viewpoint Diversity:** Universities that take billions in taxpayer dollars have been captured by radical faculties. In the humanities and social sciences areas, faculty espouse a narrow range of views which are oftentimes deeply antisemitic. Academic standards have deteriorated, and at many institutions viewpoint diversity is nearly nonexistent. This must change, especially among tenured faculty.

---

[78] To discriminate against "Zionists" would have the effect of discriminating against the vast majority of Jews. The Anti-Defamation League defines Zionism as "the movement for the self-determination and statehood for the Jewish people in their ancestral homeland, the land of Israel." A 2020 Pew Research Center survey found 82 percent of American Jews said caring about Israel is an "important or essential" part of their Jewish identity." *See U.S. Jews' connections with and attitudes toward Israel*, Pew Research Center (May 11, 2021), https://www.pewresearch.org/religion/2021/05/11/u-s-jews-connections-with-and-attitudes-toward-israel/

[79] 169 CONG. REC. H6131 (daily ed. Dec. 5, 2023).

16

**JA167**

HHSHarv_00000029

Universities must restore academic rigor and stop their programs from being platforms for intellectually bankrupt radicalization and indoctrination, including the perpetuation of antisemitic falsehoods.

- **Universities Must Increase Transparency Regarding Their Handling of Conduct Incidents:** Universities have frequently refused to share details with the public on their handling of conduct incidents, leaving campus communities in the dark as to what actions, if any, were taken. While universities have often asserted the *Family Educational Rights and Privacy Act* (FERPA) as a purported ground for refusing to produce this information, their blanket refusals go beyond FERPA's requirements. Schools have handled this issue inconsistently, often asserting FERPA as a grounds for not releasing information they prefer to withhold, while on the other hand sharing information on specific incidents publicly or to non-governmental third-parties in certain instances where it suited them.[80] Institutions can and should share more information on their handling of antisemitic conduct incidents.

## The Executive Branch

- **The Executive Branch Should Aggressively Enforce Title VI and Hold Universities Accountable for Violating Their Obligations:** Despite a historic explosion of virulent antisemitism, the Biden-Harris administration failed to hold universities accountable for Title VI violations. The Department of Education has not imposed real consequences for noncompliant institutions, initiated proactive compliance reviews or directed investigations as called for by its own procedures,[81] nor has it issued a promised rulemaking implementing President Trump's December 2019 Executive Order on Combating Antisemitism.[82] The executive branch should aggressively enforce Title VI and hold schools accountable for their failures to protect students. Universities that fail to fulfill the obligations upon which their federal funding is predicated or whose actions make clear they are unfit stewards of taxpayer dollars should be treated accordingly.

- **The Executive Branch Should Ensure Rigorous Adherence to the Clery Act and Issue Fines to Noncompliant Universities:** The Department of Education should promote transparency and accountability around campus safety by ensuring institutions comply with the Clery Act. Designated Clery Act crimes including assaults on Jewish students have been committed with antisemitic motivations. In the face of the explosion of such conduct, the

---

[80] *See, e.g.,* Miranda Nazzaro, Columbia says it has begun suspending students who refuse to leave encampment, THE HILL (Apr. 29, 2024), https://thehill.com/homenews/education/4630879-columbia-says-it-has-begun-suspending-students-who-refuse-to-leave-encampment/; Rebecca Cohen, *Columbia University says it has banned student protester who said 'Zionists don't deserve to live'*, NBC NEWS (Apr. 27, 2024), https://www.nbcnews.com/news/us-news/columbia-university-says-banned-khymani-james-protester-said-zionists-rcna149642; Harvard University provided information regarding the October 18 assault of an Israeli Harvard Business School student to a third party, *see:* E-mail from Claudine Gay, President, Harv. Univ., to Penny Pritzker, et al. (Oct. 22, 2024, 11:24 AM) (on file with Comm.).

[81] U.S. DEP'T OF ED. OFF. OF C.R., CASE PROCESSING MANUAL (May 7, 2024), https://www.ed.gov/sites/ed/files/about/offices/list/ocr/docs/ocrcpm.pdf.

[82] Exec. Order No. 13899, 84 Fed. Reg. 68779 (Dec. 11, 2019); The Biden Administration has failed to issue a notice of proposed rulemaking to implement EO 13899, *see Confronting the Scourge of Antisemitism on Campus Before the H. Comm. on Ed. & the Workforce*, 118th Cong. 27 (2023) (statement of Kenneth Marcus, Chairman, Brandeis Center for Human Rights Under Law).

17

**JA168**

HHSHarv_00000030

House Antisemitism Staff Report

Department appears not to have conducted program reviews at colleges to ensure their compliance with reporting requirements. The new administration should rigorously enforce the Clery Act to prompt colleges to maintain safe campuses.

### Congress

- **Congress Should Pass Legislation Removing Title IV Eligibility from Any University That Boycotts or Divests From Israel:** A significant amount of campus unrest resulted from anti-Israel radicals' efforts to coerce institutions to divest from and boycott Israel. Congress can help stop this madness by passing legislation so any institution of higher education that contravenes U.S. foreign policy by boycotting or divesting from Israel will become ineligible for federal student aid under Title IV. Federal laws already prohibit U.S. persons from participating in unsanctioned foreign boycotts, most notably the Arab League boycott of Israel, with significant criminal and administrative penalties for violators.[83]

- **Congress Should Pass the DETERRENT Act:**[84] There has been significant concern regarding potential malign foreign influence in postsecondary education, including in funding antisemitic faculty and programs. The DETERRENT Act would reform section 117 of the *Higher Education Act* to strengthen enforcement and bring much-needed transparency and accountability to existing requirements, mandating the disclosure of foreign gifts. DETERRENT passed the House in a bipartisan 246-170 vote.[85]

- **Congress Should Pass the *College Cost Reduction Act* ("CCRA"):** For too long, unlimited taxpayer dollars have allowed colleges to raise tuition endlessly,[86] fueling a spending spree on factors contributing to the rise in campus antisemitism, including the proliferation of Diversity, Equity, and Inclusion administrators and radical academic centers.[87] Universities must refocus their missions to academic rigor and programs that provide returns on students' investments. The CCRA will hold colleges accountable for charging exorbitant prices for

---

[83] Bureau of Industry & Security, *Antiboycott Compliance under the EAR*, U.S. Dep't. of Commerce, https://www.bis.doc.gov/index.php/enforcement/oac.

[84] Defending Education Transparency and Ending Rogue Regimes Engaging in Nefarious Transactions Act, H.R. 5933, 118th Cong. (2024).

[85] 169 Cong. Rec. H6184 (daily ed. Dec. 6, 2023).

[86] David O. Lucca, et al., Credit Supply and the Rise in College Tuition: Evidence from the Expansion in Federal Student Aid Programs, Fed. Reserve Bank of N.Y. (Jul. 2015), https://www.newyorkfed.org/medialibrary/media/research/staff_reports/sr733.pdf; Grey Gordon and Aaron Hedlund, Accounting for Tuition Increases Across U.S. Colleges (Oct. 28, 2020), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3720860; Sandra E. Black, et al., Plus or Minus? The Effect of Graduate School Loans on Access, Attainment, and Prices, Nat'l Bureau of Economic Research (May 2023), https://www.nber.org/papers/w31291.

[87] Melissa Korn, et al., *Colleges Spend Like There's No Tomorrow. 'These Places Are Just Devouring Money.'*, The Wall Street Journal (Aug. 10, 2023), https://www.wsj.com/articles/state-university-tuition-increase-spending-41a58100; Jennifer Kabbany, Ohio State University doubled DEI staff in five years, payroll costs almost tripled, The College Fix (Nov. 3, 2023), https://www.thecollegefix.com/ohio-state-university-doubled-dei-staff-in-five-years-payroll-costs-almost-tripled/; Jason Bedrick, *Here's How the Federal Government Is Funding Antisemitism With Your Tax Dollars*, Heritage Fdn. (Jan. 30, 2023), https://www.heritage.org/civil-society/commentary/heres-how-the-federal-government-funding-antisemitism-your-tax-dollars.

18

**JA169**

## House Antisemitism Staff Report

valueless degrees and provide a pathway for states and new accreditors to focus on degree quality rather than appeasing progressive agendas. By ending the stream of subsidies for radicalism and holding schools accountable for their graduates' success, colleges will need to focus less on "woke" initiatives and more on ensuring students have access to an affordable education and a well-paying job after they graduate.[88]

---

[88] Robert Kelchen and Marc Novicoff, *Are Gaza Protests Happening Mostly at Elite Colleges?*, WASH. MONTHLY (May 24, 2024), https://washingtonmonthly.com/2024/05/24/are-gaza-protests-happening-mostly-at-elite-colleges/.

19

**JA170**

HHSHarv_00000032

House Antisemitism Staff Report

## IV. The Committee on Energy and Commerce

### A. Overview of the Investigation

Incidents of antisemitism exploded across colleges, universities, and other institutions[89] in the U.S. since the October 7, 2023, Hamas terrorist attack on Israel. While antisemitism has been a growing issue, this attack amplified these tensions aimed at the Jewish community. Moreover, antisemitism has spread into and infected our health care systems, including medical schools and hospital systems.

The Committee on Energy and Commerce ("E&C") and the Committee on Education and the Workforce ("E&W") opened investigations into the extent to which HHS and one of its awarding agencies, the National Institutes of Health ("NIH"), are ensuring that institutions receiving hundreds of millions of taxpayer dollars from HHS or NIH are complying with relevant federal civil rights laws and are providing safe environments for all, particularly those individuals of Jewish ancestry.[90] The Committees also opened investigations into the Advanced Research Projects Agency for Health ("ARPA-H"), an independent agency within NIH that has funded more than $595 million in biomedical and health research at institutions and organizations in the last year alone.[91] Thus far the Committees have launched investigations into incidents of antisemitism at three NIH-funded institutions: the University of California, San Francisco[92] and Columbia University,[93] including their medical schools and associated health care systems, and the Gladstone Institutes, an independent research institution.[94]

The Committees' investigation found that HHS, NIH and HHS OCR failed to act in the wake of emerging antisemitism across college campuses, medical schools, and medical systems. HHS leadership has refused either to cooperate with congressional inquiries into their actions – or lack thereof – or to require federal taxpayer funded institutions to comply with civil rights laws and prevent antisemitism at their institutions. Investigation into the NIH-funded institutions unearthed fear amongst institutional leadership to publicly push back on antisemitic behavior.

---

[89] In this report, institutions refer to organizations such as colleges, universities, and research institutes which receive federal taxpayer funding.

[90] H. Comm. on Energy and Commerce and H. Comm. on Education & the Workforce, Letter to HHS Sec'y Xavier Becerra (May 23, 2024), https://d1dth6e84htgma.cloudfront.net/05_23_24_Letter_to_HHS_re_Antisemitism_e86731652b.pdf; H. Comm. on Energy and Commerce and H. Comm. on Education and the Workforce, Letter to HHS Sec'y Xavier Becerra (Sept. 18, 2024), https://d1dth6e84htgma.cloudfront.net/09_18_24_Joint_Letter_to_HHS_Antisemitism_c6d7ffb666.pdf.

[91] H. Comm. on Energy and Commerce and H. Comm. on Education and the Workforce, Letter to Director Renee Wegrzyn, Ph.D. (Oct. 2, 2024), https://d1dth6e84htgma.cloudfront.net/10_02_24_Joint_Letter_to_ARPA_H_Antisemitism_122a3a0f8b.pdf.

[92] H. Comm. on Energy and Commerce, Letter to Chancellor Sam Hawgood (July 31, 2024), https://d1dth6e84htgma.cloudfront.net/07_31_24_Letter_to_UCSF_re_Antisemitism_a1bf4b421f.pdf.

