**No. 25-2230**

## UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

PRESIDENT AND FELLOWS OF HARVARD COLLEGE,

*Plaintiff-Appellee*,

v.

US DEPARTMENT OF HEALTH AND HUMAN SERVICES; NATIONAL INSTITUTES OF HEALTH; ROBERT F. KENNEDY, JR., in the official capacity as Secretary of the United States Department of Health and Human Services; US DEPARTMENT OF JUSTICE; TODD BLANCHE, in the official capacity as Acting Attorney General of the United States; US DEPARTMENT OF EDUCATION; LINDA M. MCMAHON, in the official capacity as Secretary of the United States Department of Education; US GENERAL SERVICES ADMINISTRATION; EDWARD FORST, in the official capacity as Administrator of the United States General Services Administration; US DEPARTMENT OF ENERGY; CHRISTOPHER A. WRIGHT, in the official capacity as Secretary of the United States Department of Energy; US NATIONAL SCIENCE FOUNDATION; BRIAN STONE, in the official capacity as Acting Director of the United States National Science Foundation; US DEPARTMENT OF DEFENSE; PETER B. HEGSETH, in the official capacity as Secretary of the United States Department of Defense; NATIONAL AERONAUTICS AND SPACE ADMINISTRATION; JARED ISAACMAN, in the official capacity as Administrator of the National Aeronautics and Space Administration; US DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT; SCOTT TURNER, in the official capacity as Secretary of Housing and Urban Development; US DEPARTMENT OF AGRICULTURE; BROOKE L. ROLLINS, in her official capacity as Secretary of Agriculture,

*Defendants-Appellants*.

On Appeal from the United States District Court for the District of Massachusetts,
No. 25-cv-11048

### BRIEF FOR PLAINTIFF-APPELLEE

| | |
|---|---|
| STEVEN P. LEHOTSKY | PAUL D. CLEMENT |
| MARY ELIZABETH MILLER | *Counsel of Record* |
| SHANNON G. DENMARK | JAMES Y. XI |
| LEHOTSKY COHN LLP | JEFFREY C. THALHOFER |
| 200 Massachusetts Ave. NW, Suite 700 | CLEMENT & MURPHY, PLLC |
| Washington, DC 20001 | 706 Duke Street |
| | Alexandria, VA 22314 |
| | (202) 742-8900 |
| | paul.clement@clementmurphy.com |

*Counsel for Plaintiff-Appellee*

July 15, 2026          (*Additional counsel listed on inside cover*)

Joshua S. Levy
ROPES & GRAY LLP
800 Boylston Street
Boston, MA 02199

Douglas H. Hallward-Driemeier
ROPES & GRAY LLP
2099 Pennsylvania Ave NW
Washington, DC 20006

William A. Burck
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
1300 I St. NW, Suite 900
Washington, DC 20005

Robert K. Hur
KING & SPALDING LLP
1700 Pennsylvania Ave. NW, Suite 900
Washington, DC 20006

ii

# TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................i

INTRODUCTION ........................................................................................ 1

STATEMENT OF THE CASE ..................................................................... 4

    A.    Legal Background. ................................................................... 4

    B.    Factual Background and Procedural History. ........................... 6

SUMMARY OF ARGUMENT ................................................................... 26

ARGUMENT ............................................................................................. 30

I.    The District Court Correctly Granted Summary Judgment To Harvard On Its First Amendment Claims. ........................................ 30

    A.    The Freeze Orders and Termination Letters Violate the First Amendment ............................................................... 30

        1.    The Freeze Orders and Termination Letters are retaliation for First Amendment-protected activity. ...................................................................... 30

        2.    The Freeze Orders and Termination Letters impose unconstitutional conditions based on viewpoint. ................................................................. 36

    B.    The Government's Contrary Arguments Are Meritless.............. 38

II.    The District Court Correctly Granted Summary Judgment For Harvard On Its Title VI Claims............................................................ 41

III.    The District Court Had Jurisdiction Over Harvard's First Amendment And Title VI Claims And The Relief Requested And Granted. ............................................................................................ 45

CONCLUSION ......................................................................................... 56

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases**

*Agency for Int'l Dev. v. All. For Open Soc'y Int'l,*
  570 U.S. 205 (2013).............................................................. 26, 37, 38

*Alexander v. Sandoval,*
  532 U.S. 275 (2001)..................................................................... 5

*Asociacion de Educacion Privada de Puerto Rico v. Garcia-Padilla,*
  490 F.3d 1 (1st Cir. 2007)............................................................ 31

*Barton v. Clancy,*
  632 F.3d 9 (1st Cir. 2011)............................................................ 33

*Berge v. Sch. Comm. of Gloucester,*
  107 F.4th 33 (1st Cir. 2024)...................................................... 27, 30

*Blasdel v. Nw. Univ.,*
  687 F.3d 813 (7th Cir. 2012)........................................................ 32

*Borough of Duryea v. Guarnieri,*
  564 U.S. 379 (2011)..................................................................... 32

*Bowen v. Massachusetts,*
  487 U.S. 879 (1988)..............................................................*passim*

*Bowman Transp. v. Ark.-Best Freight Sys.,*
  419 U.S. 281 (1974)..................................................................... 24

*Colwell v. HHS,*
  558 F.3d 1112 (9th Cir. 2009)..................................................... 6, 49

*Crowley Gov't Servs. v. Gen. Servs. Admin.,*
  38 F.4th 1099 (D.C. Cir. 2022) .......................................... 21, 47, 48, 49

*D.B. ex rel. Elizabeth B. v. Esposito,*
  675 F.3d 26 (1st Cir. 2012)....................................................... 27, 30

*Dep't of Com. v. New York,*
  588 U.S. 752 (2019)..................................................................... 42

*Dep't of Educ. v. California*,
   604 U.S. 650 (2025)..................................................................................*passim*

*DSE, Inc. v. United States*,
   169 F.3d 21 (D.C. Cir. 1999)....................................................... 49

*FEC v. Democratic Senatorial Campaign Comm.*,
   454 U.S. 27 (1981)..................................................................... 44

*Great-West Life & Annuity Ins. v. Knudson*,
   534 U.S. 204 (2002)................................................................... 20

*Guardians Ass'n v. Civ. Serv. Comm'n*,
   463 U.S. 582 (1983)..................................................................... 5

*Healy v. James*,
   408 U.S. 169 (1972)................................................................... 32

*Hiers v. Bd. of Regents*,
   2022 WL 748502, at *13 (E.D. Tex. Mar. 11, 2022) ..................................... 36

*Hou. Cmty. Coll. Sys. v. Wilson*,
   595 U.S. 468 (2022)....................................................... 4, 26, 30

*Kennedy v. Bremerton Sch. Dist.*,
   597 U.S. 507 (2022)................................................................... 39

*Keyishian v. Bd. of Regents*,
   385 U.S. 589 (1967)..................................................................... 4

*Kidwell v. Dep't of Army*,
   56 F.3d 279 (D.C. Cir. 1995)....................................................... 47

*Koontz v. St. Johns River Water Mgmt. Dist.*,
   570 U.S. 595 (2013)................................................................... 37

*Lozman v. Riviera Beach*,
   585 U.S. 87 (2018)..................................................................... 32

*Massachusetts v. NIH*,
   164 F.4th 1 (1st Cir. 2026)....................................................... 29

iii

*Me. Cmty. Health Options v. United States*,
    590 U.S. 296 (2020)......................................................................... 22, 50

*Megapulse v. Lewis*,
    672 F.2d 959 (D.C. Cir. 1982) ....................................................... 46, 47, 55

*Moody v. NetChoice*,
    603 U.S. 707 (2024).............................................................................. 40

*Mt. Healthy City Sch. Dist. v. Doyle*,
    429 U.S. 274 (1977).............................................................................. 35

*New York v. Trump*,
    171 F.4th 1 (1st Cir. 2026)................................................................. 51, 52

*NIH v. APHA*,
    145 S.Ct. 2658 (2025) ....................................................................*passim*

*P. Gioioso & Sons v. OSHRC*,
    115 F.3d 100 (1st Cir. 1997)................................................................. 44

*Pearson v. Mass. Bay Transp. Auth.*,
    723 F.3d 36 (1st Cir. 2013)................................................................... 40

*Pernell v. Fla. Bd. of Governors*,
    __F.4th__, 2026 WL 1955783, at *5 (11th Cir. July 7, 2026)...................... 4, 38

*Perry v. Sindermann*,
    408 U.S. 593 (1972).............................................................................. 37

*Pickering v. Board of Educ.*,
    391 U.S. 563 (1968).............................................................................. 38

*Regents of Univ. of Mich. v. Ewing*,
    474 U.S. 214 (1985).............................................................................. 32

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
    515 U.S. 819 (1995).............................................................................. 39

*SEC v. Chenery Corp.*,
    318 U.S. 80 (1943)............................................................................... 42

*Sols. in Hometown Connections v. Noem*,
165 F.4th 835 (4th Cir. 2026)...................................................... 53, 54

*Spectrum Leasing v. United States*,
764 F.2d 891 (D.C. Cir. 1985) .................................................... 47

*Sustainability Inst. v. Trump*,
165 F.4th 817 (4th Cir. 2026)...................................................... 53, 54

*Tootle v. Sec'y of Navy*,
446 F.3d 167 (D.C. Cir. 2006) .................................................... 48

*United States v. Freitas*,
904 F.3d 11 (1st Cir. 2018)........................................................ 30

*United States v. Sineneng-Smith*,
590 U.S. 371 (2020)................................................................... 36

*W. Va. State Bd. of Educ. v. Barnette*,
319 U.S. 624 (1943)................................................................... 4

*Weinstock v. Columbia Univ.*,
224 F.3d 33 (2d Cir. 2000) ........................................................ 32

*Wilmer Cutler Pickering Hale & Dorr v. Exec. Off. of President*,
784 F.Supp.3d 127 (D.D.C. May 27, 2025) ............................... 32, 33

**Statutes**

5 U.S.C. §702 ............................................................................. 46

28 U.S.C. §1491(a)(1)................................................................. 46

42 U.S.C. §2000d........................................................................ 5

42 U.S.C. §2000d-1 .................................................................... 5, 6, 44

42 U.S.C. §2000d-2 .................................................................... 49

**Other Authorities**

R. Brownstein, *Trump's Drive Against Top Universities Could Carry a
Big Economic Cost*, CNN (Apr. 13, 2025),
https://perma.cc/HR4S-5MC2......................................................... 7

CNBC Television, *Watch CNBC's Full Interview with Education Secretary Linda McMahon*, at 10:27-10:38 (YouTube, May 28, 2025), https://www.youtube.com/watch?v=h3KHwRH1DYQ ................................. 19

Harvard, Academic Life (last visited July 14, 2026), https://perma.cc/UP5G-4E29 ...................................................................... 10

Harvard, Administrative Infrastructure, Policies, Procedures, and Training (last visited July 14, 2026), https://perma.cc/XE84-3ZMZ .............. 10

Harvard, Admissions and Early Student Experiences (last visited July 14, 2026), https://perma.cc/7DT2-3KLU............................................................. 10

S. Inskeep, *As Trump Targets Elite Schools, Harvard's President Says They Should 'Stand Firm'*, NPR (May 28, 2025), https://perma.cc/99P3-8ZNT..................................................................... 20

*President and Fellows of Harvard Coll. v. U.S. Dep't of Homeland Sec.*, Case No. 25-1627 (1st Cir. filed July 1, 2025)........................................ 19, 48

## Regulations

2 C.F.R. §200.340................................................................................... 42

2 C.F.R. §200.340(a)(4) ................................................................*passim*

OMB Guidance for Grants and Agreements, 85 Fed. Reg. 49,506 (Aug. 13, 2020) ................................................................................................ 45

**INTRODUCTION**

This case involves an unprecedented, all-of-government campaign to punish Harvard for its perceived viewpoints and protected First Amendment activity—and an extraordinary assertion that the Article III courts lack jurisdiction to stop it.

