Case No. 25-2230

---

# IN THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

---

PRESIDENT AND FELLOWS OF HARVARD COLLEGE,
Plaintiff-Appellee,

v.

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; NATIONAL INSTITUTES OF HEALTH AND HUMAN SERVICES; ROBERT F. KENNEDY, JR., in his official capacity as Secretary of the United States Department of Health and Human Services; U.S. DEPARTMENT OF JUSTICE; TODD BLANCHE, in his official capacity as Acting Attorney General of the United States; U.S. DEPARTMENT OF EDUCATION; LINDA M. MCMAHON, in her official capacity as Secretary of the United States Department of Education; GENERAL SERVICES ADMINISTRATION; EDWARD FORST, in his official capacity as Administrator of the United States General Services Administration; UNITED STATES DEPARTMENT OF ENERGY; CHRISTOPHER WRIGHT, in his official capacity as Secretary of the Department of Energy; NATIONAL SCIENCE FOUNDATION; BRIAN STONE, in his official capacity as Acting Director of the National Science Foundation; UNITED STATES DEPARTMENT OF DEFENSE; PETER HEGSETH, in his official capacity as Secretary of the United States Department of Defense; NATIONAL AERONAUTICS AND SPACE ADMINISTRATION; JARED ISAACMAN, in his official capacity as Administrator of the National Aeronautics and Space Administration; U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT; SCOTT TURNER, in his official capacity as Secretary of Housing and Urban Development; UNITED STATES DEPARTMENT OF AGRICULTURE; BROOKE L. ROLLINS, in her official capacity as Secretary of Agriculture,
Defendants-Appellants.

---

*On Appeal from the United States District Court for the District of Massachusetts, No. 1:25-cv-11048-ABD*

---

## BRIEF OF AMICUS CURIAE LAWYERS DEFENDING AMERICAN DEMOCRACY IN SUPPORT OF PLAINTIFF-APPELLEE

---

*Attorneys for amicus on following page.*

i

MIRIAM WEIZENBAUM
(Counsel of Record)
199 North Main Street
Providence, RI 02903
(401) 293-8624
miriam@dwbrlaw.com

AMATO A. DELUCA
199 North Main Street
Providence, RI 02903
(401) 293-8624
amato@dwbrlaw.com

*Attorneys for* amicus curiae *Lawyers Defending American Democracy*

ii

**RULE 26.1 CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1, *amicus curiae*

Lawyers Defending American Democracy has no parent corporation and no stock.

# TABLE OF CONTENTS.

RULE 26.1 CORPORATE DISCLOSURE STATEMENT ................................... iii

TABLE OF AUTHORITIES............................................................................ v-viii

IDENTIFICATION AND INTEREST OF AMICUS CURIAE ..............................1

I.    SUMMARY OF ARGUMENT......................................................................2

II.   ARGUMENT ................................................................................................3

  I.    THE ADMINISTRATION'S ATTACK ON HARVARD IS PART OF A
  COORDINATED EFFORT TARGETING INDEPENDENT SECTORS OF
  SOCIETY THAT CAN CONSTRAIN EXECUTIVE POWER. .........................5

    A.   The Administration's Reliance on Antisemitism at Harvard and Other
    Universities is a Pretext to Further a Systematic Assault on Independent
    Sectors of Society and the Rule of Law. .........................................................7

    B.   The Administration is Using Autocratic Legalism to Weaken Checks on
    Executive Power............................................................................................17

CERTIFICATE OF COMPLIANCE ...................................................................32

CERTIFICATE OF SERVICE............................................................................33

iv

# TABLE OF AUTHORITIES

**Cases**

*Abrego Garcia v. Noem*, No. 25-1404, 2025 WL 1135112 (4th Cir. Apr. 17, 2025) ....................................................................................................................25

*Abrego Garcia v. Noem*, No. 8:25-cv-00951 (D. Md. 2025–26)................................25

*Alexander v. Sandoval*, 532 U.S. 275 (2001) ..........................................................16

*Am. Ass'n of University Professors, et al. v. Donald J. Trump, et al.*, No. 3:25-cv-07864-RFL (N.D. Cal. Nov. 14, 2025) ....................................................................14

*Dep't of Commerce v. New York*, 588 U.S. 752 (2019) ....................................3, 29

*Frankel v. Regents of the Univ. of Cal.*, No. 2:24-cv-04702 (C.D. Cal. July 29, 2025)......................................................................................................................13

*Guardians Ass'n v. Civil Serv. Comm'n*, 463 U.S. 582 (1983)................................16

*Jenner & Block LLP v. U.S. Dep't of Justice*, 784 F. Supp. 3d 76 (D.D.C. 2025) ..21

*J.G.G. v. Trump*, No. 1:25-cv-00766 (D.D.C. 2025) ...............................................25

*Moreta Duran v. Bondi*, No. 0:25-cv-04816 (D. Minn. Jan. 25, 2026) .................25

*Perkins Coie LLP v. U.S. Dep't of Justice*, 783 F. Supp. 3d 105 (D.D.C. 2025).....21

*President and Fellows of Harvard College v. U.S. Dep't of Health & Hum. Servs.*, No. 1:25-cv-11048-ADB, ECF No. 238 (D. Mass. Sept. 3, 2025)..... 4, 7, 15, 16, 28

*Susman Godfrey LLP v. Exec. Off. of the President*, 789 F. Supp. 3d 15 (D.D.C. 2025)......................................................................................................................22

*Tobay Robles v. Noem*, No. 0:26-cv-00107-PJS-DLM (D. Minn. Feb. 26, 2026) ..24

*United States v. Chemical Found., Inc.*, 272 U.S. 1 (1926) .....................................29

*United States v. Fox,* No. 1:26-cv-01658 (D.D.C. May 13, 2026)..............................23

*United States v. Zubaydah*, 595 U.S. 195 (2022) ......................................................30

*Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of the President*,
784 F. Supp. 3d 127 (D.D.C. 2025).................................................................22


**Statutes**

Title VI, 2 C.F.R. § 200.340..................................................................................27

**Secondary Authorities**

Compact for Academic Excellence in Higher Education (Oct. 1, 2025) ............9, 10

