No. 25-2230

**UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT**

PRESIDENT AND FELLOWS OF HARVARD COLLEGE,

PLAINTIFF-APPELLEE,

v.

US DEPARTMENT OF HEALTH AND HUMAN SERVICES; NATIONAL INSTITUTES OF HEALTH; ROBERT F. KENNEDY, JR., in the official capacity as Secretary of the United States Department of Health and Human Services; US DEPARTMENT OF JUSTICE; TODD BLANCHE, in the official capacity as Acting Attorney General of the United States; US DEPARTMENT OF EDUCATION; LINDA M. MCMAHON, in the official capacity as Secretary of the United States Department of Education; US GENERAL SERVICES ADMINISTRATION; EDWARD FORST, in the official capacity as Administrator of the United States General Services Administration; US DEPARTMENT OF ENERGY; CHRISTOPHER ALLEN WRIGHT, in the official capacity as Secretary of the United States Department of Energy; NATIONAL SCIENCE FOUNDATION; BRIAN STONE, in the official capacity as Acting Director of the United States National Science Foundation; US DEPARTMENT OF DEFENSE; PETER B. HEGSETH, in the official capacity as Secretary of the United States Department of Defense; NATIONAL AERONAUTICS AND SPACE ADMINISTRATION; JARED ISAACMAN, in the official capacity as Administrator of the National Aeronautics and Space Administration; US DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT; SCOTT TURNER, in the official capacity as Secretary of Housing and Urban Development; US DEPARTMENT OF AGRICULTURE; BROOKE L. ROLLINS, in the official capacity as Secretary of Agriculture,

DEFENDANTS–APPELLANTS.

On Appeal from the United States District Court for the District of Massachusetts, No. 25-cv-11048

**BRIEF OF AMICI CURIAE AMERICAN CIVIL LIBERTIES UNION, AMERICAN CIVIL LIBERTIES UNION OF MAINE, AMERICAN CIVIL LIBERTIES UNION OF MASSACHUSETTS, AMERICAN CIVIL LIBERTIES UNION OF NEW HAMPSHIRE,  AMERICAN CIVIL LIBERTIES UNION OF PUERTO RICO, AMERICAN CIVIL LIBERTIES UNION OF RHODE ISLAND, CATO INSTITUTE, ELECTRONIC FRONTIER FOUNDATION, KNIGHT FIRST AMENDMENT INSTITUTE, NATIONAL COALITION AGAINST CENSORSHIP, REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS, AND RUTHERFORD INSTITUTE IN SUPPORT OF PLAINTIFF-APPELLEE AND AFFIRMANCE**

Jessie J. Rossman No. 1161236
Rachel E. Davidson No. 1197867
American Civil Liberties Union
   Foundation of Massachusetts, Inc.
One Center Plaza, Suite 850
Boston, MA 02108
(617) 482-3170
jrossman@aclum.org
rdavidson@aclum.org

Vera Eidelman No. 1220845
Brian Hauss No. 1183865
American Civil Liberties Union
   Foundation
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
veidelman@aclu.org
bhauss@aclu.org

Fermín L. Arraiza-Navas No. 73810
American Civil Liberties Union
   Puerto Rico Chapter
Union Plaza, Suite 1105
416 Avenida Ponce de León
San Juan, Puerto Rico 00918
(787) 753-9493
farraiza@aclu.org

Lynette Labinger No. 23027
Cooperating Counsel
American Civil Liberties Union
   Foundation of Rhode Island
128 Dorrance St., Box 710
Providence, RI 02903
(401) 465-9565
ll@labingerlaw.com

*Counsel continued on next page*

Gilles R. Bissonnette No. 123868
Henry Klementowicz No. 1179814
Maria D. Savarese No. 1223427
American Civil Liberties Union
  Foundation of New Hampshire
18 Low Avenue
Concord, NH 03301
(603) 224-5591
gilles@aclu-nh.org
henry@aclu-nh.org
maria@aclu-nh.org

Carol Garvan No. 1145471
Zachary L. Heiden No. 99242
American Civil Liberties Union
  of Maine Foundation
P.O. Box 7860
Portland, ME 04112
(207) 619-6224
cgarvan@aclumaine.org
zheiden@aclumaine.org

