**No. 25-2230**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

PRESIDENT AND FELLOWS OF HARVARD COLLEGE,
Plaintiff-Appellee,

v.

US DEPARTMENT OF HEALTH AND HUMAN SERVICES; NATIONAL INSTITUTES OF HEALTH; ROBERT F. KENNEDY, JR., in the official capacity as Secretary of the United States Department of Health and Human Services; US DEPARTMENT OF JUSTICE; TODD BLANCHE, in the official capacity as Acting Attorney General of the United States; US DEPARTMENT OF EDUCATION; LINDA M. MCMAHON, in the official capacity as Secretary of the United States Department of Education; US GENERAL SERVICES ADMINISTRATION; EDWARD FORST, in the official capacity as Administrator of the United States General Services Administration; US DEPARTMENT OF ENERGY; CHRISTOPHER A. WRIGHT, in the official capacity as Secretary of the United States Department of Energy; US NATIONAL SCIENCE FOUNDATION; BRIAN STONE, in the official capacity as Acting Director of the United States National Science Foundation; US DEPARTMENT OF DEFENSE; PETER B. HEGSETH, in the official capacity as Secretary of the United States Department of Defense; NATIONAL AERONAUTICS AND SPACE ADMINISTRATION; JARED ISAACMAN, in the official capacity as Administrator of the National Aeronautics and Space Administration; US DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT; SCOTT TURNER, in the official capacity as Secretary of Housing and Urban Development; US DEPARTMENT OF AGRICULTURE; BROOKE L. ROLLINS, in the official capacity as Secretary of Agriculture,
Defendants-Appellants.

On Appeal from the United States District Court
for the District of Massachusetts
Case No. 1:25-cv-11048

### BRIEF OF *AMICI CURIAE* FORMER UNITED STATES AGENCY OFFICIALS IN SUPPORT OF PLAINTIFF-APPELLEE AND AFFIRMANCE

July 22, 2026                                    *(Counsel listed on following page)*

Rebecca Livengood
John Relman
Reed Colfax
RELMAN COLFAX PLLC
1225 19th Street NW, Suite 600
Washington, DC 20036
202-728-1888
rlivengood@relmanlaw.com
jrelman@relmanlaw.com
rcolfax@relmanlaw.com

*Counsel for Amici Curiae*

ii

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................. iv

INTEREST OF THE *AMICI CURIAE*.....................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT.........................................1

ARGUMENT ..........................................................................................................4

    I.     Title VI Requires Procedural Protections Prior to Fund Termination. .4

    II.    For Decades, Federal Agencies Across Administrations Have Followed Title VI's Procedures. ...........................................................8

    III.   The Administration Failed to Follow Those Procedures Here. ..........15

    IV.   The Government Was Bound by Title VI, and None of Its Arguments to the Contrary Avail. .......................................................17

CONCLUSION .....................................................................................................27

## TABLE OF AUTHORITIES

**Page(s)**

<u>**Cases**</u>

*Adams v. Richardson*,
480 F.2d 1159 (D.C. Cir. 1973) ................................................................ 19, 20

*Alabama NAACP State Conf. of Branches v. Wallace*,
269 F. Supp. 346 (M.D. Ala. 1967) ...............................................................20

*Alexander v. Sandoval*,
532 U.S. 275 (2001) ......................................................................................17

*Barnes v. Gorman*,
536 U.S. 181 (2002) ......................................................................................24

*Board of Pub. Instruction of Taylor Cnty., Fla. v. Finch*,
414 F.2d 1068 (5th Cir. 1969)..........................................................................8

*Brown v. Califano*,
627 F.2d 1221 (D.C. Cir. 1980) ................................................................ 19, 20

*City of Chicago v. United States Dep't of Homeland Sec'y*,
815 F. Supp. 3d 727 (N.D. Ill. 2025)...............................................................23

*Cummings v. Premier Rehab Keller, P.L.L.C.*,
596 U.S. 212 (2022) ......................................................................................24

*Guardians Ass'n of New York City Police Dep't, Inc. v. Civil Serv. Comm'n of City of New York*,
633 F.2d 232 (2d Cir. 1980)............................................................................26

*Landor v. Louisiana Dep't of Corr. & Pub. Safety*,
609 U.S. --, 146 S. Ct. 1931 (2026)................................................................24

*Metropolitan Transp. Auth. v. Duffy*,
784 F. Supp. 3d 624 (S.D.N.Y. 2025)..............................................................23

*Mohasco Corp. v. Silver*,
447 U.S. 807 (1980) ......................................................................................23

*National Black Police Ass'n v. Velde*,
 712 F.2d 569 (D.C. Cir. 1983) ..................................................................19

*Nat'l Fed'n of the Blind v. U.S. Dep't of Educ.*,
 407 F. Supp. 3d 524 (D. Md. 2019)............................................................14

*P. Gioioso & Sons, Inc. v. Occupational Safety & Health Rev. Comm'n*,
 115 F.3d 100 (1st Cir. 1997) .....................................................................23

*Pennhurst State School and Hospital v. Halderman*,
 451 U.S. 1 (1981) ......................................................................................24

*Regents of Univ. of California v. Bakke*,
 438 U.S. 265 (1978) ...............................................................................2, 26

## **Statutes**

5 U.S.C. §§ 554–57...........................................................................................6

42 U.S.C. § 2000d.......................................................................................1, 23

42 U.S.C. § 2000d-1................................................................................ passim

42 U.S.C. § 2000d-2.........................................................................................7

42 U.S.C. § 2000d-3.......................................................................................25

## **Rules**

Fed. R. App. P. 29(a)(2) ..................................................................................1

Fed. R. App. P. 29(a)(4)(E) .............................................................................1

