Case No. 25-2230

# In the United States Court of Appeals
# For the First Circuit

PRESIDENT AND FELLOWS OF HARVARD COLLEGE,

*Plaintiff-Appellee,*

v.

US DEPARTMENT OF HEALTH AND HUMAN SERVICES; NATIONAL INSTITUTES OF HEALTH; ROBERT F. KENNEDY, JR., in the official capacity as Secretary of the United States Department of Health and Human Services; US DEPARTMENT OF JUSTICE; TODD BLANCHE, in the official capacity as Attorney General of the United States; US DEPARTMENT OF EDUCATION; LINDA M. MCMAHON, in the official capacity as Secretary of the United States Department of Education; US GENERAL SERVICES ADMINISTRATION; EDWARD FORST, in the official capacity as Administrator of the United States General Services Administration; US DEPARTMENT OF ENERGY; CHRISTOPHER A. WRIGHT, in the official capacity as Secretary of the United States Department of Energy; US NATIONAL SCIENCE FOUNDATION; BRIAN STONE, in the official capacity as Acting Director of the United States National Science Foundation; US DEPARTMENT OF DEFENSE; PETER B. HEGSETH, in the official capacity as Secretary of the United States Department of Defense; NATIONAL AERONAUTICS AND SPACE ADMINISTRATION; JARED ISAACMAN, in the official capacity as Administrator of the National Aeronautics and Space Administration; US DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT; SCOTT TURNER, in the official capacity as Secretary of Housing and Urban Development; US DEPARTMENT OF AGRICULTURE; BROOKE L. ROLLINS, in her official capacity as Secretary of Agriculture,

*Defendants-Appellants.*

*On Appeal from the United States District Court for the District of Massachusetts; Judge Allison Burroughs, Case No. 1:25-cv-11048-ABD*

## APPELLANTS' REPLY BRIEF

*(Counsel on following page)*

**BRETT A. SHUMATE**
Assistant Attorney General
Civil Division

**MICHAEL VELCHIK**
Senior Counsel to the Assistant
Attorney General, Civil Division
U.S. Department of Justice
950 Pennsylvania Ave
Washington, D.C. 20530
Tel. 202-860-8388

**TIBERIUS DAVIS**
Counsel to the Assistant Attorney
General, Civil Division

*Counsel for Appellants*

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

ARGUMENT ........................................................................................................4

    I.     Harvard Cannot Erase Its Documented History of Racial
          Discrimination and Anti-Semitism. ...................................................4

    II.    The District Court Lacked Jurisdiction To Vacate And Enjoin
          The Termination Letters. ....................................................................7

    III.   The Government's Termination Of Funding Pursuant To The
          Terms Of The Grants Did Not Violate Title VI. ...............................14

    IV.   The Government Was Entitled To Judgment On Plaintiffs' First
          Amendment Claims. ..........................................................................20

CONCLUSION ...................................................................................................29

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

i

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
570 U.S. 205 (2013)...............................................................................28

*Alston v. Town of Brookline*,
997 F.3d 23 (1st Cir. 2021)............................................... 4, 20, 22

*Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*,
178 F.4th 456 (9th Cir. 2026) ......................................... 25, 27

*Bakersfield City Sch. Dist. of Kern Cnty. v. Boyer*,
610 F.2d 621 (9th Cir. 1979) .............................................................13

*Board of County Commissioners v. Umbehr*,
518 U.S. 668 (1996)...............................................................................20

*Connick v. Myers*,
461 U.S. 138 (1983)...............................................................................22

*Consol. Edison Co. of N.Y. v. United States*,
247 F.3d 1378 (Fed. Cir. 2001) ..........................................................14

*Dep't of Educ. v. California*,
604 U.S. 650 (2025)....................................................... 2, 7, 9, 10, 19

*Keyishian v. Board of Regents of University of New York*,
385 U.S. 589 (1967)...............................................................................26

*Mt. Healthy City Sch. Dist. v. Doyle*,
429 U.S. 274 (1977)....................................................... 4, 20, 24

*Nat'l Insts. of Health v. Am. Pub. Health Ass'n*,
145 S.Ct. 2658 (2025)................................................... 2, 7, 8, 10, 19

*New York v. Trump*,
171 F.4th 1 (1st Cir. 2026)...........................................................9, 10

*Nieves v. Bartlett*,
587 U.S. 391 (2019)...............................................................................24

ii

*Pernell v. Fla. Bd. of Governors of State Univ.*,
181 F.4th 1135 (11th Cir. July 7, 2026)....................................................... 21, 26

*Perry v. Sindermann*,
408 U.S. 593 (1972)............................................................................................28

*Pickering v. Bd of Ed. of Twp. High Sch. Dist. 205*,
391 U.S. 563 (1968)............................................................................................20

*Rosenfeld v. Egy*,
346 F.3d 11 (1st Cir. 2003)................................................................................24

*Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*,
547 U.S. 47 (2006).................................................................................... 23, 27

*Securities and Exchange Commission v. Chenery Corporation*,
318 U.S. 80 (1943).................................................................................... 18, 25

*Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*,
549 U.S. 422 (2007)..............................................................................................7

*Solutions in Hometown Connections v. Noem*,
165 F.4th 835 (4th Cir. 2026) ............................................................................11

*Spectrum Leasing Corp. v. United States*,
764 F.2d 891 (D.C. Cir. 1985)...........................................................................11

*Speiser v. Randall*,
357 U.S. 513 (1958)............................................................................................27

*Stand With US Ctr. for Legal Just. v. Mass. Inst. of Tech.*,
158 F.4th 1 (1st Cir. 2025)..................................................................................27

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*,
600 U.S. 181 (2023)................................................................... 1, 4, 21, 27

*Sustainability Inst. v. Trump*,
165 F.4th 817 (4th Cir. 2026) .................................................................... 11, 19

