**No. 25-2230**

IN THE

# United States Court of Appeals for the First Circuit

PRESIDENT AND FELLOWS OF HARVARD COLLEGE,

*Plaintiff - Appellee*,

v.

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; NATIONAL INSTITUTES OF HEALTH; ROBERT F. KENNEDY, JR., in his official capacity as Secretary of the United States Department of Health and Human Services; UNITED STATES DEPARTMENT OF JUSTICE; TODD BLANCHE, in his official capacity as Attorney General of the United States; UNITED STATES DEPARTMENT OF EDUCATION; LINDA MCMAHON, in her official capacity as Secretary of the United States Department of Education; GENERAL SERVICES ADMINISTRATION; EDWARD FORST, in his official capacity as Administrator of the United States General Services Administration; UNITED STATES DEPARTMENT OF ENERGY; CHRISTOPHER WRIGHT, in his official capacity as Secretary of the Department of Energy; NATIONAL SCIENCE FOUNDATION; BRIAN STONE, in his official capacity as Acting Director of the United States National Science Foundation; UNITED STATES DEPARTMENT OF DEFENSE; PETER HEGSETH, in his official capacity as Secretary of the United States Department of Defense; NATIONAL AERONAUTICS AND SPACE ADMINISTRATION; JARED ISAACMAN, in his official capacity as Administrator of the National Aeronautics and Space Administration; UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT; SCOTT TURNER, in his official capacity as Secretary of Housing and Urban Development; UNITED STATES DEPARTMENT OF AGRICULTURE; BROOKE L. ROLLINS, in her official capacity as Secretary of Agriculture,

*Defendants - Appellants*.

## BRIEF OF *AMICI CURIAE* AMERICAN COUNCIL ON EDUCATION AND 26 OTHER HIGHER EDUCATION ORGANIZATIONS IN SUPPORT OF PLAINTIFF-APPELLEE AND AFFIRMANCE

On Appeal from the United States District Court for the District of Massachusetts
Case No. 1:25-cv-11048-ADB

JESSICA L. ELLSWORTH
STEPHANIE J. GOLD
REEDY C. SWANSON
ERIC ROYTMAN-CASH
HOGAN LOVELLS CADWALADER US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600
jessica.ellsworth@hlc.com

July 22, 2026

*Counsel for Amici Curiae*

## RULE 26.1 DISCLOSURE STATEMENT

*Amici* have no parent companies, and no publicly-owned corporation owns 10% or more of their stock.

/s/ Jessica L. Ellsworth
Jessica L. Ellsworth

# TABLE OF CONTENTS

Page

RULE 26.1 DISCLOSURE STATEMENT ................................................ i

TABLE OF AUTHORITIES ................................................ iii

STATEMENT OF INTEREST OF AMICI CURIAE ................................................ 1

ARGUMENT ................................................ 2

I. INSTITUTIONAL AUTONOMY IN HIGHER EDUCATION IS A BEDROCK PRINCIPLE IN AMERICAN LAW, AND IT DELIVERS CONCRETE BENEFITS FOR THE NATION ..................... 4

II. INSTITUTIONAL AUTONOMY DOES NOT PLACE UNIVERSITIES ABOVE THE LAW ................................................ 8

III. THE ADMINISTRATION'S ACTIONS ARE FUNDAMENTALLY INCONSISTENT WITH INSTITUTIONAL AUTONOMY .................... 9

A. The Government Is Retaliating Against Harvard ............................ 9

B. The Government's Actions Violate the First Amendment, And It Cannot Justify Those Actions Based On Its Role As A Contracting Party ................................................ 11

IV. THE ADMINISTRATION'S RETALIATORY ACTIONS AGAINST HARVARD SET A DANGEROUS PRECEDENT FOR ALL INSTITUTIONS OF HIGHER EDUCATION ...................... 15

CONCLUSION ................................................ 18

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

Page

**CASES:**

*Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*,
570 U.S. 205 (2013)....................12, 13

*Asociación de Educación Privada de Puerto Rico, Inc. v. García-Padilla*,
490 F.3d 1 (1st Cir. 2007)....................5

*Board of Cty. Comm'rs, Wabaunsee Cty. v. Umbehr*,
518 U.S. 668 (1996)....................13, 14

*Chiles v. Salazar*,
146 S. Ct. 1010 (2026)....................2, 11

*Citizens United v. FEC*,
558 U.S. 310 (2010)....................12

*Cuesnongle v. Ramos*,
713 F.2d 881 (1st Cir. 1983)....................2, 5

*Hosty v. Carter*,
412 F.3d 731 (7th Cir. 2005)....................4

*Jenner & Block LLP v. DOJ*,
784 F. Supp. 3d 76 (D.D.C. 2025)....................8

*Joint Anti-Fascist Refugee Comm. v. McGrath*,
341 U.S. 123 (1951)....................17

*Keyishian v. Board of Regents of Univ. of State of N.Y.*,
385 U.S. 589 (1967).................... 2-5

*Koontz v. St. Johns River Water Mgmt. Dist.*,
570 U.S. 595 (2013)....................18

*Legal Servs. Corp. v. Velazquez*,
531 U.S. 533 (2001)....................13

*Lieberman v. Gant*,
630 F.2d 60 (2d Cir. 1980)....................7

**TABLE OF AUTHORITIES—CONTINUED**

Page(s)

