**No. 25-2230**

# In the United States Court of Appeals for the First Circuit

PRESIDENT AND FELLOWS OF HARVARD COLLEGE,

*Plaintiff-Appellee,*

v.

US DEPARTMENT OF HEALTH AND HUMAN SERVICES;
*(Caption continued on inside cover)*

*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS, NO. 1:25-CV-11048
HON. ALLISON D. BURROUGHS

**BRIEF OF AMICI CURIAE PROFESSORS BENJAMIN EIDELSON AND DEBORAH HELLMAN IN SUPPORT OF PLAINTIFF-APPELLEE AND AFFIRMANCE**

Benjamin Eidelson
1575 Massachusetts Ave.
Cambridge, MA 02138
(617) 495-4846

*Counsel for Amici Curiae*

*(caption continued)*

NATIONAL INSTITUTES OF HEALTH; ROBERT F. KENNEDY, JR., in the official capacity as Secretary of the United States Department of Health and Human Services; US DEPARTMENT OF JUSTICE; TODD BLANCHE, in the official capacity as Acting Attorney General of the United States; US DEPARTMENT OF EDUCATION; LINDA M. MCMAHON, in the official capacity as Secretary of the United States Department of Education; US GENERAL SERVICES ADMINISTRATION; EDWARD FORST, in the official capacity as Administrator of the United States General Services Administration; US DEPARTMENT OF ENERGY; CHRISTOPHER A. WRIGHT, in the official capacity as Secretary of the United States Department of Energy; US NATIONAL SCIENCE FOUNDATION; BRIAN STONE, in the official capacity as Acting Director of the United States National Science Foundation; US DEPARTMENT OF DEFENSE; PETER B. HEGSETH, in the official capacity as Secretary of the United States Department of Defense; NATIONAL AERONAUTICS AND SPACE ADMINISTRATION; JARED ISAACMAN, in the official capacity as Administrator of the National Aeronautics and Space Administration; US DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT; SCOTT TURNER, in the official capacity as Secretary of Housing and Urban Development; US DEPARTMENT OF AGRICULTURE; BROOKE L. ROLLINS, in the official capacity as Secretary of Agriculture,

*Defendants-Appellants.*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .......... ii

STATEMENT OF INTEREST OF AMICI CURIAE .......... 1

ARGUMENT .......... 2

I. THE COURT SHOULD NOT SUGGEST THAT THE GOVERNMENT'S "ANTISEMITISM" ALLEGATIONS BELONGED UNDER TITLE VI .......... 2

II. THE INAPTNESS OF TITLE VI DOES NOT VINDICATE THE GOVERNMENT'S ACTION HERE. .......... 5

CONCLUSION .......... 9

# TABLE OF AUTHORITIES

**Pages**

## Cases

*Agency for Int'l Development v. Alliance for Open Society Int'l, Inc.*, 570 U.S. 205 (2013) ........ 8

*Dep't of Commerce v. New York*, 588 U.S. 752 (2019) ........ 7

*R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992) ........ 8–9

*Stand With Us Center for Legal Justice v. MIT*, 158 F.4th 1 (1st Cir. 2025) ........ 4, 5, 6, 8

## Regulations

2 C.F.R. § 200.340(a)(4) ........ 7

## Other Authorities

Benjamin Eidelson & Deborah Hellman, *Antisemitism, Anti-Zionism, and Title VI: A Guide for the Perplexed*, 139 Harv. L. Rev. F. 1 (2025), https://perma.cc/8VSP-EEZL ........ 1, 3, 7

Benjamin Eidelson, *Testimony for U.S. Commission on Civil Rights Hearing on Campus Antisemitism* (Feb. 6, 2026), https://perma.cc/X4HS-PS23 ........ 1, 3, 5, 8

Brief for Amici Curiae Benjamin Eidelson and Deborah Hellman, *United States v. President & Fellows of Harvard College*, No. 1:26-cv-11352-RGS (D. Mass. July 13, 2026), https://perma.cc/9SWW-6XJE ........ 1, 3, 8