[93] H. Comm. on Energy and Commerce and H. Comm. on Education & the Workforce, Letter to Interim President Dr. Katrina Armstrong (Sept. 18, 2024), https://d1dth6e84htgma.cloudfront.net/09_18_24_Joint_Letter_to_Columbia_Antisemitism_047ab2c1a7.pdf.

[94] H. Comm. on Energy and Commerce and H. Comm. on Education & the Workforce, Letter to President Dr. Deepak Srivastava (Nov. 21, 2024), https://d1dth6e84htgma.cloudfront.net/11_21_24_Joint_Letter_to_Gladstone_Antisemitism_Updated_a60e036b23.pdf.

20

JA171

## House Antisemitism Staff Report

The lack of action by HHS, NIH, and the leadership at the institutions they fund allowed antisemitism to permeate and take root not only in the educational system but also in the medical system where vulnerable individuals need to trust that their provider will treat them fairly and appropriately regardless of their national origin.

### U.S. Department of Health and Human Services

HHS contains numerous grant awarding agencies, such as the NIH. The NIH is the largest public funder of biomedical research in the world, funding nearly $35 billion in biomedical and behavioral research grants awarded to colleges, universities, hospitals, and other institutions in fiscal year ("FY") 2023 alone.[95] The NIH spent these federal taxpayer dollars in the form of nearly 59,000 awards across more than 2,700 institutions, referred to as grantee institutions, throughout the U.S. and internationally.[96] While the NIH is the component of HHS that manages and billions of dollars in funds per FY in biomedical and behavioral research grants, it does not have the authority to investigate or oversee investigations of discrimination and harassment at grantee institutions, such as antisemitism. Rather, as a law enforcement agency,[97] HHS OCR is charged with ensuring grantee institutions comply with federal laws, including Title VI of the *Civil Rights Act of 1964,* which protects against discrimination based on national origin.[98] HHS OCR has the authority to investigate allegations of antisemitism and to conduct reviews of grantee institutions to ensure compliance with relevant federal civil rights laws.[99]

On May 23, 2024, E&C and E&W wrote a joint letter to HHS Secretary Xavier Becerra inquiring as to the extent to which the HHS and NIH are ensuring that grantee institutions are fostering and maintaining an environment free from harassment and discrimination.[100] This letter specifically pointed to the April 2024 antisemitic, and at times violent, protests that broke out across several prominent NIH-funded institutions—including Columbia University, the University of Southern California ("USC"), UCLA, GW, Harvard University, and Yale University— protests that resulted in unsafe learning and research environments for students, faculty, patients, and staff, especially for those of Jewish ancestry.[101] For example, on April 17, 2024, at Columbia University, which received more than $358 million in NIH funding in FY

---

[95] The National Institutes of Health (NIH), FY 2023 By the Numbers: Extramural Grant Investments in Research, *available at* https://nexus.od.nih.gov/all/2024/02/21/fy-2023-by-the-numbers-extramural-grant-investments-in-research.
[96] *Id.*
[97] U.S. Dep't. of Health and Human Services Office of Civil Rights, OCR Mission & Vision, https://www.hhs.gov/ocr/about-us/mission-vision/index.html.
[98] U.S. Dep't. of Health and Human Services Office of Civil Rights, Laws and Regulations Enforced by OCR, https://www.hhs.gov/civil-rights/for-providers/laws-regulations-guidance/laws/index.html.
[99] U.S. Dep't. of Health and Human Services Office of Civil Rights, Know the rights that protect us from discrimination based on race, color or national origin, yourrightsundertitleviofthecivilrightsact.pdf (hhs.gov).
[100] H. Comm. on Energy and Commerce and H. Comm. on Education & the Workforce, Letter to HHS Sec'y Xavier Becerra (May 23, 2024), https://d1dth6e84htgma.cloudfront.net/05_23_24_Letter_to_HHS_re_Antisemitism_e86731652b.pdf.
[101] *Id.*

**JA172**

HHSHarv_00000034

# House Antisemitism Staff Report

2023,[102] an encampment including hundreds of protestors and tents sprang up on campus.[103] Banners and signs vandalized the campus—including residence halls—with antisemitic sentiments and even support for the terrorist organization Hamas.[104] Despite more than 100 arrests, the protests progressed to the occupation of a campus building and physical attacks of Jewish students—leading campus officials to move some classes online.[105] In addition, professors at Columbia University openly made antisemitic and even pro-Hamas statements, adding to the harassment of Jewish students.[106] A prominent rabbi at Columbia University also warned Jewish students to remain off-campus due to fears that the university and New York City police could not keep students safe.[107] Jewish students on campus also expressed concerns over their safety on campus and the mental and psychological toll the hostile environment is taking on their ability to work and learn.

According to the U.S. Department of Education's OCR, colleges and universities are prohibited from discriminating based on a variety of categories, including national origin.[108] A college or university is in violation of Title VI of the *Civil Rights Act of 1964* if: (1) there is harassing conduct on the basis of race, color, or national origin that is sufficiently serious as to limit or deny a student's ability to participate in or benefit from the educational program (i.e., creates a hostile environment); (2) a responsible employee of the school knew, or should have known, about the harassment; and (3) the school failed to take prompt and effective steps reasonably calculated to end the harassment, eliminate the hostile environment, prevent the harassment from reoccurring, and as appropriate, remedy its effects.[109] According to NIH's Grant Policy Statement, any institution receiving federal funds must assure work environments are free of discriminatory harassment and are safe and conducive to high-quality work.[110] HHS's OCR is responsible for ensuring that institutions that receive Federal financial assistance comply

---

[102] National Institutes of Health (NIH), Research Portfolio Online Reporting Tools (RePORT): NIH awards by location & organization, https://report.nih.gov/award/index.cfm?ot=DH,27,47,4,52,64,41,MS,20,16,6,13,10,49,53,86,OTHDH&fy=2023&state=&ic=&fm =&orgid=&distr=&rfa=&om=n&pid=.

[103] Isa Farfan, et al., *How the Columbia protests sparked campus demonstrations across the country*, NBC NEWS (Apr. 24, 2024), https://www.nbcnews.com/news/us-news/columbia-protests-sparked-campusdemonstrations-country-rcna148994.

[104] Greg Wehner, *Columbia University student files class action lawsuit against school to protect Jews on campus*, FOX NEWS (Apr. 29, 2024), https://www.msn.com/en-us/money/companies/columbia-university-student-files-class-action-lawsuit-againstschool-to-protect-jews-on-campus/ar-AA1nToLz.

[105] Isa Farfan, et al., *How the Columbia protests sparked campus demonstrations across the country*, NBC NEWS (Apr. 24, 2024), https://www.nbcnews.com/news/us-news/columbia-protests-sparked-campusdemonstrations-country-rcna148994.

[106] Emi Tuyetnhi Tran, *Columbia University president grilled about campus antisemitism at congressional hearing*, NBC NEWS (Apr. 17, 2024), https://www.nbcnews.com/news/education/columbia-university-president-grilled-campus-antisemitismcongressiona-rcna148177.

[107] Doree Lewak and Isabel Keane, *Columbia rabbi warns Jewish students to go home, don't come back to campus because of 'extreme antisemitism,'* NEW YORK POST (Apr. 21, 2024), https://www.msn.com/en-us/news/us/columbia-rabbi-warns-jewishstudents-to-go-home-don-t-come-back-to-campus-because-of-extreme-antisemitism/ar-AA1nouyc.

[108] U.S. Dep't. of Education Office of Civil Rights, Know Your Rights: Title VI and Religion, https://www2.ed.gov/about/offices/list/ocr/docs/know-rights-201701-religious-disc.pdf.

[109] *Id.*

[110] National Institutes of Health (NIH), NIH Grants Policy Statement Apr. 2024, https://grants.nih.gov/grants/policy/nihgps/nihgps.pdf.

HHSHarv_00000035

## House Antisemitism Staff Report

with Title VI as well as other civil rights laws.[111] Colleges or universities that violate Title VI can ultimately lose Federal funding.[112]

These six grantee institutions received more than **$2.7 billion** in taxpayer funding through the NIH in FY 2023 alone.[113] The Committees questioned what, if any, efforts the NIH is making to hold grantee institutions accountable for rising antisemitism on their campuses and what, if any, efforts HHS OCR is making to ensure grantee institutions' comply with Title VI.[114] Furthermore, the Committees inquired about the number of complaints HHS OCR and NIH have received alleging incidents of antisemitism.[115]

After three months of follow-up from E&C staff, on August 22, 2024, the HHS Assistant Secretary for Legislation sent a two-page response on behalf of HHS Secretary Becerra.[116] HHS refused to provide specific information about either HHS OCR or NIH steps taken to ensure institutions and universities receiving funding from HHS are complying with federal civil rights laws, or whether HHS OCR or NIH have received any complaints regarding potential violations of federal law as it pertains to antisemitism.[117] Rather, HHS's response focused on publicly available documentation about what is or is not allowed under Title VI.[118] Merely issuing guidance does not demonstrate that HHS, NIH or HHS OCR are taking any steps to ensure that universities or institutions are complying with federal civil rights laws, specifically as they pertain to antisemitism. Moreover, none of the guidance, training, or other information outlined by HHS has been developed or updated since the Hamas terrorist attack on October 7, 2024.

HHS also refused to provide any specific information about what NIH is doing to respond to significant antisemitic behavior at institutions to which it awards hundreds of millions of dollars each FY. The NIH has a duty to ensure that federal taxpayer funds do not support harassing or discriminatory behavior.

---

[111] U.S. Dep't. of Health and Human Services Office of Civil Rights, Laws and Regulations Enforced by OCR, https://www.hhs.gov/civil-rights/for-providers/laws-regulations-guidance/laws/index.html.

[112] U.S. Dep't. of Education, U.S. Department of Education's Office for Civil Rights announces list of open Title VI shared ancestry investigations of institutions of higher education and K-12 schools, https://www.ed.gov/about/news/press-release/us-department-of-educations-office-civil-rights-announces-list-of-open.

[113] National Institutes of Health (NIH), Research Portfolio Online Reporting Tools (RePORT): NIH awards by location & organization, https://report.nih.gov/award/index.cfm?ot=DH,27,47,4,52,64,41,MS,20,16,6,13,10,49,53,86,OTHDH&fy=2023&state=&ic=&fm =&orgid=&distr=&rfa=&om=n&pid=.

[114] H. Comm. on Energy and Commerce and H. Comm. on Education & the Workforce, Letter to HHS Sec'y Xavier Becerra (May 23, 2024), https://d1dth6e84htgma.cloudfront.net/05_23_24_Letter_to_HHS_re_Antisemitism_e86731652b.pdf; H. Comm. on Energy and Commerce and H. Comm. on Education & the Workforce, Letter to HHS Sec'y Xavier Becerra (Sept. 18, 2024), https://d1dth6e84htgma.cloudfront.net/09_18_24_Joint_Letter_to_HHS_Antisemitism_c6d7ffb666.pdf.

[115] *Id.*

[116] Prior to receiving HHS's limited response to the Committees' May 23, 2024, letter, the Committees followed up via email on June 13, 2024, July 8, 2024, Aug. 2, 2024, and earlier in the day Aug. 22, 2024, before finally receiving the HHS's response that afternoon.

[117] Letter from Melanie Anne Egorin, PhD, HHS Assistant Sec'y for Leg., to The Hon. Cathy McMorris Rodgers, Chair, H. Comm. on Energy and Commerce and The Hon. Virginia Foxx, Chair, H. Comm. on Education & the Workforce (Aug. 22, 2024) (on file with the Comms.).