Following the October 7, 2023, massacre and kidnapping of Israelis orchestrated by the terrorist group Hamas, Harvard, like many other institutions of higher learning, witnessed increased tensions in its campus community. That included disturbing, offensive, and vile treatment of Jewish students. In response, Harvard commissioned a Task Force to confront the problem of antisemitism on campus. But where Harvard saw a need to repair campus relations and reestablish a safe, fair, and welcoming environment for students, staff, and faculty of all religions and viewpoints, the government saw an opportunity to bend one of our "nation's most prestigious universities" to its will. A.11.

And that is what the government set about doing. In April 2025, the government sent two lists of demands to which Harvard would need to accede if it wanted to "maintain [its] financial relationship with the federal government." A.8. The list included submitting to government "audit[s]" of viewpoint diversity among its student body, faculty, staff, and leadership; eschewing "ideological litmus tests"; "reducing the power held" by faculty "more committed to activism than scholarship"; and hiring a "critical mass" of faculty and admitting a "critical mass"

of students to bring the campus viewpoint mix in line with the government's preferred ratios. A.9.

Those demands that Harvard cede control over its faculty, curriculum, student body, and administration were a nonstarter. As Harvard President Alan Garber communicated shortly after the second of the government's two April demands, Harvard would not accede to demands that, "in contravention of the First Amendment, invade university freedoms long recognized by the Supreme Court." A.10. Within hours, the government announced a freeze on $2.2 billion in federal funding. And within days, the President of the United States opined that Harvard should lose its tax-exempt status because of its "ideological" views and "hiring [of] almost all woke, Radical Left, idiots." A.12. When Harvard filed this lawsuit a few days later, President Trump, name-checking this case, labeled Harvard "a Liberal mess." *Id*. A fortnight later, the Education Secretary announced that Harvard would never get another federal grant. A.14.

That is just the tip of the extensive evidence of obvious, facial retaliation and viewpoint discrimination in the record. There is no serious debate that the Freeze Orders and Termination Letters challenged here work together to declare Harvard categorically ineligible for federal funding and form part of a broader campaign of governmental retaliation against Harvard unless and until it kowtows to the government in matters of viewpoint and academic freedom. That is as egregious a

2

First Amendment violation as this Court is likely to see. And the statutory violations are equally clear. While the government claims to be acting to remedy antisemitism, it does not contest that it failed to comply with Title VI's procedural guarantees that protect universities before funding is terminated, asserting instead—in an obvious *post-hoc* rationalization—that a regulation makes Title VI compliance (and Article III jurisdiction) entirely optional.

The government thus spends the bulk of its brief contesting the district court's jurisdiction. But the government no longer contests jurisdiction over the Freeze Orders and now disputes jurisdiction over only the Termination Letters. Yet these two retaliatory measures are inextricably intertwined, and the notion that a First Amendment and statutory challenge to the government's all-out assault against Harvard—of which the termination of Harvard's grants is merely one part—belongs in the Court of Federal Claims is as implausible as it sounds. Indeed, the Court of Federal Claims cannot even grant the relief that Harvard requested (and the district court granted) here: An order prohibiting the government from implementing the Freeze Orders and Termination Letters and issuing future terminations, freezes, or stop-work orders in retaliation for Harvard's exercise of First Amendment rights or on purported grounds of discrimination without complying with the procedures set out in Title VI.

This Court should affirm.

## STATEMENT OF THE CASE

### A.    Legal Background.

#### 1.    The First Amendment protects private universities like Harvard from viewpoint-based retaliation and unconstitutional conditions.

As the Supreme Court has emphasized time and again, viewpoint discrimination is the cardinal First Amendment sin.  Indeed, "if there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).  And while "[v]iewpoint-based restrictions designed to compel or ban a set of beliefs are dangerous in any setting, [] they are especially pernicious in the classroom context." *Pernell v. Fla. Bd. of Governors*, __F.4th__, 2026 WL 1955783, at *5 (11th Cir. July 7, 2026).  The First Amendment "does not tolerate laws that cast a pall of orthodoxy over the classroom." *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967).  Those principles apply with full force when the government retaliates on account of First Amendment-protected activity or attempts to impose orthodoxy as the price to pay for receiving a government benefit.  *See Hou. Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022).

**2.** **Congress set out detailed and mandatory procedures in Title VI that agencies must follow before halting federal funding due to discrimination.**

While universities enjoy a constitutional right to academic freedom, they are not free to discriminate against students or to deny them educational opportunities based on forbidden characteristics. Research universities that receive federal funding are subject to Title VI of the Civil Rights Act of 1964, which provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. §2000d. An allegation of unlawful discrimination, and a resulting termination of federal financial assistance, is strong medicine. Title VI therefore sets out "elaborate restrictions" that agencies must follow before terminating aid based on a government determination that a university has engaged in unlawful discrimination. *Alexander v. Sandoval*, 532 U.S. 275, 290 (2001) (citing 42 U.S.C. §2000d-1).

Because Title VI provides for a range of sanctions and Congress designed termination of federal funding to be a "last resort," *Guardians Ass'n v. Civ. Serv. Comm'n*, 463 U.S. 582, 601 (1983), those detailed statutory procedures require an agency to first "advise[] the appropriate person or persons of the failure to comply with the requirement and … determine[] that compliance cannot be secured by

5

voluntary means," 42 U.S.C. §2000d-1. If the agency determines that voluntary compliance is impossible, then it must hold a hearing and make express findings on the record before terminating or refusing to grant or to continue federal financial assistance. *Id.* The agency head must file "a full written report of the circumstances and the grounds for such action" with the relevant committees in the House and Senate. *Id.* The action does not "become effective until thirty days have elapsed after the filing of such report." *Id.* And any funding terminations must be "limited in [their] effect to the particular program, or part thereof, in which such noncompliance has been so found." *Id.* Agency regulations impose additional procedural requirements that must be satisfied before the government may terminate or refuse to grant or to continue federal financial assistance based on Title VI. D.Ct.Dkt.70 at 7 n.5 (collecting authorities). And after that, "[j]udicial review of any funding termination is available in an Article III court." *Colwell v. HHS*, 558 F.3d 1112, 1128 (9th Cir. 2009).

### B.    Factual Background and Procedural History.

#### 1.    Harvard has long secured federal grants for crucial, cutting-edge research.

University research has long been one of our nation's leading drivers of scientific and medical advancement to improve public welfare. Since the Second World War, Congress has appropriated monies that are awarded competitively to retain the best researchers in the country—many of whom work at top-flight research

6

universities like Harvard.[1]   Today, this government-funded research work is a cornerstone of American innovation.

Harvard University is the oldest institution of higher learning in the United States and one of the world's leading research universities.   A.4.   Harvard's researchers have pioneered life-altering advancements in everything from cancer prevention and treatment to understanding neurodegenerative disorders, protecting American troops from biological threats, creating a new class of antibiotics to treat infections, and studying how spaceflight affects blood cell formation in astronauts. A.5, A.19-20.   And Harvard's research programs—funded in part by the government—serve as training grounds for the next generation of scientific, technological, medical, and public health leaders, with grants supporting the work of thousands of graduate students and postdoctoral fellows.  A.4-5.

### 2.      Harvard responds to antisemitism on its campus.

On October 7, 2023, the terrorist organization Hamas attacked Israel, killing and brutalizing thousands of Israelis and Americans and taking more than 240 people hostage.   Like other schools, Harvard experienced increased tensions among members of its campus community, with members of the Jewish and Israeli communities experiencing disturbing, offensive, and vile treatment.

---

[1]  R. Brownstein, *Trump's Drive Against Top Universities Could Carry a Big Economic Cost*, CNN (Apr. 13, 2025), https://perma.cc/HR4S-5MC2.

In response, Harvard implemented many changes aimed at ensuring its campus is safe, fair, and welcoming to Jewish and Israeli students. Harvard has disciplined those who have violated its policies, D.Ct.Dkt.73 ¶18; enhanced programs and policies designed to address bias and promote ideological diversity and civil discourse, *id*. ¶¶11, 13-15, 24-25; adopted new accountability procedures and clarified policies, *id.* ¶¶3, 5, 8, 10-11, 13; supplemented existing safety and security measures, *id.* ¶7; and refined its procedures and protections for reporting misconduct, *id.* ¶16. Updated policies clarify that protests are not permitted in classrooms, libraries, dormitories, dining halls, Harvard offices, and other places where they would interfere with normal activities, and they expressly prohibit unauthorized encampments, exhibits, and displays on campus. All these changes were publicly announced and widely reported. *Id.* ¶¶4, 6, 9, 12, 19, 23.

Concurrently with these changes, President Garber charged a Presidential Task Force on Combating Antisemitism and Anti-Israeli Bias ("Harvard Task Force") in January 2024 with "identifying the root causes of and contributing factors to bias-based behaviors on campus" and "recommending approaches to combat bias and to mitigate its impact on campus." A.5. On April 29, 2025, the Harvard Task Force released a final 311-page report that, while noting "numerous examples of students, staff, and faculty dedicated to renewing and strengthening the Harvard community," acknowledged the "alienating and hostile atmosphere" experienced by

many Jewish and Israeli students at Harvard, as well as "instances where administrators and faculty at certain Harvard Schools seemingly fell short in their responsibility to uphold principles of open inquiry, civility, and respectful disagreement within specific courses, programs, and events." A.12-13.