Javier Corrales, *The Authoritarian Resurgence: Autocratic Legalism in Venezuela*,
26 J. DEMOCRACY 37 (2015) .................................................................................5

Kim Lane Scheppele, *Autocratic Legalism*, 85 U. CHI. L. REV. 545 (2018).......4, 17

Scott L. Cummings, *The Autocratic Legal Playbook*, 73 UCLA L. REV.
(forthcoming 2026), UCLA Sch. of L. Pub. L. Research Paper No. 25-31 (Aug. 14,
2025)..............................................................................4, 6, 7, 18, 19, 27

Steven Levitsky & Daniel Ziblatt, *How Democracies Die* (2018)..........................5

Tom Ginsburg & Aziz Huq, *How to Save a Constitutional Democracy* (2018).....28

**Other Authorities**

Letter from Pamela Bondi, Att'y Gen., to William R. Bay, Am. Bar. Ass'n (May
29, 2025)..............................................................................................22

Memorandum from Pam Bondi, Att'y Gen., to All Dep't Emps, General Policy
Regarding Zealous Advocacy on Behalf of the United States (Feb. 5, 2025) ........18

Press Release, U.S. Dep't of Educ., U.S. Dep't of Just., U.S. Dep't of Health &
Hum. Servs. & Gen. Servs. Admin., DOJ, HHS, ED, and GSA Announce Initial

Cancellation of Grants and Contracts to Columbia University Worth $400 Million (Mar. 7, 2025).................................................................................................................10

Review of State Bar Complaints and Allegations Against Department of Justice Attorney, 91 Fed. Reg. 10780 (March 5, 2026) .....................................................23

Suspension of Security Clearances and Evaluation of Government Contracts,

Memorandum of Feb. 25, 2025, 90 Fed. Reg. 11,011 (Feb. 25, 2025)....................20

*White House Fact Sheet: Settlement with Cornell University* (Nov. 7, 2025).........12

**Executive Orders**

EO No. 14230, 90 Fed. Reg. 11781 (Mar. 11, 2025) ................................................21

EO No. 14237, 90 Fed. Reg. 13039 (Mar. 20, 2025) ................................................21

EO No. 14244, 90 Fed. Reg. 13685 (Mar. 26, 2025) ................................................21

EO No. 14246, 90 Fed. Reg. 13997 (Mar. 28, 2025) ................................................21

EO No. 14250, 90 Fed. Reg. 14549 (Apr. 3, 2025) ..................................................21

EO No. 14263, 90 Fed. Reg. 15615 (Apr. 15, 2025) ................................................21

## IDENTIFICATION AND INTEREST OF AMICUS CURIAE

Lawyers Defending American Democracy ("LDAD") is a nonpartisan organization composed of attorneys, law professors, former judges, and former government officials dedicated to preserving the rule of law, constitutional democracy, and the independence of the legal profession. LDAD has previously filed ethics complaints against Administration lawyers and amicus curiae briefs, organized public legal education events, and issued statements condemning systematic attacks on the institutions that guard against the arbitrary exercise of executive power.

LDAD has a substantial interest in this appeal because the conduct challenged is not an isolated regulatory decision but rather one episode in a comprehensive campaign to disable the institutions—universities, the Bar, law firms, courts, independent executive branch agencies, civil society, and the media—whose independence is necessary to maintain our democratic form of limited government.[1]

---

[1] No party's counsel authored this brief in whole or in part. No person or party other than amicus curiae, its members, or its counsel contribute money that was intended to fund preparing or submitting this brief. LDAD has consent of the parties to this appeal to file this amicus curiae brief.

# I.  SUMMARY OF ARGUMENT

The Administration's purported reliance on antisemitism to justify its punishment of Harvard was pretextual. Its attack on Harvard is consistent with and part of a broader campaign against independent institutions that stand in the way of unfettered executive power, including other universities, lawyers, the courts, civil society, and the media.

This crusade draws directly from a playbook followed by would-be autocrats in other countries. While the Administration attempts to cloak its conduct in legal formalities, its actions are fundamentally inconsistent with the rule of law. The district court correctly determined that the Administration's conduct here violated applicable statutes and the Constitution. The broader context we describe in this brief reinforces the court's conclusion that the Administration's actions were arbitrary and capricious under the Administrative Procedure Act. Indeed, the pattern of governmental action of which Harvard's punishment is a part demonstrates that, as in several other cases, the Administration no longer deserves the presumption of regularity in judicial review of its conduct at issue in this case.

2

## II.    ARGUMENT

While the Administration maintains that it terminated $2.2 billion in federal funds to Harvard College ("Harvard" or the "University") because the University failed to combat antisemitism, the District Court correctly concluded that this was a pretext to coerce Harvard to adhere to the Administration's demands regarding the content of its curriculum.

The Supreme Court has affirmed that an agency's "decision must be set aside because it rested on a pretextual basis…." *Dep't of Commerce v. New York*, 588 U.S. 752, 784-85 (2019). "The reasoned explanation requirements of administrative law [See 5 U.S.C. Sect. 706(2)(A)], after all, is meant to ensure that agencies offer genuine justifications for important decisions, reasons that may be scrutinized by courts and the interested public. Accepting contrived reasons would defeat the purpose of the enterprise." *Id*. at 785.

The Administration's action in this case is part of their larger campaign to concentrate power in the Executive by weakening independent institutions such as universities, law firms, the media, non-profit organizations, and the federal civil service that serve as vital checks on the executive in a democracy. The actions against Harvard in this case reflect the use of "autocratic legalism," in which officials use formal legal proceedings and discretionary legal authority to dismantle democratic guardrails while maintaining the appearance of legality. As

3

scholarship has established, this is a strategy that has been used in other countries to consolidate authoritarian rule. *See, e.g.,* Scott L. Cummings, *The Autocratic Legal Playbook*, 73 UCLA L. REV. (forthcoming 2026), UCLA Sch. of L. Pub. L. Research Paper No. 25-31 (Aug. 14, 2025), https://ssrn.com/abstract=5392409; Kim Lane Scheppele, *Autocratic Legalism*, 85 U. CHI. L. REV. 545, 548 (2018).