Bruce D. Brown No. 1067194
Gabriel Rottman No. 1193825
Grayson Clary No. 1206499
Reporters Committee for Freedom of
  the Press
1156 15th Street NW, Ste. 1020
Washington, DC 20005

Alex Abdo No. 1154992
Jameel Jaffer No. 1218690
Knight First Amendment Institute at
Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115

*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1(a) of the Federal Rules of Appellate Procedure, amici curiae American Civil Liberties Union, American Civil Liberties Union of Maine, American Civil Liberties Union of Massachusetts, American Civil Liberties Union of New Hampshire,  American Civil Liberties Union of Puerto Rico, American Civil Liberties Union of Rhode Island, Cato Institute, Electronic Frontier Foundation, Knight First Amendment Institute, National Coalition Against Censorship, Reporters Committee for Freedom of the Press, and Rutherford Institute state that they do not have a parent corporation and that no publicly held corporation owns 10% or more of their stock.

Dated: July 22, 2026

By: */s/ Vera Eidelman*
Vera Eidelman

*Counsel for Amici Curiae*

i

**TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ...........................................................i

TABLE OF AUTHORITIES .................................................................... iii

INTERESTS OF AMICI CURIAE...............................................................1

INTRODUCTION ................................................................................4

ARGUMENT ......................................................................................7

    I.   The Government Cannot Force an Ideological Takeover of Private
        Institutions. ........................................................................7

    II.  The First Amendment Principle of Academic Freedom Prohibits
        the Government from Imposing Ideological Admissions, Hiring,
        and Programmatic Requirements on Colleges and Universities. .............11

CONCLUSION....................................................................................14

CERTIFICATE OF COMPLIANCE.......................................................16

CERTIFICATE OF SERVICE ...............................................................17

## TABLE OF AUTHORITIES

**Cases**

*303 Creative LLC v. Elenis,*
600 U.S. 570 (2023).................................................................................8

*Agency for International Development v. Alliance for Open Society
International, Inc.,*
570 U.S. 205 (2013).................................................................................9

*Arkansas Writers' Project, Inc. v. Ragland,*
481 U.S. 221 (1987)...............................................................................10

*Asociacion de Educacion Privada de Puerto Rico, Inc. v. Garcia-Padilla,*
490 F.3d 1 (1st Cir. 2007)................................................... 11, 12, 13

*Doe v. Hopkinton Public Schools,*
19 F.4th 493 (1st Cir. 2021).....................................................................1

*Garcetti v. Ceballos,*
547 U.S. 410 (2006)...............................................................................10

*Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.,*
515 U.S. 557 (1995).................................................................................9

*Keyishian v. Board of Regents of University of State of N.Y.,*
385 U.S. 589 (1967)............................................................... 11, 13

*Miami Herald Publishing Co. v. Tornillo,*
418 U.S. 241 (1974).................................................................................8

*Moody v. NetChoice,*
603 U.S. 707 (2024)............................................................... 6, 8, 14

*National Endowment for the Arts v. Finley,*
524 U.S. 569 (1998)...............................................................................10

*National Rifle Association of America v. Vullo,*
602 U.S. 175 (2024)............................................................... 1, 5, 8

*Pacific Gas & Electric Company v. Public Utilities Commission of California,*
   475 U.S. 1 (1986)..................................................................................9

*Pernell v. Florida Board of Governors of State University*,
   No. 22-13992, 2026 WL 1955783 (11th Cir. July 7, 2026) ..............................10

*Pickering v. Board of Education*,
   391 U.S. 563 (1968).............................................................................10

*Regan v. Taxation with Representation of Washington*,
   461 U.S. 540 (1983).............................................................................10

*Regents of the University of Michigan v. Ewing*,
   474 U.S. 214 (1985).............................................................................12

*Rosenberger v. Rector & Visitors of University of Virginia*,
   515 U.S. 819 (1995)...........................................................................8, 10

*Rust v. Sullivan*,
   500 U.S. 173 (1991)...........................................................................1, 11

*Shelton v. Tucker*,
   364 U.S. 479 (1960).......................................................................... 13, 14

*Sorrell v. IMS Health Inc.*,
   564 U.S. 552 (2011).............................................................................14