## **Regulations**

2 C.F.R. § 200.340 ........................................................................ 3, 21, 22, 23

7 C.F.R. § 15.6 ................................................................................................5

10 C.F.R. § 1040.104 ......................................................................................5

14 C.F.R. § 1250.106(c).................................................................................5

24 C.F.R. § 1.7(c)...........................................................................................5

28 C.F.R. § 42.411(a) ................................................................20

28 C.F.R. § 50.3 ............................................................... passim

32 C.F.R. § 195.8(c) ...................................................................5

34 C.F.R. § 100.10(e) .................................................................7

34 C.F.R. § 100.11.....................................................................7

34 C.F.R. § 100.3(a) .................................................................23

34 C.F.R. § 100.7(c) ...................................................................5

34 C.F.R. § 100.8 ............................................................. passim

34 C.F.R. § 100.9 ....................................................................5-6

41 C.F.R. § 101-6.210-3 ..............................................................6

45 C.F.R. § 80.10(e) ...................................................................7

45 C.F.R. § 80.3(a) ...................................................................23

45 C.F.R. § 80.8 ................................................................ 5, 8, 19, 20

45 C.F.R. § 80.9 .........................................................................6

45 C.F.R. § 611.7(c) ...................................................................5

## Other Authorities

110 Cong. Rec. 2498 (1964) ......................................................7

110 Cong. Rec. 6544 (1964) ....................................................26

110 Cong. Rec. 7063 (1964) ....................................................26

Edward B. Fiske, *Reagan Record in Education, Mixed Results*, N.Y. Times, Nov. 14, 1982, https://www.nytimes.com/1982/11/14/education/reagan-record-in-education-mixed-results.html ................................................................ 11-12

Exec. Order No. 11,246, 30 Fed. Reg. 12,319 (Sept. 24, 1965)..............................25

*Matt Vogel, Bias to Box Graters: Jewish Life Then & Now at UVM,* The Times of
Israel, December 2024*, https://perma.cc/PB44-4QV9..........................................13

Tom Mirga, *ED to Withhold Funds From Mississippi District*, EducationWeek,
March 21, 1982, https://www.edweek.org/education/ed-to-withhold-funds-from-
mississippi-district/1982/03 .................................................................... 13-14

U.S. Dep't of Educ., *Annual Report, Fiscal Year 1982* (1983),
https://perma.cc/3L7B-QTE8 ...............................................................13

U.S. Dep't of Educ., OCR, *Annual Report, Fiscal Year 2019* (2020),
https://perma.cc/L6ZD-8BVE. ..............................................................14

Reginald Stuart, *Mississippi Town Divided Over 2 Ousted Coaches*, N.Y. Times,
April 8, 1982, https://www.nytimes.com/1982/04/08/us/mississippi-town-
divided-over-2-ousted-coaches.html. ...................................................14

vii

**INTEREST OF THE *AMICI CURIAE***

*Amici* are former officials of United States Departments and agencies that were responsible for enforcing or administering Title VI, 42 U.S.C. § 2000d *et seq*. Collectively, they have served in career and noncareer positions in Republican and Democratic administrations from the 1970s through January of 2025, and the Departments and agencies they worked for and led enforced Title VI's protections through thousands of investigations, including investigations into antisemitic discrimination on university campuses. *Amici* are Don Ayer, Samuel Bagenstos, Sharon Block, Richard Campanelli, Miguel Cardona, Kristen Clarke, Arne Duncan, Kathryn A. Ellis, Chai Feldblum, Anthony R. Foxx, Stuart Gerson, Vanita Gupta, Seth Harris, Wan J. Kim, Peter Keisler, Adina Kole, Catherine E. Lhamon, Christopher Lu, Seema Nanda, Deval Patrick, John D. Porcari, Alan Raul, León Rodríguez, Jocelyn Samuels, Margo Schlanger, Donna Shalala, David Tatel, Kathryn Thomson, Judith A. Winston, Jenny Yang. Their roles and dates of service are identified in Ex. A.[1]

**INTRODUCTION AND SUMMARY OF ARGUMENT**

When it gave agencies the ability to terminate funds for noncompliance

---

[1] All parties have consented to the filing of this brief. *See* Fed. R. App. P. 29(a)(2). As required by Federal Rule of Appellate Procedure 29(a)(4)(E), *amici* provide this statement: no party's counsel authored this brief in whole or in part; and no person other than *amici* or their counsel made a monetary contribution to this brief's preparation or submission.

under Title VI, Congress made clear that termination cannot be used for punitive or vindictive purposes; it is an option of last resort, available only when voluntary civil rights compliance is not possible. *See Regents of Univ. of California v. Bakke*, 438 U.S. 265, 382 (1978) ("Termination of funding was regarded by Congress as a serious enforcement step," and so Title VI's "legislative history is replete with assurances that it would not occur until every possibility for conciliation had been exhausted.").

Title VI and its implementing regulations accordingly require agencies to engage in a rigorous process before terminating funds:

(1)  Agencies must investigate to determine whether discrimination exists;

(2)  Agencies must make every effort to end discrimination through voluntary means;

(3)  If voluntary resolution is not possible, recipients must have a chance to present their case to a neutral decisionmaker whose express findings on the record are subject to judicial review; and

(4)  Before terminating, the agency must provide a full written report to Congress and wait 30 days.

42 U.S.C. § 2000d-1.

This process protects the interests of all involved while ensuring that federal funding recipients do not discriminate in violation of the statute. As illustrated in the declarations filed in the District Court by Judge David Tatel (ret.) and former Assistant Secretary for Civil Rights Catherine E. Lhamon, the process mandated by

2

Title VI has worked time and again, and as a direct result, termination of federal funds has been rare. Doc. 176-2; 176-3. *Amici* are aware of no fund terminations executed under Title VI—before this administration—since 1982. Following the law by complying with the mandated process is not a partisan issue; every prior administration, regardless of politics, has followed these requirements faithfully.