*Sweezy v. New Hampshire ex rel. Wyman*,
354 U.S. 234 (1957)............................................................................................26

iii

*Texas v. Lesage,*
  528 U.S. 18 (1999)..................................................................................24

*Thakur v. Trump,*
  176 F.4th 1187 (9th Cir. 2026) ....................................................... 12, 13, 27

*TikTok Inc. v. Garland,*
  604 U.S. 56 (2025)..................................................................................24

*Trump v. Hawaii,*
  585 U.S. 667 (2018)................................................................................25

*United States v. Florida,*
  172 F.4th 1201 (11th Cir. 2026) ...........................................................17

*United States v. Freitas,*
  904 F.3d 11 (1st Cir. 2018)....................................................................21

*United States v. L.A. Tucker Trick Lines, Inc.,*
  344 U.S. 33 (1952)..................................................................................12

*United States v. Lahey Clinic Hosp., Inc.,*
  399 F.3d 1 (1st Cir. 2005)......................................................................15

*United States v. Marion Cnty. Sch. Dist.,*
  625 F.2d 607 (5th Cir. 1980) ........................................................... 15, 16

*United States v. President & Fellows of Harvard College,*
  No. 1:26-cv-10844 (D. Mass.)................................................................21

*United States v. Tingey,*
  30 U.S. 115 (1831)..................................................................................14

*United States v. United Mine Workers of Am.,*
  330 U.S. 258 (1947)................................................................................15

*West Virginia State Board of Education v. Barnette,*
  319 U.S. 624 (1943)................................................................................26

*Woonasquatucket River Watershed Council v. U.S. Dep't of Agriculture,*
  No. 25-1428, 2026 WL 2279789 (1st Cir. Aug. 7, 2026)......................... 9, 10, 13

iv

**Statutes**

5 U.S.C. § 8116(c) ................................................................................16

28 U.S.C. § 2679 .................................................................................16

42 U.S.C. § 2000a-6(b) ........................................................................15

42 U.S.C. § 2000d-1........................................................... 15, 16, 17

42 U.S.C. § 2000d-2.............................................................................13

46 U.S.C. § 30904 ...............................................................................16

**Regulations**

2 C.F.R. § 200.340 .............................................................................18

**Other Authorities**

Civil Rights Under Federal Programs: An Analysis of Title VI (1965)..................17

Health Partners Institute, HHS DAB Ruling No. 2026-16 (2026) ...........................19

v

**INTRODUCTION**

Even the district court was compelled to observe that "Harvard has been plagued by antisemitism in recent years and could (and should) have done a better job of dealing with the issue." A79.  But if you read Harvard's and AAUP's briefs,[1] you might think Harvard's problems began on April 11, 2025.  Neither brief mentions, much less confronts, the college's documented history of racial discrimination and anti-Semitic misconduct.  Harvard does not mention that the Supreme Court already found that its admissions practices violated the requirements of Title VI, by discriminating against applicants based on the color of their skin. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, 600 U.S. 181, 214-15, 230 (2023) ("*SFFA*").  Harvard does not mention that protestors engaged in criminal assault, vandalized pro-Israeli posters, and forcibly occupied Harvard Yard, Widener Library, and University Hall.  And Plaintiffs offer no response to the district court's admonition that "Harvard was wrong to tolerate hateful behavior for as long as it did." A81.

Harvard's entire theory of the case depends upon erasing this history.  Instead, Harvard argues that the Government's concerns over racial discrimination and anti-

---

[1] References are to "Harvard," No. 25-2230 and "AAUP," No. 25-2231.

1

Semitism were contrived—notwithstanding the fact that the Supreme Court, House of Representatives, and Senate reached similar conclusions—and interprets the Government's settlement proposals aimed at effectuating meaningful reforms as a trojan horse intended to abridge academic freedom, despite the fact that Harvard's own Task Force made similar findings and recommendations.  Harvard's urge to rewrite history infects all three of its legal arguments.

First, on jurisdiction, Harvard now pretends that the district court never ordered specific performance.  The Supreme Court has squarely held that a district court may not "order relief designed to enforce any 'obligation to pay money' pursuant to … grants[.]" *Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 145 S.Ct. 2658, 2658 (2025) ("*NIH*") (quoting *Dep't of Educ. v. California*, 604 U.S. 650, 651 (2025)).  Yet here, the district court vacated and set aside the Termination Letters, enjoined Defendants from giving them any force, and further enjoined Defendants from "withholding payment on existing grants." A82-84.  Unable to square a circle, Harvard now claims for the first time that the district court's injunction did "not order the government to disburse funds, which it could still, in theory, refuse to do, without violating the injunction."  Harvard Br. 52.  But the Government was so ordered and has already complied with the district court's directive.  No amount of revisionist history can alter the fact that the district court ordered specific performance, in violation of the Supreme Court's directives in *NIH*.  This Court

2

should therefore reverse the district court's assertion of jurisdiction over the Termination Letters.

Second, as to statutory interpretation, Harvard rewrites Title VI to protect grantees who would violate the law, rather than to provide Federal agencies with additional tools to root out invidious discrimination. According to Harvard, the crowning achievement of the civil rights movement made it uniquely harder for agencies to terminate grants to schools that discriminated on the basis of race. But the Civil Rights Act of 1964 gave the Government more authorities—not fewer—to combat invidious discrimination. Nothing in the text abrogates the Government's pre-existing authority to enter into contracts with termination provisions along the lines of 2 C.F.R. § 200.340. To the contrary, Title VI includes repeated and unmistakable cues that it intended to preserve the authority of agencies to exercise these authorities. Harvard is silent on the absurd consequences that follow from its revisionist history.