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024)....................11, 12

*National Rifle Ass'n of Am. v. Vullo*,
602 U.S. 175 (2024)....................11, 12

*Pernell v. Fla. Bd. of Gov. of State Univ.*,
__ F.4th ___, 2026 WL 1955783 (11th Cir. July 7, 2026)....................2, 14

*Pickering v. Board of Educ. of Twp. High Sch. Dist. 205*,
391 U.S. 563 (1968)....................13, 14

*Sweezy v. New Hampshire*,
354 U.S. 234 (1957)....................5, 15

*United States v. Alvarez*,
567 U.S. 709 (2012)....................18

*United States v. American Library Ass'n, Inc.*,
539 U.S. 194 (2003)....................12

*United States v. National Treasury Emps. Union*,
513 U.S. 454 (1995)....................15

*Wandering Dago, Inc. v. Destito*,
879 F.3d 20 (2d Cir. 2018)....................13

*West Va. State Bd. of Educ. v. Barnette*,
319 U.S. 624 (1943)....................3, 18

*Whitney v. California*,
274 U.S. 357 (1927)....................18

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952)....................8

**STATUTES:**

20 U.S.C. § 1232a....................5, 12

## TABLE OF AUTHORITIES—CONTINUED

Page(s)


42 U.S.C. § 2000d-1 .......... 3, 8

42 U.S.C. § 2000d-2 .......... 3, 8

**CONSTITUTIONAL PROVISION:**

U.S. Const. amend. I .......... *passim*

**OTHER AUTHORITIES:**

@realDonaldTrump, Truth Social (Apr. 15, 2025, 10:09 AM ET), https://tinyurl.com/4u7dmjdc .......... 10

@realDonaldTrump, Truth Social (Apr. 16, 2025, 7:05 AM ET), https://tinyurl.com/yww6nfw7 .......... 10

Philippe Aghion et al., *The Governance and Performance of Research Universities: Evidence from Europe and the U.S.*, National Bureau of Economic Research (Apr. 2009) .......... 6

Center for World Univ. Rankings, *Global 2000 List 2025 Edition*, https://perma.cc/ZYQ2-JN63 .......... 16

Lauren Coffey, *AI Taking Root in Growing Number of Agriculture Programs*, Inside Higher Ed (July 10, 2024), https://perma.cc/8PKW-KK4D .......... 7

Jonathan R. Cole, *The Great American University: Its Rise to Preeminence, Its Indispensable National Role, Why It Must Be Protected* (PublicAffairs 2010) .......... 6, 7, 15, 16

Higher Ed Dive, *Harvard's Operations Lost $112.6M in FY25 Amid Trump's Pressure Campaign* (Oct. 17, 2025), https://perma.cc/4TVX-N5GX .......... 17

Michael W. McConnell, *Academic Freedom in Religious Colleges and Universities*, 53 Law & Contemp. Probs. 303 (1990) .......... 7

**TABLE OF AUTHORITIES—CONTINUED**

Page(s)

Gustavo Morello, *The Catholic Church and Argentina's Dirty War* (Oxford Univ. Press 2015) ....... 16

President Donald Trump Taking Questions in the Oval Office (Newsmax, aired May 28, 2025, 12:42 PM ET), https://perma.cc/ZUC6-3SP6 ....... 10

President John F. Kennedy, Special Message to the Congress on Education (Feb. 6, 1962), https://perma.cc/4BUM-R8EM ....... 5

Staff Writers, *From Campus to Combat: How University Research is Revolutionizing Defense Technology*, EnvZone (Dec. 16, 2024), https://perma.cc/XX26-TAD8 ....... 7

Times Higher Education, *World University Rankings 2026*, https://perma.cc/HQ6V-DFSC ....... 16

United States Dep't of Educ., *U.S. Department of Education's Office for Civil Rights Sends Letters to 60 Universities Under Investigation for Antisemitic Discrimination and Harassment*, https://perma.cc/AUK6-7VU8 ....... 17

## STATEMENT OF INTEREST OF *AMICI CURIAE*[1]

*Amicus* American Council on Education (ACE) is joined on this amicus brief in support of Harvard University by 26 associations of colleges, universities, educators, trustees, and other representatives of American higher education. A list of all *amici* is in the addendum to this brief. *Amici*, whose members include public, independent, large, small, urban, rural, denominational, non-denominational, graduate, and undergraduate institutions throughout the United States, submit this brief to explain how the Administration's actions against Harvard threaten the autonomy of institutions throughout American higher education and impose unacceptable costs on society as a whole. The District Court's injunction should be affirmed.

[1] All parties have consented to the filing of this brief. This brief was authored entirely by counsel for amici; no party or party's counsel contributed money intended to fund the brief's preparation or submission; and no person other than *amici* contributed money intended to fund the brief's preparation or submission.