Benjamin Eidelson, *Reasoned Explanation and Political Accountability in the Roberts Court*, 130 Yale L.J. 1748 (2021) ........ 7

## STATEMENT OF INTEREST OF AMICI CURIAE

Amici are legal scholars who teach and write about antidiscrimination law and constitutional law. They are the co-authors of *Antisemitism, Anti-Zionism, and Title VI: A Guide for the Perplexed*, 139 Harv. L. Rev. F. 1 (2025), and have testified before federal agencies as experts on Title VI and campus antisemitism. *See, e.g.*, Benjamin Eidelson, *Testimony for U.S. Comm'n on Civil Rights Hearing on Campus Antisemitism* (Feb. 6, 2026), https://perma.cc/X4HS-PS23. They also recently filed an amicus brief arguing that the Government's pending Title VI complaint against Harvard fails to state a claim. *See* Brief of Amici Curiae, *United States v. President & Fellows of Harvard College*, No. 1:26-cv-11352-RGS (D. Mass. July 13, 2026), Dkt. 50, *available at* https://perma.cc/9SWW-6XJE.

Benjamin Eidelson is the Felix Frankfurter Professor of Law and an Affiliate Professor of Philosophy at Harvard University. Deborah Hellman is the Robert E. Scott Distinguished Professor of Law at the University of Virginia School of Law.[1]

---

[1] All parties have consented to the filing of this brief. No counsel for a party authored this brief in whole or in part, and no person other than amici curiae made any monetary contribution intended to fund the preparation or submission of this brief. This brief reflects only amici's views and not those of amici's employers or any other institutions.

## ARGUMENT

Although these appeals do not squarely present the question of how Title VI applies to claims of campus antisemitism, this Court's reasoning here could have significant implications for that important issue. Amici thus submit this short brief for the limited purpose of urging this Court to affirm *without* making or inviting any problematic assumptions about the substantive scope of Title VI.

### I. THE COURT SHOULD NOT SUGGEST THAT THE GOVERNMENT'S "ANTISEMITISM" ALLEGATIONS BELONGED UNDER TITLE VI.

In the decision below, the District Court said that the Government had to satisfy Title VI's procedures in part because the Government had rested its action on "Harvard's purported failure to combat antisemitism," and Title VI "explicitly provides for when and how an agency can terminate federal funding to address this type of discrimination." A63–64; *accord* A65 (declining to "disregard an explicit statutory scheme aimed at exactly the harm at issue"). If the court meant only that the Government could not base its defunding decision on claimed "Title VI" violations and yet bypass Title VI, that is true. *See* AAUP Br. 63–64; Harvard Br. 43. But the court could also be read as holding that "Title VI's procedures provide the exclusive mechanism to terminate any grants

where a recipient fails to address antisemitism on campus" (Gov't Br. 39). And if the court's analysis were read that way—or if this Court were to embrace that preclusion theory—it would seem to imply that Title VI's substantive scope must extend, at least in principle, to the sorts of "antisemitism" allegations that the Government has leveled here.

Yet that implication would be false: Under the leading interpretation of Title VI, little if any of the conduct that the Government describes as "antisemitism" here actually implicates that law. For present purposes, we will just briefly note four of the reasons why.[2] First, Title VI extends only to claims of discrimination on the basis of Jewish or Israeli *ancestry*—an immutable, heritable characteristic—and not to claims based on hostility to any religious conviction or felt attachment to a cause or institution, including Zionism or the State of Israel. *See, e.g.*, Eidelson

[2] Each of the claims in this paragraph is developed and supported in the amicus brief that we recently filed in *United States v. President & Fellows of Harvard College*, No. 1:26-cv-11352-RGS (D. Mass. July 13, 2026), Dkt. 50, *available at* https://perma.cc/9SWW-6XJE, as well as in a recent law-review article and testimony before the U.S. Commission on Civil Rights. *See* Benjamin Eidelson & Deborah Hellman, *Antisemitism, Anti-Zionism, and Title VI: A Guide for the Perplexed*, 139 Harv. L. Rev. F. 1 (2025), https://perma.cc/8VSP-EEZL; Benjamin Eidelson, *Testimony for U.S. Commission on Civil Rights Hearing on Campus Antisemitism* (Feb. 6, 2026), https://perma.cc/X4HS-PS23.