[118] *Id.*

23

**JA174**

## House Antisemitism Staff Report

Likewise, HHS refused to provide any information regarding whether HHS OCR or NIH received complaints of antisemitism from NIH-funded institutions in FY 2023 or FY 2024. Despite HHS OCR being the enforcement arm of HHS with the responsibility to investigate complaints of potential federal civil rights violations in NIH-funded programs and activities, HHS's response directed the Committees to NIH's Office of Extramural Research.[119] This further illustrates HHS OCR's willingness to abandon its enforcement responsibilities when it comes to antisemitism at grantee institutions.

In response to HHS's inadequate response, on September 18, 2024, the Committees wrote another letter to HHS OCR requesting specific documentation outlining HHS OCR's and NIH's actions in preventing and responding to incidents of antisemitism at grantee institutions.[120] Secretary Becerra did not respond by the October 2, 2024, deadline and both Committees requested a follow-up meeting to discuss HHS's failure to deliver the requested documentation.[121] During this meeting, HHS stated that it has no timeline or further information about when HHS expects to provide the Committees with the requested information. As of mid-December, HHS has failed to provide the Committees with additional information or an updated timeline for when information will be available, despite follow-up communications from committee staff.

HHS's refusal to adequately respond to the Committees' requests for information reflects HHS leadership's unwillingness to require institutions receiving federal taxpayer funding to comply with federal civil rights laws and provide a safe research environment free from discrimination and harassment for all students. The dismissive response leads the Committees to believe that HHS is either unconcerned or unable to demonstrate evidence of actions they are taking to appropriately handle complaints of antisemitism. Committee staff heard directly from a grantee institution that it has not been contacted by HHS OCR or NIH regarding the very public issues of antisemitism on its campus and associated medical centers to confirm the institution was ensuring a safe research environment for NIH-funded grants and complying with Title VI or communicating any specific guidance since before October 7, 2023.[122]

On November 22, 2024, HHS OCR Director Melanie Fontes Rainer published a Dear Colleague Letter on antisemitism, islamophobia, and related forms of discrimination.[123] Rather than take meaningful action based on the Committee's inquiry, this letter once again pointed to

---

[119] Letter from Melanie Anne Egorin, PhD, HHS Assistant Sec'y for Leg., to The Hon. Cathy McMorris Rodgers, Chair, H. Comm. on Energy and Commerce and The Hon. Virginia Foxx, Chair, H. Comm. on Education & the Workforce (Aug. 22, 2024) (on file with the Comms.).

[120] H. Comm. on Energy and Commerce and H. Comm. on Education & the Workforce, Letter to HHS Sec'y Xavier Becerra (Sept. 18, 2024), https://d1dth6e84htgma.cloudfront.net/09_18_24_Joint_Letter_to_HHS_Antisemitism_c6d7ffb666.pdf.

[121] Email from staff, H. Comm. on Energy and Commerce and H. Comm. on Education & the Workforce to staff, HHS Office of the Assistant Secretary for Legislation (Oct. 4, 2024) (on file with the Comms.).

[122] Video interview with Aaron Culter, Partner, and Ari Fridman, Counsel, Hogan Lovells, representing the University of California, San Francisco (Sept. 5, 2024).

[123] U.S. Dep't of Health and Human Services (HHS) Office for Civil Rights (OCR), *Addressing Discrimination based on Religion or Shared Ancestry and Ethnicity in HHS Funded Programs and Activities* (Nov. 22, 2024), https://www.hhs.gov/sites/default/files/ocr-dcl-religious-discrimination-final.pdf.

**JA175**

HHSHarv_00000037

# House Antisemitism Staff Report

guidance on HHS' website and White House fact sheets. This is yet another example of HHS's focus on platitudes over sincere action.

**Advanced Research Projects Agency for Health**

ARPA-H is an independent agency of HHS within NIH, that reports directly to Secretary Becerra.[124] ARPA-H was created to advance high-potential, high-impact biomedical and health research that cannot be readily accomplished through traditional research or commercial activity.[125] Appropriations for ARPA-H began in FY 2022, with total appropriations between FY 2022 and 2024 totaling $4 billion.[126]

On October 2, 2024, E&C and E&W opened investigations into the extent to which ARPA-H is ensuring the research it funds is conducted in an environment free from harassment and discrimination.[127] These inquiries stemmed in part due to the fact that of the 14 university-based projects ARPA-H funded in the last year, 11 are at universities that were recently or are currently under federal and/or congressional investigation for potential Title VI violations and/or are being sued in federal court for permitting antisemitic behavior on campus.[128] For example, Columbia University has been sued in federal court,[129] is currently undergoing several investigations by the U.S. Department of Education OCR,[130] and is undergoing investigation by

---

[124] Advanced Research Projects Agency for Health (ARPA-H), *Frequently Asked Questions*, https://arpa-h.gov/about/faqs#:~:text=The%20Advanced%20Research%20Projects%20Agency%20for%20Health%20%28ARPA-H%29,on%20leveraging%20research%20advances%20for%20real%20world%20impact.

[125] *Id.*

[126] U.S. Dep't of Health and Human Services (HHS) Advanced Research Projects Agency for Health (ARPA-H) Congressional Justification for Appropriations Committees Fiscal Year 2025, https://arpa-h.gov/sites/default/files/2024- 03/ARPA-H%20FY%202025.pdf#page=17 (see page 13 for FY 2023 and 2024).

[127] H. Comm. on Energy and Commerce and H. Comm. on Education and the Workforce, Letter to Director Renee Wegrzyn, Ph.D. (Oct. 2, 2024), 10_02_24_Joint_Letter_to_ARPA_H_Antisemitism_122a3a0f8b.pdf.

[128] U.S. Dep't of Education, *List of Open Title VI Shared Ancestry Investigations*, https://www2.ed.gov/about/offices/list/ocr/sharedancestry-list.html?queries%5Bsearch%5D=columbia (last accessed Sept. 4, 2024); U.S. Dep't. of Education, *U.S. Department of Education's Office for Civil Rights Announces List of Open Title VI Shared Ancestry Investigations of Institutions of Higher Education and K-12 Schools* (Nov. 16, 2023), https://www.ed.gov/news/press-releases/us-department-educations-office-civil-rights-announces-list-open-title-vi-shared-ancestry-investigations-institutions-higher-education-and-k-12-schools; U.S. Dep't. of Education, *U.S. Department of Education's Office for Civil Rights Announces Resolution of a Complaint Against the University of Illinois – Urbana Champaign Alleging Antisemitic Discrimination* (Sept. 3, 2024), https://www.ed.gov/news/press-releases/us-department-educations-office-civil-rights-announces-resolution-complaint-against-university-illinois-%E2%80%93-urbana-champaign-alleging-antisemitic-discrimination; H. Comm. on Energy and Commerce, Letter to Chancellor Sam Hawgood (July 31, 2024), https://d1dth6e84htgma.cloudfront.net/07_31_24_Letter_to_UCSF_re_Antisemitism_a1bf4b421f.pdf; AP and TOI Staff, *Judge dismisses antisemitism lawsuit against MIT, says Jewish students were kept safe*, THE TIMES OF ISRAEL (Aug. 8, 2024), https://www.timesofisrael.com/judge-dismisses-antisemitism-lawsuit-against-mit-says-jewish-students-were-kept-safe/#:~:text=Massachusetts%20Institute%20of%20Technology.

[129] "Kasowitz Files Amended Lawsuit Adding Dozens of New Plaintiffs and New Allegations of Columbia's Antisemitic Hostile Educational Environment and Egregious Civil Rights Violations," Kasowitz Benson Torres (June 18, 2024), https://www.kasowitz.com/media/client-news/kasowitz-files-amended-lawsuit-adding-dozens-of-new-plaintiffs-and-new-allegations-of-columbia-s-antisemitic-hostile-educational-environment-and-egregious-civil-rights-violations/.

[130] U.S. Dep't. of Education, List of Open Title VI Shared Ancestry Investigations, https://www2.ed.gov/about/offices/list/ocr/sharedancestry-list.html?queries%5Bsearch%5D=columbia (last accessed Sept. 4, 2024).

**JA176**

HHSHarv_00000038

## House Antisemitism Staff Report

congressional committees,[131] for complaints of antisemitism. E&C is currently investigating the University of California, San Francisco ("UCSF") regarding concerns of antisemitism at the university, medical school, and associated medical centers.[132] The U.S. Department of Education recently closed its investigation into the University of Illinois-Urbana Champaign with a resolution agreement that found the university was not meeting its obligation under Title VI as it relates to complaints of shared ancestry discrimination—including 135 complaints of anti-Jewish discrimination.[133]

As of mid-December 2024, ARPA-H has not provided any information to the Committees, despite follow-up by E&C Committee staff. Like HHS and NIH, ARPA-H does not seem to take seriously its role of ensuring federal taxpayer dollars are not spent on harassment and discrimination.

**NIH-Funded Institutions**

In addition to opening an investigation into HHS OCR and NIH's role in appropriately responding and overseeing incidents of antisemitism, E&C opened several investigations into how NIH-funded institutions, specifically grantee institutions with medical schools and associated medical centers, were ensuring compliance with Title VI and ensuring safe environments for all members of the institution. Specifically:

- On July 31, 2024, E&C opened an investigation into UCSF, which received nearly $790 million in grants from NIH in FY 2023,[134] due to ongoing and pervasive acts of antisemitic harassment and intimidation not only on the campus but within its associated medical centers under UCSF Health.[135] For example, patients walking to the medical center saw and heard pro-terror and pro-violence statements and symbols, including Hamas symbolism, at the nearby encampment in spring of 2024.[136] There were both public and confidential reports of patients of Jewish heritage and faith feeling unsafe or

---

[131] H. Comm. on Education & the Workforce (Feb. 12, 2024), https://edworkforce.house.gov/uploadedfiles/2-12-24_foxx_letter_to_columbia_university.pdf; H. Comm. on Energy and Commerce, Letter to Interim President Dr. Katrina Armstrong (Sept. 18, 2024), https://energycommerce.house.gov/posts/e-and-c-e-and-w-republicans-demand-answers-from-columbia-university.

[132] H. Comm. on Energy and Commerce, Letter to Chancellor Sam Hawgood (July 31, 2024), https://d1dth6e84htgma.cloudfront.net/07_31_24_Letter_to_UCSF_re_Antisemitism_a1bf4b421f.pdf.

[133] U.S. Dep't of Education, *U.S. Department of Education's Office for Civil Rights Announces Resolution of a Complaint Against the University of Illinois – Urbana Champaign Alleging Antisemitic Discrimination* (Sept. 3, 2024), https://www.ed.gov/news/press-releases/us-department-educations-office-civil-rights-announces-resolution-complaint-against-university-illinois-%E2%80%93-urbana-champaign-alleging-antisemitic-discrimination.

[134] National Institutes of Health (NIH), *Research Portfolio Online Reporting Tools (RePORT): NIH awards by location & organization*, https://report.nih.gov/award/index.cfm?ot=DH,27,47,4,52,64,41,MS,20,16,6,13,10,49,53,86,OTHDH&fy=2023&state=&ic=&fm=&orgid=&distr=&rfa=&om=n&pid=.

[135] H. Comm. on Energy and Commerce, Letter to Chancellor Sam Hawgood (July 31, 2024), https://d1dth6e84htgma.cloudfront.net/07_31_24_Letter_to_UCSF_re_Antisemitism_a1bf4b421f.pdf.

[136] This information is based on screenshots of Instagram posts from a now deleted account (ucsf4palestine), videos of the encampment, flyers for the encampment, and other materials provided to the committee from confidential sources.

**JA177**

HHSHarv_00000039

## House Antisemitism Staff Report

uncomfortable when coming in for treatment.[137] While this investigation is ongoing, the Committee has been in regular contact with representatives for UCSF who have been cooperative with the inquiry.