To address those shortcomings, the Harvard Task Force recommended comprehensive changes to the "campus culture and student experience" and "governance" at Harvard. A.13. The report called for changes in nine specific areas related to "campus culture and student experience": (1) admissions, (2) early student experiences, (3) academics, (4) academic offerings, (5) "co-curricular activities and residential life," (6) "building a pluralistic community," (7) religious life, (8) administrative infrastructure, and (9) "protests, complaints, and discipline." *Id.* The Harvard Task Force made clear that "the resolutions and the reforms" must come from Harvard. If "external parties … seek to compel adoption of some of [the] proposed reforms," the report observed, it "will make it more difficult for Harvard to fix itself." *Id.*

For the last fifteen months, Harvard has carefully studied and taken action in response to the report's recommendations. As President Garber emphasized after the report's release, "Harvard cannot—and will not—abide bigotry" and is committed to "address[ing] with determination at every level of the University" the challenges identified in the report and to "act[ing] decisively" to do so. *Id.* To that

9

end, Harvard already has taken steps to "centralize and [to] strengthen its disciplinary procedures," including by "empower[ing] the President to call on a faculty panel of the University Committee on Rights and Responsibilities ('UCRR') to investigate, find facts, and impose discipline in cases involving students from multiple Schools and alleged violations of" University policies. A.14. Harvard's Academic Council (the president, provost, deans, and other senior leaders) is further developing and implementing "new recommendations" to "nurtur[e] a widespread sense of belonging and promot[e] respectful dialogue; revis[e] and implement[] policies, procedures, and training; and strengthen[] academic and residential life." *Id*. The University's deans have implemented changes concerning admissions (with a focus on "open inquiry and constructive dialogue");[2] appointments and curriculum (including bolstered course offerings and faculty focused on Jewish history and antisemitism);[3] and orientation and training programs (aimed at combating antisemitism and reinforcing community standards that uphold freedom of expression without threatening "the essential conditions for research, teaching and learning");[4] among other things. *Id*. This process, which is supervised by the Office

---

[2] Harvard, Admissions and Early Student Experiences (last visited July 14, 2026), https://perma.cc/7DT2-3KLU.

[3] Harvard, Academic Life (last visited July 14, 2026), https://perma.cc/UP5G-4E29.

[4] Harvard, Administrative Infrastructure, Policies, Procedures, and Training (last visited July 14, 2026), https://perma.cc/XE84-3ZMZ.

10

of the President and Provost, and which includes "the establishment of a University-wide initiative to promote and support viewpoint diversity," D.Ct.Dkt.73 ¶29, is ongoing.

### 3. Defendants threaten Harvard's federal research funding.

On February 3, 2025, the Department of Justice announced the formation of a multi-agency Task Force to Combat Antisemitism ("Federal Task Force"), which includes representatives from the Department of Justice, the Department of Education, the Department of Health and Human Services, and other agencies. A.6. Leo Terrell, a presidential appointee, was selected to head the Federal Task Force. *Id.* Before his appointment, Terrell made his views about Harvard clear, promising that "Harvard will lose much more effective January 2025." *Id.* On March 31, 2025, the Federal Task Force notified Harvard of a "review" of more than $8.7 billion in federal funding to Harvard (the "March 31 Letter"). A.7. The March 31 Letter linked the review of funding to the government's allegations about antisemitism on Harvard's campus. *Id*.

The Federal Task Force followed up on April 3, 2025, with an "official notice" of certain "pre-conditions" Harvard would need to meet to continue receiving federal funding (the "April 3 Letter"). A.7. The April 3 Letter expressly invoked Title VI, alleging that Harvard had "failed to protect American students and faculty from antisemitic violence and harassment in addition to other alleged violations of Title

11

VI and Title VII." A.7-8. And it described "several broad, non-exhaustive areas of reform that the government views as necessary for Harvard to implement to remain a responsible recipient of federal taxpayer dollars," including reforms "to foster clear lines of authority"; oversight of "biased programs" and to "improve viewpoint diversity"; and efforts to "shutter" diversity, equity, and inclusion ("DEI") programs that "teach" certain things. A.7. The April 3 Letter demanded Harvard's "immediate cooperation in implementing" what it deemed "these critical reforms" as a prerequisite for "Harvard University's continued financial relationship with the United States government." A.8.

That same day, the government sent Harvard's counsel an email to schedule a meeting, attaching a document that provided a "[m]enu" of demands. *Id*. Many of those demands mirrored those contained in the April 3 Letter, such as a "choice" between "install[ing] new leadership in problematic depts" and "receivership." *Id*. The document also sought a "[s]enior secured 1st Lien on all Harvard assets which will serve as collateral to pay back [the] government from Harvard in event of non-compliance in the future." *Id*.

On April 11, 2025, the Federal Task Force sent another letter to President Garber (the "April 11 Letter"). A.8. The April 11 Letter, which "incorporates and supersedes" the April 3 Letter, asserted that Harvard "failed to live up to … [the] civil rights conditions that justify federal investment" and laid out a more detailed

12

list of conditions to "maintain Harvard's financial relationship with the federal government," many of which were aimed at monitoring and policing the viewpoints of the University's students and faculty. *Id*. They included: (1) "commission[ing] an external party," which shall satisfy the federal government as to its competence and good faith, "to *audit the student body, faculty, staff, and leadership* for viewpoint diversity, such that each department, field, or teaching unit *must be individually viewpoint diverse*"; (2) "abolish[ing] all criteria, preferences, and practices, whether mandatory or optional, throughout its admissions and hiring practices, that function as ideological litmus tests"; (3) for departments, fields, and teaching units found to "lack viewpoint diversity," "hiring a *critical mass* of new faculty" and "admitting a *critical mass* of students" to provide the government's preferred balance of viewpoint diversity; (4) "reform[ing] and restructuring" governance; (5) "*reducing the power* held by students and untenured faculty," as well as "the power held by faculty … more committed to activism than scholarship"; and (6) "shutter[ing]" all DEI programs "through *structural and personnel changes*." A.9 (emphases added).

The federal government would be the final arbiter of compliance with these conditions. It retained the right to audit Harvard (or review final audit reports by third parties) until at least the end of 2028. A.9. Like the April 3 Letter, the April 11 Letter made clear the government expected "immediate cooperation in

13

implementing these critical reforms" if the University wanted to "maintain Harvard's financial relationship with the federal government." A.9. Neither the April 3 Letter nor the April 11 Letter acknowledged the reforms and commitments Harvard had already made, including commissioning the Harvard Task Force, which had, by then, issued its preliminary recommendations. Nor did the letters even advert to the rigorous procedural requirements that govern termination of federal financial assistance under Title VI. *Id.*

**4.      Harvard rejects the government's unconstitutional demands.**

In a letter to the government on April 14, 2025, Harvard explained that "[n]either Harvard nor any other private university can allow itself to be taken over by the federal government." A.10. Harvard explained that, because the April 11 Letter "presents demands that, in contravention of the First Amendment, invade university freedoms long recognized by the Supreme Court," Harvard is "not prepared to agree to demands that go beyond the lawful authority of this or any administration" and "will not accept the government's terms." A.10, 51. That same day, President Garber explained to the Harvard community that "[a]lthough some of the demands outlined by the government are aimed at combating antisemitism, the majority represent direct governmental regulation of the 'intellectual conditions' at Harvard." A.10. He explained that Harvard "do[es] not take lightly [its] moral duty to fight antisemitism," noting the steps Harvard had already taken and would

14

continue to take. *Id.* Ultimately, President Garber made clear that "[n]o government—regardless of which party is in power—should dictate what private universities can teach, whom they can admit and hire, and which areas of study and inquiry they can pursue." *Id.*

### 5. Defendants retaliate by freezing and terminating Harvard's federal research funding.

Within hours of Harvard's April 14 refusal of the demands, the government "announc[ed] a freeze on $2.2 billion in multi-year grants and $60 [million] in multi-year contract[s] … to Harvard University" (the "April 14 Freeze Order"). A.10. The April 14 Freeze Order claimed that it was prompted by "[t]he harassment of Jewish students" and "the troubling entitlement mindset that is endemic in our nation's most prestigious universities and colleges." A.11. The government immediately began issuing stop work orders, requiring the cessation of all activities related to the affected projects. *Id.* On April 15, the morning after the government announced the April 14 Freeze Order, the President opined that Harvard should lose its tax-exempt status because of its "political" and "ideological" views. A.12. On April 16, the President criticized Harvard for "hiring almost all woke, Radical Left, idiots" and said Harvard "should no longer receive Federal Funds." *Id.* That same day, the Department of Homeland Security terminated two grants "totaling over $2.7 million to Harvard University, declaring it unfit to be entrusted with taxpayer dollars." A.11. On April 24, three days after Harvard sued, the President again denounced

15

the University as "a Liberal mess," while referencing this lawsuit. A.12.

On May 5, the Education Secretary, purporting to speak on behalf of every federal agency and department, announced an "end of new grants for the University" (the "May 5 Freeze Order"). A.14. The May 5 Freeze Order stated that "Harvard should no longer seek GRANTS from the federal government, since none will be provided," and declared that "Harvard will cease to be a publicly funded institution." *Id*. In addition to a litany of seemingly unrelated complaints, the letter expressed the government's objection to what it characterized as an imbalance of viewpoints in Harvard's governance. *Id*. The government also reiterated the demands made in its April letters and emphasized that "[t]he Administration's priorities have not changed." *Id*.

To effectuate its determination that Harvard would be ineligible for any federal funding, the Federal Task Force collected from agencies the total universe of available grants and then—under the direction of the White House and using a common template letter—began terminating them on an agency-by-agency basis. A.15-A.16. Harvard received letters from the National Institutes of Health, the Department of Agriculture, the Department of Energy, the Department of Defense, the National Science Foundation, the Department of Education, the Department of Commerce, and the Centers for Disease Control and Prevention. A.16.

16

The Termination Letters halted ongoing funding of research on all manner of subjects vital to the national interest, from breast cancer detection and prevention to biological threats and overcoming antibiotic resistance. A.16. Research in these diverse and critical areas was halted using boilerplate language with little material variation from agency to agency. No letter presented any grant-specific rationale for the terminations, and no letter reflected that any grant-specific consideration had occurred. A.17. That is unsurprising, because (as the record reflects) the termination decisions were made outside the agencies that had made the decision to provide federal funding to Harvard and that oversaw specific grants. *See, e.g.*, A.15-16.