The administration has targeted Harvard as a warning to other universities with smaller endowments: comply with our demands or lose all federal funding. The Administration argues that Title VI authorizes comprehensive government oversight of university governance and that changes in "agency priorities" justify termination of federal funding already authorized by Congress because of alleged antisemitic policies and practices by Harvard. *President and Fellows of Harvard College v. U.S. Dep't of Health & Hum. Servs.,* No. 1:25-cv-11048-ADB, ECF No. 238, at 8-11 (D. Mass. Sept. 3, 2025) ("Order"). This Court should affirm the District Court's finding that this asserted justification is a pretext for the Administration's effort to exercise control over the University to dictate the content of the education that it provides and therefore is arbitrary and capricious.

4

I.    **THE ADMINISTRATION'S ATTACK ON HARVARD IS PART OF A COORDINATED EFFORT TARGETING INDEPENDENT SECTORS OF SOCIETY THAT CAN CONSTRAIN EXECUTIVE POWER.**

This Administration has pursued a coordinated effort to expand and consolidate presidential control over the Executive branch, while weakening the other branches of government, and attempting to gain control over independent agencies and institutions. *See, e.g.,* Steven Levitsky & Lucan A. Way, *The Path to American Authoritarianism*, 104 Foreign Aff. 48 (Mar./Apr. 2025) (identifying several mechanisms pursued during the second Trump administration, including the politicalization of the Department of Justice, targeting independent institutions, and efforts to bring the federal bureaucracy under direct presidential control).[2] Political scientists and legal scholars have noted that modern autocracy does not typically supplant democracy via military coups or outright abolition of constitutional forms. *See, e.g.,* Steven Levitsky & Daniel Ziblatt, *How Democracies Die* (2018); Javier Corrales, *The Authoritarian Resurgence: Autocratic Legalism in Venezuela*, 26 J. DEMOCRACY 37 (2015).

Modern autocratic leaders instead have followed a playbook that President Trump has repeatedly publicly admired, which consolidates power by "using the appearance of legally valid strategies to target and ultimately dismantle democratic

---

[2] Note that *Trump v. Slaughter*, No. 25-332, slip op. at __ (U.S. June 29, 2026) addressed the President's authority to replace agency commissioners, but there remain issues regarding the scope of the Court's decision.

5

institutions that check consolidation of executive power." Cummings, *Autocratic Legal Playbook* at 4. *See also* Teri Schultz, *Why Trump Is Lavishing Praise on Hungary's Authoritarian Leader Viktor Orbán*, NPR (Mar. 11, 2024), https://www.npr.org/2024/08/20/nx-s1-5075164/why-trump-is-lavishing-praise-on-hungarian-prime-minister-viktor-orban. The Administration is following this autocratic playbook to increase presidential authority over the Executive Branch, weaken institutional checks on executive power, and bring traditionally independent governmental and civil-society institutions under greater presidential influence. *See generally* Cummings, *Autocratic Legal Playbook*; Levitsky & Way, *The Path to American Authoritarianism*. *See also* Scheppele, 85 U. CHI. L. REV. at 550 ("One should first suspect a democratically elected leader of autocratic legalism when he launches a concerted and sustained attack on institutions whose job it is to check his actions or on rules that hold him to account."). Modern leaders seeking autocratic power in countries like Hungary, Venezuela, and Israel have followed this strategy, using legal mechanisms to: 1) centralize executive authority; 2) weaken institutional checks; 3) pressure or capture independent institutions; 4) delegitimize courts, universities, and the press; 5) deploy enforcement powers against perceived opponents; and 6) maintain a veneer of legality while altering the constitutional balance. Cummings, *Autocratic Legal Playbook* at 21-35.

6

Professor Cummings has identified Administration actions that follow this approach, citing specifically the Administration's: 1) pressure on universities; 2) attacks on law firms; 3) efforts to control the civil service; 4) assertions of presidential control over agencies; and 5) use of executive orders and investigations against institutional opponents. *Id*. *See also* John F. Harris, *The Great Grovel: How Trump Forced Elite Institutions to Bend to His Will*, Politico (Mar. 31, 2025), https://www.politico.com/news/2025/03/31/trump-institutions-grovel-law-media-business-028840.

**A.    The Administration's Reliance on Antisemitism at Harvard and Other Universities is a Pretext to Further a Systematic Assault on Independent Sectors of Society and the Rule of Law.**

The Administration has used alleged antisemitism as a pretext to punish Harvard and other universities via massive funding cuts for refusing to capitulate to the administration's demands for a curriculum that reflects its ideological preferences, with a goal of provoking fear and therefore compliance from other American universities and independent institutions. *See President and Fellows of Harvard College*, No. 1:25-cv-11048-ADB at 50-51 (finding that "the texts of the Freeze Orders and Termination letters…blatantly link Harvard's April 14 rejection of the government's demands to the funding cuts.").

The Administration's campaign against universities is not limited to Harvard. Beginning in its opening weeks, the Administration launched a coordinated, multi-

7

agency effort to use federal funding as a coercive instrument against universities across the country. *See*, *e.g.*, Bianca Quilantan, *Trump Administration Freezes $1B for Cornell, $790M for Northwestern, Trump's Pressure Campaign Against Universities*, Politico (Apr. 9, 2025), https://www.politico.com/news/2025/04/09/trump-administration-freezes-millions-at-cornell-and-northwestern-00280681 (explaining that multiple universities including Princeton, Cornell, Northwestern, Brown, the UC system, Penn and Harvard faced freezes, reviews, or cancellations involving billions of dollars).