*Sweezy v. New Hampshire*,
   354 U.S. 234 (1957)...................................................................... 12, 13, 14

*West Virginia State Board of Education v. Barnette*,
   319 U.S. 624 (1943)..............................................................................8

*Wieman v. Updegraff*,
   344 U.S. 183 (1952)........................................................................ 12, 13

*Wilmer Cutler Pickering Hale & Dorr LLP v. Executive Offices of the President*,
   No. 25-cv-917, 2025 WL 1502329 (D.D.C. May 27, 2025) ..............................1

iv

## INTERESTS OF AMICI CURIAE[1]

The American Civil Liberties Union ("ACLU") is a nationwide, nonprofit organization that since 1920 has sought to protect the civil liberties of all Americans. The ACLU of Massachusetts, ACLU of Maine, ACLU of New Hampshire, ACLU of Rhode Island, and ACLU of Puerto Rico are affiliates of the ACLU. The ACLU and its affiliates have frequently appeared as both counsel and amici in cases about the Constitution's limits on government power, including consequential First Amendment cases about retaliation, government funding conditions, and academic freedom. *See, e.g.*, *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175 (2024) (ACLU as counsel); *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of the President*, No. 25-cv-917, 2025 WL 1502329 (D.D.C. May 27, 2025) (ACLU as amicus); *Doe v. Hopkinton Pub. Schs.*, 19 F.4th 493 (1st Cir. 2021) (ACLU-MA as amicus); *Rust v. Sullivan*, 500 U.S. 173 (1991) (ACLU as counsel).

The Cato Institute is a nonpartisan public policy research foundation founded in 1977 dedicated to advancing the principles of individual liberty, free markets, and limited government. Cato's Robert A. Levy Center for Constitutional Studies helps restore the principles of constitutional government that are the foundation of liberty.

---

[1] Counsel for amici curiae certify that no counsel for a party authored this brief in whole or in part, and no person other than amici curiae, their members, or their counsel made a monetary contribution to the brief's preparation or submission. All parties consent to the filing of this brief.

1

Toward those ends, Cato publishes books and studies, conducts conferences, produces the annual *Cato Supreme Court Review*, and files amicus briefs.

The Electronic Frontier Foundation ("EFF") is a nonprofit organization that has defended the rights of technology users in U.S. courts, and through advocacy, education and technology development for almost 35 years. EFF's work is in furtherance of human rights, the rule of law, and the preservation of democratic institutions throughout the world, and has pursued numerous lawsuits challenging the government's ability to penalize disfavored speakers.

The Knight First Amendment Institute at Columbia University is a non-partisan, not-for-profit organization that works to defend the freedoms of speech and the press in the digital age through strategic litigation, research, and public education. The Institute's aim is to promote a system of free expression that is open and inclusive, that broadens and elevates public discourse, and that fosters creativity, accountability, and effective self-government.

The National Coalition Against Censorship ("NCAC") is an alliance of more than 50 national non-profit literary, artistic, religious, educational, professional, labor, and civil liberties groups. NCAC was founded in 1974 in response to the United States Supreme Court's landmark decision *Miller v. California*, 413 U.S. 15 (1973), which narrowed First Amendment protections for sexual expression and opened the door to obscenity prosecutions. The organization's purpose is to protect

2

freedom of thought, inquiry, and expression and to oppose censorship in all its forms. NCAC engages in direct advocacy and education to support free expression rights of students, teachers, authors, readers, publishers, booksellers, librarians, artists, and others. NCAC has long recognized–and opposed–attempts to censor or limit access to speech, including in the academic context. It therefore has a longstanding interest in assuring the continuance of robust First Amendment protections for all. The positions advocated in this brief do not necessarily reflect the views of NCAC's member organizations.

The Reporters Committee for Freedom of the Press is an unincorporated nonprofit association. The Reporters Committee was founded by leading journalists and media lawyers in 1970 when the nation's news media faced an unprecedented wave of government subpoenas forcing reporters to name confidential sources. Today, its attorneys provide *pro bono* legal representation, amicus curiae support, and other legal resources to protect First Amendment freedoms and the newsgathering rights of journalists.