Until now. In terminating all federal financial assistance to Harvard, Defendants have violated Title VI's procedural and remedial requirements as no administration has ever done.

The government concedes it did not follow Title VI's mandate, but it contends it was not required to because (1) the statute itself "expressly exempts efforts to achieve compliance when effectuated 'by any other means authorized by law,'" DOJ Br. 22, and (2) the "law" that authorized an alternate termination avenue was the grant agreement. Termination is permissible under that agreement, the government says, when the funding "no longer effectuates the program goals or agency priorities," as set forth in Office of Management and Budget (OMB) regulation 2 C.F.R. § 200.340(a)(4).

But the District Court correctly found that the government terminated funds based on Harvard's allegedly insufficient response to antisemitic discrimination, and so the Title VI pre-termination procedure controls. The government's arguments to the contrary fail. First, the "any other means authorized by law"

3

language in Title VI refers exclusively to compliance efforts, not fund termination, and so is not applicable here. And, in any event, that avenue also requires the government to find that voluntary compliance is not possible. *See* 42 U.S.C. § 2000d-1. Second, the government's argument that its right to terminate derives from the grant agreements also fails. All federal grants are effectuated through grant agreements; the government's argument that incorporating 2 C.F.R. § 200.340(a)(4) into such agreements allows it to ignore Title VI would render the statute meaningless.

## ARGUMENT

### I.    Title VI Requires Procedural Protections Prior to Fund Termination.

Title VI contains two methods for ensuring compliance:

> (1) by the termination of . . . assistance under such program or activity to any recipient as to whom there has been an express finding on the record, after opportunity for hearing, of a failure to comply with such requirement . . . or (2) by any other means authorized by law.

42 U.S.C. § 2000d-1. Title VI thus identifies two routes for ensuring that federal funds will not be used in a discriminatory manner: the government can terminate funds **or** it can ensure compliance by other means authorized by law. And it can pursue either route only if compliance cannot be achieved by voluntary means.

Terminating federal financial assistance is a drastic remedy, and it requires procedural protections to ensure that termination is not used vindictively where voluntary compliance remains possible. Specifically, prior to funding termination,

4

a federal agency must take the following steps:

*Investigation.* An agency may terminate funds for Title VI noncompliance only for a recipient "as to whom there has been an express finding on the record" of noncompliance, 42 U.S.C. § 2000d-1, and so the agency must first investigate to determine whether a violation occurred. *See, e.g.*, 34 C.F.R. § 100.7(c); 45 C.F.R. § 80.7.[2]

*Voluntary Compliance.* Title VI prohibits termination of funds, as well as enforcement "by any other means authorized by law," unless an agency "has determined that compliance cannot be secured by voluntary means." 42 U.S.C. § 2000d-1; *see also* 34 C.F.R. § 100.8(c); 45 C.F.R. § 80.8(c).[3] If an agency cannot secure voluntary compliance and concludes that fund termination is necessary, it must proceed to the administrative hearing process, described herein. However, as explained below, fund termination is an agency's last, not first, resort.

*Adjudication—Notice, Hearing, Findings, and Appeal.* The administrative

---

[2] Citations here are to Department of Education and Department of Health and Human Services regulations respectively; the other Appellant-Defendants have comparable (often identical) regulations. *See* 7 C.F.R. § 15.6 (USDA); 32 C.F.R. § 195.8(c) (Defense); 10 C.F.R. § 1040.104 (Energy); 41 C.F.R. § 101-6.210-3 (GSA); 24 C.F.R. § 1.7(c) (HUD); 14 C.F.R. § 1250.106(c) (NASA); 45 C.F.R. § 611.7(c) (NSF).

[3] Department of Justice (DOJ) Title VI enforcement guidelines, applicable government-wide, likewise require "[e]fforts to secure voluntary compliance . . . undertaken at the outset in every noncompliance situation and pursued through each stage of enforcement action." 28 C.F.R. § 50.3 at I.C.

hearing process begins with giving notice, which, according to the regulations, must identify "the action proposed to be taken, the specific provision under which . . . it is to be taken, and the matters of fact or law asserted as the basis" for the action. 34 C.F.R. § 100.9(a); 45 C.F.R. § 80.9(a). The agency must set a hearing before a hearing officer or allow the recipient at least twenty days to request one. 34 C.F.R. § 100.9(a)(1); 45 C.F.R. § 80.9(a)(1). If a hearing is waived, the agency must allow submission of "written information and argument." 34 C.F.R. § 100.9(a)(2); 45 C.F.R. § 80.9(a)(2). The recipient has the right to counsel. 34 C.F.R. § 100.9(c); 45 C.F.R. § 80.9(c). The agency must adhere to Sections 5 through 8 of the Administrative Procedure Act, which address Adjudications, Ancillary Matters, Hearings, and Decisions. 34 C.F.R. § 100.9(d)(1); 45 C.F.R. § 80.9(d)(1); 5 U.S.C. §§ 554–57. The hearing must follow evidentiary rules and principles designed to "assure production of the most credible evidence available," and it must allow cross-examination. 34 C.F.R. § 100.9(d)(2); 45 C.F.R. § 80.9(d)(2). The hearing officer must issue written findings, 34 C.F.R. § 100.9(d)(2); 45 C.F.R. § 80.9(d)(2), which may be appealed within the agency, 34 C.F.R. § 100.10(e); 45 C.F.R. § 80.10(e). By statute, a termination is subject to judicial review. 42 U.S.C. § 2000d-2; *see also* 34 C.F.R. § 100.11; 45 C.F.R. § 80.11.