Finally, as to the First Amendment, Harvard seeks to erase its history of discrimination and recast the Government's efforts to redress such discrimination as incursion on academic freedom. To this end, Harvard isolates a few public statements by public officials and the most speech-related portions of the Government's settlement proposals, while pretending nothing else was at stake. But this Court has made clear that in evaluating claims of retaliation, courts should not

3

be so "artificially constrained" in "the sources [they are] willing to consider" and must evaluate such claims "against the full summary judgment record." *Alston v. Town of Brookline*, 997 F.3d 23, 40 (1st Cir. 2021). Viewed holistically, the record shows that the Government was concerned with racial discrimination and anti-Semitism, not with woke course offerings, and "would have reached the same decision … even in the absence of the protected conduct." *Mt. Healthy City Sch. Dist. v. Doyle*, 429 U.S. 274, 287 (1977).

The Court should reverse.

## ARGUMENT

### I.    Harvard Cannot Erase Its Documented History of Racial Discrimination and Anti-Semitism.

In 2023, the Supreme Court held that Harvard's admissions practices violated the requirements of Title VI by discriminating against applicants on the basis of race. *SFFA*, 600 U.S. at 198 n.2 & 230; *see, e.g.*, *id.* at 218 ("First Circuit found that Harvard's consideration of race has led to an 11.1% decrease in the number of Asian-Americans admitted to Harvard"). Just weeks later, Hamas conducted a terrorist attack on the State of Israel. Immediately, thirty-three Harvard student groups released a statement that they hold "the Israeli regime entirely responsible for all unfolding violence." JA303. Professors excused students to participate in pro-Palestine but not pro-Israeli demonstrations. JA215. Protestors held a series of "die-ins" and other disruptive protests in Widener Library, Langdell Library, and the

4

Caspersen Student Center in violation of university policies, which Harvard did not enforce. JA306-07. These protests prominently featured genocidal chants, such as "from the river to the sea, Palestine will be free" and "globalize the intifada." JA308. University chat platforms were flooded with calls for Jews and Israelis to "COOK" and similarly reprehensible statements. JA307. Protestors stormed University Hall, destroying windows and desecrating the John Harvard statute with red paint. JA317. Protestors vandalized pro-Israeli posters, posted swastikas near Harvard's Jewish student center, and engaged in criminal assault. JA311-17. Encamped protestors surveilled the movements of Jewish faculty; protestors held a "vigil for martyrs" to glorify dead Hamas terrorists. JA340-41. Harvard did nothing.

The Government acted. Congress held hearings, conducted investigations, issued reports, and passed resolutions condemning Harvard's failure to address anti-Semitism on campus. Gov't Br. 9-10. Then-President Gay resigned shortly after she refused to condemn anti-Semitism in her testimony before Congress. Upon taking office, President Trump promulgated Executive Order 14188, directing agencies "to combat anti-Semitism vigorously, using all available and appropriate legal tools[.]" JA138. Certain Defendants established a Task Force to Combat Anti-Semitism and opened investigations into dozens of universities that, like Harvard, failed to address vitriolic outbreaks of anti-Semitism. JA140. In parallel, student

5

groups sued Harvard under Title VI. Gov't Br. 7-8. All of this concerned Harvard's documented racial discrimination and failure to address anti-Semitism.

Harvard's alternative history begins on April 11 and focuses myopically on its invocation of academic freedom, control over curriculum, and university governance. Under new leadership, Harvard's lawyers seized upon a settlement offer and executed a clever litigation ploy: they ran to court invoking the mantel of academic freedom and crying retaliation, knowing full well that it was about to lose billions of dollars in funding for its failure to address anti-Semitism. On appeal, Harvard makes only an oblique mention to the fact that, "Following the October 7 … Harvard, like, many other institutions of higher learning, witnessed increased tensions in its campus community." Harvard Br. 1. AAUP, for its part, only references "unspecified and unproven concerns about Harvard's alleged tolerance of antisemitism." AAUP Br. 2-3. But these accountings elide that the Supreme Court, the House of Representatives, the Senate, the entire Executive Branch, and other District Courts in this Circuit found that Harvard has discriminated on the basis of race and failed to address anti-Semitism. Gov't Br. 7-11. The problems at Harvard were real, serious, and abundantly documented. They more than justify the Government's decision to reallocate taxpayer funds to universities that align with the Government's stated policy "to combat anti-Semitism vigorously, using all available and appropriate legal tools[.]"

6

## II.    The District Court Lacked Jurisdiction To Vacate And Enjoin The Termination Letters.

Jurisdiction comes first, yet Harvard relegates this question to last.  *See, e.g., Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430-31 (2007) ("a federal court generally may not rule on the merits of a case without first determining that it has jurisdiction").  The Supreme Court explained just thirteen days before the district court's opinion below that "[t]he Administrative Procedure Act's 'limited waiver of [sovereign] immunity' does not provide the District Court with jurisdiction to adjudicate claims 'based on' the research-related grants or to order relief designed to enforce any 'obligation to pay money' pursuant to those grants."  *NIH*, 145 S.Ct. at 2658 (quoting *California*, 604 U.S. at 651).  Yet the district court did just that, when it (1) "vacated and set aside" the Termination Letters, which it enumerated by name and date; (2) enjoined Defendants from "implementing, instituting, maintaining, or giving effect to the … Termination Letters"; and (3) further enjoined Defendants from "withholding payment on existing grants." A82-A86.  That is the very thing that Supreme Court said a district court could not do.  "Lower court judges may sometimes disagree with [Supreme Court] decisions, but they are never free to defy them."  *NIH*, 145 S.Ct. at 2663 (Gorsuch, J., concurring in part and dissenting in part).  Yet the district court did just that here.  *See* A27 n.9.