## ARGUMENT

The First Amendment protects the institutional autonomy of universities to make decisions free from the political interference of the federal government. *See, e.g.*, *Cuesnongle v. Ramos*, 713 F.2d 881, 884-885 (1st Cir. 1983). As the Supreme Court only recently reaffirmed, "the people lose" when the government's response to "good-faith disagreements" is "enforced conformity." *Chiles v. Salazar*, 146 S. Ct. 1010, 1029 (2026) (quotations omitted and alteration adopted). "The classroom is peculiarly the marketplace of ideas," and the flourishing of that marketplace is "vital" to "the future of our Nation." *Keyishian v. Board of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967) (quotations omitted). Thus, governmental "suppression of disfavored viewpoints" is "especially pernicious" in the university context, "where students are trusted to puzzle through ideas that are good and bad, easy and hard, ideally getting ever closer to the truth." *Pernell v. Fla. Bd. of Gov. of State Univ.*, __ F.4th ___, 2026 WL 1955783, at *1, *5-6 (11th Cir. July 7, 2026). These principles have fueled this nation's preeminence in research and innovation, and have cultivated generations of leaders.

This case puts those bedrock principles to the test. The current Administration has engaged in an unprecedented effort to coerce institutions of higher education to behave in a manner that reflects the Administration's preferred ideology, including by reshaping their faculty, curriculum, and student body. Hours after Harvard

refused the Administration's unlawful demands, the Administration froze Harvard's federal funding—referencing purported discrimination on campus. But the President and other administrative officials later made clear in stark terms that Harvard was being punished for the perceived political leanings of its faculty.

*Amici* condemn all race, ethnicity, or heritage-based discrimination in the strongest possible terms. The government has both an authority and a duty to hold universities accountable when they enable discrimination in contravention of federal law: our Nation's universities should be a place where all members of the community feel safe and diversity of thought is welcomed. Higher education, after all, should facilitate "that robust exchange of ideas which discovers truth out of a multitude of tongues." *Keyishian*, 385 U.S. at 603 (quotations omitted). When universities fall short of this ideal, they can and should be held accountable. Indeed, federally funded institutions must comply with Title VI, and Congress has provided reticulated procedures through which the Executive can defund noncompliant universities. 42 U.S.C. §§ 2000d-1, 2000d-2. This case is not about those procedures, because the Administration admittedly did not follow them.

The government's authority to combat discrimination does not permit any political actor—past, present, or future—to impose by executive fiat "what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *West Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). Yet that is exactly what

the Administration seeks to do at Harvard. Its actions are dangerous—not just for Harvard, and not just for higher education, but for the nation as a whole. Every American enjoys the concrete benefits that have resulted from institutional autonomy in colleges and universities, and the whole country will bear the cost if that autonomy is dismantled.

The Administration's actions in this case are directed at Harvard, but they reverberate throughout the nation. If the federal government may punish a university for the perceived ideology of its professors, then the marketplace of ideas that is a core part of American higher education will be transformed into a state-held monopoly on controlling academic philosophy. That is the antithesis of America's constitutional values, and it jeopardizes the richness of the spectrum of higher education that has long been one of our country's greatest strengths.

## I. INSTITUTIONAL AUTONOMY IN HIGHER EDUCATION IS A BEDROCK PRINCIPLE IN AMERICAN LAW, AND IT DELIVERS CONCRETE BENEFITS FOR THE NATION.

Institutional autonomy in higher education, which is "a special concern of the First Amendment," *Keyishian*, 385 U.S. at 602-603, includes a university's right to "manage an academic community and evaluate teaching and scholarship free from interference by . . . units of government," *Hosty v. Carter*, 412 F.3d 731, 736 (7th Cir. 2005) (en banc) (Easterbrook, J.). The First Amendment protects "four essential freedoms of a university—to determine for itself on academic grounds who may

teach, what may be taught, how it shall be taught, and who may be admitted to study." *Asociación de Educación Privada de Puerto Rico, Inc. v. García-Padilla*, 490 F.3d 1, 9 (1st Cir. 2007) (quoting *Sweezy v. New Hampshire*, 354 U.S. 234, 263 (1957) (Frankfurter, J., concurring)). Courts have thus long held that the government violates the First Amendment where it seeks to "supervis[e] the conduct of basic university affairs." *Cuesnongle*, 713 F.2d at 884-885.

Congress, too, has endorsed these bedrock principles, providing that "[n]o provision of any applicable program shall be construed to authorize any" federal officer "to exercise any direction, supervision, or control over the curriculum, program of instruction, administration, or personnel of any educational institution." 20 U.S.C. § 1232a. This statute codifies a presidential message to Congress over 60 years ago, affirming that "[t]he control and operation of education in America" must not accrue to the federal government, but instead "remain the responsibility of State and local governments and private institutions." President John F. Kennedy, Special Message to the Congress on Education 2 (Feb. 6, 1962), https://perma.cc/4BUM-R8EM.

These principles of institutional autonomy and academic freedom are "of transcendental value to all of us." *García-Padilla*, 490 F.3d at 8 (quoting *Keyishian*, 385 U.S. at 603). By ensuring that "laws [do not] cast a pall of orthodoxy over the classroom," *Keyishian*, 385 U.S. at 603, the First Amendment creates "breathing

space" for the full spectrum of colleges and universities: secular, religious, public, private, STEM-focused, liberal-arts-focused, community colleges, and everything in between. *Id*. at 604. When universities have independence in defining their mission and curriculum, students and faculty are better able to select institutions that meet their specific needs.