Testimony, *supra* note 2, at 3–8 (tracing judicial authority and executive-branch practice on this point); Eidelson & Hellman, *supra* note 2, at 2–6. Second, under *Stand With Us Center for Legal Justice v. MIT*, 158 F.4th 1 (1st Cir. 2025), Title VI addresses only peer harassment that is motivated by discriminatory intent; it does not apply to any other conduct at which students of Jewish or Israeli ancestry might reasonably take offense. Third, the First Amendment and the distinctive norms of the university context further limit the relevant conception of "harassment" to personally targeted abuse, as opposed to offensive or disruptive protests addressed to the community at large. And finally, because Title VI addresses only a funding recipient's *own* intentional conduct, a university does not engage in any covered "discrimination" merely by "fail[ing] adequately to address" discrimination by its students (Gov't Br. 2). For Title VI to come into play, a university must exhibit such deliberate indifference to known acts of severe, ancestry-based harassment that its inaction amounts to intentional discrimination in its own right.

Because the Government's fuzzy and sweeping charges of an "erupt[ion]" of "antisemitism on campus" (Br. 6) thus bear little resemblance to an actual Title VI claim, the Court should take care to avoid

any implication that Title VI might have been an appropriate vehicle for addressing the Government's purported concerns. In fact, the Court should not suggest that "antisemitism"—as opposed to certain discrimination on the basis of Jewish or Israeli ancestry—is addressed by Title VI at all. *See, e.g.*, Eidelson Testimony, *supra* note 2, at 5–6. We do not condone antisemitism (of course), but any legal usage of the word requires exceptional care in light of the extremely broad, legally unmoored understanding of "antisemitism" that the Trump Administration, unlike this Court, has embraced. *See Stand With Us*, 158 F.4th at 11, 15 (defining "antisemitic" in this context as "racist" and requiring the plaintiffs to "allege actionable racial harassment").

## II. THE INAPTNESS OF TITLE VI DOES NOT VINDICATE THE GOVERNMENT'S ACTION HERE.

Admittedly, the mismatch between the Government's complaints about "antisemitism on campus" (Br. 6) and the elements of a Title VI violation also casts doubt on the idea that Title VI inherently precluded the Government from resorting to any other lawful remedies that might have addressed the problems that it purportedly perceived. The statute cannot occupy a field that it does not really even reach. But while the

Court should therefore steer clear of that particular rationale, that is little help to the Government here—for four main reasons.

First, there are overwhelming grounds for affirmance here that do not concern Title VI at all. As Harvard and the AAUP demonstrate, this is an open-and-shut case of retaliation for the exercise of Harvard's "academic freedom," which is "a special concern of the First Amendment." *Stand With Us*, 158 F.4th at 12–13 (citation omitted). Insofar as the Government's defunding decision rested on ideological animus toward the university (and its faculty of "idiots and 'birdbrains,'" A55)—rather than on any purported concerns about "antisemitism"—it makes no difference what lawful avenues, if any, might have existed for pursuing the concerns that the Government invoked as a pretext.

Second, even on the assumption that the Government *was* seeking to address purported "antisemitism," the Government cannot escape its own mistaken choice to lodge those concerns in Title VI for purposes of the agency action at issue in this case. *See* Harvard Br. 42–43; AAUP Br. 59, 61–62. And that rule against *post hoc* rationalizations has special force in high-salience cases, like this one, where the Government sells its action to "the interested public" based on one rationale but then seeks to

defend its decision on markedly different grounds in court. *Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019); *see* Benjamin Eidelson, *Reasoned Explanation and Political Accountability in the Roberts Court*, 130 Yale L.J. 1748, 1768–71 (2021) (elaborating on the Supreme Court's recent "use of *Chenery* as an accountability-forcing tool" to ensure the Government's reasons do not evade public scrutiny).