- On September 18, 2024, E&C opened a joint investigation with E&W into Columbia University—including its medical school, Vagelos College of Physicians and Surgeons, and associated medical centers—as reports of antisemitism and even unequal medical treatment were reported.[138] For example, in July 2024, an Israeli student reported that when she went to the university's health services, no one came into the room to see her and she overheard a discussion between two health care professionals in another room in which one said they would not treat her because she was Israeli.[139] She sat in the room for another ten minutes until someone finally came to address her health needs.[140] As of mid-December 2024, representatives of Columbia University have not provided any information to the Committees as a part of this investigation beyond an October 2, 2024, response of basic platitudes.[141] E&C Committee staff sent follow-up requests for updates but have not received the requested information.[142]

- On November 21, 2024, E&C opened a joint investigation with E&W into complaints of leadership turning a blind eye to antisemitic discrimination and harassment at the Gladstone Institute, an independent research institution with a strong partnership with UCSF. Specifically, when a highly antisemitic email was sent to all members of Gladstone by a trainee in response to October 7, 2023,[143] the institute's response was, "I want to ask you all to refrain from sending emails to Gladstone-All on this topic […]" and that "we should not allow any form of disrespectful speech, actions, or violence

---

[137] M.J. Koch, *Leading California Hospitals Are Becoming a 'Battlefield' as Jewish Patients, Doctors Face Surging Antisemitism*, THE NEW YORK SUN (Mar. 7, 2024), https://www.nysun.com/article/leading-california-hospitals-are-becoming-a-battlefield-as-jewish-patients-doctors-face-surging-antisemitism; *see also* Heather Knight, *In San Francisco, Doctors Feud Over 'Do No Harm' When It Comes to War Protests*, THE NEW YORK TIMES (June 24, 2024), https://www.nytimes.com/2024/06/24/us/israel-hamas-war-sf-doctors.html; *see also* Ayala Orel, *Antisemitism at UCSF: 'They Added Genocide in Gaza in a Presentation,'* YNETNEWS.COM (June 26, 2024), https://www.ynetnews.com/article/hyjzf119ir.

[138] H. Comm. on Energy and Commerce and H. Comm. on Education and the Workforce, Letter to Interim President Dr. Katrina Armstrong (Sept. 18, 2024), https://d1dth6e84htgma.cloudfront.net/09_18_24_Joint_Letter_to_Columbia_Antisemitism_047ab2c1a7.pdf.

[139] Columbia University Task Force on Antisemitism, Report #2 Columbia University Student Experiences of Antisemitism and Recommendations For Promoting Shared Values and Inclusion (Aug. 2024), https://president.columbia.edu/sites/default/files/content/Announcements/Report-2-Task-Force-on-Antisemitism.pdf.

[140] *Id.*

[141] Letter from Brian D. Smith, Partner, Covington, representing Columbia University, to The Hon. Cathy McMorris Rodgers et al., Chair, H. Comm. on Energy and Commerce and The Hon. Virginia Foxx et al., Chair, H. Comm. on Education & the Workforce (Oct. 2, 2024) (on file with the Comms.).

[142] Email from staff, H. Comm. on Energy and Commerce to Darcy Slayton, Associate, Covington, representing Columbia University (Nov. 1, 2024, and Dec. 11, 2024) (on file with the Comms.).

[143] Email from unnamed graduate student employed by the Gladstone Institutes, to "Gladstone All" email list (Oct. 9, 2023, 3:18pm) (on file with the Comms.).

**JA178**

HHSHarv_00000040

## House Antisemitism Staff Report

under any circumstances."[144] There was no condemnation of the attacks of October 7, 2023, and no stance taken on the abhorrent email.[145]

The Committees' investigation determined that grantee institutions are struggling with balancing free speech and discrimination or harassment, often excusing antisemitic harassment under the guise of free speech. It also appears that while some institutions may privately disagree with the actions of students, faculty or staff, the fear of public reaction or lawsuits seems to limit the extent to which grantee institution leadership are willing to take public stances on incidents occurring on campus or on social media amongst institution faculty and/or students, particularly with regards to antisemitism. The consistent examples of inappropriate antisemitic materials being taught in classrooms, or spewed at events on campus, show that the counseling or minimal punishments that individuals receive is not sufficient to stop the incidents from continuing to occur. The actions being taken by institutions have not improved the situation for Jewish students, faculty, and other members of the grantee institutions. It is imperative that federal awarding agencies like HHS hold grantee institutions responsible for compliance with federal civil rights laws and ensure that public funds are not being used to support institutions and individuals who promote discrimination and harassment.

### B. Recommendations

**Recommendations for HHS, HHS OCR, and NIH**

- The incoming administration should make wholesale personnel changes in HHS OCR. HHS OCR's refusal to engage with Congressional inquiries and apparent failure to act in reference to taxpayer funded grantee institutions demonstrates a need for change in personnel throughout HHS OCR, to include all levels of management.

- NIH should make clear to individuals at grantee institutions that incidents or allegations of antisemitism and other harassment and discrimination for shared ancestry can be reported through their grantee harassment web portal and email address.

- NIH should update its grant terms and conditions to require institutions seeking NIH funding to add the following new requirements:

  o NIH-funded institutions are required to notify NIH when key grant personnel are under investigation for shared ancestry/national origin discrimination or harassment and an action is taken against personnel (e.g., suspension from campus) that would impede the grant.

  o All investigations started into allegations of shared ancestry/national origin discrimination or harassment must be completed within six months, even if the accused or alleged victim leaves the institution. Without a conclusion about what happened, the institution and NIH cannot redress harm sustained by the victim. When investigations are stopped because the accused resigns/leaves the

---

[144] Email from President Srivastava to "Gladstone All" email list (Oct. 9, 2023, 6:13pm) (on file with the Comms.).
[145] *Id.*

28

**JA179**

institution, the harasser/abuser skirts consequences even if the accusations are true.

- o  All investigative reports must be made available to NIH. If the grantee institution chooses to conduct the investigations in-house rather than through a third-party law firm, it is responsible for ensuring the accuracy of the information. Therefore, the Chancellor, Provost, or other high-ranking member of the grantee institution must attest to NIH that the reports and files sent to NIH are complete and accurate representations of the facts of the case. If NIH is not satisfied with the investigation completed by the institution or its proxy, NIH may refer the case to HHS OCR and HHS OGC for investigation. The grantee institution must cooperate with any investigation conducted by these entities. If NIH is not satisfied with the actions taken by the grantee institution because of the investigation, it may recommend further actions. Failure to implement said actions may result in suspension or reconsideration of the grant.

- o  Principal investigators, co-principal investigators, or other key grant personnel on NIH-funded grants or networks may be removed by NIH, temporarily or permanently, if the grantee institution fails to take appropriate and timely action to make the research environment safe in response to allegations of shared ancestry/national origin discrimination or harassment.

- o  HHS must specify a required number of Title VI compliance reviews that HHS OCR must conduct per year at grantee institutions.

**Recommendations for NIH-Funded Institutions**

- All NIH-funded institutions should create a task force or commission of external experts in civil rights—including an expert in antisemitism—to review their curriculums for bias, discrimination, indoctrination, etc., to ensure that students are not being subjected to politicized or biased educations. This would not just be for classes or curriculum focused on topics such as diversity or inclusion, but for all classes, lectures, and curricular materials. This external group would create recommendations for ways to reduce bias and ensure that the curriculum is not biased or discriminatory towards any one group of people, any culture, etc. This review should be inclusive of all areas of study, including medical schools, nursing programs, public health programs, and social work programs.

- All NIH-funded institutions should create an antisemitism task force to review the current climate within the institution, evaluate the actions taken by the institution, put processes and procedures in place for responding to these incidents, and provide recommendations for action. This task force should not be made up of leadership within the institution. Rather, the task force should be a representative group of faculty, students, and independent subject matter experts.

- All NIH-funded institutions should update their discrimination and harassment training to include a section on antisemitism.

29

**JA180**

House Antisemitism Staff Report

## V.    The Committee on the Judiciary

The Committee on the Judiciary has jurisdiction over the Biden-Harris Administration's enforcement of federal immigration law. This jurisdiction includes the adjudication, issuance, and revocation of nonimmigrant visas, such as student visas.

Certain conduct during the antisemitic protests may render aliens removable from the United States. Under the Immigration and Nationality Act ("INA"), an alien is inadmissible to and removable from the United States if the alien "endorses or espouses terrorist activity or persuades others to endorse or espouse terrorist activity or support a terrorist organization."[146] Despite the clear statutory language, in October 2023, only three weeks after Hamas's attacks on Israel, U.S. Department of Homeland Security ("DHS") Secretary Alejandro Mayorkas declined to state whether foreign students should "have their visas revoked" if they "advocate for the elimination of Israel and attacks on Jewish individuals."[147] Instead, Secretary Mayorkas claimed that "it is a matter of law and it requires a legal interpretation," noting that DHS was "assessing [the] legal assertion" that those aliens could have their visas revoked.[148]

In light of the despicable antisemitic protests that occurred nationwide on college campuses and elsewhere, on April 30, 2024, the Committee wrote to DHS Secretary Alejandro Mayorkas and U.S. Secretary of State ("State Department") Antony Blinken, requesting various documents and information relating to each Department's inaction in revoking visas for aliens who endorse or espouse terrorist activities, including aliens on student visas who endorse Hamas's terrorist activities against Israel and violence against Jews.[149] From the State Department, the Committee requested:

1. The number of aliens, including those on student visas, for whom DHS has requested the State Department revoke their visas based on their actions related to anti-Israel protests, disaggregated by visa category, country of nationality, and the specific action that precipitated the request, including:

   a. The number of such aliens for whom the State Department has revoked visas, disaggregated by visa category, country of nationality, and the reason for the revocation; and

   b. The number of such aliens who remain in the United States, disaggregated by visa category and country of nationality.[150]

---

[146] 8 U.S.C. § 1182(a)(3)(B)(i)(VII); *see* 8 U.S.C. § 1227(a)(4)(B).

[147] John Binder, *DHS Chief Mayorkas Will Not Commit to Deporting Pro-Hamas Foreign Students from U.S.*, BREITBART (Oct. 31, 2023), https://www.breitbart.com/politics/2023/10/31/dhs-chief-mayorkas-will-not-commit-to-deporting-pro-hamas-foreign-students-from-u-s/.

[148] *Id.*

[149] Letter from Jim Jordan et al., Chairman, H. Comm. on the Judiciary, to Antony Blinken, Sec'y, U.S. Dep't of State (Apr. 30, 2024); Letter from Jim Jordan et al., Chairman, H. Comm. on the Judiciary, to Alejandro Mayorkas Sec'y, U.S. Dep't of Homeland Sec. (Apr. 30, 2024).

[150] Letter from Jim Jordan et al., Chairman, H. Comm. on the Judiciary, to Antony Blinken, Sec'y, U.S. Dep't of State (Apr. 30, 2024).

JA181

HHSHarv_00000043

## House Antisemitism Staff Report

2. The total number of aliens, including those on student visas, for whom the State Department has revoked visas based on their actions related to anti-Israel protests disaggregated by visa category, country of nationality, and the specific action that precipitated the revocation.[151]

Similarly, from DHS the Committee requested:

1. The number of aliens, including those on student visas, who have endorsed or espoused terrorist activity or have persuaded others to endorse or espouse terrorist activity or support a terrorist organization during anti-Israel protests, disaggregated by visa category, if applicable, and country of nationality, including:

   a. The number of such aliens for whom DHS has requested the State Department revoke visas based on their actions related to anti-Israel protests, disaggregated by visa category, the country of nationality, and the specific action that precipitated the revocation request; and

   b. The number of such aliens who have been placed in removal proceedings, including the number removed from the United States, disaggregated by visa category and the country of nationality.[152]

2. Whether aliens who endorse or espouse terrorist activity or persuade others to endorse or espouse terrorist activity or support a terrorist organization are enforcement priorities under the September 30, 2021, memo, Guidelines for the Enforcement of Civil Immigration Law.[153]

Initially the Committee received no substantive response from either Department. Then on May 17, 2024, the Committee reiterated its requests via letters to Secretaries Mayorkas and Blinken.[154]

On May 29, 2024, the State Department responded in part that "The Department has not received any such requests from partners to revoke visas for individuals based on their actions related to on-campus protests within the referenced period and has not revoked any visas in that period for such activity."[155] To date, DHS has refused to provide a substantive response to the Committee's questions.