Despite that lack of grant-specific details, virtually every letter relied on a purported change in program goals or agency priorities, invoking 2 C.F.R. §200.340(a)(4). As the letters note, that regulation provides that a federal agency may terminate an award "pursuant to the terms and conditions of the … award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." *Id.*; A.16-17. In purporting to explain why Harvard's grant awards "no longer effectuate agency priorities," all but one of the letters cited "Harvard's ongoing inaction in the face of repeated and severe harassment and targeting of Jewish students," coupled with Harvard's "refus[al] to take appropriate action ... or implement necessary reforms." A.17. The one letter that did not cite such concerns contained no explanation at all. *Id*. Some of the

17

letters asserted that "no modification of the projects could align the projects with agency priorities" because Harvard had rejected the government's demands. A.17.

On May 13, 2025, the Federal Task Force issued a press release claiming "Harvard University has repeatedly failed to confront the pervasive race discrimination and anti-Semitic harassment plaguing its campus," and stating that "[t]he Task Force fully supports the Trump Administration's multi-agency move to cut funding to Harvard." A.18. Again, the government did not acknowledge, let alone engage with, the many reforms and commitments Harvard had "already made and committed to make" to eliminate antisemitism and other forms of hate from its campus." *Id.* Nor did the government purport to adhere to Title VI's detailed procedural requirements. *Id.*

After this flurry of termination letters, the government resumed its sweeping reductions in federal funding to Harvard. On May 20, HHS announced it was cutting an additional $60 million in multi-year grants to Harvard. A.20. On May 26, the President stated that he was considering taking away "Three Billion Dollars" from "a very antisemitic Harvard," which he would then give to "TRADE SCHOOLS." A.21. And on May 27, the General Services Administration targeted approximately $100 million in contracts, instructing agencies to "consider [their] contracts with Harvard University and determine whether Harvard and its services efficiently promote the priorities of the agency." A.20.

18

The government has left no doubt about the impetus for the Freeze Orders and Termination Letters, which are part of a broader campaign of retaliation that includes everything from an unlawful travel ban on international students and scholars bound for Harvard, *see* No. 25-1627, to threats to revoke Harvard's tax-exempt status. On May 28, during an interview in the Oval Office, President Trump candidly provided the rationale for all this adverse government action: Harvard is "hurting [itself]" by "fighting." A.21. He noted that "Columbia has been, really, and they were very, very bad … But they're working with us on finding a solution." *Id.* Harvard, meanwhile, "wants to fight. They want to show how smart they are, and they're getting their ass kicked." *Id.* In President Trump's words, "every time [Harvard] fight[s], they lose another $250 million." *Id.* "All they're doing is getting in deeper and deeper and deeper." *Id.* That same day, the Education Secretary told CNBC that "we had conversations with President Garber" and "Harvard's answer was a lawsuit." *Id.* She added, "I've said all along I would like to see Harvard come back to the table. But when the response out of the box is a lawsuit, then you've got to answer to that."[5] On May 30, a White House spokesperson reiterated, "Mr. Garber's public outburst only fuels the push to shut off the taxpayer money propping up their

---

[5] CNBC Television, *Watch CNBC's Full Interview with Education Secretary Linda McMahon*, at 10:27-10:38 (YouTube, May 28, 2025), https://www.youtube.com/watch?v=h3KHwRH1DYQ.

19

institution."[6]

### 6. Harvard files suit against Defendants and the District Court grants summary judgment to Harvard.

Harvard filed this lawsuit on April 21, 2025, alleging that the April 14 Freeze Order violated the First Amendment as retaliation for protected activity and as viewpoint-based unconstitutional conditions; violated Title VI because the government terminated funding based on alleged Title VI violations without following the statutorily required procedures; and was arbitrary and capricious and *ultra vires*. D.Ct.Dkt.1. Following the May 5 Freeze Order and subsequent Termination Letters, Harvard amended its complaint to add similar challenges to those documents. D.Ct.Dkt.59. The parties cross-moved for summary judgment.

The district court granted Harvard's motions for summary judgment in part. The court first held that it had jurisdiction over Harvard's constitutional and statutory claims as to both the Freeze Orders and the Termination Letters. As the district court recognized, the APA's waiver of sovereign immunity "does not extend to orders 'to enforce a contractual obligation to pay money.'" *Dep't of Educ. v. California*, 604 U.S. 650, 651 (2025) (per curiam) (quoting *Great-West Life & Annuity Ins. v. Knudson*, 534 U.S. 204, 212 (2002)). *See* A.23-24. But "whether a case is, in some

---

[6] S. Inskeep, *As Trump Targets Elite Schools, Harvard's President Says They Should 'Stand Firm'*, NPR (May 28, 2025), https://perma.cc/99P3-8ZNT.

sense, 'about the money' is not necessarily dispositive of the issue of jurisdiction." A.24 (discussing *Bowen v. Massachusetts*, 487 U.S. 879 (1988)). Instead, the question is "[w]hether [the Plaintiffs'] claim is 'at its essence' contractual," which "depends both on the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought (or appropriate)." A.25 (quoting *Crowley Gov't Servs. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1106 (D.C. Cir. 2022)).

Applying the Supreme Court's recent interim-docket decisions in *California* and *NIH v. APHA*, 145 S.Ct. 2658 (2025), the district court first decided that, because Harvard's arbitrary and capricious claims were "substantially similar" to those in *APHA*, the court had jurisdiction over the claims insofar as they challenged the Freeze Orders, but not insofar as they challenged the Termination Letters. A.27; *see APHA*, 145 S.Ct. at 2661-62 (controlling concurrence of Barrett, J.). As to Harvard's APA claims based on the First Amendment and Title VI, the court held that it had jurisdiction under *California* and *APHA* over both the Freeze Orders and the Termination Letters. First, the court reasoned that First Amendment rights and rights under Title VI are unlike the "contract-focused" rights covered by the Tucker Act. A.28. Second, Harvard sought "relief beyond enforcement of an 'obligation to pay money' pursuant to … grants." A.29 (quoting *APHA*, 145 S.Ct. at 2658). Because Harvard sought prospective relief requiring that the government comply with the First Amendment and Title VI, Harvard sought relief that the Court of Federal

21

Claims "does not have the general equitable powers" to grant. A.29 (quoting *Me.*
*Cmty. Health Options v. United States*, 590 U.S. 296, 327 (2020)). Finally, the
district court reasoned that Harvard's First Amendment and Title VI claims differed
from the claims in *APHA* because "one judgment vacating" the government's
retaliatory course of conduct under the First Amendment, or holding the termination
letters unlawful under Title VI, could grant Harvard relief. A.29-30 (quoting *APHA*,
145 S.Ct. at 2661 (Barrett, J., concurring)). The claims in *APHA* could be bifurcated
because the fact that the guidance was arbitrary did not necessarily mean the grant
terminations were too. Here, by contrast, "as to the First Amendment, the
Termination Letters are not 'legally distinct' as they constitute part of the pattern of
retaliatory conduct and, as to the Title VI claim, the Termination Letters form the
sole basis of the claim." A.30.

Proceeding to the merits, the district court granted summary judgment on
Harvard's First Amendment and Title VI claims. As to the First Amendment, the
district court explained that normal First Amendment retaliation standards, not the
*Pickering* balancing urged by the government, applied (noting that, even if *Pickering*
applied, Harvard would still have been entitled to summary judgment). A.47-48 &
n.19. The court found that Harvard had engaged in protected activity in "refus[ing]
the terms set forth in the April 11 Letter, which sought to control viewpoints at
Harvard," and in "fil[ing] this lawsuit." A.49. The court then found, "[b]ased on

22

this administrative record," that Harvard's protected activity was a substantial and motivating factor in the Freeze Orders and Termination Letters.  A.52.

Rejecting the government's claims that it was motivated by combating antisemitism and would have taken the same actions regardless of Harvard's protected activity, the court explained that "nothing else in the administrative record supports Defendants' contention that they were primarily or even substantially motivated by that goal."  A.53.  After all, Defendants had notified Harvard of an antisemitism-related funding review on March 31, but the record "does not reflect that Defendants engaged in such a review, weighed the value of any grant, gathered any data regarding antisemitism at Harvard, or considered if and how terminating certain grants would improve the situation for Jewish students at Harvard."  A.53. Instead, "all that Defendants learned" between March 31 and the April 14 Freeze Order "was that Harvard would not capitulate to government demands that it audit, censor, or dictate viewpoints of staff and students."  A.53.  And the record was replete with evidence of Defendants' ulterior motives.  A.52-57.  Turning to Harvard's unconstitutional conditions claim, the court held that Harvard was entitled to summary judgment given the "conditioning [of] Harvard's federal funding, even as part of settlement negotiations, on Harvard's realigning its campus to better reflect a viewpoint favored by the government."  A.58-59.

23

As for Title VI, the court first explained that "[i]t is undisputed that Defendants did not comply with [Title VI's procedural] requirements before issuing the Freeze Orders or Termination Letters." A.61. While the government cited a regulatory provision permitting the termination of grants "to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities," 2 C.F.R. §200.340(a)(4), the Freeze Orders nowhere mentioned that regulation. A.62. And while Defendants tried to remedy their Title VI failures, *post-hoc*, by referencing the regulation in the Termination Letters, the purported misalignment with "agency priorities" was the failure to combat antisemitism, and Congress carefully defined the procedures required for such a funding termination to be "authorized by law." A.63-64.

Finally, the court granted summary judgment for Harvard on its arbitrary and capricious claims challenging the Freeze Orders. First, although a court must "uphold a decision of less than ideal clarity if the agency's path may be reasonably discerned," A.67 (quoting *Bowman Transp. v. Ark.-Best Freight Sys.*, 419 U.S. 281, 286 (1974)), no such "path was charted" and no such "weighing occurred." A.67 (quotation marks omitted). Indeed, the government's retaliatory campaign kicked off with an announcement that the government was "embarking on a comprehensive review of federal contracts at Harvard to combat antisemitism," but not a shred of evidence supported that such a review happened before the government froze

24

Harvard's funding. *Id.* Second, "the record reflects that Defendants had essentially no information about the prevalence of antisemitism at Harvard before issuing the Freeze Orders." A.68. Third, "the administrative record contain[ed] no evidence that Defendants considered any of the steps Harvard had taken to research or address antisemitism on campus before declaring that funding would be frozen because Harvard had failed to address the issue." A.69. Fourth, "the administrative record d[id] not indicate that Defendants considered the potential societal costs to Harvard, the American public generally, Jews in particular, or even the government itself of freezing the underlying research." A.71. Finally, the court faulted the government for failing to consider the enormous reliance interests at stake. A.72.