The scope, uniformity of method, and explicit presidential acknowledgment of the campaign's purposes confirm that it was a deliberate strategy of institutional control, not a series of individualized responses to specific civil rights violations. The sanctions were severe and expansive. By July 2025, the Administration had targeted more than 4,000 grants for termination at more than 600 universities and colleges in every state and had frozen or terminated more than $3 billion in funding. *See* Greta Bedekovics & Will Ragland, *Mapping Federal Funding Cuts to U.S. Colleges and Universities,* Center for American Progress (July 23, 2025); Ben Brasch & Danielle Douglas-Gabriel, *Trump Freeze on $2.2 Billion to Harvard Provided No Proof of Wrongdoing*, Wash. Post (Apr. 17, 2025), https://www.washingtonpost.com/education/2025/04/17/harvard-trump-grant-freeze-antisemitism/. Approximately $11 billion in university funding was

threatened or placed under review. Justine McDaniel & Susan Svrluga, *Trump vs. Harvard: A Timeline of How the Fight Escalated*, Wash. Post (Sept. 3, 2025), https://www.washingtonpost.com/education/interactive/2025/timeline-trump-harvard/. No administration had ever cut off funding to a university on civil rights grounds; the current administration has done so repeatedly, indiscriminately, and without the individualized findings and process that Title VI and applicable regulations require.[3]

In October 2025, the Administration issued a "Compact for Academic Excellence in Higher Education," initially demanding that nine universities agree to a sweeping set of White House political priorities—including banning consideration of race, gender, sexuality, nationality, or political views in admissions and hiring; capping international student enrollment at fifteen percent; freezing tuition for five years; and submitting to annual anonymous compliance surveys—as a condition for "preferential access to federal funding." Compact for Academic Excellence in Higher Education (Oct. 1, 2025). Schools that refused faced continued pressure; schools that signed were offered White House access and

---

[3] The origin of Title VI is rooted in the premise that it cannot be used by the Executive branch as a broad punitive tool: "[Title VI] would not permit the Federal Government to cut off all Federal aid of all kinds as a means of punishing an area for the discrimination occurring therein." Civil Rights: Message from the President of the United States, H.R. Misc. Doc. No. 88-124 (1963).

funding priority. The compact was subsequently offered to all American universities.

Most universities do not have the endowment that Harvard does and had no choice but to capitulate to the Administration's demands. Columbia University is one example of many. On March 7, 2025, the Departments of Justice, Education, Health and Human Services, and the General Services Administration announced the cancellation of approximately $400 million in grants and contracts to Columbia University through a "Joint Task Force to Combat Anti-Semitism" and stated that the agencies would "continue to review and coordinate across federal agencies to identify additional cancellations." Press Release, U.S. Dep't of Educ., U.S. Dep't of Just., U.S. Dep't of Health & Hum. Servs. & Gen. Servs. Admin., DOJ, HHS, ED, and GSA Announce Initial Cancellation of Grants and Contracts to Columbia University Worth $400 Million (Mar. 7, 2025), https://www.justice.gov/opa/pr/doj-hhs-ed-and-gsa-announce-initial-cancelation-grants-and-contracts-columbia-university.

"Leaders at [Columbia]... knew "lifesaving research" would be "seriously curtailed" without the $400 million in research funding… . Taking the actions, the Trump administration made clear, would be the only path toward getting it back." *The Great Grovel,* Politico (Mar. 31, 2025). "The actions" were ones that promoted the Administration's chosen politics and ideology, gave the

10

Administration unprecedented control over a private university, and included extensive reporting requirements on admissions data broken down by race, GPA, and standardized test performance; review of its "portfolio of programs in regional areas, starting with the Middle East"; new faculty appointments to promote administration-approved "intellectual diversity"; curtailment of campus protests; a ban on masks at campus events; and submission to oversight by an externally appointed resolution monitor with access to university staff, facilities, documents, and data. Jameel Jaffer et al., *What the Columbia Settlement Really Means*, Knight First Amendment Institute (Aug. 2025), https://knightcolumbia.org/blog/what-the-columbia-settlement-really-means.

Having succeeded at Columbia, the Administration then proceeded with assembly-line efficiency. It froze approximately $790 million in research funding at Northwestern University—reportedly with no explanation—triggering 425 layoffs as Northwestern sought to reduce its staff budget. *How Trump Forced Cuts at Wealthy Universities*, Inside Higher Ed (Aug. 7, 2025), https://www.insidehighered.com/news/business/cost-cutting/2025/08/07/how-trump-forced-cuts-wealthy-universities. The Administration froze more than $1 billion at Cornell University, issuing more than 75 stop-work orders on research into national defense, cybersecurity, cancer, jet engines, superconductors, and space communications. Elissa Nadworny & Michel Martin, *Universities Push Back*

11

*Against Trump's Cuts on Federal Funding*, NPR (Apr. 10, 2025), https://www.npr.org/2025/04/10/nx-s1-5357619/universities-push-back-against-trumps-cuts-on-federal-funding. Cornell ultimately settled in November 2025, paying $30 million to the federal treasury and redirecting an additional $30 million to administration-preferred agricultural research programs, with its president required to certify quarterly under penalty of perjury that Cornell was in compliance with an agreement effective through December 2028. *White House Fact Sheet: Settlement with Cornell University* (Nov. 7, 2025). Brown University agreed to a $50 million commitment to Rhode Island workforce development programs, adoption of the Administration's binary definition of "male" and "female" for housing and athletics, and policy changes on campus antisemitism. Bill Chappell, *Trump Has Sued Universities for Billions. Here's What the Strategy Tells Us*, NPR (Jan. 29, 2026), https://www.npr.org/2026/01/29/nx-s1-5559293/trump-settlements-colleges-universities. The University of Virginia, facing seven civil rights investigations in nine weeks, agreed to adopt then Attorney General Pamela Bondi's guidance equating DEI programs with civil rights violations; its president resigned after acknowledging that the federal government had threatened to gut funding if he remained in office. *Id.*

The University of California, Los Angeles, presents perhaps the most instructive parallel to Harvard. The Administration froze $584 million in UCLA

research grants in August 2025, citing the university's response to a 2024 pro-Palestinian protest encampment, and demanded a $1.2 billion settlement that included—in the Administration's own 27-page settlement document—requirements that UCLA hire a senior administrator to review DEI efforts, bar its medical center from providing gender-affirming care, deny admissions to foreign students with "anti-Western" sentiment, and limit campus protests. Mikhail Zinshteyn, *Federal Judge Orders Trump Administration to Restore Hundreds of UCLA Research Grants*, CalMatters (Aug. 13, 2025), https://calmatters.org/education/2025/09/ucla-research-grants/; Lynn La, *What's Inside Trump's $1.2 Billion Settlement Demand Letter to UCLA*, Cal Matters (Oct. 27, 2025), https://calmatters.org/newsletter/trump-ucla-settlement-proposal/. Ironically, the Administration's termination of UCLA funding went into effect on the same day that the university settled a private lawsuit, the terms of which included affirmative measures to address antisemitism at the university, and with several million dollars of the settlement going to Jewish community organizations. *Frankel v. Regents of the Univ. of Cal.*, Consent Judgment & Permanent Injunction, No. 2:24-cv-04702 (C.D. Cal. July 29, 2025).