The Rutherford Institute is a nonprofit civil liberties organization. Founded in 1982 by its President, John W. Whitehead, the Institute provides legal assistance at no charge to individuals whose constitutional rights have been threatened or violated and educates the public about issues affecting their freedoms.

Amici are legal advocacy organizations from across the ideological spectrum. Though they vary in their views on many issues, they have in common an abiding commitment to the Constitution and the liberties it protects.

**INTRODUCTION**

The government cannot attempt a hostile takeover of any private institution, much less a private college or university, in order to impose its preferred vision of ideological balance. The First Amendment protects all private speakers and institutions from viewpoint-based discrimination, coercion, and retaliation, and it specifically protects colleges and universities from infringements on their academic freedom, including the choices they make about what to teach, how to teach it, who will teach it, and to whom.

This case arises from the federal government's summary decision to withhold billions of dollars in federal research grants from the nation's oldest private university, and its threat to withhold all such funds in the future, because the university refused to forfeit its institutional autonomy and conform to the government's preferred ideological approach.

On April 11, 2025, the government threatened to upend "Harvard's financial relationship with the federal government" if the university refused to, among other things, 1) vet all of its students, faculty, and academic departments and fields for viewpoint diversity and, where "ideological capture" was detected, alter its hiring,

4

admissions, and curriculum choices to accord with the government's preferred ideological balance, 2) commission a third party audit of particular programs that "reflect ideological capture," including the Center for Middle Eastern Studies, the Department of Near Eastern Languages and Cultures, and several centers devoted to human rights, and 3) install governance structures and leaders devoted to acceding to these demands. JA128, 129–31.[2] After Harvard rejected these demands, making clear that "[t]he university will not surrender its independence or relinquish its constitutional rights," JA134, the administration proceeded to cancel billions of dollars in grants, and additionally informed Harvard that it "should no longer seek GRANTS from the federal government, since none will be provided." JA136.

The administration's conduct is unconstitutional any way you slice it: It represents an effort by this administration to impose "its own conception of speech

---

[2] These demands were motivated, at least in part, by the administration's stated concerns about Harvard's "ideological capture" and insufficient "viewpoint diversity." JA128-30. The administration has also asserted that Harvard has fostered, and failed to deal with, harassment of and discrimination against Jewish and Israeli members of its community. Universities are bound by civil rights laws that guarantee all students equal access to education, including Title VI of the Civil Rights Act. This means that schools can, and indeed must, protect students from discriminatory harassment on the basis of race or national origin. However, as detailed in Plaintiff's Amended Complaint, JA61, the government can, and indeed must, enforce these obligations according to the procedures and requirements set forth in Title VI, which has not occurred here, and consistent with the First Amendment. The government is "free to . . . pursue . . . violations of . . . law," but it cannot "wield [its] power . . . to threaten enforcement actions . . . in order to punish or suppress" speech. *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 187 (2024).

nirvana" on a private institution, *Moody v. NetChoice*, 603 U.S. 707, 742 (2024); it improperly seeks to leverage federal research funds in a viewpoint-based way, to control speech outside of the scope of the program, and to control the work of a private university—each of which is unconstitutional in its own right; and it specifically targets a university's protected academic freedom.

The government argues that, when a private party accepts federal government grants, it somehow receives only the free speech rights that government contractors or employees are accorded. *See* Gov. Br. 46–47. No court has ever validated such an approach, and for good reason. It would shrink the First Amendment rights of all private speakers who seek government funds—whether they are writers, artists, scientific researchers, or, as here, private universities uniquely protected by academic freedom—to those of public employees.

The district court correctly rejected that argument and went on to hold that, under the "typical framework applicable to private citizens," the record shows that Harvard prevails on its First Amendment claim for three reasons. *See* A047–48. First, the government unlawfully terminated and froze federal funding to punish Harvard for refusing to succumb to the government's ideological demands and for filing this lawsuit. A048–57. Second, the government sought to impose unconstitutional "content- and viewpoint-based conditions" on funding that "were unrelated to any legitimate government interest." A057. And third, the government

6

sought to unconstitutionally coerce Harvard "to hire faculty and make curricula and research choices that better aligned with the government's preferred viewpoints, to the detriment of professors and researchers with competing views." A060.