***Written Report to Congress.*** Even with formal findings of discrimination in hand, an agency may not terminate funds until thirty days after providing "a full written report of the circumstances and the grounds for such action" to relevant committees in Congress. 42 U.S.C. § 2000d-1; 34 C.F.R. § 100.8(c); 45 C.F.R. § 80.8(c). The reporting requirement and waiting period were incorporated in Title VI as a check on the extraordinary power of a single agency head to terminate funding by "bring[ing] into play other minds." 110 Cong. Rec. 2498 (1964) (Rep. Edwin E. Willis).

These procedural protections are, by statute, mandatory before an agency may terminate federal financial assistance in response to a violation of Title VI. Indeed, at the time of passage, Congress understood these process safeguards as integral to the availability of termination as a remedy: Senator Hubert Humphrey explained that "the authority to cut off funds is hedged about with a number of procedural restrictions." 110 Cong. Reg. 6544, 6546 (1964); *see also id.* at 7062 (Sen. Pastore) (the charge that Title VI is "punitive" or "vindictive" "ignores both the purpose of title VI and all of the limitations that have carefully been written into its language."). Members of Congress repeatedly highlighted and listed these safeguards during debates on the bill. *See, e.g.*, *id.* at 6544 (Sen. Humphrey); *id.* at 7063 (Sen. Pastore); *id.* at 7103 (Sen. Javits); *see also Board of Pub. Instruction of Taylor Cnty., Fla. v. Finch*, 414 F.2d 1068, 1075–76 & n.11-13 (5th Cir. 1969).

7

And, as described below, the regulations also provide that instead of pursuing fund-termination, an agency may refer a matter to the Department of Justice ("DOJ") "with a recommendation that appropriate proceedings be brought to enforce any rights of the United States . . . or any assurance or other contractual undertaking." *See, e.g.*, 34 C.F.R. § 100.8(a); 45 C.F.R. § 80.8(a). The DOJ Title VI enforcement guidelines counsel that Title VI compliance "may often be obtained more promptly by appropriate court action than by hearings and termination of assistance." 28 C.F.R. § 50.3 at I.B.1.

## II. For Decades, Federal Agencies Across Administrations Have Followed Title VI's Procedures.

The declarations of Judge Tatel and Assistant Secretary Lhamon,[4] submitted to the District Court, describe what the government's careful adherence to Title VI requirements has looked like in practice. As Judge Tatel explains, because of its effect on students who benefit from federal funding, fund termination in the education context is "like dropping an atom bomb: everyone gets hurt . . . ." Doc. 176-2 ¶ 7.

---

[4] Before serving on the D.C. Circuit, Judge Tatel was the director of the Office for Civil Rights ("OCR") in the U.S. Department of Health, Education, and Welfare ("HEW"), the predecessor of the Departments of Education and of Health and Human Services, from 1977 to 1979. Doc. 176-2 ¶ 2. Catherine E. Lhamon was the Assistant Secretary heading OCR at the Department of Education from 2013 to 2017 and again from 2021 to 2025. Doc. 176-3 ¶ 2.

The declarations show how the requirements of investigation, negotiation, and full administrative process when voluntary compliance is not possible help agencies combat discrimination while maintaining funding for program beneficiaries as much as possible and preventing lawless, unilateral executive action to terminate Congressionally approved funds. These declarations accurately reflect the processes used consistently across administrations. As Judge Tatel explains,

> No matter how egregious the discrimination, Title VI bars the government from cutting off federal funds unless there is no genuine chance of a voluntary resolution. . . . The possibility of terminating funds was there, but never the goal. Fund termination was to be used as a matter of last resort, only when all efforts at negotiating a voluntary resolution had been exhausted.

Doc. 176-2 ¶ 6. And Assistant Secretary Lhamon notes:

> The goal of the thorough investigation and resolution process . . . is to evaluate whether unlawful discrimination occurred and if so to reach voluntary resolutions to redress those injuries and prevent their recurrence . . . . Termination of funds was, as is required in statute and regulation, a last resort, and . . . we never needed to take this step.

Doc. 176-3 ¶ 8.

OCR under Judge Tatel and Assistant Secretary Lhamon conducted careful investigations to comply with the statutory scheme. Judge Tatel explains that he spent nearly a year overseeing an investigation of racial segregation in the Chicago public schools, leading to a 102-page report detailing OCR's findings. Doc. 176-2 ¶¶ 11–12. Assistant Secretary Lhamon describes OCR's months-long investigation

9

of alleged antisemitic discrimination at the University of Vermont ("UVM"), including interviews of campus officials, students, and staff, and the review of anti-discrimination policies and procedures, records of antisemitic incidents, social media posts, and media coverage. Doc. 176-3 ¶¶ 21–22. This comprehensive approach is typical of investigations conducted into antisemitic discrimination at many universities during Assistant Secretary Lhamon's tenure. *Id*. ¶ 13.

Judge Tatel and Assistant Secretary Lhamon explain how they sought to reach voluntary resolutions, as Title VI mandates, and how doing so allowed them to secure meaningful agreements. They explain that a benefit of the statutorily mandated negotiation process is that it allows OCR to learn about a school community's specific needs. Negotiating based on those needs—instead of preconceived ideas of what will work—"best effectuate[s] a remedy that works in practice." Doc. 176-3 ¶ 16. Assistant Secretary Lhamon "repeatedly saw this process work to remedy discrimination, including with respect to antisemitism in the higher education context." *Id.* The UVM negotiation is a case in point. "OCR staff spent extensive time in discussions with UVM that allowed OCR to understand UVM's concerns and constraints," and reached an effective agreement. *Id.* ¶ 28.