7

The distinction between Freeze Orders and Termination Letters is dispositive. In *NIH*, the Supreme Court distinguished between prospective "guidance documents" and "individual grant terminations." 145 S.Ct. at 2661 (Barrett, J., concurring). District courts may issue prospective relief enjoining the future operation of guidance documents. *Id.* But vacating guidance does not effect the reinstatement of grants; those are "legally distinct." *Id.* Here, the Government does not appeal the district court's assertion of jurisdiction as to the Freeze Orders, which are analogous to the agency guidance documents in *NIH*; but the Government appeals the district court's assertion of jurisdiction and relief ordered with respect to the Termination Letters, which are equivalent to the grant terminations in *NIH*. The Government's limited position faithfully tracks and applies *NIH*.

Harvard argues that its claims as to the Freeze Orders are "inextricably intertwined" with its claims as to the Termination Letters. Harvard Br. 45. But that ignores the core holding of *NIH*, which distinguished between challenges to prospective agency guidance (which belonged in district court) and challenges to grant termination decisions (which belonged in the Court of Federal Claims). *See NIH*, 145 S.Ct. at 2661 (Barrett, J., concurring) ("Even if the guidance and grant terminations are linked, vacating the guidance does not necessarily void decisions made under it"). Indeed, that decision expressly unwound plaintiffs' challenge to agency guidance documents and grant terminations.

8

Defendants' position also honors the distinction this Court drew in *New York v. Trump*, 171 F.4th 1 (1st Cir. 2026). This Court upheld portions of the district court's order that, when "[r]ead in context," did not "order direct money payments." *Id.* at 27. In contrast, this Court held that the district court lacked jurisdiction to "orde[r] specific performance" as to "awarded grants" and "executed contracts." *Id.* Nor did this Court find that the presence of constitutional claims altered the analysis: after all, "the plaintiffs in [*NIH*], like the plaintiffs here, argued that the challenged grant terminations violated the APA and other various constitutional guarantees." *Id.* at 28.

Just last week, this Court reaffirmed this distinction in *Woonasquatucket River Watershed Council v. U.S. Dep't of Agriculture*, invalidating "[t]he portion of the District Court's order that directs the Agency Defendants to resume payment of funds awarded under grants" because it "is, in effect, an order 'to enforce a contractual obligation to pay money'" and therefore "beyond the District Court's authority under the APA." No. 25-1428, 2026 WL 2279789, at *17 (1st Cir. Aug. 7, 2026) (quoting *California*, 604 U.S. at 651). Indeed, "it is hard to see how the relief sought here—insofar as it takes the form of an injunction to pay the funds obligated under existing grants—could be premised on anything other than the enforcement of a contractual obligation." *Id.* That same reasoning controls here.

9

Harvard seeks to distinguish these cases by reading them to require magic words—a directive to "release and transmit disbursements." Harvard Br. 52. But neither *NIH*, nor *New York*, nor *Woonasquatucket* imposed such a requirement. In *NIH*, Justice Gorsuch specifically explained that "[a]n order vacating the government's decision to terminate grants under the APA is in every meaningful sense an order requiring the government to pay those grants." *NIH*, 145 S.Ct. at 2664 (Gorsuch, J., concurring in part and dissenting in part). Then in *New York*, this Court explained that its own undertaking was to "[r]ead in context" the district court's order and "understand" whether each "paragraph of the … order," in fact, "does" or "does not order the payment of money." 171 F.4th at 27; *see also Woonasquatucket*, 2026 WL 2279789, at *17 (analyzing whether order "in effect" enforced contractual obligation to pay money).

Here, the district court in fact ordered the Government to pay money, in violation of *NIH*'s admonition that district courts may not "order relief designed to enforce any obligation to pay money pursuant to … grants." *NIH*, 145 S.Ct. at 2658 (quoting *California*, 604 U.S. at 651). It did so by explicitly naming the eleven termination letters, vacating and setting them aside, and then enjoining Defendants from giving them any effect or withholding these funds. A82-86. Both "[t]he relief Plaintiffs sought and the relief the district court gave them was the reinstatement of their grants[,]" which "is 'the classic *contractual* remedy of specific performance.'"

10

*Sustainability Inst. v. Trump*, 165 F.4th 817, 828 (4th Cir. 2026) (quoting *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985)).  The district court had no jurisdiction to order this.

The Fourth Circuit squarely rejected the distinctions Harvard seeks to draw.  In *Sustainability Institute* the court explained "that the alleged statutory and constitutional violations do not alter the essentially contractual nature of Plaintiffs' APA claims."  165 F.4th at 827.  Nor did it matter that plaintiffs said they were seeking "forward-looking injunctive and declaratory relief."  *Id.* at 828 (quoting brief).  Rather, the court "s[aw] no meaningful distinction between the relief ordered here and the relief ordered in [*California* and *NIH*], which the Supreme Court determined was sufficiently contractual to trigger the Tucker Act."  *Id.*  Then in *Solutions in Hometown Connections v. Noem*, that court confirmed that substance controls over naming conventions: even if "the verbiage and characterizations differed[,]" courts should look to whether the relief requested and granted was "factually analogous" to *California* and *NIH*.  165 F.4th 835, 843-44 (4th Cir. 2026).

Remarkably, Harvard on appeal now suggests that the Government did not need to pay the university anything at all under the district court's injunction.  *See* Harvard Br. 52 ("Nothing in the district court's injunction orders the government to 'release and transmit disbursements.'"); *see id.* ("They do not order the government to disburse funds, which it could still, in theory, refuse to do, without violating the

injunction."). But even Harvard is forced to acknowledge that the district court's injunction prohibited the Government from "withholding payment on existing grants" covered by the Termination Letters. *Id.* at 56 (quoting A84). And there is no doubt that if the Government had refused to do so, Harvard would have sought to enforce compliance with the district court's injunction. In a desperate effort to distinguish the above precedents, Harvard now claims for the first time that the Government could have refused to pay out the billions of dollars at issue in this case (conveniently only after Harvard has already pocketed all the money).