Institutional autonomy also fosters a competitive environment, which in turn drives innovation and forms the mosaic that *is* American higher education. "U.S. universities are obvious positive outliers in performance on the international indices" because "autonomy and competition increase . . . inventive output." Philippe Aghion et al., *The Governance and Performance of Research Universities: Evidence from Europe and the U.S.*, National Bureau of Economic Research, 1, 28 (Apr. 2009). America's tradition of institutional autonomy has allowed universities to "evolve[] into creative machines unlike any other," "cranking out information and discoveries." Jonathan R. Cole, *The Great American University: Its Rise to Preeminence, Its Indispensable National Role, Why It Must Be Protected* 4 (PublicAffairs 2010). Independent university research drives national achievement in biomedical engineering, medicine, genetics, technological development, national defense, agriculture, and more. *Id.* at 207-298.

The fruits of that innovation benefit Americans every day—from the engineering underlying GPS to the "algorithm for Google searches," from MRI

technology to DNA fingerprinting. *Id.* at 4. Because universities have historically been able to enroll students, hire faculty, and pursue research without fear of government backlash, they have, for example, pioneered innovations to food production and water security. Lauren Coffey, *AI Taking Root in Growing Number of Agriculture Programs*, Inside Higher Ed (July 10, 2024).[2] The Department of Defense has a long history of benefitting from research projects led by universities, which can and do take on the kind of "high-risk, high-reward research projects" that the private sector often shies away from. Staff Writers, *From Campus to Combat: How University Research is Revolutionizing Defense Technology*, EnvZone (Dec. 16, 2024).[3] And institutional autonomy allows faculty at religious schools to "teach and research within the parameters of the religious tradition." Michael W. McConnell, *Academic Freedom in Religious Colleges and Universities*, 53 Law & Contemp. Probs. 303, 306 (1990).

These innovations are "the *sine qua non* for [this nation's] greatness," Cole, *Great American University*, *supra*, at 5, and they did not fall out of the sky. Rather, they are the product of a fundamental commitment to a "long tradition" of institutional autonomy. *Lieberman v. Gant*, 630 F.2d 60, 67 (2d Cir. 1980) (Friendly, J.).

---

[2] https://perma.cc/8PKW-KK4D.

[3] https://perma.cc/XX26-TAD8.

## II. INSTITUTIONAL AUTONOMY DOES NOT PLACE UNIVERSITIES ABOVE THE LAW.

None of this makes universities and colleges beyond reproach or above the law. The Administration claims (at 1) that it seeks to enforce Title VI and combat antisemitism. *Amici* and their member institutions abhor antisemitism and are deeply committed to combating all forms of discrimination, and to complying fully with their civil rights obligations. Universities should be receptive to thoughtful criticism and embrace accountability when they fall short of those obligations. *See* Harvard Br. 7-11 (detailing Harvard's independent response to antisemitism allegations).

To that end, Congress has mandated that federally funded institutions comply with Title VI, and it established detailed procedures through which funding may be terminated. 42 U.S.C. §§ 2000d-1, 2000d-2. But the Administration followed none of them—instead freezing billions of dollars in grants via a press release. That approach is "incompatible with the expressed . . . will of Congress." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637-638 (1952) (Jackson, J., concurring). The Administration's pointed refusal to use the lawful process for enforcing Title VI leaves no doubt that its actions are not truly about Title VI enforcement. *See Jenner & Block LLP v. DOJ*, 784 F. Supp. 3d 76, 111 (D.D.C. 2025) ("the President may not evade the 'extensive regulation' governing EEOC proceedings" by imposing

penalties on a law firm via Executive Order while citing unsubstantiated allegations of discrimination), *appeal filed*, No. 25-5265 (D.C. Cir. July 22, 2025).

## III. THE ADMINISTRATION'S ACTIONS ARE FUNDAMENTALLY INCONSISTENT WITH INSTITUTIONAL AUTONOMY.

### A. The Government Is Retaliating Against Harvard.

The sequence of events in this case shows that the funding freeze is retaliatory. *See* Harvard Br. 11-14. Beginning March 31, 2025, the Administration initiated a "comprehensive review" of Harvard's federal contracts, citing what the Administration called the promotion of "divisive ideologies." JA144. Over the following two weeks, it escalated its demands: an April 3 letter demanded that Harvard improve "viewpoint diversity," end "ideological capture," and shutter all DEI programs as preconditions for continued funding. JA126-127. An April 11 letter went further, demanding that Harvard grant the government access to all hiring and admissions data through at least 2028, submit to government audits of its hiring, admissions, and student body for "viewpoint diversity," admit "a critical mass of students with diverse viewpoints," allow third-party audits of departments deemed to reflect "ideological capture," and reform student discipline policies to eliminate what the government called "double standards based on identity or ideology." JA128-132.

When Harvard rejected those demands on April 14, the Administration froze its federal funding within hours, citing "the troubling entitlement mindset that is

endemic in our nation's most prestigious universities—that federal investment does not come with the responsibility to uphold civil rights laws." JA554. In the following days, President Trump stated that Harvard should lose its tax-exempt status "if it keeps pushing political[] [and] ideological" ideas.[4] He also stated that Harvard "should no longer receive Federal Funds" because of the political associations of its faculty, who he called "Radical Left fools" and "Leftist dopes."[5] Secretary of Education Linda McMahon followed with a letter explaining Harvard would be receiving no further federal funds in part because its governing board included a "strongly left-leaning Obama political appointee." JA135-137.