Third, the fact that Title VI does not actually address the Government's purported "antisemitism" concerns does not mean that any other source of authority does. Here, Harvard and the AAUP powerfully argue that, irrespective of Title VI, 2 C.F.R. § 200.340(a)(4) does not authorize the Government's action. *See* Harvard Br. 44–45; AAUP Br. 63 n.6. Ironically, the most plausible legal foothold for the Government's concerns about inclusion and campus culture would probably have been the disparate-impact regulations that the President ordered repealed, *see* Eidelson & Hellman, *supra* note 2, at 9, although these too would have been circumscribed by the First Amendment.

Indeed (and finally), *any* alternate legal mechanism or criterion for defunding a university would need to satisfy the same First Amendment constraints that Title VI, at least as rightly interpreted, does. Yet even

the Government's "smokescreen" rationale (A79) here is that it defunded the entire university largely because of activities that, according to this Court, could not constitutionally form the basis of a Title VI complaint. *See Stand With Us*, 158 F.4th at 11–20 (recognizing a university's constitutional right to tolerate students' "stridently pro-Palestinian and anti-Zionist" advocacy, notwithstanding plaintiffs' construal of the protests as "antisemitic").[3] If we indulge the Government's premise here that it employed an *ad hoc* defunding regime instead of Title VI—and that such a regime has some statutory or regulatory basis—that would not solve the basic problem that punishing Harvard for tolerating its students' offensive viewpoints violates the First Amendment. *See, e.g.*, *Agency for Int'l Development v. Alliance for Open Society Int'l, Inc.*, 570 U.S. 205, 218 (2013) (forbidding grant terminations that are based on "protected conduct outside the scope of the federally funded program"); *see also R.A.V.*

[3] Among other things, the Government (Br. 7–9) accuses students of chanting "antisemitic slogans," "hoist[ing] a Palestinian flag over" a statue, and "block[ing] the use of libraries"—a tendentious description of study sessions in which students taped anti-Israel slogans to their laptops, *see* Eidelson Testimony, *supra* note 2, at 10 & nn.60–61. We have explained more fully in *United States v. Harvard*—where the Government is packaging these same allegations as a Title VI complaint—why squaring the statute with the First Amendment precludes treating this conduct as harassment. *See* D. Ct. Amicus Br., *supra* note 2, at 9–20.

*v. City of St. Paul*, 505 U.S. 377, 391–92 (1992) (prohibiting viewpoint discrimination even as to *unprotected* speech).

## CONCLUSION

The judgment of the district court should be affirmed on grounds that do not suggest that the Government's purported concerns, if proved, might fall within the substantive scope of Title VI.

Respectfully submitted,

/s/ Benjamin Eidelson
Benjamin Eidelson
1575 Massachusetts Ave.
Cambridge, MA 02138
(617) 495-4846

Dated: July 20, 2026

*Counsel for Amici Curiae*

**CERTIFICATE OF COMPLIANCE**

I certify that:

1. This brief complies with the type-volume limitations of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) because, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), it contains 1,800 words.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced, serif typeface in 14-point Century Schoolbook font.

Dated: July 20, 2026

/s/ Benjamin Eidelson
Benjamin Eidelson

**CERTIFICATE OF SERVICE**

I hereby certify that on July 20, 2026, I electronically filed the foregoing document with the United States Court of Appeals for the First Circuit by using the Court's CM/ECF system. I certify that all parties or their counsel of record are registered as ECF filers and that service will be accomplished by the CM/ECF system.

Dated: July 20, 2026

/s/ Benjamin Eidelson
Benjamin Eidelson