---

[151] *Id.*

[152] Letter from Jim Jordan et al., Chairman, H. Comm. on the Judiciary, to Alejandro Mayorkas Sec'y, U.S. Dep't of Homeland Sec. (Apr. 30, 2024).

[153] *Id.*

[154] Letter from Jim Jordan et al., Chairman, H. Comm. on the Judiciary, to Antony Blinken, Sec'y, U.S. Dep't of State (May 17, 2024); Letter from Jim Jordan et al., Chairman, H. Comm. on the Judiciary, to Alejandro Mayorkas Sec'y, U.S. Dep't of Homeland Sec. (May 17, 2024).

[155] Letter from Naz Durakoglu, Asst. Sec., Bureau of Leg. Affairs, U.S. Dep't of State to Jim Jordan et al., Chairman, H. Comm. on the Judiciary, (May 29, 2024).

JA182

HHSHarv_00000044

House Antisemitism Staff Report

## VI.  The Committee on Oversight and Accountability

On April 30, 2024, House Committee on Oversight and Accountability Chairman James Comer and House Committee on Education and the Workforce Chairwoman Virginia Foxx (R-NC) sent a letter to Mayor Muriel Bowser and Metropolitan Police Department ("MPD") Chief Pamela Smith raising concerns about MPD's refusal to assist in clearing out an encampment of unlawful and antisemitic protestors on GWU's campus.[156]

The GWU encampment, which was occupying the main outdoor space at the University since April 26, 2024, was quickly condemned by University leadership once antisemitic chants were heard and graffiti was spread throughout the area. The encampment called for the end of the Israeli state and obstructed multiple buildings within campus.[157] The encampment was filled with a mix of students and individuals unaffiliated with the University who had no business being on its campus.[158] This unlawful chaos was taking place during finals week, already one of the most stressful times for students.

On May 1, 2024, House Committee on Oversight and Accountability Chairman James Comer and Representatives Lauren Boebert (R-CO), Anna Paulina Luna (R-FL), Byron Donalds (R-FL), Eric Burlison (R-MO), and William Timmons (R-SC) met with GWU leadership and toured the radical, antisemitic, and unlawful encampment on the university's campus. Following the tour, the Committee members called on D.C. Mayor Muriel Bowser to empower the MPD to clear out the unlawful encampment and restore the rule of law to protect students and staff.[159] Mayor Bowser's office continued to refuse to act on behalf of the university administration, students, and faculty. In response, Chairman Comer announced a full committee hearing on the inaction scheduled for May 8. Mayor Bowser and Police Chief Pamela Smith were invited to testify.[160]

In the early morning of May 8—just hours before the Oversight Committee hearing with Mayor Bowser and MPD Chief Pamela Smith—MPD finally cleared out the encampment.[161] This action led to 33 arrests; only 6 of those arrestees were GWU students.

---

[156] Letter from Hon. Virginia Foxx, Chairwoman, H. Comm. on Educ. & the Workforce, and Hon. James Comer, Chairman, H. Comm. on Oversight & Accountability, to Hon. Muriel Bowser, Mayor of Washington, D.C., and Ms. Pamela Smith, Chief, Metro. Police Dep't of D.C. (Apr. 30, 2024).

[157] Peter Hermann, *D.C. Police Rejected GWU's Plea to Sweep Out University Protestors*, THE WASHINGTON POST (Apr. 27, 2024).

[158] Briefing for Comm. on Oversight & Accountability Members from GWU officials (May 1, 2024).

[159] *Id.*

[160] Press Release, H. Comm. on Oversight & Accountability, *Comer Announces Hearing on the District of Columbia's Response to Radical, Antisemitic, and Unlawful Protests at GWU* (May 1, 2024), https://oversight.house.gov/release/comer-announces-hearing-on-the-district-of-columbias-response-to-radical-antisemitic-and-unlawful-protests-at-gwu/.

[161] Peter Hermann, Keith L. Alexander, Lauren Lumpkin, *Six GWU students among 33 arrested at campus protest encampment*, THE WASHINGTON POST (May 9, 2024).

JA183

HHSHarv_00000045

## VII. The Committee on Veterans' Affairs

### A. Overview of the Investigation

In December 2023, the House Committee on Veterans' Affairs ("Committee") became aware of a U.S. Department of Veterans Affairs ("VA") OGC attorney who posted a social media video mocking Israelis who were asking for the return of hostages captured by Hamas.[162] Chairman Bost sent VA a request for information to get more details on the attorney in the video and to see if VA was investigating. After learning the attorney was employed in VA's Veterans Benefits Law Group and had yet to face any administrative action, Chairman Bost and 18 House Republicans sent the VA Secretary a letter expressing concern that the attorney's blatant antisemitism could affect veterans of Jewish faith and requesting that VA provide all documents related to its investigation to ensure VA was adequately investigating.[163]

Concerns regarding VA's investigation were validated when VA stated the attorney would not face discipline but instead would be required to complete harassment training.[164] Notably, VA failed to provide the Committee with any of its investigation documents. In May 2024, following months of negotiation, Committee staff reviewed the documents *in camera*. This review, and a subsequent June 2024 transcribed interview with the VA employee who conducted the investigation into the attorney, exposed troubling details about VA's investigation. First, the VA investigator worked in the same OGC practice group as the attorney who made the video, which raised questions regarding the investigation's independence.[165] Second, the investigator merely interviewed the attorney who made the video before determining no wrongdoing occurred.[166] The investigator did not investigate whether the attorney's coworkers felt unsafe following the attorney's comments or whether the attorney's work product was affected by the attorney's apparent bias. Even worse, the sole interview was neither transcribed or otherwise memorialized.[167] Finally, the investigator used Wikipedia's antisemitism definition instead of a reliable source when concluding the attorney's conduct was not antisemitic.[168]

The transcribed interview also revealed that the investigator worked with the attorney who posted the video but did not have a personal relationship with her.[169] The interview also revealed that the investigator failed to investigate the video's effect on the workplace and whether the attorney's work product was affected by her beliefs because the investigator was

---

[162] Leo Shane III, *VA Att'y Disciplined for Video Mocking Israeli Hostages*, MIL. TIMES, Jan. 12, 2024, https://www.militarytimes.com/veterans/2024/01/13/va-attorney-disciplined-for-video-mocking-israeli-hostages/.

[163] Letter from Mike Bost et al., Chairman, H. Comm. on Veterans' Aff. to the Hon. Denis McDonough, Sec'y, U.S. Dep't of Veterans Aff. (Dec. 13, 2023).

[164] *See* Letter from the Hon. Denis McDonough, Sec'y, U.S. Dep't of Veterans Aff. to Mike Bost, Chairman, H. Comm. on Veterans' Aff. (Jan. 12, 2024).

[165] VA Investigator, Transcribed Interview before the H. Comm. on Veterans' Affairs, 15 (June 27, 2024) (on file with Comm).

[166] *Id.* at 19.

[167] *Id.* at 24.

[168] *Id.* at 22.

[169] VA Investigator, Transcribed Interview before the H. Comm. on Veterans' Affairs, 16 (June 27, 2024) (on file with Comm).

HHSHarv_00000046

## House Antisemitism Staff Report

directed to conduct a narrow investigation.[170] Specifically, the investigator was directed by the Benefits Law Group's Chief Counsel, after consultation with VA OGC Personnel Group attorneys, to determine only whether: (1) the attorney's social media account contained information identifying the attorney as a VA employee; (2) the video the attorney posted on her social media could be attributed to VA; and (3) the attorney expressed antisemitic views on her personal social media within the VA workplace.[171] The investigator found none of this occurred.[172] Additionally, the investigator concluded the video was not antisemitic as the attorney was expressing their personal disagreement with the Israeli Government's actions in response to Hamas' terrorist attack on October 7, 2023.[173]

The Committee's investigation highlights how VA's internal misconduct investigations under the Biden-Harris administration are inadequate and lead to a lack of accountability throughout VA.

### Letters to the Department of Veterans Affairs and the Governors to Address Antisemitism on Campus

In July 2024, Chairman Bost sent letters to VA and the Governors of California, New York, Illinois, Massachusetts, Michigan, and North Carolina.[174] The letters inquired about the measures being taken by VA and state officials in each of their states on specific college campuses to ensure that Jewish student veterans are safe and free from harassment and discrimination. The letters also requested that the State Approving Agencies ("SAAs") investigate whether the safety and treatment of Jewish veteran students are affecting the ability of these universities to offer a harassment-free environment and to provide a quality education for GI Bill approval of schools. These states and universities were chosen because they received a D or F rating from the Anti-Defamation League's report card,[175] in part due to current litigation or recent anti-Zionist student activities.

As of the release of this staff report, the Committee has only received responses from the Governor of North Carolina,[176] Northwestern University,[177] and VA.[178] VA stated they are monitoring the situation and has shared a list of available federal resources for veterans. They have not, however, taken any further action to ensure the safety and quality of education for student veterans on campus. On November 12, 2024, a follow-up email was sent to the

---

[170] *Id.* at 18-21.

[171] *Id.* at 12-13.

[172] *Id.* at 13-14.

[173] *Id.* at 14.

[174] H. Committee on Veterans Affairs Letter from Mike Bost, Chairman, H. Comm. on Veterans Affairs, to Denis McDonough, Sec'y, U.S. Dep't of Veterans Affairs (July 8, 2024); H. Committee on Veterans Affairs Letters from Mike Bost, Chairman, H. Comm. on Veterans Affairs, to Governors Kathy Hochul, Gavin Newsom, Jay Robert Pritzker, Maura Healey, Gretchen Whitmer, Roy Cooper (July 8, 2024).

[175] Anti-Defamation League, Campus Antisemitism Report Card, https://www.adl.org/campus-antisemitism-report-card.

[176] Letter from Gov. Roy Cooper to Mike Bost, Chairman, the H. Comm. on Veterans Affairs (Aug. 9, 2024).

[177] Letter from Gov. Jay Robert Pritzker to Mike Bost, Chairman, the H. Comm. On Veterans Affairs (Nov. 9, 2024).

[178] Letter from Denis McDonough, Sec'y, U.S. Dep't of Veterans Affairs, to Mike Bost, Chairman, the H. Comm. on Veterans Affairs (Sept. 6, 2024).

**JA185**

HHSHarv_00000047

Governors' offices to request details about what actions have been taken to address the situation and to ensure the safety and treatment of Jewish veteran students. Specifically, the Committee asked what investigations or oversight actions, if any, have been initiated by colleges and universities where antisemitic activities have been reported. To date, the Committee has not heard back from any of the other Governors, with the exception of North Carolina, or any of the universities involved regarding these concerns.

**Northwestern University Policy Updates**

As referenced above, Northwestern provided the Committee with policy updates to address some of the concerns raised in our July letter to Governor Jay Robert Pritzker.[179] Northwestern indicated that it established a display and solicitation policy that provides clear rules regarding on-campus displays and flyers, prohibits the use of chalk on buildings or signs that violate university regulations, and updated its demonstration policy to include new requirements for how community members may engage in protests or similar activities. The university also revised its policies on discrimination, harassment, and sexual misconduct to align with definitions provided by the U.S. Department of Education.