The district court held that the remaining permanent injunction factors favored Harvard. Defendants did not dispute that the loss of First Amendment freedoms constitutes irreparable harm or that the balancing of harms and the public interest favored an injunction. A.78. Instead, Defendants argued that any relief must be limited to remedying improper agency action (and must preserve the government's prerogative to "consider other future agency actions"). A.78. Noting that Harvard had not "request[ed] an injunction that would prevent the [g]overnment from initiating *proper* investigations in full conformance with the Title VI process," the court concluded that an injunction was necessary given the harms to Harvard's research and the public interest. A.78-79. The court therefore enjoined "Defendants

25

reimposing any unconstitutional conditions imposed to date, and enjoin[ed] Defendants from issuing any other termination, freezing of funds, stop work orders, or withholding of payment on existing grants or other federal funding, or refusal to award future grants, contracts, or other federal funding to Harvard in retaliation for the exercise of its First Amendment rights, or on purported grounds of discrimination without compliance with the requirements of Title VI." A.79.

The government filed a notice of appeal, but has limited its appeal of jurisdiction to the Termination Letters, thus conceding Article III jurisdiction over Harvard's challenge to the Freeze Orders. Br.25 n.9.

## SUMMARY OF ARGUMENT

As the district court held, there is no genuine dispute of material fact that the Freeze Orders and Termination Letters violate both the First Amendment and Title VI. Indeed, they violate the First Amendment twice over: they impermissibly retaliate for protected activity and impose unconstitutional conditions on government benefits. The Supreme Court has made clear beyond cavil that the government may neither take adverse action against a person or entity on account of its First Amendment-protected activity nor condition government benefits on surrendering First Amendment rights. *See Wilson*, 595 U.S. at 474; *Agency for Int'l Dev. v. All. For Open Soc'y Int'l*, 570 U.S. 205, 214 (2013). Here, the government did both.

26

To make out a *prima facie* retaliation claim, a plaintiff must show (1) that it engaged in First Amendment-protected activity; (2) that it suffered an adverse action; and (3) that the protected activity played a "substantial or motivating factor" in the adverse action. *See Berge v. Sch. Comm. of Gloucester*, 107 F.4th 33, 37 (1st Cir. 2024). Once a plaintiff makes out such a case, the burden shifts to the government to show that "it would have reached the same decision … even in the absence of the protected conduct." *D.B. ex rel. Elizabeth B. v. Esposito*, 675 F.3d 26, 43 (1st Cir. 2012).

Harvard engaged in protected activity both when it refused the government's demand to submit to governmental oversight of the mix of viewpoints on campus and when it sued. It suffered adverse action when the government terminated over $2 billion in research grants, slamming the brakes on critical scientific projects that had been at the cutting edge of everything from breast cancer prevention to the prevention of biological threats. And Harvard's protected activity was plainly *the* motivating factor in the government's slash-and-burn campaign. The administrative record itself is chock full of evidence that the government's animus toward Harvard's perceived viewpoints drove the Freeze Orders and Termination Letters, and supporting evidence abounds.

For similar reasons, the Freeze Orders and Termination Letters impose unconstitutional conditions on Harvard's protected activity, demanding that Harvard

27

alter its mix of viewpoints to the government's liking in exchange for continuing eligibility for federal funding. The district court granted summary judgment on this claim, and the government's brief simply ignores it. That forfeiture is reason enough to affirm on the merits.

Affirming as to the government's Title VI violations is just as straightforward. Unable to claim compliance with Title VI's procedural requirements, the government instead asserts that compliance was optional because of a regulatory escape hatch that went unmentioned until after this lawsuit was filed. That is a classic *post-hoc* rationalization that cannot sustain administrative action, but, in all events, it is an impermissible attempt to circumvent the statutory process set out by Congress and the government's own implementing regulations.

Given the obvious First Amendment and Title VI violations it committed, the government spends the lion's share of its brief trying to avoid Article III review altogether. But the notion that this effort to enjoin an ongoing First Amendment assault against Harvard belongs in an Article I court with no power to issue an injunction is a nonstarter. Indeed, the government itself concedes jurisdiction over Harvard's challenge to the Freeze Order, and the Termination Letters are part and parcel of the same unconstitutional, retaliatory effort to deem Harvard ineligible for federal funding. As both the Supreme Court and this Court have recently clarified, whether a claim is in essence a breach-of-contract action within the exclusive

28

jurisdiction of the Court of Federal Claims turns on the source of the asserted rights and the relief sought. *See California*, 604 U.S. at 651; *Massachusetts v. NIH*, 164 F.4th 1, 10 (1st Cir. 2026). On both scores, this case belongs in the Article III courts. Harvard's claims do not rely on any contract; they are premised on First Amendment rights that preexist any contract and Title VI statutory rights that expressly grant a right to district court review when the government terminates funding based on a determination of impermissible discrimination. And the relief that Harvard sought and the district court granted is prospective—an order enjoining ongoing statutory and constitutional violations that inflict irreparable injuries that no damages remedy could adequately remedy. The Court of Federal Claims does not even have the authority to order the relief that the district court ordered here.

## ARGUMENT

I.     **The District Court Correctly Granted Summary Judgment To Harvard On Its First Amendment Claims.**

A.     **The Freeze Orders and Termination Letters Violate the First Amendment.**

1.     **The Freeze Orders and Termination Letters are retaliation for First Amendment-protected activity.**

The First Amendment "prohibits government officials from subjecting individuals to retaliatory actions after the fact for having engaged in protected speech." *Wilson*, 595 U.S. at 474. To establish a *prima facie* case of First Amendment retaliation, a plaintiff must prove (1) "that [it] engaged in First Amendment-protected conduct," (2) "that [it] suffered an adverse action," (3) "that [its] protected conduct played a 'substantial or motivating' part in the adverse action." *Berge*, 107 F.4th at 37 n.4. Once a plaintiff makes out a *prima facie* retaliation case, the burden shifts to the government to prove that it "would have reached the same decision … even in the absence of the protected conduct.'" A.48 (quoting *D.B.*, 675 F.3d at 43).[7]

---

[7] The government fleetingly adverts to the *Pickering* balancing test for government employees and services contractors, Br.46, an argument the district court correctly rejected below. *See infra* pp.38-39. The government's *Pickering* argument "appears in a single sentence, is not seriously supported … and is therefore waived." *United States v. Freitas*, 904 F.3d 11, 21 (1st Cir. 2018).

1. Harvard plainly (and undisputedly) engaged in protected First Amendment activity. It did so by engaging in all manner of First Amendment activity that drew the government's ire, by refusing the government's demand to reshape its speech more to the government's liking, and by suing. As to the government's demand that Harvard take steps to alter the mix of viewpoints on its campus, that demand was prompted by the government's dislike for the speech of Harvard's faculty. Although the government has tried to suggest that it was focused solely on issues of antisemitism on Harvard's campus, both the nature of its demands and the statements of the President and other officials belie that claim. The government's list of demands for Harvard to maintain its eligibility for federal funding went well beyond remedies to redress supposed Title VI violations; they consisted of a litany of governmental efforts to dictate the curriculum and rebalance the faculty and student body across the University. The President, meanwhile, laid bare his disdain for Harvard, which he described as a "Political Entity" staffed by "almost all woke, Radical Left, idiots." A.12.

Both the government's targeting of Harvard for its viewpoints and its slew of demands for rebalancing the faculty, curriculum, and university speech more to the government's liking implicate the "zone of First Amendment protection for the educational process itself." *Asociacion de Educacion Privada de Puerto Rico v. Garcia-Padilla*, 490 F.3d 1, 8 (1st Cir. 2007). That includes not just "the

31

independent and uninhibited exchange of ideas among teachers and students," but Harvard's "autonomous decisionmaking" too. *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 226 n.12 (1985). The First Amendment protects Harvard's right to "manage an academic community and evaluate teaching and scholarship free from [governmental] interference," *Blasdel v. Nw. Univ.*, 687 F.3d 813, 816 (7th Cir. 2012), and the "prerogative 'to determine for itself on academic grounds *who* may teach,'" *Weinstock v. Columbia Univ.*, 224 F.3d 33, 47 (2d Cir. 2000), and *what* is taught in the "college classroom," *Healy v. James*, 408 U.S. 169, 180-81 (1972).

Harvard's decision to sue is also quintessential activity protected by the First Amendment, which safeguards the right "to petition the Government for a redress of grievances," U.S. Const. amend. I, including "the right of individuals to appeal to courts and other forums established by the government for resolution of legal disputes." *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 387 (2011). Put simply, "[f]iling and pursuing lawsuits are forms of protected petitioning," *Wilmer Cutler Pickering Hale & Dorr v. Exec. Off. of President*, 784 F.Supp.3d 127, 155 (D.D.C. May 27, 2025), "integral to the democratic process," *Borough of Duryea*, 564 U.S. at 388. In fact, the First Amendment right to file a lawsuit free of governmental retaliation sits "high in the hierarchy of First Amendment values." *Lozman v. Riviera Beach*, 585 U.S. 87, 101 (2018).

32

2.  Nor is there any question that the Freeze Orders and Termination Letters were "adverse" government action.  "[V]iewed objectively," they "would deter a reasonably hardy individual in the exercise of his or her First Amendment rights." *Barton v. Clancy*, 632 F.3d 9, 29-30 (1st Cir. 2011).  The government threatened to withhold federal funding (both current and in the future) unless Harvard surrendered its academic freedom and mix of viewpoints to government control.  *See supra* pp.11-14.  When Harvard refused, the government made true on its threat and froze the funds.  *See supra* pp.14-19.  When Harvard then sued to protect its rights, the government began terminating the frozen funds and announced a moratorium on all future funding to Harvard.  Those punitive measures would deter just about any research university from exercising its First Amendment rights, given the grave risk to the university's educational mission and the livelihoods of its faculty and researchers.  Indeed, there is no need for speculation.  Other universities facing similar threats chose to negotiate rather than petitioning to vindicate their constitutional and statutory rights. *Cf. WilmerHale*, 784 F.Supp.3d at 151-52 (noting retaliation was particularly obvious when "[o]ther firms facing similar Executive Orders have capitulated").