The 27-page settlement demand "had nothing to do with antisemitism," U.S. District Judge Rita Lin found. Judge Lin, in a sweeping preliminary injunction entered November 15, 2025, described "a playbook of initiating civil rights

investigations of preeminent universities to justify cutting off federal funding, with the goal of forcing them to change their ideological tune," and barred the Administration from using civil rights investigations to freeze UC grant money or condition grants on measures designed to suppress speech and academic freedom. *Am. Ass'n of University Professors, et al. v. Donald J. Trump, et al.*, No. 3:25-cv-07864-RFL, slip op. at 1, 28 (N.D. Cal. Nov. 14, 2025).

Similarly, in the Harvard case, the Administration engaged in the same "playbook of initiating civil rights investigations of preeminent universities to justify cutting off federal funding, with the goal of forcing them to change their ideological tune." *Id.* As the District Court noted in its Order: "The April 14 Freeze Order was also immediately followed by an intensifying public pressure campaign, including from President Trump, regarding Harvard's federal funding and other federal benefits. On April 15, 2025, the President posted on social media, "[p]erhaps Harvard should lose its Tax Exempt Status and be Taxed as a Political Entity if it keeps pushing political, ideological, and terrorist inspired/supporting 'Sickness?' Remember, Tax Exempt Status is totally contingent on acting in the PUBLIC INTEREST!" [Harvard SOF ¶ 49]; [AAUP SOF ¶ 89]. The next day, the President further criticized Harvard on social media for "hiring almost all woke, Radical Left, idiots," and declared that Harvard "should no longer receive Federal Funds." [Harvard SOF ¶ 50]; [AAUP SOF ¶ 90]. Within the week, the President

14

again denounced the university as "a Liberal mess," while referencing this lawsuit. [Harvard SOF ¶ 55]; [AAUP SOF ¶ 91]. On May 2, 2025, President Trump posted on social media: "We are going to be taking away Harvard's Tax Exempt Status. It's what they deserve!" [Harvard SOF ¶ 56]; [AAUP SOF ¶ 92]." *President and Fellows of Harvard College*, No. 1:25-cv-11048-ADB, ECF No. 238, at 12.

Clearly, none of the Administration's actions in the Harvard case were Title VI enforcement based on antisemitism. Rather, this was a comprehensive effort for governmental control of American higher education, using federal funding as the lever. "The Trump Administration's assertion of unilateral authority to terminate a grant on the grounds that the institution is engaged in discrimination is simply inconsistent with the text and history of Title VI." Catherine E. Lhamon & Seth M. Galanter, *Commander-in-Thief: President Trump's Withholding of Federal Funds from Universities Based on Alleged Discrimination Unlawfully Disregards the Procedures and Limits Adopted by Congress in the Civil Rights Statutes*, Edley Ctr. on L. & Democracy (2025).

This abuse of federal law was not accidental - the Administration's actions directly followed the Authoritarian Legal Playbook. The Administration weaponized not only the Department of Justice in this case, but also the dozens of federal agencies that it forced to cut off funding to Harvard, using Title VI

violations as a pretext to fight the administration's "war on woke," and using blanket funding cuts as its ammunition.

If the Administration were truly concerned about its pretextual argument regarding antisemitism, it could use Title VI as it was intended - and indeed as it has been codified - to target precisely the program or programs where antisemitism exists. Congress enacted Title VI to combat discrimination while simultaneously imposing significant limits on the Executive Branch's authority to terminate federal funding. *See, e.g., Alexander v. Sandoval*, 532 U.S. 275, 280–81 (2001); *Guardians Ass'n v. Civil Serv. Comm'n*, 463 U.S. 582, 598–99 (1983) (explaining that Congress designed Title VI's fund-termination remedy to be carefully constrained and directed at the particular program receiving federal assistance, not employed as a broad institutional sanction).

As the District Court's summary judgment opinion repeatedly stated, in *none* of its letters cutting off federal funding to Harvard did the government cite or specify violations of Title VI. As the district court found, the Administration's "sudden focus on antisemitism was, at best . . . arbitrary and, at worst, pretextual." *President and Fellows of Harvard College*, No. 1:25-cv-11048-ADB, ECF No. 238, at 54. The Administration's pretextual sanctions on Harvard are precisely the type of expansive punishment that Title VI and its specific requirements were authored to avoid. *See, e.g., Guardians*, 463 U.S. at 598.

16

A broader review of the Administration's illegal efforts to seize and consolidate executive power in instances involving other social institutions further confirms the wisdom of the District Court's decision. Using an alleged Title VI violation as a pretext to cut off all funding to Harvard is an important part of this administration's authoritarian power grab. It not only punishes Harvard, but intentionally creates fear in all research universities and other institutions receiving federal funds.

## B.    The Administration is Using Autocratic Legalism to Weaken Checks on Executive Power.

The Administration's actions against Harvard in this case were not fortuitous but rather reflect the Administration's autocratic legalism strategy: "launch[ing] legal reforms that remove the checks on executive power, limit the challenges to their rule, and undermine the crucial accountability institutions of a democratic state." Scheppele, 85 U. CHI. L. REV. at 547. Acting through executive orders, existing statutes and judicial decisions, the aspiring autocratic administration is able to posit that their actions are lawful, even as the cumulative effect undermines constitutional democracy. *Id.* at 577-80.

Consistent with autocratic legalism, the Administration has used conspiratorial rhetoric to justify actions that would otherwise be plainly illegal by constructing a narrative in which the targets of those actions are themselves the lawbreakers. Cummings, *Autocratic Legal Playbook* at 23. The Administration's

17

weaponization narrative—the claim that prior administrations weaponized the DOJ against conservatives, requiring a purge of career prosecutors to restore integrity—serves precisely this function. It provides a rhetorical basis for firing independent prosecutors, dropping cases against the President's political allies, and opening investigations against prosecutors who refused to follow unlawful directives, while characterizing all of these as the "appropriate remedial actions" authorized by executive order. *Id.* at 31-32.