This Court should affirm these holdings. The government cannot require Harvard, as a purportedly "strongly left-leaning" university, to correct ideological course, JA135, any more than another administration could impose its preferred viewpoint-balance on a "strongly right-leaning" private university. It can no more demand changes to Harvard's Middle Eastern Studies Center than it could force the shuttering of the University of Chicago's Economics Department. And it cannot interfere with the autonomy of any private institution in choosing its governance structure, leadership, and public messaging because it dislikes the institution's ideological choices to date. Allowing the administration's unlawful conduct here could open the floodgates to retaliation, coercion, and ideological bullying of private actors across sectors.

## ARGUMENT

### I.   The Government Cannot Force an Ideological Takeover of Private Institutions.

At the core of the First Amendment lies the principle that the government cannot impose its preferred ideological approach on private actors or institutions. "No government … may affect a speaker's message by forcing her to accommodate other views… and no government may interfere with her desired message." *303*

7

*Creative LLC v. Elenis*, 600 U.S. 570, 596 (2023) (citation omitted). As Justice Robert Jackson wrote more than eighty years ago, "[i]f there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).

"[T]he First Amendment stands as a shield against any effort to enforce orthodoxy in thought or speech in this country." *Chiles v. Salazar*, 146 S. Ct. 1010, 1029 (2026). And it reflects "the recognition that viewpoint discrimination is uniquely harmful to a free and democratic society." *Vullo*, 602 U.S. at 187; *see also Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 830 (1995) (holding that viewpoint discrimination is presumptively unconstitutional).

Here, the administration purports to be *advancing* viewpoint diversity and attempting to correct what it perceives to be "ideological capture" at Harvard. But "the government cannot get its way just by asserting an interest in improving, or better balancing, the marketplace of ideas." *Moody*, 603 U.S. at 732. To the contrary, "in case after case, the [Supreme] Court has barred the government from forcing a private speaker to present views it wished to spurn in order to rejigger the expressive realm." *Id.* at 733 (citing *Miami Herald Publishing Co. v. Tornillo,* 418 U.S. 241 (1974), *Pacific Gas & Electric Company v. Public Utilities Commission of*

*California,* 475 U.S. 1 (1986), and *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.,* 515 U.S. 557 (1995)). The goal of "balanc[ing] the marketplace of ideas" is one that the government simply "may not pursue . . . consistent with the First Amendment." *Id.* at 742 (cleaned up).

Yet that is precisely what the administration seeks to do here: bully Harvard into enacting its platonic ideal of an academic institution—one where "[e]very department or field found to lack viewpoint diversity" is reformed by "hiring a critical mass of new faculty," "admitting a critical mass of students who will provide viewpoint diversity," and empowering "those most . . . committed to the[se ideological] changes" through the school's leadership and governance structure. JA 128, 130.

The administration appears to put much stock in the idea that federal grants are a privilege, not a right, and so grantees must be sufficiently deserving, including in terms of "academic rigor" and not succumbing to "strongly left-leaning" leaders, to receive them. *See, e.g.,* JA135. But this argument is on equally weak First Amendment footing. "The Government may not deny a benefit to a person on a basis that infringes his constitutionally protected … freedom of speech even if he has no entitlement to that benefit,'" including by attempting to "regulate speech outside the contours of the federal program itself." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.,* 570 U.S. 205, 206, 214–15 (2013) (cleaned up). Equally, "ideologically

driven attempts to suppress a particular point of view are presumptively unconstitutional in funding, as in other contexts." *Rosenberger*, 515 U.S. at 830. Thus, "even in the provision of subsidies, the Government may not 'aim at the suppression of dangerous ideas'" or "disfavored viewpoints," *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587 (1998) (quoting *Regan v. Taxation with Representation of Wash.*, 461 U.S. 540, 550 (1983)), much less "'manipulate' [a subsidy] to have a 'coercive effect,'" *id.* (quoting *Ark. Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 237 (1987) (Scalia, J., dissenting)).[3]

The challenged actions here violate each of these rules: They deny a private university the benefit of federal research funding because the university does not align with the administration's vision of what "viewpoint diversity" and a lack of