Judge Tatel devoted at least half his time to trying to reach voluntary resolutions, involving schools in the development of goals, and then asking schools

10

to help determine how to meet those goals in light of their own circumstances. Doc. 176-2 ¶ 22. He traveled to rural school districts in Arkansas and Texas that had engaged in racial discrimination during desegregation. *Id.* ¶ 8. And to negotiate an end to segregation in public colleges in southern states, he met with governors, members of Congress, and education officials. *Id.* OCR's efforts to negotiate with public colleges took months or years but produced agreements with five of six states. *Id.* ¶ 16–18.

In North Carolina, Judge Tatel made every effort to reach a voluntary agreement. *Id.* ¶ 18. He met frequently with Governor Jim Hunt, with the head of the UNC system, and with many more officials, sometimes in North Carolina and even at their homes. *Id.* ¶ 20. He exchanged many draft agreements and memoranda with officials in an effort that lasted more than eighteen months. *Id.* ¶ 20. When negotiations failed, UNC was afforded full process through an administrative hearing and in court and ultimately resolved the matter through a consent decree under the Reagan administration. *See* Edward B. Fiske, *Reagan Record in Education, Mixed Results*, N.Y. Times, Nov. 14, 1982, https://www.nytimes.com/1982/11/14/education/reagan-record-in-education-mixed-results.html. OCR has been careful to use the negotiation process through presidential administrations to craft remedies that respect universities' academic freedom. Doc. 176-2 ¶ 20; Doc. 176-3 ¶ 7. As Judge Tatel points out, good faith

11

negotiations "demonstrate that the government [i]s committed to eliminating discrimination, not punishing the university." *Id.* ¶ 24.

And Judge Tatel describes how when, having made every effort to reach an agreement, voluntary compliance was not possible, he pursued the "other means authorized by law" by a referral to DOJ for litigation—not for fund termination, but to enforce compliance by other means. In the case of Chicago, Judge Tatel "reached a stalemate" with the Chicago school system "after months of talk and many trips to Chicago to work with city leaders." *Id.* ¶ 14. "As a result, HEW referred the matter to the Department of Justice, which filed suit seeking not termination of funding, but rather a court order requiring Chicago to bring its schools into compliance with Title VI." *Id.* ¶ 15. *See also* Doc. 176-3 at ¶ 16.

OCR's enforcement at UVM demonstrates the power of the Title VI enforcement scheme to combat discrimination. A voluntary resolution was reached with UVM in 2023 after months of negotiations. Doc. 176-3 ¶¶ 25–27. The results have been transformative for UVM's Jewish students. *Id.* ¶ 27. In December 2024, the director of UVM Hillel wrote in *The Times of Israel*:

> Last year was chaos. The previous few years were exceedingly difficult. . . . I can honestly say that this year, things are markedly better. . . . Last year I coordinated extra security and regularly coordinated with UVM Police to ensure our students were safe. This year, it's quieter thanks to UVM's policy and procedural changes to keep our entire community safe . . . At this moment, and now into our future Jewish life at UVM is thriving.

*Id.* ¶ 27; Matt Vogel, *Bias to Box Graters: Jewish Life Then & Now at UVM*, The

Times of Israel, December 2024, https://perma.cc/PB44-4QV9. By following the statutorily mandated process, OCR under Assistant Secretary Lhamon secured many similar voluntary agreements with colleges and universities to address antisemitic and other types of discrimination based on shared ancestry. *Id.* ¶ 6.

While both declarants served under Democratic presidents, adherence to Title VI's protections was also consistent across Republican administrations. A Department of Education report from 1982, when now-Justice Clarence Thomas served as Assistant Secretary for Civil Rights, explained that for "99 percent of [civil rights] cases involving an initial finding of violation, the recipient came into compliance on a voluntary basis." U.S. Dep't of Educ., *Annual Report, Fiscal Year 1982* 80 (1983) [hereinafter Fiscal Year 1982 Report], https://perma.cc/3L7B-QTE8. In one case involving the race-based firing of coaches in Perry County, Mississippi, the district refused voluntary compliance. OCR, under Assistant Secretary Thomas, did terminate funds, but only after following the mandatory process, receiving a ruling from a hearing officer that the district had violated Title VI, and working for more than a year to secure voluntary compliance. *See* Tom Mirga, *ED to Withhold Funds From Mississippi District*, EducationWeek, March 21, 1982, https://www.edweek.org/education/ed-to-withhold-funds-from-mississippi-district/1982/03; Reginald Stuart, *Mississippi Town Divided Over 2 Ousted Coaches*, N.Y. Times, April 8, 1982,

13

https://www.nytimes.com/1982/04/08/us/mississippi-town-divided-over-2-ousted-coaches.html. Three times in 1982 when OCR could not reach a voluntary resolution (including two involving segregation in higher education), it pursued "other means authorized by law" and referred the cases to DOJ for enforcement. Fiscal Year 1982 Report at 81.

The first Trump administration also adhered to Title VI's procedural requirements. As that administration itself explained, Title VI "require[s] federal agencies to ensure compliance first through voluntary means," and "[i]f that fails, a federal agency may initiate enforcement proceedings that could lead to the termination of federal funding." Mem. in Supp. of Dep't of Educ.'s MTD at 10, *Nat'l Fed'n of the Blind v. U.S. Dep't of Educ.*, 407 F. Supp. 3d 524 (D. Md. 2019) (citing 34 C.F.R. § 100.8). From 2017 through 2019, the Department of Education's OCR reached 520 voluntary compliance agreements providing for reform in Title VI cases, without ever resorting to fund termination. U.S. Dep't of Educ., OCR, *Annual Report, Fiscal Year 2019* 26 (2020), https://perma.cc/L6ZD-8BVE.

Steadfast adherence to Title VI's procedural requirements has not been a partisan issue, but a hallmark of federal civil rights offices across administrations. *Amici* are not aware of any instance until now where an agency has terminated funds without following the mandated process.