AAUP—but not Harvard—cites *Thakur v. Trump*, 176 F.4th 1187 (9th Cir. 2026). That case did not present the question whether the Tucker Act applied to the DEI class's First Amendment claim; the Ninth Circuit accordingly only decided the merits of that claim. *Id.* at 1199-1204. Such an unexamined jurisdictional assumption has no persuasive value. *United States v. L.A. Tucker Trick Lines, Inc.*, 344 U.S. 33, 38 (1952). But *Thakur* did address and expressly rejected the plaintiffs' attempt "to distinguish *NIH* on the ground that they are not parties to the grant agreements at issue." 176 F.4th at 1199. The Ninth Circuit explained, "[t]he plaintiffs in *NIH* also included non-parties to the grant agreements, and the Supreme Court's reasoning did not turn on whether the plaintiffs were parties to the contracts at issue." *Id.* The Ninth Circuit was therefore "bound by the Court's holding" in *NIH*. *Id.* In a concurrence, Judge Christen elaborated that "the identity of the party

12

bringing a claim is immaterial to whether the claim is contractual in nature." *Id.* at 1207 (Christen, J., concurring). This makes sense: a litigant's lack of privity cannot expand the APA's waiver of sovereign immunity. *See Woonasquatucket*, 2026 WL 2279789, at \*17. Litigants cannot evade the Tucker Act by commandeering third parties who lack privity and thereby obtain greater relief than even the contracting parties could obtain. The Court should therefore reject AAUP's non-privity argument.

Nor does the presence of a Title VI claim alter the analysis. That statute's judicial review provision only applies to "department or agency action taken pursuant to section 2000d-1." 42 U.S.C. § 2000d-2. Here, the grants were terminated not pursuant to Title VI but pursuant to their terms and conditions. Furthermore, even if they had been terminated pursuant to Section 2000d-1, Title VI provides that they would be "subject to such judicial review as may otherwise be provided by law." *Id.* Where, as here, plaintiffs seek continued payments pursuant to Federal grants, judicial review is "otherwise provided" in the Court of Federal Claims under the Tucker Act. *Bakersfield City Sch. Dist. of Kern Cnty. v. Boyer*, 610 F.2d 621, 628 (9th Cir. 1979). AAUP's only response is to argue that *Bakersfield* should be read narrowly and limited to its facts, AAUP Br. 35, but they identify no precedent for this gloss or for their alternative reading of the statute.

13

Finally, Harvard argues that the Court of Federal Claims lacks jurisdiction to issue injunctions. But in evaluating Tucker Act jurisdiction, the question is not whether there is a preferred remedy but whether there is an "adequate remedy." *Consol. Edison Co. of N.Y. v. United States*, 247 F.3d 1378, 1383 (Fed. Cir. 2001). As to the Termination Letters, there is a more than adequate remedy, namely, damages for those terminated grants.

### III.   The Government's Termination Of Funding Pursuant To The Terms Of The Grants Did Not Violate Title VI.

Nothing in the text, structure, or history of Title VI declares that it is the only tool available to the Government for combatting discrimination in higher education. Harvard's theory of the case depends on inserting a limitation absent from the statute's text: that whenever an agency's funding decision concerns conduct that might also violate Title VI, the agency must invoke Title VI and follow its administrative enforcement procedures. But Congress enacted no such limitation. Title VI merely prescribes procedures for agency action taken to enforce requirements adopted under Title VI. This did not displace the Government's independent authority arising from the terms of Federal awards. Harvard has no response to the absurd consequences that would follow from its radical reinterpretation of our nation's civil rights laws.

The United States has a preexisting "right to enter into a contract" that is "incident to the general right of sovereignty[.]" *United States v. Tingey*, 30 U.S.

14

115, 128 (1831) (Story, J.). "Statutes are presumed not to divest the United States of pre-existing rights …, absent a clear congressional command[,]" and this presumption is "even stronger when a longstanding power of the United States is involved." *United States v. Lahey Clinic Hosp., Inc.*, 399 F.3d 1, 15-6 (1st Cir. 2005); *see also United States v. United Mine Workers of Am.*, 330 U.S. 258, 272 (1947) ("statutes which in general terms divest pre-existing rights or privileges will not be applied to the sovereign without express words to that effect"). Here, "there is no persuasive, much less unmistakable, evidence that Congress intended to eradicate or even restrict the United States' right" to terminate grants pursuant to their terms and conditions. *United States v. Marion Cnty. Sch. Dist.*, 625 F.2d 607, 611 (5th Cir. 1980).

Section 602 authorizes agencies to "effectuate" Title VI "by issuing rules, regulations, or orders of general applicability." 42 U.S.C. § 2000d-1. It then provides that "[c]ompliance with any requirement adopted pursuant to this section *may* be effected" through either a formal termination proceeding or "any other means authorized by law[.]" *Id.* (emphasis added). Title VI's hearing and congressional-notification requirements apply only to actions terminating funding "because of failure to comply with a requirement imposed pursuant to this section[.]" *Id.* But unlike Title II of the Civil Rights Act of 1964, or many other statutes, Title VI does not contain an exclusive remedy provision. *Cf.* 42 U.S.C. § 2000a-6(b) (for Title II

15

of Civil Rights Act of 1964, "The remedies provided in this subchapter shall be the exclusive means of enforcing the rights based on this subchapter"); 5 U.S.C. § 8116(c) (Workers' Compensation); 28 U.S.C. § 2679 (Federal Tort Claims Act); 46 U.S.C. § 30904 (admiralty).   Nothing in Title VI clearly abrogates the Government's authority to pursue anti-discrimination goals through contract.

Harvard's contrary interpretation of Title VI effectively reads out the phrase "requirement adopted pursuant to this section." 42 U.S.C. § 2000d-1.  On its view, once an agency mentions discrimination or anti-Semitism, Title VI occupies the field and disables any other authority to discontinue funding.  Harvard interprets "may be effected" to mean "may only be effected." 42 U.S.C. § 2000d-1.  Harvard would also strike the statute's express carveout for agencies to pursue non-discrimination aims through "any other means authorized by law[.]" *Id.*  In short, Harvard must rewrite the statute.