On May 28, during an interview in the Oval Office, President Trump remarked that Harvard is "hurting" itself by "fighting." President Donald Trump Taking Questions in the Oval Office at 6:01 (Newsmax, aired May 28, 2025, 12:42 PM ET).[6] "Columbia has been . . . working with us on finding a solution," he explained, but Harvard "wants to fight. They want to show how smart they are, and they're getting their ass kicked." *Id.* But "every time [Harvard] fight[s], they lose another $250 million." *Id.* That is retaliation, plain and simple.

---

[4] @realDonaldTrump, Truth Social (Apr. 15, 2025, 10:09 AM ET), https://tinyurl.com/4u7dmjdc.
[5] @realDonaldTrump, Truth Social (Apr. 16, 2025, 7:05 AM ET), https://tinyurl.com/yww6nfw7.
[6] https://perma.cc/ZUC6-3SP6.

**B. The Government's Actions Violate the First Amendment, And It Cannot Justify Those Actions Based On Its Role As A Contracting Party.**

The Administration's retaliation against Harvard is unconstitutional. "[I]n case after case," the Supreme Court "has barred the government from" efforts "to rejigger the expressive realm." *Moody v. NetChoice, LLC*, 603 U.S. 707, 733 (2024). "However imperfect the private marketplace of ideas" might be, it is far worse for "the government itself [to decide] when speech [i]s imbalanced" and coerce "speakers to provide more of some views or less of others." *Id.* "[T]he First Amendment stands as a shield against any effort to enforce orthodoxy in thought or speech in this country." *Chiles*, 146 S. Ct. at 1029. And the government cannot leverage discretionary benefits to achieve the same ends—that is, "a government official cannot do indirectly what she is barred from doing directly." *National Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 190 (2024).

The Administration's actions in this case flout these basic principles. Its goal is to "rejigger the expressive realm" in higher education. *Moody*, 603 U.S. at 733. The Administration thinks that Harvard's faculty is too "Leftist," *supra* n.5, and that its curricula are too "political[] [and] ideological," *supra* n.4. And Harvard, the Administration believes, should not have a "left-leaning" former appointee of a politician the President dislikes serving on its board. JA135. So the Administration

is leveraging state power to coerce Harvard "to provide more of some views [and] less of others," *Moody*, 603 U.S. at 733.

The Administration argues (at 45) that its actions are constitutional because when it "appropriates public funds to establish a program it is entitled to define the limits of that program." (Quoting *United States v. American Library Ass'n, Inc.*, 539 U.S. 194, 211 (2003)). But it is "rudimentary" that the government cannot "exact as a price" of federal benefits "the forfeiture of First Amendment rights." *Citizens United v. FEC*, 558 U.S. 310, 351 (2010) (citation omitted); *cf. Vullo*, 602 U.S. at 190 ("a government official cannot do indirectly what she is barred from doing directly"). And while Congress's spending power includes the authority to ensure that federal funds "are used in the manner Congress intends," *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.* (*AID*), 570 U.S. 205, 213 (2013), that power belongs to *Congress*—not the President. Congress has exercised its power here, and in the opposite direction: It has expressly barred federal officers from exercising "any direction, supervision, or control over the curriculum, program of instruction, administration, or personnel of any educational institution." 20 U.S.C. § 1232a. The Administration did not enforce Congress's conditions on federal funding—it defied them.

The Administration is also wrong that its actions should be subject to the relaxed First Amendment standards applied to federal employees because this case

involves federal grants and contracts. *See Pickering v. Board of Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 568 (1968). The government invokes *Board of County Commissioners, Wabaunsee County v. Umbehr*, where the Court applied *Pickering* balancing to a garbage-disposal company whose contract with a local government was terminated, finding no "difference of constitutional magnitude" between the contractor and a government employee "in this context." 518 U.S. 668, 684 (1996) (quotations omitted).

To the extent the government acted as a grantor in this case, the rationale of *Pickering* and *Umbehr* is inapplicable. *See* Harvard Br. 38-39. Those cases do not extend to every "economic arrangement involving [the government] and private vendors"—rather, the *Pickering*/*Umbehr* framework applies only where the government "pay[s] public moneys to private individuals for services to be rendered" to the government. *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 38 (2d Cir. 2018). It is no surprise, then, that the Supreme Court has not applied *Pickering* or *Umbehr* when evaluating First Amendment claims by recipients of government grants. *See, e.g.*, *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 540-549 (2001); *AID*, 570 U.S. at 217-220.

Even if Harvard is considered a contractor, the Court emphasized that First Amendment cases "span a spectrum from government employees"—"whose close relationship with the government requires a balancing of important free speech and

government interests"—to entities "more like ordinary citizens whose viewpoints on matters of public concern the government has no legitimate interest in repressing." *Umbehr*, 518 U.S. at 680. A garbage-disposal contractor may be analogous to a government employee for First Amendment purposes, but given this nation's bedrock tradition of institutional autonomy in higher education, *see supra* Sec. I, universities are "at the other end of the spectrum." *Pernell*, 2026 WL 1955783, at *8.

Indeed, universities "perform important civic functions," which are "different in kind than the ordinary business of public administration." *Id.* at *7. Because of this distinction, the "*Pickering* test is inapplicable" when "political authorities" who traditionally "exercise no direct supervision or control" over academic institutions seek to suppress disfavored viewpoints within those institutions. *Id.* at *8 (citation omitted). A balancing test calibrated to the federal government's interest in managing its workforce cannot be stretched to cover the government's attempt to dictate the ideological composition of the faculty and student body at an independent institution for higher learning. The contrary position, which the government advances in this appeal, "strikes at the core" of the First Amendment, "transforming the classroom into a place where a deadening dogma takes the place of free inquiry." *Id.* at *18 (quotations omitted).