According to Northwestern, the annual update to the Student Code of Conduct includes specific provisions that address the Committee's concerns. The new Intimidation Standard prohibits individuals from subjecting others to abusive, harassing, or violent behavior that substantially affects the ability of the person or group to learn, work, or live in the University environment. Furthermore, Northwestern has updated its Failure to Comply policy to ensure that students are held accountable for their actions. The University also clarified its University Properties Policy, defining what constitutes a violation of university spaces and expanding the definition of tampering or damaging property. At the start of the academic year, Northwestern enhanced its resources for law enforcement performance and increased patrols in areas significant to the University's Jewish community. Further, the University plans to strengthen its enforcement capacity by hiring an additional investigator in the Office of Community Standards, whose role will be to investigate and adjudicate alleged violations of the Student Code of Conduct. Finally, Northwestern implemented several educational and training initiatives aimed at improving the community's ability to engage in difficult conversations constructively and respectfully, including programs offered by the Center for Enlightened Disagreement.[180]

## B. <u>Recommendations</u>

- The Secretary, in collaboration with the State Approving Agencies, should establish anti-harassment and equal treatment policies and guidelines for educational institutions approved for participation in VA education programs to ensure that Jewish student veterans feel safe and respected on campus.

---

[179] H. Committee on Veterans Affairs Letters from Mike Bost, Chairman, H. Comm. on Veterans Affairs, to Gov. Kathy Hochul, Gavin Newsom, Jay Robert Pritzker, Maura Healey, Gretchen Whitmer, Roy Cooper (July 8, 2024).
[180] Northwestern Univ., Updates to Northwestern's Policies and Student Code of Conduct, Academic Year 2024-2025.

**JA186**

## House Antisemitism Staff Report

- State Approving Agencies should consider complaints related to antisemitism when conducting compliance surveys, risk-based surveys, and supervisory visits and consider these issues when certifying educational institutions for participation in the VA education programs.

- VA should establish a clear antisemitism definition to include in existing VA anti-harassment policies and ensure that all employees are held accountable for conduct that violates such policies.

**JA187**

HHSHarv_00000049

House Antisemitism Staff Report

## VIII.        The Committee on Ways and Means

### A. Overview of the Investigation

The House Committee on Ways and Means ("Ways and Means") has been actively investigating tax-exempt organizations and antisemitism across the U.S. in the wake of Hamas' attack in Israel on October 7, 2023. The Committee held its first hearing on this issue on November 15, 2023, and has since held three hearings related to tax-exempt organizations and antisemitism, gathering testimony from a dozen witnesses in the process.[181]

In addition to hearings, the Committee requested information and materials from various tax-exempt organizations, including tax-exempt colleges and universities. It also collected over 1,500 pages of documentation throughout its investigation, including information related to tax-exempt school policies, enforcement standards and activities of tax-exempt colleges and universities, various sources of funding for tax-exempt colleges and universities, and other information relevant to the investigation.

The Committee also leveraged resources and gained information and assurances from various governmental entities and tax-exempt organizations that more will be done going forward to better protect students on campus; hold bad actors accountable who violate rules on campus; and use tools available to the government to step-in when tax-exempt organizations are supporting illegal activity or operating outside of their tax-exempt purpose. To date, the Committee has sent over 40 letters to various tax-exempt schools, government entities including the U.S. Department of the Treasury, Internal Revenue Service ("IRS"), Federal Bureau of Investigation ("FBI"), and Department of Justice ("DOJ") as part of its investigation.

### B. Findings

Over the course of its investigation, the Ways and Means Committee found that several American-based tax-exempt organizations have funneled or are suspected of funneling American taxpayer dollars to designated terrorist organizations like Hamas. At the same time, American-based tax-exempt organizations have used taxpayer dollars to support, enable, and organize illegal encampments and/or protests that often resulted in violence, threats, and arrests. The Committee continues to investigate tax-exempt organizations engaging in activity that falls outside of well accepted tax-exempt purposes. Below are two case studies to illustrate some of the Committee's findings to date.

---

[181] H. Comm. on Ways and Means, *Hearing: From Ivory Towers to Dark Corners: Investigating the Nexus Between Antisemitism, Tax-Exempt Universities, and Terror-Financing* (Nov. 15, 2023), https://waysandmeans.house.gov/event/hearing-from-ivory-towers-to-dark-corners-investigating-the-nexus-between-antisemitism-tax-exempt-universities-and-terror-financing/; H. Comm. on Ways and Means, *Hearing on the Crisis on Campus: Antisemitism, Radical Faculty, and the Failure of University Leadership* (June 13, 2024), https://waysandmeans.house.gov/event/hearing-on-the-crisis-on-campus-antisemitism-radical-faculty-and-the-failure-of-university-leadership/; H. Comm. on Ways and Means, *Oversight Subcommittee Hearing on Fueling Chaos: Tracing the Flow of Tax-Exempt Dollars to Antisemitism* (July 23, 2024), https://waysandmeans.house.gov/event/oversight-subcommittee-hearing-on-fueling-chaos-tracing-the-flow-of-tax-exempt-dollars-to-antisemitism/.

JA188

HHSHarv_00000050

House Antisemitism Staff Report

**Case Study: The Alliance for Global Justice and Samidoun**

The Alliance for Global Justice ("the Alliance") is an Arizona-based 501(c)(3) organization that serves as a financial sponsor to over 130 "projects."[182] According to their website, the Alliance envisions "societies which explore and implement alternatives to the unjust domination of governments, global financial institutions and multinational corporations" and their mission is to "achieve social change and economic justice by helping to build a stronger more unified grassroots movement."[183] According to the Alliance's 2023 Form 990, its mission is to "achieve social change and economic justice by helping to build a stronger and more unified grassroots movement."[184]

Over the course of its investigation, the Committee discovered that Samidoun—a financially sponsored project of the Alliance—was connected to terrorism in the Middle East and actively worked with Hamas and others to use "donations" to fund unrest and chaos in the region.[185] Despite describing itself as "an international network of activists working to build solidarity with Palestinian prisoners in their struggle for freedom,"[186] their conduct suggests something very different. For example, in February 2021, the National Bureau for Counter Terror Financing of Israel ("NBCTF") designated Samidoun a terrorist organization and a "part of the Popular Front for the Liberation of Palestine ("PFLP"),"[187] which itself has been designated as a foreign terrorist organization by the U.S. Department of State since 1997.[188] According to the NBCTF, one of Samidoun's leaders is part of the leadership of the PFLP, has been involved in the establishment of militant cells, and has motivated terrorist activity in "Judea & Samaria and abroad."[189]

On September 24, 2024, the Committee called on the IRS to revoke the tax-exempt status of multiple organizations, including the Alliance.[190] On October 15, 2024, just weeks after the Committee sent a letter to the IRS demanding an investigation into Samidoun and revocation of its financial sponsor's tax-exempt status, the Committee's suspicions were confirmed when the Department of the Treasury's Office of Foreign Assets Control designated Samidoun as a sham charity that serves as an international fundraiser for the PFLP terrorist organization.[191]

---

[182] Fiscal Sponsorship, Alliance for Global Justice (last accessed Aug. 14, 2024), https://afgj.org/fsp.

[183] Our Mission, Alliance for Global Justice (last accessed Aug. 14, 2024), https://afgj.org/about/our-mission.

[184] 2023 Form 990, Alliance for Global Justice Corp, PROPUBLICA (Feb. 12, 2024), https://projects.propublica.org/nonprofits/organizations/522094677/202430439349301048/full.

[185] *Israel Designates "Samidoun" As A Terrorist Organization*, National Bureau for Counter Terror Financing of Israel (Feb. 28, 2021), https://nbctf.mod.gov.il/en/Pages/SamidounEN.aspx.

[186] Donate, Samidoun (last accessed June 25, 2024), https://samidoun.net/about-samidoun/; About Samidoun, Samidoun (last accessed June 25, 2024), https://samidoun.net/about-samidoun/.

[187] *Israel Designates "Samidoun" As A Terrorist Organization*, National Bureau for Counter Terror Financing of Israel (Feb. 28, 2021), https://nbctf.mod.gov.il/en/Pages/SamidounEN.aspx.

[188] Foreign Terrorist Organizations, U.S. Dept. of State (last accessed Aug. 14, 2024), https://www.state.gov/foreign-terrorist-organizations/.

[189] *Id.*

[190] Letters from The Hon. Jason Smith, Chairman, H. Comm. on Ways and Means to The Hon. Daniel Werfel, Comm'r of the IRS (Sept. 24, 2024), https://waysandmeans.house.gov/wp-content/uploads/2024/09/Tax-Exempt-Status-Revocation-Letters.pdf.

[191] Tom Winter, Simone Weichselbaum, and Chloe Atkins, *Pro-Hamas group that helped organize college protests is a 'sham charity,' Treasury says*, NBC (Oct. 15, 2024), https://www.nbcnews.com/news/us-news/-hamas-group-helped-organize-college-protests-sham-charity-treasury-sa-rcna175529.

38

**JA189**

## House Antisemitism Staff Report

**Case Study: American Muslims for Palestine and AJP Educational Foundation, Inc.**

      Another American-based tax-exempt organization connected to illegal activity here in the U.S. is American Muslims for Palestine ("AMP"). AMP is a Virginia-based nonprofit network which claims to educate, organize, and mobilize Muslim-American communities, as well as other communities, to advance Palestinian rights.[192] In part through their tax-exempt 501(c)(3) organization called AJP Educational Foundation ("AJP") and its financially sponsored project, Students for Justice in Palestine ("SJP"), however, AMP is suspected of supporting illegal activity and has been one of the leading agitators in campus unrest this past year through SJP.[193]

      Over the course of its investigation, the Committee discovered that AMP and SJP provided tangible support, including flyers, talking points, pamphlets, and other materials, to help support unauthorized and illegal encampments on college campuses across the country this spring.[194] For example, the day after the Hamas terrorist attacks in Israel, SJP chapters disseminated a "toolkit" which identified AMP and SJP as part of a "Unity Intifada" governed by Hamas' "unified command," encouraged teach-ins and training on how to organize a protest, and advertised a "National Day of Resistance."[195] Following the release of this "toolkit," colleges and universities across the country became hot beds for threats, violence, and discrimination, ultimately leading to dozens of arrests.[196] Along with providing tangible resources like talking points and flyers, AMP and AJP also financially sponsored SJP, helping to provide the funding necessary to organize illegal encampments and other events that have often resulted in violence and arrests.

      While AMP and SJP have been helping incite violence, promulgate propaganda, and foment chaos across the country, they have also been under investigation for suspected ties to organizations previously associated with terrorist activity and possible financial links to

---

[192] *Id.*

[193] Shimon Sherman, *Who is paying for the American campus protests?*, JEWISH NEWS SYNDICATE (May 3, 2024), https://www.jns.org/who-is-paying-for-the-american-campus-protests/; *see also* Will Carless and Romina Ruiz-Goiriena, *Amid campus protests, organizers with past ties to Hamas also emerge*, USA TODAY (May 22, 2024), https://www.usatoday.com/story/news/investigations/2024/05/22/gaza-student-protests-american-muslims-for-palestine/73775372007/.

[194] *Lawsuit Filed on Behalf of American and Israeli Victims of Hamas Oct. 7 Terrorist Attack Against AJP Educational Foundation, Inc. a/k/a American Muslims for Palestine and National Students for Justice in Palestine*, Holtzman Vogel (May 1, 2024), https://www.holtzmanvogel.com/news-insights/lawsuit-filed-on-behalf-of-american-and-israeli-victims-of-hamas-oct-7-terrorist-attack-against-ajp-educational-foundation-inc-a-k-a-american-muslims-for-palestine-and-national-students-for-justice-in-palestine.; *see also* Morgan Sweeney, *American Muslims for Palestine ordered to comply with Virginia AG records request*, WASHINGTON EXAMINER (July 17, 2024), https://www.washingtonexaminer.com/news/3086995/american-muslims-for-palestine-ordered-to-comply-with-virginia-ag-records-request/.