3.  The connection between Harvard's protected activity and the government's punitive actions is also crystal clear.  Although causation can sometimes be complicated for a plaintiff in a First Amendment retaliation case to prove, here the

33

government said the quiet part out loud. The government's April 11 letter "explicitly conditioned federal funding on Harvard's acceding to the government's demands, and … the April 14 Freeze Order came within hours of Harvard's refusal to do so." A.51. The Freeze Orders "blatantly link[ed]" Harvard's rejection of government superintendence to the government's punitive action, with the April 14 Freeze Order inveighing that "Harvard's *statement today* reinforces the troubling entitlement mindset that is endemic in our nation's most prestigious universities and colleges." A.51-52. The May 5 Freeze Order cited Harvard's refusal to make "proposed common-sense reforms"—reforms that the government thought necessary given Harvard's hiring of "failed Mayors Bill [d]e Blasio and Lori Lightfoot, perhaps the worst mayors ever to preside over major cities in our country's history," and allowing "strongly left-leaning Obama political appointee Penny Pritzker, a Democrat operative," to manage the Harvard Corporation. A.52. For their part, "many of the Termination Letters reiterate that the impetus for the terminations was Harvard's refusal to adopt 'reforms.'" *Id.*

And that is just what is in the administrative record, which the district court (understandably) found fully sufficient to support impermissible retaliation. A.54 n.21. Copious evidence corroborates the point, as "numerous government officials spoke publicly and contemporaneously on these issues, including about their motivations, and those statements are flatly inconsistent" with the government's

34

assertion that it was not punishing Harvard's protected activity. A.54. Among other examples, the President took to Truth Social 48 hours after the April 14 Freeze Order to offer an explanation "untethered from antisemitism and instead based entirely on Harvard's 'hiring almost all woke, Radical Left, idiots and 'birdbrains' who are only capable of teaching FAILURE to students.'" A.55. And the Education Secretary, two days after the May 5 Freeze Order, argued in the same breath that the funding cutoff was "about civil rights," not the First Amendment, and that the government has an interest in "vetting students who are coming in from outside of the country to make sure they're not activists" and "vetting professors that [Harvard is] hiring to make sure that they're not teaching ideologies." A.55-56 n.22.

For much the same reasons, the district court did not err in finding that no reasonable jury could agree with the government's defense that it would have issued the Freeze Orders and Termination Letters "even in the absence of [Harvard's] protected conduct." *Mt. Healthy City Sch. Dist. v. Doyle*, 429 U.S. 274, 287 (1977). The district court correctly rejected the argument that the "agencies' terminations are explained by a nonretaliatory purpose: opposing antisemitism." A.52. The administrative record is bereft of evidence that the government was "primarily or even substantially motivated by that goal," A.53, and evidence abounds (including on the face of Freeze Orders, *see* A.52-53) that the government was actually motivated by "ideological and pedagogical concerns, including who may lead and

35

teach at Harvard, who may be admitted, and what may be taught." A.53.

In short, the district court did not err in finding that no reasonable jury could dispute that Harvard engaged in constitutionally protected activity, that the Freeze Orders and Termination Letters constitute adverse government action, that Harvard's protected activity was a substantial or motivating factor in that adverse action, and that the government's proffered nonretaliatory explanation was a smokescreen for punishing protected First Amendment activity.

### 2. The Freeze Orders and Termination Letters impose unconstitutional conditions based on viewpoint.

For similar reasons, the district court correctly concluded that "Defendants imposed unconstitutional conditions on Harvard's receipt of federal funding in violation of the First Amendment." A.59.[8] Just as the government may not directly dictate the mix of viewpoints on Harvard's campus and Harvard's exercise of its academic freedom, it is unconstitutional to impose those same speech restrictions indirectly, through conditions on Harvard's eligibility for federal funding. The

---

[8] The government's brief ignores Harvard's unconstitutional conditions claim, a distinct claim on which the district court granted summary judgment. A.60. That forfeiture suffices to affirm summary judgment on the merits. At a minimum, the availability of a *Mt. Healthy* defense, and any application of *Pickering*, should not apply to Harvard's unconstitutional conditions claim. *See Hiers v. Bd. of Regents*, 2022 WL 748502, at *13 (E.D. Tex. Mar. 11, 2022) (declining to apply *Pickering* to unconstitutional-conditions claim where defendants had not argued it "should be dismissed as duplicative of [plaintiff's] retaliation claim" (citing *United States v. Sineneng-Smith*, 590 U.S. 371, 375-76 (2020))).

government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests," because such a denial would "penaliz[e]" and "inhibit[]" the exercise of constitutional rights to "produce a result which [the Government] could not command directly." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972) (citation omitted); *see AID*, 570 U.S. at 214. Even if the government could deny funding "for some other reason," that "authority does not imply a lesser power to condition [funding] on [a person's] forfeiture of his constitutional rights." *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 608 (2013).

The government threatened to—and, with the Freeze Orders and Termination Letters, did—deny Harvard eligibility for federal funding because of Harvard's unwillingness to relinquish its First Amendment rights. As a condition of a continued "financial relationship with the federal government," the government demanded, among other measures, that Harvard increase "viewpoint diversity" in faculty hiring and admissions to achieve the government's preferred balance of views and shutter academic programs associated with viewpoints the government disfavors. A.8-9. The government thus conditioned eligibility for funding to "produce a result"—government control over Harvard's academic freedom and speech—that it "could not command directly." *Perry*, 408 U.S. at 597.

These conditions went far beyond any permissible regulation of speech in the context of Harvard programs funded by the government. *See AID*, 570 U.S. at 217.

37

The government did not attach germane restrictions that "define the limits of the government spending program" to individual research grants, *id.* at 214-15; it required Harvard to fundamentally reshape all aspects of its operations as an institution of higher education to achieve the government's preferred ideological balance. "By demanding that funding recipients adopt—as their own—the Government's view on an issue of public concern, the condition by its very nature affects 'protected conduct outside the scope of the federally funded program.'" *Id.* at 218 (citation omitted).

### B.    The Government's Contrary Arguments Are Meritless.

The government's half-hearted merits defense on the First Amendment claims is unavailing. The government's lead response is the utterly unsupported (and thus waived) suggestion that the framework announced in *Pickering v. Board of Education*, 391 U.S. 563 (1968), applies. But the *Pickering* framework governs efforts by government employers to punish public employees for their speech. In that context, courts balance the public employee's speech rights with the government employer's interest "in promoting the efficiency of the public services it performs." *Id.* at 568. That framework does not apply to the federal government's effort to "drive out speech it disfavors," as concerns about government-workplace harmony and control over government speech that animate *Pickering* are entirely absent. *Pernell*, 2026 WL 1955783, at *4-5. "[I]deologically driven attempts to suppress a

particular point of view," moreover, "are presumptively unconstitutional in funding, as in other contexts." *Rosenberger v. Rector & Visitors of Univ. of Va.,* 515 U.S. 819, 830 (1995). And even setting that aside, the Supreme Court has flagged additional concerns in applying *Pickering* (even to actual public employees) in cases that "raise questions of academic freedom." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 528 (2022).

The government next argues that the sweeping ideological and governance reforms demanded by its April 11 Letter mostly pertain to activity unprotected by the First Amendment. Br.47-51. That contention does not survive even a cursory review of the April 11 Letter. The April 11 Letter demanded, among other things, an external "audit [of] the student body, faculty, staff, and leadership for viewpoint diversity, such that each department, field, or teaching unit must be individually viewpoint diverse"; an abolition of "all criteria" that "function as ideological litmus tests" for departments "found to 'lack viewpoint diversity'"; the neutering of "faculty … more committed to activism than scholarship"; and "hiring a critical mass of new faculty" and "admitting a critical mass of students" to "provide the government's preferred balance of viewpoint diversity." A.9. As the Supreme Court has repeatedly made clear, "[o]n the spectrum of dangers to free expression, there are few greater than allowing the government to change the speech of private actors in order to achieve its own conception of speech nirvana." *Moody v. NetChoice*, 603

39

U.S. 707, 741-42 (2024). The government's suggestion that its demands implicate free expression and academic freedom "only incidentally" serves only to underscore the critical need for injunctive relief. Br.49-50.

The government fares no better arguing that "a fair reading of the record shows that the Government was concerned first and foremost" with antisemitism and would have terminated Harvard's funding *en masse* regardless of its stated antipathy toward Harvard's perceived viewpoints. Br.51-52. It is unclear what record the government has in mind. The contemporaneous record undermines any suggestion that the government was motivated by concerns about antisemitism when it issued the Freeze Orders. Any effort to backfill with revisionist history is unavailing. "Causation moves forward, not backwards." *Pearson v. Mass. Bay Transp. Auth.*, 723 F.3d 36, 42 (1st Cir. 2013). The government's "subsequent actions," Br.52, cannot wash away its stated reasons for taking the adverse actions. If it were otherwise, then the government could always insulate itself from charges of impermissible First Amendment retaliation by inventing a *post-hoc* smokescreen for viewpoint discrimination.

The government's discussion of how it "has addressed similar problems at other universities," Br.52-53, only hurts its cause. The government's treatment of UCLA confirms that it typically addresses antisemitism concerns through the prescribed Title VI procedures, and underscores that its all-out assault against

40

Harvard is motivated by something entirely different.  Likewise, the government's treatment of Columbia undermines its assertion that it "would still have terminated Harvard grants" regardless of Harvard's protected First Amendment activity.  Br.53. As President Trump put it: "Columbia has been, really, and they were very, very bad…But they're working with us on finding a solution."  A.21.  Harvard, meanwhile, "wants to fight. They want to show how smart they are, and they're getting their ass kicked," and "every time [Harvard] fight[s], they lose another $250 million."  *Id.*  Or as the Education Secretary put it: "I've said all along I would like to see Harvard come back to the table.  But when the response out of the box is a lawsuit, then you've got to answer to that."  *Supra* p.19.  In other words: because Columbia "work[ed] with" the government on "finding a solution," it has not faced the same all-of-government effort to "get[] their ass kicked."  *Id.*  Harvard, by contrast, has—because it decided to "fight" by filing a "lawsuit."  *Id.*

## II.    The District Court Correctly Granted Summary Judgment For Harvard On Its Title VI Claims.

"It is undisputed that Defendants did not comply with" a litany of Title VI procedural requirements "before issuing the Freeze Orders or Termination Letters." A.61.  Unable to claim that it satisfied Title VI, the government argues that compliance was optional because it relied on 2 C.F.R. §200.340(a)(4), which provides that a "[f]ederal award may be terminated in part or its entirety … [b]y the Federal agency … pursuant to the terms and conditions of the Federal award,

41

including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

Neither of the Freeze Orders mentions 2 C.F.R. §200.340(a)(4). A.62. In fact, the administrative record contains not "a single document predating the Termination Letters that references 2 C.F.R. §200.340 as a basis for ending Harvard's funding"; instead, "the record is replete with documents calling on Harvard's funding to be investigated and terminated pursuant to Title VI (not 2 C.F.R. §200.340) or, more generally, 'civil rights laws' (like Title VI)." A.62-63. And although the Termination Letters cited that provision, they offered no grant-specific explanation for the change of priorities and instead referenced government complaints about antisemitism. A.16-17. The government's late-breaking invocation of 2 C.F.R. §200.340 is thus a classic *post-hoc* rationalization that cannot support agency action. *See SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943). As the district court correctly found, "[t]o conclude that 2 C.F.R. §200.340(a)(4) served as the basis for these terminations, rather than Title VI, is simply 'incongruent with what the record reveals about the agenc[ies'] priorities and decisionmaking process.'" A.63 (quoting *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019)).[9]

---

[9] In fact, the relevant portion of §200.340 did not even govern NIH (which provides much of Harvard's research funding) when it awarded the majority of the grants at issue. *See* D.Ct.Dkt.211 at 21-22.