The current administration has moved aggressively in this area: it installed as Attorney General and Deputy Attorney General lawyers who had served as the President's personal criminal defense attorneys—individuals with documented loyalty to the President as an individual client. Alan Feuer & Maggie Haberman, *Trump Turns to His Personal Lawyers to Stock Top Ranks of Justice Dept.*, N.Y. Times (Nov. 15, 2024), https://www.nytimes.com/2024/11/15/us/politics/trump-lawyers-justice-department.html. Former Attorney General Pamela Bondi's memorandum on her first day in office directed all DOJ lawyers to "zealously" advocate for that "client"—meaning Donald Trump. Memorandum from Pam Bondi, Att'y Gen. to All Dep't Emps, General Policy Regarding Zealous Advocacy on Behalf of the United States (Feb. 5, 2025), https://www.justice.gov/ag/media/1388521/dl?inline. This misrepresents the duties of prosecutors and government lawyers, who are required to represent the United

18

States, not any individual, and to exercise independent judgment to protect constitutional values. *See, e.g.,* Cummings, *Autocratic Legal Playbook* at 32 (citing Model Rules of Prof'l Conduct r. 3.8 cmt. [1]).

The implications of the Attorney General's memo soon were apparent: newly installed "loyal" attorneys refused to follow court orders, and prosecutors who sought to fulfill their ethical responsibilities were fired. For example, the US Attorney for the Southern District of New York, Danielle Sassoon, declined to follow an order to move to dismiss the bribery prosecution of New York Mayor Eric Adams, on the grounds that it had been motivated by the President's desire to secure Adams's cooperation with immigration enforcement. She resigned and her successor opened an investigation against her. Erez Reuveni, a fifteen-year DOJ veteran with a sterling record, was suspended and then fired for conceding undisputed facts in the Abrego Garcia case—facts the government itself had already acknowledged in court filings—because his honesty was deemed inconsistent with the "zealous representation" demanded by then AG Bondi. Cummings, *Autocratic Legal Playbook* at 33; Sadie Gurman, *He Represented Contentious Immigration Cases for the Government. His Candor Lost Him His Job*, Wall St. J. (Apr. 15, 2025), https://www.wsj.com/us-news/law/this-lawyer-defended-republicans-and-democrats-his-candor-cost-him-his-job-b3515a38.

The Administration has closed the DOJ unit charged with preventing

19

politically motivated prosecutions, and the Civil Rights Division has lost approximately seventy percent of its lawyers. Sam Levine, *Justice Dep't Civil Rights Division Loses 70% of Lawyers Under Trump*, Guardian (May 1, 2025), https://www.theguardian.com/us-news/2025/may/01/civil-rights-division-doj-trump.[4]

Concurrent with its purge of independent government lawyers, the Administration has conducted a coordinated campaign to disable the private bar's capacity to litigate against the government. Through a series of executive orders and memoranda, the Administration has sought to impose draconian economic sanctions—revocation of security clearances, denial of access to federal buildings, and threatened termination of federal contracts with law firms' corporate clients— against major law firms that have represented perceived adversaries of the President or whose partners, in prior roles, prosecuted or investigated him. *See* Suspension of Security Clearances and Evaluation of Government Contracts, Memorandum of Feb. 25, 2025, 90 Fed. Reg. 11,011 (Feb. 25, 2025); Addressing Risks From Perkins Coie LLP, Exec. Order No. 14,230, 90 Fed. Reg. 11,781 (Mar. 11, 2025); Addressing Risks From Paul Weiss, Exec. Order No. 14,237, 90 Fed.

---

[4] These and numerous other actions compromising the nonpartisan and apolitical character of DOJ have been meticulously documented by Justice Connection's compilation, DOJ Tracker: A List of the Trump Administration's Attacks on DOJ, available at https://www.thejusticeconnection.org/doj-tracker.

Reg. 13,039 (Mar. 20, 2025), revoked by Exec. Order No. 14,244, 90 Fed. Reg. 13,685 (Mar. 26, 2025); Addressing Risks From Jenner & Block, Exec. Order No. 14,246, 90 Fed. Reg. 13,997 (Mar. 28, 2025); Addressing Risks From WilmerHale, Exec. Order No. 14,250, 90 Fed. Reg. 14,549 (Apr. 3, 2025); Addressing Risks From Susman Godfrey, Exec. Order No. 14,263, 90 Fed. Reg. 15,615 (Apr. 15, 2025).

These executive orders targeting powerful law firms are pretextual in precisely the same way as the university grant terminations were in this case. Each executive order recited a stated rationale—ending "weaponization" of the legal system, combating DEI, responding to claimed misconduct—that served as a cover for a different actual purpose: preventing the targeted firms from representing clients adverse to the President. Courts considering challenges to these orders uniformly found them facially unconstitutional as violations of the First Amendment right to counsel, the adversarial process, and free speech. *Jenner & Block LLP v. U.S. Dep't of Justice,* 784 F. Supp. 3d 76 (D.D.C. 2025); *Perkins Coie LLP v. U.S. Dep't of Justice,* 783 F. Supp. 3d 105 (D.D.C. 2025); *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of the President,* 784 F. Supp. 3d 127 (D.D.C. 2025); *Susman Godfrey LLP v. Exec. Off. of the President,* 789 F. Supp. 3d 15 (D.D.C. 2025).

Importantly, and similar to the demands made on Harvard, what the

21

Administration demanded from law firms had nothing to do with its stated rationale(s) for attacking them. This was made clear by the fact that the agreements entered into by other targeted firms required *pro bono* representation of clients aligned with the President's interests. *See* Mike Spector et al. *How Trump's Crackdown on Law Firms is Undermining Legal Defenses for the Vulnerable*, Reuters (July 31, 2025), https://www.reuters.com/investigations/trumps-war-big-law-leads-firms-retreat-pro-bono-work-underdogs-2025-07-31/(reporting that nine firms pledged nearly $1 billion in free work to "administration-backed causes").