---

[3] Contrary to the government's argument, Harvard's First Amendment claim is not governed by public employee doctrine. *See* Gov. Br. 46–47. None of the government funding cases apply the rules governing public employees and contractors to federal grant recipients; grant funding does not implicate the government's interest *as an employer* in the efficient provision of public services. *See Pickering v. Board of Education*, 391 U.S. 563, 568 (1968). The employee-speech doctrine is also an exceptionally poor fit for higher education grants because "'expression related to academic scholarship or classroom instruction,'" even when uttered by *public university* professors *employed* by the government, "may implicate 'additional constitutional interests that are not fully accounted for by th[e Supreme Court's] customary employee-speech jurisprudence.'" *Pernell v. Fla. Bd. of Governors of State Univ.*, No. 22-13992, 2026 WL 1955783, at *7 (11th Cir. July 7, 2026) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 425 (2006)). "In First Amendment cases, the context always matters, and university professors are not in the same box as civil servants." *Id.*

"ideological capture" should look like on a college campus; they aim to suppress the balance of ideas the university has chosen for itself; and they seek to regulate speech far outside of the scope of the federal research grants that have been revoked.

**II.    The First Amendment Principle of Academic Freedom Prohibits the Government from Imposing Ideological Admissions, Hiring, and Programmatic Requirements on Colleges and Universities.**

The government's violations are particularly egregious in light of the university's role in a free society. "[T]he university is a traditional sphere of free expression so fundamental to the functioning of our society that the Government's ability to control speech within that sphere by means of conditions attached to the expenditure of Government funds is restricted by the vagueness and overbreadth doctrines of the First Amendment." *Rust v. Sullivan*, 500 U.S. 173, 200 (1991). In other words, even conditions that could be imposed on other grant recipients cannot be imposed on private colleges and universities.

And for good reason. "Our Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us." *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967). "The functions of educational institutions in our national life and the conditions under which alone they can adequately perform them are at the basis of . . . limitations upon national power." *Asociacion de Educacion Privada de Puerto Rico, Inc. v. Garcia-Padilla*, 490 F.3d 1, 9 (1st Cir. 2007) (quoting *Wieman v. Updegraff*, 344 U.S. 183, 197

(1952)). Academic freedom thus plays a critical role in securing individual freedom against government intrusion because it "protect[s] universities, as academic institutions, against government control." *Id.* at 8–9. Undergirding this protection are "concern[s] regarding institutional competence in government interference with academia." *Id.* at 15, n.10 (citing *Regents of the Univ. of Mich. v. Ewing*, 474 U.S. 214, 226 (1985)).

The First Amendment's protection of academic freedom encompasses "the four essential freedoms of a university—to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study." *Id.* at 9–10 (quoting *Sweezy v. New Hampshire*, 354 U.S. 234, 263 (1957) (Frankfurter, J., concurring)). When it comes to these four areas, "interfere[nce] with autonomous decisionmaking by private schools . . . intrudes upon their freedom to pursue their academic objectives without interference from the government." *Id.* at 15. This includes government action that "may force schools to teach [in ways that are] directly in conflict with [the schools'] particular philosophy, methodology, or mission"—government interference that the First Circuit has deemed most "alarming." *Id.* at 13.

The First Amendment protects academic freedom because "[t]eachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die."

12

*Sweezy*, 354 U.S. at 250 (plurality opinion). Allowing the administration to interfere in "'the four essential freedoms' of a university," *id.* at 263 (Frankfurter, J., concurring, joined by Harlan, J.), runs the risk of inhibiting "that free play of the spirit which all teachers ought especially to cultivate and practice." *Shelton v. Tucker*, 364 U.S. 479, 487 (1960). "The essentiality of [these] freedom[s] in the community of American universities is almost self-evident," *Sweezy*, 354 U.S. at 250 (plurality opinion), for "[i]t is the business of a university to provide that atmosphere which is most conducive to speculation, experiment and creation." *Asociacion de Educacion Privada de Puerto Rico, Inc.*, 490 F.3d at 9–10 (quoting *Sweezy*, 354 U.S. at 263 (Frankfurter, J., concurring)).