14

### III.    The Administration Failed to Follow Those Procedures Here.

In terminating billions of dollars' worth of grants to Harvard, federal funding agencies concede that they disregarded Title VI's pre-termination procedures.

In contrast to the conduct of every previous administration, this approach is flatly incompatible with the law. The administration raised allegations of antisemitism at Harvard, and then, despite ample evidence that Harvard wanted to comply, could comply, and was undertaking efforts to comply voluntarily, terminated funds across Harvard's programs less than three months after its initial communication without engaging in any of the pre-termination process that Title VI and the regulations mandate.

The administration first suggested Harvard had failed to comply with Title VI and Title VII[5] in a February 27, 2025 letter, in which DOJ wrote it was "aware of allegations that [Harvard] may have failed to protect Jewish students and faculty members from unlawful discrimination, in potential violation of the statutes that we enforce." JA551. In letters sent on March 31, April 3, and April 11, the administration reiterated its allegations about antisemitism without any discussion about the possibility of voluntary compliance. *See* JA124–27. On April 14, Harvard responded by detailing the steps it had taken to combat antisemitism and

---

[5] Title VII, unlike Title VI, does not provide a statutory mechanism for terminating federal funds to remedy discrimination.

15

said it would continue to make "lasting and robust structural, policy, and programmatic changes to ensure that the university . . . continues to abide in all respects with federal law . . . ." JA133. Rather than conducting an investigation sufficient to determine whether Title VI violations were occurring and whether voluntary compliance was possible, the government moved swiftly to fund termination—hours after Harvard issued the letter, the government "announc[ed] a freeze on $2.2 billion in multi-year grants and $60 [million] in multi-year contract[s] to Harvard University." A10. It followed with an additional freeze order on May 5, JA135–37, and agency-by-agency termination letters in early- to mid-May, JA510–52.

The statute and regulations prohibit this course. As Assistant Secretary Lhamon and Judge Tatel's declarations make clear, agencies must seek voluntary compliance even when recipients' statements suggest they may not comply. Here, the evidence shows that Harvard *was* voluntarily undertaking steps to combat antisemitic discrimination when Defendants terminated funding.

And even if it were clear that voluntary compliance was not possible and the agencies decided to seek fund termination, the statute and regulations would then mandate the pre-deprivation process described above. Patently, no such process was afforded here. There was no administrative hearing. No express findings on the record of noncompliance were made. Congress was not notified. In short, Title

16

VI's procedural requirements were ignored. Where Title VI applies, no federal agency is free to disregard the statute's "elaborate restrictions on agency enforcement." *Alexander v. Sandoval*, 532 U.S. 275, 276 (2001).

## IV. The Government Was Bound by Title VI, and None of Its Arguments to the Contrary Avail.

### A. "Any Other Means Authorized By Law" Does Not Include Fund Termination and Requires a Finding That Voluntary Compliance Is Not Possible.

#### 1. *"Any Other Means Authorized By Law" Does Not Include Fund Termination.*

The government contends that it was not bound by Title VI's pre-termination procedures because the statute "expressly exempts" agencies from pre-termination procedures when they seek to ensure compliance by "any other means authorized by law." DOJ Br. 22. DOJ does not claim it is entitled to any deference in this matter of statutory interpretation, and its reading is patently incorrect—the statutory text, contemporaneous statements, enforcement guidance, agency regulations, and case law all contradict DOJ's approach.

The statute provides disjunctive avenues for enforcement: either "the termination of . . . assistance . . . *or* (2) by any other means authorized by law," 42 U.S.C. § 2000d-1 (emphasis added). The statute thus explicitly distinguishes fund termination from any "other" (i.e., different) means of ensuring compliance.

As Senator John Pastore explained at the time of passage, by "authorizing

17

the agency to achieve compliance 'by any other means authorized by law,'" Section 602 "encourages agencies to find ways to end discrimination *without refusing or terminating assistance*," 110 Cong. Reg. 6544, 7063 (1964) (emphasis added).

The "other means" has most commonly been referral to DOJ (for example, pursuant to 34 C.F.R. § 100.8(a)(1)) to compel compliance through litigation. The Title VI enforcement guidelines, adopted in 1966, reflect this understanding: while fund termination—the "ultimate sanction"—is available after "completion of the procedures called for by section 602 [42 U.S.C. § 2000d-1]," 28 C.F.R. § 50.3, I.A, the guidelines suggest that compliance "may often be obtained more promptly by appropriate court action than by hearings and termination of assistance," citing several theories under which DOJ may seek judicial enforcement. *Id.* § 50.3, I.B.1. The guidelines also cite other administrative actions, not involving funding termination, to secure compliance. *Id.* § 50.3, I.B.2.

Agency-specific implementing regulations likewise explain: "other means authorized by law" may include "a reference to the Department of Justice with a recommendation that appropriate proceedings be brought to enforce any rights of the United States . . . or any assurance or other contractual undertaking." 34 C.F.R. § 100.8(a); 45 C.F.R. § 80.8(a).

Decades of authority confirm that effecting compliance through "other

18

means authorized by law" is an alternative to fund termination. *See, e.g.*, *National Black Police Ass'n v. Velde*, 712 F.2d 569, 575–576 (D.C. Cir. 1983) ("Prominent among these other means of enforcement [not involving fund termination] is referral of cases to the Attorney General, who may bring an action against the recipient."); *Brown v. Califano*, 627 F.2d 1221, 1224–1225 & n.10 (D.C. Cir. 1980) ("The regulations specify the primary alternative to fund-termination: referral to the Department of Justice with a recommendation of appropriate legal action."); *Adams v. Richardson*, 480 F.2d 1159, 1161 n.1, 1163 (D.C. Cir. 1973) (en banc) (Title VI "sets forth two alternative courses of action by which enforcement may be effected"—either funding termination or "by any other means authorized by law," including "appropriate proceedings" by DOJ.).