But as the Fifth Circuit has observed, "[t]he Civil Rights Act nowhere states that" its "remedies are to be the exclusive means for eliminating discrimination," and in fact, the statute contains numerous provisions that express a "stated intent to preserve other means of action." *Marion*, 625 F.2d at 612.  The statute includes a number of "means by which the government may act to eliminate discrimination," and so "it would be error for a court to presume … that these other means were intended to be exclusive." *Id.* at 611-12.  As a contemporaneous report by the U.S.

16

Commission on Civil Rights explained, "Rather than follow internal administrative proceedings, an agency may take other formal actions authorized by law, including … [i]f there is a formal contract with a non-discrimination agreement between the Government and the recipient, the appropriate legal action may be a civil suit to enforce the agreement or to invoke any other contractual remedies." Civil Rights Under Federal Programs: An Analysis of Title VI, at 12 (1965).

Here, the Termination Letters did not purport to enforce any "requirement adopted pursuant to" Title VI. 42 U.S.C. § 2000d-1. They did not purport to make an "express finding" that Harvard violated Title VI. *Id.* Rather, they revoked continued funding pursuant to the terms of the agreements, because they no longer effectuated agency priorities. JA512, JA517, JA520, JA522, JA524. That choice has important consequences. Title VI proceedings can produce a formal determination that a funding recipient is a discriminator, disqualify the recipient for future funding, and trigger the availability of injunctive relief. *See, e.g.*, *United States v. Florida*, 172 F.4th 1201, 1222 (11th Cir. 2026) ("the United States could seek broad remedies—like the busing of students—to prevent racial discrimination"). Instead, the Government chose to terminate some—but not all—of the grants to Harvard. But that was it.

Plaintiffs nevertheless cast the Termination Letters as pretextual retribution for unlawful discrimination. Harvard Br. 42. But their invocation of *Chenery* is

17

without merit. The award authority is not a post hoc rationale: the Termination Letters expressly cited the governing termination provision and stated that the awards no longer effectuated agency priorities. JA512, JA517, JA520, JA522, JA524 (citing 2 C.F.R. § 200.340). The earlier Freeze Orders were separate actions and did not need to anticipate the legal basis later invoked by individual agencies when taking those final agency actions. *Securities and Exchange Commission v. Chenery Corporation* only requires that the "grounds upon which an" agency action "must be judged are those upon which the record discloses that its action was based." 318 U.S. 80, 87 (1943). It does not permit a court to disregard the reasons cited in the final Termination Letters, because earlier communications discussed related concerns.

Nor did the Government forfeit this position. The Government's opening brief repeatedly argued that the agencies terminated the awards pursuant to their terms, rather than through Title VI; identified the Termination Letters as the relevant final agency actions; and cited those letters' express invocation of the award authority. Gov't Br. 39-43.

AAUP's argument concerning HHS's adoption of § 200.340 confuses codification with incorporation. AAUP Br. 62. Although HHS did not fully replace 45 C.F.R. part 75 with 2 C.F.R. part 2000 until October 1, 2025, the NIH Grants Policy Statement has provided since 2021 that NIH awards may be terminated as

18

outlined in § 200.340, and that Policy Statement is incorporated into NIH awards as a term and condition. JA517-19. The HHS Departmental Appeals Board has repeatedly recognized that distinction. *See, e.g.*, Health Partners Institute, HHS DAB Ruling No. 2026-16, n.8 (2026).

And while *California*, *NIH*, and *Sustainability Institute* did not decide this precise Title VI question, they strongly undermine Plaintiffs' exclusivity theory. Those cases treated grant terminations based on DEI and discrimination-related priorities as award disputes governed by the Tucker Act, notwithstanding the availability of statutory or constitutional objections. *See California*, 604 U.S. at 651; *NIH*, 145 S.Ct. at 2659; *Sustainability Inst.*, 165 F.4th at 826-29. If every discrimination-related termination necessarily requires Title VI enforcement, those decisions would make little sense.

Finally, Harvard has no answer to the absurd consequences that would flow from its proposed interpretation. Harvard Br. 45. Under its interpretation, Federal awards including nondiscrimination obligations would be harder to enforce than any other contractual provision because Title VI subjected such enforcement to additional procedural requirements. In effect, discriminators would have more procedural rights to keep grant money than anyone else. But that is not what Congress did. Title VI instead provides a new authority for terminating Federal assistance, regardless of the independent terms and conditions of any awards. This

19

Court should not read the Civil Rights Act of 1964 to silently abrogate the Government's preexisting tools for combatting discrimination.

## IV.    The Government Was Entitled To Judgment On Plaintiffs' First Amendment Claims.

As for the First Amendment claims, this Court should reverse the district court's decision below because the Government "would have reached the same decision … even in the absence of the protected conduct." *Mt. Healthy*, 429 U.S. at 287.  Harvard narrowly focuses on parts of the April 11 Letter and extrinsic public statements by officials.  *See, e.g.*, Harvard Br. 2 (quoting social media posts).  But this Court has made clear that when evaluating similar claims under the First Amendment, courts must do so "against the full summary judgment record" rather than through a plaintiff's "artificially constrained" version of past events.  *Alston*, 997 F.3d at 40.  On the full administrative record, the Government was entitled to summary judgment on the First Amendment claims.

Because Harvard's claims concern the termination of an existing Federal funding relationship, *Board of County Commissioners v. Umbehr* requires this Court to apply "the *Pickering* balancing test, adjusted to weigh the government's interests as contractor rather than as employer[.]"  518 U.S. 668, 702 (1996); *Pickering v. Bd of Ed. of Twp. High Sch. Dist. 205*, 391 U.S. 563 (1968).  While academic freedom may bear on the balance, it does not categorically displace *Umbehr* in cases where, as here, the Government was not legislating what professors may say in the

20

classroom. *Cf. Pernell v. Fla. Bd. of Governors of State Univ.*, 181 F.4th 1135, 1151 (11th Cir. July 7, 2026) (distinguishing "curricular speech by university professors"). Instead, the Government was deciding whether to continue substantial taxpayer funding to an institution whose conduct implicated students' civil rights and the Government's stewardship of taxpayer dollars.