If this Court finds some form of *Pickering* balancing is appropriate, it should hold the government to the more rigorous showing required where state action imposes "significant burdens" on employee speech: "that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *United States v. National Treasury Emps. Union*, 513 U.S. 454, 475 (1995) (quotations omitted). The Administration cannot meet that standard here. For one thing, that Harvard employs professors the Administration considers too "left-leaning" is not a harm the First Amendment permits the government to remedy. For another, even crediting the Administration's claims of discrimination, it has not explained how reshaping Harvard's ideological balance would combat discrimination "in a direct and material way." *Id.*

## IV. THE ADMINISTRATION'S RETALIATORY ACTIONS AGAINST HARVARD SET A DANGEROUS PRECEDENT FOR ALL INSTITUTIONS OF HIGHER EDUCATION.

History teaches where the path the Administration is pursuing leads. "Scholarship cannot flourish in an atmosphere of suspicion and distrust," and a "university ceases to be true to its own nature if it becomes the tool of . . . [the] State." *Sweezy*, 354 U.S. at 250 (plurality op.); *id.* at 263 (Frankfurter, J., concurring). When educational institutions come "under the thumb of external political forces," "[s]ound science" gives way to "unsubstantiated belief." Cole, *Great American University*, supra, at 349. For example, before 1933, "German

universities were the best in the world," *id.* at 4, but now they struggle to creep into the top thirty. *See, e.g.*, Times Higher Education, *World University Rankings 2026*;[7] Center for World Univ. Rankings, *Global 2000 List 2025 Edition*.[8] A similar story played out in the Soviet Union, where in the 1930s, the government stifled scientific advances deemed "antithetical to the state's political ideology." Cole, *Great American University*, supra, at 347-349. And in Argentina, where the government's military junta attacked dissident Catholic seminarians in the 1970s. *See* Gustavo Morello, *The Catholic Church and Argentina's Dirty War* 13-16 (Oxford Univ. Press 2015).

Even if one agrees with the current Administration's criticisms of Harvard's academic community, what happens when the shoe is on the other foot down the road? The pendulum of politics will inevitably swing in the other direction. When it does, are colleges and universities, together with their faculty, researchers, and students, forced to swing with it? A future administration might, for example, encourage universities to fire professors critical of government policy, suppress research that contradicts government narratives, or condition financial aid on installing government loyalists as university administrators. If the actions here are permissible, then it is hard to see how those actions could be distinguished.

---

[7] https://perma.cc/HQ6V-DFSC.

[8] https://perma.cc/ZYQ2-JN63.

Case: 25-2230 Document: 00118409398 Page: 24 Date Filed: 01/29/2026 Entry ID: 6803577

After all, relatively speaking, Harvard is fortunate. It has substantial resources to resist these incursions on its autonomy through litigation—and to withstand financial consequences in the meantime. *See, e.g.*, Higher Ed Dive, *Harvard's Operations Lost $112.6M in FY25 Amid Trump's Pressure Campaign* (Oct. 17, 2025) (noting Harvard reported a $112 million operating deficit in FY 2025, its first since the pandemic).[9] But the Administration is also targeting numerous other institutions—public and private, large and small, religious and secular. *See, e.g.*, United States Dep't of Educ., *U.S. Department of Education's Office for Civil Rights Sends Letters to 60 Universities Under Investigation for Antisemitic Discrimination and Harassment*.[10] Many of these schools are not as well positioned to withstand the Administration's punitive approach, even for a short time. If the Executive Branch can put Harvard on a "proclaimed governmental blacklist[]," no university is safe. *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 143-144 (1951) (Black, J., concurring).

The Administration points (at 53) to settlements with other universities as vindication—proof, it says, that it is acting in good faith. But courts should be troubled, not reassured, when a party offers evidence of prior arm-twisting to justify more of the same. "Extortionate demands . . . that would thwart" constitutional

[9] https://perma.cc/4TVX-N5GX.
[10] https://perma.cc/AUK6-7VU8.

rights are not saved just because a party is forced to "accede to the government[]." *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 605-606 (2013). The remedy in America for viewpoints the government disfavors will always be "more speech, not enforced silence." *United States v. Alvarez*, 567 U.S. 709, 727-728 (2012) (quoting *Whitney v. California*, 274 U.S. 357, 377 (1927) (Brandeis, J., concurring)). It is thus essential for this Court to affirm "that no official, high or petty, can prescribe what shall be orthodox" in American higher education. *Barnette*, 319 U.S. at 642.

## CONCLUSION

For these reasons and those in Plaintiff-Appellee's brief, this Court should affirm.

Respectfully submitted,

/s/ Jessica L. Ellsworth
JESSICA L. ELLSWORTH
STEPHANIE J. GOLD
REEDY C. SWANSON
ERIC ROYTMAN-CASH
HOGAN LOVELLS CADWALADER US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600
jessica.ellsworth@hlc.com

*Counsel for Amici Curiae*

July 22, 2026

## CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limits of Fed. R. App. P. 32(a)(7) and Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 5,592 words (including the addendum).