[195] Compl. For Damages and Jury Trial Demand, 42, *Parizer et al v. AJP Educational Foundation Inc. et al*, E.D. Va. (May 2024).

[196] Caitlin McLean, *MPD Clears GW Encampment, Arrests 33*, THE HOYA (May 8, 2024), https://thehoya.com/news/developing-mpd-clears-gw-encampment-arrests-33-students/; Shimon Prokupecz, et. al, *Over 100 people arrested as NYPD breaks up pro-Palestinian protest at Columbia University, law enforcement source says*, NCAA (April 18, 2024), https://www.cnn.com/2024/04/18/us/nypd-disperses-pro-palestinian-protest-columbia-university/index.html; Haley Sandlow, *Brown Students for Justice in Palestine talk organizing efforts, respond to Nov. 8 student arrests*, THE BROWN DAILY HERALD (Nov. 19, 2023), https://www.browndailyherald.com/article/2023/11/brown-students-for-justice-talk-organizing-efforts-respond-to-nov-8-student-arrests.

**JA190**

HHSHarv_00000052

## House Antisemitism Staff Report

Hamas.[197] The Virginia Attorney General initiated an investigation of the organization, alleging that it may have used funds for impermissible purposes, including "benefiting or providing support to terrorist organizations."[198] Even without any potential ties to terrorism, however, AMP's activities make it difficult to understand what tax-exempt purpose the group serves.

As the above case studies show, American taxpayer funding is currently supporting terrorist organizations and violations of American law, and certain tax-exempt organizations appear to be lacking any charitable or socially beneficial purpose to justify a tax exemption. The Committee's findings that tax-exempt organizations are operating outside of their tax-exempt purposes and in violation of the law are not only concerning, but also amount to a violation of the American people's trust. Congress must consider ways to put an end to this abuse. Based on the Committee's findings, several recommendations are listed below.

### C. **Recommendations**

Below are five recommendations from the Ways and Means Committee based on the Committee's investigative findings to date.

- Congress should enact legislation that was previously reported by the Ways and Means Committee and passed by the House, including H.R. 9495 and/or H.R. 6408. Both bills would help cut off funding for groups that provide material support for terrorism.

- Congress should enact other bills previously considered and passed by the Ways and Means Committee that would support this effort and build on the Committee's investigation including H.R. 8913, which would incentivize schools to prioritize enrolling American students, and H.R. 8914, which would give the IRS tools to hold tax-exempt colleges and universities accountable by imposing a significant tax penalty if they are found by a court of law to have violated a student's civil rights.

- Congress should also consider finding ways to incentivize colleges and universities to better protect students and secure their campuses. For example, many of the worst offenders this past year were the colleges and universities with the largest endowments in the country. It is worth exploring mechanisms that require colleges and universities to leverage their massive endowments to better secure their campuses. For example, Congress should consider legislation that changes the endowment formula and/or the endowment tax rate.

- Congress should consider enacting various policies, including one that would prohibit individuals who are associated with organizations that have been shut down due to ties or suspected ties to known terrorist organizations from organizing and starting a similar or identical tax-exempt organization under a different name. This would help close loopholes that groups like AMP and SJP have taken advantage of in the past.

---

[197] *Id.*

[198] Michael Starr, *Court orders American Muslims for Palestine to give Virginia AG documents over alleged Hamas ties*, THE JERUSALEM POST (July 17, 2024), https://www.jpost.com/diaspora/antisemitism/article-810733.

**JA191**

HHSHarv_00000053

# House Antisemitism Staff Report

- Congress should explore ways to ensure that tax-exempt organizations do not financially sponsor projects that do not further their tax-exempt purpose, organizational mission, or result in illegal activity. While many financial sponsorship relationships are genuine and beneficial for the country, others are used to shield bad actors from transparency and accountability. We must explore mechanisms to hold financial sponsors more accountable for illegal activity conducted by the projects they sponsor.

41

**JA192**

HHSHarv_00000054

## House Antisemitism Staff Report

## IX. Conclusion

The House-wide investigation has uncovered deeply troubling realities about how antisemitism has been allowed to fester unchecked, including in universities and institutions across the country, with little to no accountability or oversight to prevent its continued spread. The events of the past year have laid bare the systemic failures of many universities, other nonprofit organizations, public officials, higher education administrators, and the federal government in addressing antisemitism – a pervasive issue they can no longer ignore.

The findings expose a disturbing pattern of defensiveness and denial among institutions. Rather than confronting the severity of the problem, many institutions have dismissed congressional and public criticism and abdicated responsibility for the hostile environments they have enabled. This refusal to acknowledge or address the issue has allowed antisemitism to take root and thrive in spaces that contravene the values of this great nation.

The House-wide effort has culminated in a set of recommendations for schools, Congress, and the executive branch to consider. These actionable steps are designed to ensure that the rising tide of antisemitism is confronted and eradicated at its core. By holding institutions accountable and fostering an environment of responsibility, these measures aim to restore safety and respect for Jewish Americans across the country.

This report serves to summarize the House-wide effort in the 118th Congress, but we are committed to continuing this vital work. As we move toward the 119th Congress, we look forward to collaborating with the Senate and executive branch to combat antisemitism with the urgency and moral clarity this moment demands. Together, we will uphold the principles that define our nation and work to root out antisemitism from every corner of American society.

JA193

HHSHarv_00000055



AN INTERNATIONAL ORGANIZATION DEDICATED TO PROTECTING THE RIGHTS OF ALL ANIMALS

PEOPLE FOR
THE ETHICAL
TREATMENT
OF ANIMALS

Washington
1536 16th St. N.W.
Washington, DC 20036
202-483-PETA

Los Angeles
2154 W. Sunset Blvd
Los Angeles, CA 90026
323-644-PETA

Norfolk
501 Front St.
Norfolk, VA 23510
757-622-PETA

Info@peta.org
PETA.org

April 1, 2025

Josh Gruenbaum
Commissioner
Federal Acquisition Service
U.S. General Services Administration

Via e-mail: josh.gruenbaum@gsa.gov

Dear Mr. Gruenbaum:

Thank you in advance for your time and for your dedication to improving how taxpayer money is allocated for biomedical research. I'm writing as a neuroscientist on behalf of People for the Ethical Treatment of Animals (PETA) to request that, as you and other members of the Joint Task Force to Combat Anti-Semitism review federal funding to Harvard University, you consider canceling Harvard's National Institutes of Health (NIH) funding for cruel and ineffective visual deprivation experiments on infant rhesus macaques.

The experiments, conducted at Harvard Medical School and supported by projects R01NS123778 and R01EY02567, have *already* received $15,469,436 in funding from NIH but have produced no meaningful benefit to humans. These experiments involve performing exceptionally harmful procedures on infant rhesus macaques that are not only unethical but also outdated and redundant. Hundreds of scientists have openly objected to these experiments on ethical and scientific grounds, but to date, the concerns of these outside scientists have been ignored.

After reviewing the information provided below, I think you will agree that these experiments no longer deserve federal funding and should be terminated immediately.

**Useless Data and Irreversible Harms**
The experiments in question, led by principal investigator Margaret Livingstone, involve permanently removing infant monkeys from their mothers at birth and subjecting them to various visual deprivation procedures. These procedures, shockingly, include forcing these newborn infants to wear helmets and goggles that create stroboscopic effects for the first 18 months of their lives. Other visual deprivation procedures to which these maternally deprived infants are subjected include forcing them to wear goggles that invert their visual input or alternatively occlude their right and left eyes for at least their first year of life. The eyelids of some monkeys in this laboratory were sewn shut for an entire year. After these monkeys have been removed from their mothers and their visual input has been disrupted, impeded, or warped, their skulls are then encased in an acrylic shell so

Entities
• PETA Asia
• PETA India
• PETA France
• PETA Australia
• PETA Germany
• PETA Switzerland
• PETA Netherlands
• PETA Foundation (U.K.)

**JA194**

HHSHarv_00000056

that experimenters can attach a head fixation device and implant electrodes into their brains.

It's well established that mother-deprived infant monkeys like those in this laboratory experience both immediate and long-term effects from this deprivation. Monkeys separated from their mothers exhibit excessive fearfulness and/or aggression,[1] produce excess stress hormones,[2] display abnormal reproductive behavior, and frequently rank at the bottom of the social-dominance hierarchy.[3] Maternally deprived macaques are more likely to engage in self-injurious behavior,[4] exhibit motor stereotypies indicative of frustration and stress,[5] experience abnormal sleep patterns,[6] and demonstrate increased startle and stress responses to threatening stimuli.[7] They are also more susceptible to infection.[8]

Additionally, maternal deprivation affects brain structure and function. Monkeys "hand-reared" in a laboratory setting exhibit altered serotonin pathway function[9,10] and cerebral blood flow[11] as well as altered levels of brain-derived neurotrophic factor and nerve growth factor critical for normal brain function.[12] Maternal deprivation also has long-term effects on brain morphology,[13] including in the cortical regions Livingstone is studying.[14] These substantive brain alterations not only reflect the atypical development these animals are being forced to experience but also influence the generalizability of Livingstone's own neurological data. As the purported purpose of these experiments is to selectively study the impact of visual deprivation on these animals' cortical and visual processing development, ignoring the additional neurological effects caused by maternal deprivation is problematic and potentially misleading.

These already emotionally and physically damaged monkeys are then forced to live in what can only be described as a visually confusing and terrifying world, with their vision continuously and ultimately permanently disrupted. Moreover, these sorts of visual deprivation procedures are known to cause permanent retinal damage (including retinal detachment in some species) and balance and gait abnormalities, in addition to the expected visual deficits and visual system aberrations the experimenters are trying to induce. In fact, brief stroboscopic conditions are frequently used as both chronic and acute stressors in animals in laboratories due to their long- and short-term effects on the animals' physical and psychological well-being.[15,16,17,18] The impact of 18 months of strobe lighting on the overall health of these monkeys is likely to be profound, but it was not taken into consideration when evaluating the harms induced by these experiments versus their purported scientific merits.

**Redundant Experiments**

The purported purpose of these experiments is to "explore how specific abnormal early visual experience changes neuronal selectivity." However, these sorts of visual deprivation experiments have been performed ad nauseam for the past 50 years in a host of animal species, including goldfish,[19] chickens,[20] rats,[21,22] songbirds,[23] frogs,[24] rabbits,[25,26,27] guinea pigs,[28] cats,[29,30,31,32,33] *and* nonhuman primates.[34,35,36,37] The only novel aspect of this $2 million project is the extreme length of time that the monkeys will endure strobe-, prism-, and binocular deprivation–rearing. The fact that, to date, no other experimenter has forced infant macaques to live under stroboscopic lighting conditions for the first 18 months of their lives doesn't make these experiments scientifically innovative; it simply makes them ethically unprecedented.

There are a multitude of projects using noninvasive methods with humans to study the impact of early sensory experience on neural and visual development. For example, research with humans who experience early transient congenital blindness,[38,39,40,41] amblyopia,[42] and visual impairments[43] has investigated the effects of abnormal early visual experience on the development of vision and

**JA195**

HHSHarv_00000057

other senses, eye-tracking behavior, neural reorganization, and domain-specific visual abilities. Researchers have also studied the effect of short-term monocular deprivation in human volunteers and its effects on binocular rivalry,[44] visual evoked potentials,[45] and BOLD activity in the visual cortex[46] and have assessed the neurochemical mechanisms associated with plasticity in the visual cortex.[47] In addition to being human-relevant, these studies don't suffer from the numerous confounds introduced by maternal deprivation in the experiments performed in Livingstone's laboratory.