The government's opening brief does not address the district court's holding that the invocation of 2 C.F.R. §200.340(a)(4) was an impermissible *post-hoc* rationalization, A.62, nor does the government make the argument it made below, A.63, that the Termination Letters are the relevant final agency action (and that the government's reasoning in the Freeze Orders and other documents and statements is therefore irrelevant). The government's forfeitures suffice to affirm summary judgment on the Title VI merits.

The arguments the government does make are meritless. The government argues that Title VI does not govern because "the Government terminated the awards at issue pursuant to the terms of these contracts" and is "seeking to enforce a contractual provision that allows it to terminate due to nonalignment with priorities," not "seeking compliance with a regulation issued pursuant to Title VI." Br.42-43. As noted above, that ignores the across-the-board nature of the government's boycott of Harvard and the district court's correct finding that the government was, in fact, seeking to enforce Title VI—as all the evidence reflected until the government's haphazard, post-litigation pivot to 2 C.F.R. §200.340(a)(4). Regardless, "the argument that this regulation authorizes Defendants' conduct is, at best, circular," because the agency priority identified in almost all of the Termination Letters was "Harvard's purported failure to combat antisemitism." A.63-64. Title VI specifically addresses terminations of "grant[s]" based on discrimination concerns,

as opposed to altered priorities or the obsolescence of a particular funding stream, and Title VI itself sets forth a mandatory process with which agencies must comply. 42 U.S.C. §2000d-1. "[R]egulations cannot alter th[is] statutory scheme." *P. Gioioso & Sons v. OSHRC*, 115 F.3d 100, 105 (1st Cir. 1997). Yet the government's argument that Title VI is not the "exclusive mechanism to terminate any grants where a recipient fails to address antisemitism on campus," Br.39, does just that. It would permit the government to circumvent the Title VI process, impermissibly "frustrat[ing] the policy that Congress sought to implement." *FEC v. Democratic Senatorial Campaign Comm.,* 454 U.S. 27, 32 (1981).

The government cannot pursue what is, in substance, a Title VI sanction via a 2 C.F.R. §200.340(a)(4) termination. The text of the regulation itself contemplates that such terminations must be made as individual, project-level determinations—not based on White House diktats that an entire institution is ineligible for further federal funding because of antisemitism or unless it cedes its academic freedom to the government. The regulation allows termination only "if *an award* no longer effectuates the program goals or agency priorities." 2 C.F.R. §200.340(a)(4) (emphasis added). In other words, the regulation focuses on whether a specific grant (as opposed to an entire research institution) no longer effectuates goals or priorities—goals and priorities defined by reference to the granting agency, not White House vendettas. That is why OMB explained at the time of its

44

promulgation that the regulation could be invoked when "additional evidence reveals that a specific award objective is ineffective at achieving program goals" or casts doubt on "the feasibility of the intended objective of the award." OMB Guidance for Grants and Agreements, 85 Fed. Reg. 49,506 at 49,507-08.

The government argues that the district court's interpretation would produce absurd results, as "those who discriminate on the basis of race would be afforded *greater* procedural protections than any other government contractor." Br.44. To the contrary, racially discriminatory contractors would be afforded exactly the same procedural protections as everyone else. No institution can be deemed ineligible for federal funding by executive fiat; only a finding of unlawful discrimination based on all the available process for such a serious allegation and remedy can lead to that draconian result.

## III. The District Court Had Jurisdiction Over Harvard's First Amendment And Title VI Claims And The Relief Requested And Granted.

Likely recognizing that the Freeze Orders and Termination Letters are indefensible on the merits, the government focuses the bulk of its brief on trying to dodge review in the Article III courts. The government does not dispute that the district court had jurisdiction over Harvard's claims with respect to the Freeze Orders. But even though the Freeze Orders and the Termination Letters are inextricably intertwined and part and parcel of the government's effort to deem Harvard categorically ineligible for federal funds, the government insists that

45

Harvard's First Amendment and Title VI claims with respect to the latter belong in the Court of Federal Claims—even though that court lacks jurisdiction to enjoin the government from continuing its all-out campaign against Harvard, which is the relief that Harvard sought and the district court granted. That is as wrong as it sounds.

1. The APA waives the government's sovereign immunity for claims against the United States "seeking relief other than money damages" for persons "adversely affected or aggrieved by agency action." 5 U.S.C. §702. That waiver, however, does not apply "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." *Id.*; *see California*, 604 U.S. at 651. The Tucker Act gives the Court of Federal Claims jurisdiction "to render judgment upon any claim against the United States founded … upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. §1491(a)(1). Although "not based on any language in the Tucker Act granting [the Court of Federal Claims] exclusive jurisdiction," *Bowen*, 487 U.S. at 910 n.48, courts have construed the Tucker Act to impliedly displace the APA's waiver of sovereign immunity for a claim against the United States that is "at its essence a contract claim." *E.g.*, *Megapulse v. Lewis*, 672 F.2d 959, 967 (D.C. Cir. 1982).

To decide whether a claim is in essence contractual, courts look to the "source of the rights upon which the plaintiff bases its claims" and "the type of relief sought

46

(or appropriate)." *Id.* at 968. The mere fact that a claim "requir[es] some reference to or incorporation of a contract" does not necessarily make the claim contractual. *Id.* at 967-68. As to the source of the rights, courts "make rational distinctions between actions sounding genuinely in contract and those based on truly independent legal grounds," *id.* at 969-70, considering whether the rights arise from statute, whether the rights "exist[] prior to and apart from rights created under the contract" and whether the plaintiff seeks to enforce duties imposed by the relevant contract, *Crowley*, 38 F.4th at 1107 (quoting *Spectrum Leasing v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985)). As to the type of relief sought, the "crux of this inquiry … boils down to whether the plaintiff effectively seeks to attain monetary damages in the suit." *Crowley*, 38 F.4th at 1107.

It is well settled law, reaffirmed by the Supreme Court's recent interim-docket decisions and this Court's decisions, that "a district court's jurisdiction 'is not barred by the possibility' that an order setting aside an agency's action may result in the disbursement of funds." *California*, 604 U.S. at 651 (quoting *Bowen*, 487 U.S. at 910); *see also Kidwell v. Dep't of Army*, 56 F.3d 279, 284 (D.C. Cir. 1995) (a claim is not essentially contractual merely "because success on the merits may obligate the United States to pay the complainant"). More broadly, courts "categorically reject the suggestion that a federal district court can be deprived of jurisdiction by the Tucker Act when no jurisdiction lies in the Court of Federal Claims." *Tootle v. Sec'y*

47

*of Navy*, 446 F.3d 167, 176 (D.C. Cir. 2006).

2. Applying these principles, Harvard's First Amendment and Title VI claims are not "in essence" contract actions that must be brought in the Court of Federal Claims. The *sources* of the rights that Harvard asserts are the First Amendment and Title VI—Harvard does not rely on (indeed, does not even cite the terms of) any government contract or grant. To the contrary, the fact that the government has deemed Harvard ineligible for funding across all grants without regard to their nature or any contractual provisions is both the crux of Harvard's First Amendment challenge and an integral reason that Title VI, rather than 2 C.F.R. §200.340(a)(4), governs here. Determining whether the government "infringed [Harvard's] rights" requires "primarily an examination of the statute[]" that the government violated, along with First Amendment principles—not any contract. *Crowley*, 38 F.4th at 1108-09.

As the appeal in No. 25-1627 underscores, the actions challenged here are part of a broader all-of-government campaign designed to punish Harvard for its First Amendment activity and coerce it to change its tune. Harvard has a right to be free from First Amendment retaliation and unconstitutional conditions apart from any contractual rights. Moreover, had the government followed the procedures that Title VI requires in terminating Harvard's grants, Title VI would unquestionably furnish jurisdiction for APA review of that agency action "terminating or refusing to grant

48

or to continue financial assistance" under 42 U.S.C. §2000d-2. *See Colwell*, 558 F.3d at 1128. The government's reward for violating Title VI's procedural guarantees cannot be to strip the Article III courts of jurisdiction.

The *relief* sought is not essentially contractual, either. Harvard seeks "neither the 'prototypical contractual remedy' of damages" nor the "classic contractual remedy of specific performance." *Crowley*, 38 F.4th at 1110. Harvard's First Amendment and Title VI claims do not seek "money in *compensation* for the damage sustained by the failure of the Federal Government to pay as mandated." *Bowen,* 487 U.S. at 900. They seek to define Harvard's rights under the Constitution and federal statute, and to prospectively enforce those rights through equitable relief. Granting Harvard relief would not "in any way constitute[] an adjudication of [Harvard's] rights under its [grants]." *DSE, Inc. v. United States*, 169 F.3d 21, 34 (D.C. Cir. 1999). That is particularly clear of Harvard's Title VI claims, which are essentially procedural and insist that certain statutory procedures must precede termination for discrimination, wholly apart from the terms of any grant or contract. But it is also clear from the fact that the district court's injunction does not preclude the government from re-terminating specific grants on a constitutionally and statutorily sound basis (if any such basis exists).

At bottom, Harvard seeks "prospective declaratory and injunctive relief to clarify the extent of the Government's ongoing obligations," including resort to

49

statutorily required procedures and restoring Harvard's ability to compete for future grants—relief that the Court of Federal Claims "does not have the general equitable powers" to grant. *Maine Community*, 590 U.S. at 326-27. The Tucker Act does not impliedly preclude district court jurisdiction where, as here, "a naked money judgment against the United States" would not be "an adequate substitute for prospective relief." *Bowen,* 487 U.S. at 905.