The Administration also has targeted the American Bar Association for issuing statements criticizing the Administration's attacks on the rule of law: withdrawing federal grants, stripping its role in rating judicial nominees, and threatening to revoke its law school accreditation authority. Letter from Pamela Bondi, Att'y Gen., to William R. Bay, Am. Bar. Ass'n (May 29, 2025). Administration allies have sought to capture the leadership of the DC Bar itself to disable its oversight of DOJ lawyers. Allan Smith & Ryan J. Reilly, T*rump Allies Launch a Bid to Take Control of a Powerful Washington Legal Group*, NBC News (Mar. 7, 2025), https://www.nbcnews.com/politics/trump-administration/trump-allies-bradley-bondi-control-dc-bar-association-rcna195253. In addition, the Trump Administration is attempting to stop bar associations from disciplining Administration lawyers. The Justice Department has filed a lawsuit seeking to

prohibit the D.C. Bar from conducting disciplinary proceedings against Jeffrey Clark, who during the first Trump Administration played a central role in attempting to reverse the 2020 Presidential election. Complaint, *United States v. Fox,* No. 1:26-cv-01658 (D.D.C. May 13, 2026). The Administration has also proposed a regulation requiring that bar disciplinary authorities suspend ethics investigations of DOJ lawyers during the DOJ's internal investigations. Review of State Bar Complaints and Allegations Against Department of Justice Attorney, 91 Fed. Reg. 10780 (March 5, 2026) (to be codified at 28 C.F.R. pt. 77).

Having politicized the DOJ, weakened legal adversaries and attacked the Bar, the Administration next moved to delegitimize courts and their orders while using the federal courts and judicial system to advance the Administration's agenda. Courts are the most direct institutional constraint on executive overreach. They have the authority to declare executive action unlawful, to enjoin ongoing constitutional violations, and—crucially—to enforce those judgments against a potentially recalcitrant executive. The Administration has responded to adverse judicial decisions, not by complying with them, but by ignoring them or attacking the legitimacy of the judges who issued them, and calling for judges' impeachment. *See* Justin Jouvenal, *Trump Officials Accused of Defying 1 in 3 Judges Who Ruled Against Him*, Wash. Post (July 21, 2025), https://www.washingtonpost.com/politics/2025/07/21/trump-court-orders-defy-

23

noncompliance-marshals-judges/; Tom Hals, *What Happens if the Trump Administration Doesn't Comply with a Court Order?*, Reuters (Mar. 19, 2025), https://www.reuters.com/world/us/what-happens-if-trump-administration-doesnt-comply-with-court-order-2025-03-18/; Justin Jouvenal et al., *Trump Calls to Impeach U.S. Judge, Drawing Rebuke from Chief Justice*, Wash. Post (Mar. 18, 2025), https://www.washingtonpost.com/politics/2025/03/18/trump-judges-impeach-chief-justice-roberts/. The Administration has failed to comply with court orders in more than 300 immigration *habeas corpus* proceedings and in 34 other cases, and as of July 2025, there were allegations of noncompliance in roughly one-third of the more than 160 cases in which judges ruled against the Administration. Justin Jouvenal, *Trump Officials Accused of Defying 1 in 3 Judges Who Ruled Against Him*, Wash. Post (July 21, 2025), https://www.washingtonpost.com/politics/2025/07/21/trump-court-orders-defy-noncompliance-marshals-judges/. Federal judges have repeatedly expressed concern over the Administration's noncompliance with judicial orders. *See, e.g.*, *Tobay Robles v. Noem,* No. 0:26-cv-00107-PJS-DLM, slip op. at 5 (D. Minn. Feb. 26, 2026) (Schiltz, C.J.) ("The Court is not aware of another occasion in the history of the United States in which a federal court has had to threaten contempt—again and again and again—to force the *United States government* to comply with court orders."); *Moreta Duran v. Bondi*, No. 0:25-cv-04816, slip op. at 3 (D. Minn. Jan.

24

25, 2026) (Davis, J.) ("There has been an undeniable move by the government ... to defy court orders or at least stretch the legal process to the breaking point …."); *Abrego Garcia v. Noem,* No. 8:25-cv-00951 (D. Md. 2025–26); *J.G.G. v. Trump*, No. 1:25-cv-00766 (D.D.C. 2025); *Abrego Garcia v. Noem*, No. 25-1404, 2025 WL 1135112 (4th Cir. Apr. 17, 2025) (Wilkinson, J.) .

When the Administration does not agree with a court's ruling, if they do not ignore it, they often argue that it is not binding or is unlawful: When a federal judge disallowed an Administration policy of holding immigrants without bond, a top Justice Department official insisted the ruling wasn't binding, and the administration continued denying detainees around the country a chance for release. Sudhin Thanawala, *Trump Flexes Executive Power with Unprecedented Flouting of Lower Courts Rulings*, Wash. Post (May 2, 2026), https://www.washingtonpost.com/national/2026/05/02/trump-courts-contempt-defiance/64c68f08-45dc-11f1-b19d-32431046b5b4_story.html. The District Court judge in that case accused Trump officials of seeking "to erode any semblance of separation of powers," adding that they could "only do so in a world where the Constitution does not exist." *Id.*

When federal judges have ruled "against" the President, he has publicly attacked them by name, calling them "troublemakers," "agitators," and calling for judges to be impeached. When the Supreme Court overturned his tariffs, President

25

Trump publicly denigrated the majority Justices as "fools and lap dogs," "unpatriotic and disloyal to our Constitution," "swayed by foreign interests" that were "slimeballs," and "an embarrassment to their families." *See, e.g., Angry Trump Slams Six Supreme Court Justices Who Nixed His Tariffs*, Roll Call (Feb. 20, 2026), https://rollcall.com/2026/02/20/angry-trump-slams-six-supreme-court-justices-who-nixed-his-tariffs/. The Administration has pursued multiple legislative strategies to remove independent judges, such as articles of impeachment against judges who rule against the Administration and proposals to disestablish specific judgeships held by judges who have ruled adversely to it. Congressional Republicans have introduced articles of impeachment against several judges, and the Speaker of the House has suggested that Congress has authority to disestablish district court judgeships as a disciplinary measure. Lisa Mascaro, *Republicans Eye Actions Against the Courts and Judges as Trump Rails Against Rulings*, AP News (Mar. 26, 2025), https://apnews.com/article/1019459fc9517231204b814fd6f36127.