Considering that "[n]o field of education is so thoroughly comprehended by man that new discoveries cannot yet be made," *Sweezy*, 354 U.S. at 250 (plurality opinion), students, faculty, and educational institutions themselves "must be exemplars of open-mindedness and free inquiry." *Wieman*, 344 U.S. at 196 (Frankfurter, J., concurring). Such "freedom in the community of American universities," *Sweezy*, 354 U.S. at 250, allows students and professors to engage in "that robust exchange of ideas which discovers truth out of a multitude of tongues, rather than through any kind of authoritative selection," *Keyishian*, 385 U.S. at 603 (cleaned up). "To impose any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation." *Id.* (quoting

13

*Sweezy*, 354 U.S. at 250 (plurality opinion). Particularly with respect to institutions of education, there must thus be "vigilant protection of constitutional freedoms," so as to avoid "inhibition of freedom of thought." *Shelton*, 364 U.S. at 487.

As noted above, the administration's assertion that it is trying to correct Harvard's lack of viewpoint diversity does not cure the constitutional defects here. Once the federal government is allowed to interfere in colleges' and universities' internal governance regarding speech or academic freedom more broadly, it will inevitably do so to promote its own ideologies and suppress alternatives. That is why "the way the First Amendment achieves th[e] goal [of an expressive realm in which the public has access to a wide range of views] is by preventing *the government* from 'tilt[ing] public debate in a preferred direction,'" *Moody*, 603 U.S. at 741 (emphasis in original) (quoting *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 578–579 (2011)), "not by licensing the government to stop *private actors* from speaking as they wish and preferring some views over others," *id.* (emphasis in original). Giving the government that power would present a far graver threat to academic freedom than any single college or university's intellectual chauvinism could.

## CONCLUSION

For the reasons stated above, Amici respectfully submit that the Court should affirm.

Dated: July 22, 2026

Jessie J. Rossman No. 1161236
Rachel E. Davidson No. 1197867
American Civil Liberties Union
  Foundation of Massachusetts, Inc.
One Center Plaza, Suite 850
Boston, MA 02108
(617) 482-3170
jrossman@aclum.org
rdavidson@aclum.org

Fermín L. Arraiza-Navas No. 73810
American Civil Liberties Union
  Puerto Rico Chapter
Union Plaza, Suite 1105
416 Avenida Ponce de León
San Juan, Puerto Rico 00918
(787) 753-9493
farraiza@aclu.org

Gilles R. Bissonnette No. 123868
Henry Klementowicz No. 1179814
Maria D. Savarese No. 1223427
American Civil Liberties Union
  Foundation of New Hampshire
18 Low Avenue
Concord, NH 03301
(603) 224-5591
gilles@aclu-nh.org
henry@aclu-nh.org
maria@aclu-nh.org

Bruce D. Brown No. 1067194
Gabriel Rottman No. 1193825
Grayson Clary No. 1206499
Reporters Committee for Freedom of
  the Press
1156 15th Street NW, Ste. 1020
Washington, DC 20005

Respectfully submitted,

/s/ *Vera Eidelman*
Vera Eidelman No. 1220845
Brian Hauss No. 1183865
American Civil Liberties Union
  Foundation
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
veidelman@aclu.org
bhauss@aclu.org

Lynette Labinger No. 23027
Cooperating Counsel
American Civil Liberties Union
  Foundation of Rhode Island
128 Dorrance St., Box 710
Providence, RI 02903
(401) 465-9565
ll@labingerlaw.com

Carol Garvan No. 1145471
Zachary L. Heiden No. 99242
American Civil Liberties Union
  of Maine Foundation
P.O. Box 7860
Portland, ME 04112
(207) 619-6224
cgarvan@aclumaine.org
zheiden@aclumaine.org

Alex Abdo No. 1154992
Jameel Jaffer No. 1218690
Knight First Amendment Institute at
Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115

*Counsel for Amici Curiae*

15

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Times New Roman in 14-point type.

I further certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and Fed. R. App. P. 32(a)(7)(B) because it contains 3,397 words, excluding the parts of the brief exempted under Rule 32(f), according to the count of Microsoft Word.

Dated: July 22, 2026                          By: */s/ Vera Eidelman*
                                                    Vera Eidelman

                                                    *Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I certify that on July 22, 2026, the foregoing Amici Curiae Brief was filed electronically through the Court's CM/ECF system. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system.

Dated: July 22, 2026

By: */s/ Vera Eidelman*
Vera Eidelman

*Counsel for Amici Curiae*