> 2.  *When Ensuring Compliance Through "Any Other Means Authorized By Law," an Agency Must Still First Find That Voluntary Compliance Is Not Possible.*

When effecting compliance through "other means authorized by law," an agency must still follow statutorily mandated procedures to ensure voluntary compliance is not possible: "no such action shall be taken until the department or agency concerned has advised the appropriate person or persons of the failure to comply with the requirement and has determined that compliance cannot be secured by voluntary means." 42 U.S.C. § 2000d-1.

19

These predicate requirements are also embodied in DOJ's Title VI enforcement guidelines and regulations coordinating Title VI's enforcement. *See, e.g.*, 28 C.F.R. § 50.3, I.C. ("Efforts to secure voluntary compliance should be undertaken at the outset of every noncompliance situation.") (Title VI enforcement guidelines); *id.* § 50.3(a) ("In each case, the objective should be to secure prompt and full compliance so that needed Federal assistance may commence or continue.") (same); 28 C.F.R. § 42.411(a) ("Effective enforcement of title VI requires that agencies take prompt action to achieve voluntary compliance in all instances in which noncompliance is found.") (DOJ regulations coordinating Title VI enforcement). Agency implementing regulations likewise provide that "[n]o action to effect compliance by any other means authorized by law shall be taken" until the agency has determined that compliance cannot be secured by voluntary means. *See, e.g.*, 34 C.F.R. § 100.8(d); 45 C.F.R. § 80.8(d).

Courts, too, have emphasized that enforcement efforts should not begin before a recipient has had the opportunity to comply voluntarily. *See, e.g.*, *Brown*, 627 F.2d at 1224; *Adams*, 480 F.2d at 1161 n.1, 1163; *Alabama NAACP State Conf. of Branches v. Wallace*, 269 F. Supp. 346, 351 (M.D. Ala. 1967) ("The philosophy of the Act is to induce as much voluntary compliance as possible.").

20

B. Federal Agencies Must Follow Title VI Procedures, Not the OMB Regulation (2 C.F.R. § 200.340), Before Terminating Funds for Title VI Violations.

DOJ next asserts that Title VI applies only to efforts to achieve "[c]ompliance with any requirement adopted *pursuant to this section*." DOJ Br. 43 (quoting 42 U.S.C. 2000d-1; alteration in original). The government, DOJ insists, seeks not to enforce compliance with Title VI, but to enforce a provision in the grant agreement that allows it to terminate funding because of an award's "nonalignment with priorities" under OMB regulation 2 C.F.R. § 200.340(a)(4). *Id.* As the District Court rightly concluded, this argument is contrary to the record and unsupported by the law. A63-64.

> 1. *The Only Basis the Government Invoked for Termination Was Discrimination Under Title VI.*

As the District Court found, the only basis the government invoked for freezing and then terminating funding to Harvard was the university's allegedly insufficient response to antisemitism on campus, a Title VI violation. A62–64. Neither the administration's April 14, 2025 freeze order nor the May 5, 2025 freeze order contains any reference to 2 C.F.R. § 200.340. A62; *see* JA135–137, 147–148. The Court could not identify a single document predating the termination letters that cited 2 C.F.R. § 200.340 as grounds for ending Harvard's funding. A62. Nor did the agencies follow the procedures outlined in 2 C.F.R. §§ 200.340 to .342 for terminating funding under that route.

21

Instead, the District Court found that the record is "replete with documents calling on Harvard's funding to be investigated and terminated pursuant to Title VI" or, more generally, under the "civil rights laws." A62–63; *see, e.g.*, JA126–127 (Apr. 3, 2025 letter); JA128–132 (Apr. 11, 2025 letter); JA147 (Apr. 14, 2025 freeze letter). And while most of the termination letters claimed a change in program goals or agency priorities, citing 2 C.F.R. § 200.340(a)(4), the Court found that "no termination letter presented any program-specific rationale for the terminations." A16–17. To the contrary, nearly all the letters cited recent events at Harvard "involving antisemitic action," Harvard's "ongoing inaction in the face of repeated and severe harassment and targeting of Jewish students," and Harvard's "refus[al] to take appropriate action . . . or implement necessary reforms." *Id.* at 17.[6]

Because the federal agencies terminated Harvard's funding in response to its purported failure to protect Jewish students from harassment, they acted to effect "[c]ompliance with a[] requirement adopted pursuant to this section," 42 U.S.C. § 2000d-1—*i.e.*, the prohibition on discrimination on the ground of race, color, or national origin, adopted in Title VI and its implementing regulations. 42 U.S.C. § 2000d; *e.g.*, 34 C.F.R. § 100.3(a); 45 C.F.R. § 80.3(a). The conclusion is

---

[6]  *See, e.g.*, JA517–18 (HHS); JA527 (Energy); JA510 (DoD); JA520 (NSF); JA522–23 (USDA); JA512 (ED).

inescapable that Title VI applies where an agency's action is based on a Title VI violation.

### 2. The OMB Regulation Cannot Supersede the Title VI Statute.

Where Title VI applies, as it does to the agencies' conduct here, a regulation cannot supersede it. *See, e.g.*, *Mohasco Corp. v. Silver*, 447 U.S. 807, 825 (1980); *P. Gioioso & Sons, Inc. v. Occupational Safety & Health Rev. Comm'n*, 115 F.3d 100, 105 (1st Cir. 1997) ("regulations cannot alter the statutory scheme."). An agency can terminate a federal grant under Section 200.340(a)(4) "if an award no longer effectuates the program goals or agency priorities"—but only "*to the extent authorized by law.*" 2 C.F.R. § 200.340(a)(4) (emphasis added). Thus, Section 200.340(a)(4) "does not create a default ability by the federal government to terminate an award over the award recipient's objection, whenever an agency determines its priorities have changed." *Metropolitan Transp. Auth. v. Duffy*, 784 F. Supp. 3d 624, 670 (S.D.N.Y. 2025). Instead, by providing that an agency may terminate an award only "to the extent authorized by law," 2 C.F.R. § 200.340, the regulation incorporates statutory limits on agencies' grant termination authority. *See City of Chicago v. United States Dep't of Homeland Sec'y*, 815 F. Supp. 3d 727, 755 (N.D. Ill. 2025) ("the regulation states that termination may only occur 'to the extent authorized by law,' and thus it cannot permit agencies to flout statutory mandates").