Harvard incorrectly suggests in a footnote that the Government waived *Pickering*. Harvard Br. 30 n.7. But the Government's opening brief identified *Pickering* and *Umbehr* as the governing framework and devoted the balance of its First Amendment discussion to applying that framework. Gov't Br. 46-54. This is not the sort of undeveloped, citation-free reference that this Court condemned in *United States v. Freitas*, 904 F.3d 11, 21-24 (1st Cir. 2018) (appellant "fail[ed] to mention …. standard—much less develop any argument" and did "not cite any authority"). In any event, this Court need not resolve whether *Pickering* applies because the *Mt. Healthy* defense provides an independent basis to rule in favor of the Government.

The administrative record establishes that the Government would have acted based on unprotected conduct alone. The Supreme Court has already held that Harvard unlawfully discriminated against applicants on the basis of race. *SFFA*, 600 U.S. at 198 n.2 & 230. Indeed, Harvard still refuses to share its admissions data with the Government, which has been forced to sue for it. *United States v. President &*

21

*Fellows of Harvard College*, No. 1:26-cv-10844 (D. Mass.).  Harvard's own Task Force report documented serious episodes of anti-Semitism and recommended extensive reforms to university governance, admissions, oversight, disciplinary process, and complaint mechanisms.  JA227, JA371-88.  And the district court found it "clear … that Harvard has been plagued by antisemitism … and could (and should) have done a better job of dealing with the issue."  A79.  Those established concerns supply adequate speech-neutral reasons for the Government's actions.

Plaintiffs avoid mentioning this history and these speech-neutral concerns, choosing instead to extract the most speech-related provisions of the April 11 letter and treating the Government's proposal as almost exclusively concerned with viewpoint diversity, faculty governance, and academic programs.  But that account of the Letter's demands does not tell the whole story.  *Cf. Connick v. Myers*, 461 U.S. 138, 147-48 (1983) (application of First Amendment "must be determined by the content, form, and context of a given statement, as revealed by the whole record").  In fact, the administrative record is surprisingly sparse on any of those concerns prior to April 11 and is instead dominated by concerns with racial discrimination and anti-Semitism.  *See supra* Part I; *Alston*, 997 F.3d at 40 (evaluating First Amendment retaliation claims "against the full summary judgment record" that included "a tableau" dating back over a decade). Indeed, the majority of the April 11 letter itself concerned ending racial preferences in admissions and

hiring, the evenhanded enforcement of university policies, the investigation of discriminatory harassment, added whistleblower protections, and improved transparency mechanisms. JA129-32. These all regulate conduct, not protected speech. *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 60-62 (2006). Furthermore, Harvard rejected the Government's proposal as a whole. It did not offer to accept reforms to its racially discriminatory practices or anti-Semitism on campus, while objecting only to the speech-related provisions. Even assuming that some proposed terms implicated academic freedom, the Government would have nonetheless discontinued funding because Harvard refused to resolve the independently sufficient conduct-based concerns.

Harvard's own Task Force recommendations reinforce this conclusion. Plaintiffs answer that private actors may recommend changes that the Government could not compel. AAUP Br. 55. That is true but beside the point. The Government cited the Task Force not as an authority to compel Harvard's speech, but as evidence that reforms to governance, admissions, oversight, complaints, and discipline genuinely bear on redressing anti-Semitism at Harvard. The Task Force's own conclusions refute any suggestion that proposals touching on those areas of university life are necessarily pretextual attempts at ideological control.

Critically, while Plaintiffs spend an inordinate amount of time focusing on retaliatory motive, they fail to engage with the more important issue of causation.

23

The April 11 Letter, Harvard's response, and the ensuing Freeze Orders may show that Harvard's refusal played a role in the sequence. But *Mt. Healthy* asks the further, dispositive question: whether the Government "would have reached the same decision … even in the absence of the protected conduct." 429 U.S. at 287. The Supreme Court has repeatedly restated that "[t]he government can avoid liability by proving that it would have made the same decision without the impermissible motive." *Texas v. Lesage*, 528 U.S. 18, 21 (1999). This follows from the fact that, "It is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured—the motive must *cause* the injury." *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019). Just last year, the Supreme Court affirmed in the context of the First Amendment that government action in "mixed-justification cases" will be sustained where "[t]he record … adequately supports the conclusion" that the Government would have taken the same action based on a neutral "justification alone." *TikTok Inc. v. Garland*, 604 U.S. 56, 79 (2025). Here, neither brief meaningfully answers—or even cites—*TikTok*, much less applies this "counterfactual analysis," *id.*, to explain why Harvard's documented civil rights failures were insufficient to justify the Government's course of action.

Public statements by Government officials do not alter this conclusion. *Cf. Rosenfeld v. Egy*, 346 F.3d 11, 18 (1st Cir. 2003) (rejecting retaliation claims where, "[o]n the record as a whole, the isolated comments to which [plaintiff] points are

24

insufficient to ground a finding that [the conduct at issue] was grounded in retaliation and would not have occurred absent the parties' tangled history"). Statements criticizing Harvard as a "Radical Left" institution, Harvard Br. 2, do not negate the contemporaneous civil rights grounds stated in the Government's communications or establish that every grantmaking agency would have continued its awards absent that alleged animus. As the Ninth Circuit recently explained, when upholding an executive order under *Mt. Healthy*, reliance on "extrinsic evidence" of retaliatory motive does not invalidate government action with "'a legitimate grounding . . . quite apart from any' retaliatory animus" where "the President would have taken the same actions in the absence of the asserted retaliatory intent." *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 178 F.4th 456, 466-67 (9th Cir. 2026) ("*AFGE*") (quoting *Trump v. Hawaii*, 585 U.S. 667, 706 (2018)). Nor does Harvard's lawsuit establish retaliation for petitioning: the April 14 Freeze Order preceded Harvard's suit, which was not filed until April 21. JA1. This timeline shows that the Government's underlying decision resulted from Harvard's refusal to address the full spectrum of its concerns.