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

/s/ Jessica L. Ellsworth
Jessica L. Ellsworth

## CERTIFICATE OF SERVICE

I certify that on July 22, 2026, the foregoing was electronically filed through this Court's CM/ECF system, which will send a notice of filing to all registered users.

/s/ Jessica L. Ellsworth
Jessica L. Ellsworth

# ADDENDUM

The **American Council on Education (ACE)** is a membership organization that leads higher education with a united vision for the future, galvanizing its members to make change and collaborating across the sector to design solutions for today's challenges, serve the needs of a diverse student population, and shape effective public policy. As the major coordinating body for the nation's colleges and universities, its strength lies in its diverse membership of nearly 1,600 colleges and universities, related associations, and other organizations in America and abroad. ACE is the only major higher education association to represent all types of U.S. accredited, degree-granting colleges and universities.
https://www.acenet.edu/About/Pages/default.aspx

The **American Association of Collegiate Registrars and Admissions Officers (AACRAO)**, founded in 1910, is a non-profit, voluntary, professional association of more than 22,000 higher education professionals who represent approximately 2,100 institutions in more than 30 countries. AACRAO advances and supports a richly diverse, globally interconnected community of higher education professionals, as well as the institutions, organizations, and learners they serve through its resources, leadership, and advocacy.
https://www.aacrao.org

The **American Association of Community Colleges (AACC)** is the primary advocacy organization for the nation's community colleges. It represents the more than 1,000 regionally accredited, associate degree-granting institutions.
https://www.aacc.nche.edu/about-us/

The **American Association of State Colleges and Universities (AASCU)** is a Washington, D.C.-based higher education association that represents the sector of over 500 regional public colleges, universities, and systems whose members share a learning- and teaching-centered culture, a historic commitment to serving today's students, and a dedication to research and creativity that advances their regions' economic progress and cultural development. These are institutions delivering America's promise.
https://aascu.org/our-organization/

The **Association of American Colleges and Universities (AAC&U)** has over 1,200 member institutions, including accredited public and private colleges, community colleges, and universities of every type and size. Its mission is to

reinforce commitment to liberal education and inclusive excellence in service to democracy.
https://www.aacu.org/about

The **Association of American Law Schools (AALS)** is a 501(c)(3) nonprofit association of 174 member and 20 fee-paid law schools. Its member schools enroll most of the nation's law students and produce the majority of the country's lawyers and judges, as well as many of its lawmakers. Founded in 1900, the mission of AALS is to improve and advance legal education. AALS carries out its mission by promoting the core values of excellence in teaching and scholarship, academic freedom, and diversity of viewpoints, perspectives, backgrounds, and experiences, while seeking to serve our many communities–local, national, and international. In support of its mission, AALS serves as both the institutional membership organization for law schools, and as the learned society for law faculty.
https://www.aals.org/about/

The **Association of American Medical Colleges (AAMC)** is a nonprofit association dedicated to improving the health of people everywhere through medical education, clinical care, biomedical research, and community collaborations. Its members are all 163 U.S. medical schools accredited by the Liaison Committee on Medical Education; more than 400 academic health systems and teaching hospitals; and more than 70 academic societies. Through these institutions and organizations, the AAMC leads and serves America's medical schools, academic health systems and teaching hospitals, and the millions of individuals across academic medicine, including more than 210,000 full-time faculty members, 99,000 medical students, 162,000 resident physicians, and 60,000 graduate students and postdoctoral researchers in the biomedical sciences.
https://www.aamc.org/about-us

The **Association of American Universities (AAU)** was founded in 1900 and is composed of America's leading research universities. AAU's member universities earn the majority of competitively awarded federal funding for research that improves public health, seeks to address national challenges, and contributes significantly to our economic strength, while educating and training tomorrow's visionary leaders and innovators. Its members include 69 public and private research universities in the United States.
https://www.aau.edu/who-we-are-americas-leading-research-universities

The **Association of Community College Trustees (ACCT)** is a non-profit educational organization of governing boards, representing more than 6,500 elected

Case: 25-2230 Document: 00118493978 Page: 31 Date Filed: 07/28/2026 Entry ID: 6835577

and appointed trustees who serve on over 500 governing boards of community, technical, and junior colleges in the United States and beyond.
https://www.acct.org/about

The **Association of Governing Boards of Universities and Colleges (AGB)** believes in the power of higher education to transform lives, strengthen inclusive democracy, and support a thriving society. We believe that strong higher education starts with great governing boards. AGB provides advocacy, leading practices, educational resources, expert support, and renowned programs that advance board excellence for 40,000 AGB members from more than 2,000 institutions and foundations. For more than 100 years, AGB has been the trusted authority for board members, chief executives, board professionals, and key administrators on higher education governance and leadership.
https://agb.org/

**The Association of Jesuit Colleges and Universities (AJCU)** represents all 27 Jesuit institutions in the U.S. (and one in Belize) and is affiliated with over 180 Jesuit institutions worldwide.
https://www.ajcunet.edu/about/

**The Association of Research Libraries (ARL)** is a nonprofit membership organization of research libraries and archives in major public and private universities, federal government agencies, and large public institutions in the U.S. and Canada. ARL champions research libraries and archives, develops visionary leaders, and shapes policy for the equitable advancement of knowledge.
https://www.arl.org/who-we-are/