**Conclusion**
Given the cruelty inherent in the experiments performed under projects R01EY02567 and R01NS123778, their complete redundancy to the field, and the availability of modern, noninvasive methods, we think you will agree that they are not in line with your vision for what the government should fund. These projects should be discontinued before any more money is wasted or more baby monkeys are harmed.

I would be happy to meet with you to discuss this critical matter. Thank you again.

Sincerely,

Katherine V. Roe, Ph.D.
Chief Scientist
Laboratory Investigations Department

[1]Suomi SJ. Early determinants of behaviour: evidence from primate studies. *Br Med Bull*. 1997;53(1):170–184.
[2]Feng X, Wang L, Yang S, et al. Maternal separation produces lasting changes in cortisol and behavior in rhesus monkeys [published correction appears in *Proc Natl Acad Sci U S A*. 2012 Jul 24;109(30):12260].
[3]Dettmer AM, Novak MA, Suomi SJ, Meyer JS. Physiological and behavioral adaptation to relocation stress in differentially reared rhesus monkeys: hair cortisol as a biomarker for anxiety-related responses. *Psychoneuroendocrinology*. 2012;37(2):191–199.
[4]Drago L, Thierry B. Effects of six-day maternal separation on Tonkean macaque infants. *Primates*. 2000;41(2):137–145.
[5]Barr CS, Becker M L, Suomi SJ., Higley JD. Relationships among CSF monoamine metabolite levels, alcohol sensitivity, and alcohol-related aggression in rhesus macaques. *Aggressive Behavior*. 2005. 29(4), 288–301.
[6]Barrett CE, Noble P, Hanson E, Pine DS, Winslow JT, Nelson EE. Early adverse rearing experiences alter sleep-wake patterns and plasma cortisol levels in juvenile rhesus monkeys. *Psychoneuroendocrinology*. 2009;34(7):1029–1040.
[7]Nelson EE, Herman KN, Barrett CE, et al. Adverse rearing experiences enhance responding to both aversive and rewarding stimuli in juvenile rhesus monkeys. *Biol Psychiatry*. 2009;66(7):702–704.
[8]Bailey MT, Coe CL. Maternal separation disrupts the integrity of the intestinal microflora in infant rhesus monkeys. *Dev Psychobiol*. 1999;35(2):146–155.
[9]Bennett AJ, Lesch KP, Heils A, et al. Early experience and serotonin transporter gene variation interact to influence primate CNS function. *Mol Psychiatry*. 2002;7(1):118–122.
[10]Spinelli S, Chefer S, Carson RE, et al. Effects of early-life stress on serotonin(1A) receptors in juvenile rhesus monkeys measured by positron emission tomography. *Biol Psychiatry*. 2010;67(12):1146–1153.

**JA196**

[11]Ichise M, Vines DC, Gura T, et al. Effects of early life stress on [11C]DASB positron emission tomography imaging of serotonin transporters in adolescent peer- and mother-reared rhesus monkeys. *J Neurosci*. 2006;26(17):4638–4643.

[12]Cirulli F, Francia N, Branchi I, et al. Changes in plasma levels of BDNF and NGF reveal a gender-selective vulnerability to early adversity in rhesus macaques. *Psychoneuroendocrinology*. 2009;34(2):172–180.

[13]Spinelli S, Chefer S, Suomi SJ, Higley JD, Barr CS, Stein E. Early-life stress induces long-term morphologic changes in primate brain. *Arch Gen Psychiatry*. 2009;66(6):658–665.

[14]Wang J, Feng X, Wu J, et al. Alterations of gray matter volume and white matter integrity in maternal deprivation monkeys. *Neuroscience*. 2018;384:14–20.

[15]McNeal N, Appleton KM, Johnson AK, et al. The protective effects of social bonding on behavioral and pituitary-adrenal axis reactivity to chronic mild stress in prairie voles. *Stress*. 2017;20(2):175–182. doi:10.1080/10253890.2017.1295444

[16]Tõnissaar M, Herm L, Eller M, Kõiv K, Rinken A, Harro J. Rats with high or low sociability are differently affected by chronic variable stress. *Neuroscience*. 2008;152(4):867–876. doi:10.1016/j.neuroscience.2008.01.028

[17]Huang YL, Zeng NX, Chen J, et al. Dynamic changes of behaviors, dentate gyrus neurogenesis and hippocampal miR-124 expression in rats with depression induced by chronic unpredictable mild stress. *Neural Regen Res*. 2020;15(6):1150–1159. doi:10.4103/1673-5374.270414

[18]Crombie GK, Palliser HK, Shaw JC, Hodgson DM, Walker DW, Hirst JJ. Neurosteroid-based intervention using Ganaxolone and Emapunil for improving stress-induced myelination deficits and neurobehavioural disorders. *Psychoneuroendocrinology*. 2021;133:105423. doi:10.1016/j.psyneuen.2021.105423

[19]Schmidt JT, Eisele LE. Stroboscopic illumination and dark rearing block the sharpening of the regenerated retinotectal map in goldfish. *Neuroscience*. 1985;14(2):535–546. doi:10.1016/0306-4522(85)90308-2

[20]Goode CT, Maney DL, Rubel EW, Fuchs AF. Visual influences on the development and recovery of the vestibuloocular reflex in the chicken. *J Neurophysiol*. 2001;85(3):1119–1128. doi:10.1152/jn.2001.85.3.1119

[21]Song SJ, Lee EJ, Craft CM, Shin JA. Recovery of dopaminergic amacrine cells after strobe light stimulation in the developing rat retina. *Exp Eye Res*. 2023;228:109394. doi:10.1016/j.exer.2023.109394

[22]Shin JA, Jeong E, Kim IB, Lee HY. Effects of strobe light stimulation on postnatal developing rat retina. *Exp Brain Res*. 2014;232(3):765–773. doi:10.1007/s00221-013-3786-8

[23]Hultsch H, Schleuss F, Todt D. Auditory-visual stimulus pairing enhances perceptual learning in a songbird. *Anim Behav*. 1999;58(1):143–149. doi:10.1006/anbe.1999.1120

[24]Brickley SG, Dawes EA, Keating MJ, Grant S. Synchronizing retinal activity in both eyes disrupts binocular map development in the optic tectum. *J Neurosci*. 1998;18(4):1491–1504. doi:10.1523/JNEUROSCI.18-04-01491.1998

[25]Pearson HE, Berman N, Murphy EH. Critical periods in development for susceptibility to the effects of stroboscopic rearing in the rabbit visual cortex. *Exp Brain Res*. 1983;50(2–3):367–372. doi:10.1007/BF00239202

[26]Pearson HE. Frequency specific effects of stroboscopic rearing in the visual cortex of the rabbit. *Brain Res*. 1983;283(2–3):187–196. doi:10.1016/0165-3806(83)90175-x

[27]Pearson HE, Murphy EH. Effects of stroboscopic rearing on the response properties and laminar distribution of single units in the rabbit superior colliculus. *Brain Res*. 1983;285(3):241–250. doi:10.1016/0165-3806(83)90022-6

[28]Di Y, Lu N, Liu R, Chu R, Zhou X, Zhou X. The effect of various levels of stroboscopic illumination on the growth of guinea pig eyes. *Clin Exp Optom*. 2014;97(1):55–61. doi:10.1111/cxo.12079

[29]Cynader M, Berman N, Hein A. Cats reared in stroboscopic illumination: effects on receptive fields in visual cortex. *Proc Natl Acad Sci U S A*. 1973;70(5):1353–1354. doi:10.1073/pnas.70.5.1353

[30]Melvill Jones G, Mandl G, Cynader M, Outerbridge JS. Eye oscillations in strobe reared cats. *Brain Res*. 1981;209(1):47–60. doi:10.1016/0006-8993(81)91171-9

[31]Flandrin JM, Kennedy H, Amblard B. Effects of stroboscopic rearing on the binocularity and directionality of cat superior colliculus neurons. *Brain Res*. 1976;101(3):576–581. doi:10.1016/0006-8993(76)90481-9

[32]Rauschecker JP, Schrader W. Effects of monocular strobe rearing on kitten striate cortex. *Exp Brain Res*. 1987;68(3):525–532. doi:10.1007/BF00249796

[33]Marchand AR, Crémieux J, Amblard B. Early sensory determinants of locomotor speed in adult cats: II. Effects of strobe rearing on vestibular functions. *Behav Brain Res*. 1990;37(3):227–235. doi:10.1016/0166-4328(90)90134-z

[34]Nakatsuka C, Zhang B, Watanabe I, et al. Effects of perceptual learning on local stereopsis and neuronal responses of V1 and V2 in prism-reared monkeys. *J Neurophysiol*. 2007;97(4):2612–2626. doi:10.1152/jn.01001.2006

[35]Karsolia A, Burns E, Pullela M, Das VE. Longitudinal Development of Ocular Misalignment in Nonhuman Primate Models for Strabismus. *Invest Ophthalmol Vis Sci*. 2020;61(4):8. doi:10.1167/iovs.61.4.8

[36]Smith EL 3rd, Hung LF, Arumugam B, Wensveen JM, Chino YM, Harwerth RS. Observations on the relationship between anisometropia, amblyopia and strabismus. *Vision Res*. 2017;134:26–42. doi:10.1016/j.visres.2017.03.004

[37]Tusa RJ, Mustari MJ, Das VE, Boothe RG. Animal models for visual deprivation-induced strabismus and nystagmus. *Ann N Y Acad Sci*. 2002;956:346–360. doi:10.1111/j.1749-6632.2002.tb02833.x

**JA197**

HHSHarv_00000059

[38]Guerreiro MJ, Putzar L, Röder B. The effect of early visual deprivation on the neural bases of multisensory processing. *Brain*. 2015;138(Pt 6):1499–1504.

[39]Bottari D, Kekunnaya R, Hense M, Troje NF, Sourav S, Röder B. Motion processing after sight restoration: no competition between visual recovery and auditory compensation. *Neuroimage*. 2018;167:284–296.

[40]Ossandón JP, Zerr P, Shareef I, Kekunnaya R, Röder B. Active vision in sight recovery individuals with a history of long-lasting congenital blindness [published online ahead of print, 2022 Sep 26]. *eNeuro*. 2022;ENEURO.0051-22.2022.

[41]Guerreiro MJS, Kekunnaya R, Röder B. Top-down modulation of visual cortical processing after transient congenital blindness. *Neuropsychologia*. 2022;174:108338.

[42]Ghasia F, Wang J. Amblyopia and fixation eye movements. *J Neurol Sci*. 2022;441:120373. doi:10.1016/j.jns.2022.120373

[43]Collignon O, Voss P, Lassonde M, Lepore F. Cross-modal plasticity for the spatial processing of sounds in visually deprived subjects. *Exp Brain Res*. 2009;192(3):343–358.

[44]Lunghi C, Burr DC, Morrone C. Brief periods of monocular deprivation disrupt ocular balance in human adult visual cortex. *Curr Biol*. 2011;21(14):R538–R539.

[45]Lunghi C, Berchicci M, Morrone MC, Di Russo F. Short-term monocular deprivation alters early components of visual evoked potentials. *J Physiol*. 2015;593(19):4361–4372.

[46]Binda P, Kurzawski JW, Lunghi C, Biagi L, Tosetti M, Morrone MC. Response to short-term deprivation of the human adult visual cortex measured with 7T BOLD. *Elife*. 2018;7:e40014.

[47]Sheynin Y, Chamoun M, Baldwin AS, Rosa-Neto P, Hess RF, Vaucher E. Cholinergic potentiation alters perceptual eye dominance plasticity induced by a few hours of monocular patching in adults. *Front Neurosci*. 2019;13:22.

**JA198**

HHSHarv_00000060