3.    The government's arguments to the contrary massively overread the Supreme Court's interim decisions in *California* and *APHA*. The government argues that the "inclusion of a constitutional claim does not alter the analysis here" because that "constitutional claim is merely a vehicle to block the termination of a contract obligating money" for which "an adequate remedy exists in the Court of Federal Claims." Br.30. That argument is misplaced. Although it may be possible that a tacked-on or artfully-pleaded constitutional claim would not alter the essentially contractual nature of a claim, Harvard's claims do not fit that bill. Far from "merely a vehicle to block the termination of a contract," Harvard sought declaratory and injunctive relief against a campaign of First Amendment retaliation—and sweeping violations of Title VI by which the government terminated grants *en masse*—in no small part to restore Harvard's eligibility to compete for future grants. And the district court issued forward-looking injunctive relief prohibiting the government from "[i]ssuing any other termination, fund freezes, stop work orders, or otherwise

50

withholding payment on existing grants or other federal funding, *or refusing to award future* grants, contracts, or other federal funding to Harvard in retaliation for the exercise of its First Amendment rights." A.84 (emphasis added). That is prospective relief that the Court of Federal Claims could not provide, which eviscerates the government's argument that damages in the Court of Federal Claims can provide an adequate remedy. The fact that "purely monetary aspects" of a district-court APA action "could have been decided in the Claims Court is not a sufficient reason to bar that aspect of the relief available in a district court." *Bowen*, 487 U.S. at 910 n.48.

The government relies on this Court's decision in *New York v. Trump*, 171 F.4th 1 (1st Cir. 2026), to argue that the injunction was improperly "designed to enforce an[] obligation to pay money pursuant to th[e] grants." Br.38. But *New York* actually underscores why the district court *properly* exercised its jurisdiction here. The district court in *New York* ordered the government "to release and transmit any disbursements to the States on awarded grants, executed contracts, or other executed financial obligations," and thereby "ordered specific performance with respect to payment." 171 F.4th at 27. Although this Court vacated that portion of the injunction under *APHA* and *California*, it *affirmed* portions of the injunction that prohibited the defendants from "implementing" or "giving effect to" the challenged directive, including enjoining defendants from "impeding the disbursement of

51

appropriated federal funds to the States" under that directive. *Id.* at 27.

Nothing in the district court's injunction orders the government to "release and transmit disbursements." Instead, the district court vacated Freeze Orders and Termination Letters that were the product of ongoing First Amendment retaliation, A.82; enjoined the government from "[i]mplementing, instituting, maintaining, or giving any force or effect to Defendants' Freeze Orders, Termination Letters, and attendant unconstitutional conditions"; and enjoined the government from issuing other freeze orders or terminations, or "otherwise withholding payment on existing grants … or refusing to award future grants, contracts, or other federal funding to Harvard in retaliation for the exercise of its First Amendment rights" or based on procedurally defective "grounds of discrimination" under Title VI. A.82-84. These terms "specif[y] the portion of the [] injunction that bars" the government's First Amendment retaliation and abuse of Title VI against Harvard. *New York*, 171 F.4th at 27. They do not order the government to disburse funds, which it could still, in theory, refuse to do, without violating the injunction. Instead, they order the government to cease unconstitutional retaliation and afford Harvard the procedural protections that Title VI demands. That is perfectly consistent with *New York*, which vacated a provision that *actually* ordered funds disbursed while sustaining provisions that, notwithstanding a similar payment-obligation argument from the government, merely made more specific the properly prospective relief.

52

The government's reliance on two Fourth Circuit cases founders for similar reasons. Br.30-32 (citing *Sustainability Inst. v. Trump*, 165 F.4th 817 (4th Cir. 2026) and *Solutions in Hometown Connections v. Noem*, 165 F.4th 835 (4th Cir. 2026)). In *Sustainability Institute*, the plaintiffs requested, and the court granted, an order "setting aside the termination of grants and *directing the Government to restore plaintiffs' access to grant funds immediately*." Br.30-31 (emphasis added). *That directive* is why it mattered that, constitutional and statutory claims notwithstanding, "Plaintiffs identif[ied] no source of law, besides their grant agreements, guaranteeing them the relief they seek: continued payments on those grants." Br.31 (quoting *Sustainability Inst.*, 165 F.4th at 827). But here, Harvard principally sought an order barring the government from continuing its retaliatory campaign against Harvard and affording it the procedural rights that Title VI—not any grant or contract— demands. The fact that revoking Harvard's grants was one aspect of that retaliatory campaign does not deprive the district court of jurisdiction.

*Solutions in Hometown Connections* is of a piece. Emphasizing that "we have before us only the denial of a motion for a preliminary injunction, not the claims that might more broadly be alleged in the complaint," the Fourth Circuit "focus[ed] only on the relief sought in the motion for a preliminary injunction." 165 F.4th at 841. And that requested relief was "an injunction 'to restore' the Grant Program to provide 'funding' so as to 'preserve the ability to run their naturalization programs'

53

and to 'have funding for ongoing legal representation obligations.'" *Id.* at 843. Again, Harvard sought no comparable relief, nor did the district court grant any. On top of that, the constitutional claims in *Solutions in Hometown Connections* were fundamentally "monetary in nature and backward-looking." *Id.* at 840. The district court's injunction, by contrast, is at its core prospective, prohibiting the government from "withholding payment on existing grants … or refusing to award future grants, contracts, or other federal funding to Harvard *in retaliation for the exercise of its First Amendment rights*, or on any *purported grounds of discrimination without compliance with the terms of Title VI*." A.84 (emphases added).

Finally, the government overreads Justice Barrett's concurrence in *APHA* to urge that the district court's injunction was "designed to enforce an[] obligation to pay money pursuant to [] grants." Br.38. The district court correctly perceived that Harvard's First Amendment and Title VI claims stand on fundamentally different footing from the arbitrary and capricious claim in *APHA*.[10] In *APHA*, "[v]acating

---

[10] The government, citing *Sustainability Institute*, makes much of the fact that the plaintiffs in *APHA* and *California* had asserted various constitutional and statutory claims in addition to arbitrary and capricious claims. True enough, but the Court never mentioned them. *Cf. APHA*, 145 S.Ct. at 2661 (Barrett, J., concurring) ("Plaintiffs frequently seek vacatur of internal agency guidance on arbitrary-and-capricious grounds in district court or directly in the D.C. Circuit."); *id.* at 2665 (Kavanaugh, J., concurring in part and dissenting in part) (even if "plaintiffs' challenge to the guidance is separable from their challenge to the grant terminations … plaintiffs are unlikely to succeed on the merits *of their arbitrary and capricious challenge to the guidance*." (emphasis added)). These drive-by

54

[agency] guidance [did] not reinstate terminated grants"; "[i]f one simply flowed from the other, the District Court would have needed only to vacate the guidance itself." 145 S.Ct. at 2661 (Barrett, J., concurring). Because one did not simply flow from the other, both logic and law supported channeling the grant terminations to the Court of Federal Claims notwithstanding that "the fact that the purely monetary aspects" of a district-court APA action "could have been decided in the Claims Court is not a sufficient reason to bar that aspect of the relief available in a district court." *Bowen*, 487 U.S. at 910 n.48. Justice Barrett thus contrasted *Bowen*, which involved but "one judgment vacating [an] HHS decision," with the order in *APHA*, which "separately 'vacated' the grant terminations and *ordered the Government to pay* plaintiffs sums due under the agreements '*forthwith*.'" 145 S.Ct. at 2661 (emphasis added).

As the district court recognized, Harvard's challenge to an ongoing campaign of First Amendment retaliation, which implicates the Freeze Orders, the Termination Letters, and future eligibility to compete for grants, logically invites a "single order invalidating Defendants' course of unlawful conduct, which would include both the

---

jurisdictional rulings, if they are even that, are far too thin a reed on which to premise the implicit overruling of *Bowen*. It is far more likely that the Court thought, in an interim posture, that arbitrary and capricious claims are especially susceptible of being "'disguised' contract claims." *Megapulse*, 672 F.2d at 969. The record below, and the decision explaining the final judgment, demonstrate that Harvard's claims are no such thing.

Freeze Orders and the Termination Letters." A.30.  Indeed, that is the core relief the district court ordered:  an injunction against "withholding payment on existing grants … or refusing to award future grants, contracts, or other federal funding to Harvard in retaliation for the exercise of its First Amendment rights."  A.84.  Like the "one judgment" in *Bowen*, neither logic nor law supports splitting claims for relief as to the Freeze Orders and Termination Letters across two tribunals, given that the First Amendment claims with respect to both are the same.  True, the Title VI claims would logically apply only to the Termination Letters, but the Title VI relief is even more obviously distinct from anything at issue in *APHA*.  The relief ordered here is not an order directing the government to pay any particular grant, but an order requiring the government to comply with the procedural requirements of Title VI before terminating grants on the basis of discrimination.  Had the government complied with those procedural requirements, it is clear beyond cavil that the Article III courts (and not the Court of Federal Claims) would have jurisdiction.  That just underscores the absurdity of the government's jurisdictional argument.  It cannot be that the government's reward for blatantly violating the procedural requirements of Title VI in terminating federal funds is to strip the Article III courts of jurisdiction.

## CONCLUSION

This Court should affirm.

56

Dated: July 15, 2026

Respectfully submitted,

*/s/ Paul D. Clement*

STEVEN P. LEHOTSKY
MARY ELIZABETH MILLER
SHANNON G. DENMARK
LEHOTSKY COHN LLP
200 Massachusetts Ave. NW, Suite 700
Washington, DC 20001

JOSHUA S. LEVY
ROPES & GRAY LLP
800 Boylston Street
Boston, MA 02199

DOUGLAS H. HALLWARD-DRIEMEIER
ROPES & GRAY LLP
2099 Pennsylvania Ave. NW
Washington, DC 20006

PAUL D. CLEMENT
 *Counsel of Record*
JAMES Y. XI
JEFFREY C. THALHOFER
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

WILLIAM A. BURCK
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
1300 I St. NW, Suite 900
Washington, DC 20005

ROBERT K. HUR
KING & SPALDING LLP
1700 Pennsylvania Ave. NW, Suite 900
Washington, DC 20006

57

## <u>CERTIFICATE OF SERVICE</u>

I certify that they have submitted the foregoing document with the Clerk of Court for the United States Court of Appeals for the First Circuit, using the electronic case filing system of the Court.  I hereby certify that opposing counsels are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

<em><u>/s/Paul D. Clement</u></em>

Dated: July 15, 2026

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), I hereby certify that this document complies with the type-volume limitations set forth in Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 12,991 words.

I further certify that this document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in a 14-point Times New Roman font.

Dated:  July 15, 2026

*/s/Paul D. Clement*