These attacks on judicial independence are relevant in this case because they demonstrate that the Administration's pattern of conduct is not one of good-faith legal compliance that may falter in a few particular cases. It is a systematic effort to disable the institutions—including this Court—that have authority to declare that the executive branch is acting outside the law. The Administration is following the Authoritarian Legal Playbook, deploying discretionary legal authority—

particularly over federal funding—as a coercive instrument to extract institutional compliance. Cummings, *Autocratic Legal Playbook* at 29.

Having fired independent prosecutors who refused to tow the Administration's line, weakened powerful law firms and their ability to sue the government, attacked the Bar, and installed loyal attorneys at the Department of Justice, the Administration moved to follow another important facet of autocratic legalism: invoking laws and legal processes as "precedents" for actions that are in fact their antithesis. Cummings, *Autocratic Legal Playbook* at 26-29. The legal framework deployed here—the claim that Title VI authorizes comprehensive government oversight of university governance, or that changes in "agency priorities" constitute a legal justification for termination of all grants without individualized analysis—is invocation of formal legal authority (Title VI, 2 C.F.R. § 200.340) deployed far beyond its actual scope and absent compliance with a single one of its procedural requirements, providing what might appear to be a colorable statutory basis for conduct that is in reality arbitrary, retaliatory, and unconstitutional. *See* Cummings, *Autocratic Legal Playbook* at 79-81. The District Court saw through this strategy and revealed it for what it is: "at best . . . arbitrary and, at worst, pretextual." *President and Fellows of Harvard College*, No. 1:25-cv-11048-ADB at 54. Other courts have agreed that this is what is happening in many cases argued by pro-Administration lawyers. For example, "In a case over the

27

suspension of refugee admissions, [a] U.S. District Judge . . . accused the Justice Department last May of "hallucinating new text" in an appellate court order and "rewriting" it to achieve the government's preferred outcome." Thanawala, *Trump Flexes Executive Power with Unprecedented Flouting of Lower Court Rulings*.

The scholars who have studied democratic backsliding converge on a sobering empirical finding: the decisive variable in whether democracies survive authoritarian pressure is whether independent institutions—particularly courts—resist that pressure early, before legal changes become irreversible. *See, e.g.*, Steven Levitsky & Daniel Ziblatt, *How Democracies Die* (2018); Tom Ginsburg & Aziz Huq, *How to Save a Constitutional Democracy* (2018). Courts that act while they retain their independence preserve both democracy and their own authority. Courts that defer until that independence has been eroded preserve neither. As the District Court concluded, "[n]ow it is the job of the courts to similarly step up . . . even if doing so risks the wrath of a government committed to its agenda no matter the cost." *President and Fellows of Harvard College*, No. 1:25-cv-11048-ADB at 81.

The doctrinal framework for the scrutiny that the record here demands is well established. When an agency action is shown to rest on pretext—when the stated rationale is not the actual reason for the decision—the action fails arbitrary-and-capricious review regardless of whether the stated rationale would otherwise

support the action. *Dep't of Commerce,* 588 U.S. at 769–72.

Furthermore, courts reviewing governmental action typically presume good faith and adherence to legal norms and authority. *See, e.g., United States v. Chemical Found., Inc.*, 272 U.S. 1, 14–15 (1926). This "presumption of regularity" is not a constitutional mandate but a pragmatic approach grounded in the assumption that agencies exercise their discretionary authority in pursuit of statutory objectives rather than ulterior political goals. *Id.* at 14. When the record rebuts that presumption—when it shows that the agency's stated rationale is *post hoc*, its process was corrupted by bad faith, or its decisions were made for reasons the statute does not authorize—a more searching inquiry is called for to determine whether the challenged actions violate applicable constitutional and statutory requirements. *Dep't of Commerce*, 588 U.S. at 781–85 (recognizing the presumption of regularity but holding it overcome where the agency's explanation was pretextual). This Administration can no longer benefit from a presumption that it has acted in this case with due regard for the procedural and substantive limits on its powers in light of its systematic efforts to flout those constraints and undermine the rule of law. Ryan Goodman et al., *The "Presumption of Regularity" in Trump Administration Litigation* (4th ed.), Just Security (Mar. 19, 2026), https://www.justsecurity.org/120547/presumption-regularity-trump-administration-litigation/.

Courts confronted with a systematic pattern of institutional attack must not miss the forest for the trees by treating each action as an isolated agency decision made in good faith by career professionals applying their statutory authority to the facts before them. "[T]here comes a point where we should not be ignorant as judges of what we know to be true as citizens," *United States v. Zubaydah*, 595 U.S. 195, 238 (2022) (Gorsuch, J., dissenting). Defendants' invocation of antisemitism as the basis for its Harvard funding termination decision was pretextual, and "arbitrary and capricious" under the Administrative Procedure Act. For this and all the other reasons given above, the Court should affirm the decision below.

30

CONCLUSION

For the foregoing reasons, the decisions of the District Court should be affirmed.

Respectfully submitted,

/s/Miriam Weizenbaum

MIRIAM WEIZENBAUM
(Counsel of Record)
199 North Main Street
Providence, RI 02903
(401) 293-8624
miriam@dwbrlaw.com

AMATO A. DELUCA
199 North Main Street
Providence, RI 02903
(401) 293-8624
amato@dwbrlaw.com

Counsel for *amicus curiae* Lawyers Defending American Democracy

July 22, 2026

31

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 6,166 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman font size 14.

/s/Miriam Weizenbaum

Miriam Weizenbaum
Counsel for *amicus curiae* Lawyers Defending American Democracy

32

**CERTIFICATE OF SERVICE**

I certify that pursuant to Fed. R. App. P. 25(d) and First Circuit R. 32.0, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system. I certify that I will timely file nine paper copies pursuant to First Cir. R. 31.0(b) and Fed. R. App. P. 32(a)(2).

/s/Miriam Weizenbaum

Miriam Weizenbaum
Counsel for *amicus curiae* Lawyers Defending American Democracy