23

As the District Court properly ruled, canceling Harvard's grants without following Title VI's procedures is not "authorized by law" and not permissible even under the OMB regulation. A63–64.

### 3. Contract Law Principles Do Not Exempt Agencies' Grants to Harvard from Title VI's Procedural Requirements.

Title VI does not exempt those agency enforcement efforts that purportedly are based on another "source" of "law," *i.e.*, contract law. *See* 42 U.S.C. § 2000d-1. To allow contract law to usurp Title VI on the theory that a grant is a contract would be to bypass Title VI altogether. *All* federal grants are to some extent analogous to contracts, in that Title VI, like other Spending Clause legislation, creates obligations "much in the nature of a contract: in return for federal funds, the [recipients] agree to comply with federally imposed conditions." *Barnes v. Gorman*, 536 U.S. 181, 186 (2002) (quoting *Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 17 (1981)); *see also Landor v. Louisiana Dep't of Corr. & Pub. Safety*, 609 U.S. --, 146 S. Ct. 1931, 1941 n.2 (2026) (collecting cases). And, "[e]xercising this authority, Congress has passed a number of statutes," including Title VI, "prohibiting recipients of federal financial assistance from discriminating based on certain protected characteristics." *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 216 (2022).

24

    4.    *DOJ's Historical Analogy for Permitting Fund Termination Absent Required Processes Is Incorrect.*

DOJ also contends that the District Court's opinion is "in tension with historical practice," citing President Johnson's Executive Order 11,246. DOJ Br. 43-44. As originally issued, that executive order prohibited federal contractors from engaging in employment discrimination on the basis of race, creed, color, or national origin. 30 Fed. Reg. 12,319, 12,320 (Sept. 24, 1965). The executive order required all government contracts to include a provision that, in the event of noncompliance, "this contract may be cancelled, terminated or suspended in whole or in part and the contractor may be declared ineligible for further Government contracts." *Id.* The government's argument seems to be that this executive order illustrates that other contract termination mechanisms can coexist with Title VI in effecting compliance with nondiscrimination mandates.

But Title VI expressly *excludes* coverage of employment practices unless the primary objective of the federal funding is to provide employment. *See* 42 U.S.C. § 2000d-3. Thus, President Johnson's executive order did not provide for a contract termination mechanism that would replace Title VI. Instead, it provided such a mechanism where Title VI did not apply.

    5.    *DOJ's Policy Argument Ignores the History and Purpose of Title VI.*

DOJ also claims as a policy matter that the District Court's interpretation

would produce "absurd results" because discriminators would be afforded greater procedural protections than other fund recipients. DOJ Br. 22-23, 44. That argument ignores the history and purpose of Title VI. As discussed above, because "[t]ermination of funding was regarded by Congress as a serious enforcement step," Title VI's "legislative history is replete with assurances that it would not occur until every possibility for conciliation had been exhausted." *Regents of Univ. of California v. Bakke*, 438 U.S. 265, 382 (1978). "[B]ecause it punishes innocent beneficiaries of federally funded programs as well as those who violate Title VI's nondiscrimination mandate," fund termination "is the least-favored way to enforce the rule of non-discrimination." *Guardians Ass'n of New York City Police Dep't, Inc. v. Civil Serv. Comm'n of City of New York*, 633 F.2d 232, 261 (2d Cir. 1980), *aff'd*, 463 U.S. 582 (1983).

In short, the Title VI scheme does not put "discriminators" on better footing than others who violate federal contract terms; instead, it ensures a fair process for all participants before an agency can use the ultimate, intentionally significant lever of fund withholding where voluntary compliance is not possible. This reflects the congressional mandate that "the purpose of title VI is not to cut off funds, but to end racial discrimination." 110 Cong. Rec. 6544 (1964) (Sen. Humphrey); *accord* 110 Cong. Rec. 7063 (1964) (Sen. Pastore).

26

## CONCLUSION

For the reasons set forth above, *amici* respectfully submit that the Government impermissibly failed to adhere to the requirements of Title VI in terminating Harvard's funding.

Dated: July 22, 2026

Respectfully submitted,

s/Reed Colfax
Rebecca Livengood
John Relman
Reed Colfax
RELMAN COLFAX PLLC
1225 19th Street NW, Suite 600
Washington, DC 20036
202-728-1888
rcolfax@relmanlaw.com

*Counsel for Amici Curiae*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 32(g)(1), I hereby certify that this document complies with the type-volume limitations set forth in Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 6306 words.

I further certify that this document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in a 14-point Times New Roman font.

Dated: July 22, 2026                    */s/ Reed Colfax*
                                        Reed Colfax

                                        *Counsel for Amici Curiae*

28

## CERTIFICATE OF SERVICE

I hereby certify that on August 6, 2026, I electronically filed the foregoing document with the United States Court of Appeals for the First Circuit by using the CM/ECF system. I certify that opposing counsels are registered as ECF Filers and that they will be served by the CM/ECF system.

Dated: August 6, 2026                          */s/ Reed Colfax*
                                               Reed Colfax

                                               *Counsel for Amici Curiae*

29