Plaintiffs' objection that the Government relies on "post hoc" evidence incorrectly imports *Chenery* into the First Amendment causation inquiry. As noted, *Chenery* governs the rationales on which a court may sustain agency action under the APA. 318 U.S. at 87. In contrast, *Mt. Healthy* establishes an affirmative

25

constitutional defense that asks what the Government would have done absent protected conduct. Evidence bearing on this counterfactual analysis is not inadmissible merely because it includes subsequent corroboration. At any rate, the most essential evidence was all contemporaneous: the Supreme Court's decision in *SFFA*, Executive Order 14188, Harvard's Task Force report, separate anti-Semitism litigation, and the parties' correspondence. But later investigations into dozens of universities to address similar misconduct illustrate that anti-Semitism has been a consistent enforcement priority.

Indeed, the results of these investigations answer the counterfactual. Columbia University faced similar concerns but reached a settlement with the Government, which addressed its history of racial discrimination and anti-Semitism on campus, rather than altering faculty speech or otherwise infringing on academic freedom. Conversely, the Government's notice of Title VI violations to UCLA shows that investigations with non-settling universities may ultimately lead to full-scale Title VI proceedings.

The academic freedom authorities on which Plaintiffs rely do not immunize Harvard's unlawful and discriminatory conduct. *West Virginia State Board of Education v. Barnette*, 319 U.S. 624 (1943), *Sweezy v. New Hampshire ex rel. Wyman*, 354 U.S. 234 (1957), *Keyishian v. Board of Regents of University of New York*, 385 U.S. 589 (1967), and *Pernell*, 181 F.4th 1135 all concerned government

26

control over what faculty may teach or believe. Here, the Government has independently sufficient grounds to terminate funding, namely, Harvard's failure to redress its discriminatory and anti-Semitic practices. While academic freedom is a "special concern" of the First Amendment, it does not confer freedom to discriminate or disregard civil rights laws. *Stand With US Ctr. for Legal Just. v. Mass. Inst. of Tech.*, 158 F.4th 1, 14 (1st Cir. 2025); *see also SFFA*, 600 U.S. at 230. And "it trivializes the freedom protected in *Barnette* … to suggest" otherwise. *Rumsfeld*, 547 U.S. at 62.

*Thakur* is similarly distinguishable. There, "the record show[ed] the agencies made the decisions to terminate" grants "based *only* on the recipients' perceived expression" of views. 176 F.4th at 1203 (emphasis added); *cf. AFGE,* 178 F.4th at 466-67. The plaintiffs did not challenge merely one component of a broader compliance proposal supported by documented unlawful conduct. *Thakur* merely applied ordinary viewpoint discrimination principles; it does not eliminate *Mt. Healthy* where the record supports a same-decision defense.

Harvard again suggests in a footnote that the Government forfeited its appeal of the district court's unconstitutional conditions ruling. Harvard Br. 36 n.8. Again, the Government explicitly cited *Rumsfeld*, 547 U.S. 47 and *Speiser v. Randall*, 357 U.S. 513 (1958), the applicable unconstitutional conditions theory, and explained in detail how the April 11 Letter passed muster under the First Amendment and *Mt.*

27

*Healthy*. Gov't Br. 47-54.  Harvard cannot require a separate header for an argument that defeats both its retaliation and unconstitutional conditions theories alike.

As for the merits, while the Supreme Court has struck down attempts to require funding recipients to express the Government's viewpoint as their own as a condition of funding, *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205 (2013), the Government required no comparable pledge here.  Rather, the Government proposed structural reforms to address unprotected, illegal conduct and to ensure that Harvard would protect the civil rights of applicants, students, and faculty alike.  The Government's decision to terminate grants was not done "on a basis that infringe[d] … constitutionally protected interests," *Perry v. Sindermann*, 408 U.S. 593, 597 (1972), because, as noted, the Government would have acted the same way based on Harvard's refusal to address discrimination and harassment. Further, applying this doctrine, as Plaintiffs propose, to settlement negotiations where the Government is seeking to redress civil rights concerns, will only disincentivize the Government from reaching amicable resolutions of similar issues in the future.

The First Amendment protects Harvard's academic expression and its decision to sue.  But it does not entitle Harvard to continued Federal funding when the Government would have taken the same action because of Harvard's unprotected conduct, namely, its failure and refusal to adequately address racial discrimination

28

and anti-Semitism.  The Government was therefore entitled to judgment on the First

Amendment claims.

## **CONCLUSION**

The Court should reverse and vacate.

Respectfully submitted,

**BRETT A. SHUMATE**
Assistant Attorney General
Civil Division

/s/ Michael Velchik_____
**MICHAEL VELCHIK**
Senior Counsel to the Assistant Attorney
General, Civil Division

**TIBERIUS T. DAVIS**
Counsel to the Assistant Attorney General
Civil Division

DATED:  August 12, 2026

29

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 6495 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Word in fourteen-point Times New Roman.

## CERTIFICATE OF SERVICE

I certify that on August 12, 2026, I electronically filed the foregoing Brief for Respondent with the Clerk of Court for the United States Court of Appeals for the First Circuit using the appellate CM/ECF system. I also certify that opposing counsels are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ *Michael Velchik*
**MICHAEL VELCHIK**
Senior Counsel to the Assistant Attorney
General, Civil Division