**The College and University Professional Association for Human Resources (CUPA-HR)**, the voice of human resources in higher education, represents more than 25,000 human resources professionals at more than 1,700 colleges and universities. Its membership includes 87 percent of all United States doctoral institutions, 63 percent of all master's institutions, 57 percent of all bachelor's institutions, and over 550 two-year and specialized institutions.
https://www.cupahr.org/about/

**Council for Advancement and Support of Education (CASE)** is the global nonprofit association dedicated to educational advancement—alumni relations, communications, development, marketing, and advancement services—and

championing education to transform lives and society.
https://www.case.org/about-case

The **Council for Opportunity in Education (COE)** is a nonprofit organization, established in 1981, dedicated to furthering the expansion of college opportunities for low-income, first generation students, and students with disabilities. Through its numerous membership services, the Council works in conjunction with colleges, universities, and agencies that host Federal TRIO Programs that help approximately 800,000 low-income students and students with disabilities each year receive college access and retention services.
https://coenet.org/about-coe/

The **Council of Graduate Schools (CGS)** is an organization of 400 institutions of higher education in the United States, Canada, and across the globe engaged in graduate education, research, scholarship, and the preparation of candidates for master's and doctoral degrees.
https://cgsnet.org/about

The **Council of Independent Colleges (CIC)** is an association of more than 700 nonprofit independent colleges and universities, state-based councils of independent colleges, and other higher education affiliates, that works to support college and university leadership, advance institutional excellence, and enhance public understanding of independent higher education's contributions to society.
https://cic.edu/about/what-we-do/

**Council on Governmental Relations (COGR)**, an association of over 230 public and private research universities, affiliated medical centers, and independent research institutes, is a national authority on federal policies and regulations affecting U.S. research institutions.
https://www.cogr.edu

The **Council on Social Work Education (CSWE)** is the national association representing social work education in the United States. Membership includes over 900 accredited baccalaureate, master's, and doctoral degree social work programs, as well as individual social work educators, practitioners, and agencies dedicated to advancing quality social work education. Through its many initiatives, activities, and centers, CSWE supports quality social work education and provides opportunities for leadership and professional development that position social workers in central

roles to achieve the profession's goals of social and economic justice. CSWE's Board of Accreditation is recognized by the Council for Higher Education Accreditation as the sole accrediting body for social work education in the United States and its territories.
https://www.cswe.org/about-cswe/

**EDUCAUSE** is a nonprofit association comprised of approximately 2,100 colleges, universities, and related organizations. EDUCAUSE's mission is to lead the way, advancing the strategic use of technology and data to further the promise of higher education. We connect and empower our member community through insights, advocacy, resources, and learning opportunities to anticipate trends and strengthen professional practice. We believe in inspiring the transformation of higher education in service to a greater good.
https://www.educause.edu

The **Middle States Commission on Higher Education (MSCHE)** is a global institutional accreditor recognized by the United States Secretary of Education since 1952. As an accreditor and member of the regulatory triad, MSCHE assures students and the public of the educational quality for its over 500 institutions of higher education.
https://www.msche.org/about-us/

The **National Association for College Admission Counseling (NACAC)**, founded in 1937, is a global organization of more than 28,000 professionals dedicated to supporting students as they navigate choices about pursuing postsecondary education. NACAC empowers college admission counseling professionals through education, advocacy, and community, and advances a vision in which the transformative power of postsecondary education is accessible to all.
https://www.nacacnet.org/who-we-are/

The **National Association of College and University Business Officers (NACUBO)**, founded in 1962, is a nonprofit professional organization representing chief administrative and financial officers at more than 1,700 colleges and universities across the country. NACUBO works to advance the economic vitality, business practices, and support of higher education institutions in pursuit of their missions.
https://www.nacubo.org/About/Who-We-Are

The **National Association of Independent Colleges and Universities (NAICU)** serves as the unified national voice of private, non-profit higher education in the United States. With more than 5 million students attending 1,700 independent colleges and universities in all 50 states, the private sector of American higher education has a dramatic impact on our nation's larger public interests. https://www.naicu.edu/about-naicu/

The **National Association of Student Financial Aid Administrators (NASFAA)** represents more than 28,000 student financial assistance professionals at nearly 3,000 colleges, universities, and career schools across the country. NASFAA provides professional development and services for financial aid administrators; advocates for public policies that increase student access and success; serves as a forum on student financial aid issues, and is committed to diversity throughout all activities.
https://www.nasfaa.org/About_NASFAA

The **Phi Beta Kappa Society** is the nation's premier honor society, championing education in the arts and sciences for 250 years. Today, Phi Beta Kappa spans more than 290 chapters on campuses nationwide, nearly 50 alumni associations, and more than 700,000 members worldwide. Phi Beta Kappa advocates for freedom of thought and free inquiry, and for the arts and sciences, promoting their integral role in our communities, democracy, and institutions across the country.
https://www.pbk.org

The **Presidents' Alliance on Higher Education and Immigration** is a nonpartisan, nonprofit organization, comprising nearly 600 public and private member institutions, collectively serving over 5 million students across 42 states, the District of Columbia, and Puerto Rico. The Alliance brings college and university leaders together to address immigration issues impacting higher education, our students, communities and the nation, and to advance immigration policies and practices that support immigrant, international, and refugee student access and success through U.S. higher education and into their career pathways and workforce eligibility beyond campus.
https://www.presidentsalliance.org/about-our-members/mission/